## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Lordstown Motors Corp., *et al.*,[1] | Case No. 23-[_____] ( ) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF ADAM KROLL IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Adam Kroll, Executive Vice President and the Chief Financial Officer of Lordstown

Motors Corp., declare pursuant to 28 U.S.C. § 1746 as follows:

## I.   Introduction[2]

1.      The Debtors' mission is to accelerate electric vehicle adoption and be a catalyst in

the transition of commercial fleets to all-electric vehicles for a more sustainable future.  Legacy

Lordstown was incorporated as a private company on April 30, 2019.  Since its founding, the

Company has been designing and engineering its flagship vehicle, the Endurance, a full-size, all-

electric pickup truck.  In 2021, the Debtors began manufacturing beta and pre-production vehicles

in preparation for the full commercial production and sale of the Endurance.  Commercial

production of the Endurance began with the first two vehicles completing assembly in September

2022.  The Debtors subsequently began sales and deliveries to customers in the fourth quarter of

---

[1]      The Debtors and the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corporation (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101).  The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

[2]      Except as otherwise indicated or where the context otherwise indicates, capitalized terms have the meanings ascribed to them in this Declaration.

2022 at low volumes.  As of the Petition Date, with the Company still in its nascent stages, only approximately 65 Endurances have been manufactured.

2. The excitement about the Debtors' innovative technology and EV aspirations drove its equity market capitalization to reach $5.3 billion.  Nonetheless, the Debtors, like many start-ups, encountered headwinds and sought a partner to help make their vision a reality.  The Debtors thought they found that partner in September 2021, when they executed the first of several agreements with Hon Hai Technology Group (together with its affiliates, "**Foxconn**").  Foxconn, a manufacturing giant with over $215 billion in annual revenue globally with ambitions to grow into the electric vehicle sector, promised to bring deep resources and massive economies of scale to the partnership.  The deal was to combine these resources and efficiencies with the Debtors' innovation, technology, manufacturing plant (one of the largest in North America) and people in order to jointly develop the next generation of electric vehicles and grow a successful business.  The Debtors materially and permanently changed their entire business model based on Foxconn's repeated assurances of financial support and operational cooperation.  The terms of the deal also restricted the Company's ability to pursue alternative transactions absent Foxconn's consent.

3. Once Foxconn secured control of the plant and the team of talented employees who work there, Foxconn refused to honor its contractual promises to the Debtors. For over 18 months, Foxconn fraudulently and repeatedly misled the Debtors about Foxconn's ability or willingness to support the Endurance and collaborate and support future product development, while at the same time causing Debtors to devote substantial resources to the same cause.  Even late last year, Foxconn promised to invest approximately $170 million of additional equity capital in the business, and to work closely with the Debtors on a new vehicle development platform.  But after an initial $52.7 million investment, Foxconn again repudiated its contractual obligations.  As a

2

result of Foxconn's actions, a number of major customers and vendors terminated or cut back their business dealings with the Company, and the Company has had to initiate significant cost-cutting actions, including employee lay-offs and the issuance of WARN Act notices that have further damaged the Company's business relationships, employee morale and relations, as well as the Company's future prospects. Instead of building a thriving business for the benefit of all Lordstown stakeholders, Foxconn's fraudulent actions have destroyed the Company's business and future, stripping it of its ability to continue as a going concern absent a strategic chapter 11 transaction.

4.      The Debtors have filed these chapter 11 cases for the purpose of maximizing value for the benefit of their stakeholders given the fraudulent conduct by Foxconn, its ongoing, repeated breaches of contractual commitments and its pattern of bad faith.  Among other things, as part of these chapter 11 cases, the Debtors intend to pursue claims against Foxconn, commence a sale process for their assets, reduce their expenses, centralize and rapidly resolve claims, and, ultimately, distribute maximum value to creditors and—if sufficient—equity security holders under a chapter 11 plan.

## II.   <u>Background of Declarant</u>

5.      I am an Executive Vice President and the Chief Financial Officer of Lordstown Motors Corp. ("**LMC**," and, together with the above-captioned debtors and debtors in possession, the "**Debtors**" or the "**Company**").  I have served as the Chief Financial Officer since October 25, 2021.

6.      I have more than 25 years of experience in corporate finance as a strategic advisor, lender and principal.  Since 2015, I have been a senior operating executive overseeing or directly involved in finance, treasury, accounting, budgeting, financial planning and analysis, M&A,

AMERICAS 122798756

strategy, investor relations and purchasing with various companies.  Prior to joining LMC, I was the Chief Administrative Officer of Hyzon Motors, a startup original equipment manufacturer of heavy-duty fuel cell electric trucks that executed a de-spac transaction in the third quarter of 2021. Prior to that, I served as the interim CFO of UPG Enterprises, a family office acquisition vehicle in the metal services sector.  Preceding UPG, I held roles of increasing responsibility over five years at PSAV Holdings LLC ("**PSAV**"), a leading global event production company.  In my final two years at PSAV, I served as the Senior Vice President of Finance, overseeing a substantial portion of its finance functions, including financial planning and analysis, treasury, investor relations, financial reporting and procurement.  Prior to PSAV, I had an 18-year career in banking, the last nine years of which were as an investment banker with J.P. Morgan Securities, providing strategic, M&A and capital markets advisory services to primarily mid and large capitalization automotive companies.  I have a bachelor's degree in Business Administration from the University of Wisconsin and a master's degree in Business Administration from the University of Chicago Booth School of Business.

7.      In my capacity as the Debtors' Chief Financial Officer, I am responsible for the Debtors' accounting, treasury, financial reporting, budgeting and planning, investor relations, corporate development and corporate strategy functions.  I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

8.      On June 27, 2023 (the "**Petition Date**"), the Debtors each filed in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), thereby commencing chapter 11 cases for the Debtors (collectively, the "**Chapter 11 Cases**").  In order to ease their transition into operations as debtors in possession, the Debtors also filed motions seeking various types of "first-day" relief (the "**First Day**

4

Motions"). I submit this declaration to (i) offer the Court and parties in interest a background on the Company and the circumstances leading to the commencement of the Chapter 11 Cases; and (ii) provide an evidentiary basis for the relief requested in the First Day Motions.

9.      Unless stated otherwise, all facts in this declaration are based upon my personal knowledge; my discussions with members of the Company's management team and outside advisors to the Company; my review of documents and information concerning the Company's operations, financial affairs, and restructuring efforts; and/or my personal opinion based upon my experience and general knowledge about the Company. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors. If called to testify, I would testify to the facts set forth in this declaration.

## III.     Company History and Business Overview

### A.  The Company's Mission and Flagship EV

10.     The Debtors were founded for the purpose of developing, manufacturing and selling electric vehicles ("**EVs**") primarily to commercial fleet customers. The commercial segment, including government fleets, has been generally underserved, with very few light-duty EVs specifically geared towards the sector until recently. The Company's mission of accelerating adoption of EVs by commercial fleets would meaningfully drive down tailpipe emissions insofar as commercial fleets account for a significant amount of vehicle miles driven.

11.     The Company's first vehicle, the Endurance, is a full-size, all-electric pickup truck, one of the first all-electric trucks sold in North America. The Endurance's most unique design attribute is its hub motor design, which features a propulsion hub motor in each wheel. The Company licenses certain of the non-proprietary intellectual property for the Endurance hub motors from an Eastern European company (Elaphe Propulsion Technologies Ltd.) that developed the base technology. The Company has made various enhancements to the base technology. To

the best of my knowledge, the core hub motor technology is not being pursued by any other light-duty OEM in the United States.  The hub motor technology has certain design attributes that would make the vehicle even more attractive to potential customers.  For example, it allows for a superior turning radius, maneuverability and traction.

### B.  SPAC Merger and Initial Capital Raises

12.     Lordstown Motors Corp. was incorporated under the name DiamondPeak Holdings Corp. ("**DiamondPeak**")[3] as a Delaware corporation on November 13, 2018 as a blank check company for the purpose of effecting a business combination.  DiamondPeak completed its initial public offering in March 2019 (the "**Initial Public Offering**"), raising approximately $250 million.  Subsequent offerings totaling $37.0 million resulted in $280.0 million in cash held in trust, net of fees.

13.     On October 23, 2020, the entity now known as Lordstown EV Corporation ("**LEVC**") and then known as Lordstown Motors Corp. ("**Legacy Lordstown**") consummated a merger (the "**SPAC Merger**") with DiamondPeak and DPL Merger Sub Corp ("**Merger Sub**"), in which Merger Sub merged with and into Legacy Lordstown, with Legacy Lordstown (post-merger, LEVC) surviving as a subsidiary of DiamondPeak.  In connection with the SPAC Merger, DiamondPeak changed its name to Lordstown Motors Corp. (such post-SPAC Merger entity, "**LMC**").  Concurrently with the SPAC Merger, DiamondPeak entered into separate subscription agreements to raise an additional $500 million in cash or payment-in-kind contributions through the sale of 50 million shares of Class A common stock (the "**PIPE Stock**") in a private investment in public equity transaction (the "**PIPE**").   Total consideration for Legacy Lordstown was

---

[3]      DiamondPeak, as used herein, refers to the entity now known as Lordstown Motors Corp. prior to its name change.

$788.7 million.  After fees, expenses and redemptions, Lordstown had pro-forma cash of $696.0 million as of September 30, 2020.

14.     On October 29, 2020, the Company formed Lordstown EV Sales LLC ("**LMC Sales**") to sell vehicles directly to customers.  LMC Sales is the wholly owned subsidiary of Legacy Lordstown, which, in turn, is the wholly owned subsidiary of LMC.

### C.  Business Arrangements with GM

15.     Early in its history, the Company entered into several agreements with General Motors and its affiliates (collectively, "**GM**").  On November 7, 2019, Legacy Lordstown and GM entered into an Asset Transfer Agreement, Operating Agreement and Mortgage Agreement (collectively, the "**GM Property Agreements**").  The GM Property Agreements provided for the Company's acquisition and continued operation of GM's 6.2 million square foot automotive assembly plant (the "**Plant**") in Lordstown, Ohio, where the Endurance is manufactured.

16.     On April 3, 2020, the Company continued its relationship with GM by entering into an agreement pursuant to which GM would make certain GM parts, including airbags, steering columns and steering wheels, accessible to the Company.  The parties later renewed the agreement, which has a current term ending December 31, 2023.

17.     In October 2020, in connection with the PIPE transaction discussed in more detail below, with cash and payments-in-kind, GM purchased $75 million of PIPE Stock, further expanding its relationship with the Company.[4]

18.     On December 21, 2021, the Company and GM entered into a separate five year-term supply agreement, which required a pre-payment of $17.8 million to GM.  As the design phase progressed, GM stopped providing the support it promised, and as a result, the Company

---

[4]     GM later sold its stake in the Company in the fourth quarter of 2021.

AMERICAS 122798756

moved away from certain core elements of the design that resulted in fewer of the GM parts being incorporated into the Endurance bill of materials ("**BOM**").[5]

### D.  Initial Development and Manufacturing Plans

19.      The Company initially projected that it would require up to $415 million (including a $60 million cushion to fund contingencies) to complete its initial plan relating to the Endurance, including to retool the Plant; perform all research and development, product development, validation, certification and homologation to commence vehicle sales (together "**R&D**"); and fund all operating and overhead costs, including significant hiring activities.

20.      The initial plan anticipated the Endurance would launch for sale in 2021, as the first all-electric pickup truck in North America.  The Company had forecast that it would achieve a positive gross margin and break-even EBITDA in February 2022 and attain positive free cash flow in 2023.  Anticipated BOM costs were approximately $42,000 per vehicle for manufacturing in 2021, which would decline by 12% over the ensuing four years as the Company scaled production. This compared favorably to the Company's anticipated selling price of $52,500 for the Endurance.

21.      Due to unanticipated factors, discussed in more detail below, the Endurance launched commercial production later than expected.  Further, the actual BOM cost of initial production was significantly higher than anticipated.  It became clear that operating and capital expenditures, including total selling, general and administrative expenses, engineering development and testing costs and additional production costs would meaningfully exceed projections.  Changes primarily related to adding more production capacity and reducing reliance on components sourced from GM, along with commencing advance design work on additional

---

[5]      BOM represents all the components of a product (here, the Endurance), including part numbers, quantities, unit price, vendor, and the currency in which the component is being purchased.  In short, it details the total direct materials cost for manufacturing each vehicle.  The BOM can either be referred to with or without freight, handling, taxes or other duties.

AMERICAS 122798756

products and features, led to a material increase of the forecasted cash outflow from operations in 2021.  The delay in commercial production and increased costs stressed the Debtors' financial condition.

### E.  Change in Management

22.    On June 8, 2021, the Company amended its annual report with the SEC, revising its forecasts due to the circumstances described above, add a going concern risk factor and three material weaknesses.  Amid these challenges, and following the filing of the Securities Litigation (discussed in greater detail below), the Company decided to install new management.  On June 14, 2021, LMC announced that Steve Burns would resign as Chief Executive Officer and from his position on the Board of Directors, and Julio Rodriguez would resign as Chief Financial Officer, each effective immediately.  The Company installed new key management, including CEO, President, CFO, and general counsel from August 2021 to January 2022, and continued filling additional key roles with candidates that brought new and upgraded skillsets to the Company over the course of 2022.

### F.  Partnership with Foxconn

23.    In the second half of 2021, the Company made the decision to significantly change its business model to one that would focus on deep collaboration with one or more strategic partners, and began the search that ultimately resulted in its partnership with Foxconn.   The Company began its ill-fated relationship with Foxconn in September 2021 after exploring other attractive options.  On September 30, 2021, the Company and Foxconn entered into an Agreement in Principle (the "**AIP**") to form a deep partnership and work jointly on electric vehicle programs. The AIP contemplated that Foxconn and the Company would (a) enter into an asset purchase agreement by which Foxconn would buy the Debtors' manufacturing Plant in Lordstown, Ohio (the "**Plant APA**"), (b) enter into a manufacturing supply agreement (the "**Contract**

AMERICAS 122798756

**Manufacturing Agreement**" or "**CMA**") by which Foxconn would manufacture the Endurance, and (c) jointly collaborate on the development of future vehicle programs.  The AIP was crucial to the Debtors' future strategy not only because selling the Plant would bring in necessary capital while lowering go-forward operational costs, but also because the Debtors were in need of strategic partners to assist in bringing their vehicles to market, and Foxconn, one of the world's leading manufacturers, was eager to fill this role.  In particular, the assurance of joint collaboration was essential to provide the Company with the strategic partner and the scalable business model it had bargained for.  The Company would never have sold its most valuable asset (*i.e.*, the Plant) for a fraction of its replacement cost without strong assurances from Foxconn that it would follow through on joint vehicle development leveraging Foxconn's EV ecosystem.  The Debtors' shift in business model was intended to come with significant capital contributions from Foxconn, access to intellectual property relating to certain vehicle designs, and a plan to co-design and develop vehicle programs for the global commercial fleet market using Foxconn's supply chain resources and mobility-in-harmony open platform.  The Debtors were particularly optimistic because Foxconn had identified electric vehicles as a key to its long-term growth strategy.

24.    In October 2021, Foxconn made its first investment in the Company, purchasing 7.2 million shares of the Company's Common Stock (defined below) for approximately $50 million, giving Foxconn an approximately 3.8% stake in the Company.

25.    On November 10, 2021, the parties signed the Plant APA.  Pursuant to the Plant APA, the parties agreed to use commercially reasonable efforts to enter into a joint venture ("**JV**") prior to closing the Plant APA and commercially reasonable best efforts to agree upon and finalize the CMA prior to April 30, 2022.  However, months after the parties signed the Plant APA, Foxconn caused delays in the progress towards developing the parties' agreed joint venture

10

program.  For its part. the Company quickly circulated term sheets to Foxconn detailing the plan for the joint venture.  But Foxconn repeatedly failed to engage.

26.     In April 2022, despite the parties' documented intention to enter into the JV prior to closing the Plant APA, Foxconn stated that it would not even discuss the JV until after closing. The Company was understandably concerned because Foxconn had done nothing to further the joint venture since the APA was signed.  The Company's concerns would only get worse.

27.     The Company continued to insist that Foxconn honor its commitment to enter into the JV before closing the Plant APA.  On May 11, 2022, Foxconn, eager to secure ownership of the Plant, finally closed the Plant APA, executed the CMA, and entered into a joint venture agreement (the "**JV Agreement**").  Pursuant to the Plant APA, Foxconn purchased the Plant, excluding the Company's hub motor assembly line, battery module and packing line assets, certain intellectual property rights and other excluded assets, for $230 million plus certain reimbursements.

28.     Pursuant to the CMA, the Company outsourced all of the manufacturing of the Endurance to Foxconn, which would (a) manufacture the Endurance at the Plant for a fee per vehicle, (b) following a transition period, which Foxconn agreed to use commercially reasonable efforts to complete no later than October 15, 2022, procure components for the manufacture and assembly of the Endurance, subject to sourcing specifications provided by Lordstown, and more broadly, to provide critical strategic support leveraging its size and expertise to achieve better pricing and payment terms with suppliers of the Endurance and (c) provide certain post-delivery services.

29.     As part of the JV, Foxconn committed to provide the JV with access to data, information and vehicle designs regarding two other electric vehicles—the Model C, a mid-size

AMERICAS 122798756

crossover, and the Model E, a large sedan—that had been partially developed by its affiliate in Taiwan, Foxtron.  The JV would take the Model C and modify it for the U.S. market, providing huge advantages in speed and cost.  The JV Agreement included detailed provisions regarding how JV funds would be spent, including certain approval rights by Foxconn.  The JV was owned 55% by Foxconn and 45% by the Company.  A representative of Foxconn became the Chairman of the JV and a representative of the Company was appointed CEO.  As explained in more detail below, Foxconn never followed through on its commitments—indeed, it never intended to—and its delays materially damaged the Debtors and their business prospects.

30.     Notwithstanding its repeated delays and failures to abide by its agreements with the Company, Foxconn was quick to move forward with its other plans for the Plant in Lordstown. The day after closing the Plant APA, Foxconn announced that it would be manufacturing the PEAR EV with automaker Fisker Inc. at the Plant.  Over the coming months, Foxconn announced plans to manufacture INDIEV's electric vehicle (the INDI One) and Monarch's all-electric MK-V tractor from the Plant.  The Debtors, meanwhile, supported Foxconn's commercial efforts with other vehicle makers and had meetings with both Fisker and INDIEV regarding potential product development collaboration opportunities.  For example, at Foxconn's request, the Company spent four weeks meeting with and developing a proposal for Fisker.  Fisker ultimately communicated that it did not have the funds to proceed with the requested vehicle program.

31.     Foxconn stymied the Company's attempts to move forward with the development of electric vehicles by refusing to engage on proposed budgets and timelines for EV projects. Foxconn (a) failed to grant the Company access to the Model C and Model E data, information and vehicle designs that Foxconn had committed to provide; (b) refused to agree on a budget or timeline for developing its electric vehicle program as contemplated by the JV Agreement; (c) did

not meaningfully engage with the Company during weekly board meetings on the development of a business plan for the JV; (d) no-showed meetings with the Company and failed to provide approvals on even the most basic items; and (e) otherwise failed to fulfill other agreed upon obligations. Foxconn also failed to honor several material commitments under the CMA, including its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good faith to reduce the production cost of the Endurance. Moreover, for months after closing the Plant APA, Foxconn continued to delay progress on the parties' agreed joint venture program. Although the Company continued to move quickly, beginning predevelopment work on the Model C design modifications and outreach to potential fleet customers, Foxconn failed to respond to the Company's repeated requests for required engineering drawings and data relating to the Model C and Model E vehicle designs that were a fundamental basis for the JV. The result was the Company's joint vehicle development efforts with Foxconn were completely stymied.

32. Moreover, not only did Foxconn's inaction thwart the Company's efforts to move forward on the JV vehicle programs and the Endurance, the few actions Foxconn did take served as roadblocks. For example, on June 9, 2022, Foxconn announced a new visitor policy, that would severely restrict Company employee's access to the Plant, including by prohibiting Company employees that were permanently assigned to the Plant from accessing the Plant floor without a Foxconn employee escort and placing burdensome restrictions on visiting Company employees. Foxconn only loosened these restrictions after push back from the Company.

33. As a result of these failures, it became clear that the Debtors would not receive the benefits that Foxconn had promised and was legally required to provide in connection with the JV. Soon after receiving a letter from the Company setting forth Foxconn's breaches of the JV

13

Agreement, Foxconn scheduled a meeting with the Company to discuss a direct investment by a different Foxconn entity, Foxconn Ventures Pte. Ltd. ("**FVP**"). Foxconn was interested in the new entity increasing its share ownership in the Company, potentially even taking the Company private. Importantly, the new entity was 55% owned by Foxconn and 45% owned by SoftBank, a large multi-national technology investor.   SoftBank's Chairman was interested in developing proprietary electric vehicle programs in North America and the Company was told by Foxconn that it should re-focus resources to these new programs.  Several meetings were held between the Company and representatives of Foxconn and SoftBank, including SoftBank's Chairman, to discuss the new programs.

34.    Since it was clear that Foxconn had no intention of satisfying its commitments in the JV Agreement, the Company agreed, on November 7, 2022, to pivot away from the JV Agreement and instead Lordstown and FVP entered into a direct investment agreement (the "**Investment Agreement**").  The Investment Agreement replaced the JV and provided that the parties' respective obligations under the JV would be terminated, but would be replaced with even greater direct funding into the Company.[6]  Under the Investment Agreement, FVP agreed to make additional equity investments in the Company through the purchase of $70 million of Common Stock and up to $100 million in Preferred Stock (defined below), subject to certain conditions. The net proceeds of the Common Stock sale could be used by the Company for general corporate purposes while the net proceeds from the sale of the Preferred Stock were to be used specifically for the new SoftBank vehicles or any substitute programs.  It also provided for a new avenue of cooperation and contemplated that LMC would develop a new series of milestones and budgets for the production of EVs.

---

[6]        On April 21, 2023, a certificate of cancellation was filed with the State of Delaware dissolving the JV.

14

35.     Unfortunately, Foxconn continued its pattern of misrepresentations, delay and non-cooperation.  Within days of entering into the Investment Agreement, Foxconn indicated that SoftBank's commitment was no longer clear, SoftBank's Chairman was sometimes erratic and that the Company should not rely on the SoftBank program.  Instead, Foxconn directed the Company to resume work on the previous internal program that was similar to what was first discussed in November 2021.  The parties then entered into an amendment to the Investment Agreement, effective November 15, 2022, allowing the Company to use the net proceeds from the purchases of Preferred Stock for the substitute program, which Foxconn claimed to fully support. In December 2022, however, Foxconn held up a necessary regulatory filing with the Committee on Foreign Investment ("**CFIUS**") until the Company agreed to rescind that amendment and to replace it with a new, more restrictive amendment document that also identified the substitute program, which Foxconn continued to claim to fully support. Even though Foxconn had no contractual basis to withhold its cooperation, the Company, with a tremendous need for the financing Foxconn promised, particularly due to the delays to the program caused by Foxconn, agreed to execute the rescission document, and the CFIUS application was filed on December 23 – two weeks late, and after the start of the holiday season.

36.     Between December 2022 and March 2023, the Company completed the first phase of the new vehicle development work.  This work included market analyses to determine the target segments and attributes needed to be successful in the US commercial fleet marketplace, vehicle architecture engineering to create a platform that could yield multiple vehicle model types, studies to determine which components (e. g. batteries, electronics and motors) could be supplied by the Foxconn EV ecosystem, initial design alternatives, and cost targets needed to ensure program profitability.  The Company provided Foxconn, including Chairman Young Liu, with regular

AMERICAS 122798756

updates about its work, scorecards on the completion status of each deliverable, and topics where assistance was needed from Foxconn. On January 25, 2023, the Company sent Foxconn a document containing its proposed program budget, milestones and deliverables, and held a meeting with Chairman Liu on the same day.  On March 6, 2023, the Company held a meeting with Foxconn to, among other things, discuss its development collaboration with Foxconn and the status of the Endurance.

37.     On March 22, 2023, the Company delivered the first set of program deliverables as contemplated by the Investment Agreement.  Once those deliverables were approved by Foxconn, Foxconn was required to pursue and to fund the Second Tranche Preferred Purchase (as defined in the Investment Agreement).  But Foxconn continued its longstanding pattern of delay.  A meeting to discuss the deliverables scheduled for March 23 was cancelled by Foxconn and never re-scheduled. To this day, the Company still has not received any substantive response from Foxconn on its proposals for budgeting and milestones.

38.     On April 24, 2023, as a result of the Company's continued efforts, Foxconn received CFIUS approval to complete a subsequent closing of the purchase of $47.3 million of common shares under the Investment Agreement (the "**Subsequent Common Closing**"), which was to occur within 10 business days from receipt of the CFIUS approval (*i.e.*, on May 8, 2023).

39.     Foxconn has refused to close the Subsequent Common Closing, despite being required to do so under the terms of the Investment Agreement.  On March 7, 2023, the Common Stock dropped below the $1.00 per share threshold set forth in Nasdaq Listing Rule 5450(a)(1). On April 19, 2023, the Listing Qualifications Department of Nasdaq sent the Company a notice (the "**Nasdaq Notice**") that the Company had a 180-day period to remedy the drop in the stock price below $1.00 per share.   The Company, having anticipated that its stock price could drop

below the $1.00 per share threshold, had already included a proposal for a reverse stock split in the agenda for its annual meeting to be held on May 22, 2023.

40.     Seizing on the Nasdaq Notice, by letter dated April 21, 2023, just 17 days before the anticipated Subsequent Common Closing, Foxconn sent a notice of default (the "**Notice of Default**") under the Investment Agreement.  The Notice of Default provided that Foxconn would terminate the Investment Agreement effective May 21, 2023, one day prior to the Company's shareholders' meeting and the approval of the reverse stock split, in the event the Company failed to cure such default.

41.     On April 25, 2023, the Company responded to the Notice of Default.  The Company (i) disputed that the Nasdaq Notice constituted a breach under the Investment Agreement, (ii) noted that the Investment Agreement, by its terms, does not permit Foxconn to terminate it following the Initial Closing (which occurred on November 22, 2022), and (iii) in any event, Foxconn cannot exercise termination rights because Foxconn has breached the Investment Agreement by failing to use necessary efforts to agree upon the budget and milestones to facilitate the Subsequent Preferred Funding.

42.     On May 2, 2023, after forcing the Company to publicly disclose Foxconn's purported termination, causing a significant drop in the Company's stock price and uncertainty about its future, Foxconn acknowledged, both in correspondence to the Company and publicly, that it had no legal right to terminate the Investment Agreement.

43.     On May 3, 2023, Lordstown sent Foxconn a letter recognizing its retraction of its purported termination of the Investment Agreement.  The Company also disputed Foxconn's assertion that the Nasdaq Notice constituted a failure to satisfy a condition precedent to the Subsequent Common Closing.  As noted above, the Nasdaq Notice did not delist or threaten to

delist the Company's shares.  Instead, the Company was provided with a period of 180 calendar days, or until October 16, 2023, to remedy the issues raised in the Nasdaq Notice.  Only if the Company failed to maintain a stock price above $1.00 per share for 10 consecutive business days by the end of the period would Nasdaq contemplate termination of its listing.  As discussed below, the Company did return its stock price to greater than $1.00 per share for 10 consecutive business days shortly after receipt of the Nasdaq Notice and Nasdaq closed the issues raised in the notice. Moreover, Foxconn's refusal to file the CFIUS application, in clear violation of the Investment Agreement, until the Company rescinded an amendment that the parties had executed (despite the covenants in Investment Agreement requiring Foxconn submit a notice to CFIUS as promptly as reasonably practicable) is the only reason that the Nasdaq Notice was received before the date of the Subsequent Common Closing, as the application would have been approved weeks earlier absent Foxconn's breach.

44.    On May 23, 2023, the Company executed a reverse stock split to improve the marketability and liquidity of the Common Stock.  As of June 7, 2023, the Common Stock price had remained above $1.00 per share for 10 consecutive trading days following the reverse stock split.  As a result, even under Foxconn's flawed interpretation of the agreement, all conditions to closing would have been satisfied and Foxconn's pretext for not closing was gone.

45.    Knowing that its most recent excuse for failing to meet its contractual obligation was about to disappear, on June 5, Foxconn asserted for the first time that because of the Company's 1:15 reverse stock split, it was now entitled to purchase not the 10% of the Common Stock of the Company that had been agreed, but 62.7% for the same $47.3 million price. Foxconn's assertion ignores several provisions of the Investment Agreement, which makes clear that following the Subsequent Common Closing, Foxconn would not own more than 19.99% of

18

the capital stock of the Company that is entitled to vote generally in any election of directors of the board of directors of the Company and at no point would it own anywhere near 65.9%, which is the percentage of the voting interest that Foxconn would hold on an as-converted basis when combining the stock that Foxconn asserts it has the right to purchase in the Subsequent Common Closing with its existing holdings of the Company's capital stock and warrants.  In fact, until at least December 31, 2024, Foxconn had agreed that it would not acquire, offer or seek to acquire or make a proposal to acquire (a) more than 19.99% of the capital stock of the Company that is entitled to vote generally in any election of directors of the board of directors of the Company prior to a vote of the Company's stockholders allowing Foxconn to acquire more than 19.99% of such capital stock and (b) more than 24% of the capital stock of the Company that is entitled to vote generally in any election of directors of the board of directors of the Company even after the Subsequent Common Closing and a vote of the Company's stockholders approving an acquisition by Foxconn of more than 19.99% of such capital stock, if such vote were obtained.

46.    Foxconn's newest position also contradicts the terms of its own certifications to CFIUS, where it represented to the United States government that the transactions contemplated by the Investment Agreement, together with Foxconn's existing holdings of the Company's capital stock and warrants on an as-converted basis, could not result in Foxconn owning anywhere near a 65.9% voting interest in the Company.  Foxconn's position would mean that the Company could have effectuated a 30:1 stock dividend (which is has the right to do under the Investment Agreement) and Foxconn would have been required to pay $47.3 million for a mere fraction of the capital stock of the Company, which is an absurd interpretation of the Investment Agreement.

## IV.    **Capital Structure**

47.     The Debtors include three entities.  Debtor Lordstown Motors Corp. or LMC (formerly known as DiamondPeak Holdings Corp.), a public company whose Class A common stock ("**Common Stock**") trades on the NASDAQ Global Stock Market under the symbol "RIDE," is the ultimate parent of the Debtors.  Debtor LEVC (or Legacy Lordstown), is a wholly-owned subsidiary of LMC and the Debtors' primary operating company.  Debtor Lordstown EV Sales LLC or LMC Sales is a wholly-owned subsidiary of Legacy Lordstown and was formed to sell vehicles directly to customers. A chart depicting the Debtors' organizational structure as of the Petition Date is attached as **Exhibit A**.

48.     As of the Petition Date, none of the Debtors are borrowers or obligors with respect to any funded debt obligations.  Instead, the Company's capital comes from the SPAC Merger, additional capital raises, and sales of the Company's Series A Convertible Preferred Stock, $0.0001 par value per share ("**Preferred Stock**") and Common Stock, as well as the sale of the Plant to Foxconn.  As of the Petition Date, the Company estimates that there are 300,000 outstanding shares of Preferred Stock held by Foxconn.[7]  As of the Petition Date, there were 15,952,991 shares of Common Stock either outstanding or in the process of being settled for equity awards that vested prior to the Petition Date, which reflects the Reverse Stock Split implemented on May 23, 2023.  As of the Petition Date, Foxconn holds approximately 8.4% of the Common

---

[7]     Preferred Stock ranks senior to Common Stock with respect to dividend rights; distribution rights in the event of a liquidation or wind down; and redemption rights.  Holders of Preferred Stock are entitled to receive cumulative dividends at a rate of 8% per annum, compounding on a quarterly basis to the extent they are not paid by the Company. Pursuant to the Company's certificate of designation regarding Preferred Stock, shares of Preferred Stock are entitled to receive distributions in cash in the greater of (i) $100 per share plus accrued unpaid dividends or (ii) the amount the holder would have received had it converted such share into Common Stock immediately prior to the date of such liquidation event, before any distributions shall be made on any shares of Common Stock.

AMERICAS 122798756

Stock and there are no other holders that hold 5% or more of Common Stock.  For the date prior to the Petition Date, the closing Common Stock share price was $2.76.

49.      As of the Petition Date, the Company has approximately $136 million in cash on hand, which the Company believes is entirely unencumbered by any liens, with the exception of one $100,000 account related to the debtors purchase card program, deposits with landlords, and customs bonds.[8]

50.      In addition, as of December 31, 2022, the Company estimated that it had valuable tax attributes including, without limitation, (i) federal NOLs of approximately $629.6 million, which generated a deferred tax asset of $132 million, (ii) local NOLs of approximately $327 million, which generated a deferred tax asset of $3.7 million, and (iii) an indeterminate amount of net unrealized built-in loss.

## V.      Description of the Debtors' Workforce and Facilities

51.      As of the Petition Date, the Debtors had approximately 243 employees across three main locations in Lordstown, Ohio, Farmington Hills, Michigan and Irvine, California.  Of these employees, approximately 225 are active full-time salaried employees and approximately 18 are active hourly employees.  The Debtors' employees are employed by LEVC, with the exception of one full-time Employee employed with Lordstown EV Sales LLC.

52.      The Debtors operate out of the following leased facilities: (1) office space leased from Foxconn at the Plant in Lordstown, Ohio (from which approximately 15 employees operate); (2) two sites  Farmington Hills, Michigan, including space for engineering, product development, vehicle inspection and benchmarking, labs for testing, validation and prototyping, and corporate

---

[8]      The company maintains one encumbered bank account in connection with its purchase card program, which has an account balance of only $100,000 as of the Petition Date.

AMERICAS 122798756

offices (and from which approximately 192 employees operate); and (3) an engineering, vehicle development, and service center in Irvine, California, primarily for developing advanced electronic hardware and software for infotainment systems as well as vehicle cybersecurity, connected vehicle and fleet services systems (and from which approximately 27 employees operate). In addition, approximately 9 of the Debtors' employees work remotely, serving in managerial, administrative, and research and development roles.

53.    On May 9, 2023, the Debtors issued notices to 17 employees in the Farmington Hills, Michigan office location pursuant to the Worker Adjustment and Retraining Notification ("**WARN**") Act. 29 U.S.C. §§ 2101–09. On May 18, 2023, the Debtors issued a second round of WARN notices (together with the notices issued on May 9, 2023, the "**WARN Notices**") to 98 employees, all located in the Farmington Hills, Michigan office location.[9] The Debtors notified these employees that permanent layoffs would begin as early as July 8, 2023 and no later than July 21, 2023. The Debtors also notified the relevant government authorities. These layoffs are due to insufficient funding resulting primarily from a dispute with Foxconn regarding its contractual obligations to LMC.

## VI.    Prepetition Litigation

54.    The Company is subject to various litigations and an investigation (collectively, the "**Prepetition Litigations**"), including securities class action litigation, shareholder derivative suits, a stockholder class action, an SEC investigation, and litigation involving alleged trade secret misappropriation, unfair competition and other related claims, among other disputes.

---

[9]    Some of these employees have been placed on administrative leave. Therefore, they are not reporting to work but are continuing to be paid.

**A. SEC Investigation and Securities Actions**

55.     In February 2021, the SEC initiated an investigation (the "**SEC Investigation**") related to the SPAC Merger with DiamondPeak and the Company's reported pre-orders for vehicles and certain other matters.  Following the initiation of the SEC Investigation, a series of plaintiffs brought class action and derivatives suits (collectively, the "**Securities Actions**") against the Company, certain of its current and former directors and officers ("**D&Os**"), and/or employees. The Securities Actions include the following:

- **N.D. Ohio Securities Class Action**.  A consolidated securities fraud class action pending in the U.S. District Court for the Northern District of Ohio captioned *In re Lordstown Motors Corp. Sec. Litig.*, No. 4:21-cv-616-DAR (N.D. Ohio).  This matter consists of six consolidated putative securities fraud class action lawsuits in which certain putative class plaintiffs[10] assert claims against LMC, Lordstown EV Corp., and certain D&O defendants[11] for violations of Section 10(b), Section 14(a), Section 20(a), and Section 20A of the Securities Exchange Act of 1934 ("**Exchange Act**") and SEC Rule 10b-5 promulgated thereunder.  On November 9, 2021, the Debtors and D&O defendants filed a motion to dismiss the Securities Class Action.  The motion has been fully briefed since March 3, 2022 and is awaiting the court's scheduling of a hearing and ruling.  Discovery is stayed pending resolution of the motion to dismiss.  No deadline has been set for plaintiffs to seek class certification, and no trial date has been set.

- **Delaware Chancery Class Action.**  A consolidated stockholders class action pending in the Delaware Court of Chancery captioned *In re Lordstown Motors Corp. Stockholders Litig.*, C.A. No. 2021-1066-LWW (Del. Ch.).  This matter consists of two consolidated putative class action lawsuits filed by plaintiffs Benjamin Hebert and Atri Amin, respectively, asserting breach of fiduciary duty claims against certain D&O defendants.[12]  On February 3, 2023, the D&O defendants filed an answer to the amended complaint. Discovery has commenced.  While the Company is not named as a defendant, defendants have asserted indemnification rights against the Company and, on June 9, 2023, the chancery court granted, in part, a motion to compel document discovery from Debtor LMC.  The deadline to move for class certification is July 21, 2023.  A trial date has been set for March 11, 2024.

---

[10]     The plaintiffs are: Jesse Brury, FNY Managed Accounts LLC, Robert Palumbo, Matthew Rico, Raymond Romano, George Troicky, and Sulayman Zuod.

[11]     The D&O defendants are: Stephen S. Burns, Shane Brown, Caimin Flannery, David T. Hamamoto, Julio Rodriguez, Phil Richard Schmidt, and Darren Post.

[12]     The D&O defendants are: David Hamamoto, Mark Walsh, Andrew Richardson, Steven Hash, and Judith Hannaway.  DiamondPeak Sponsor LLC, a non-debtor entity that was involved in the SPAC Merger, was also named as a defendant, but was dismissed, without prejudice, by order entered by the chancery court on June 21, 2023.

- **N.D. Ohio Derivative Action**.  A derivative action pending in the U.S. District Court for the Northern District of Ohio captioned *Thai v. Burns et al.*, No. 4:21-cv-01267 (N.D. Ohio).  On June 30, 2021, Derivative Plaintiff An Thai brought this shareholder derivative lawsuit on behalf of LMC, as nominal defendant, against nineteen D&O defendants[13] asserting violations of Sections 14(a), 10(b), and 20(a), and for contribution under Sections 10(b) and 21D, of the Exchange Act, as well as claims for breach of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets.  On October 21, 2021, the Court entered a stipulated stay of the action and scheduling order relating to defendants' anticipated motion to dismiss and/or subsequent motion to stay that is conditioned on the resolution of the motion to dismiss in the consolidated securities class action. Discovery has not yet commenced, and no trial date has been set.

- **District of Delaware Derivative Action**.  A consolidated derivative action pending in the U.S. District Court for the District of Delaware under lead case captioned *In re Lordstown Motors Corp. Shareholder Derivative Litigation*, No. 21-00604-SB (D. Del.).  The matter consists of four consolidated shareholder derivative lawsuits filed between April 28, 2021 and July 9, 2021 by certain plaintiffs[14] on behalf of LMC, as nominal defendant, against certain D&O defendants[15] asserting violations of Section 10(b), Section 14(a), Section 20(a), and contribution for violations of Sections 10(b) and 21D, of the Exchange Act, as well as breach of fiduciary duty, insider selling, and unjust enrichment derivatively for the benefit of LMC.  On May 9, 2023, the Court re-issued a stay in the action pending resolution of the motion to dismiss in the N.D. Ohio Securities Class Action.  Discovery has not yet commenced, and no trial date has been set.

- **Delaware Chancery Derivative Action**.  A consolidated derivative action pending in the Delaware Court of Chancery under lead case captioned *In re Lordstown Motors Corp. Stockholder Derivative Litigation*, C.A. No. 2021-1049-LWW (Del. Ch.).  The matter consists of two consolidated shareholder derivative lawsuits filed on December 2, 2021 and February 18, 2022 by derivative plaintiffs David M. Cormier[16] and Janelle Jackson asserting derivative claims for breach of fiduciary duty and unjust enrichment against certain D&O defendants.[17]  The matter is stayed pending resolution of the motion to

---

[13]    The D&O defendants are: Stephen S. Burns, Phil Richard Schmidt, Julio Rodriguez, Angela Strand Boydston, Shane Brown, Michael Fabian, Keith A. Feldman, Michael D. Gates, David T. Hamamoto, Judith A. Hannaway, Steven R. Hash, Mickey W. Kowitz, Darren Post, Jane Reiss, Andrew C. Richardson, Martin J. Rucidlo, Dale G. Spencer, Chuan D. "John" Vo, and Mark A. Walsh.

[14]    The derivative plaintiffs are: Daniel J. Cohen, David M. Cohen, Alicia Kelley, Claude L. Patterson, Evaristo Sarabia, and Herbert Stotler.

[15]    The D&O defendants are: Stephen S. Burns, Phil Richard Schmidt, Julio Rodriguez, Michael Fabian, David T. Hamamoto, Mark A. Walsh, Andrew C. Richardson, Steven R. Hash, Judith A. Hannaway, Keith A. Feldman, Jane Reiss, Dale G. Spencer, Michael D. Gates, Mickey Kowitz, Angela Strand Boydston, and Martin J. Rucidlo.

[16]    Lead plaintiff David M. Cormier has been replaced with lead plaintiff Ed Lomont in this action.

[17]    The D&O defendants are: Keith A. Feldman, Michael D. Gates, David T. Hamamoto, Mickey Kowitz, Jane Reiss, Martin J. Rucidlo, Dale G. Spencer, Angela Strand, Shane Brown, Stephen S. Burns, Caimin Flannery, Darren Post, Julio Rodriguez, Phil Richard Schmidt, Chuan D. "John" Vo, Judith Hannaway, Steven R. Hash, Andrew C. Richardson, and Mark A. Walsh.

dismiss in the N.D. Ohio Securities Class Action.  Discovery has not yet commenced, and no trial date has been set.

56.     The SEC Investigation and Securities Actions have caused the Company to incur substantial costs.  First, the Company has incurred significant direct expenditures for legal fees and other costs incurred to defend against the Prepetition Litigations.  As of the Petition Date, the Company estimates that it has incurred more than $60 million in out-of-pocket fees associated with legal time and consulting and administrative costs, including costs to fulfill the Company's indemnification obligations to its current and former directors and officers.  Second, the Company has been forced to sacrifice valuable employee time to respond to discovery, conduct internal investigations, and participate in depositions and interviews, all of which have resulted in large losses to productivity over the two years that the SEC Investigation and Securities Actions have been pending.

57.     The Company timely tendered claims with respect to the SEC Investigation and Securities Actions to insurers under the applicable directors and officers ("**D&O**") policies. However, the Debtors' primary and excess insurers under the post-SPAC Merger D&O policy have taken the position that no coverage is available for the vast majority of the Securities Actions and the SEC Investigation.  The Company and its legal advisors have been and continue to contest the insurers' denial.

**B.  Karma Litigation**

58.     On October 30, 2020, Karma Automotive LLC filed an action (the "**Karma Action**") against the Company and certain of its current and former executive officers and employees in the US District Court for the Central District of California asserting claims for misappropriation of trade secrets, conspiracy, breach of the non-disclosure agreement, interference

with employment contracts, and violation of the computer fraud statutes.  The Company disputes

these allegations.  Absent a stay, trial was set to begin in the Karma Action on September 5, 2023.

## VII.    Circumstances Leading to the Commencement of the Chapter 11 Cases

59.    The purpose of these Chapter 11 Cases is for the Company to maximize value by

conducting a robust sale process, reducing its cash burn to preserve resources, and centralizing the

claims asserted against the Company to efficiently resolve those claims and provide meaningful

recoveries to its creditors and, if sufficient, its shareholders.

60.    Given current market conditions and impediments facing the Company, including

Foxconn's breach of its commitments and the looming threat of the Prepetition Litigations, it is

unlikely that the Company will be able to raise sufficient capital in the near term without a strategic

transaction that includes the certainty and protections afforded by the Bankruptcy Code.

Meanwhile, prior to recent aggressive cost cutting actions taken due to the circumstances in which

the Company finds itself, the Company's average cash burn ranged from $10 million to

$15 million per month.  Accordingly, absent these Chapter 11 Cases, the Company's cash position

would continue to erode with no realistic hope of right-sizing its trajectory, to the detriment of all

stakeholders.

61.    The Company also requires additional capital to remove the uncertainty

surrounding the Company's ability to execute its business plan and scale the Endurance.  While

Foxconn is contractually obligated to provide a meaningful amount of capital and critical

operational support, it has repudiated its obligations.  Further, the Company does not believe that

capital from other sources is available.  In September 2021, the Company retained Jefferies LLC

("**Jefferies**") to explore all market alternatives.  Through that process, the Company and Jefferies,

in consultation with Foxconn, prepared a list of more than 50 potential investors and strategic

OEM partners across the globe to be contacted.  Jefferies, the Company and Foxconn allocated responsibility to contact the potential investors and strategic OEM partners based upon who had the best relationship with the most relevant person at those companies.  While the Company, its advisors, and potential partners held numerous meetings and in-person evaluations of the Endurance, as of the Petition Date, the Company has not received any actionable indications of interest.[18]

62.      Further, the current market outlook makes it unlikely that the Company's prospects will change in the near future.  General market forces and outlooks, including rising interest rates and unemployment rates as well as forecasts of a near term recession will make raising capital extremely difficult.  Moreover, those general hardships are even more pronounced in the electric vehicle sector.  As evidenced by the Debtors' prepetition capital raise and marketing process, there is a broadly negative investor sentiment towards publicly traded startup companies, and especially electric vehicle manufacturers.  Indeed, there have been almost no traditional marketed equity sales of size among small capitalization EV companies in over a year and every start-up EV company has sustained massive declines in market capitalization.  Moreover, from January 1, 2022 to April 19, 2023, even the largest U.S. OEMs (Ford, GM, and Tesla), experienced market capitalization declines of 45%, 47% and 57%, respectively, in comparison to only a 21% decline of the Russell 2000 index.

63.      The Debtors have also faced additional challenges to raising capital.  Chief among these challenges is the lack of progress with its new vehicle program with Foxconn and the substantial uncertainty related to the outcome of the Prepetition Litigations.  That uncertainty has

---

[18]      The Company also pursued an Advanced Technology Vehicles Manufacturing ("**ATVM**") loan from the U.S. Department of Energy.  However, the Debtors were not able to satisfy the conditions to obtain an ATVM Loan, particularly due to the requirement to demonstrate the Company's viability.

AMERICAS 122798756

contributed to the generally negative prepetition investor sentiment toward the Company, driving LMC's stock price down over the past two years.  As of December 31, 2022, the Company reported a $35.9 million reserve accrued on account of the Prepetition Litigations, noting that the full range of possible outcomes could result in significantly higher liability.  The threat of this potentially significant loss, the Company's need to divert resources to defending the Prepetition Litigations, and the lack of aid from insurers, and perhaps most importantly, the ongoing disputes with Foxconn, together created a significant obstacle to raising capital in size prior to the Petition Date.

64.     Although the Company has successfully reduced its cash burn—outperforming its liquidity forecasts in every fiscal quarter of 2022—and maintains sufficient cash to continue operations in the near term, time is of the essence.  As of the Petition Date, the Debtors have approximately $136 million in cash, and an estimated monthly cash burn of approximately $5 million (excluding extraordinary costs and contingent liabilities).  The Company filed these Chapter 11 Cases to execute an expeditious strategic transaction and preserve as much value as possible for all stakeholders.

## VIII.  The Company's Ongoing Operations

65.     Recognizing that it would still require substantial additional funding to execute its business plan, including scaling the Endurance program and developing new vehicle programs, the Company has continued to take steps to reduce its cash burn and preserve its assets for the benefit of stakeholders.  Given the Company's current prospects—including Foxconn's unwillingness to honor its funding and product development commitments and the extremely limited ability to raise capital in the current market environment—continuing production of the Endurance would only eat away at the Company's resources.  In connection with its efforts to reduce expenditures, prior to the Petition Date, the Company issued the WARN Notices that will,

28

if not rescinded, significantly reduce the number of the Company's employees to only those necessary to (i) complete previously ordered vehicles that were nearing the end of production and (ii) assist the Company as it considers and pursues its strategic alternatives.  The Company also made certain actual reductions of employee headcount prior to the Petition Date and anticipates additional headcount reductions.

66.     The Company is currently in the process of finalizing a limited number of Endurances still in production.  Once that process is complete, the Company intends to halt production of the Endurance until a value-maximizing transaction is identified in order to preserve its assets and turn its focus entirely to maximizing recoveries through the chapter 11 cases, including marketing and selling the Company and/or substantially all of its assets pursuant to the sale process (the "**Sale Process**") contemplated by the proposed bidding procedures that the Debtors will file in the Chapter 11 Cases.

67.     In connection with the Sale Process, the Company will continue to employ its reduced workforce which consists of employees that will be crucial to marketing the Company to any potential buyers interested in the Endurance program.  The Company also will employ corporate staff necessary to maintain operations and administer the bankruptcy proceeding.  If a buyer intends to continue the Company's Endurance and/or new vehicle programs, then the Company anticipates that its employees may stay on under that buyer's ownership.  If the Sale Process does not yield a buyer interested in the Company's ongoing programs, then the Company will take further actions, as necessary, to reduce administrative expenses other than those necessary to achieve the best result possible for stakeholders in a liquidation of the Company's assets.

AMERICAS 122798756

## IX.    **The First Day Motions**

68.    Concurrently with the filing of these Chapter 11 Cases, the Debtors filed the First Day Motions seeking relief related to the administration of the cases; the Debtors' vendors, employees, franchisees, and customers; their operations; and their cash management.  A list of the First Day Pleadings is set forth below.

### A.  Administrative Motions

- *Debtors' Motion for Entry of an Order Directing Joint Administration of the Chapter 11 Cases*

- *Debtors' Motion for Entry of Interim and Final Orders (a) Authorizing, but not Directing, the Debtors to (i) Waive Requirements to File A List of, and Provide Notice to, All Equity Holders and (ii) Redact Certain Personal Identification Information for Individual Creditors and (b) Granting Other Related Relief*

- *Debtors' Application for Entry of an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective as of the Petition Date*

### B.  Substantive Motions

- *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing, but Not Directing, the Debtors to (a) Continue Use of Existing Cash Management System, Bank Accounts, and Business Forms, (b) Pay Related Prepetition Obligations, and (c) Continue Intercompany Transactions; (ii) Waiving the Section 345(b) Deposit and Investment Requirements; and (iii) Granting Other Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (a) Authorizing, but Not Directing, the Debtors to (i) Pay Prepetition Wages and Compensation; (ii) Continue Certain Employee Benefits and Incentive Programs; (iii) Continue Certain Health and Insurance Benefits; and (b) Granting Other Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (i) Approving the Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (ii) Establishing Procedures for Resolving Objections by Utility Providers, and (iii) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, and (iv) Granting Other Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing, but not Directing, the Debtors to Pay Prepetition Claims of Critical Vendors, (ii) Confirming Administrative Expense Priority Status for Outstanding Prepetition Purchase Orders, and (iii) Granting Other Related Relief*

30

- *Debtors' Motion for Entry of Interim and Final Orders (a) Authorizing, but not Directing the Debtors to (i) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising thereunder and (ii) Renew, Revise, Extend, Supplement, Change or Enter into New Insurance Policies, (b) Modifying Automatic Stay with respect to Workers' Compensation Programs, and (c) Granting Other Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing, but not Directing, the Payment of Certain Prepetition Taxes and Fees and (ii) Granting Other Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (a) Establishing Notice and Hearing Procedures for Trading In Equity Securities In the Debtors, and (b) Granting Other Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (a) Authorizing, but Not Directing, the Debtors To (i) Maintain Their Existing Warranty Programs and (ii) Honor Certain Customer Obligations and (b) Granting Other Related Relief*

- *Debtors' Motion for Entry of an Order (a) Authorizing, but not Directing, the Debtors to (i) Confirm, Restate, and Enforce the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code and (ii) Use the Form and Manner of Notice and (b) Granting Other Related Relief*

- *Debtors' Motion for Entry of an Order (i)(a) Establishing Bidding and Auction Procedures, (b) Scheduling Certain Dates With Respect Thereto, (c) Approving the Form and Manner of Notice Thereof, (d) Approving Contract Assumption and Assignment Procedures, and (e) Granting Other Related Relief; and (ii) (a) Authorizing the Debtors to Enter Into a Definitive Purchase Agreement and (b) Granting Other Related Relief*

### C.  The Relief Sought by the First Day Motions Is Tailored and Necessary

69.     The Debtors have narrowly tailored the relief requested in the First Day Motions to meet their goals of: (a) continuing their current operations in chapter 11 with as little disruption as possible; (b) maintaining the confidence and support of their vendor, customer, employee, franchisee, and other key constituencies; and (c) establishing procedures for the efficient administration of these Chapter 11 Cases.

70.     I have reviewed each of the First Day Motions (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate

AMERICAS 122798756

reliance on corporate officers, employees, and advisors.  I incorporate by reference the factual statements in each of the First Day Motions as though set forth herein.

71.    I believe that the relief sought in each of the First Day Motions is necessary to the successful implementation of the Debtors' efforts to maximize the value of their estates.  It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims or continue selected prepetition programs, the relief requested is essential to the maintenance of the Debtors' operations and necessary to avoid immediate and irreparable harm to the Debtors' estates and creditors.

72.    The success of these Chapter 11 Cases depends upon the Debtors' ability to preserve their operations while they pursue a transaction and otherwise restructure their obligations.  The relief requested in the First Day Motions is a critical component of maintaining the confidence of key constituencies necessary to implement this strategy.

73.    Accordingly, I respectfully request that all of the relief requested in the First Day Motions, and such other and further relief as may be just and proper, be granted.

AMERICAS 122798756

I declare under penalty of perjury that the foregoing *Declaration of Adam Kroll in Support of Debtors' Chapter 11 Petitions and First Day Motions* is true and correct.

Executed on:   June 27, 2023
                      Lordstown, Ohio

 */s/  Adam Kroll*                                                          
ADAM KROLL
Executive Vice President and Chief Financial Officer of
Lordstown Motors Corp.

**<u>EXHIBIT A</u>**

**Corporate Organizational Chart**

# Lordstown Motors Corp. and its Debtor Affiliates

