**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| Lordstown Motors Corp., *et al.*,[1] | Case No. 23-10831 ( ) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) (A) ESTABLISHING BIDDING AND AUCTION PROCEDURES, (B) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (E) GRANTING OTHER RELATED RELIEF; AND (II) (A) AUTHORIZING THE DEBTORS TO ENTER INTO A DEFINITIVE PURCHASE AGREEMENT AND (B) GRANTING OTHER RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") state as follows in support of this motion (the "**Motion**"):

**Preliminary Statement**

1.      As more fully set forth in the First Day Declaration, the Debtors have filed these chapter 11 cases for the purpose of using the tools of the Bankruptcy Code to maximize value in the face of Foxconn's ongoing and repeated breaches of its commitments to the Company.  In this regard, the Debtors are initiating a timely and efficient chapter 11 marketing and sale process to pursue and consummate a value-maximizing sale of their assets for the benefit of all stakeholders. As more fully set forth herein, a marketing and sale process under section 363 of the Bankruptcy Code will permit the Debtors to maximize value through a sale of assets free and clear of the

---

[1]      The Debtors and the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corp. (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101).  The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

overhang of the Foxconn relationship and the destruction it has caused, and of any and all liens, claims, encumbrances, and other interests of any party against the Debtors or their assets.

2.      To that end, the Debtors' proposed investment banker and financial advisor, Jefferies LLC ("**Jefferies**") is beginning a marketing process on the Petition Date (as defined herein). The Debtors, with the assistance of Jefferies, have developed a list of parties whom they believe may be interested in, and whom, the Debtors reasonably believe would have the financial resources to consummate, a sale. The list of parties includes both strategic and financial investors (collectively, the "**Contact Parties**"). The Debtors or Jefferies will promptly distribute a teaser to the Contact Parties and expect to execute confidentiality agreements with certain Contact Parties as quickly as possible. Jefferies and the Debtors will work with interested parties and any additional parties to provide diligence and will continue to actively seek potentially interested purchasers.

3.      The Debtors are filing this Motion to approve their proposed Bidding Procedures (as defined herein), the sale process contemplated thereby, and related relief. The marketing process and the Bidding Procedures proposed herein will promote a value-maximizing transaction. The Bidding Procedures are fair and flexible, giving the Debtors the ability to select a Stalking Horse Bidder (as defined herein) and provide reasonable Bid Protections (as defined herein), and giving all Bidders (as defined herein) appropriate latitude with respect to transactions that may be proposed with respect to the Debtors' assets. Moreover, the timeline proposed in the Bidding Procedures will allow the Debtors sufficient time to appropriately market the assets, receive and evaluate bids, execute one or more sale agreements, if necessary, hold an Auction (as defined herein) to determine the highest or otherwise best bid, and sell the assets, all while balancing the need to proceed expeditiously through the chapter 11 cases to reduce cash burn and preserve value. In sum, the marketing process, Bidding Procedures, and other matters contemplated herein will

promote an open, fair, and productive sale process in which interested parties will have the opportunity to submit proposals and bid on the assets in a manner that maximizes value for all stakeholders.

4.    The Debtors therefore request that the Court grant the relief requested herein.

## **Relief Requested**

5.    By this Motion, pursuant to sections 105, 363, 503, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"):

    a.    approving the proposed bidding procedures in connection with the sale or sales of all or substantially all of the Debtors' assets or any portion thereof (the "**Assets**") free and clear of liens, claims, encumbrances, and other interests (the "**Sale**"), in the form attached to the Bidding Procedures Order as **Schedule 1** (the "**Bidding Procedures**");

    b.    subject to final Court approval of the Stalking Horse Approval Order (as defined herein), authorizing, but not directing, the Debtors, in their discretion, to select one or more Stalking Horse Bidder(s) (as defined below) in accordance with the Bidding Procedures;

    c.    authorizing the Debtors to conduct an auction (the "**Auction**") and a hearing (the "**Sale Hearing**") to approve the Sale, if needed;

    d.    approving the form and manner of notice of the Bidding Procedures, Auction, and Sale Hearing with respect to the Sale, substantially in the form attached to the Bidding Procedures Order as **Schedule 2** (the "**Sale Notice**");

    e.    approving procedures for the assumption and assignment of executory contracts and unexpired leases (collectively, the "**Contracts**") in connection with the Sale (the "**Assumption and Assignment Procedures**"), and approving the form and manner of the notice thereof, substantially in the form attached to the Bidding Procedures Order as **Schedule 3** (the "**Cure Notice**"); and

    f.    granting other related relief.

6.    The Debtors also seek entry of an order with respect to any Sale (the "**Sale Order**") (a) authorizing and approving the Debtors' entry into a definitive purchase agreement substantially in the form that will be attached to the Sale Order (the "**Definitive Purchase Agreement**"),

(b) authorizing and approving the Sale of the Assets free and clear of all liens, claims, encumbrances, and other interests, (c) authorizing and approving the assumption and assignment of the Assumed Contracts (as defined herein) in connection with the Sale, including proposed cure amounts (if any), and (d) granting other related relief.  The Debtors will file a proposed Sale Order and Definitive Purchase Agreement (as defined herein) in advance of the hearing to consider the Sale Order.

### Jurisdiction, Venue, and Predicates for Relief

7.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference*, dated February 29, 2012 (Sleet, C.J.).  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these Chapter 11 Cases (as defined below) and this Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.

8.      The predicates for relief requested by this Motion are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006(a), 9006, 9007, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 3017-1, 6004-1, and 9006-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**").

9.      Pursuant to Local Bankruptcy Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order by the Court with respect to this Motion if it is determined that the Court lacks Article III jurisdiction to enter such final order or judgment absent consent of the parties.

### Background

10.     On June 27, 2023 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").  The Debtors have filed a separate procedural motion requesting that the Chapter 11 Cases be jointly administered.  The Debtors continue to operate their businesses and manage their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No creditors' committee has been appointed by the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), nor has a trustee or examiner been appointed in these Chapter 11 Cases.

11.　The Company develops, manufactures and sells electric vehicles ("**EVs**") primarily to commercial fleet customers.  It is one of the only original equipment manufacturers ("**OEMs**") in North America focused solely on light-duty electric vehicles for commercial fleet customers. The Company's flagship vehicle is the "Endurance," a full-size, all-electric pickup truck.  As of the Petition Date, with the Company still in its nascent stages, only approximately 65 Endurances have been manufactured, with a limited number of Endurances still in production.

12.　On November 7, 2019, the Company purchased General Motors' 6.2 million square foot automobile manufacturing facility (the "**Plant**") in Lordstown, Ohio.  Manufacturing operations at the Plant had ceased prior to the purchase.  The Company's business and vision for the Plant reinvigorated local industry.  On October 23, 2020, the Debtor entity now known as Lordstown EV Corporation ("**LEVC**," and then known as Lordstown Motors Corp.) completed a merger with a subsidiary ("**MergerSub**") of DiamondPeak Holdings Corp. ("**DiamondPeak**"),[2] pursuant to which MergerSub merged with and into LEVC, with LEVC surviving the merger as a wholly-owned subsidiary of DiamondPeak.  DiamondPeak is now known as Lordstown Motors Corp. ("**LMC**"), a Debtor in these Chapter 11 Cases.[3]

13.　In September 2021, the Company began a partnership with an affiliate of Hon Hai Precision Industry Co., Ltd., also known as Foxconn ("**Foxconn**"), the world's largest electronics

---

[2]　DiamondPeak Holdings Co., now known as Lordstown Motors Corp., incorporated in Delaware on November 13, 2018 as a blank check company for the purpose of effecting a business combination.

[3]　Lordstown EV Sales LLC was formed to sell vehicles directly to customers and is a subsidiary of LEVC, which is in turn a subsidiary of LMC.

manufacturer.  The purpose of the Foxconn partnership was to allow the Company to shift its business strategy from a vertically integrated OEM to a less capital-intensive model, focused on developing, engineering, testing, and industrializing EVs.  Since the inception of the partnership, however, Foxconn has repeatedly refused to honor its contractual promises to the Debtors. Foxconn has misled the Debtors about Foxconn's ability or willingness to proceed with joint product development plans and repudiated its promise to invest additional equity capital in the business.  Most recently, Foxconn has refused to complete its second purchase of common stock in accordance with the terms of the investment agreement between the Company and Foxconn. Foxconn's actions have damaged the Company's business relationships, employee morale and relations, and the Company's future prospects, stripping it of its ability to continue as a going concern absent a strategic chapter 11 transaction.

14.     The Debtors have filed these Chapter 11 Cases for the purpose of maximizing value for the benefit of their stakeholders given the ongoing, repeated breaches of contract and commitments by Foxconn.  Among other things, as part of these Chapter 11 Cases, the Debtors intend to pursue claims against Foxconn, commence a sales process for their assets, reduce their expenses, centralize and rapidly resolve claims, and, ultimately, distribute maximum value to creditors and—if sufficient—equity security holders under a chapter 11 plan.

15.     Additional factual background and information regarding the Debtors, including their business operations, their corporate and capital structure, their restructuring activities, and the events leading to the commencement of these Chapter 11 Cases, is set forth in detail in the *Declaration of Adam Kroll in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**").[4]

---

[4]     Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

**Proposed Sale Process**

16.     The Debtors seek approval of the Bidding Procedures to establish an open process for the solicitation, receipt, and evaluation of bids on a timeline that allows the Debtors to consummate a sale of their Assets efficiently and prior to confirmation of a chapter 11 plan.  In September 2021, the Company retained Jefferies to explore all market alternatives.  That process resulted in the sale of the Plant to Foxconn and the intent to form a joint venture with Foxconn. Starting in June 2022, Jefferies, in consultation with Foxconn, prepared a list of more than 50 potential investors and strategic original equipment manufacturing partners across the globe seeking potential acquirors and/or strategic partners for Lordstown to be contacted. Jefferies, the Company and Foxconn allocated responsibility to contact the potential investors and strategic OEM partners based upon who had the best relationship with the most relevant person at those companies.  While the Company, its advisors, and potential partners held numerous meetings and in-person evaluations of the Endurance, the Company did not receive any actionable indications of interest.

17.     Jefferies is conducting the marketing process as of the Petition Date to seek potential bidders to acquire some or all of the Debtors' Assets.  To that end, the Debtors and Jefferies have developed a list of Contact Parties whom they believe could be interested in, and would have the financial resources to consummate, a Sale.  The Debtors and Jefferies intend to distribute a teaser to the Contact Parties and facilitate access to diligence materials.  Such materials include a non-confidential presentation and, for those executing a non-disclosure agreement with the Debtors, access to a virtual data room, which will contain confidential presentation materials, additional legal, financial, operational, and other information on the Debtors and, as appropriate, meetings with the Debtors' management.

18.     The timeline set forth in the Bidding Procedures was calculated to balance the need to provide adequate notice and opportunities to diligence and develop bids to parties in interest and potential bidders with the need to conduct an efficient sale process.  The Bidding Procedures are designed to generate the highest or otherwise best recoveries to the Debtors' stakeholders by encouraging prospective bidders to submit competitive, value-maximizing bids for the Assets.  Specifically, the Debtors propose the following timeline for the consideration of transaction proposals, the Auction, and the Sale, which the Debtors may modify in accordance with the Bidding Procedures:

| **Event or Deadline** | **Date and Time[5]** |
|---|---|
| Hearing to consider entry of the Bidding Procedures Order | On or about July 17, 2023, or as soon thereafter as the Court's calendar permits |
| Indication of Interest Deadline | July 20, 2023 at 5:00 p.m. (ET) |
| Deadline for Debtors to file the Cure Notice | As soon as reasonably practicable after Indication of Interest Deadline |
| Deadline to object to the Cure Notice | Fourteen (14) calendar days after service of the Cure Notice at 4:00 p.m. (ET) |
| Stalking Horse Notice Deadline | August 17, 2023 at 5:00 p.m. (ET) |
| Deadline to object to the Stalking Horse Notice | Five (5) business days after the service of the Stalking Horse Notice at 4:00 p.m. (ET) |
| Bid Deadline | August 24, 2023 at 5:00 p.m. (ET) |
| Sale Objection Deadline | August 25, 2023 at 4:00 p.m. (ET) |
| Deadline for the Debtors to notify all Qualified Bidders of the highest or otherwise best Qualified Bid | August 29, 2023 |
| Auction (if required) | August 31, 2023 at 10:30 a.m. (ET) |
| Deadline for objection to Successful Bidder and adequate assurance of future performance | September 5, 2023 at 4:00 p.m. (ET) |
| Deadline to file replies in support of Sale | 4:00 p.m. (ET) on the date that is two (2) business days prior to the Sale Hearing |

---

[5]     All dates and deadlines are subject to Bankruptcy Rule 9006.

| Sale Hearing | On or about September 12, 2023 at [●] [●]. (ET), or as soon thereafter as the Court's calendar permits |
| --- | --- |

19.     The Debtors in their reasonable business judgment have determined that the Bidding Procedures are in the best interests of the Debtors' estates, will establish whether and to what extent any additional market for the Debtors' Assets exists, and provide interested parties with sufficient opportunity to participate.  The Auction will allow all interested parties a full and fair opportunity to present their best transaction proposals and the Debtors to consider such proposals on a definitive timeline that will not put the Debtors' confirmation schedule at risk.

**Proposed Bidding Procedures**

20.     The Debtors request authorization to conduct a marketing, auction, and sale process pursuant to the Bidding Procedures.  The Bidding Procedures are designed to maximize value for the Debtors' estates, while ensuring an expeditious resolution of the chapter 11 cases.  The Bidding Procedures describe, among other things, the procedures for interested parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of any ultimately Successful Bidders and the Back-Up Bidder, designation and approval of any Stalking Horse Bidder, Stalking Horse APA and Bid Protections, if one is designated, and the deadlines with respect to the foregoing.

21.     The Bidding Procedures are attached as **Schedule 1** to the Bidding Procedures Order.  The following describes certain of the key terms of the Bidding Procedures and discloses certain information required pursuant to Local Rule 6004-1:[6]

---

[6]     The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures and is provided for convenience purposes only.  To the extent any of the terms described below are inconsistent with the Bidding Procedures, the terms of the Bidding Procedures shall govern.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Bidding Procedures.

| **Summary of Bidding Procedures** | |
|---|---|
| **Qualifications to Access Diligence Materials and Participate in Bidding**<br><br>**Local Rule 6004-1(c)(i)(A)** | To participate in the bidding process and to receive access to due diligence materials (the "**Diligence Materials**"), a party must, to the extent not submitted prior to the approval of the Bidding Procedures, submit to the Debtors (i) an executed confidentiality agreement in form and substance satisfactory to the Debtors and (ii) reasonable evidence demonstrating the party's financial capability to consummate a transaction on terms sufficient to confirm and consummate the Sale (a "**Potential Transaction**") as determined by the Debtors in their reasonable business judgment. No party will be permitted to conduct any due diligence without entering into a confidentiality agreement.<br><br>A party who qualifies for access to Diligence Materials shall be a "**Potential Bidder**." The Debtors will afford any Potential Bidder the time and opportunity to conduct due diligence, as determined by the Debtors in their reasonable discretion and within the deadlines referenced above. All due diligence requests must be directed to Jefferies or such other party as the Debtors may designate in writing. Potential Bidders shall not, directly or indirectly, contract or initiate or engage in discussions in respect of matters relating to the Debtors or a Potential Transaction with any employee, officer, directors, independent contractors, customer, supplier, equity holder, or contractual counterparty of the Debtors without the prior written consent of the Debtors or Jefferies.<br><br>For the avoidance of any doubt, (a) the Debtors shall have no obligation to provide information to any Potential Bidder who, in the Debtors' reasonable business judgment, has not established or who has raised doubt that such Potential Bidder intends in good faith, or has the capacity to, consummate any Sale and (b) with respect to any Potential Bidder (i) that is a competitor or customer of the Debtors (or who is affiliated with any competitor or customer of the Debtors) or (ii) for which the Debtors determine, in their business judgment, that providing any diligence material would be detrimental to the Debtors, the Debtors may withhold or modify any diligence materials that the Debtors, in their sole discretion, determine are business-sensitive or otherwise inappropriate for disclosure to such Potential Bidder. Neither the Debtors nor their representatives shall be obligated to furnish Diligence Materials of any kind whatsoever to any person that is not determined to be a Potential Bidder. The Debtors shall inform the Consultation Parties[7] of any person or entity that becomes a Potential Bidder and shall consult with the |

---

[7]     The "**Consultation Parties**" shall be any statutory committee appointed in these chapter 11 cases (a "**Committee**"). Notwithstanding anything to the contrary contained in this Motion or the Bidding Procedures, the Debtors shall not be required to consult with a Consultation Party (or its advisors) that is actively participating as a Potential Bidder for the Assets.

| Summary of Bidding Procedures | |
|---|---|
| | Consultation Parties (a) with respect to any due diligence disputes that arise concerning any such entity and (b) prior to revoking due diligence access to any such entity. |
| **Communications With Potential Bidders**<br><br>**Local Rule 6004-1(c)(i)(A)-(B)** | Except to the extent otherwise indicated by the Debtors in writing, all substantive direct communications, including any diligence requests, from Potential Bidders and Qualified Bidders shall be through Jefferies (via email shall be acceptable), 520 Madison Avenue, New York, NY 10022, Attn.: Sean Costello (scostello@jefferies.com), Jeff Finger (jfinger@jefferies.com), Ryan Hamilton (rhamilton@jefferies.com), Kelly Pasekoff (kpasekoff@jefferies.com) and Kevin Lisanti (klisanti@jefferies.com). |
| **Stalking Horse Bidders**<br><br>**Local Rule 6004-1(c)(i)(C)** | **Designation of the Stalking Horse Bidder**.  The Debtors may, at any time prior to the Auction, subject to entry of a Stalking Horse Approval Order (as defined below) by the Court, designate one or more stalking horse bidder(s) (each, a "**Stalking Horse Bidder**"), whose Qualified Bid shall serve as the stalking horse bid for substantially all, or a portion of, the Assets of the Debtors (each, a "**Stalking Horse Bid**").    Any asset purchase agreement memorializing the proposed transaction set forth in a Stalking Horse Bid (each, a "**Stalking Horse APA**") shall be binding on the Stalking Horse Bidder and shall be subject to higher or otherwise better Qualified Bids.  If the Stalking Horse Bid is not selected as the Successful Bid, the Stalking Horse Bidder may still serve as the Back-Up Bidder, if its bid represents the second-highest or otherwise best bid after the Auction.  Notwithstanding any of the foregoing, the Debtors are not obligated to select any Stalking Horse Bidder and may proceed to the Auction without one.<br><br>**Timing of the Designation of the Stalking Horse Bidder**.  In the event that the Debtors designate one or more Stalking Horse Bidders and seek to enter into one or more Stalking Horse APAs on or prior to August 17, 2023, at 5:00 p.m. (prevailing Eastern Time) (the "**Stalking Horse Notice Deadline**"), the Debtors will file a notice that contains information about the Stalking Horse Bidder(s) (the "**Stalking Horse Notice**"), and serve the Stalking Horse Notice by email, where available, or otherwise by first class mail, to: (a) the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), (b) the Consultation Parties; (c) the Service Parties (as defined below); (d) all Contract Counterparties (as defined below); and (e) any other parties as directed by the Court (collectively, the "**Stalking Horse Notice Parties**")<br><br>The Stalking Horse Notice shall:  (a) set forth the identity of the Stalking Horse Bidder(s) (and if any Stalking Horse Bidder is a newly-formed entity, then the Stalking Horse Bidder's parent |

| Summary of Bidding Procedures |
|---|
| company or sponsor); (b) set forth the amount of the Stalking Horse Bid(s); (c) state whether any Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Stalking Horse Bid; (d) specify any proposed bid protections (the "**Bid Protections**"); (e) attach (i) the Stalking Horse APA(s), and (ii) if a form purchase agreement has been previously provided by the Debtors, a redline of the Stalking Horse APA against the form purchase agreement to reflect any proposed amendments and modifications to the form purchase agreement; (f) attach (i) a form of proposed sale order agreed to by the Stalking Horse and (ii) if a form sale order has been provided by the Debtors, a redline comparison against the Form Sale Order; (g) set forth the deadline to object to the Stalking Horse Bidder designation and any Bid Protections (which shall be five (5) business days after the service of the Stalking Horse Notice) (the "**Stalking Horse Objection Deadline**"); and (h) attach a form of proposed order approving the designation of the Stalking Horse Bidder, the Stalking Horse APA, and any Bid Protections (the "**Stalking Horse Approval Order**"). |

In the event the Debtors designate one or more Stalking Horse Bidders after the occurrence of the Stalking Horse Notice Deadline, but prior to the Auction, the Debtors may seek Court approval on an expedited basis of any Stalking Horse Bidder and Stalking Horse APA, including the Bid Protections, and the Debtors' rights are reserved to file such a motion at any time after the Stalking Horse Notice Deadline and prior to the Auction.

**Stalking Horse Objections**.  Objections to the designation of one or more Stalking Horse Bidders or any of the terms of a Stalking Horse Bid (a "**Stalking Horse Objection**") shall: (a) be in writing; (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (c) state, with specificity, the legal and factual bases thereof; and (d) be filed with the Court and served on the Stalking Horse Notice Parties and the proposed Stalking Horse Bidder within five (5) business days after the service of the Stalking Horse Notice.

If a timely Stalking Horse Objection is filed, the Debtors will schedule a hearing regarding such Stalking Horse Objection as soon as reasonably practicable seeking approval of such Stalking Horse Bid on or before August 28, 2023 (but in no event fewer than five (5) business days after the service of the Stalking Horse Notice).  If no Stalking Horse Objection is timely filed and served with respect to the Stalking Horse Bid, upon the expiration of the Stalking Horse Objection Deadline, the Debtors will submit to the Court an order under certification of counsel approving the designation of the Stalking Horse Bidder and Stalking Horse APA (the "**Stalking Horse Approval Order**"), which may be entered by the Court

| **Summary of Bidding Procedures** | |
|---|---|
| | without a hearing, including with respect to any Bid Protections set forth in the Stalking Horse Notice. |
| | Upon entry of the Stalking Horse Approval Order, the Debtors' obligation to pay the Bid Protections shall constitute, pursuant to section 503(b) of the Bankruptcy Code, an administrative expense claim against the Debtors' bankruptcy estates, and shall survive termination of the Stalking Horse APA.  In such case, the Bid Protections shall be payable by the Debtors to the Stalking Horse Bidder on the terms and conditions set forth in the Stalking Horse APA. |
| **Indication of Interest Deadline**<br><br>**Local Rule 6004-1(c)(i)(B)** | Any party interested in purchasing the Debtors' Assets shall submit a non-binding indication of interest (each, an "**Indication of Interest**") in writing, so as to be actually received on or before July 20, 2023 at 5:00 p.m. (prevailing Eastern Time) (as may be extended without notice or hearing by the Debtors, the "**Indication of Interest Deadline**") by (a) proposed counsel to the Debtors, (i) White & Case LLP, 200 South Biscayne Boulevard, Suite 4900, Miami, FL 33131, Attn: Thomas E. Lauria (tlauria@whitecase.com), Matthew C. Brown (mbrown@whitecase.com), and Fan B. He (fhe@whitecase.com), White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: David M. Turetsky (david.turetsky@whitecase.com) and Adam Cieply (adam.cieply@whitecase.com), and (ii) Richards, Layton, & Finger, P.A., 920 North King Street, Wilmington, DE 19801, Attn.: Kevin Gross (gross@rlf.com), Daniel J. DeFranceschi (defranceschi@rlf.com), Paul N. Heath (heath@rlf.com), Amanda R. Steele (steele@rlf.com), (b) the Debtors' proposed investment banker, Jefferies LLC, 520 Madison Avenue, New York, NY 10022, Attn.: Sean Costello (scostello@jefferies.com), Jeff Finger (jfinger@jefferies.com), Ryan Hamilton (rhamilton@jefferies.com), Kelly Pasekoff (kpasekoff@jefferies.com) and Kevin Lisanti (klisanti@jefferies.com), and (c) the Debtors' proposed restructuring advisors, Silverman Consulting, One North Wacker Drive, Suite 3925, Chicago, IL 60606, Attn.: Scott Kohler (skohler@silvermanconsulting.net) and Constadinos Tsitsis (ctsitsis@silvermanconsulting.net) (collectively, the "**Notice Parties**").<br><br>The Indication of Interest should (i) identify whether the party is interested in acquiring all or substantially all of the Assets or any number or combination of assets, and shall identify which Assets it intends to purchase, (ii) set forth a proposed purchase price for the proposed transaction, including by identifying separately any cash and non-cash components of the proposed transaction consideration, |

| Summary of Bidding Procedures | |
|---|---|
| | including any liabilities to be assumed and other forms of non-cash consideration acceptable to the Debtors in their sole discretion, (iii) identify any proposed conditions to closing the transaction, (iv) identify whether the party intends to serve as a Stalking Horse Bidder, (v) describe how the party proposes to finance the proposed transaction and any potential sources of financing, (vi) provide a summary of due diligence necessary to make a Bid, (vii) set forth the level and timing of review and approvals that the Indication of Interest has received within the party's organization, including any material preconditions to the consummation of the Transaction, and (viii) set forth contemplated timeline and interim requirements to complete the Transaction. <br><br> Indications of Interest should be submitted to the Debtors by the Indication of Interest Deadline.  Note that submitting an Indication of Interest by the Indication of Interest Deadline does not obligate the submitting party to submit a formal bid or to participate in the sale process and does not exempt the submitting party from also having to submit a Qualified Bid by the Bid Deadline to participate in the Auction, each as defined below. |
| **Bid Deadline and Auction Qualification Process** <br><br> **Local Rule 6004-1(c)(i)(B)** | To be eligible to participate in the Auction, a party must be a Potential Bidder and must submit an offer for a Potential Transaction (each, a "**Bid**" and the Potential Bidder that submits such Bid, a "**Bidder**"), in writing, so as to be **actually received on or before August 24, 2023 at 5:00 p.m.** (prevailing Eastern Time) (as may be extended without notice or hearing by the Debtors, the "**Bid Deadline**") by the Notice Parties.[8]  The Debtors shall provide to the Consultation Parties copies of each Bid received by the Debtors as soon as reasonably practicable following receipt of such Bid, but in no event later than the next business day following receipt. <br><br> All Bids must comply with the following requirements: <br><br> 1. fully disclose the identity of each entity that will be directly or indirectly participating in connection with such Bid, the complete terms of any such participation (including any agreements, arrangements, or understandings concerning a collaborative or joint bid or any other combination concerning the Bid), and the contact information of the |

---

[8]     The Debtors will also consider proposals to acquire any or all of the Assets in connection with the sale process.  Should any such proposal be received prior to the Bid Deadline that the Debtors, following consultation with the Consultation Parties, concludes is in the best interest of the estate and its stakeholders, then the Debtors reserve the right to postpone the Auction and proceed toward the confirmation of a plan.  Without limiting the foregoing, the Debtors also reserve the right, following consultation with the Consultation Parties, to consider such proposal as a Bid and to consider such a Bid in connection with any Auction.

| Summary of Bidding Procedures |
| --- |

specific person(s) whom the Debtors or their advisors should contact (including any equity holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating the proposed Sale) in the event that the Debtors have any questions or wish to discuss the Bid submitted by the Bidder.

2.  set forth (i) the purchase price to be paid by such Bidder and forms of consideration, including all cash and non-cash consideration, the Potential Bidder intends to use to pay such purchase price, which purchase price should be a single point value in U.S. Dollars for the total enterprise value of the Assets the Potential Bidder seeks to acquire on a cash-free, debt free basis and (ii) the value(s) in U.S. Dollars that the Potential Bidder ascribes to each component (including cash and non-cash consideration);

3.  provide evidence, in form and substance satisfactory to the Debtors, of its financial ability to consummate the Bid;

4.  state with specificity the Assets (including any specific executory contracts and unexpired leases) such Potential Bidder wishes to bid on and the liabilities and obligations (including any applicable cure costs) to be assumed by the Bidder in the Sale;

5.  provide, other than as may be exclusively applicable to any Stalking Horse Bidder, if designated, that the Bid is not subject to any bidding fee, break-up fee, termination fee, transaction fee, expense reimbursement or any similar type of reimbursement, and including an express waiver of any substantial contribution administrative expense claim under Section 503(b) of the Bankruptcy Code related to bidding for the Assets; *provided* that, in the event any Stalking Horse Bidder for all, substantially all, or any portion of the Assets is designated, all bids must provide consideration to the Debtors of at least the sum of (1) the applicable Stalking Horse Bid, (2) the amount of any Bid Protections, and (3) a reasonable minimum overbid amount equal to or greater than $100,000 or such other amount determined by the Debtors in consultation with the Consultation Parties over the Stalking Horse Bid;

6.  agree that the Bidder's offer is binding, unconditional, and irrevocable until three (3) business days after the closing of the Sale, except as may otherwise be specified in any binding agreement entered into between a Potential Bidder and the

| Summary of Bidding Procedures |
|---|

|  | Debtors; |
|  | 7. contain a commitment to close as soon as possible, but in no event later than September 29, 2023. The Debtors may consider a Bid that proposes to close after September 29, 2023, including if the Bidder commits to provide sufficient funding to cover the costs of administering these cases after such date. |
|  | 8. provide that such Bid is not subject to contingencies of any kind, including, without limitation, contingencies related to financing, regulatory approvals, shareholder, board or other internal approvals, or due diligence; |
|  | 9. include a written acknowledgment and representation that the Bidder: (a) has had an opportunity to conduct any and all due diligence regarding the Sale before making its offer; (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Sale in making its Bid; (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets, Sale, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's proposed form of definitive agreement; and (d) the Bidder did not engage in any collusive conduct with respect to any Bids, the Auction, or the Sale and acted in good faith in submitting its Bid; |
|  | 10. include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate or similar governance authorization of the Bidder to consummate the proposed Potential Transaction; provided that if the Bidder is an entity specially formed for the purpose of effectuating such Bid, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Bid by the equity holder(s) of such Bidder; |
|  | 11. agree that the sale of the Assets shall be on an "as is, where is" and "with all defects" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates, except to the extent agreed to by the Debtors; |
|  | 12. include a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Bidder's operations reasonably required to analyze issues arising with |

16

| Summary of Bidding Procedures |
|---|
| respect to any applicable antitrust laws and other applicable regulatory requirements; and |
|     13. provide that the Bidder agrees to serve as the Back-Up Bidder if the Bidder's Qualified Bid is the Back-Up Bid with respect to the relevant Assets through the Closing Date. |
| **Proposed Transaction Agreement**: Each Bid must be accompanied by (i) an executed purchase agreement in form and substance satisfactory to the Debtors (a "**Qualified Bid Purchase Agreement**"), and (ii) if a Stalking Horse APA has been entered into, or if the Debtors provide a form purchase agreement, a redline of the executed Qualified Bid Purchase Agreement to reflect any proposed amendments and modifications to the Stalking Horse APA or the form purchase agreement, as applicable, and the applicable schedules and exhibits. |
| **Adequate Assurance Information**: Each Bid must be accompanied by adequate assurance of future performance information (the "**Adequate Assurance Information"),** which may include (i) information demonstrating (in the Debtors' reasonable business judgment) that the Bidder has the financial capacity to consummate the proposed Sale, (ii) evidence that the Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid, and (iii) such additional information regarding the Bidder as the Bidder may elect to include. By submitting a Bid, the Bidders agree that the Debtors may disseminate their Adequate Assurance Information to affected counterparties to any contracts or leases potentially being assumed and assigned in connection with the Sale and the Consultation Parties in the event that the Debtors determines such bid to be a Qualified Bid. |
| **Good Faith Deposit**: Each Bid must be accompanied by (i) a deposit in the form of wire transfer, payable to the order of the Debtors, in the amount of ten percent (10%) of the total cash and non-cash consideration of the Bid (excluding the value of the liabilities and the obligations (including any applicable cure costs) to be assumed by the Potential Bidders in the Sale), which funds will be deposited, prior to the Bid Deadline, into an escrow account to be identified and established by the Debtors (a "**Good Faith Deposit"),** and (ii) written evidence, documented to the Debtors' satisfaction, that demonstrates the Bidder has available cash, a commitment for financing if selected as the Successful Bidder with respect to the relevant Assets (*provided, however,* that the closing shall not be contingent in any way on the Successful Bidder's financing) and such |

| Summary of Bidding Procedures | |
|---|---|
| | other evidence of ability to consummate the transaction(s) as the Debtors may request, including proof that such funding commitments or other financing are not subject to any internal approvals, syndication requirements, diligence or credit committee approvals (provided further that such commitments may have covenants and conditions acceptable to the Debtors). The Debtors reserve the right to increase the Good Faith Deposit for one or more Qualified Bidders (as defined below) in their sole discretion after consulting with the Consultation Parties. |
| **Qualified Bidder**<br><br>**Local Rule 6004-1(c)(i)(A)-(B)** | A Bid shall constitute a "**Qualified Bid**," and each Bidder that submits a Qualified Bid will be considered a "**Qualified Bidder**," if the Debtors determine that such Bid meets the qualifications set forth above.<br><br>Within three business days after the Bid Deadline, the Debtors will notify each Bidder whether such party is a Qualified Bidder.<br><br>Between the date that the Debtors notify a Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to improve the terms of the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.<br><br>Notwithstanding anything herein to the contrary, the Debtors reserve the right to work with (a) Bidders to aggregate two or more Bids into a single consolidated Bid prior to the Bid Deadline or (b) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualified Bid prior to the conclusion of the Auction. The Debtors reserve the right to cooperate with any Bidder to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid. The Debtors may accept a single Qualified Bid or multiple Bids that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders shall be treated as a single Qualified Bidder and their Bid a single Qualified Bid for purposes of the Auction). |
| **Auction**<br><br>**Local Rule 6004-1(c)(ii)** | If at least two Qualified Bids with respect to any particular Assets is received by the Bid Deadline, the Debtors will conduct the Auction to determine the highest or otherwise best Qualified Bid with respect to such Assets. If no Qualified Bid other than any Stalking Horse Bid is submitted by the Bid Deadline, the Debtors will not hold an Auction and will request at the Sale Hearing that the Court approve |

| **Summary of Bidding Procedures** | |
|---|---|
| | the Stalking Horse APA. If the Debtors elect not to conduct an Auction because the Debtors did not receive a Qualified Bid, then the Debtors shall file a notice with the Court of such election within one business day of the determination of such election by the Debtors. |
| | For the avoidance of doubt, any Stalking Horse Bid will be deemed a Qualified Bid and the Stalking Horse Bidder will be deemed a Qualified Bidder, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that a Potential Bidder must satisfy to be a Qualified Bidder. The Debtors shall inform the Stalking Horse Bidder of the Qualified Bids received and shall provide copies of the Starting Bid(s) (as defined below) no later than August 28, 2023 at 5:00 p.m. (prevailing Eastern Time). |
| | No later than August 28, 2023, the Debtors will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, as determined in the Debtors' business judgment (the "**Baseline Bid**"), and provide copies of the documents supporting the Baseline Bid to all Qualified Bidders. |
| | The Auction, if any, shall commence on August 31, 2023 at 10:30 a.m. (prevailing Eastern Time) (and may continue to such other date selected by the Debtors) via remote video or in-person. |
| | The Auction shall be conducted via remote video or in-person, at the Debtors' election. In the event the Debtors elect to conduct the Auction in-person, the Auction shall take place at the offices of White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020, or such other location as may be determined by the Debtors. By no later than the date that is two (2) business days before the Auction is scheduled to commence, the Debtors shall notify each party permitted to attend the Auction of whether the Auction will be conducted via remote video or in-person. |
| **Auction Procedures**<br><br>**Local Rule 6004-1(c)(ii)** | **Attendance**: Except as otherwise determined by the Debtors, only the following parties and their respective representatives and counsel shall be entitled to attend the Auction: (i) the Debtors; (ii) any Qualified Bidder; (iii) the U.S. Trustee; and (iv) any other creditor of the Debtors that delivers to Debtors' counsel a written request to attend the Auction (by email to andrea.kropp@whitecase.com) no later than 24 hours prior to the commencement of the Auction; *provided* that the Debtors reserve the right to retract their permission at any point during the Auction if the creditor does not act in good faith and in an orderly fashion during the Auction; *provided further* that the Debtors may, in their sole discretion, establish a reasonable limit on the number of advisors that may appear on behalf of each party. Only the Debtors and Qualified Bidders shall be permitted to |

| Summary of Bidding Procedures | |
|---|---|
| | participate in the Auction and only Qualified Bidders shall be entitled to make any Bids at the Auction. |
| | **<u>Conducting the Auction</u>**: The Debtors and their professionals shall direct and preside over the Auction and the Auction shall be transcribed.  Other than as expressly set forth herein, the Debtors may conduct the Auction in the manner they determine will result in the best offer.  The Debtors may modify the format of the Auction. |
| | Twenty-four hours before the start of the Auction, each Qualified Bidder and other party participating in the Auction shall identify one individual that will be its spokesperson at the Auction. |
| | Subject to the deadlines set forth herein, the Debtors reserve the right, in their reasonable business judgment, in consultation with the Consultation Parties, to make one or more continuances of the Auction. |
| | **<u>No Collusion</u>**: Each Qualified Bidder participating in the Auction must confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding, (ii) it has reviewed, understands, and accepts the Bidding Procedures, and (iii) its Qualified Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder. |
| **Overbids**<br><br>**Local Rule 6004-1(c)(ii)** | An "**Overbid**" is any Bid made at the Auction subsequent to the Debtors' announcement of the Baseline Bid.  To submit an Overbid for purposes of the Auction, a Bidder must comply with the following conditions: |
| | Any Bid submitted at the Auction must include the amount and form of consideration of the Bid.  Any Bid must remain open and binding on the Bidder.  During the course of the Auction, the Debtors shall, after submission of each Bid, promptly (as permitted by the circumstances) inform the Qualified Bidders of the terms of the previous Bids and inform the Qualified Bidders and state on the record which Bid reflects, in the Debtors' business judgment, the highest or otherwise best Bid and, in reasonable detail, the reasons for such determination.  If the Debtors determine that any submitted Bid is not higher or better, the Debtors shall promptly (as permitted by the circumstances) inform the Qualified Bidders and state on the record, in reasonable detail, the reasons for such determination. |
| | The Debtors shall announce at the Auction the material terms of each leading Bid, and the basis for determining that such Bid constitutes the leading Bid. |

| Summary of Bidding Procedures | |
|---|---|
| **Successful Bidder**<br><br>**Local Rule 6004-1(c)(ii)** | The Auction shall continue until there is only one Qualified Bid that the Debtors determine in their business judgment, in consultation with the Consultation Parties, to be the highest or otherwise best Qualified Bid.  Such Qualified Bid shall be declared the "**Successful Bid**" and such Qualified Bidder, the "**Successful Bidder**," at which point the Auction will be closed.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then prevailing highest or otherwise best Bid.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.<br><br>As soon as reasonably practicable after closing the Auction, the Debtors shall finalize definitive documentation to implement the terms of the Successful Bid.<br><br>Promptly following the Debtors' selection of the Successful Bid and the conclusion of the Auction, the Debtors shall announce the Successful Bid and Successful Bidder and shall file with the Court notice of the Successful Bid and Successful Bidder. |
| **Back-Up Bidder**<br><br>**Local Rule 6004-1(c)(i)(E)** | The Qualified Bidder with the next highest and otherwise best bid to the Successful Bid at the Auction, as determined by the Debtors, in the exercise of their reasonable business judgment, in consultation with the Consultation Parties, will be designated as the backup bidder (the "**Back-Up Bidder**").  The identity of the Back-Up Bidder and the amount and material terms of the Back-Up Bid (as defined below) shall be announced by the Debtors at the same time the Debtors announce the identity of the Successful Bidder.<br><br>The Back-Up Bidder shall be required to keep its initial Qualified Bid (or if the Back-Up Bidder submitted one or more Overbids at the Auction, the Back-Up Bidder's final Overbid (the "**Back-Up Bid**")) open and irrevocable until the closing of the transaction with the Successful Bidder.<br><br>If the Successful Bid is terminated for any reason prior to consummation of the transactions contemplated thereby, the Debtors will be authorized, without further order of the Court, to consummate the transaction contemplated by the Back-Up Bid with the Back-Up Bidder. |
| **Modification of Bidding Procedures**<br><br>**Local Rule 6004-1(c)(i)(D)** | The Debtors reserve their rights to: (i) determine whether a Bid is a Qualified Bid; (ii) determine which Bid at the Auction is the highest or otherwise best Bid; (iii) reject any Bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtors and their estates; (iv) waive terms and conditions set forth herein with respect to all |

| Summary of Bidding Procedures | |
|---|---|
| | Bidders; (v) impose additional terms and conditions at the Auction with respect to all Bidders; (vi) extend the key dates and deadlines set forth above; (vii) continue or cancel the Auction by filing a notice or in open court without further notice; (viii) modify the Bidding Procedures, as required to maximize the value of the Debtors' Assets, including as a result of market conditions, and (ix) implement additional procedural rules that the Debtors determine, in their business judgment, will better promote the goals of the bidding process and discharge their fiduciary duties and are not inconsistent with any Court order.<br><br>Without limiting the generality of the foregoing, the Debtors may announce on the record at the Auction additional procedural rules.<br><br>Any modification of Bidding Procedures shall not be inconsistent with the Bankruptcy Code, the Bidding Procedures Order, or any other order of the Bankruptcy Court entered in the Debtors' chapter 11 cases, and shall be disclosed to each Qualified Bidder.<br><br>For the avoidance of any doubt, notwithstanding anything to the contrary herein, no party that submits a Qualified Bid and participates in the Auction shall have any consultation rights with respect to the Auction outside the rights specifically enumerated in this paragraph. |
| **Consultation With Consultation Parties**<br><br>**Local Rule 6004-1(c)(i)-(ii)** | The Debtors shall consult with the Consultation Parties as explicitly provided for in these Bidding Procedures; *provided, however*, that the Debtors shall not be required to consult with any Consultation Party (or its advisors) regarding any particular issue, selection, or determination if the Debtors determine in good faith on advice of counsel that such consultation would be inconsistent with the exercise of their fiduciary duties or inappropriately disclose competitively sensitive information to such Consultation Party.<br><br>For the avoidance of any doubt, the Debtors shall not be required to consult with a Consultation Party (or its advisors) that is actively participating as a Potential Bidder for the Assets. |
| **Return of Good Faith Deposit**<br><br>**Local Rule 6004-1(c)(i)(B)(3)** | The Good Faith Deposits of all Qualified Bidders will be held in escrow and while held in escrow will not become property of the Debtors' bankruptcy estates unless released from escrow to the Debtors pursuant to terms of the escrow agreement, the applicable definitive agreement between the Qualified Bidder and the Debtors or otherwise pursuant to further order of the Court. At the closing of a Sale contemplated by a Successful Bid, the applicable Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit to the extent such a deposit was provided. The Good Faith Deposits of any Next-Highest Bidder shall be retained until three (3) business days after the applicable Closing Date. The Good Faith |

| Summary of Bidding Procedures | |
|---|---|
| | Deposits of any other Qualified Bidders will be returned as soon as practicable but no later than seven (7) business days following the Auction. |
| **Fiduciary Out** | Nothing in these Bid Procedures shall require the board of directors or such similar governing body of a Debtor to take any action, or to refrain from taking any action, with respect to these Bid Procedures or otherwise, to the extent such board of directors or such similar governing body determines that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations. |

### Notice Procedures

22.     The Debtors also request approval of the Sale Notice.  As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice, substantially in the form attached to the Bidding Procedures Order as **Schedule 2**, to be served on (a) the Service Parties (as defined below), and (b) any parties that have expressed written interest in pursuing a potential transaction in connection with the marketing process.  As soon as practicable following the entry of the Bidding Procedures Order, the Debtors shall cause the Sale Notice to be published in the national edition of *The Wall Street Journal* and *Automotive News.*  In addition, the Debtors will post the Sale Notice on the Debtors' restructuring website, http://kccllc.net/tlordstown.

23.     The Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Auction (if any), Sale Hearing, the assumption and assignment of the Assumed Contracts, and the Sale.  Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and no other or further notice of the Bidding Procedures, the Auction (if any), Sale Hearing, the assumption and assignment of the Assumed Contracts, and the Sale be required.

## **Assumption and Assignment Procedures**

24.     The Debtors are also seeking approval of the Assumption and Assignment Procedures set forth below to facilitate the fair and orderly assumption, assumption and assignment, or rejection of certain of the Debtors' Contracts in connection with the Sale.   The proposed Assumption and Assignment Procedures are as follows:

a.   **Cure Notice**.  As soon as reasonably practicable after the Indication of Interest Deadline, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, the notice attached as Schedule 3 to the proposed Bidding Procedures Order (the "**Cure Notice**"), on non-Debtor Contract counterparties (collectively, the "**Contract Counterparties**," and each, a "**Contract Counterparty**"), and post the Cure Notice to the case website (http://kccllc.net/tlordstown).  The Cure Notice shall list the Contracts that the Debtors determine, in their business judgment, are likely to potentially be assumed in connection with a Sale and any such other Contracts as the Debtors may determine to include in their business judgment.   For the avoidance of any doubt, the Debtors shall not be required to file any Cure Notice to the extent that the Debtors have not received any Indication of Interest indicating an intention to assume any Contracts. The Debtors may supplement the Cure Notice from time to time as necessary or desirable.

b.   **Content of Cure Notice**.  The Cure Notice shall notify the applicable Contract Counterparties that the Contracts may be subject to assumption and assignment in connection with the Sale, and contain the following information: (i) a list of the applicable Contracts that may be assumed and assigned in connection with the Sale (the "**Assumed Contracts**," each individually, an "**Assumed Contract**"); (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimate of the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Assumed Contract (the "**Cure Amounts**"); and (iv) the deadline by which any Contract Counterparty to an Assumed Contract must file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto; *provided* that service of a Cure Notice does not constitute an admission that such Assumed Contract is an executory contract or unexpired lease or that such Assumed Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid.

c.   **Cure Objections**.   Objections, if any, to a Cure Notice (each, a "**Cure Objection**") must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Amounts, state the cure amount alleged to be owed to the objecting Contract Counterparty,

together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court no later than 4:00 p.m. (prevailing Eastern Time) on the date that is fourteen (14) calendar days from date of the service of the Cure Notice, and be served on the Notice Parties.

d. **Effects of Filing a Cure Objection**.  A properly filed Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Assumed Contract at issue, and/or objection to the accompanying Cure Amounts, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in the Motion.

e. **Dispute Resolution**.  Any Cure Objection to the proposed assumption and assignment of an Assumed Contract or Cure Amounts that remains unresolved after the Sale Hearing, shall be heard at such later date as may be agreed upon by the parties or fixed by the Court.  To the extent that any Cure Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the reasonable discretion of the Debtors and the Successful Bidder.  To the extent a Cure Objection remains unresolved, the Contract may be conditionally assumed and assigned, subject to the consent of the Debtors and the Successful Bidder, pending a resolution of the Cure Objection after notice and a hearing. If a Cure Objection is not satisfactorily resolved, the Successful Bidder may determine that such Contract should not be assigned, in which case the Successful Bidder will not be responsible for any Cure Amounts in respect of such contract.

f. **Supplemental Cure Notice**.  If the Debtors discover Contracts inadvertently omitted from the Cure Notice or determine to supplement or modify an existing Cure Notice, or if the Successful Bidder identifies other Contracts that it desires to assume or assume and assign in connection with the Sale, the Debtors may, after consultation with the Successful Bidder (if any), at any time before the closing of the Sale supplement the Cure Notice with previously omitted Contracts or modifying a previously filed Cure Notice, including modifying the previously stated Cure Amounts associated with any Contracts (the "**Supplemental Cure Notice**").

g. **Objection to the Supplemental Cure Notice**.  Any Contract Counterparty listed on the Supplemental Cure Notice may file an objection (a "**Supplemental Cure Objection**") only if such objection is to the proposed assumption or assumption and assignment of the applicable Contracts or the proposed Cure Amounts, if any.  All Supplemental Cure Objections must: (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Amounts are required, if any; (ii) include appropriate documentation in support thereof; and (iii) be filed no later than 4:00 p.m. (prevailing Eastern Time) on the date that is 14 days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

h. **Dispute Resolution of Supplemental Cure Objection**.   If a Contract Counterparty files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Amounts, if any, and approve the assumption of the relevant Contracts.  If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Amounts and approving the assumption of any Contract listed on a Supplemental Cure Notice.

i. **No Cure Objections**.  If there are no Cure Objections or Supplemental Cure Objections, or if a Contract Counterparty does not file a Cure Objection or a Supplemental Cure Notice in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Amount, (i) the Cure Amounts, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract and the Cure Amounts, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Contract and rights thereunder, including the Cure Amounts, if any, and from asserting any other claims related to such Contract against the Debtors or the Successful Bidder, or the property of any of them.

### The Proposed Sale Order

25.     The Debtors anticipate that the Sale Order will contain certain provisions that require disclosure under Local Rule 6004-1. At this time, the Debtors makes the following statements:

a. Local Rule 6004-1(b)(iv)(A).  To the extent a proposed purchaser is an insider (within the meaning of section 101(31) of the Bankruptcy Code), the Debtors will make the necessary disclosures to the Court and take measures to ensure the fairness of the sale process and the proposed transaction.

b. Local Rule 6004-1(b)(iv)(B).  The Debtors do not presently have any agreement between any interested bidder and the Debtors' management or key employees. If any agreements are reached, the Debtors will make the necessary disclosures.

c. Local Rule 6004-1(b)(iv)(C).   To the extent that the Sale Order includes a release in favor of any entity, the Debtors will make the necessary disclosures.

d. Local Rule 6004-1(b)(iv)(D). If at least two Qualified Bids with respect to any particular Assets are received by the Bid Deadline, the Debtors will conduct an Auction to determine the highest or otherwise best Qualified Bid with respect to such Assets on August 31, 2023.

e. <u>Local Rule 6004-1(b)(iv)(E)</u>. The current contemplated Closing Date for the Sale is no later than September 29, 2023.

f. <u>Local Rule 6004-1(b)(iv)(F)</u>. The Debtors are requiring Qualified Bids to include a good faith deposit constituting ten percent (10%) of the total cash consideration of the bid.

g. <u>Local Rule 6004-1(b)(iv)(G)</u>. The Debtors do not currently have any interim management or other agreement with any party. If any agreements are reached, the Debtors will make the necessary disclosures.

h. <u>Local Rule 6004-1(b)(iv)(H)</u>. The Debtors are not seeking to release or allocate any sale proceeds without further order of the Court.

i. <u>Local Rule 6004-1(b)(iv)(I)</u>. The Debtors are not seeking to have the Sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code pursuant to this Motion.

j. <u>Local Rule 6004-1(b)(iv)(J)</u>. The Debtors will retain necessary books and records, copies thereof, or include as part of the Purchase Agreement appropriate access to such information, to enable them to administer the Chapter 11 Cases following any Sale.

k. <u>Local Rule 6004-1(b)(iv)(K)</u>. The Debtors may seek to sell avoidance actions.

l. <u>Local Rule 6004-1(b)(iv)(L)</u>. The Debtors are seeking to sell the Assets free and clear of successor liability claims. The Debtors may have unpaid prepetition unsecured claims after the closing of the Sale. No party would likely be willing to purchase the Debtors' Assets if it were at risk of liability for those claims under principles of successor liability.

m. <u>Local Rule 6004-1(b)(iv)(M)</u>. The Debtors are seeking to sell the Assets free and clear of all liens, claims, and encumbrances to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code.

n. <u>Local Rule 6004-1(b)(iv)(N)</u>. The Debtors does not seek to affect credit bidding pursuant to Bankruptcy Code section 363(k) in any manner.

o. <u>Local Rule 6004-1(b)(iv)(O)</u>. The Debtors are seeking relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) for any Sale, as further described below.

**Basis for Relief**

I.    **The Relief Sought in the Bidding Procedures Order Is in the Best Interest of the Debtors' Estates and Should Be Approved.**

26.    Section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). The statute "is a powerful, versatile tool . . . within the context of bankruptcy proceedings." *Joubert v. ABN Amro Mortg. Grp., Inc. (In re Joubert)*, 411 F.3d 452, 455 (3d Cir. 2005). Courts have relied upon section 105(a) to grant relief that would mitigate harm to the estates. *See Schlein v. Golub (In re Schlein)*, 178 B.R. 82, 86 (Bankr. E.D. Pa. 1995) (granting relief under section 105(a) in order to spare the parties from "the painful, expensive and lengthy legal odyssey" that was predicted to occur if denied). Courts have also relied on section 105(a) in granting relief necessary to ensure the efficient and expeditious administration of bankruptcy estates. *See, e.g.*, *In re Raytech Corp.*, 222 B.R. 19, 24-25 (Bankr. D. Conn. 1998); *In re Johns-Manville Corp.*, 68 B.R. 618, 625 (Bankr. S.D.N.Y. 1986).

27.    Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.' If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale." (*quoting In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business

justification' (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (*quoting In re Schipper*); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992).

28.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Adams Res. Expl. Corp.*, No. 17-10866 (KG), at 12 (Bankr. D. Del. 2017) ("The relief requested in the Sale Motion. . . . is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate, and its creditors."); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate."); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").  To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions.  *See*, *e.g.*, *In re Dura Auto. Sys.*, 379 B.R. 257, 263 (Bankr. D. Del. 2007); *Integrated Resources*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets").

29.     Here, the Bidding Procedures will promote active bidding from interested parties and will elicit the highest or otherwise best offers available for the Assets.  The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the value realized by these estates from the Sale.  Specifically, the Bidding Procedures contemplate an open auction process and provide Potential Bidders with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.  The Bidding Procedures also ensure that the Debtors will have adequate information and the opportunity to consider any

competing proposals and to select, in their reasonable business judgment, the transaction that would be in the best interests of the Debtors and their stakeholders.

30.     Moreover, it is well-settled that, where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction").  This is especially true here, where the sale of the Assets has will be scrutinized by the Debtors and their proposed investment banker, Jefferies.  Moreover, having the option to enter into a Stalking Horse Agreement with one or more Stalking Horse Bidder ensures that the Debtors retain flexibility to set a minimum purchase price for the Assets that will be tested by the marketplace.  As such, the Debtors and their creditors and stakeholders can be assured that, taking into account the financial condition of the market and the economy, the consideration obtained will be fair and reasonable and at or above market.

31.     The proposed Bidding Procedures will encourage competitive bidding and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  Accordingly, the Court should enter an order approving the Bidding Procedures.

## II.     The Debtors Have a Sound Business Purpose For Designating a Stalking Horse Bidder and Providing Bid Protections

32.     The Debtors are also seeking authority to designate one or more Stalking Horse Bidders and offer Bid Protections to each such Stalking Horse Bidder.  The use of a stalking horse in a public auction process for sales is a customary practice in chapter 11 cases, as the use of a

stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Interforum Holding LLC*, 2011 WL 2671254 at *1 n. 1. Stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id.* (citation omitted). Thus, the use of bidding protections has become an established practice in chapter 11 cases.

33.     Indeed, break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted in chapter 11: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value." *Integrated Res*., 147 B.R. at 659-60 (emphasis in original). Specifically, bid protections "may be legitimately necessary to convince a `white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); *see also Integrated Res*., 147 B.R. at 660-61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

34.     As a result, courts in this jurisdiction routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) ("In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010).

31

The allowance of Bid Protections, in the event that the Debtors execute a Stalking Horse Agreement, is in the best interests of the Debtors' estates and their creditors, as any Stalking Horse Agreement will establish a floor for further bidding that may increase the consideration given in exchange for the Assets, which will inure to the benefit of the Debtors' estates.

35.     The Debtors believe that the Bid Protections are necessary to attract and retain a Stalking Horse Bidder. Any Bid Protections will be negotiated through back-and-forth, arm's length negotiations. By inducing the Stalking Horse Bidder to hold its offer open as a baseline from which other potential bidders can submit higher or better offers, the Bid Protections will serve to encourage more competitive bidding, which will hopefully increase the purchase price of the Assets.  As such, the Bid Protections will, among other things, enable the Debtors to maximize the value of their estates for the benefit of all economic stakeholders in these chapter 11 cases.  *See e.g.*, *In re PES Holdings, LLC*, 19-11626 (KG) (Bankr. Del. Nov. 14, 2019) (pre-approving bid protections in an amount of up to 3% of the proposed purchase price).

36.     If the Court does not approve the Bid Protections, the Stalking Horse Bidder, to the extent one may otherwise exist, may elect not to serve as the stalking horse, to the detriment of the Debtors' estates.  Further, if the Bid Protections were to be paid, it will be because the Debtors have received higher or otherwise superior offers for the assets.  In short, the proposed Bid Protections are fair and reasonable under the circumstances because they constitute a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662 (quoting 995 Fifth Ave., 96 B.R. at 28).  The Bid Protections are a sound exercise of the Debtors' business judgment and are in the best interests of the Debtors, their estates, and all stakeholders. Accordingly, the Court should approve Bid Protections.

III.    **The Court Should Approve the Debtors' Entry Into a Definitive Purchase Agreement Because the Sale Is a Sound Exercise of the Debtors' Business Judgment**

37.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets so long as they can articulate a sound business justification for doing so.  *See*, *e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983).

38.    The business judgment rule shields a debtor's management's decisions from judicial second-guessing.  Once a debtor articulates a valid business justification for its actions, courts should "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose."  *In re Global Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (citing *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 n.17 (Del. 1994)); *Integrated Resources*, 147 B.R. at 656 (presuming, based on the business judgment rule, "that in making a business decision the directors of [the debtor] acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company") (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

39.    Based on this rationale, courts have authorized a debtor's sale of assets as a sound exercise of business judgment under section 363 of the Bankruptcy Code.

### A.    A Sound Business Purpose Exists For the Sale

40.    The Bidding Procedures are designed to test the market and foster an open, fair, and competitive process for the Debtors' Assets.  Moreover, any Stalking Horse Bidder and Stalking Horse APA will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. Consequently, the ultimately successful bid, after being subject to a further "market check" in the form of the Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

41.    Thus, the Definitive Purchase Agreement of the Successful Bidder, will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  As such, the Debtors' determination to sell the Assets through the open and fair process contemplated by the Bidding Procedures, and to enter into the Definitive Purchase Agreement with the Successful Bidder will be a valid and sound exercise of the Debtors' business judgment.  Therefore, the Debtors request that the Court authorize the proposed Sale as a proper exercise of the Debtors' business judgment.

### B. The Sale Should be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code

42. Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U .S.C. § 363(f).

43. Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Sale free and clear of all liens, security interests, pledges, charges, defects, or similar encumbrances (collectively, "**Encumbrances**"), except with respect to any Encumbrances that may be assumed Encumbrances under the Definitive Purchase Agreement of the Successful Bidder. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

44. Any Encumbrance that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such Encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto. The Debtors accordingly request authority to convey the Assets to the Successful Bidder free and clear of all Encumbrances, including liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

**IV.    The Court Should Approve the Form of Sale Notice**

45.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein.  As required under Bankruptcy Rule 2002(b), the Debtors seek approval of the Sale Notice as proper notice of the Auction and Sale Hearing.  Notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, as provided for herein, constitutes adequate notice of the Auction and Sale Hearing and the proceedings in compliance with, and satisfaction of, the requirements of applicable Bankruptcy Rules.  Accordingly, the Debtors request that the Court approve the form and manner of the Sale Notice.

**V.    The Assumption and Assignment Procedures Are Appropriate and Should Be Approved.**

    **A.    The Assumption and Assignment of the Assumed Contracts reflects the Debtors' Reasonable Business Judgment.**

46.    To facilitate and effectuate the Sale, the Debtors are seeking authority to assign or transfer the Assumed Contracts to the Successful Bidder to the extent required by such Successful Bidder.  Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court; provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See*, *e.g.*, *Richmond Leasing*, 762

F.2d at 1309 (applying a business judgment standard to debtor's determination to assume unexpired lease).

47.     As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assumed Contract be deemed to consent to the assumption and assignment of the applicable Assumed Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the Cure Notice.  *See*, *e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

48.     Here, the Court should approve the decision to assume and assign the Assumed Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment.  First, the Assumed Contracts are essential to the value of the Assets and, as such, they are essential to inducing the highest or otherwise best offer for the Assets.  Second, it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the contracts and leases needed to conduct business and manage day-to-day operations of the Assets were included in the transaction. Third, the Assumed Contracts will be assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

49.     Accordingly, the assumption and assignment of the Assumed Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of the Debtors' business judgment.

B.    **The Assumption and Assignment of the Assumed Contracts reflects the Debtors' Reasonable Business Judgment.**

50.    Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

51.    The statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults. The Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-Debtor parties.

C.    **Non-Debtor Parties Will Be Adequately Assured of Future Performance**

52.    Similarly, the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*,

166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

53.     The Debtors will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Successful Bidder will be satisfied.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder or Successful Bidder (e.g., financial credibility, willingness, and ability of the interested party to perform under the Assumed Contracts), including as it relates to such Qualified Bidder's willingness, and ability to perform under the Assumed Contracts assigned to the Successful Bidder.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Assumed Contracts or proposed cure amounts.  The Court therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Assumed Contracts as set forth in the Definitive Purchase Agreement of the Successful Bidder.

## Notice

54.     Notice of this motion has been provided to the following parties, or, in lieu thereof, their counsel:  (i) the U.S. Trustee; (ii) Foxconn; (iii) holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (iv) the Internal Revenue Service; (v) the Securities and Exchange Commission; (vi) the United States Attorney for the District of Delaware; (vii) the state attorneys general for all states in which the Debtors conduct business; (viii) any

parties who have asserted liens against the Debtors' assets; and (ix) any such other party entitled to receive notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Service Parties**").  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

### WAIVER OF BANKRUPTCY RULE 6004(h) AND 6006(d)

55.    To Debtors request that, upon entry of the Sale Order, the 14-day stay under Bankruptcy Rule 6004(h) and 6006(d) be waived.  Such waiver is warranted here to permit the Sale to close expeditiously.

### Conclusion

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this motion and such other and any further relief as is just and proper.

Dated: June 27, 2023

Respectfully submitted,

/s/ *Amanda R. Steele*

**RICHARDS, LAYTON & FINGER, P.A.**

Kevin Gross (No. 209)
Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Amanda R. Steele (No. 5530)
Jason M. Madron (No. 4431)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
gross@rlf.com
defranceschi@rlf.com
heath@rlf.com
steele@rlf.com
madron@rlf.com

*Proposed Co-Counsel to Debtors and
Debtors-in-Possession*

**WHITE & CASE LLP**

Thomas E Lauria (*pro hac vice* application pending)
Matthew C. Brown (*pro hac vice* application pending)
Fan B. He (*pro hac vice* application pending)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
tlauria@whitecase.com
mbrown@whitecase.com
fhe@whitecase.com

David M. Turetsky (*pro hac vice* application pending)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
david.turetsky@whitecase.com

Jason N. Zakia (*pro hac vice* application pending)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
jzakia@whitecase.com

Roberto Kampfner (*pro hac vice* application pending)
Doah Kim (*pro hac vice* application pending)
RJ Szuba (*pro hac vice* application pending)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700
rkampfner@whitecase.com
doah.kim@whitecase.com
rj.szuba@whitecase.com

*Proposed Co-Counsel to Debtors and
Debtors-in-Possession*