IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>LORDSTOWN MOTORS CORP., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-10831 (MFW)<br><br>Jointly Administered<br><br>**Obj. Deadline: July 19, 2023, at 4:00 p.m. (Eastern)**<br>**Hearing Date**: July 27, 2023, at 9:30 a.m. (Eastern) |

### KARMA AUTOMOTIVE LLC'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Karma Automotive LLC ("Karma"), respectfully moves this Court for relief from the automatic stay to complete the now-stayed trial against Lordstown Motors Corp., ("Debtor"), in the United States District Court for the Central District of California ("District Court"), Case No. 20-cv-02104 ("District Court Case"). In support of the Motion, Karma states as follows:

### INTRODUCTION

1. Karma is an electric vehicle company based in Irvine, California. Karma commenced the District Court Case on October 30, 2020 based on well-documented claims that Debtor and eleven (11) of its current and former officers, executives, engineers, contractors and related entities (collectively, the "Individual Defendant(s)") engaged in a scheme to poach Karma's employees and willfully and maliciously misappropriate the confidential designs and computer code for Karma's infotainment system in order to expedite development of its long-delayed sole product – an electric vehicle called the Endurance. Karma seeks $913,235,982 in damages (plus fees, costs, and punitive damages) and injunctive relief against based on claims

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corp. (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101). The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

00053253.4

including willful and malicious misappropriation of trade secrets, violation of the computer fraud and abuse act, and breach of contract. After nearly three years of contentious litigation, discovery involving millions of documents, more than 50 depositions, and dozens of pretrial motions including summary judgment, the District Court set a multi-week jury trial commencing on September 5, 2023.

2. Debtor commenced this bankruptcy case on June 27, 2023. The Individual Defendants have not filed for bankruptcy protection. Nevertheless, on June 27, 2023 the District Court orally stayed the entirety of the District Court Case. For the reasons more fully explained below, the Bankruptcy Court should grant Karma relief from the automatic stay under Bankruptcy Code section 362 so that the upcoming trial in the District Court Case can be completed and include both Debtor and the Individual Defendants.

## JURISDICTION

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this case is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(1) and (b)(2)(A), (G), and (O).

4. The statutory predicate for the relief is section 362(d)(1) of title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by Rule 4001 Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). Pursuant to Local Rule 9013-1(f), Karma consents for purposes of this Motion to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent

of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

A. **The Parties in the District Court Case.**

5. Karma manufactures luxury electric vehicles, components, hardware, and software and maintains its principal place of business in Irvine, California. Karma is licensed to conduct business in California, and conducts business throughout the United States.

6. Debtor manufactures electric vehicles and maintains its principal place of business in Lordstown, Ohio and also conducts business in Michigan and California.

7. The Individual Defendants are residents of the States of California, Ohio, and North Carolina and include Debtor's former Chief Executive Officer, Debtor's former Chief Operations Officer, Debtor's former Chief Technology Officer, Debtor's former Chief Production Officer, and several current and former Debtor employees.[2]

B. **Debtor and the Individual Defendant's Misappropriation of Karma's Trade Secrets.**

8. As of 2019, Debtor had yet to finalize a working vehicle for sale to the public, was under increasing scrutiny for its failure to do so and became subject to an investigation by the Securities and Exchange Commission for misrepresentations about alleged "pre-orders" for its products.[3]

9. Faced with pressure from investors, regulatory authorities, and the general public about its significant development and production delays, Debtor decided to take a shortcut and

---

[2] There is also one other corporate defendant – Punak Engineering, Inc., a California coporatoion, which is owned by Stephen Punak, one of the Individual Defendants.

[3] Debtor is now subject to a litany of securities class actions and stockholder derivative lawsuits. *See* Debtor's First Day Declaration [Dkt. No. 15, ¶¶ 54-57].

steal Karma's trade secrets. By doing so, Debtor hoped to avoid—in the words of its own executives—millions of dollars in costs, and months if not years of development time.

10. Debtor accomplished its theft by approaching Karma in 2019 about a partnership. In the high-tech and highly-competitive electric vehicle industry, the "infotainment" systems offered by manufacturers are a key distinguishing feature and selling point. The infotainment system collects, displays, and allows a driver to interact with all of the vehicle's informational and entertainment systems, often through a prominently-placed interactive touch-screen contained in the vehicle's front dash. Karma has years of experience developing cutting-edge infotainment systems, and Debtor desperately needed one. When it approached Karma, Debtor claimed to be interested about entering into a development partnership with Karma for an infotainment system.

11. Through that feigned interest, Debtor entered into a five-month "due diligence" with Karma's engineering and project management staff, culminating in a fraudulent "letter of intent," and a promise by Debtor to issue payments to Karma in short order.

12. The courtship was a ruse and the promised check never arrived. Instead, Debtor used those five months to begin poaching and onboarding key Karma employees, and to steal Karma's confidential information and trade secrets—not just about the infotainment system being developed, but *about every aspect of Karma's business*. This included software source code, bills of materials with confidential price and part numbers, highly technical system and software requirement documents outlining in detail Karma's electrical architecture and power moding system, and Karma's entire highly confidential product development system.

13. Debtor pulled out of the fake deal at the last minute and, almost overnight, set up its own infotainment team (which never existed before) in California (where Debtor had no presence prior) in order to save itself millions in immediate development costs. Indeed, just a few

days before cancelling its project with Karma, and without telling Karma, Debtor hired and on-boarded Individual Defendant Roger J. "Joe" Durre ("Durre") - Karma's Director of Engineering. Yet despite becoming an employee of Debtor, and of course without disclosing that fact to Karma, Durre continued to work as an employee of Karma for nearly a month. As an agent for Debtor during the weeks in which he was employed by both entities, Durre downloaded and copied electronic files containing Karma's trade secrets and confidential information, then permanently deleted thousands of files from Karma's computer system in an effort to hinder Karma's own development plans.

14. Debtor and the Individual Defendants were at all times aware of the illegal nature of their actions. Debtor's executives acknowledged in their internal communications that what they were doing was wrong and would lead to lawsuits once their conduct was uncovered. On August 6, 2020, Individual Defendant Darren Post – Debtor's Chief Technology Officer – emailed another Debtor executive (Jonathan Wood), explaining: "I hired Joe Durre but it must never be mentioned to Karma. He is on vacation and technically still with Karma, so if he is on a call with Karma people involved, treat him like Karma. To avoid lawsuits, we must not let Karma know – they will find out on their own several months from now."

15. Debtor was wildly successful in its efforts to steal Karma's trade secrets and confidential information. Discovery in the District Court Case demonstrates that Debtor and the Individual Defendants stole, among other things, thousands of documents reflecting the technology outlined above and subsequently incorporated that technology into Debtor's own documents for the development of Debtor's Endurance electric pickup truck, which Debtor began to sell in the fourth quarter of 2022. Among the documents that Debtor stole were highly confidential technical

system requirement documents and stand-alone diagrams that their employees and executives copied *word-for-word* and later passed off internally and to third parties as their own.

16. In short, Debtor lied about its interest in a joint development deal to further gain access to Karma's trade secrets, and to understand which of Karma's employees could most directly aid Debtor by stealing Karma's trade secrets and ideas. Debtor then backed out of the joint development deal, stole Karma's intellectual property, and poached Karma's employees in order to save money and time. The cancelled project was projected to bring in more than $3 billion in revenue to Karma by 2024.

17. Worse yet, Karma's valuable trade secrets continue to be used and remain in the possession of not just Debtor, but also in the possession of the Individual Defendants, some of whom downloaded thousands of files containing Karma's trade secrets and confidential information to external storage devices while working for Karma.

C. **The District Court Case.**

18. Karma filed the District Court Case on October 30, 2020. (Dist. Ct. Dkt. No. 1). On April 20, 2021, Karma filed an amended complaint ("Complaint") which included 28 counts and a request for injunctive relief. (Dist. Ct. Dkt. No. 72).

19. Karma, Debtor, the Individual Defendants have exchanged a combined 12.5 million individual documents in discovery - a figure that does not include the tens of millions of lines of source code that were also produced in discovery – and have taken a total of 54 depositions, including those of expert witnesses, totaling several hundred hours of sworn testimony. Discovery in the District Court Case has been contentious and Debtor has been twice sanctioned by the District Court for misconduct. (Dist. Ct. Dkt. Nos. 159, 189).

20. The parties filed dozens of pretrial motions, including a lengthy motion for summary judgment filed by Debtor and the Individual Defendants that involved hundreds of pages

of the factual record, as well as, motions in limine. The District Court has ruled on all of the pretrial motions including summary judgment. The District Court has also approved the final pretrial order, which includes thousands of trial exhibits identified by the parties. To date, Karma, Debtor, and the individual defendants have identified ten (10) expert witnesses who are expected to testify at trial, along with an undetermined number of fact witnesses.

21. The trial was previously scheduled to commence in April 2023. However, due to a health issue requiring the substitution of one of Defendants' expert witnesses, the District Court reset the commencement date for the trial to September 5, 2023. (Distr. Ct. Dkt. Nos. 510, 513). Each side will have 26.5 hours for all direct and cross examinations, excluding voir dire, opening statements, and closing statements. (Distr. Ct. Dkt. No. 437, ¶ 3). Except for limited discovery and motion practice related to Debtor's replacement expert witness, the case is essentially ready to proceed to trial.

D. **Debtor's Bankruptcy Filing.**

22. Debtor commenced this bankruptcy case on June 27, 2023 ("Petition Date"). Despite being omitted from Debtor's List of 30 Largest Creditors (Dkt. No. 1), Karma is the largest creditor of Debtor's estate by virtue of its damages claim in excess of $900 Million asserted in now-stayed litigation against Debtor in the District Court.

23. On June 27, 2023, Debtor filed a Suggestion of Bankruptcy in the District Court Case (Distr. Ct. Dkt. No. 537) which incorrectly asserted that the automatic stay also applied to the Individual Defendants. Based in part on Debtor's misrepresentation, the District Court orally stayed the entirety of the District Court Case on June 27, 2023, but did not vacate the September 5, 2023 trial date in order to permit Karma to seek relief from the automatic stay. After Karma brought Debtor's misstatement to this Court's attention, this Court ordered Debtor to withdraw or amend the Suggestion of Bankruptcy. On June 28, 2023, Debtor filed an Amended Suggestion of

Bankruptcy correcting the prior misstatement regarding the scope of the automatic stay. (Distr. Ct. Dkt. No. 540). To date, none of the Individual Defendants has filed for bankruptcy protection.

24. Debtor has also filed a Sale Procedures Motion proposing a September 2023 sale of all of Debtor's assets – presumably including Karma's stolen intellectual property. (Dkt. No. 16). The Sale Procedures Motion is set for hearing on July 27, 2023. (Dkt. No. 73). Karma intends to object to Debtor's proposed sale to the extent it potentially includes any of Karma's trade secrets.

## ARGUMENT

### I. "CAUSE" EXISTS FOR THE COURT TO MODIFY THE AUTOMATIC STAY.

25. Bankruptcy Code section 362(d) allows the court to grant relief from the automatic stay "for cause." *See* 11 U.S.C. § 362(d). "Cause is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." *In re Tribune Co.*, 418 B.R. 116, 126 (Bankr. D. Del. 2009) (citing *In re SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007)). The *Tribune Co.* Court noted that:

> The legislative history to section 362(d)(1) emphasizes the section's applicability to proceedings in another tribunal. "It will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from duties that may be handled elsewhere." H.R.Rep. No. 595, 95th Cong., 1st Sess., 341 (1977), U.S. Code & Admin. News 1978, pp. 5787, 5297. Most courts follow this logic and apply an equitable balancing test to determine if cause exists to lift the stay to allow pending litigation to proceed or continue in another forum.

*Id.* (citation omitted).

26. Delaware bankruptcy courts generally rely upon the following three-pronged balancing test to determine whether "cause" exists for granting relief from the stay to continue litigation:

>   (a) whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit;
>
>   (b) whether the hardship to the nonbankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor, and
>
>   (c) whether the creditor has a probability of prevailing on the merits.

*Id*. "[T]his analysis ultimately boils down to a common-sense judgment about whether it makes good sense to have the case proceed in the court where it was pending as opposed to being heard in the bankruptcy court." *Medical Tech. Assocs. II, Inc., v. Carl W. Rausch and World Tech. East II, Limited (In re Medical Tech. Assocs. II, Inc.,)*, Case No. 22-10534 (CTG), Adv. Pro. No., 22-50389 (CTG) (Bankr. D. Del. Nov. 2, 2022). Accordingly, cause exists to modify the stay in instances where discovery is nearly complete and the case is near the start of trial. *Id*. (citing *In re Rexene Products Co.*, 141 B.R. 574, 577 (Bankr. D. Del. 1992)).

27. After the moving party establishes a *prima facie* case that cause exists to modify the stay, the burden then shifts to the debtor to prove that it does not. *Id*. at 127.

28. For the reasons explained below, "cause" exists pursuant to Bankruptcy Code section 362(d) to modify the automatic stay to permit Karma to complete the September 2023 trial before the District Court.

   **A.    Completion of the District Court Case Trial Will Not Prejudice Debtor.**

29. Modifying the automatic stay to permit the District Court Case to conduct the trial will not prejudice Debtor.

30. In determining "whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit," Delaware bankruptcy courts look to the purpose of the automatic stay:

to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.

*Tribune Co.*, 418 B.R. at 127 (internal quotes and citations omitted). This criteria makes clear that Debtor will suffer no prejudice by permitting the trial to proceed.

31. First, Karma will not gain any preference because Karma is only seeking to modification of the stay to complete the trial and obtain a final, non-appealable judgment. This would not include collection or enforcement of any judgment against Debtor or Debtor's property.

32. Second, Debtor will not be prejudiced because the legal and factual issues presented in the District Court Case – Debtor's ownership and right to continue to use the intellectual property underlying the infotainment system – must be decided, either before this Court or the District Court before Debtor is able to sell its assets. *In re Scarborough-St. James Corp.*, 535 B.R. 60, 68 (Bankr. D. Del. 2015). These issues are ready for trial before the District Court. Therefore, modification of the stay to permit the trial would actually benefit Debtor's estate by reducing the legal fees that will be incurred in resolving these issues.

33. Third, modifying the stay will not interfere with administration of Debtor's case. On the contrary, as stated above, the legal and factual issues in the District Court Case must be decided in order for Debtor's proposed sale to proceed so modification of the stay would materially advance Debtor's bankruptcy case. Moreover, few if any, of Debtor's current officers and directors are not parties or witnesses in the District Court Case so it will not distract from management of Debtor's affairs. Finally, Debtor has separate counsel in the District Court Case so Debtor's bankruptcy counsel will not be "distracted" from focuses on the bankruptcy case.

34. Therefore, modifying the automatic stay will not prejudice Debtor.

### B. If the Stay is Maintained the Hardship to Karma Would Significantly Outweigh any Hardship to Debtor if the Stay is Lifted.

35. With respect to the second factor, the hardship to Karma by maintenance of the automatic stay would considerably outweigh the hardship to Debtor. Where the stayed non-bankruptcy litigation has reached an advanced stage, courts have shown a willingness to lift the stay to allow the litigation to proceed because the hardship of keeping the stay in place would outweigh any hardship on Debtor of concluding the litigation. *Medical Tech. Assocs. II, Inc., v. Carl W. Rausch and World Tech. East II, Limited (In re Medical Tech. Assocs. II, Inc.,)*, Case No. 22-10534 (CTG), Adv. Pro. No., 22-50389 (CTG) (Bankr. D. Del. Nov. 2, 2022) (citing *In re Rexene Products Co.*, 141 B.R. 574, 577 (Bankr. D. Del. 1992)). "The attention paid to the stage to which the non-bankruptcy litigation has progressed is based on the sound principle that the further along the litigation, the more unfair it is to force the plaintiff suing the debtor-defendant to duplicate all of its efforts in the bankruptcy court." *IBM v. Fernstrom Storage and Van Co. (In re Fernstrom Storage and Van Co.)*, 938 F.2d 731, 737 (7th Cir. 1991) (internal citations omitted).

36. Here, the District Court Case is ready for a jury trial that involves claims against non-debtor Individual Defendants who are likely beyond this Court's jurisdiction. As such, maintaining the stay as to Debtor would require Karma to complete the trial before the District Court, and again litigate the same claims against Debtor in this district. This would also create the possibility of inconsistent rulings. Given the costs of litigation, implementing a stay in a non-bankruptcy litigation after it has reached an advanced stage is a great prejudice to a creditor; whereas, maintaining the stay when a non-bankruptcy litigation is in an infancy stage is less prejudicial. *In re SCO Group, Inc.*, 395 B.R. 852, 858-59 (Bankr. D. Del. 2007). This is especially true in this case because Karma's jury trial rights would require the litigation to be tried by the district court.

37. Further, not allowing Karma to continue before the District Court Case would cause delays and force Karma to "duplicate all of its efforts in the bankruptcy court," which is of great prejudice to the creditor. *Fernstrom*, 938 F.2d at 737.

**C.    Karma has a probability of prevailing on the merits.**

38. The third factor, whether the creditor has a probability of prevailing on the merits, weighs heavily in favor of Karma. "Even a slight probability of success on the merits may be sufficient to support lifting an automatic stay in an appropriate case." *Tribune*, 418 B.R. at 129 (citation omitted). Here, Karma's has already survived summary judgment. In addition, based on the discovery obtained by Karma, Debtor cannot in good faith contest that it is in possession of Karma's trade secrets and used them in the development of the Endurance. In fact, Debtor's executives acknowledged in their internal communications that what they were doing was wrong and would lead to lawsuits once their conduct was uncovered and conspired to do everything they could to hide these facts from Karma. This included Debtor's own chief of engineering emailing Lordstown engineers confidential trade secret documents regarding Karma's bills of materials, product development system, electrical architecture and power moding that he improperly retained from his time at Karma. This also included Debtor retaining and using in their own system the designs and technical documents regarding the infotainment system Karma shared with Debtor under the confidentiality agreement during the due diligence phase. It also involved Debtor secretly employing Durre *for a month* while he was still an employee of Karma so he could continue to develop the infotainment system at Karma's expense while working bring over his Karma infotainment team and finish its development of the system at Debtor. Finally, it also involved, without limitation, three former Karma employees now at Debtor (and Debtor itself) who have been cited by the District Court for deliberately destroying relevant evidence. Therefore,

the primary focus of the District Court Case trial will likely resolve around damages. As such, this factor also favors lifting the stay.

### REQUEST FOR WAIVER OF 14-DAY STAY

39. To avoid unnecessary further delay, Karma respectfully requests waiver of the 14-day stay provided for in Federal Rule of Bankruptcy Procedure 4001(a)(3).

### NOTICE

40. Notice of this Motion are being served on the following: (a) Office of the United States Trustee; (b) counsel for the Debtors; and (c) all parties who have requested notice pursuant to Fed. R. Bankr. P. 2002. In light of the nature of the relief requested herein, Karma respectfully submits that no other or further notice is required.

[*Remainder of Page Intentionally Left Blank*]

**WHEREFORE**, Karma respectfully requests that the Court modify the automatic stay to permit Karma to complete the District Court Case litigation, including all appeals, against Debtor and all Individual Defendants.

Dated: July 5, 2023
  Wilmington, Delaware

Respectfully submitted,

**CHIPMAN BROWN CICERO & COLE, LLP**

/s/ *William E. Chipman, Jr.*
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street Suite 5400
Wilmington, DE 19801
Telephone: (302) 295-0191
Email: chipman@chipmanbrown.com
      olivere@chipmanbrown.com

-and-

**SEYFARTH SHAW LLP**
Michael D. Wexler (admitted *pro hac vice*)
James B. Sowka (admitted *pro hac vice*)
233 South Wacker Drive, Suite 8000
Chicago, IL 60606-6448
Telephone: (312) 460-5000
Email: mwexler@seyfarth.com
      jsowka@seyfarth.com

Jesse M. Coleman (admitted *pro hac vice*)
700 Milam Street, Suite 1400
Houston, TX 77002-2797
Telephone: (713) 225-2300
Email: jcoleman@seyfarth.com

*Counsel for Karma Automotive, LLC*