## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| | Case No. 23-10831 (MFW) |
| Lordstown Motors Corp., *et al.*,[1] | (Jointly Administered) |
| Debtors. | **Re: D.I. 82** |

### DEBTORS' OBJECTION TO KARMA AUTOMOTIVE LLC'S
### MOTION FOR RELIEF FROM THE AUTOMATIC STAY

The debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned cases hereby respectfully submit this objection to *Karma Automotive LLC's Motion for Relief from the Automatic Stay* [D.I. 82] (the "**Lift Stay Motion**"). In support of this objection, the Debtors respectfully state as follows:

### PRELIMINARY STATEMENT

1.      The Debtors filed these chapter 11 cases to maximize value to their stakeholders quickly and efficiently. To that end, the Debtors have proposed an efficient chapter 11 marketing and sale process to pursue and consummate a value-maximizing sale of their assets. Given the current financial state of the Company, time is of the essence. There is currently no meaningful revenue from the Debtors' operations and a prolonged stay in chapter 11 will rapidly deplete the Debtors' cash on hand and potential recoveries to stakeholders. The Debtors have, therefore, proposed a sale process that would conclude with a sale hearing on or about September 12, 2023, and intend to vigorously pursue the confirmation of a plan that will provide for

---

[1]      The Debtors and the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corporation (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101). The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

distributions from the Debtors' assets (including cash, sale proceeds, and litigation claims against Foxconn) to creditors and, if there is sufficient value, stockholders.

2.      A chief obstacle to the Debtors' ability to rapidly consummate and make distributions under a chapter 11 plan are claims that Karma Automotive LLC ("**Karma**") has against Debtor Lordstown Motors Corp.  ("**LMC**" or the "**Company**").  As the Court is aware, Karma has filed an action against the Company and certain of its current and former officers and employees in the U.S. District Court for the Central District of California (the "**Karma Action**"), asserting massive damages based on claims of misappropriation of trade secrets, conspiracy, breach of a non-disclosure agreement, interference with employment contracts, and violation of computer fraud statutes.

3.      In its Lift Stay Motion, Karma states that its damages amount to $913,235,982 plus fees, costs, and punitive damages, and asks that this Court allow the Karma Action to proceed to complete a multi-week jury trial set to begin on September 5, 2023 and obtain a final, non-appealable judgment—an endeavor likely to take years.  Karma has failed to meet its burden to establish cause for relief and the motion should be denied for at least three reasons.

4.      *First*, granting the Lift Stay Motion will prejudice the Debtors and their estates by diverting crucial Company attention and depleting estate resources at a critical stage in the chapter 11 cases.  Having already lost a considerable number of personnel since filing their petitions, the Debtors' only chance to realize value for all stakeholders is an expedited sale process administered by the core management team with direct knowledge of the Company's assets.  Any delay to the Debtors' proposed schedule will likely result in further attrition, which will undermine the Debtors' ability to run an effective sale process from the outset.  Moreover, the sheer size of the damages asserted by Karma relative to the value of the Debtors' estates and

AMERICAS 124238572

the time to complete a lengthy and protracted trial and appeals process would derail the Debtors' restructuring efforts entirely, delaying the Debtors' ability to effectuate a plan that would provide a swift and equitable distribution to creditors indefinitely.

5.      *Second*, Karma will suffer no harm if the stay remains in place.  If the motion is denied, Karma will have the ability to assert its claims against the Company in this Court. Karma fails to show how its claims are different from any other claims against the Debtors, including all other prepetition litigation claims, so as to justify the delay and diversion of the Debtors' resources and management's attention from the restructuring efforts.  As explained in the Debtors' estimation motion, the size of Karma's claim can be estimated quickly and efficiently for purposes of distribution at a fraction of the cost of ordinary litigation.  This process will ensure Karma, as well as all other creditors, will know in the next few months the size of Karma's claim and the impact that claim may have on distributions to other stakeholders.  Estimation will cause Karma no hardship, and certainly no hardship that "considerably outweighs" the harm to the Debtors from lifting the stay.

6.      *Third*, judicial economy and other key policies underlying the automatic stay weigh heavily in favor of maintaining the stay and estimating Karma's claim in this Court. Karma asserts that *either* this Court or the district court in the Karma Action must resolve the issue of the Debtors' ownership and right to use the intellectual property at issue before the Debtors can proceed to a sale.  But these issues—i.e., whether that intellectual property is property of the Debtors' estates—fall squarely within *this* Court's core jurisdiction.  Karma does not (and cannot) claim this Court is not equipped to adjudicate these issues, especially where this Court already will have the last word on Karma's damages claim.  To the contrary, because Karma states it will object to the sale process, this Court will be required to resolve these issues

3

in the first instance—long before a final, non-appealable judgment could exist in the Karma Action. Lifting the stay will do nothing but ensure inefficient parallel proceedings are ongoing in two courts at the same time. This is not only wasteful but creates the risk of inconsistent findings and is the very opposite of judicial economy.

7.      The balance of hardships and each of the relevant factors weighs heavily against granting relief from the automatic stay. Not only would maintaining the stay and resolving the Karma Action through claim estimation minimize the immense harm to the Debtors and their estates if the sale process is delayed, it would also mitigate any hardship that Karma claims it would suffer as a result of delay in adjudicating its claims or potential duplication of time and resources. The Court should deny the Lift Stay Motion.

## FACTUAL BACKGROUND

### A.      The Debtors' Chapter 11 Cases

8.      On June 27, 2023 (the "**Petition Date**"), the Debtors each commenced a voluntary case under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Court has granted a separate procedural motion requesting that the Chapter 11 Cases be jointly administered. The Debtors continue to operate their businesses and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. On July 11, 2023, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed the official committee of unsecured creditors (the "**Committee**") pursuant to section 1102 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

9.      The Debtors commenced the Chapter 11 Cases for the purpose of maximizing value for the Company by conducting a robust sale process, reducing its cash burn to preserve

4

resources, and centralizing the claims asserted against the Company to efficiently resolve those claims and provide meaningful recoveries to stakeholders. Given the Company's current financial condition and the need to maximize value on a timely basis, the Debtors have proposed a bid procedures timeline [D.I. 16] that would result in a consummation of the sale of its assets prior to confirmation of a plan of reorganization. The Debtors propose that a sale hearing occur on or about September 12, 2023.

10.      Additional factual background and information regarding the Debtors, including their business operations, their corporate and capital structure, their restructuring activities, and the events leading to the commencement of these Chapter 11 Cases, is set forth in detail in the *Declaration of Adam Kroll in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [D.I. 15] (the "**First Day Declaration**").

### A.      The Karma Action

11.      On October 30, 2020, Karma filed its initial complaint against LMC and the Individual Defendants,[2] commencing the Karma Action, styled *Karma Automotive LLC v. Lordstown Motors Corp., et al.*, No. 20-cv-02104-DFM, in the United States District Court for the Central District of California (the "**District Court**"). The operative amended complaint was filed on April 20, 2021. *See* Ex. A (the "**Complaint**"). The Complaint alleges the same general wrongdoing against all defendants under various legal theories. The crux of Karma's claims is that, almost immediately after entering into a non-disclosure agreement with Karma, LMC and the Executive Defendants hatched a plan to poach, and then conspired with, the Employee Defendants to steal Karma's alleged intellectual property. Compl. ¶¶ 1–7. Further details

---

[2]      The Individual Defendants include four current and former executive officers of LMC: Steven Burns (former CEO), John Lefleur (former COO), Darren Post (current VP of Engineering), Rich Schmidt (current CPO) (together, the "**Executive Defendants**"), as well as Roger Durre, George Huan, and other former Karma employees (the "**Employee Defendants**").

AMERICAS 124238572

regarding Karma's allegations are set forth in the Debtors' *Motion Under 11 U.S.C. §§ 502(c) and 105(a) for Entry of Orders (I) Establishing Procedures and Schedule for Estimation Proceedings and (II) Estimating the Maximum Amount of the Claim Held by Karma Automotive LLC* [D.I. 108] (the "**Karma Estimation Motion**").

12.    The Company disputes Karma's allegations and has vigorously defended the Karma Action. *Declaration of Adam Kroll in Support of Debtors' Objection* ("**Kroll Decl.**") ¶ 5. On September 21, 2022, LMC and the Individual Defendants filed a joint motion for summary judgment based on Karma's failure to provide evidence of damages and wrongful conduct.  In its November 18, 2022 order partially granting the defendants' motion for summary judgment, the District Court dismissed nine of Karma's claims but allowed the following causes of action to proceed to trial: (1) violation of the Computer Fraud & Abuse Act against Individual Defendants Punak, Kim, and Huan; (2) misappropriation of trade secrets in violation of the Defend Trade Secrets Act against LMC and the Individual Defendants; (3) misappropriation of trade secrets in violation of the California Uniform Trade Secrets Act against LMC and the Individual Defendants; (4) breach of contract against LMC, the Employee Defendants, and Executive Defendant Post; (5) tortious interference with contract against LMC and the Executive Defendants; (6) unfair competition in violation of California law against LMC and the Individual Defendants; (7) common law conspiracy against LMC and the Individual Defendants; (8) RICO conspiracy against LMC and the Individual Defendants; and (9) violation of Cal. Penal Code § 502 against LMC and the Individual Defendants. *See Order Regarding Motion for Summary Judgment*, No. 20-cv-02104-DFM (C.D. Cal. Nov. 18, 2022) [Dkt. No. 430] ("**SJ Order**").

13.    While discovery was largely complete prior to the Petition Date, two depositions remain to be completed prior to trial.  The witnesses to be deposed are Adam Kroll, the

AMERICAS 124238572

Company's Executive Vice President and Chief Financial Officer, and the defendants' expert witness, James E. Pampinella.  But for the filing of these Chapter 11 Cases and the imposition of the automatic stay, a multi-week jury trial, including ten days of evidence, as well as jury selection, opening statements, and closing arguments, was set to begin in the Karma Action on September 5, 2023.  Mr. Kroll and other key members of the Company's executive team will be called to testify during trial.  The Debtors estimate that their costs for preparing for and completing this trial will be approximately $2.5 million.  *See* Kroll Decl. ¶ 7.  This estimate does not include the cost of any post-trial briefing or appeals, all of which will be necessary to secure the final, non-appealable judgment Karma seeks leave to pursue.[3]

14.    In connection with the Lift Stay Motion, Karma states that it seeks damages totaling $913,235,982, plus fees, costs, and punitive damages.  *See* Lift Stay Mot. ¶ 1.  Karma seeks to hold the Company and the Individual Defendants jointly and severally liable for these exorbitant amounts.  *See, e.g.*, Ex. B ("**June 27 Hearing Transcript**") at 6:8–10.  On July 13, 2023, in light of the sheer size of the damages asserted by Karma and the need to promptly liquidate the amount of Karma's claim, if any, the Debtors filed the Karma Estimation Motion. Estimation of Karma's contingent, unliquidated claim is the only viable alternative to costly and protracted litigation and appeals Karma seeks through the Lift Stay Motion.  Kroll Decl. ¶ 10.

## ARGUMENT

15.    The three-fold purpose of the automatic stay is well established: "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in

---

[3]    Lift Stay Mot. ¶ 31 ("Karma is only seeking to modification of the stay to complete the trial and obtain a final, non-appealable judgment"); *id.* at 14 ("Karma respectfully requests that the Court modify the automatic stay to permit Karma to complete the District Court Case litigation, including all appeals, against Debtor and all Individual Defendants.").

general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *Borman v. Raymark Indus., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991) (quoting *St. Croix Condo. Owners v. St. Croix Hotel*, 682 F.2d 446, 448 (3d Cir.1982)).  The automatic stay is one of the fundamental protections provided to debtors under the Bankruptcy Code, which serves not only the interests of the debtor, but also the estate and its creditors.  *See ACandS Inc. v. Travelers Cas. and Sur. Co.*, 435 F.3d 252, 259 (3d Cir. 2006) ("[T]he automatic stay serves the interests of both debtors and creditors."); *Krystal Cadillac Oldsmobile GMC Truck, Inc.*, 142 F.3d 631, 637 (3d Cir. 1998) ("The automatic stay also provides creditor protection.").  The Court may grant relief from the automatic stay "for cause."  11 U.S.C. § 362(d)(1); *In re DBSI, Inc.*, 407 B.R. 159, 166 (Bankr. D. Del. 2010).

## I.    Karma Has Failed to Establish Cause for Relief from the Automatic Stay

16.    A movant seeking relief from the automatic stay bears the burden to "produce evidence that cause exists."  *DBSI,* 407 B.R. at 166.  To meet this burden, the movant must show that the "balance of hardships from not obtaining relief tips significantly in [its] favor."  *Atl. Marine, Inc. v. Am. Classic Voyages, Co. (In re Am. Classic Voyages, Co.),* 298 B.R. 222, 225 (D. Del. 2003); *see also In re W.R. Grace & Co.*, No. 01–01139 (JFK), 2007 WL 1129170, at *3 (Bankr. D. Del. Apr. 13, 2007) (finding that the party seeking relief from the stay "bears 'the heavy and possibly insurmountable burden of proving that the balance of hardships tips significantly in favor of granting relief'" (internal citation omitted)).

17.    Courts should consider "'the totality of the circumstances in each particular case' to determine whether 'cause' for relief from stay exists."  *In re Aleris Int'l, Inc.*, 456 B.R. 35, 47 (Bankr. D. Del. 2011) (citing *Baldino v. Wilson (In re Wilson),* 116 F.3d 87, 90 (3d Cir. 1997)).  This Court has developed a three-part balancing test to evaluate whether cause exists in

a specific case: "a) [a]ny great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit, b) the hardship to the non-bankrupt party by maintenance of the stay *considerably outweighs* the hardship of the debtor, and c) the creditor has a probability of prevailing on the merits." *Izzarelli v. Rexene (In re Rexene Prods. Co.)*, 141 B.R. 574, 576–77 (Bankr. D. Del. 1992) (emphasis added).  Courts also emphasize "whether lifting the automatic stay will impede[] the orderly administration of the debtor's estate," *DBSI*, 407 B.R. at 167, and should take into account the general policies underlying the automatic stay, in deciding whether to grant relief, *In re SCO Grp., Inc.*, 395 B.R. 852, 859–60 (Bankr. D. Del. 2007) (considering the twelve policies outlined by the Second Circuit in *Sonnax Indus., Inc. v. Tri Component Prods. Corp.*, 907 F.2d 1280 (2d Cir. 1990)).

18.    In the absence of compelling evidence demonstrating that the above factors significantly weigh in the movant's favor, requests for relief from the automatic stay should be denied.  *See, e.g.*, *W.R. Grace*, 2007 WL 1129170, at *3 (denying motion to lift stay because movant "presented no compelling evidence that the balance of hardships [was] in its favor"); *In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006) (denying motion to lift stay where movant failed to demonstrate "that the balance of hardships from not obtaining relief tips significantly in [its] favor").[4]  Karma and the Company do not disagree about the relevant test and burden of proof involved to seek relief from the automatic stay.  Lift Stay Mot. ¶¶ 25–28. Nevertheless, Karma has failed to produce evidence that cause exists with respect to any prong

---

[4]    The standard for demonstrating "cause" to lift the stay is particularly stringent for unsecured creditors. *See, e.g.*, *In re Brown*, 311 B.R. 409, 413 (E.D. Pa. 2004) ("Unsecured creditors are generally entitled to relief from an automatic stay only in extraordinary circumstances."); *In re Stranahan Gear Co.*, 67 B.R. 834, 838 (Bankr. E.D. Pa. 1986) ("Several factors militate strongly against the allowance of any relief in this case—or in any but the most extraordinary set of circumstances—where the moving party is an unsecured creditor."); *In re Residential Capital, LLC*, 508 B.R. 838, 848 (Bankr. S.D.N.Y. 2014) ("If the movant is an unsecured creditor, the policies of the automatic stay weigh against granting the relief requested."); *see also Aleris Int'l*, 456 B.R. at 47 ("[W]here a creditor seeks relief from stay and claims an interest in property of the estate, an implicit requirement is a showing by the creditor that its claim is secured.").

of the three-part test. *See In re Irish Bank Resol. Corp. Ltd.*, No. BR 13-12159-CSS, 2019 WL 4740249, at *7 & n.4 (D. Del. Sept. 27, 2019) (noting a movant must "submit[] evidence to establish a *prima facie* showing of cause, which is a predicate for relief"). Accordingly, the Lift Stay Motion should be denied.

### A.    Lifting the Stay Would Significantly Prejudice the Debtors and the Estates

19.    Lifting the stay to allow the Karma Action to proceed will impose substantial prejudice upon the Debtors and their estates, to the detriment of all stakeholders, by diverting the attention of the Company's senior leadership team, depleting vital estate resources, undermining the Debtors' sale process, and indefinitely prolonging the Debtors' ability to make distributions.

20.    One of the primary benefits of bankruptcy is the "breathing room" afforded by the automatic stay. *In re Linear Elec. Co.*, 852 F.3d 313, 323 (3d Cir. 2017) ("The purpose of the automatic stay is to give breathing room for the development of . . . a plan."); *Raymark Indus., Inc. v. Lai*, 973 F.2d 1125, 1130 (3d Cir. 1992) ("[T]he purpose of the stay is 'to give the debtor a breathing spell . . . and it permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.'"). This protection is especially important here, where the Debtors filed their petitions less than a month ago, with a limited pool of assets and unencumbered cash sufficient to administer the estate and sale prospects through the initial stages of the Chapter 11 Cases. *See* First Day Decl. ¶ 49. Permitting the Karma Action to proceed in the District Court would distract the Debtors from the crucial tasks at hand, defeating the very purpose of the automatic stay and prejudicing the Debtors and the many parties whose interests depend on a successful restructuring.

21.    Within the first few weeks of the Chapter 11 Cases, the Debtors have begun critical work and made meaningful progress on several important initiatives intended to facilitate

an efficient and inclusive restructuring process.  The Debtors and their advisors continue to work tirelessly on the various critical matters necessary to move the cases forward, including, among other things, conducting an expedited sale process and formulating a chapter 11 plan that will address all claims in a clear and orderly manner and provide for timely distributions to creditors. *See* Kroll Decl. ¶ 8.  These tasks are resource-intensive, and they cannot be accomplished solely by the Debtors' counsel and other advisors.  Much of the Debtors' senior leadership team has dedicated, and continues to dedicate, a significant amount of time to these chapter 11 cases.  *See id.* ¶¶ 8–9.  The "breathing spell" afforded by the automatic stay has made this possible.  If these protections are lifted, the Debtors' ability to provide appropriate attention to the sale process and to consummating a successful plan will be significantly compromised.  *See id.* ¶ 9.  Thus, it is crucial that the Debtors not be mired in ongoing litigation—including the Karma Action—that would force them to divert these vital resources.  *See In re Fairchild*, No. 09-10899, 2009 WL 4546581, at *6 (Bankr. D. Del. Dec. 1, 2009) (recognizing the "work being done by the debtors and their professionals to reorganize the debtors' remaining assets," debtors' management should not be distracted by litigation); *In re Nw. Airlines Corp.*, No. 05-1793 (ALG), 2006 WL 2583642, at *2 (Bankr. S.D.N.Y. Jul. 7, 2006) (holding that, given the "significant tasks" required in the bankruptcy proceedings, the debtor "should not have to divert their management resources" to defend the actions before other courts).

22.    Karma attempts to diminish this substantial prejudice to the Debtors by shifting the focus away from the Company (the subject of the Lift Stay Motion) to whether the Individual Defendants would be "distracted" by ongoing litigation.  *See, e.g.*, Lift Stay Mot. ¶ 33 (arguing that "few if any" of the Company's current officers and directors are parties to or witnesses in

the Karma Action, so lifting the stay "will not distract from management of Debtor's affairs").[5]

Karma's arguments are based on the erroneous assumption that continuing the Karma Action

would only burden the Debtors' "current directors or officers" who are *also* named as Individual

Defendants or called as a non-party witnesses. Karma misses the point.  Whether Karma has

directly involved certain individuals in the litigation is irrelevant to the prejudice imposed on the

Company.  If the stay is lifted, the Debtors will be required to divert substantial time, attention,

and resources—including management and other organizational leadership (even those who are

not parties to the Karma Action)—away from critical restructuring efforts.  *See* Kroll Decl. ¶ 9.

The Company's key management, including Mr. Kroll, would immediately be required to

prepare for and attend depositions, assist counsel with pre-trial briefing, and prepare for, attend,

and testify during a multi-week trial scheduled to begin at the same time as the Debtors'

anticipated sale process.  The Debtors' have already lost nearly 50% of their headcount, which

makes any distraction of the Company's management during this critical stage in the

restructuring immensely prejudicial.  *See id.* ¶ 8.

23.     Courts in this District and elsewhere frequently deny requests to lift the automatic

stay where, as here, such relief would divert vital resources away from the bankruptcy case to the

detriment of the Debtors' estate and its creditors.  *See, e.g.*, *Fairchild*, 2009 WL 4546581, at *6

(declining to lift stay because "it would be distracting for the Debtors' management and

professionals to be entangled in" ongoing litigation against one of the debtors); *see also In re*

*SunEdison, Inc.*, 557 B.R. 303, 308 (Bankr. S.D.N.Y. 2016) (denying motion to lift stay where

---

[5]     Karma's assertion that litigation will not distract the Debtors' counsel in these Chapter 11 Cases because the Company has separate litigation counsel is similarly misplaced.  *See* Lift Stay Mot. ¶ 33.  If the Karma Action is allowed to proceed, the undersigned counsel will be required to monitor ongoing developments, coordinate with litigation counsel to prepare for depositions and trial, assist in developing legal defenses and litigation strategy, and work to safeguard the Debtors' ability to formulate, confirm, and implement a successful plan under various litigation scenarios, among other things.

AMERICAS 124238572

defending separate lawsuit would "divert[] the Debtors' resources and personnel at a critical time in the case"); *In re Bally Total Fitness of Greater New York, Inc.*, 402 B.R. 616, 623 (Bankr. S.D.N.Y. 2009) (denying motion to lift stay where "allowing the actions to proceed would distract the Debtors' management from the bankruptcy proceeding by forcing them to litigate the [underlying action] and hinder its ability to perform its fiduciary duty of maximizing the value of the Debtors' estates, thereby affecting the interests of other creditors"); *Nw. Airlines*, 2006 WL 2583642, at *2 (noting that debtors faced several "significant tasks" in their bankruptcy proceedings, including "negotiating with their creditor constituencies and other stakeholders regarding formulation of a plan," and "should not have to divert their management resources" to defending the actions).

24.     Karma asserts nearly a billion dollars in damages against the Company and the Individual Defendants.  Karma seeks to hold the Company jointly and severally liable with the Executive Defendants, who the Company is contractually obligated to indemnify in any event. Kroll Decl. ¶ 4.  If Karma were to secure even a small fraction of the damages it seeks, that amount could be sufficient to dilute all other creditors and eliminate the possibility of any recovery to equity.  *See id.* ¶¶ 5, 10.  Even if Karma is unsuccessful on its claims, the Company is responsible for all attorneys' fees, costs, and other expenses related to defending the Karma Action, and will continue to incur substantial additional costs should the action proceed through trial and a lengthy appeal process.  *Id.* ¶ 4.  The Debtors estimate that these costs, even absent a damages award, will be $2.5 million through trial alone—the Company's fees and costs associated with post-trial briefing and appeals will be significantly more.  *Id.* ¶ 7.  These costs undermine the central purpose of the automatic stay "to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it."  *W.R. Grace*, 2007 WL 1129170,

AMERICAS 124238572

at *2 (citation omitted).[6]  Such burdensome litigation expenses are routinely cited as a basis for declining to lift the automatic stay.  *See, e.g.*, *In re DVI, Inc.*, 306 B.R. 496, 505 (Bankr. D. Del. 2004) (denying motion to lift the stay where relief would "cause the[] estate to incur substantial additional attorneys' fees . . . and that their efforts are required instead in proposing a plan of reorganization and dealing with other administrative matters involved in this chapter 11 case").

25.     The Debtors, their estates, and all stakeholders will also face extreme prejudice due to the length of time likely required for Karma to obtain the "final, non-appealable judgment" it seeks through trial and a near certain round of appeals.  The Debtors have proposed a sale process that would conclude with a sale hearing on or about September 12, 2023, and intend to vigorously pursue the confirmation of a plan that will provide for distributions from the Debtors' assets (including cash, sale proceeds, and litigation claims against Foxconn) to creditors as soon as they reasonably can.   Allowing litigation to proceed in the District Court will substitute the Debtors' proposed efficient restructuring and sale process with the lengthy and unpredictable schedule in the Karma Action.  While trial is currently set to begin on September 5, 2023, any final judgment and damages award could take years to achieve.  In the meantime, the Debtors' anticipated sale process—also planned for September—and ability to consummate a successful restructuring will be hamstrung indefinitely.  Forcing the Company to remain tied up in prepetition litigation, as opposed to resolving Karma's claims quickly and efficiently through estimation in this Court, will forestall their ability to right-size the claims pool, negotiate and

---

[6]      Karma also claims that its claims against the Company are not "against" property of the Debtors' estates, so will not result in any prejudice the Debtors.  Lift Stay Mot. ¶ 31.  Karma is wrong.  The Bankruptcy Code defines property of the estate to include "all legal and equitable interests of the debtor in property." 11 U.S.C. § 541(a)(1). That Karma disputes the Company's ownership of alleged intellectual property does not change this fact, since the automatic stay precludes acts against not only property of the estate, but also property in the debtor's possession. *See* 11 U.S.C. § 362(a)(3) (staying "any act to obtain possession of property of the estate *or of property from the estate*" (emphasis added)); *Borman v. Raymark*, 946 F.2d 1031, 1035 (3d Cir. 1991) ("[T]he automatic stay was intended to apply to actions that do not necessarily involve property of the estate.").

finalize a plan, and make distributions to all other stakeholders—delaying completion of these critical tasks well beyond the timeline the Debtors have proposed.  *See* Kroll Decl. ¶¶ 9–10.  In these circumstances, there is no question that "lifting the automatic stay will impede[] the orderly administration of the debtor's estate."  *DBSI,* 407 B.R. at 167; *see also In re W.R. Grace & Co.*, No. 01-01139 (JKF), 2007 WL 1129170, at *2 n.7 (Bankr. D. Del. Apr. 13, 2007) (recognizing that the effect of continuing litigation on the administration of the bankruptcy estate is "[t]he most important factor in determining whether to grant relief from the automatic stay").

### B.     The Automatic Stay Imposes Minimal Hardship on Karma and the Balance of the Hardships Favors Maintaining the Stay

26.     The second *Rexene* factor requires a showing that the "hardship to the non-bankrupt party by maintenance of the stay *considerably* outweighs the hardship of the debtor." 141 B.R. at 576 (emphasis added); *see also W.R. Grace & Co.*, 2007 WL 1129170, at *3 (finding that the party seeking relief from the stay "bears 'the heavy and possibly insurmountable burden of proving that the balance of hardships tips significantly in favor of granting relief.'" (citation omitted)).  Karma has failed to meet this heavy burden.

27.     In contrast to the enormous hardship that the Debtors and their estates will suffer if the Karma Action is resumed, Karma has failed to show that maintaining the automatic stay would cause it any meaningful hardship.  Karma's primary argument is that it will be harmed if relief from the stay is not granted because it will be required to litigate its claims against the Individual Defendants in the District Court, then separately litigate its claims against the Company in this Court.  *See* Lift Stay Mot. ¶ 36.  Karma is wrong.  The District Court has already stayed Karma's claims against the Individual Defendants, so Karma cannot continue litigating against them unless and until this Court first lifts the stay as to the Company.

AMERICAS 124238572

28.     In its oral ruling, the District Court addressed the possible damage to Karma from staying its claims against the Individual Defendants and found it to be "inconsequential" given that Karma's claims against the Company are automatically stayed.   As the District Court recognized, pursuing Karma's claims against the Individual Defendants is effectively the same as litigating against the Company, and thus Karma "would have difficulty going forward [against the Individual Defendants], and the same resources that would be drawn down from [the Company] would be drawn down whether the trial is against [the Company] or the individuals." June 27 Hr'g Tr. 7:10–18.   And, as "this Court has no jurisdiction to consider the stay imposed by the [District Court]," there is no risk that maintaining the stay will force Karma to duplicate efforts. *Nw. Airlines*, 2006 WL 694727, at *2 (recognizing bankruptcy court lacked jurisdiction to lift stay imposed by state court and declining to question the reasonableness of that court's likely conclusion that it was more economical to proceed against all defendants in one forum).

29.     Karma further argues that it will be greatly prejudiced because the case is already at an "advanced stage."   Lift Stay Mot. ¶ 36.   This argument fails for at least two reasons.   *First*, Karma has not established that it will suffer substantial hardship if it is required to wait—like every other creditor—while the Debtors avail themselves of the "breathing spell" afforded by the automatic stay.   Karma fails to show how its claims are different from other claims against the Debtors, including all other prepetition litigation claims, so as to justify diversion of the Debtors' resources and management's attention from the Chapter 11 Cases.   Karma is not the only potential creditor asserting litigation claims against the Debtors; the Debtors face a host of other prepetition litigation claimants.   *See* Kroll Decl. ¶ 10.   Thus, granting Karma relief from the stay may invite a "race to the courthouse" among other litigation claimants.   *See DBSI*, 407 B.R. at 167 ("[B]y lifting the stay, I may encourage a race to the courthouse by parties seeking similar

orders, which will cause undue hardship and expense to the estate.").  And the Debtors would be forced to devote vital resources to address Karma's claims in District Court ahead of those litigation claimants, prejudicing all other claimants who follow the normal claims filing and administration process that is central to chapter 11.  *Id.* at 166 ("[I]f the automatic stay is lifted, [the movant] may recover a greater percentage of its claims than similarly-situated creditors.").  In any case, delay in litigating a claim does not outweigh the potential harm to the Debtors.  *See, e.g.*, *In re Union Tr. Phila., LLC*, 465 B.R. at 773 ("[T]he fact that efforts to collect on the judgments may be delayed for short period in and of itself is not sufficient to outweigh the potential harm to [Debtor].").

30.    *Second*, the parties are not yet so trial-ready as would justify lifting the stay.  *See* Kroll Decl. ¶¶ 6–7.  Karma's argument to the contrary (Lift Stay Mot. ¶ 21) relies heavily on *In re SCO Grp., Inc.*, 395 B.R. 852 (Bankr. D. Del. 2007), where the underlying litigation had been pending for four years when the debtors filed for bankruptcy—just three days before trial.  *See id.* at 856.  The bankruptcy court noted the "unusual" circumstances of the case at the outset, drawing particular attention to the fact that "the parties were on the door-step of beginning a five-day trial of complex issues when Debtors filed their petitions."  *Id.* at 856–57.  In assessing the burden that would be imposed on the debtors and the estate if the case were to proceed to trial, the court determined that, "because this bankruptcy case was filed on the eve of trial" and "both parties ha[d] already spent all of the necessary time and resources in preparation," the longer trial was delayed the "more burdensome it [would be] to both parties to ready themselves again."  *Id.* at 858.  In addition, *SCO Grp.* recognized that the result could have been different had there been greater prejudice to the estate.  *See id.* at 857 ("[T]he legislative history of section

17

362(d)(1) emphasizes the importance of allowing a case to continue in the original tribunal *so long as there is no prejudice to the estate*." (emphasis added)).

31.     Unlike *SCO Grp.*, this is not such an "unusual" case in which the parties were "on the door-step" of trial.  The parties here still have significant trial preparation and pre-trial tasks on the horizon when the Debtors filed their petitions on June 27, 2023—months before the trial was set to begin in September.  During a status conference before the District Court that same day, counsel for Karma outlined some of these near-term tasks, including Karma's deposition of the defendants' damages expert, Mr. Pampinella, briefing on Karma's motion to strike "a bunch of Mr. Pampinella's report," and an expert rebuttal report due from Karma on July 31.  *See* June 27 Hr'g Tr. 4:23–5:7.  These and other tasks, including the deposition of Mr. Kroll, remain outstanding and, if the stay is lifted, will require the Company to expend substantial additional time and resources before the case is trial-ready, which may cause additional delays.  Kroll Decl. ¶¶ 6–7.  As the District Court noted, the question then will be "whether the sheer realities of preparation allow[] us to put the matter back on a trial track with the current date."  June 27 Hr'g Tr. 8:14–17.  These circumstances do not favor lifting the stay.  *See, e.g.*, *Fairchild*, 2009 WL 4546581, at *6 (maintaining stay where underlying litigation was "not on the verge of trial and many hours by the Debtor and its professional would be needed to prepare for such a trial," including hours needed for depositions and expert reports).

32.     More analogous here is *In re Choice ATM Enterprises, Inc.*, No. 14-44982-DML, 2015 WL 1014617 (Bankr. N.D. Tex. Mar. 4, 2015), where the underlying action was "at a stage in the litigation where discovery and pre-trial motions between the parties are complete but trial has not yet begun."  *See id.* at *5.  Rather than lifting the stay to allow the action to proceed to trial, the bankruptcy court determined the interests of the parties and the estate best served by

AMERICAS 124238572

ordering the parties to "use the previously completed discovery without redundancy to assist the court in liquidating the [claim] through estimation." *Id.*  Similarly, in *In re John Q. Hammons Fall 2006, LLC*, No. No. 16–21142, 2017 WL 4620872 (Bankr. D. Kan. Oct. 13, 2017), the bankruptcy case was commenced a few weeks before the scheduled trial date.  The plaintiff in the underlying action moved for relief from the automatic stay, arguing—as Karma does here— that the "imminent trial" weighed in favor of lifting the stay "given the extensive discovery, depositions, and overall preparation of the parties in that court, and that starting over in bankruptcy court would be waste of resources and time." *Id.* at *5.  The bankruptcy court rejected these arguments, finding it less burdensome and prejudicial to liquidate the claims through estimation, even though the state court had "invested significant time" in the action and "was prepared to conduct a trial on the merits." *Id.*

33.     That is exactly what should happen here.  As discussed above and in the Karma Estimation Motion, estimation will allow this Court to liquidate the amount of Karma's claim, if any, in short order.  That is far better for all of the Debtors' stakeholders, including Karma, than an expensive and protracted trial and appeal process in the Karma Action.

### C.     Karma Has Not Established Probability of Success on the Merits

34.     The third *Rexene* factor—whether Karma is likely to succeed on the merits of its claims—does not weigh in favor of lifting the automatic stay.  The Lift Stay Motion also fails to submit any evidence to meet this threshold.

35.     Karma argues that documents and information uncovered through extensive discovery establish that it is likely to succeed on the merits, but fails to identify any such information.  *See* Lift Stay Mot. ¶ 38.  Without support, this assertion is plainly insufficient to establish cause for relief.  *See Irish Bank Resol.*, 2019 WL 4740249, at *7 (affirming bankruptcy

AMERICAS 124238572

court's denial of relief from stay where movant failed to "substantiate its case with an evidentiary showing of a factual and legal right to the relief it seeks"); *In re RNI Wind Down Corp.*, 348 B.R. 286, 299–300 (Bankr. D. Del. 2006) (denying relief from stay where movant failed to move supporting declaration and documentation into record and, even if admitted, such evidence was insufficient to establish *prima facie* cause for relief).  Further, the mere fact that the Karma Action has "survived summary judgment" does not show a probability of success on the merits.  Karma has not moved for summary judgment on any of its claims, nor did it submit evidence in opposition to the defendants' motion that would justify Karma's unsupported conclusion that its success on the merits is virtually guaranteed.  *See generally* SJ Order.[7]

36.    Even assuming Karma established probability of success on the issues of ownership and liability (which the Debtors dispute), Karma fails to show that its alleged damages of over $900 million can be substantiated or that it is entitled to additional, punitive damages.  Karma's damages are premised on: (a) hypothetical sales figures that have no basis in anything ever accomplished by either the Company or Karma; (b) alleged savings of research and development costs that are speculative and unreliable; and (c) the amount of capital raised by the Company unrelated to the alleged misconduct.  *See* Kroll Decl. ¶ 5.  But Karma has not demonstrated commercial success by *any party*—including Karma or the Company—that has used the alleged intellectual property at issue.  Over the course of the Karma Action, the Company has identified factual evidence and expert testimony demonstrating that the maximum

---

[7]    Unlike *SCO Grp.*, cited extensively in the Lift Stay Motion, the District Court's summary judgment order was not nearly as thorough as the "thorough 105-page opinion [on the parties' motions for summary judgment] carefully analyzing the facts and law."  *See* 395 B.R. at 855 n.4.  Here, the District Court analyzed the evidence presented on the defendants' motion for summary judgment in the light most favorable to Karma, and determined only that certain issues of disputed fact prevented dismissal of Karma's claims.  SJ Order 1, 3.  It said nothing about Karma's probability of success on those claims.  Indeed, the Company disputes Karma's claims and has identified information and evidence in the defendants' favor on the many open issues to be resolved at trial—including those pertaining to the Debtor's "ownership" of the intellectual property at issue and, more importantly, Karma's exorbitant damages claim.  *See* Kroll Decl. ¶ 5.

AMERICAS 124238572

value of Karma's claims, even if valid, would be a very small fraction of the alleged billion-dollar damages claim. *Id.* The Company has submitted expert evidence demonstrating that replacing theoretical sales figures with actual sales figures proves that Karma's real damages are far closer to zero than to the fantastical amounts Karma seeks. *Id.* The evidence will show that the savings of research costs are speculative, unreliable, and grossly overstated and that the amount of capital raised by the Company has nothing to do with Karma's claims. *Id.* This is no reason to delay the administration of Debtors' estates in favor of lifting the automatic stay.

37.     In any case, courts weigh this factor against the balance of harms. *See, e.g.*, *In re Spansion, Inc.*, 418 B.R. 84, 97 (Bankr. D. Del. 2009) (probability of success "not crucial" where other considerations weigh in favor of maintaining automatic stay); *In re Cont'l Airlines*, 152 B.R. 420, 426 (D. Del. 1993) ("Given the Court's conclusions above that the balance of hardships weighs in favor of [the appellant], the Court concludes that [the appellant's] probability of success is sufficient to support modifying the stay."). Given the significant threat to the Debtors' ability to sell their assets and promptly resolve the Chapter 11 Cases if the stay is lifted—and the minimal harm that Karma will face if the stay is maintained—this final factor should favor denial of the Lift Stay Motion or, at worst, should be of neutral weight in the Court's analysis.

## II.     Policies Underlying the Automatic Stay Weigh Heavily Against Lifting the Stay

38.     In addition to the three-factor balancing test, courts in this District consider the general policies underlying the automatic stay to determine whether cause exists to grant relief. *See, e.g.*, *SCO Grp.*, 395 B.R. at 859–60 (considering twelve policies as outlined by the Second Circuit in *Sonnax*, 907 F.2d at 1287); *Fairchild*, 2009 WL 4546581, at *7 & n.43

(same).[8]  Many of the *Sonnax* policies have already been addressed above, including "7) whether litigation in another forum would prejudice the interests of other creditors," "11) whether the parties are ready for trial in the other proceeding," and "12) impact of the stay on the parties and the balance of the harms."  *See Sonnax*, 907 F.2d at 1287.  None of these policies favors lifting the automatic stay and, indeed, each supports leaving the stay in place.

39.     Additional *Sonnax* policies are particularly important here, including "1) whether relief would result in a partial or complete resolution of the issues, 2) lack of any connection with or interference with the bankruptcy case," "4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action," and "10) the interests of judicial economy and the expedition and economical resolution of litigation."  *Id.*  These interrelated policies weigh heavily against granting the Lift Stay Motion.[9]

40.     *First*, as discussed above, right-sizing Karma's claims against the Company is deeply connected to the Debtors' ability to complete its sale process and restructuring in a timely manner and with sufficient funds for distributions to stakeholders.  The magnitude of Karma's damages claim amplifies the importance of maintaining the stay.  Karma's nearly one billion dollars in alleged damages, if a claim is allowed in that amount, would be the largest claim

---

[8]     The *Sonnax* policies are "1) whether relief would result in a partial or complete resolution of the issues; 2) lack of any connection with or interference with the bankruptcy case; 3) whether the other proceeding involves the debtor as a fiduciary; 4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; 5) whether the debtor's insurer has assumed full responsibility for defending it; 6) whether the action primarily involves third parties; 7) whether litigation in another forum would prejudice the interests of other creditors; 8) whether the judgment claim arising from the other action is subject to equitable subordination; 9) whether the moving party's success in the other proceeding would result in a judicial lien avoidable by the debtor; 10) the interests of judicial economy and the expeditious and economical resolution of litigation; 11) whether the parties are ready for trial in the other proceeding; and 12) impact of the stay on the parties and the balance of the harms."  *SCO Grp.*, 395 B.R. at 857 (quoting *Sonnax*, 907 F.2d at 1287).

[9]     Other *Sonnax* policies also support maintaining the automatic stay.  For instance, the Karma Action does not "[6] primarily involve[] third parties." 907 F.2d at 1286.  The Company's alleged conduct is at the core of each of Karma's claims, including its claims against the Individual Defendants, which are inextricably intertwined with those against the Company.  There is also no indication that the Company's insurers will have "[5] assumed full responsibility for defending" the Karma Action.  *Id.*

against the Debtors' estates by a wide margin.  Kroll Decl. ¶ 5.  But, even before a judgment can

be issued by the District Court and the parties' appeals are exhausted, the prospective attorneys'

fees, costs, and other expenses required to defend the Karma Action threaten to deplete the

Debtors' remaining assets and threaten a successful restructuring.  *See id.* ¶ 7.  On the other

hand, maintaining the stay will allow this Court to proceed quickly through the claim estimation

process, avoid duplication of judicial resources and inconsistent results, and maximize the

recoveries of all creditors, including Karma.  *See, e.g.*, *Choice ATM*, 2015 WL 1014617, at *5–6

(denying motion to lift stay because the bankruptcy "court can rapidly proceed through the

claims estimation process and impose a lesser burden on [debtors'] management and avoid the

aforementioned unnecessary delay and expense").

41.    *Second*, no "specialized tribunal" has been established to adjudicate Karma's

claims.  Other than noting that the District Court is already familiar with the action, Karma has

made no attempt to show the District Court "is in a better position, or better equipped, to rule on

such claims than this Court."  *See John Q. Hammons*, 2017 WL 4620872, at *4–5 (refusing to

lift the stay even where state court had "invested significant time" and "was familiar" with the

dispute and had "made previous rulings").  The District Court is a court of general, not

specialized, jurisdiction, and Karma does not argue that its claims are so complex such that this

Court lacks the necessary expertise to adjudicate them.  Bankruptcy courts "routinely decide

disputes involving a variety of subject matters and are often called upon to interpret and apply

non-bankruptcy law," including state and federal laws applicable to specialized industries.  *See,

e.g.*, *In re Windhaven Top Ins. Holdings, LLC*, 636 B.R. 596, 605 (Bankr. D. Del. 2021) (citation

omitted) (denying relief from stay because bankruptcy court is capable of interpreting and

applying state insurance law to decide whether disputed funds were property of the estate);

AMERICAS 124238572

*SNMP Research Int'l, Inc. v. Nortel Networks Inc., et al. (In re Nortel Networks Inc.)*, No. 09-10138 (KG), 2016 WL 491639, at *4–9 & n.1 (Bankr. D. Del. Feb. 8, 2016), as clarified, 2016 WL 3751653 (Bankr. D. Del. July 7, 2016) (adjudicating claims for copyright infringement, violations of state trade secrets law, and breach of contract, after district court confirmed bankruptcy court's ability to resolve such claims and declined to withdraw the reference).

42.    *Third*, and relatedly, the interests of judicial economy favor proceeding through the claim estimation process rather than litigation in the District Court and subsequent appeals.  Compared to the costly and protracted process necessary to obtain the "final, non-appealable judgment" contemplated by the Lift Stay Motion—which would likely take years, not months, to complete—proceeding in this Court is far more expedient.  *Choice ATM*, 2015 WL 1014617, at *5 (noting that "[t]here is no judicial inefficiency inherent in proceeding in the bankruptcy court," but rather "the Code's highly efficient claims estimation process may improve Debtor's chances at a reorganization through an accelerated process without significantly harming [the movant]").

43.    Karma asserts that the Company's ownership and right to use the intellectual property at issue "must be decided, *either* before this Court or the District Court" before the Debtors can sell their assets in September,[10] and that it intends to object to the Debtors' sale process on this ground.  Lift Stay Mot. ¶¶ 24, 32 (emphasis added).  To resolve Karma's objection, this Court will be required to determine the Company's ownership interest and rights

---

[10]    The sole case cited by Karma in support of this point, *In re Scarborough-St. James Corp.*, 535 B.R. 60 (Bankr. D. Del. 2015), is inapposite here.  In that case, the bankruptcy court found the issue of whether the debtor-tenant's lease had been terminated prepetition (the only remaining issue in the underlying action) had to be decided before the bankruptcy court could determine whether the lease was property of the debtor's estate. *Id.* at 68.  The court granted relief from the stay to allow the creditor-landlord to proceed on that narrow issue, finding that continuing litigation would cause no hardship to the debtor or the estate. *See id.* at 68–70.  Rather, the debtor was itself continuing litigation and using the automatic stay as "a sword" rather than "a shield," including by removing the action to federal court and filing an adversary proceeding in the bankruptcy court regarding interpretation of the lease. *Id.* at 70.

AMERICAS 124238572

in the disputed intellectual property at the same time trial is scheduled to address the same issues in the District Court. By the time Karma could obtain a final, non-appealable judgment, this Court will already have ruled on these issues, rendering any duplicative and potentially inconsistent decision of the District Court effectively moot. *See, e.g.*, *In re Celsius Network LLC*, 642 B.R. 497, 504 (Bankr. S.D.N.Y. 2022) (denying relief from stay where state court litigation "would lead to a duplication of efforts for both the parties and the Court and has the potential of leading to inconsistent judgments").

44. Moreover, these issues—which go to the scope and extent of property of the Debtors' estates—fall squarely within *this* Court's core jurisdiction. *See In re New Century Holdings, Inc.*, 387 B.R. 95, 105 (Bankr. D. Del. 2008) ("[A] determination of what is property of the estate and concurrently, of what is available for distribution to creditors of that estate, is precisely the type of proceeding over which the bankruptcy court has exclusive jurisdiction." (internal citation omitted)). This Court is ultimately best positioned to rule on these issues because it will also be required to decide the validity, extent, and dischargability of Karma's claim, if any, in the Chapter 11 Cases. *See John Q. Hammons*, 2017 WL 4620872, at *4 ("[R]uling on the validity, extent, and dischargeability of debtors' obligations to a prepetition creditor is the *raison d'être* of bankruptcy courts."). Thus, continued litigation in the District Court over Karma's damages claim "would not result in a complete resolution of the issues between the parties; as the allowance of the claims would still be for this Court to determine." *Id.* at *5; *see also In re Prate*, 634 B.R. 72, 76 (Bankr. N.D. Ill. 2021) (declining to lift the stay because proceeding in underlying action would "require a return trip to the bankruptcy court to determine dischargeability even if [movants] prevail," so "the most efficient and least burdensome route for both sides is to have the bankruptcy court dispose of their dispute").

25

45.    For all the reasons detailed above, lifting the automatic stay will impede the orderly administration of the Debtors' estates, which is the "most important" consideration when deciding whether relief from the automatic stay is warranted. *W.R. Grace & Co.*, 2007 WL 1129170, at *2 n.7 (recognizing the effect of continuing litigation on the administration of the bankruptcy estate as "[t]he most important factor in determining whether to grant relief from the automatic stay"). Consistent with the longstanding purpose of the Bankruptcy Code, liquidating Karma's claims through estimation in this Court would preserve judicial and party resources and avoid the cost, delay, and substantial hardship that will arise if Karma pursues its claims in both forums. *See, e.g.*, *Katchen v. Landy*, 382 U.S. 323, 328–29 (1966) (noting that the Supreme Court "has long recognized that a chief purpose of the bankruptcy laws is 'to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period'" (internal citation omitted)).

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court deny the Lift Stay Motion and maintain the automatic stay in the Karma Action.

AMERICAS 124238572

Dated: July 19, 2023

Respectfully submitted,

/s/ James F. McCauley

**RICHARDS, LAYTON & FINGER, P.A.**

Kevin Gross (No. 209)
Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Amanda R. Steele (No. 5530)
Jason M. Madron (No. 4431)
Cory D. Kandestin (No. 5025)
James F. McCauley (No. 6991)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
gross@rlf.com
defranceschi@rlf.com
heath@rlf.com
steele@rlf.com
madron@rlf.com
kandestin@rlf.com
mccauley@rlf.com

*Proposed Co-Counsel to Debtors and
Debtors-in-Possession*

**WHITE & CASE LLP**

Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
Fan B. He (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
tlauria@whitecase.com
mbrown@whitecase.com
fhe@whitecase.com

David M. Turetsky (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
david.turetsky@whitecase.com

Jason N. Zakia (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
jzakia@whitecase.com

Roberto Kampfner (admitted *pro hac vice*)
Doah Kim (admitted *pro hac vice*)
RJ Szuba (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700
rkampfner@whitecase.com
doah.kim@whitecase.com
rj.szuba@whitecase.com

*Proposed Co-Counsel to Debtors and
Debtors-in-Possession*

AMERICAS 124238572