**<u>Exhibit A</u>**

**Complaint**

# EXHIBIT A

ROBERT B. MILLIGAN, SBN 217348
rmilligan@seyfarth.com
DANIEL JOSHUA SALINAS, SBN 282065
jsalinas@seyfarth.com
SIERRA J. CHINN-LIU, SBN 322994
schinnliu@seyfarth.com
SEYFARTH SHAW LLP
2029 Century Park East, Suite 3500
Los Angeles, California 90067
Telephone: (310) 277-7200
Facsimile: (310) 201-5219

MICHAEL D. WEXLER (*admitted pro hac vice*)
mwexler@seyfarth.com
KEVIN J. MAHONEY (*admitted pro hac vice*)
kmahoney@seyfarth.com
KATELYN R. MILLER (*admitted pro hac vice*)
krmiller@seyfarth.com
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

JESSE M. COLEMAN (*admitted pro hac vice*)
jmcoleman@seyfarth.com
SEYFARTH SHAW LLP
700 Milam Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 225-2300
Facsimile: (713) 225-2340

*Attorneys for Plaintiff*
Karma Automotive LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

KARMA AUTOMOTIVE LLC, a
California limited liability company,

Plaintiff,

v.

LORDSTOWN MOTORS CORP., an

**CASE NO.: 8:20-cv-02104-JVS-DFM**

**FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES:**

1. Violation of the Computer Fraud

1

Ohio corporation; STEVE BURNS, an individual, JOHN LEFLEUR, an individual, DARREN POST, an individual, RICH SCHMIDT, an individual, ROGER J. DURRE, an individual, HONG XIN HUAN (A.K.A "GEORGE" HUAN), an individual; BEI QIN, an individual; STEPHEN PUNAK, an individual; CHRISTOPHER KIM, an individual; DAN ZHIHONG HUANG, an individual; PUNAK ENGINEERING, INC., a California corporation; and DOES 1 through 50, inclusive,

Defendants.

& Abuse Act, 18 U.S.C. § 1030, *et seq.*—Count I;

2. Violation of the Computer Fraud & Abuse Act, 18 U.S.C. § 1030, *et seq.*—Count II;

3. Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*;

4. Misappropriation of Trade Secrets in Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426.1 *et seq.*;

5. Breach of Durre's Confidentiality Agreement;

6. Breach of Huan's Confidentiality Agreement;

7. Breach of Qin's Confidentiality Agreement;

8. Breach of Punak's Confidentiality Agreement;

9. Breach of the Punak Engineering, Inc. Independent Contractor Agreement;

10. Breach of Kim's Confidentiality Agreement;

11. Breach of Huang's Confidentiality Agreement;

12. Breach of Post's Confidentiality Agreement;

13. Breach of the MNDA;

14. Breach of the Letter of Intent;

15. Tortious Interference with Contract;

16. Tortious Interference with Prospective Economic Advantage;

17. Unfair Competition in Violation of Cal. Bus. & Prof. Code § 17200 *et seq.*;

18. Breach of Duty of Loyalty;

19. Breach of Fiduciary Duty;

20. Aiding & Abetting Breach of Duty of Loyalty;

21. Aiding & Abetting Breach of Fiduciary Duty;

22. Conspiracy;

23. Fraud;

24. RICO, 18 U.S.C. § 1962(c) *et seq.*;

25. RICO Conspiracy, 18 U.S.C. §

2

1962(d) *et seq.*;
26. Unfair Competition Under Lanham Act, 15 U.S.C. § 1125(A);
27. Violation of the California Penal Code § 502; and
28. Violation of the California Penal Code § 502

Plaintiff Karma Automotive LLC ("Plaintiff" or "Karma"), by and through its undersigned counsel, hereby brings this First Amended Complaint for preliminary and permanent injunctive relief and damages against Defendants Lordstown Motors Corp. ("LMC"); LMC executives Steve Burns, Darren Post, John LeFleur, and Rich Schmidt (collectively, "LMC Individual Defendants"); and former Karma employees Roger "Joe" Durre, Hong Xin "George" Huan, Bei Qin, Stephen Punak, Christopher Kim, Dan Zhihong Huang, and Punak Engineering, Inc. (collectively, "Former Employee Defendants") (LMC, LMC Individual Defendants, and Former Employee Defendants collectively, "Defendants") and, in support thereof, avers as follows:

## INTRODUCTION

1.      Karma and LMC both make electric automobiles. While Karma has sold its vehicles to the public for years, LMC has yet to finalize a working vehicle for sale to the public, is under increasing scrutiny for its failure to do so, and is now under investigation by the Securities and Exchange Commission for misrepresentations about alleged "pre-orders" for its products. Faced with pressure from investors, regulatory authorities, and the general public about its significant development and production delays, LMC decided to take a shortcut and steal Karma's trade secrets. By doing so, LMC hoped to avoid—in the words of its own executives—millions of dollars in costs, and months if not years of development time.

2.      LMC accomplished its theft by first approaching Karma about a partnership. In the high-tech and highly-competitive electric vehicle industry, the

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

"infotainment" systems offered by manufacturers are a key distinguishing feature and selling point. The infotainment system collects, displays, and allows a driver to interact with all of the vehicle's informational and entertainment systems, often through a prominently-placed interactive touch-screen contained in the vehicle's front dash. Karma has years of experience developing cutting-edge infotainment systems, and LMC desperately needed one. When it approached Karma, LMC claimed to be interested about entering into a development partnership with Karma for an infotainment system.

3. Through that feigned interest, LMC entered into a five-month "due diligence" with Karma's engineering and project management staff, culminating in a fraudulent "letter of intent," and a promise by LMC to issue payments to Karma in short order.

4. The courtship was a ruse and the promised check never arrived. Instead, LMC used those five months to begin poaching and onboarding key Karma employees, and to steal Karma's confidential information and trade secrets—not just about the infotainment system being developed, but about every aspect of Karma's business.

5. Indeed, almost immediately after entering into a Mutual Non-Disclosure Agreement ("MNDA") with Karma that would start the due diligence period, LMC began systematically identifying which Karma's employees to solicit, based on the volume of trade secrets those employees could steal. LMC was aided in doing so by Defendant Roger J. "Joe" Durre: Karma's own Director of Engineering and one of its key managers on the project it had undertaken with LMC.

6. Not content to simply steal Karma's confidential and trade secret information, LMC incentivized multiple Karma employees to accept job offers from, and begin to work for, LMC *while they were still employed by and working for Karma*. LMC did so not only to avoid paying for their services, but to ensure

that these employees downloaded, saved, and/or sent to their personal email addresses massive amounts of Karma's confidential and trade secret information. In communications involving LMC's Chief Executive Officer Steve Burns, LMC's executives openly discussed how it would be preferable to have Karma engineers "executing [LMC's] program under Karma so that we don't face the full costs of benefits and other costs to stand up the team right away…."

7. LMC pulled out of the fake deal at the last minute and, almost overnight, set up its own "LMC Infotainment Group" (which never existed before) in California (where LMC had no presence prior) in order to save itself <u>millions</u> in immediate development costs. Indeed, just a few days before cancelling its project with Karma, and without telling Karma, LMC hired and on-boarded Durre. Yet despite becoming an employee of LMC, and of course without disclosing that fact to Karma, Durre continued to work as an employee of Karma *for nearly a month*. As an agent for LMC during the weeks in which he was employed by both entities, Durre downloaded and copied electronic files containing Karma's trade secrets and confidential information, then permanently deleted thousands of files from Karma's computer system in an effort to hinder Karma's own development plans.

8. LMC and the LMC Individual Defendants were at all times aware of the illegal nature of their actions. LMC's executives acknowledged in their internal communications that what they were doing was wrong and would lead to lawsuits once their conduct was uncovered. On August 6, 2020, Defendant Darren Post— LMC's Chief Technology Officer—emailed another LMC executive (Jonathan Wood), explaining: "I hired Joe Durre but it must never be mentioned to Karma. He is on vacation and technically still with Karma, so if he is on a call with Karma people involved, treat him like Karma. *To avoid lawsuits, we must not let Karma know* – they will find out on their own several months from now." (emphasis added).

9. LMC and the LMC Individual Defendants also privately

5

acknowledged the value of the materials that they were stealing, discussing that Karma's intellectual property being stolen was worth "into the billions" of dollars. In particular, on July 28, 2020, Post asked Durre (at the time, still employed as Karma's Director of Engineering) to "send me the leanest organization needed to execute the program. I would have both unemployed/furloughed plus those you think you can get – asterisk names of furloughed people." Excited by their own illicit work, Post and Durre conspired that, if "LMC owns all of the IP…*it tallies into the billions*."

10.    LMC was at least partially successful in its efforts to steal Karma's trade secrets and confidential information.

11.    Discovery to date in this matter demonstrates that Defendants stole Karma's source code and subsequently incorporated it into LMC's infotainment system source code for the Endurance: an electric pickup truck under development by LMC that it claims will soon be offered for sale. Discovery has also uncovered, that Defendants' theft is not limited to source code and the infotainment system. Indeed, it is now apparent that LMC's theft of Karma's trade secrets stretches back before its fake deal with Karma to at least December 2019, when Post originally left Karma for LMC. Documents discovered to be in Post's custody during this litigation, and the custody of others at LMC, demonstrate that in addition to the conspiracy to raid Karma's infotainment team and steal its infotainment technology, Defendants stole Karma's highly confidential and proprietary information *regarding nearly every aspect of Karma's vehicles*.

12.    For example, LMC copied word for word one of Karma's technical specifications for a vehicle power moding system—which for an electric vehicle is a critical system design that specifies power management mechanism of the entire vehicle. Defendants did this brazenly and lazily, slapping "Lordstown" on the front page of their technical specifications but then failing to remove references to Karma later in the document tables.

13.    Similarly, Defendants stole and then copied and pasted into their own company documents *entire sections* of Karma's development plans, software and hardware development project plans and timelines, hardware development specifications for individual vehicle and infotainment system components, design documents for electric vehicle communication systems, electric vehicle network architecture diagrams, full and complete bills of materials identifying the components and pricing for components of electric vehicles, and even secret plans for a new Karma vehicle.

14.    Defendants further stole and used Karma's production processes and tools, including, without limitation, electric vehicle testing and validation documents, mobile device application product requirements, process improvement methodologies, supplier information, and project budgets. Sometimes the copying was so obvious, Defendants forgot to fix the typos from the original Karma documents and even sometimes failed to remove the word "Karma" and the Karma design logo from the text of the document itself. Collectively the information LMC stole is conservatively worth hundreds of millions and perhaps billions of dollars.

15.    In short, LMC lied about its interest in a joint development deal to further gain access to Karma's trade secrets, and to understand which of Karma's employees could most directly aid LMC by stealing Karma's trade secrets and ideas. LMC then backed out of the joint development deal, stole Karma's ideas, and poached Karma's employees in order to save money and time. The cancelled project was projected to bring in *more than $3 billion in revenue* by 2024 to Karma.

16.    Moreover, Karma's valuable trade secrets *continue* to remain in the possession of not just LMC, but also in the possession of the Former Employee Defendants, some of whom downloaded thousands of files containing Karma's trade secrets and confidential information to external storage devices while working for Karma. Further demonstrating their ill intent, and in an effort to destroy

evidence of their wrongdoing, Durre and Huan deleted hundreds of stolen Karma files from their personal external storage devices immediately after learning of the Original Complaint filed by Karma in this matter, and did so in such a way that most of the files could not be restored.

17.     Karma brings this action to stop Defendants' continued illegal conduct, and to redress the harm that Karma already suffered through Defendants' blatantly illegal actions. Karma seeks injunctive relief from this Court to compel Defendants to refrain from disclosing and using any of Karma's confidential and trade secret information and to order them to return to Karma the property that they stole.

## THE PARTIES

18.     Plaintiff Karma Automotive LLC is a manufacturer of luxury electric vehicles, components, hardware, and software. Karma maintains its principal place of business in Orange County, California. Karma is licensed to conduct business in California, and conducts business throughout the United States.

19.     Defendant Lordstown Motors Corporation ("LMC") is a manufacturer of electric vehicles. LMC maintains its principal place of business in Ohio.

20.     Defendant Steve Burns ("Burns") is the Chief Executive Officer of LMC. Upon information and belief, Burns is a resident of the State of Ohio.

21.     Defendant John LeFleur ("LeFleur") is the Chief Operations Officer of LMC. Upon information and belief, LeFleur is a resident of the State of Ohio.

22.     Defendant Darren Post ("Post") is the Chief Technology Officer of LMC. From January 5, 2016 to December 1, 2019, Post was employed by Karma as a managing agent and, during the last few years of his employment, held the title of Chief Engineer. Upon information and belief, Post is a resident of the State of Ohio.

23.     Defendant Rich Schmidt ("Schmidt") is the Chief Production Officer of LMC. Upon information and belief, Schmidt is a resident of the State of Ohio.

24. From December 5, 2016 through September 1, 2020, Defendant Roger "Joe" Durre was employed by Karma as Director of Infotainment Systems at Karma's headquarters in Irvine, California. Upon information and belief, Durre, is a resident of the State of California, residing in the County of Orange.

25. From June 26, 2017 through August 28, 2020, Defendant Hong Xin "George" Huan ("Huan") was employed by Karma as Software System Architect at Karma's headquarters in Irvine, California. Upon information and belief, Huan is a resident of the State of North Carolina.

26. From on or about December 14, 2015 to September 18, 2020, Defendant Bei Qin ("Qin") was employed by Karma as Senior Software Engineer at Karma's headquarters in Irvine, California. Upon information and belief, Qin is a resident of the State of California, residing in the County of Orange.

27. From May 23, 2016 to October 14, 2016, Defendant Stephen Punak ("Punak") was employed by Karma as a Senior Software Engineer at Karma's headquarters in Irvine, California. Punak, through his company Punak Engineering, Inc., provided services to Karma as an independent contractor from October 17, 2016 through May 8, 2020, when his contract was terminated. Upon information and belief, Punak is a resident of the State of California, residing in the County of Orange.

28. Defendant Punak Engineering, Inc. ("PEI") is a corporation formed under the laws of the State of California and having its principal place of business in San Clemente, California. PEI is wholly-owned and operated by Defendant Punak, and was the company through which he provided engineering services to Karma as an independent contractor from October 17, 2016 through May 8, 2020.[1]

29. Defendant Christopher Kim ("Kim") provided electronic hardware engineering services to Karma as an independent contractor from on or about April

---

[1] While PEI is included in the definition of "Former Employee Defendants" herein for ease of reference, PEI was not an employee of Karma.

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

29, 2019 through April 9, 2020, when his contract was terminated. Upon information and belief, Kim is a resident of the State of California, residing in the County of Orange.[2]

30.     From on or about January 9, 2017 to September 4, 2020, Defendant Dan Zhihong Huang ("Huang") was employed by Karma as a Senior Software Engineer at Karma's headquarters in Irvine, California. Upon information and belief, Huang is a resident of the State of California, residing in the County of Orange.

## JURISDICTION & VENUE

31.     The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 because this action involves claims asserted pursuant to 18 U.S.C. § 1030, *et seq.* and 18 U.S.C. § 1836, *et seq.*

32.     The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1367 to consider Karma's claims under California common law and the California Uniform Trade Secret Act, as well as Karma's claim under any other applicable state law.

33.     This Court has personal jurisdiction over Defendants, and venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### Karma's Trade Secrets

34.     Karma is a manufacturer of luxury electric vehicles, including high-end sedans and sports cars. Karma also develops automotive hardware and software for use in electric vehicles.

35.     Over the course of at least six years and through substantial efforts

---

[2] Similarly, while Kim is included in the definition of "Former Employee Defendants" herein, his relationship to Karma was that of an independent contractor, rather than that of an employee.

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

and financial investment, Karma developed, compiled, and maintained a wealth of trade secret information (hereinafter referred to as Karma's "Trade Secrets") that it uses to service the needs of its customers, and achieve and secure a competitive edge over other manufacturers of automobiles, automotive hardware, and automotive software, and in particular over other electric vehicle systems manufacturers. Karma's Trade Secrets include, but are not limited to:

    a.  Karma's source code, engineering plans, and cost structure for Karma's cloud-based system to send new software and software updates to the consumer over the air;

    b.  Karma's source code, engineering plans, and cost structure for Karma's system to deliver messages communicating vehicle event actions automatically to drivers;

    c.  Karma's project planning documents, including internal estimates and figures to develop its engineering and design projects, including a breakdown of discrete tasks and projects to complete and the amount of expected labor time and costs to complete them;

    d.  Karma's internal processes for developing a vehicle—from building a factory, to synchronizing suppliers, to Karma's guidelines for quality assurance;

    e.  Karma's files and records regarding customers, prospective customers, independent contractors, subcontractors, vendors, and suppliers, and each of their profiles, preferences, specifications, account history, and habits;

    f.  information and documents pertaining to Karma's analyses and forecasts of production capacity and readiness to meet customer and partner needs;

    g.  the documents, methods, and systems used by Karma in soliciting, marketing, selling, and providing its products and services to its

11

customers, including, but not limited to, comparison pricing analyses, presentation formats and contents, and strategic plans;

h. financial and accounting information, such as budgets, cost, pricing and billing information, and revenues and profit margins; and

i. other non-public information of Karma that would be valuable to a competitor or other third-party.

36. Karma's Trade Secrets, all of which were compiled and developed by Karma over many years through substantial efforts and expense, are not known to the public. Karma's Trade Secrets are not readily ascertainable in the electric automotive industry, whether through a trade or public directory or any other source. Karma's Trade Secrets were developed through considerable time, effort, and expense to Karma, and are not readily ascertainable by others, and especially not to Karma's competitors. For example, Karma's Trade Secrets related to its research and development its vehicles, including designs, software source code, component specifications, sourcing and supply chain coordination, and cost information, are valuable precisely because they give Karma a competitive advantage of being the first to market with its technology. Karma's Trade Secrets, in the hands of a competitor, would enable the competitor to bypass months or even years of research and development that the competitor would have had to otherwise do on its own.

37. Just as importantly, Karma's Trade Secrets, in the hands of a competitor, would show the competitor what *not* to do, based on proposals or ideas that Karma determined were not feasible. A competitor with access to Karma's Trade Secrets could avoid the costly trial-and-error process inherent in any engineering project, further saving time and costs.

38. Karma's Trade Secrets are valuable to Karma and their value lies primarily in being kept secret and not generally known. For that reason, Karma has taken considerable steps to maintain the secrecy of its Trade Secrets, such as: (a)

12

requiring, as a condition of employment or contractual engagement, that all employees and contractors promise not to use or disclose this information, except in the performance of their duties for Karma; (b) having employees and contractors execute confidentiality and non-disclosure agreements, which instruct Karma's employees and contractors not to disclose, reproduce, or use this information without Karma's consent; (c) emphasizing to employees and contractors Karma's need to keep this information secret; (d) limiting access and/or restricting access to this information by employees and contractors on a need-to-know basis; (e) requiring unique usernames and passwords to access source code and related data on Karma's computer systems and databases; and (f) implementing a number of physical and electronic security measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access information on Karma's computer system, servers, and networks, requiring that Trade Secrets be kept in secure locations when not in use, and requiring dual-factor authentication for remote access and VPN access to Karma's systems.

39.    Additionally, Karma entered into confidentiality and non-disclosure agreements with employees, contractors, vendors, suppliers, and business partners, including LMC, which prohibited all such individuals and entities from disclosing, reproducing, or using Karma's Trade Secrets without Karma's consent.

40.    In a further effort to prevent misappropriation, Karma also implemented a policy of disabling all USB ports on all Karma computers to prevent anyone from plugging in any flash drives or external storage drives or devices through any USB port. While certain employees were granted a special exception to enable them to use the USB ports on their Karma computers, this exception was limited to employees who required frequent USB access on their Karma computers for purposes of an ongoing and frequent job task. Requests for an exception were evaluated on an individual case-by-case basis and required approval from a Karma executive level officer responsible for the employee's department. A request for an

13

exception would be approved if (a) the job task cannot be completed by any other approved means, and (b) the job task was frequent enough that it required ongoing access. The request for an exception would be denied if the desired data exchange or transfer could happen by a different approved venue like a network drive, OneDrive, or SharePoint. It would also be denied if the need was temporary.

41.    The Former Employee Defendants were each granted an exception to the USB access policy described above because their particular engineering jobs involved frequent and ongoing need to transfer data via the USB port.

42.    In the course and scope of their duties as senior engineering employees, managers, or contractors of Karma, the Former Employee Defendants had access to, regularly used, and were responsible for maintaining and safeguarding Karma's Trade Secrets for the purpose of performing their job duties and services for Karma.

43.    While the MNDA between Karma and LMC was still in effect, LMC and the LMC Individual Defendants had access to, regularly used, and were responsible for maintaining and safeguarding Karma's Trade Secrets from use and disclosure for a competitive purpose.

## Karma's Confidential Information

44.    In addition to its Trade Secrets (as defined above), Karma maintains other information as confidential that has value for Karma in being kept confidential, or that Karma has legal or contractual obligations to maintain as confidential but does not qualify as a trade secret under applicable state or federal law (such information is referred to herein as "Confidential Information").

45.    Karma's Confidential Information encompasses all information belonging to Karma other than Trade Secrets (as defined above) that is proprietary and confidential in nature, whether the information is reduced to writing or in a form from which such information can be obtained, translated, or derived into reasonably usable form, and whether the information is simply in an employee's

14

head, that: (a) has been provided to the employee during his/her employment with Karma; (b) the employee has gained access to while employed by Karma; and/or (c) was developed by the employee in the course of his/her employment with Karma.

46. Karma's Confidential Information includes all information, correspondence, documents, and other property (whether tangible or intangible) that Karma owns pursuant to California Labor Code section 2860 that do not qualify as a trade secret under applicable state or federal law. California Labor Code section 2860 states: "Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment."

47. Examples of Karma's Confidential Information include, but are not limited to:

    a. secret but still proprietary or confidential methodologies, strategies, programs, and systems used by Karma in managing assets, liabilities, and risk and/or in soliciting, marketing, selling, and providing services to its customers;

    b. private and confidential communications with Karma's vendors, suppliers, and consultants;

    c. non-trade secret but still confidential or private information of third parties that Karma has contractual and/or legal obligations to maintain as confidential, including all customer information that Karma and its employees are restricted from disclosing by federal, state, or local statutes or regulations;

    d. non-trade secret but still proprietary or confidential financial and accounting information of Karma (such as cost, pricing information, price lists, financial policies and procedures, revenues, and profit

15

margins, targets, and forecasts);

    e.   non-trade secret but still proprietary or confidential information concerning Karma's current and prospective customers and vendors (including, but not limited to, customer and vendor lists and similar compilations, and information that customers and vendors expect Karma to keep as confidential);

    f.   non-trade secret but still proprietary or confidential information concerning Karma's consultants, independent contractors, and vendors (including lists of all the foregoing); and

    g.   personnel files and employment-related records of Karma's current and former employees (including, but not limited to, information related to the hiring, recruitment, retention, and termination of its current and former employees, as well as information related to their job duties, assignments, skills, training, performance, discipline, promotions, compensation, benefits, leaves of absence, and medical files); and

    h.   information believed by Karma to be a Trade Secret (as defined above) that ultimately does not qualify as a trade secret under applicable state or federal law, but nonetheless was maintained by Karma as confidential.

48.   Information received from a third party under contractual confidentiality obligations is valuable to Karma, regardless of its trade secret status, for a number of reasons. Disclosure or use of such information in violation of a contract with the third party may subject Karma to legal liabilities, destroy the relationship with that third party, and deprive Karma of all the benefits of its investment in that relationship. Such information would also be valuable to a competitor if it is obtained or acquired by the competitor without any contractual

obligation associated with the information, as it would be tantamount to free discovery of information.

49. Information about Karma's engineering employees is valuable to Karma because it has invested substantial resources over the years in recruiting, training, and providing opportunities to these employees to hone their skills and enable them to participate in developing Karma's cutting-edge technology. Such information is valuable to a competitor like LMC because it would enable the competitor to bypass all the time and resources otherwise needed to recruit and train top engineering talent. With access to Karma's team as a cohesive group, and not just one-off information about individual employees, a competitor would be able to target their recruiting efforts and know exactly who to recruit, especially if that employee has been working on the same exact technology the competitor is planning to develop. Rather than hiring recruiters, posting job ads on public websites, making cold calls, and asking for referrals to potential candidates, among other recruiting activities, the competitor would already know the particular employees that it needs to recruit, what those employees are working on, and which other employees work as a team with those recruiting targets.

50. As with Trade Secrets, Karma's Confidential Information is valuable to Karma, and its value lies primarily in being kept secret and not generally known. For that reason, Karma has taken steps reasonable under the circumstances to maintain the secrecy of its Confidential Information, such as: (a) requiring, as a condition of employment or contractual engagement, that all employees and contractors promise not to use or disclose this information, except in the performance of their duties for Karma; (b) having employees and contractors execute confidentiality and non-disclosure agreements, which instruct Karma's employees and contractors not to disclose, reproduce, or use this information without Karma's consent; (c) emphasizing to employees and contractors Karma's need to keep this information secret; (d) limiting access and/or restricting access to

17

this information by employees and contractors on a need-to-know basis; (e) requiring unique usernames and passwords to access this information on Karma's computer systems; and (f) implementing a number of physical and electronic security measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access information on Karma's computer system, servers, and networks, requiring that Confidential Information be kept in secure locations when not in use, and requiring dual-factor authentication for remote access and VPN access to Karma's systems.

51. Karma has also implemented a policy of disabling all USB ports on all Karma computers to prevent anyone from plugging in any flash drives or external drives or devices through any USB port. While certain employees were granted a special exception to enable them to use the USB ports on their Karma computers, this exception was limited to employees who required frequent USB access on their Karma computers for purposes of an ongoing and frequent job task. Requests for an exception were evaluated on an individual case-by-case basis and required approval from a Karma executive level officer responsible for the employee's department. A request for an exception would be approved if (a) the job task cannot be completed by any other approved means, and (b) the job task was frequent enough that it required ongoing access. The request for an exception would be denied if the desired data exchange or transfer could happen by a different approved venue like a network drive, OneDrive, or SharePoint. It would also be denied if the need was temporary.

52. The Former Employee Defendants were each granted an exception to the USB access policy described above because their particular engineering jobs involved frequent and ongoing need to transfer data via the USB port.

53. In the course and scope of their duties as senior engineering employees, managers, or contractors of Karma, each of the Former Employee Defendants had access to, regularly used, and were responsible for maintaining and

18

safeguarding Karma's Confidential Information for the purpose of performing their job duties and services for Karma.

54.     While the MNDA between Karma and LMC was still in effect, LMC and the LMC Individual Defendants had access to, regularly used, and were responsible for maintaining and safeguarding Karma's Confidential Information from use and disclosure for a competitive purpose.

**The Former Employee Defendants' Contractual Obligations to Karma**

55.     As a condition of their assignment and placement at Karma, the Former Employee Defendants were given access to Karma's Trade Secrets and Confidential Information (as defined above) in order to perform their contractual duties for Karma. The Former Employee Defendants knew or should have known of the confidential nature of this information and the fact that this information was the property of Karma and was not to be used or disclosed without Karma's express consent.

56.     Specifically, the Former Employee Defendants (except PEI, which signed a separate agreement) each executed a Confidentiality Agreement with Karma that prohibits the unauthorized disclosure and use of Karma's confidential and trade secret information including, but not limited to, Karma's source code, including source code written or developed by the Former Employee Defendants in the course of performing services for Karma. True and correct copies of the Confidentiality Agreements signed by the Former Employee Defendants are attached hereto as **Exhibits 1 (Durre), 2 (Huan), 3 (Qin), 4 (Punak), 5 (Kim), and 6 (Huang)** and are incorporated herein by reference.

57.     Before joining LMC in December of 2019, Defendant Post was also employed by LMC as its Chief Engineer. In that position, Post also executed a Confidentiality Agreement with Karma that prohibits the unauthorized disclosure and use of Karma's confidential and trade secret information including, but not limited to, Karma's source code and technical specifications. A true and correct

19

copy of the Confidentiality Agreement signed Post is attached hereto as **Exhibit 7**
and is incorporated herein by reference.

58.    Punak's employment with Karma was terminated in 2016, but Punak,
through his company PEI, continued to provide engineering services to Karma as
an independent contractor through May 8, 2020. PEI's Independent Contractor
Agreement, which governed Punak's independent contractor work for Karma,
contained similar confidentiality restrictions as Punak's Confidentiality
Agreement, and also specifically stated that any source code or other materials that
Punak developed for Karma in the course of his work for it would be the sole
property of Karma, and that neither Punak or PEI would not use or disclose those
materials without Karma's authorization. *See* **Exhibit 8** at pp. 2-3, §§ 2.1, 2.4.

59.    The Confidentiality Agreements and the PEI Independent Contractor
Agreement require that the Former Employee Defendants: (1) hold Karma's Trade
Secrets and Confidential Information in the strictest confidence; (2) use Karma's
Trade Secrets and Confidential Information only while working at Karma in
furtherance of performing services for Karma; (3) not use Karma's Trade Secrets
and Confidential Information for the Former Employee Defendants' own benefit
or the benefit of any other party (including a competitor of Karma); (4) not copy
Karma's Trade Secrets and Confidential Information; (5) not transmit or share
Karma's Trade Secrets and Confidential Information in any manner to anyone; and
(6) return all Karma's Trade Secrets and Confidential Information and property at
the conclusion of their assignment at Karma. Specifically, each Confidentiality
Agreement and the PEI Independent Contractor Agreement requires the Former
Employee Defendants to return all Karma property upon the termination of their
employment or independent contractor relationship with Karma.

**LMC's Contractual Obligations to Karma and the Endurance Project**

60.    Defendant Darren Post resigned as Karma's Chief Engineer in
December of 2019, then joined LMC as its Chief Technology Officer. Shortly

20

thereafter, in early February 2020, Post contacted Defendant Durre, who at the time was Karma's Director of Engineering. Post contacted Durre to discuss developing the infotainment system for LMC's new fleet of electric pick-up trucks, referred to as "Endurance." Specifically, Post proposed that LMC and Karma explore a potential agreement whereby Karma would develop an infotainment system for LMC for use in the Endurance.

61.    Infotainment refers to the in-vehicle entertainment systems, as well as the connectivity equipment and systems of the entertainment, which include the hardware, software, and cloud-based systems and services. Among some of the cutting-edge and unique features Karma has developed are a sophisticated cloud system to send new software and software updates to the consumer over the air, as well as a system to deliver messages that communicate vehicle event actions automatically to drivers.

62.    In 2020, LMC, was already behind schedule and desperately needed to start producing working vehicles, as Defendant Burns had made public statements that LMC had already received tens of thousands of "pre-orders" for the Endurance. Before reaching out to Karma, LMC had already approached other electronics manufacturers about developing an infotainment system for the Endurance, but those other manufacturers either refused to work with LMC or could not meet LMC's required development timeline. Put simply, LMC made public representations, which are now the subject of an SEC investigation, about the public demand for a product that LMC had not yet completed, and for which it needed to develop a working product in very short order.

63.    On February 7, 2020, Karma entered into a Mutual Non-Disclosure Agreement ("MNDA") with LMC. The MNDA allowed the parties to exchange confidential and trade secret information as part of due diligence for the proposed development deal, whereby Karma would develop the infotainment system for LMC's new fleet of electric vehicles (hereinafter, "the Endurance Project").

Among other things, the MNDA specifically prohibited the use or disclosure of the parties' confidential or trade secret information. A true and correct copy of the MNDA is attached hereto as **Exhibit 9**.

64.   For several months after the MNDA was signed, Karma's infotainment development team worked with Post (Chief Technology Officer), Zak Stelmaszek (LMC's Director of Electrical Engineering), Jonathan Wood (LMC's Purchasing Manager), and other LMC employees in an effort to identify what LMC needed in an infotainment system and the capabilities and technologies that LMC could offer for the Endurance Project. This due diligence process necessarily involved Karma providing LMC access to some of Karma's Trade Secrets and Confidential Information, including limited access to Karma's computer source code, designs, cost and pricing information, vendor and supplier relationships, the human capital and skills capabilities of Karma's software engineers, and other sensitive and proprietary information. All of the access that Karma afforded to LMC, and all of the Trade Secrets and Confidential Information that Karma shared with LMC, were subject to the MNDA.

65.   Joe Durre was appointed to lead the Endurance Project on behalf of Karma. After two months of discussions around the parameters of the Endurance Project, Karma submitted a Statement of Work for the project in April 2020, which included a rough quote. At the time, Karma was unaware that LMC, through Post, had already started to scheme with Durre to potentially cut out Karma, as more fully described below. In fact, even as he was supervising the Statement of Work submitted to LMC, Durre was communicating with Post about LMC's potential hiring of several Karma engineering employees who reported to Durre, all of whom would be involved in the Endurance Project.

66.   In June 2020, LMC informed Karma that it had selected Karma for the Endurance Project. On June 11, 2020, Karma and LMC entered into a Letter of Intent ("Letter of Intent") that detailed the infotainment system development

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

services that Karma would provide for the Endurance Project. The Letter of Intent represented the parties' intent to work together in good faith to negotiate, prepare, execute, and deliver definitive agreements governing the scope of the Endurance Project. The Letter of Intent specifically emphasized that the MNDA remained in full force and effect. A true and correct copy of the Letter of Intent, without exhibits, is attached hereto as **Exhibit 10**.

67.     In the Letter of Intent, LMC agreed that it would negotiate with Karma in good faith if any disputes arose, but that if such disputes could not be resolved that LMC would submit to the jurisdiction of the state or federal court in Los Angeles County with respect to "any action with respect to the subject matter of this Letter of Intent." LMC further agreed that any such disputes "shall be governed by the laws of the State of California without regard to the conflicts of law provisions thereof."

68.     On or about June 24, 2020, Durre (as Karma's project lead) submitted an updated quote for Karma's services to LMC.

69.     On July 9, 2020, LMC informed Karma that it would be moving forward with the Endurance Project and would issue its initial payment "shortly."

70.     Throughout the months of June and July 2020, and in virtually every interaction with Karma since February of 2020, LMC and the LMC Individual Defendants repeatedly represented to Karma that it intended to move forward with utilizing Karma's services.

**The Scheme to Steal Karma's Trade Secrets and Confidential Information and Raid Karma's Employees**

71.     On August 6, 2020, and without any prior indication that it was even considering as much, LMC terminated the Letter of Intent, stating to Karma that LMC "decided to move in a different direction with respect to [Karma's] current offering." In its letter terminating the Letter of Intent, LMC stated it would "return, destroy, and/or erase any confidential information received from Karma." A true

23

and correct copy of the email and letter that LMC sent to Karma on August 6, 2020 terminating the Letter of Intent is attached hereto as **Exhibit 11**.

72.     As is now abundantly clear, the "different direction" referenced in Karma's notice of termination was the outright theft of Karma's Trade Secrets and Confidential Information, and a scheme to raid Karma's key employees. Almost overnight, LMC set up its own, in-house "LMC Infotainment Group" in California, staffed largely with the Karma engineers who were assigned to work on the Endurance Project.

73.     What Karma later discovered is that LMC's plans to steal Karma's Trade Secrets and Confidential Information—largely through Durre—were a long time in the making.

_LMC Uses Durre to Plan the Theft of Karma's Trade Secrets and Confidential Information_

74.     On March 26, less than two months after LMC and Karma entered into the MNDA, and while Durre was overseeing the Endurance Project as Karma's Director of Engineering, Defendant Post emailed Durre with a presentation referencing a "Joe Durre LLC" that could lead LMC's west coast infotainment team. Four days later, Durre began to communicate with a real estate agent about Southern California commercial office space, using a personal email account accessed through his Karma-owned computer. Upon information and belief, the real estate that Durre was searching for was to be the California headquarters of the LMC Infotainment Group that Durre and LMC already planned to form. Indeed, months later Durre would connect the same real estate agent to LMC's Chief Operating Officer, Defendant LeFleur, to help LMC finalize the deal for that commercial space. Durre had no legitimate business purpose for engaging in this correspondence or looking for commercial office space in connection with his job at Karma or with the Endurance Project. True and correct copies of these email exchanges, which were recovered from Durre's Karma computer, are collectively

attached hereto as **Exhibit 12**.

75.     On April 2, 2020, again while employed as *Karma's* Director of Engineering, Durre discussed an internal LMC organization chart with Post and how the structure would "sell[] well with investors." This email exchange was conducted on Durre's personal Gmail account instead of his Karma email account, and had no legitimate purpose in connection with the Endurance Project. A true and correct copy of this email exchange, also recovered from Durre's Karma-owned computer, is attached hereto as **Exhibit 13**.

76.     On April 16, 2020, LMC's executives internally discussed how they planned to hire several of the Former Employee Defendants as part of the new west coast infotainment team to be headed by Durre, and created an organizational chart showing Durre, Qin, Punak, Huan, and other former Karma employees as part of that new team.

77.     Durre continued to oversee the Endurance Project on behalf of Karma throughout April, May, June, and July of 2020, while hiding his relationship with LMC from Karma. On April 24, 2020, Durre texted Defendant Post, letting him know that business development employees at Karma would be reaching out to LMC regarding the Endurance Project. Durre stated to Post that "he did not want [Karma employees] to know we have already been working on this."

78.     On July 21, 2020, just a few weeks before LMC terminated the Letter of Intent and the Endurance Project, Post emailed Schmidt, LMC's Chief Production Officer, to "propose hiring Joe Durre and his furloughed team as our west coast infotainment / connectivity team to develop Endurance's system," that "this is the opportune time to hire Joe and his furloughed team," and that Post and "Steve [Burns]" had "discussed this strategy to instantly build our software / hardware team and get our infotainment team for ½ the cost (labor without Karma costs or licensing fee). Now is the decision time before the [sic] get snapped up by Rivian and other companies." Schmidt responded to Post almost immediately:

25

"Sounds good please set up the interview, as well let's discuss the team and location."

79.     Post wrote to Schmidt again on July 24, 2020, forwarding Durre's resume and stating, "Per our previous discussions, [Durre] will be leaving Karma and is that genius who can deliver the system for us. We would own the IP and avoid spending $5-6 million with Karma. Also attached is his organization structural proposal, which I developed with him. He has candidates lined up, who were key individuals from his team who are permanently on furtlough [sic]. These are rare birds with uncanny capabilities."

80.     On July 26, 2020, Durre emailed Post attaching the "resumes of the furloughed team" with a "synopsis" for each person, along with, upon information and belief, salary information for the Karma employees whom he intended to solicit to start the LMC Infotainment Group.

81.     On July 28, 2020, Post had a chat message exchange with Durre in which he asked Durre to "send me the leanest organization needed to execute the program. I would have both unemployed/furloughed plus those you think you can get – asterisk names of furloughed people." Excited by their own illicit work, Post and Durre conspired that, if "LMC owns all of the IP…it tallies into the billions."

82.     On July 30, 2020, seven days before LMC notified Karma that it was terminating the Letter of Intent, Post sent an email to Durre with the subject "Endurance Infotainment Systems Cost Savings Estimate: justify LMC Infotainment - West." At the time of this email, LMC did not have any infotainment development operations or employees on the west coast of the United States, and Durre was still employed by Karma as its Director of Engineering overseeing the Endurance Project. In his email, Post sought help from Durre to quantify the savings that LMC could realize by hiring Durre and his team and proceeding with project Endurance in-house by cutting out Karma. By Post's own estimate, LMC would save $4.6 million by hiring Durre and his Karma team and taking advantage

26

of all their work product, along with Karma's Trade Secrets and Confidential Information. A true and correct copy of the July 30, 2020 email is attached hereto as **Exhibit 14**.

83. On August 1, 2020, Defendant Durre received an offer letter from LMC to become its Director of Software. By August 3, 2020, Durre was already enrolled in LMC's payroll software. True and correct copies of Durre's offer letter, and subsequent emails showing Durre's enrollment in LMC's payroll system, are attached collectively hereto as **Exhibit 15**.

84. LMC's scheme—to use Durre to set up a competing engineering group while Durre still worked for Karma—involved senior executives at LMC all the way up to its Chief Executive Officer, Steve Burns. On August 4, 2020, two days before LMC canceled the deal with Karma, Burns and several other LMC executives (including Schmidt and Post) exchanged emails regarding the hiring of Durre, growing his new team quickly, and LMC's need for commercial real estate space in Orange County. A true and correct copy of this email is attached hereto as **Exhibit 16**. Defendants obviously knew their actions were illegal: Post accidentally forwarded this email exchange to Durre's Karma email account instead of Durre's personal account, and Post immediately tried to "recall" the message. A true and correct copy of the recall message is attached hereto as **Exhibit 17**.

85. On August 6, 2020, the day that LMC terminated the Letter of Intent, Post emailed another LMC executive, Jonathan Wood, explaining: "I hired Joe Durre but it must never be mentioned to Karma. He is on vacation and technically still with Karma, so if he is on a call with Karma people involved, treat him like Karma. **To avoid lawsuits, we must not let Karma know** – they will find out on their own several months from now." (emphasis added).

86. Durre was also intent on Karma remaining in the dark about his work for LMC. On August 7, 2020, Durre texted Post and asked him to pass along instructions to Jonathan Wood: "Darren, be sure that Jonathan doesn't mention me

being with LMC to anyone connected with Karma." Post indicated in response that he had already done so.

87.     In the same string of text messages, Durre congratulated Post on his use of an unrelated lawsuit against Karma as cover for terminating the Letter of Intent: "Darren, nice timing on the LOI cancellation to coincide with the lawsuit news release. It shows LMC distancing itself from bad PR in light of LMC IPO." Three minutes later, Durre asked if LMC could "move quickly on Steve Punak and the other 3 guys."

88.     Despite being on LMC's payroll as early as August 3, 2020, and working on its behalf for months before that, Durre did not submit a notice of resignation to Karma until August 27, 2020, and did not actually resign from Karma until September 1, 2020. Put differently, Durre had access to Karma's Trade Secrets and Confidential Information for nearly a full month while he was officially on LMC's payroll. A true and correct copy of Durre's resignation letter is attached hereto as **Exhibit 18**.

89.     Between July 28, 2020 and September 1, 2020, Defendant Durre utilized removable storage devices and cloud services to copy and download at least seven of Karma's files or folders containing Karma's Trade Secrets and Confidential Information, including, but not limited to, highly confidential and valuable information regarding Karma's software development projects, including but not limited to the software Karma was developing for the Endurance Project.

90.     On August 5, 2020—the day before LMC terminated the letter of intent, and while he was on the payroll of both Karma and LMC—Durre began using and accessing an LMC email account from his Karma laptop. Durre created bookmarks to at least two LMC SharePoint folders—cloud-based software that allows for the removal and dissemination of large data files—that same day:

    a.  https://lordstownmotors.sharepoint.com/teams/InfotainmentandConnectedVehicle-Management.

b. https://lordstownmotors.sharepoint.com/teams/InfotainmentandConn
ectedVehicle.

91.    Specific examples of confidential and trade secret information Durre
stole from Karma in this time frame include:

**a. July 28, 2020: H3 Karma eBOM _2018_07_024**

i. This document is on a removable drive that was connected to
Durre's computer via USB, an contains all of the cost structures
of different components of a brand-new electric SUV. This is
unrelated to any work on the LMC project.

ii. Karma spent approximately $32.3 million developing this
project in collaboration with a global auto manufacturer with
which Karma had entered into a mutual non-disclosure
agreement to protect this information.

iii. This document is extremely valuable to Karma and to
competitors because it provides a roadmap to Karma's process
for building SUV components, as well as the cost of each
component. A competitor could utilize this document to bypass
18 months of time it would otherwise take to develop, build,
and price an electric SUV.

**b. August 5, 2020: Quote 7 BOM Breakdown**

i. This document is on a Western Digital Book removable storage
device. The document contains the cost breakdown of the
infotainment system Karma was developing for LMC's
Endurance project.

ii. Karma spent months developing the specifications and costs for
the various components for the Endurance project.

iii. This document is valuable to Karma because it represents

29

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND
DAMAGES

months of work for development of an infotainment service for an electric SUV. This document would be used as a baseline for potential future opportunities. This document is also particularly valuable to LMC because it was internal to Karma and was never supposed to be shared with LMC. This document will allow LMC to replicate the exact cost structure of the infotainment system Karma was to develop for LMC. This helps advance LMC's scheme of stealing Karma's trade secrets in order to build its own infotainment system in-house, without Karma.

iv.  Access to this file was limited to only those Karma employees who were involved in pricing quotes for the Endurance project with LMC (several of whom have left employment with Karma to join LMC).

c.  **August 14, 2020: HC Planning Document for Engineering Team**

i.  This document is on a Western Digital Book removable storage device. The document contains the Karma engineering team's internal estimates and figures to develop the HC project, including a breakdown of discrete tasks and projects to complete and the amount of expected labor time and costs to complete them.

ii.  Karma spent several months developing this document.

iii.  This document is extremely valuable to Karma and to competitors because it provides a precise breakdown of the discrete tasks, needs, and human capital to move forward on the project. This would provide a competitor a months' long head start on its development and planning stages.

**d. August 14, 2020: Specifications and Process Documents for KPDS**

  i.  This document is on a Western Digital Book removable storage device. The document contains a roadmap for Karma's internal processes for developing a vehicle—from building a factory, to how to synchronize suppliers, to Karma's guidelines for quality assurance.

  ii.  This document is extremely valuable to Karma and to competitors because it essentially constitutes Karma's internal model for building a vehicle from the ground floor to a finished product. In the hands of a competitor, it would allow the competitor to replicate Karma's processes for building a vehicle and quality assurance processes.

**e. August 19, 2020: Roadmaps Project Document**

  i.  This document is on a Western Digital Book removable storage device. The document contains internal development information regarding Karma's future designs for infotainment technology developments and other future vehicle developments.

  ii.  This document is extremely valuable to Karma and to competitors because it provides direct insight into Karma's research and development for the core of its business—vehicle development and vehicle technology development. This would allow a competitor to learn the progress Karma has made internally on new vehicle and technology innovations and copy that work product.

**f. August 31, 2020: Licenses and Contracts with Vendor**

  i.  These documents are on a Western Digital My Book removable storage device. These documents contain information on costs

31

and volumes of potential projects being collaborated on with a vendor. These relate to future infotainment systems that the vendor and Karma are developing together.

   ii. Both Karma and the vendor have entered into non-disclosure agreements to protect this information.

  iii. These documents are extremely valuable to Karma and to competitors because they evidence collaboration plans for development of future infotainment technology. They contain not only Karma's internal development, but the vendor's as well.

**g. September 1, 2020: CGW Internal Projects**

   i. This document is on a Western Digital My Book removable storage device. The document contains internal project information to develop hardware and software for an internal gateway, which includes information on planning for the next generation of vehicle infotainment systems.

  ii. This document is extremely valuable to Karma and to competitors because it provides internal strategic planning for future projects that are not even yet at market.

**h. September 1, 2020: Project Documents for the K1_2 Project**

   i. This document is on a Western Digital Book removable storage device. The document contains internal projects specifications for Karma's Revero GT vehicle, and development plans for future models.

  ii. Karma has spent years developing this vehicle and continues to spend significant labor hours in developing future specifications for the vehicle.

  iii. These documents are extremely valuable to Karma because

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

they represent internal project documents for one of Karma's top-flight vehicles in the market. A competitor could utilize these documents to duplicate the specifications for the Revero GT vehicle and build their own competing vehicle.

92.     Durre did not stop at merely stealing Trade Secrets and Confidential information from Karma—he also took steps to sabotage the work of Karma's engineering department that he would soon leave behind. Between 11:23 p.m. on August 31, 2020 and 4:59 p.m. on September 1, 2020 (his last day of employment at Karma) Durre also intentionally deleted and "double deleted" thousands of files in Karma's OneDrive SharePoint system and hard drive so that this information could not be recovered by Karma. Durre was never authorized or permitted to delete any of his work product or work files from Karma's SharePoint, and he had no legitimate business reason for doing so. This intentional sabotage constitutes a criminal act and was done with the intent to cripple Karma's ability to remain competitive in the marketplace against the new infotainment team Durre and other former Karma employees and contractors had established at LMC.

93.     Separate and apart from his downloading and copying of Karma's Trade Secrets and Confidential Information, Durre also forwarded from his Karma email account to his personal email account numerous emails containing sensitive vendor and pricing information, along with Endurance Project-related information (some of which contain Trade Secrets and/or Confidential Information). These downloads began prior to Durre giving his notice of resignation to Karma, but after he had received a formal job offer from LMC. Durre had no legitimate Karma-related business purpose to send these emails to his personal email account. Specifically, Durre forwarded the following emails from his Karma email account to his joe.durre@gmail.com or rjdurre@aol.com accounts:

a.  August 3, 2020 - re 'Document 1,' which is a list of positions that would be part of an Infotainment Engineering Team.

33

- This document represents a blueprint of an infotainment development or engineering department and closely follows the Karma organizational structure, and therefore could be used as a roster for LMC to use to raid Karma's employees for an in-house infotainment department. Durre had no legitimate business purpose for sending this information to his personal email account on the day he became employed by LMC.

b. August 3, 2020 - re IVI PoC with GmbH, from Vendor

- This document contains Confidential Information regarding audio/video distribution in vehicles and a proposed specific proof of concept designed for Karma's use, received from a software vendor subject to an NDA.

c. August 3, 2020 - re Hydra and LiDAR, from Vendor

- This document contains Confidential Information regarding Lidar Sensors received from a Lidar sensor vendor subject to an NDA. Lidar Sensors are used to enable autonomous driving—cutting edge feature being developed by several electric vehicle manufacturers.

d. August 3, 2020 - re Sales Deck, from Vendor

- This document contains Confidential Information regarding Connected Vehicle Services received from a Connected Vehicle Service vendor subject to an NDA.

e. August 3, 2020 - re Telematic Reference, from Vendor

- This document contains Confidential Information on the design of a telematics control device received from a communications and positioning module solutions and u-blox vendor subject to an NDA.

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

f. August 3, 2020 - re WELLS schematic, from Karma internal team

- This document contains non-public operational and cost projection information for an internal Karma project. This can be used by a competitor to duplicate Karma's blueprints and cost preparations for a similar project. This is the next generation of DIS/Cluster hardware and software for Karma vehicles and was intended to be sold to LMC under the original Letter of Intent.

g. August 4, 2020 - re NDA_List with prospective vendors

- This document contains Confidential Information in the form of Karma's prospective vendor list, which Karma does not share outside the company. This document has taken years for Karma to develop through its work with vendors and would allow a competitor to know exactly which vendors Karma prefers for its projects. This is a hand-picked and vetted list of vendors that would take a competitor time and effort to vet, and is the complete list of vendors that comprise the Karma Infotainment system.

h. August 5, 2020 - re ACU6 Pro Auto mechanical file, from Vendor

- This document contains Confidential Information regarding a new global telematics control device received from a telematics control vendor subject to an NDA.

i. August 5, 2020 - re Benchmark pricing for a TCU, from internal teammate

- This document contains non-public pricing information that Karma intended to use for the Endurance project that was never previously shared with LMC. Durre had no legitimate business purpose to send this information to his personal email account.

This information could easily be used by LMC to skip the steps of soliciting pricing information, and instead use Karma's efforts that were never shared with LMC.

j. August 12, 2020 - re PR SP Contract Extension 200214

- This document contains the terms of a contract extension with one of Karma's key contracted vendors. This information identifies one of Karma's preferred vendors (which Karma does not share outside the company) along with the terms of engagement between the two companies. This could be used by a competitor to bid against Karma for this particular vendor's services, or to simply bring this vendor on board with the LMC's new infotainment team.

k. August 15, 2020 - re Global High-End Auto Manufacturer Infotainment System

- This document contains non-public information regarding Karma's work for Porsche in providing an infotainment system for one of its vehicles. It contains a high-level summary of the construction and pricing of the infotainment system, which would be valuable to a competitor to use either to create its own infotainment system by copying Karma's information, or to use to compete with Karma to offer similar infotainment services to Karma's business partners at a lower price.

l. August 19, 2020 - re SDK Evaluation concerning Vendor

- This document contains Confidential Information regarding Automotive Artificial Intelligence received from an automotive artificial intelligence vendor subject to an NDA.

m. August 19, 2020 - re ESM Charging, from Vendor

- This document contains Confidential Information regarding

36

CAN communication protocol and design received from an external sound module vendor subject to an NDA. This document pertains to a system that was to be sold to LMC under the Letter of Intent or as a component to the marketplace.

n. August 19, 2020 - re Quotes needed for new audio system

- This document contains Confidential Information regarding product features and designs received from an audio amplifier and speaker vendor subject to an NDA.

o. August 19, 2020 - re Forms, from Vendor

- This document contains Confidential Information regarding human perception artificial intelligence received from a human perception artificial intelligence vendor subject to an NDA.

p. August 19, 2020 - re Vendor information

- This document contains Confidential Information infotainment system design received from an infotainment system vendor subject to an NDA.

q. August 19, 2020 - re NDA and W-9, from Vendor

- This document contains non-public information regarding one of Karma's preferred vendors, which Karma does not share outside the company. Karma has developed its preferred vendors through years of working with different vendors, and this information would allow a competitor to know exactly which vendors Karma prefers for its projects.

r. August 20, 2020 - re K---- and Geo, from Vendor

- This document contains Confidential Information regarding flash memory technology received from a memory chip electronics vendor subject to an NDA.

s. August 31, 2020 - internal presentation with targeted list of suppliers

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

- This document contains the identity of several of Karma's preferred suppliers, which Karma does not share outside the company. This information has taken years for Karma to develop through its work with various suppliers. This information would enable a competitor to know exactly which suppliers Karma prefers for its projects. Combined with the schematics for each of the proposed suppliers' systems, which Durre forwarded to himself or downloaded, LMC would be able to quickly establish a relationship with Karma's targeted suppliers and continue with Karma's designs.

t.   August 31, 2020 - re Solution Design, from Huan to internal team

- This document contains architectural designs for an aspect of the infotainment system Karma was developing for the Endurance project. This document, which was never shared with LMC, would allow a competitor to copy Karma's designs for a portion of the infotainment system. This is highly confidential and Karma spent significant resources developing it. It could also be used to harm Karma as it can be used to hack the Karma FOTA system.

u.   September 1, 2020 - re Q2/2020 Update WayRay, from internal team.

- This document contains Confidential Information regarding display technology received from an electronics vendor subject to an NDA.

94.   Incredibly, Durre now claims that he sent these highly confidential files to his personal email account *as a favor to Karma* so that he would be able to assist Karma employees after the end of his employment. However, Durre provided no such assistance since leaving and has instead proceeded full speed ahead with developing an infotainment system for LMC, the very system that Karma would

38

have developed for LMC if not for Durre's and Post's efforts to sabotage the deal.

95.    On Durre's last day of employment with Karma, September 1, 2020, his access to Karma's systems and email was deactivated.

96.    When Durre became employed by LMC on August 3, 2020, and especially because he was hired by LMC into a managerial position, Durre no longer had proper authorization from Karma to access Karma's computer systems. Karma never consented to or authorized any LMC employee or manager to access its computer systems. To the extent Durre continued to access Karma's system after he became employed by LMC, such access was in his capacity as an LMC employee and for the benefit of LMC, and therefore his access was unauthorized, or he obtained authorization under false pretenses. Thereafter, Durre lied to Karma and concealed material information from Karma to enable himself to continue to gain access to Karma's systems and steal its Trade Secrets and Confidential Information. Karma would not have allowed Durre to maintain access to its computer systems if it knew that he started employment with LMC on August 3, 2020 in a managerial position.

*LMC and Durre Involve Other Karma Employees for Their Scheme*

97.    LMC's scheme to hire Karma employees while they continued to work for Karma was not limited to Durre. On September 21, 2020, Durre used his LMC email account to send a message to Brian Green. Green is another former Karma engineer who was assigned to the Endurance Project before his resignation on August 21, 2020. A true and correct copy of this email is attached hereto as **Exhibit 19**. This email appears to have been accidentally sent by Durre to Green's old Karma email account, as Green did not have access to that account after his employment with Karma ended on August 21, 2020. Durre's September 21 email revealed an earlier email in the same email chain from August 24, 2020, wherein Durre (while still employed by Karma) used his LMC email account to communicate regarding LMC business with five current or former Karma

39

employees or contractor: Durre, Punak, Huan, Brian Green, and Bradley Westerhof. All five individuals had LMC email accounts, even though Durre and Huan *were still employed by Karma* on August 24.

98.    Defendants took steps to cover their tracks, and specifically to create the impression that LMC was not specifically poaching members of Karma's infotainment team. After terminating the Letter of Intent, LMC posted job descriptions online for its infotainment team. Behind the scenes, Post and Durre were coordinating to make sure that the Former Defendant Employees submitted their resumes as soon as those postings went up, and that offers would be issued by LMC immediately thereafter. On August 3, 2020, Defendant Post explained to another LMC employee that the job postings were a ruse meant to avoid litigation: "We have people in mind, but I also want to post the positions externally. This will protect us from any issues with Karma, given that individuals applying for the positions will be of their own accord if challenged." Durre instructed Defendant Hong Xin "George" Huan that, if anyone from Karma asked, he should not disclose where he was going after his resignation.

99.    Durre took a leading role in passing along LMC's instructions to Karma employees to keep Karma in the dark about those employees going to LMC. On August 19, 2020, Durre instructed Huan not to tell Karma that he was going to LMC. Another Karma employee texted Durre the same day letting him know that Post sent the employee an email on his Karma address, but carbon copied Durre at his new LMC address—Durre instructed the employee to the delete the email.

100.   Nor was Durre the only Karma employee assigned to the Endurance Project who downloaded sensitive information before joining LMC. After his resignation, Karma investigated Huan's use of his Karma-issued computer. That investigation revealed:

a. On June 2, 2020, Huan utilized a removable storage device connected to his Karma computer to copy and download to external locations at

40

least five Karma files containing Trade Secrets and Confidential Information, including, but not limited to, highly confidential and valuable software information, component costs, supply chain information, and documents and data containing specifications and blueprints for speaker systems, video systems, and software code. Huan had no legitimate business reason in connection with any work he may have been performing for Karma at the time to be downloading any of these files to an external location outside Karma's control.

b. On June 2, 2020, Huan created a folder on an external storage device called: D:\ghuan_ca\Karma\NewOrg\lmc. Included within that folder were documents relating to the Karma Infotainment Connected System, such as Karma's investment rate of return calculations and feature content and timing. Huan never turned over this external storage device to Karma. Thus, there is no question he is currently in possession of files containing Karma's Trade Secrets and Confidential Information, unless he destroyed it.

c. Huan copied and downloaded an additional five files to his removable storage device from August 14 through 27, 2020, after LMC had cancelled the project, after he had given notice of his resignation, and after he had begun working for LMC and using an LMC email account. These additional files included documents relating to Karma's Infotainment Connected System and its system architecture. Huan had no legitimate business reason in connection with any work he may have been performing for Karma at the time to be downloading these files to an external device outside Karma's control.

d. On August 31, 2020, three days after Huan's employment with Karma ended and his access to Karma systems and email was suspended, and the day before he returned the Karma laptop to the company, Huan

41

attempted to delete all 57,000-plus files and folders located in his 'C:\ghuan_ca' base folder. Huan had no authorization to access any Karma computer after August 28, 2020.

e. Also, on August 31, 2020, Huan accessed several Karma-related folders on his Karma laptop. Huan did not have authorization to access this Karma computer after August 28, 2020.

101. After Defendant Bei Qin resigned from Karma, Karma also undertook a forensic investigation of Qin's use of his Karma-owned computers. That investigation revealed the following:

a. Qin accepted an offer of employment from LMC on September 11, 2020, and provided written notice of his resignation to Karma on September 14, 2020. His last day at Karma was September 18, 2020.

b. On September 2, 2020, Qin conducted a search for "linux boot usb," using his Karma-owned computer. Upon information and belief, "linux boot usb" refers to code that allows a Linux-based computer to create and use a general USB storage device. One of the devices that Karma issued to Qin was a Linux-based computer;

c. On September 4, 2020, Qin conducted a search for "Karma lawsuit" on Google;

d. Qin connected several USB external storage devices to his Karma-owned computers, all the way up through his last day on September 18, 2020; and

e. There is an inexplicable absence of *any* work product from Qin on his Karma-owned computers for the six months leading up to his resignation. Specifically, despite the fact that he was assigned to work on Karma's Next Gen Infotainment system, the computers used by Qin have absolutely no documents indicating that Qin did any work on that project. Upon information and belief, Qin deleted that work

42

product before resigning from Karma.

102.   During the course of discovery in this matter, Karma also undertook a forensic investigation of LMC's source code. That investigation confirmed that the Former Employee Defendants stole considerable amounts of Karma's source code for the Endurance Project and then copied that source code into LMC's source code.

103.   Before they left Karma, Defendants Huan, Punak, Kim, Qin, and Huang were responsible for creating Karma's source code for the Endurance Project. Defendants Huan, Punak, Kim, Qin, and Huang were also responsible for developing LMC's source code once they accepted employment at LMC.

104.   Writing source code for an infotainment system used in an electric vehicle is a painstaking process, since any defects in the code carry the risk of a failure of the vehicle. The amount of source code created on a daily basis, under the best of circumstances, is a few dozen lines of code.

105.   Immediately after they joined LMC, Huan, Punak, Kim, Qin, and Huang began depositing hundreds, and sometimes *thousands*, of lines of source code in LMC's source code repository on a daily basis. Creating that volume of source code is impossible unless the source code had already been created somewhere else.

106.   Karma's investigation confirmed that the source code that Huan, Punak, Kim, Qin, and Huang deposited in LMC's source code repository originated at Karma. Huge sections of source code were copied verbatim from Karma to LMC's source code repository. In some instances, the copying of source code was so blatant that the only thing that Huan, Punak, Qin, and Huang changed in the source code file was the identification of the copyright owner: from Karma to LMC.

107.   Defendant Punak acted even more blatantly when copying Karma's source code. In several instances, Punak used his *Karma email address* when logging into LMC's repository and source code. Karma's investigation also

43

revealed the following with regard to Punak's involvement in LMC's scheme:

   a.  LMC's source code files contain several files that are exact copies of Karma's source code files, where copying cannot be attributed to sources outside of Karma's source code. Several of these instances of copied files include information showing that Punak himself was directly involved in the insertion of Karma source code into LMC's files. Upon information and belief, Punak knowingly used Karma source code as part of his development work for LMC's infotainment system.

   b.  On July 22, 2020—over two months following the termination of his contract with Karma on May 8, 2020—Punak accessed a Karma organizational chart embodied in a file located at, https:\\karmaautomotive.sharepoint.com\sites\hr\Organizational Charts\FINAL_Karma Organizational Structure (High Level) 20200720 v1.7 (modified version).pptx. Punak had no legitimate business need to access Karma's organizational chart, and no authorization from Karma to do so.

   c.  Upon information and belief, after Karma terminated Punak's contract with Karma and, in contravention of explicit instructions from Karma, Durre continued to direct Punak to work on projects ostensibly for Karma, thus providing Punak cover to continue to access Karma's systems.

108.   In other instances, and beyond the theft of source code, Defendants' theft of Karma's stolen information was even more brazen. Karma developed a key technical specification for Vehicle Level Power Moding. The Vehicle Level Power Moding specification guides how power is routed through an electric automobile at startup—it is one of the most central components to Karma's development process and a Trade Secret that was developed only through substantial time and

44

investment. In preliminary discovery in this matter, LMC produced a technical specification that has entire sections copied verbatim from Karma's 70-page specification. In many instances, the only changes that LMC made were to replace "Vehicle Level Power Moding" with "Vehicle Level Power Mode Management," replace "Karma" with "Lordstown Endurance," and change some of the paragraph numbering.

109.   If there were any remaining doubt about the origin of LMC's "Vehicle Level Power Mode Management" after comparing the two documents, Defendants' mistakes in their attempts to cover their tracks should dispel it. In graphics that are embedded in LMC's specification—which would *not* be caught if one simply used the "find and replace" feature in Microsoft Word—Defendants neglected to remove the references to "Fisker Karma" (a predecessor of Karma).

110.  Defendants' blatant theft of and use of Karma's confidential, proprietary, and trade secret information did not stop with Karma's source code, infotainment system, and electronic subsystem, however. Defendants stole and then copied and pasted into their strategic pricing and profitability analyses ***entire sections*** of Karma's product development plans, software and hardware development project plans and timelines, hardware development specifications for individual vehicle and infotainment system components, including USB hubs, gateways, battery chargers, advanced driver assistance systems ("ADAS"), and brake systems, design documents for electric vehicle communication systems, electric vehicle network architecture diagrams, full and complete bills of materials identifying the components and pricing for components of electric vehicles, and even secret plans for a new Karma vehicle. Defendants further stole and used Karma's production processes and tools, including, without limitation, electric vehicle testing and validation documents, including crash testing documentation, mobile device application product requirements, process improvement methodologies, supplier information, strategic pricing and profitability analyses,

and project budgets. Sometimes the copying was so obvious, Defendants forgot to fix the typos from the original Karma documents and even sometimes failed to remove the word "Karma" from the text of the document itself.

111. Several of the documents stolen by Defendants indicate that Defendant Post is the custodian of the documents, indicating that Post is also still in possession of documents that he misappropriated from his time as an employee of Karma.

112. Upon information and belief, LMC continues to use Karma's stolen information to develop its new fleet of electric pickup trucks, to raid Karma's employees to further its scheme of bringing over Karma information with new employees, and to hinder Karma's ability to develop its own cutting-edge technology. Specifically, LMC has used Karma's source code and numerous other Karma Trade Secrets and Confidential Information in the development of the electronic systems that are the foundation of its own vehicles.

113. LMC has not engaged in any efforts to prevent the employees it hired from Karma from using Karma's Trade Secrets and Confidential Information. Post has oversight responsibility for the development of the infotainment system, but he has done nothing to ensure that the employees in his organization do not use Karma's Trade Secrets and Confidential Information. In fact, LMC encouraged those employees to use Karma's Trade Secrets and Confidential Information.

114. After being sued in this matter, certain Defendants took steps to destroy highly-relevant information.

115. Specifically, on receipt of the Original Complaint, Durre deleted dozens of files from one external storage device and reformatted a second device such that all information from it would be rendered unrecoverable, and lost forever.

116. Likewise, on receipt of the Original Complaint, Huan deleted hundreds of Karma files from an external storage device, and took steps to ensure that the device would not contain any record of the files that had once existed on

it.

117.   Files that are "deleted" from an external storage device that utilizes flash memory still remain on the device, and can often still be recovered in a forensic examination. However, those files become permanently deleted and unrecoverable when new data is saved to the device, thus overwriting the old, "deleted" files. After deleting hundreds of Karma files from an external storage device, Huan overwrote those files by copying two large virtual machine images onto the device. Huan's actions, by design, permanently deleted all of the Karma files from the device and made them unrecoverable. There is no explanation for Huan's actions other than that he intended to permanently delete files from his device. Again, Huan did so after he learned of the filing of Karma's Original Complaint in this matter.

118.   Durre's and Huan's actions have left Karma without a sizeable number of the files that Durre and Huan had taken, as many of the files cannot be restored from the devices from which they were deleted and do not otherwise exist at Karma. Those actions not only deprived Karma of its Trade Secrets and Confidential Information, but destroyed critical evidence in this matter.

119.   Because LMC continues to retain and use Karma's Trade Secrets and Confidential Information—and continues in its scheme to raid Karma's employees and damage Karma's ability to compete in the marketplace—Karma's damages are ongoing and significant. First, the loss of the Endurance project with LMC represents an anticipated loss of *over $3 billion* in anticipated future revenue for Karma through 2024.

120.   LMC also currently retains significant amounts of Karma's Trade Secrets and Confidential Information and can use that information to compete with Karma and develop the infotainment system for Endurance pickup trucks "in-house"—at a significant cost savings, using cutting-edge technology developed by Karma. The damages in lost business opportunities are significant.

121.   In addition, some of the files taken by Durre and LMC are subject to non-disclosure agreements between Karma and third parties. The taking of these files may expose Karma to potential claims under those third-party NDAs. Durre and the other former Karma employees did not have authorization from any of those third parties to take and retain possession of those files outside of the course of their employment with Karma, and LMC certainly had no authorization to use Durre and others to acquire possession of those files.

122.   Moreover, as an electronic hardware engineering contractor for Karma, Kim was involved in all aspects of Karma's in-house hardware design under Durre's direction, and had access to all of Karma's design documents and files on a Karma-issued laptop. When Kim returned his Karma-issued laptop to Karma, Karma discovered that Kim had deleted Karma's hardware design files, including the hardware design files archived on OneDrive.

## COUNT I

**Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*.**

**(Against LMC and the LMC Individual Defendants)**

123.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 122.

124.   Karma's computers used by the Former Employee Defendants are "protected computers" within the meaning of 18 U.S.C. § 1030(e) of the Computer Fraud and Abuse Act ("CFAA") because they are computers purchased by Karma, and then issued to the Former Employee Defendants, who used the computers for the purposes of performing services for Karma. Similarly, Karma's SharePoint drive and other repositories of Karma's data reside on protected computers under Karma's exclusive control.

125.   Karma is informed and believes, and thereon alleges, that the Former Employee Defendants were acting as agents of LMC prior to their resignations from, and termination of their contracted work at, Karma in August 2020.

126.   Therefore, Karma is informed and believes that LMC and the LMC Individual Defendants, acting through the Former Employee Defendants, knowingly, intentionally, and with the intent to defraud Karma, accessed Karma's computers without authorization in an effort to download and transfer files containing Karma's Confidential Information and Trade Secrets, as well as to delete and purge files from Karma's computer systems. Karma never authorized any employee or agent of LMC to access Karma's computer systems.

127.   As a result, LMC and the LMC Individual Defendants furthered their intended fraud upon Karma and caused Karma damages and loss to Karma's computer systems in excess of $5,000.

128.   As a consequence of the foregoing, Karma has suffered and will continue to suffer irreparable harm and loss, and has sustained damages including, but not limited to, loss of the stolen property, loss of the work product the Former Employee Defendants were expected to produce for Karma, and the cost of Karma's investigation of the Former Employee Defendants' retention and access of Karma's Confidential Information and Trade Secrets after they became employed by LMC, in an amount to be determined at trial, which damages are ongoing and continue unabated at the time of the filing of this First Amended Complaint.

129.   Karma has no adequate remedy at law for these injuries unless and until LMC and the LMC Individual Defendants are ordered to return Karma's property, Trade Secrets, and Confidential Information and restrained from using Karma's Trade Secrets and Confidential Information in the future, because calculations of damages will be difficult, and Karma will be compelled to bring multiple suits to protect its interest.

130.   Karma, therefore, is entitled to preliminary and permanent injunctions, as prayed for herein, ordering LMC and the LMC Individual Defendants to return the property and information they stole from Karma and

49

prohibiting LMC and the LMC Individual Defendants from further acts of misuse and disclosure of Karma's Trade Secrets and Confidential Information, as alleged herein.

## COUNT II

**Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*.**

**(Against the Former Employee Defendants)**

131.  Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 130.

132.  Karma's computers used by the Former Employee Defendants are "protected computers" within the meaning of 18 U.S.C. § 1030(e) because they are computers purchased by Karma, and then issued to the Former Employee Defendants, who used the computers for the purposes of performing services for Karma.

133.  Karma is informed and believes, and thereon alleges, that the Former Employee Defendants knowingly, intentionally, and with the intent to defraud Karma accessed Karma's computers either without authorization or with authorization they obtained under false pretenses and based on lies, misrepresentations, and failure to disclose material facts that the Former Employee Defendants were legally and contractually obligated to disclose to Karma, in an effort to download and transfer files containing Karma's Confidential Information and Trade Secrets, as well as to delete and purge files from Karma's computer systems. While the Former Employee Defendants previously were granted access to Karma's computers in connection with their employment with Karma, such access and authorization became null and void when the Former Employee Defendants became employed by LMC. Karma never authorized or consented to the Former Employee Defendants accessing Karma's computer systems in their capacity as agents and employees of LMC.

134.  As a result, the Former Employee Defendants furthered their intended

50

fraud upon Karma and caused Karma damages and loss to Karma's computer systems in excess of $5,000.

135. As a consequence of the foregoing, Karma has suffered and will continue to suffer irreparable harm and loss, and has sustained damages including, but not limited to, loss of capital, loss of the stolen property, loss and disclosure of the work product the Former Employee Defendants were engaged to produce for Karma, and the cost of Karma's investigation of the Former Employee Defendants retention and access of Karma's computers after they become employed by LMC, in an amount to be determined at trial, which damages are ongoing and continue unabated at the time of the filing of this First Amended Complaint.

136. Karma has no adequate remedy at law for these injuries unless and until the Former Employee Defendants are ordered to return Karma's property, Trade Secrets, and Confidential Information and restrained from using Karma's Trade Secrets and Confidential Information in the future, because calculations of damages will be difficult, and Karma will be compelled to bring multiple suits to protect its interests every time that its Trade Secrets and Confidential Information is misused in future development projects.

137. Karma, therefore, is entitled to preliminary and permanent injunctions, as prayed for herein, ordering the Former Employee Defendants to return the property they stole from Karma and prohibiting the Former Employee Defendants from further acts of misuse and disclosure of Karma's Trade Secrets and Confidential Information, as alleged herein.

## COUNT III

### Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

### (Against All Defendants)

138. Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 137.

139.   Karma's Trade Secrets alleged above constitute trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

140.   Karma's Trade Secrets are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from use of the Trade Secrets.

141.   Karma has taken more than adequate measures under the circumstances to maintain the secrecy of this information, including requiring unique usernames, passwords, and dual-factor authentication to access Karma's computer systems and records, restricting access to the most sensitive trade secret information to only those with a business need to know or access the information for purposes of performing their job for Karma, and having employees, contractors, and third parties sign agreements which expressly prohibit the use, removal and disclosure of such information.

142.   The foregoing conduct of the Defendants constitutes an actual and threatened misappropriation and misuse of Karma's trade secret information in violation of the Defend Trade Secrets Act, 18 U.S.C. §1836.

143.   The Defendants' actions with respect to Karma's Trade Secrets, as alleged above, were a deliberate scheme and plan to deprive Karma of the benefits of Karma's own substantial investment and efforts and steal the fruits of years of Karma's labor.

144.   As a proximate result of the Defendants' actions as alleged above, Karma to date has suffered, and will continue to suffer, actual damages, including, but not limited to, loss of capital, loss of valuable business, loss of profits and future profits, and loss of goodwill, in an amount to be proven at trial. As a further proximate result of the misappropriation, Karma is informed and believes that the Defendants have been unjustly enriched as a result of the misappropriation of Karma's Trade Secrets. The amount of this unjust enrichment cannot presently be ascertained.

145. Karma is informed and believes that the Defendants continue to possess, use, and disclose Karma's misappropriated Trade Secrets. The conduct of the Defendants therefore threatens further wrongful misappropriation, use, disclosure, and destruction of Karma's Trade Secrets.

146. As a proximate result of the Defendants' actions as alleged above, Karma will continue to suffer actual damages in an amount to be proven at trial unless the Defendants are enjoined.

147. Karma has no adequate remedy at law for these injuries unless and until the Defendants are restrained from using Karma's misappropriated Trade Secrets in the future and ordered to return such information and property to Karma, because calculations of damages will be difficult, and Karma will be compelled to bring multiple suits to protect its interests every time that its Trade Secrets and Confidential Information is misused in future development projects. Karma's damages are not easily quantified but include, and are not limited to, its lost profits and productivity as a result of damage to its reputation, goodwill, disruption of its operations, and time and resources spent investigating the unlawful conduct of the Defendants, in an amount to be proven at trial.

148. Karma, therefore, is entitled to preliminary and permanent injunctions, as prayed for herein, prohibiting the Defendants from further acts of misuse and disclosure of Karma's misappropriated Trade Secrets and ordering the Defendants to return such Trade Secrets to Karma immediately.

149. Karma is informed and believes that the conduct of the Defendants was, and is, malicious, fraudulent, deliberate, and willful, as revealed by their conduct described above. Karma is therefore entitled to recover from the Defendants exemplary damages in an amount twice the total of the damages recovered for actual loss as permitted by 18 U.S.C. § 1836(b)(3)(C).

150. Karma is also entitled to an award of attorneys' fees pursuant to 18 U.S.C. §1836(b)(3)(D).

# COUNT IV

## Misappropriation of Trade Secrets in Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426.1 *et seq*.

### (Against All Defendants)

151.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 150.

152.   Karma's Trade Secrets alleged above constitute trade secrets under the California Uniform Trade Secrets Act (California Civil Code section 3426 *et seq*.) and contain information which is not generally known to the public or to Karma's competitors, who can obtain economic value from its disclosure and use it in their own interest since it was compiled based on Karma's years of experience in business. This information is a valuable asset in that it provides Karma a competitive advantage over others. As set forth herein, Karma has made reasonable efforts to keep this information secret, including having employees execute confidentiality agreements, establishing confidentiality rules and policies, and implementing security systems on its computer system to prevent unauthorized access or disclosure of its Trade Secrets.

153.   Defendants' actions with respect to Karma's Trade Secrets, as alleged above, were a deliberate scheme and plan to deprive Karma of the benefits of its own substantial investment and efforts and steal the fruits of years of Karma's labor.

154.   As a proximate result of the Defendants' actions as alleged above, Karma to date has suffered, and will continue to suffer, actual damages in an amount to be proven at trial. As a further proximate result of the misappropriation, upon information and belief, the Defendants have been unjustly enriched as a result of the misappropriation of Karma's Trade Secrets. The amount of this unjust enrichment cannot presently be ascertained.

155.  Upon information and belief, the Defendants continue to use and disclose Karma's misappropriated Trade Secrets. The conduct of the Defendants therefore threatens further wrongful misappropriation, use, and disclosure of Karma's Trade Secrets.

156.  As a proximate result of the acts of the Defendants as alleged above, Karma will continue to suffer actual damages in an amount to be proven at trial unless the Defendants are enjoined.

157.  Karma has no adequate remedy at law for these injuries unless and until the Defendants are restrained from using Karma's misappropriated Trade Secrets in the future and ordered to return such information and property to Karma, because calculations of damages will be difficult, and Karma will be compelled to bring multiple suits to protect its interest every time that its Trade Secrets are misused in future development projects. Karma's damages are not easily quantified but include, and are not limited to, its lost profits and productivity as a result of damage to its reputation, goodwill, disruption of its operations, and time and resources spent investigating the unlawful conduct of Defendants, in an amount to be proven at trial.

158.  Karma, therefore, is entitled to preliminary and permanent injunctions, as prayed for herein, prohibiting the Defendants from further acts of misuse and disclosure of Karma's misappropriated Trade Secrets and ordering them to return such information and property to Karma immediately.

159.  Upon information and belief, the conduct of the Defendants was, and is, malicious, fraudulent, deliberate, and willful, as revealed by their conduct described above. Karma is therefore entitled to recover from the Defendants exemplary damages in an amount twice the total of the damages recovered for actual loss as permitted by California Civil Code section 3426.3.

160.  Karma is also entitled to an award of attorneys' fees pursuant to California Civil Code section 3426.4.

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

## COUNT V

### Breach of the Confidentiality Agreement

### (Against Durre)

161.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 160.

162.   Karma and Durre are parties to the Confidentiality Agreement that Durre executed, attached hereto as Exhibit 1.

163.   Karma has performed all of the terms and conditions required of it under Durre's Confidentiality Agreement.

164.   Durre's obligations under the Confidentiality Agreement are valid, enforceable, and binding upon him.

165.   Despite his contractual obligations, Durre materially breached the Confidentiality Agreement based on the conduct described in the preceding paragraphs by, among other things, (a) taking, disclosing, transferring, removing, misusing, and/or misappropriating Karma's Trade Secrets and Confidential Information; (b) accepting employment with LMC, which created a conflict of interest with Karma; and (c) soliciting, recruiting, or inducing Karma's employees to leave Karma and join LMC.

166.   Karma has been damaged by Durre's breaches of the Confidentiality Agreement in an amount to be proven at trial.

## COUNT VI

### Breach of the Confidentiality Agreement

### (Against Huan)

167.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 166.

168.   Karma and Huan are parties to the Confidentiality Agreement that Huan executed, attached hereto as Exhibit 2.

56

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

169. Karma has performed all of the terms and conditions required of it under Huan's Confidentiality Agreement.

170. Huan's obligations under the Confidentiality Agreement are valid, enforceable, and binding upon him.

171. Despite his contractual obligations, Huan materially breached the Confidentiality Agreement based on the conduct described in the preceding paragraphs by, among other things, (a) taking, disclosing, transferring, removing, misusing, and/or misappropriating Karma's Trade Secrets and Confidential Information; (b) accepting employment with LMC, which created a conflict of interest with Karma; and (c) soliciting, recruiting, or inducing Karma's employees to leave Karma and join LMC.

172. Karma has been damaged by Huan's breaches of the Confidentiality Agreement in an amount to be proven at trial.

<u>**COUNT VII**</u>

**Breach of the Confidentiality Agreement**

**(Against Qin)**

173. Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 172.

174. Karma and Qin are parties to the Confidentiality Agreement that Qin executed, attached hereto as Exhibit 3.

175. Karma has performed all of the terms and conditions required of it under Qin's Confidentiality Agreement.

176. Qin's obligations under the Confidentiality Agreement are valid, enforceable, and binding upon him.

177. Despite his contractual obligations, Qin materially breached the Confidentiality Agreement based on the conduct described in the preceding paragraphs by, among other things, (a) taking, disclosing, transferring, removing, misusing, and/or misappropriating Karma's Trade Secrets and Confidential

Information; (b) accepting employment with LMC, which created a conflict of interest with Karma; and (c) soliciting, recruiting, or inducing Karma's employees to leave Karma and join LMC.

178.   Karma has been damaged by Qin's breaches of the Confidentiality Agreement in an amount to be proven at trial.

## COUNT VIII

### Breach of the Confidentiality Agreement

### (Against Punak)

179.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 178.

180.   Karma and Punak are parties to the Confidentiality Agreement that Punak executed, attached hereto as Exhibit 4.

181.   Karma has performed all of the terms and conditions required of it under Punak's Confidentiality Agreement.

182.   Punak's obligations under the Confidentiality Agreement are valid, enforceable, and binding upon him.

183.   Despite his contractual obligations, Punak materially breached the Confidentiality Agreement based on the conduct described in the preceding paragraphs by, among other things, (a) taking, disclosing, transferring, removing, misusing, and/or misappropriating Karma's Trade Secrets and Confidential Information; (b) accepting employment with LMC, which created a conflict of interest with Karma; and (c) soliciting, recruiting, or inducing Karma's employees to leave Karma and join LMC.

184.   Karma has been damaged by Punak's breaches of the Confidentiality Agreement in an amount to be proven at trial.

## COUNT IX

**Breach of the Punak Engineering, Inc. Independent Contractor Agreement**

**(Against PEI)**

185.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 184.

186.   Karma and PEI are parties to the Independent Contractor Agreement that PEI executed, attached hereto as Exhibit 8.

187.   Karma has performed all of the terms and conditions required of it under the Independent Contractor Agreement.

188.   PEI's obligations under the Independent Contractor Agreement are valid, enforceable, and binding upon it.

189.   Despite its contractual obligations, PEI materially breached the Independent Contractor Agreement based on the conduct described in the preceding paragraphs by, among other things, taking, disclosing, transferring, removing, misusing, and/or misappropriating Karma's Trade Secrets and Confidential Information.

190.   Karma has been damaged by PEI's breaches of the Independent Contractor Agreement in an amount to be proven at trial.

## COUNT X

**Breach of the Confidentiality Agreement**

**(Against Kim)**

191.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 190.

192.   Karma and Kim are parties to the Confidentiality Agreement that Kim executed, attached hereto as Exhibit 5.

193.   Karma has performed all of the terms and conditions required of it under Kim's Confidentiality Agreement.

59

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

194. Kim's obligations under the Confidentiality Agreement are valid, enforceable, and binding upon him.

195. Despite his contractual obligations, Kim materially breached the Confidentiality Agreement based on the conduct described in the preceding paragraphs by, among other things, (a) taking, disclosing, transferring, removing, misusing, and/or misappropriating Karma's Trade Secrets and Confidential Information; (b) accepting employment with LMC while performing contractual work for Karma, which created a conflict of interest with Karma; and (c) soliciting, recruiting, or inducing Karma's employees to leave Karma and join LMC.

196. Karma has been damaged by Kim's breaches of the Confidentiality Agreement in an amount to be proven at trial.

## COUNT XI
### Breach of the Confidentiality Agreement
### (Against Huang)

197. Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 196.

198. Karma and Huang are parties to the Confidentiality Agreement that Kim executed, attached hereto as Exhibit 6.

199. Karma has performed all of the terms and conditions required of it under Huang's Confidentiality Agreement.

200. Huang's obligations under the Confidentiality Agreement are valid, enforceable, and binding upon him.

201. Despite his contractual obligations, Huang materially breached the Confidentiality Agreement based on the conduct described in the preceding paragraphs by, among other things, (a) taking, disclosing, transferring, removing, misusing, and/or misappropriating Karma's Trade Secrets and Confidential Information; (b) accepting employment with LMC, which created a conflict of interest with Karma; and (c) soliciting, recruiting, or inducing Karma's employees

60

to leave Karma and join LMC.

202. Karma has been damaged by Huang's breaches of the Confidentiality Agreement in an amount to be proven at trial.

## COUNT XII

### Breach of the Confidentiality Agreement

### (Against Post)

203. Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 202.

204. Karma and Post are parties to the Confidentiality Agreement that Post executed, attached hereto as Exhibit 7.

205. Karma has performed all of the terms and conditions required of it under Post's Confidentiality Agreement.

206. Post's obligations under the Confidentiality Agreement are valid, enforceable, and binding upon him.

207. Despite his contractual obligations, Post materially breached the Confidentiality Agreement based on the conduct described in the preceding paragraphs by, among other things, taking, disclosing, transferring, removing, misusing, and/or misappropriating Karma's Trade Secrets and Confidential Information.

208. Karma has been damaged by Post's breaches of the Confidentiality Agreement in an amount to be proven at trial.

## COUNT XIII

### Breach of the Mutual Nondisclosure Agreement

### (Against LMC)

209. Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 208.

210. Karma and LMC are parties to the MNDA, attached hereto as Exhibit 9.

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

211.   Karma has performed all of the terms and conditions required of it under the MNDA.

212.   LMC's obligations under the MNDA are valid, enforceable, and binding on LMC.

213.   Despite its contractual obligations, LMC materially breached the MNDA based on the conduct described in the preceding paragraphs by, among other things, taking, disclosing, transferring, removing, misusing, and/or misappropriating Karma's Trade Secrets and Confidential Information.

214.   LMC also breached the duty of good faith and fair dealing under the MNDA by engaging under false pretenses in talks with Karma for Karma to provide services to LMC only to make a side deal with Karma's infotainment team to hire them directly for the project and cut out Karma from the deal.

215.   Karma has been damaged by LMC's breaches of the MNDA in an amount to be proven at trial.

216.   Because LMC expressly consented to injunctive relief in section 13 of the MNDA, and because damages alone may not provide Karma with a complete or adequate remedy, Karma is also entitled to preliminary and permanent injunctive relief prohibiting LMC from directly or indirectly breaching the MNDA.

## COUNT XIV

### Breach of the Letter of Intent

### (Against LMC)

217.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 216.

218.   Karma and LMC are both parties to the Letter of Intent, which is a valid and binding contract.

219.   The Letter of Intent contractually required LMC to "work together in good faith to negotiate, prepare, execute and deliver definitive agreements governing the Transactions" contemplated therein.

220.   Karma has performed all of the terms and conditions required of it under the Letter of Intent.

221.   LMC's obligations under the Letter of Intent are valid, enforceable, and binding on LMC.

222.   Despite its contractual obligations, LMC materially breached the Letter of Intent by refusing to work with Karma in good faith to negotiate definitive agreements.

223.   LMC negotiated with Karma in bad faith and in breach of the Letter of Intent by engaging in talks with Karma under false pretenses. LMC's only objective was for Karma to reveal its Confidential Information and Trade Secrets to LMC, so that LMC could misappropriate that information. LMC's conduct also constitutes a breach by LMC of its duty of good faith and fair dealing under the Letter of Intent.

224.   Further, LMC negotiated with Karma in bad faith and in breach of the Letter of Intent by carrying out its scheme to steal and misappropriate Karma's Trade Secrets and Confidential Information and key employees to enable LMC to develop the infotainment system for the Endurance project in-house and to start its own "LMC Infotainment Group" in California. This conduct also constitutes a breach by LMC of its duty of good faith and fair dealing under the Letter of Intent.

225.   Karma relied on LMC's promise to negotiate in good faith.

226.   Karma has been damaged by LMC's breaches of the Letter of Intent in an amount to be proven at trial.

## COUNT XV

### Tortious Interference with Contract

### (Against LMC and the LMC Individual Defendants)

227.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 33, 44 through 122, and 161-226 only.

228.   Karma has valid and enforceable confidentiality agreements with its

employees and contractors, including, but not limited to, the Former Employee Defendants. LMC and the LMC Individual Defendants knew or should have known of these former employees' contracts with Karma.

229. LMC and the LMC Individual Defendants willfully and intentionally interfered with these agreements, without privilege to do so, by aiding, abetting, and assisting the Former Employee Defendants in breaching their contractual obligations to Karma, including, but not limited to, their obligations to immediately return all of Karma's Confidential Information upon the end of their employment; to not use or disclose Karma's Confidential Information for their own benefit or outside the scope of their employment with Karma; to not solicit Karma's employees; and to not work for another employer in a position with similar duties to their job at Karma or that would create a conflict with their work for Karma.

230. LMC and the LMC Individual Defendants' misconduct was independently tortious and unlawful because it involved the conspiracy to recruit and hire Karma's infotainment team and have them work as double agents for Karma and LMC at the same time, and involved the misappropriation of Karma's Confidential Information.

231. As a direct and proximate cause of the above-alleged misconduct by LMC and the LMC Individual Defendants, Karma suffered injuries, including, but not limited to, actual damages, direct damages, indirect damages, incidental damages, consequential damages, special damages, lost profits, costs of mitigation, and irreparable damage to Karma's employment relationships, vendor relationships, and supplier relationships. Because the tortious conduct of LMC and the LMC Individual Defendants was willful and malicious, Karma seeks exemplary damages.

232. This cause of action for unfair competition is not based on the misappropriation of any Trade Secrets. Rather, Karma bases this cause of action on LMC's and the LMC Individual Defendants' breach of contract, breach of the duty

64

of good faith and fair dealing, and unlawful raiding of Karma's workforce while at the same time promising Karma that the Endurance project deal was going through.

## COUNT XVI

### Tortious Interference with Prospective Economic Advantage

### (Against the Former Employee Defendants)

233.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 33, 44 through 122, and 161-232 only.

234.   Based upon the Letter of Intent and LMC's assurances that payment was to be made "shortly," Karma had a reasonable expectation of receiving the benefits of its relationship with LMC for the production of infotainment systems for the Endurance Project.

235.   The Former Employee Defendants knew or should have known of Karma's relationship with LMC.

236.   One or more of the Former Employee Defendants willfully and intentionally interfered with that relationship, without privilege to do so, by aiding, abetting, and assisting LMC in ending its relationship obligations to Karma.

237.   The Former Employee Defendants' misconduct was independently tortious and unlawful because the Former Employee Defendants breached their duty of loyalty by making a side deal with LMC while they were employed by Karma, which resulted in LMC ending its relationship obligations to Karma.

238.   The Former Employee Defendants' conduct was a substantial factor in causing Karma's harm.

239.   As a direct and proximate cause of the Former Employee Defendants' misconduct, Karma suffered injuries, including, but not limited to, actual damages, direct damages, indirect damages, incidental damages, consequential damages, special damages, lost profits, costs of mitigation, and irreparable damage to Karma's goodwill, business reputation, confidential information, trade secrets, employment relationships, vendor relationships, and customer relationships.

Because the Former Employee Defendants' tortious conduct was willful and malicious, Karma seeks exemplary damages.

240.   This cause of action for unfair competition is not based on the misappropriation of any Trade Secrets. Rather, Karma bases this cause of action on (a) the actions of the Former Employee Defendants while they were still employed by Karma in breach of their duty of loyalty and/or contract with Karma including, but not limited to, being employed by and working for LMC while still employed by Karma, sabotaging and undermining the Endurance Project, recruiting or supporting the recruiting of Karma employees for the benefit of LMC, and conspiring with LMC; (b) the Former Employee Defendants' conversion of a separate category of information defined above as Confidential Information, which excludes by definition any trade secrets, and in which Karma has a separate, legally cognizable property interest; and (c) the Former Employee Defendants' other deceptive and unfair business practices that are alleged in this First Amended Complaint.

## COUNT XVII

### Unfair Competition in Violation of Cal. Business and Professions Code § 17200 *et seq.*

### (Against All Defendants)

241.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 33, 44 through 122, and 161-240 only.

242.   This is a cause of action for unfair business practices arising under California Business and Professions Code section 17200 *et seq.*, which prohibits unfair competition.

243.   This cause of action for unfair competition is not based on the misappropriation of any Trade Secrets. Rather, Karma bases this cause of action on (a) the actions of the Former Employee Defendants while they were still employed by Karma in breach of their duty of loyalty and/or contract with Karma including,

66

but not limited to, being employed by and working for LMC while still employed by Karma, sabotaging and undermining the Endurance Project, recruiting or supporting the recruiting of Karma employees for the benefit of LMC, and conspiring with LMC; (b) LMC's and the LMC Individual Defendants' breach of contract, breach of the duty of good faith and fair dealing, and unlawful raiding of Karma's workforce while at the same time promising Karma that the Endurance project deal is going through; (c) the Former Employee Defendants' conversion of a separate category of information defined above as Confidential Information, which excludes by definition any trade secrets, and in which Karma has a separate, legally cognizable property interest; and (d) the Former Employee Defendants' other deceptive and unfair business practices that are alleged in this First Amended Complaint.

244.   On information and belief and in violation of California Business and Professions Code section 17200 *et seq*., Defendants improperly misappropriated, removed, retained, and/or began using Karma's Confidential Information that Karma owns in accordance with Labor Code section 2860, as alleged above.

245.   Defendants' actions are part of a deliberate scheme and plan to deprive Karma of the benefits of its own substantial investment and efforts and to steal the fruits of several years of its labor, and to give Defendants an unfair competitive advantage.

246.   As a proximate result of Defendants' acts as alleged above, Karma to date has suffered, and will continue to suffer, damages unless Defendants are enjoined from using Karma's Confidential Information that each of them has misappropriated. Thus, as a proximate result of Defendants' wrongful acts, Karma is entitled to restitution as provided for by California Business and Professions Code section 17200 *et seq*. and a constructive trust in which Defendants, as constructive trustees, hold their income, profits, commissions, fees, revenues, or other funds, received as a result of their wrongful acts alleged herein, for Karma's

benefit.

247.   Defendants' wrongful conduct in using and/or disclosing and/or threatening to use or disclose Karma's Confidential Information will continue unless and until enjoined and restrained by order of this Court. Without such involvement, Defendants' conduct in stealing the fruits of Karma's business investments will cause great and irreparable injury to Karma's business in that Karma will lose and/or is at risk of losing employees by virtue of the Confidential Information that Defendants have obtained and misappropriated wrongfully.

248.   Karma has no adequate remedy at law for the injuries currently being suffered in that Defendants will continue to wrongfully use and/or disclose, or be a threat to use or disclose, Karma's Confidential Information that was wrongfully misappropriated, including, but not limited to, any information concerning Karma's employees that is not generally available to the public at large. Karma is entitled to preliminary and permanent injunctions against Defendants, as prayed herein.

249.   Defendants' conduct was willful and malicious, oppressive, fraudulent, despicable, and in conscious disregard of the rights of Karma, and the resulting harm to Karma. Defendants acted with the intent to cause injury and to obtain an unfair competitive advantage over Karma in the marketplace. Therefore, Defendants are liable for restitution and exemplary and/or punitive damages in an amount to be established according to proof at trial for unfair competition, and a permanent injunction against Defendants is warranted enjoining their unfair competition as alleged in the prayer below.

250.   The rights invoked herein petition for, implicate, invoke, and demand the enforcement of important rights affecting the public interest. Furthermore, because the relief sought will provide a significant benefit to the general public at large, Karma is entitled to an award of attorneys' fees to reimburse Karma for attorneys' fees incurred by undergoing the burden of seeking the private

68

enforcement of statutes vindicating important public rights, including the right of the public to be free from illegal restraints of trade, unfair competition, and violations of the California Business and Professions Code.

## COUNT XVIII

### Breach of Duty of Loyalty

### (Against Durre, Huan, and Qin)

251. Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 33, 44 through 122, and 161-250 only.

252. As employees of Karma, Durre, Huan, and Qin had a duty of loyalty to Karma by virtue of their duty to act for the benefit of Karma in matters connected with their contractual and employment relationship with Karma, and by the special confidence reposed in them by Karma in connection with their exposure and access to Karma's Confidential Information.

253. This cause of action is not based on the misappropriation of any Trade Secrets. Rather, Karma bases this cause of action on (a) the actions of Durre, Huan, and Qin while they were still employed by Karma in breach of their duty of loyalty and/or contract with Karma including, but not limited to, being employed by and working for LMC while still employed by Karma, sabotaging and undermining the Endurance Project, recruiting or supporting the recruiting of Karma employees for the benefit of LMC, and conspiring with LMC; (b) Durre's, Huan's, and Qin's conversion and misappropriation of a separate category of information defined above as Confidential Information, which excludes by definition any trade secrets, and in which Karma has a separate, legally cognizable property interest; and (c) the other breaches of their duty of loyalty by Durre, Huan, and Qin that are alleged in this First Amended Complaint.

254. Durre, Huan, and Qin breached their duty of loyalty owed to Karma by working for LMC while still employed by Karma and by supporting LMC's conspiracy to sabotage the LMC-Karma deal and enable LMC to recruit and hire

69

Karma's infotainment team in-house and proceed with the Endurance Project without Karma.

255.  Durre's, Huan's, and Qin's breaches of the duty of loyalty have directly and proximately caused Karma to suffer damages.

256.  The actions of Durre, Huan, and Qin were and are willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Karma, entitling Karma to an award of punitive damages.

257.  But for an exercise of the equitable powers of this Court, Karma will be irreparably injured and harmed by Durre's, Huan's, and Qin's continuing breaches of their duty of loyalty to Karma.

## COUNT XIX

### Breach of Fiduciary Duty

### (Against Durre, Huan, and Qin)

258.  Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 33, 44 through 122, and 161-257 only.

259.  As employees of Karma, Durre, Huan, and Qin owed a fiduciary duty to Karma by virtue of their duty to act for the benefit of Karma in matters connected with their contractual and employment relationship with Karma, and by the special confidence reposed in them by Karma in connection with their exposure and access to Karma's Confidential Information.

260.  This cause of action is not based on the misappropriation of any Trade Secrets. Rather, Karma bases this cause of action on (a) the actions of Durre, Huan, and Qin while they were still employed by Karma in breach of their fiduciary duties to and/or contract with Karma including, but not limited to, being employed by and working for LMC while still employed by Karma, sabotaging and undermining the Endurance Project, recruiting or supporting the recruiting of Karma employees for the benefit of LMC, and conspiring with LMC; (b) Durre's, Huan's, and Qin's conversion and misappropriation of a separate category of information defined

70

above as Confidential Information, which excludes by definition any trade secrets, and in which Karma has a separate, legally cognizable property interest; and (c) the other breaches of their fiduciary duties by Durre, Huan, and Qin that are alleged in this First Amended Complaint.

261.   Durre, Huan, and Qin breached their fiduciary duties owed to Karma by working for LMC while still employed by Karma and by supporting LMC's conspiracy to sabotage the LMC-Karma deal and enable LMC to recruit and hire Karma's infotainment team in-house and proceed with the Endurance Project without Karma.

262.   Durre's, Huan's, and Qin's breaches of their fiduciary duties to Karma have directly and proximately caused Karma to suffer damages.

263.   The actions of Durre, Huan, and Qin were and are willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Karma, entitling Karma to an award of punitive damages.

264.   But for an exercise of the equitable powers of this Court, Karma will be irreparably injured and harmed by Durre's, Huan's, and Qin's continuing breaches of their fiduciary duties to Karma.

## COUNT XX

### Aiding & Abetting Breach of Duty of Loyalty

### (Against LMC and Post)

265.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 33, 44 through 122, and 161-264 only.

266.   At all times alleged herein, LMC and Post knew that Durre, Huan, and Qin each owed duties of loyalty to Karma.

267.    At all times alleged herein, LMC and Post were aware of the conduct of Durre, Huan, and Qin alleged above.

268.   At all times alleged herein, LMC and Post knew that the conduct of Durre, Huan, and Qin, alleged above, constituted a breach of their duties of loyalty

owed to Karma.

269.   At all times alleged herein, LMC and Post knowingly provided substantial assistance to Durre, Huan, and Qin so they each could accomplish the unlawful results alleged above. LMC and Post did so through conduct that, itself, amounted to a breach of obligations that LMC and Post, themselves, owed directly to Karma.

270.   LMC's and Post's conduct in assisting the above-alleged breaches of duty of loyalty was a substantial factor in causing the harm suffered by Karma.

271.   LMC and Post knowingly and substantially participated, aided, and abetted the above-alleged breaches of the duties of loyalty committed by Durre, Huan, and Qin.

272.   LMC's and Post's conduct has been willful and malicious and demonstrates a complete indifference to or a conscious disregard for the rights of Karma, entitling Karma to an award of punitive damages.

273.   But for an exercise of the equitable powers of this Court, Karma will be irreparably injured and harmed by LMC's and Post's aiding and abetting of Durre's, Huan's, and Qin's breaches of their duty of loyalty to Karma.

## COUNT XXI

### Aiding & Abetting Breach of Fiduciary Duty
### (Against LMC and Post)

274.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 33, 44 through 122, and 161-273 only.

275.   This cause of action is not based on the misappropriation of any Trade Secrets. Rather, Karma bases this cause of action on (a) the actions of the Former Employee Defendants while they were still employed by Karma in breach of their duty of loyalty and/or contract with Karma including, but not limited to, being employed by and working for LMC while still employed by Karma, sabotaging and undermining the Endurance Project, recruiting or supporting the recruiting of

Karma employees for the benefit of LMC, and conspiring with LMC; (b) LMC's and the LMC Individual Defendants' breach of contract, breach of the duty of good faith and fair dealing, and unlawful raiding of Karma's workforce while at the same time promising Karma that the Endurance project deal is going through; (c) the Former Employee Defendants' conversion of a separate category of information defined above as Confidential Information, which excludes by definition any trade secrets, and in which Karma has a separate, legally cognizable property interest; and (d) the Former Employee Defendants' other deceptive and unfair business practices that are alleged in this First Amended Complaint.

276. At all times alleged herein, LMC and Post knew that Durre, Huan, and Qin each owed fiduciary duties to Karma.

277. At all times alleged herein, LMC and Post were aware of the conduct of Durre, Huan, and Qin alleged above.

278. At all times alleged herein, LMC and Post knew that the conduct of Durre, Huan, and Qin, alleged above, constituted a breach of their fiduciary duties owed to Karma.

279. At all times alleged herein, LMC and Post knowingly provided substantial assistance to Durre, Huan, and Qin so they each could accomplish the unlawful results alleged above. LMC and Post did so through conduct that, itself, amounted to a breach of obligations that LMC and Post, themselves, owed directly to Karma.

280. LMC's and Post's conduct in assisting the above-alleged breaches fiduciary duties was a substantial factor in causing the harm suffered by Karma.

281. LMC and Post knowingly and substantially participated, aided, and abetted the above-alleged breaches of the fiduciary duties committed by Durre, Huan, and Qin.

282. LMC's and Post's conduct has been willful and malicious and demonstrates a complete indifference to or a conscious disregard for the rights of

73

Karma, entitling Karma to an award of punitive damages.

283.   But for an exercise of the equitable powers of this Court, Karma will be irreparably injured and harmed by LMC's and Post's aiding and abetting of Durre's, Huan's, and Qin's breaches of their fiduciary duties owed to Karma.

## COUNT XXII

### Conspiracy

### (Against All Defendants)

284.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 1 through 33, 44 through 122, and 161-283.

285.   This cause of action for conspiracy is not based on the misappropriation of any Trade Secrets. Rather, Karma bases this cause of action on Defendants' sabotaging and undermining of the Endurance Project, recruiting or supporting the recruiting of Karma employees for the benefit of LMC, and Defendants misappropriation of a separate category of information defined above as Confidential Information.

286.   Defendants, a group of two or more persons, agreed to a common plan to commit a tortious act—specifically, to misappropriate Karma's confidential information, sabotage the Endurance Project, tortuously interfere with the fiduciary duties and duty of loyalty owed to Karma by the Former Employee Defendants, and tortuously interfere with Karma's prospective economic advantage from the Endurance Project.

287.   Pursuant to their common plan, Defendants did misappropriate Karma's confidential information, sabotage the Endurance Project, tortuously interfere with the fiduciary duties and duty of loyalty owed to Karma by the Former Employee Defendants, and tortuously interfere with Karma's prospective economic advantage from the Endurance Project.

288.   Defendants' common plan to commit a tortious act, as alleged above, directly and proximately caused Karma to suffer damages in an amount to be

determined at trial.

## COUNT XXIII

### Fraud

### (Against LMC)

289.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 33, 44 through 122, and 161-288.

290.   This cause of action for fraud is not based on the misappropriation of any Trade Secrets. Rather, Karma bases this cause of action on LMC's misrepresentations throughout the due diligence period for the Endurance Project, and in the Letter of Intent, that LMC wished to enter into an agreement with Karma for the Endurance Project and would "work together in good faith to negotiate, prepare, execute and deliver definitive agreements governing the transactions contemplated therein."

291.   LMC's misrepresentations and its Letter of Intent contained representations that were false and misleading as set forth herein.

292.   LMC misrepresented that it wished to enter into an agreement with Karma for the Endurance Project, and that it would work with Karma in good faith to negotiate definitive agreements for the Endurance Project. Contrary to its representations, LMC never had any intent to enter into a joint development agreement with Karma to provide services to LMC. On the contrary, LMC's only objective was for Karma to reveal its Confidential Information to LMC, so that LMC could misappropriate that information.

293.   LMC knew or believed that its representations as stated above were false at the time that those representations were made.

294.   LMC's misrepresentations were intended to induce Karma to rely on them by promising Karma that LMC was interested in entering into an agreement for the Endurance Project. In reality, LMC was only interested in gaining and keeping access to Karma's Confidential Information, while at the same time

75

unlawfully raiding Karma's workforce.

295.   Karma reasonably and justifiably relied on LMC's representations that it wished to enter into an agreement with Karma for the Endurance Project, and would negotiate in good faith to reach that agreement. On the basis of those representations, Karma engaged in a five-month due diligence period with LMC, without knowing that LMC's deceptions were merely a ruse to poach and onboard key Karma employees while misappropriating Karma's Confidential Information.

296.   As a direct and proximate cause of the above-alleged misconduct by LMC, Karma suffered injuries, including, but not limited to actual damages, direct damages, indirect damages, incidental damages, consequential damages, special damages, lost profits, costs of mitigation, and irreparable damage to Karma's employment relationships, vendor relationships, and supplier relationships. Because LMC's misconduct was willful and malicious, Karma seeks exemplary damages.

## COUNT XXIV

### RICO, 18 U.S.C. § 1962(c) *et seq.*

### (Against All Defendants)

297.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 226.

298.   As set forth above, Defendants were involved in a scheme to defraud Karma by committing a series of unlawful acts over a prolonged period of time—in excess of several months—and multiple nefarious bad acts in several short spans during that same prolonged timeframe.

299.   During this lengthy scheme to defraud Karma, Defendants committed predicate acts of racketeering activity, as defined in 18 U.S.C. § 1961(1), on multiple occasions and in violation of various federal statutes, including the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1836, *et seq.*, and the federal Wire Fraud statutes, 18 U.S.C. § 1343, *et seq.*

300.   For several months and in a plan which is ongoing, LMC and the LMC Individual Defendants worked in concert with one another and with the Former Employee Defendants, committing numerous and repeated violations of the above federal statutes to harm Karma economically.

301.   At various points in time, Defendants misappropriated Confidential Information and Trade Secrets of Karma through unlawful means, in violation of the DTSA.

302.   Specifically, LMC and the LMC Individual Defendants took and/or conspired with the Former Employee Defendants to take Karma's Confidential Information and Trade Secrets by downloading, stealing, copying without access, and sending it by electronic media—all in violation of the DTSA.

303.   As part of this scheme, LMC acted as a RICO legal-entity enterprise, and the LMC Individual Defendants and Former Employee Defendants conducted the affairs of LMC in an unlawful way, specifically by misappropriating Karma's Trade Secrets, conspiring with others to do so, all with the purpose of develop competing products at LMC using Karma's Trade Secrets.

304.   Alternatively, the LMC Individual Defendants, LMC, and the Former Employee Defendants created an association-in-fact to accomplish their illegal goals and stole or utilized Karma's computers and computerized protected Confidential Information and Trade Secrets, and provided them to LMC. This association in fact had the purpose of developing competing products at LMC by using LMC's Trade Secrets for illegal gain and usurpation of business opportunities. Post and Durre acted as the leaders of this association-in-fact, with each Former Employee Defendant and LMC Defendant providing assistance. These members of the association in fact communicated via electronic mail in furtherance of their common scheme and prior to their departure from Karma, and they later associated directly as employees at LMC. This association continued over several months with each Former Employee Defendant adding to the association in

fact, and it continues today.

305.    In perpetrating this scheme, Defendants used the internet and mails to accomplish many of their goals in several states.

306.    Specifically, in violation of the federal Wire Fraud statutes, Durre conspired with others to email or upload onto a cloud-based platform Karma's Confidential Information and Trade Secrets.

307.    In turn, this information was sent and/or used by Defendants for their advantage and to the disadvantage of Karma.

308.    Defendants further used the mails and wires to transfer and download Karma's Confidential Information and Trade Secrets to usurp Karma's business opportunities, existing and prospective contracts, and otherwise harm Karma.

309.    These transmissions were intentionally concealed from Karma in order to defraud Karma and to successfully deprive it of its proprietary information and harm it economically.

310.    Further, Durre and Post schemed and conspired with LMC and the LMC Individual Defendants to facilitate the Former Employee Defendants working to further LMC's interests while still employed by Karma.

311.    During this time, these same Defendants communicated with one another by electronic means and across state lines not only to recruit the Former Employee Defendants, but also to take proprietary information from Karma's computers and Karma's information system.

312.    These acts were also perpetrated through the use of the wires, in violation of federal Wire Fraud statutes.

313.    Defendants engaged in numerous unlawful, overt, predicate acts to create an illegal pattern of racketeering, which included, but is not limited to, (1) Durre's initial misappropriation of Karma's Trade Secrets in July 2020, in violation of the DTSA; (2) each Former Employee Defendant's misappropriation of Karma's Trade Secrets at, near, or around the time of his departure date

(specifically identified above); (3) each Former Employee Defendant's use of Karma's protected computer systems beyond their authorization for a non-work related purpose, and specifically to transfer Karma's Trade Secrets to LMC, in violation of CFAA; and (4) each time Defendants used Karma's Trade Secrets to develop a competing product. This pattern of racketeering has been ongoing since the time leading up to the Former Employee Defendants' departures from Karma specified above and continues to this day, thereby posing a threat of continued criminal activity. Indeed, Defendants predicate acts are so numerous and pervasive that they constitute an open-ended scheme and are part of the normal course of how Defendants regularly conduct business.

314.  Each of the predicate acts perpetrated by these same Defendants in furtherance of the scheme to defraud Karma was performed by these same Defendants while participating in the conduct of the affairs of the legal enterprise and association-in-fact enterprises identified above in violation of 18 U.S.C. § 1962(c)—whether that enterprise be LMC, or an association-in-fact comprised of the LMC Individual Defendants, LMC, and the Former Employee Defendants.

315.  As a direct and proximate result of the pattern of racketeering activity, by and through each of the unlawful acts recited herein, Karma has been injured in its business and property, including, but not limited to, loss of trade secrets, drawings, intellectual property, protected business information, equipment, business opportunities, reputation, and profits.

## COUNT XXV

### RICO Conspiracy, 18 U.S.C. § 1962(d) *et seq.*

### (Against All Defendants)

316.  Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 226 and 297-315.

317.  Defendants knowingly agreed to facilitate a scheme, a conspiracy, to defraud Karma through a pattern of interstate racketeering activity, which included

the operation and/or management of a RICO enterprise. This conspiracy included the following agreements:

a. At, near, or around April 2020, LMC and the LMC Individual Defendants and Durre conspired and agreed that Durre would (1) leave Karma and misappropriate Karma's Confidential Information and Trade Secrets for use in developing LMC's infotainment operations on the west coast of the U.S.; (2) assist LMC in recruiting Karma's employees to work at LMC, in violation of Durre's obligations to Karma; and (3) assist LMC in encouraging and entering into further agreements with the other Former Employee Defendants to misappropriate Karma's Confidential Information and Trade Secrets through access to Karma's computer systems that exceed these departing employees' authority, for a non-work related purpose, and specifically for use in developing competing products at LMC.

b. LMC and the LMC Individual Defendants conspired with each other and with the Former Employee Defendants at, near, or around the time of their departure dates from Karma (specifically identified above) that the Former Employee Defendants would (1) quit working at Karma and go to work for LMC, (2) assist in the recruitment of Karma's other employees; (3) use Karma's computer systems beyond their level of authorization prior to departure from Karma for a non-work related purpose, and specifically to take with them to LMC Karma's Confidential Information and Trade Secrets for use in developing competing products at LMC; and (4) assist and encourage other Departing Employees to take with them Karma's Confidential Information and Trade Secrets for use in developing competing products at LMC.

318. As set forth above, Defendants were involved in a scheme to defraud Karma by committing a series of unlawful acts which constitute predicate racketeering acts under 18 U.S.C. § 1962(c) over a prolonged period of time—in excess of several months—and multiple nefarious bad acts in several short spans during that same prolonged timeframe.

319.  During this lengthy scheme to defraud Karma, Defendants committed predicate acts of racketeering activity, as defined in 18 U.S.C. § 1961(1), on multiple occasions and in violation of various federal statutes, including the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1836, *et seq*., and the federal Wire Fraud statutes, 18 U.S.C. § 1343. These predicate acts included, but were not limited to, (1) Durre's initial misappropriation of Karma's Trade Secrets in July 2020, in violation of the DTSA; (2) each Former Employee Defendant's misappropriation of Karma's Trade Secrets at, near, or around the time of their respective departure date (specifically identified above); (3) each Former Employee Defendant's use of Karma's protected computer systems beyond their authorization to transfer Karma's Trade Secrets to LMC, in violation of CFAA; and (4) each time Defendants use Karma's Trade Secrets to develop a competing product. This pattern of racketeering has been ongoing since the time leading up to the Former Employee Defendants' departures from Karma specified above and continues to this day, thereby posing a threat of continued criminal activity. Indeed, Defendants predicate acts are so numerous and pervasive that they constitute an open-ended scheme and are part of the normal course of how Defendants regularly conduct business.

320.  For several months between April and September 2020 and in a plan which is ongoing, Defendants worked in concert with one another, committing numerous and repeated violations of the above federal statutes to harm Karma economically.

321.  At various points in time, in furtherance and as unlawful overt acts in support of the conspiracies, Defendants misappropriated trade secrets of Karma through unlawful means, in violation of the DTSA.

322.  In perpetrating this scheme, Defendants used the internet to accomplish many of their goals.

323.  Specifically, in violation of the federal Wire Fraud statutes,

81

Defendants e-mailed or uploaded onto a cloud-based platform countless Karma proprietary data.

324. In turn, this information was sent and/or used by Defendants for their advantage and to the disadvantage of Karma.

325. Defendants used the wires to transfer and download Karma's Confidential Information and Trade Secrets to usurp Karma's business opportunities, existing and prospective contracts, and otherwise harm Karma.

326. Further, Defendants schemed to hire away numerous employees of Karma in an effort to compete against them.

327. During this time, these same Defendants communicated with one another by electronic means and across state lines not only to recruit Karma's employees, but also to take proprietary information from Karma's computers and information system.

328. Each of the predicate acts perpetrated by these same Defendants in furtherance of the scheme to defraud Karma was performed by these same Defendants while participating in the conduct of the affairs of an enterprise— whether that enterprise be LMC or an association-in-fact comprised of Defendants—through a pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962(c).

329. As a direct and proximate result of the pattern of racketeering activity, by and through each of the unlawful acts recited herein, Karma has been injured in its business and property, including, but not limited to, loss of trade secrets, drawings, intellectual property, protected business information, equipment, business opportunities, reputation, and profits.

## COUNT XXVI

### Unfair Competition Under Lanham Act

### (Against All Defendants)

330. Plaintiff realleges and incorporates by this reference the allegations

82

set forth in Paragraphs 1 through 1 through 226 and 297-329.

331.   The acts and omissions of Defendants described above constitute unfair competition in violation of 15 U.S.C. § 1125(a).

332.   Defendants have used in commercial advertisements or promotions in interstate commerce false designations of origin, and/or false or misleading representations of fact—namely, branding products as LMC when they depend upon the use of Karma's Trade Secrets—which are likely to cause confusion, or to cause mistake, or to deceive in a material way as to the affiliation, connection, or association of Defendants to the origin, sponsorship, or approval of the technology the subject of this lawsuit, the fruits thereof, and the commercial activities associated therewith.

333.   Defendants also organized a scheme to raid Karma's employees as a means to improperly and illegally acquire Karma's workforce, its customers, its goodwill, and its confidential, proprietary, and trade secret information, in order to harm Karma in the marketplace so that Defendants could unfairly compete against Karma. This scheme, including solicitation of Karma's employees, was undertaken with unlawful and improper purpose, and employed unlawful and improper means. Defendants' conduct was contrary to honest practices in industrial or commercial matters.

334.   Until Defendants carried out their scheme, Karma maintained valid relationships with its employees and maintained the intellectual capital contained within Karma's work force through training and experience. Karma reasonably expected that these relationships, their work force, and their intellectual capital would continue and would not be unjustifiably disrupted.

335.   Karma has been competitively and commercially damaged as a proximate result of the acts and omissions of unfair competition committed by Defendants.

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

336.   Defendants' conduct has been willful and in bad faith, making this an exceptional case under 15 U.S.C. § 1117.

337.   Defendants' conduct has caused and is causing irreparable injury to Karma, including through the threat of losing the value of its confidential, proprietary, and trade secret information and certain customer relationships, along with income and goodwill. Unless enjoined by this Court, Defendants will continue to damage Karma and to deceive the public. Karma has no adequate remedy at law with respect to Defendants' acts of unfair competition.

## COUNT XXVII

### Violation of the California Penal Code § 502

### (Against LMC and the LMC Individual Defendants)

338.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 1 through 226 and 297-337.

339.   Karma maintains and owns a computer network, computer programs or software, and a computer system as those terms are defined in California Penal Code section 502 (collectively "Computer System"), and which includes the computers and network access provided by Karma to the Former Employee Defendants while they were employed or contracted by Karma. Karma maintains its data, including its Trade Secrets and Confidential Information, on its Computer System,

340.   Karma is informed and believes, and thereon alleges, that the Former Employee Defendants were acting as agents of LMC prior to their respective resignations from Karma in or around August 2020.

341.   Therefore, Karma is informed and believes that LMC and the LMC Individual Defendants, acting through the Former Employee Defendants, knowingly and without permission, accessed Karma's Computer System, including its computer and external devices, and the property and data contained therein; used and/or caused to be used Karma's Computer System, including its computer and

external device, and the data contained therein; and took, copied, and thereafter made use of and destruction of data and supporting documentation from Karma's Computer System. LMC and the LMC Individual Defendants did these acts knowingly and without permission, within the meaning of California Penal Code section 502.

342. Karma is informed and believes and thereon alleges that LMC and the LMC Individual Defendants engaged in these acts knowingly and intentionally, and for the purposes of wrongfully obtaining and controlling Karma's property and data, and destroying Karma's files.

343. Karma is informed and believes and thereon alleges that the Former Employee Defendants, as agents of LMC and the LMC Individual Defendants, knowingly and without permission accessed and wiped the data on their company-owned laptops. They did these acts knowingly and without permission, within the meaning of California Penal Code section 502. Later, the Former Employee Defendants, as agents of LMC and the LMC Individual Defendants, deleted and purged Karma files contained on Karma's external devices that they wrongfully took and accessed without permission, as well as Karma files on their personal laptops that they wrongfully transferred, accessed, and then destroyed without permission.

344. Karma is informed and believes and thereon alleges that LMC and the LMC Individual Defendants, acting through the Former Employee Defendants, engaged in these acts knowingly and intentionally, and for the purposes of concealing their wrongful conduct and wrongfully depriving Karma of its property and data.

345. Karma is informed and believes and thereon alleges that the conduct of LMC and the LMC Individual Defendants violates California Penal Code section 502, including, without limitation, California Penal Code section 502(c)(1), (2), (3), (4), (6), and (7).

346.   As an actual and proximate result of the conduct of LMC and the LMC Individual Defendants, Karma has suffered actual and/or consequential damages.

347.   As an actual and proximate result of the conduct of LMC and the LMC Individual Defendants, Karma has suffered, loss, including, but not limited to, the internal and external investigation costs associated with identifying the extent of their wrongful conduct and attempting to recover the deleted, wrongfully transferred, and copied data, including by hiring computer forensic investigators and attorneys, among other losses. Karma continues to suffer these losses.

348.   Karma is informed and believes and thereon alleges that after knowingly accessing Karma's Computer System and removing Karma's data without authorization or permission, LMC and the LMC Individual Defendants, acting through the Former Employee Defendants, retained some or all of the property and data and other information that they obtained from their unlawful conduct. Accordingly, Karma is entitled to injunctive relief and other equitable relief, including, without limitation, permanent injunctive relief and restitution and disgorgement of any and all profits or other benefits that LMC and the LMC Individual Defendants have obtained in connection with their illegal conduct.

349.   Karma is informed and believes and thereon alleges that LMC and the LMC Individual Defendants did each of the aforementioned acts willfully and maliciously, with the deliberate intent to injure Karma and with conscious disregard of Karma's rights, thus entitling Karma to an award of punitive damages in an amount commensurate with Karma's conduct and appropriate to deter others from engaging in similar misconduct.

## COUNT XXVIII

### Violation of the California Penal Code § 502

### (Against the Former Employee Defendants)

350.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 226 and 297-349.

351.   Karma maintains and owns a computer network, computer programs or software, and a computer system as those terms are defined in California Penal Code section 502 (collectively "Computer System"), and which includes the computers and network access provided by Karma to the Former Employee Defendants while they were employed or contracted by Karma. Karma maintains its data, including its Trade Secrets and Confidential Information, n its Computer System,.

352.   Karma is informed and believes and thereon alleges that the Former Employee Defendants, knowingly and without permission, accessed Karma's Computer System, including its computer and external devices, and the property and data contained therein; used and/or caused to be used Karma's Computer System, including its computer and external device, and the data contained therein; and took, copied, and thereafter made use of and destruction of data and supporting documentation from Karma's Computer System. The Former Employee Defendants did these acts knowingly and without permission, within the meaning of California Penal Code section 502.

353.   Karma is informed and believes and thereon alleges that the Former Employee Defendants engaged in these acts knowingly and intentionally, and for the purposes of wrongfully obtaining and controlling Karma's property and data, and destroying Karma's files.

354.   Karma is informed and believes and thereon alleges that the Former Employee Defendants, knowingly and without permission, accessed and wiped the data on their company-owned laptops. They did these acts knowingly and without permission, within the meaning of California Penal Code section 502. Later, the Former Employee Defendants deleted and purged Karma files contained on Karma's external devices that they wrongfully took and accessed without permission, as well as Karma files on their personal laptops that they wrongfully transferred, accessed, and then destroyed without permission.

87

355.   Karma is informed and believes and thereon alleges that the Former Employee Defendants engaged in these acts knowingly and intentionally, and for the purposes of concealing their wrongful conduct and wrongfully depriving Karma of its property and data.

356.   Karma is informed and believes and thereon alleges that the conduct of the Former Employee Defendants violates California Penal Code section 502, including, without limitation, California Penal Code section 502(c)(1), (2), (3), (4), (6), and (7).

357.   As an actual and proximate result of the Former Employee Defendants' conduct, Karma has suffered actual and/or consequential damages.

358.   As an actual and proximate result of the Former Employee Defendants' conduct, Karma has suffered, loss, including, but not limited to, the internal and external investigation costs associated with identifying the extent of the Former Employee Defendants' wrongful conduct and attempting to recover the deleted, wrongfully transferred, and copied data, including by hiring computer forensic investigators and attorneys, among other losses. Karma continues to suffer these losses.

359.   Karma is informed and believes and thereon alleges that after knowingly accessing Karma's Computer System and removing Karma's data without authorization or permission, the Former Employee Defendants retained some or all of the property and data and other information that they obtained from their unlawful conduct. Accordingly, Karma is entitled to injunctive relief and other equitable relief, including, without limitation, permanent injunctive relief and restitution and disgorgement of any and all profits or other benefits that the Former Employee Defendants have obtained in connection with their illegal conduct.

360.   Karma is informed and believes and thereon alleges that the Former Employee Defendants did each of the aforementioned acts willfully and maliciously, with the deliberate intent to injure Karma and with conscious

disregard of Karma's rights, thus entitling Karma to an award of punitive damages in an amount commensurate with Karma's conduct and appropriate to deter others from engaging in similar misconduct.

## **REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF**

361.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through __.

362.   Karma demonstrated, and the evidence to be presented at a hearing and/or trial will show, that Karma has a likelihood of success on the merits of one or more of its claims set forth in its First Amended Complaint.

363.   The CFAA, 18 U.S.C. § 1030(g), authorizes and provides an adequate, independent basis for the preliminary injunctive relief sought by Karma.

364.   Karma will be irreparably harmed without preliminary injunctive relief that restores the status quo ante between Karma and Defendants before Defendants committed one or more of the wrongful acts described in this First Amended Complaint.

365.   A balancing of the equities favors the entry of preliminary injunctive relief upon a hearing before the Court, in favor of Karma and, without the entry of such relief, Karma will suffer a greater hardship than Defendants would suffer if such relief were entered.

366.   Karma has no adequate remedy at law.

367.   It is in the public interest that confidential information remain protected and that the integrity of protected computers remains intact, rather than the alternative: unabated breaches of confidentiality agreements, disclosures of confidential and trade secret information, and the hacking of computers by individuals and entities who are not authorized to access such computers or who access such computers in excess of their authorized access for the purposes of committing fraud, transferring information, and/or destroying information that resides on protected computers.

### **PRAYER FOR RELIEF**

WHEREFORE, for the wrongful acts of Defendants complained of in the foregoing causes of action, Karma respectfully requests the following relief:

A.    Judgment in its favor and against Defendants;

B.    Preliminary and permanent injunctive relief prohibiting any further wrongful possession, disclosure, and/or misuse of Karma's Trade Secrets and Confidential Information, and preventing Defendants from profiting or benefiting from their wrongful conduct;

C.    An order that Defendants return to Karma, and purge from their possession, custody, and control, any and all documents, computer-based files or data, or information in any form, whether originals, copies, compilations, or derivations, which were removed from Karma or Karma-owned computers issued to the Former Employee Defendants by Karma, or which were obtained by Defendants or anyone acting on their behalf or in concert with them;

D.    An order that Defendants return any and all of Karma's Trade Secrets and Confidential Information, and an order prohibiting any further use or benefit from the use of such information;

E.    An award of compensatory, consequential, economic, general, and special damages, as alleged above, in an amount and nature to be proven after the discovery of all relevant evidence and trial, including, without limitation:

          a.  actual damages,

          b.  lost profits,

          c.  disgorgement of profits and other ill-gotten gains,

          d.  reasonable royalties,

          e.  established royalties,

          f.  loss of value of the trade secrets,

          g.  head-start damages,

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

h.  sweat equity damages,

i.  avoided development costs, and/or

j.  unjust enrichment;

F.    An award of compensatory damages to Karma in an amount to be determined at a hearing and/or trial including, but not limited to, the attorneys' fees, computer forensic fees, and costs Karma has incurred to investigate and address Defendants' unauthorized access and improper use of Karma's computers;

G.    An order directing Defendants to disgorge all gross revenues and profits that they or anyone acting in concert or participation with them received as a result of their wrongful conduct, in an amount to be determined at trial;

H.    An award in favor of Karma for its costs associated with this action, including, without limitation, its attorneys' fees pursuant to the common law and under the Defend Trade Secrets Act, California Uniform Trade Secrets Act, California Penal Code § 502, and California Business and Professions Code section 17203;

I.    An award in favor of Karma for its costs, damages, and computer forensics and related investigation fees and costs pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*., and California Penal Code § 502;

J.    An award of exemplary damages in an amount twice the total of the damages recovered for actual loss as permitted by 18 U.S.C. § 1836(b)(3)(C) and California Civil Code § 3426.3;

K.    An award of punitive damages in an amount to be determined at trial;

L.    An award of attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) and California Civil Code § 3426.4;

M.    Compensation to Karma for any unjust enrichment enjoyed by Defendants, including restitution of all revenues, gains, profits, and advantages obtained by Defendants as a result of their wrongful and unlawful conduct, in an

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

1  amount to be determined at a hearing and/or trial;

2      N.      An award of pre-judgment and post-judgment interest as permitted by

3  law;

4      O.      An order imposing a constructive trust;

5      P.      An order that each of the Former Employee Defendants comply with

6  the Confidentiality Agreement;

7      Q.      An order that LMC comply with the MNDA; and

8      R.      Any such other legal and equitable relief as the Court deems

9  appropriate.

10

11 Dated: April 16, 2021                    SEYFARTH SHAW LLP

12

                                           By:/s/ *Michael D. Wexler*
13                                             ROBERT B. MILLIGAN
                                               MICHAEL D. WEXLER
14                                             JESSE M. COLEMAN
                                               KEVIN J. MAHONEY
15                                             KATELYN R. MILLER
                                               DANIEL JOSHUA SALINAS
16                                             SIERRA J. CHINN-LIU
                                               Attorneys for Plaintiff
17                                             KARMA AUTOMOTIVE LLC

18

19

20              **DEMAND FOR JURY TRIAL**

21      Karma demands trial by jury to the fullest extent as allowed by law.

22

23

24

25

26

27

28

                                    92

Dated: April 16, 2021

SEYFARTH SHAW LLP

By: /s/ *Michael D. Wexler*

ROBERT B. MILLIGAN
MICHAEL D. WEXLER
JESSE M. COLEMAN
KEVIN J. MAHONEY
KATELYN R. MILLER
DANIEL JOSHUA SALINAS
SIERRA J. CHINN-LIU
Attorneys for Plaintiff
KARMA AUTOMOTIVE LLC

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES