## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LORDSTOWN MOTORS CORP., *et al.*,[1] | Case No. 23-10831 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 108** |
| | **Hearing Date: July 27, 2023, at 9:30 a.m. (Eastern)**<br>**Obj. Deadline: July 20, 2023, at 4:00 p.m. (Eastern)** |

### PRELIMINARY OBJECTION TO DEBTORS' MOTION UNDER 11 U.S.C. § 502(c) AND 105(a) FOR ENTRY OF ORDERS (I) ESTABLISHING PROCEDURES AND SCHEDULE FOR ESTIMATION PROCEEDINGS AND (II) ESTIMATION OF THE AMOUNT OF THE CLAIM HELD BY KARMA AUTOMOTIVE LLC

Karma Automotive LLC, a California limited liability company ("Karma"), by and through its undersigned counsel, submits this preliminary objection ("Objection") to Debtors' Motion for Entry of Orders (I) Establishing Procedures and Schedule for Estimation Proceedings and (II) Estimation of the Amount of the Claim Held by Karma Automotive LLC ("Estimation Motion"). (Dkt. No. 108). In support of its Objection, Karma respectfully states as follows:

### INTRODUCTION

1.       In its most favorable light, Debtors' Estimation Motion completely misses the mark because Debtors' alleged property interests in the intellectual property at issue in the now-stayed litigation ("District Court Case") pending before the United States District Court for the Central District of California ("District Court") must be decided through an adversary proceeding pursuant to Bankruptcy Rule 7001(2). In its least favorable light, Debtors' Estimation Motion wholly lacks merit and is nothing more than a blatant attempt to forum shop to evade multiple prior orders from

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corp. (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101). The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

the District Court sanctioning Debtors, permitting the jury to draw adverse inferences at trial based on the destruction of evidence, limiting the introduction of evidence at trial for failure to timely produce same, and limiting Debtors' ability to substitute the contents of its expert damages report.

2.      More specifically, pursuant to Bankruptcy Rule 7001(2) and case law from the Third Circuit and Delaware bankruptcy courts, the Debtors must commence an adversary proceeding against Karma in order to determine its property rights in the intellectual property before any sale can occur pursuant to Section 363.  Put another way, a claim estimation is insufficient to permit Debtors to sell the intellectual property.  Therefore, Debtors cannot achieve their stated goal of a September sale of its assets through a claim estimation proceeding.

3.      Debtors have also failed to allege, let alone establish, sufficient "undue delay" to warrant use of an estimation proceeding.  The undisputed facts establish that Debtors have ceased operations, have no secured creditor pressing for a sale, have no prospective for a potential buyer after nearly two years of marketing efforts, and have not yet filed schedules, let alone a plan and disclosure statement.  In fact, because Debtors must also commence an adversary proceeding pursuant to Bankruptcy Rule 7001(2), the only way to avoid undue delay is for the Court to modify the automatic stay to permit the scheduled September 5, 2023 trial to occur.

4.      Further, Debtors' Estimation Motion is also a bad faith attempt to free itself of numerous rulings by the District Court with respect adverse inferences, the limitation of submission of evidence at trial, and limitations on substitution of its damages expert report, which orders arise from conduct including the destruction and withholding of relevant evidence.  The Court should not permit the use of a claim estimation for such an improper purpose.

5.      Finally, the Estimation Motion is wholly premature as Debtors have not filed schedules, the Court has not entered a claims bar date, and Karma has not filed a proof of claim. Therefore, as of now, there is no claim to estimate.

6.      For these reasons, and as more fully set forth below, the Court should deny the Estimation Motion, deny Debtors' Sales Procedures Motion (Dkt. No. 73), and grant Karma's pending Motion for Relief from the Automatic Stay (Dkt. No. 82).[2]

## **BACKGROUND**

7.      Karma commenced the litigation against Debtors in the District Court, Case No. 20-cv-02104 ("District Court Case") on October 30, 2020 based on well-documented claims that Debtors and eleven (11) of its current and former officers, executives, engineers, contractors and related entities (collectively, the "Individual Defendant(s)") engaged in a scheme to poach Karma's employees and willfully and maliciously misappropriate the confidential designs and computer source code for Karma's electric vehicle in order to expedite development of Debtors' long-delayed sole product – an electric vehicle called the Endurance.  Karma seeks injunctive relief and damages against Debtors and the Individual Defendants based on claims including willful and malicious misappropriation of trade secrets, violation of the computer fraud and abuse act, and breach of contract.  After nearly three years of contentious litigation, discovery involving the production of over 12 million documents, the production of over 500,000,000 lines of source code, more than 50 depositions, and dozens of pretrial motions including summary judgment, the District Court set a multi-week jury trial commencing on September 5, 2023.

---

[2]  Karma incorporates by reference the facts and arguments set forth in its pending Motion for Relief from the Automatic Stay (Dkt. No. 82) and it contemporaneously filed Objection to Debtors' Sale Procedures Motion.

A. **The Parties in the District Court Case.**

8.      Karma manufactures luxury electric vehicles, components, hardware, and software and maintains its principal place of business in Irvine, California.  Karma is licensed to conduct business in California and conducts business throughout the United States.

9.      Debtors manufactured electric vehicles and maintains its principal place of business in Lordstown, Ohio, and also conducts business in Michigan and California.

10.     The Individual Defendants are residents of the States of California, Ohio, and North Carolina and include Debtors' former Chief Executive Officer, Debtors' former Chief Operations Officer, Debtors' former Chief Technology Officer, Debtors' former Chief Production Officer, and several current and former Debtors employees.[3]

B. **Debtors and the Individual Defendant's Misappropriation of Karma's Trade Secrets.**

11.     As of 2019, Debtors had yet to finalize a working vehicle for sale to the public, were under increasing scrutiny for their failure to do so, and became subject to an investigation by the Securities and Exchange Commission for misrepresentations about alleged "pre-orders" for their products.[4]

12.     Faced with pressure from investors, regulatory authorities, and the general public about its significant development and production delays, Debtors decided to take a shortcut and steal Karma's trade secrets.  By doing so, Debtors hoped to avoid—in the words of their own executives—millions of dollars in costs, and months, if not years, of development time.

---

[3]  There is also one other corporate defendant – Punak Engineering, Inc., a California corporation, which is owned by Stephen Punak, one of the Individual Defendants.

[4]  Debtors are now subject to a litany of securities class actions and stockholder derivative lawsuits.  *See* Debtors' First Day Declaration (Dkt. No. 15, ¶¶ 54-57).

13.    Debtors accomplished their theft by approaching Karma in 2019 about a partnership.  In the high-tech and highly-competitive electric vehicle industry, the "infotainment" systems offered by manufacturers are a key distinguishing feature and selling point.   The infotainment system collects, displays, and allows a driver to interact with all of the vehicle's informational and entertainment systems, often through a prominently-placed interactive touch-screen contained in the vehicle's front dash.  Karma has years of experience developing cutting-edge infotainment systems, and Debtors desperately needed one.   When it approached Karma, Debtors claimed to be interested about entering into a development partnership with Karma for an infotainment system.  Through that feigned interest, Debtors executed a letter of intent ("LOI") and entered into a five-month "due diligence" period with Karma's engineering and project management staff, culminating in a fraudulent "letter of intent," and a promise by Debtors to issue payments to Karma in short order.

14.    The courtship was a ruse and the promised check never arrived.  Instead, Debtors used those five months to begin poaching and onboarding key Karma employees, and to steal Karma's confidential information and trade secrets—not just about the infotainment system being developed, but *about every aspect of Karma's business*.  This included software source code, bills of materials with confidential price and part numbers, highly technical system and software requirement documents outlining in detail Karma's electrical architecture and power moding system, and Karma's entire highly confidential product development system.

15.    More specifically, on July 21, 2020, mere weeks before Debtors terminated the LOI, Debtors' Chief Engineer Darren Post ("Post") emailed Richard Schmidt ("Schmidt"), Debtors' Chief Production Officer, to "propose hiring [Karma's Director of Engineering] Joe Durre ("Durre")" and Karma employees working under his supervision to create Debtors' "west

coast infotainment / connectivity team," stating that he and Individual Defendant "Steve [Burns]" had "discussed this strategy," which would purportedly enable Debtors to "get [its] infotainment team for ½ the cost (labor without Karma costs or licensing fee)." (Dist. Ct. Dkt. No. 72, ¶ 78). On July 24, 2020, Post again emailed Schmidt, forwarding Durre's resume, stating that hiring Durre would allow Debtors to "own the IP and avoid spending $5-6 million with Karma," and sending the organization chart Post "developed with" Durre that outlined "key individuals from [Durre's Karma] team." (*Id.* at ¶ 79). Days later, on July 26, 2020, Durre emailed Post from his personal email account providing a "synopsis" for each of the Karma employees he intended to solicit for the Debtors' "west coast infotainment" team. (*Id.* at ¶ 80). On July 28, 2020, Post followed-up with Durre by text message, asking Durre to send him "the leanest organization needed to execute the program." (*Id.* at ¶ 81). Excited by the strides they had made in exploiting Karma's personnel and know-how, Post and Durre conspired that, if "[Debtors] owns all of the IP . . . *it tallies into the billions.*" (*Id*. at ¶ 81) (emphasis added).

16.     On August 1, 2020, Durre received an offer letter from Debtors to become their Director of Software and, by August 3, 2020, Durre was enrolled in Debtors' payroll. (*Id.* at ¶ 83 & Ex. 15). Just days later, after harvesting Karma's trade secrets for months, Debtors abruptly terminated the LOI on August 6, 2020. (*Id.* at ¶ 71). That same day, Post emailed Debtors executive Jonathan Wood explaining, "I hired Joe Durre but it must never be mentioned to Karma." (*Id.* at ¶ 85). Post further stated that, because Durre was "still with Karma . . . if he is on a call with Karma peopled involved, treat him like Karma. *To avoid lawsuits, we must not let Karma know*." (*Id.*) (emphasis added). The next day, Durre texted Post, instructing him to ensure that Wood did not "mention [Durre] being with [Debtors] to anyone connected with Karma." (*Id.* at ¶ 86).

17.    Despite becoming an employee of the Debtors in early-August 2020, Durre withheld this fact from Karma and continued to work as an employee of Karma *and* Debtors concurrently *for nearly one month*.  (Dist. Ct. Dkt. Nos. 129-1, at p. 4; 129-3, ¶ 32).  What is more, between July 28, 2020 (just a few days before he received the offer of employment from Debtors), and September 1, 2020 (the date he resigned from Karma), Durre utilized removable storage devices, cloud storage services, and his personal email account to take various Karma files containing Karma trade secrets, including valuable, non-public information regarding Karma's bills of materials ("BOMs"), financial and planning strategies, project specifications, software information, and vendor and pricing information. (Dist. Ct. Dkt. Nos. 129-3 at ¶ 33; 72 at ¶¶ 91-93).  Individual Defendant Hong Xin "George" Huan ("Huan") similarly worked for both companies for a period of time and copied to external storage devices various files containing Karma trade secrets—including specifications and blueprints for Karma hardware and software—from June 2, 2020 until August 27, 2020, one day before the termination of his employment from Karma. (Dist. Ct. Dkt. No. 72 at ¶¶ 25, 100).

18.    Discovery obtained by Karma in the District Court Case further exposed the alarming extent of Debtors and the Individual Defendants' theft of Karma trade secrets and use of the same in its electric vehicle.  (Dist. Ct. Dkt. No. 129-1 at 4-5).  In many instances, it appears that all Debtors initially did was delete the "Karma" logo and name and otherwise copied entire documents nearly verbatim.  As just a few examples, documents produced by Debtors in the District Court Case revealed that Debtors misappropriated Karma's power moding specifications, one of the most critical components to Karma's vehicle design, which guide how power is routed through an electric vehicle.  (Dist. Ct. Dkt. No. 129-4 at ¶¶ 26-30). Significantly, a comparison of Debtors' own power moding specification produced in the District Court Case revealed that *entire*

*sections* of Debtors' specification were copied ***word-for-word*** from Karma's specification.  (Dist. Ct. Dkt. No. 129-1 at 7-8).  Documents produced by Debtors in discovery further evinced that ***every*** iteration of Debtors' electrical/electronic ("EE") system architecture—the design of how various vehicle components are connected to facilitate power distribution—includes Karma's improvements to that architecture proposed during the Endurance Project, despite Debtors' obligation to cease using that information after it terminated the Project.  (*Id*. at 16).

19.    Similarly, Debtors produced during discovery various documents that incorporate Karma-specific details from Karma's product development system, a unique roadmap for Karma's entire enterprise process.  (Dist. Ct. Dkt. Nos. 129-1 at 14-15; 129-4 at ¶¶ 80-83).  Forensic investigation and discovery in the District Court additionally revealed Debtors' and Individual Defendants' unlawful copying of Karma's source code developed for Karma's next-generation infotainment and engineering tools.  (Dist. Ct. Dkt. No. 129-4 at ¶¶ 66-67).  Forensic analysis showed that, almost immediately after they joined Debtors, Individual Defendants Huan, Stephen Punak, Christopher Kim, Bei Qin, and Dan Zhihong Huang—who were responsible for creating Karma's source code for the Endurance Project—began depositing hundreds and sometimes ***thousands***, of lines of source code in Debtors' source code repository on a daily basis.  (Dist. Ct. Dkt. No. 72 at ¶¶ 102-105).  By comparison, the amount of source code typically created on a daily basis, even under the best circumstances, is a few dozen lines.  (Dist. Ct. Dkt. No. 129-4, ¶ 68).

20.    In short, Debtors lied about their interest in a joint development deal to further gain access to Karma's trade secrets, and to understand which of Karma's employees could most directly aid Debtors by stealing Karma's trade secrets and ideas.  Debtors then backed out of the joint development deal, stole Karma's intellectual property, and poached Karma's employees in order to save money and time.  Worse yet, Karma's valuable trade secrets continue to be used by

Debtors across all areas of their organization and remain in the possession of not just Debtors, but potentially also by the Individual Defendants, some of whom downloaded thousands of files containing Karma's trade secrets and confidential information to external storage devices while working for Karma.

      **C.**      **The District Court Case.**

21.      Karma filed the District Court Case on October 30, 2020.  (Dist. Ct. Dkt. No. 1).  On April 20, 2021, Karma filed an amended complaint ("Complaint") which included 28 counts including requests for injunctive relief.  (Dist. Ct. Dkt. No. 72).  A copy of the Complaint is attached to the Estimation Motion as **Exhibit B**.

22.      Karma, Debtors, the Individual Defendants have exchanged a combined 12.5 million documents in discovery – a figure that does not include the hundreds of millions of lines of source code that were also produced in discovery – and have taken a total of 54 depositions, including those of expert witnesses, totaling several hundred hours of sworn testimony.

23.      Discovery obtained by Karma also establishes that the defendants willfully began destruction of evidence as soon as the District Court Case began.  Accordingly, Debtors and the Individual Defendants have twice been sanctioned by the District Court for misconduct.  (Dist. Ct. Dkt. Nos. 159, 189).  With respect to the first sanctions order (a copy of which is attached hereto as **Exhibit 1**), the District Court found it "undisputed" that the defendants destroyed relevant information with a culpable state of mind and issued sanctions in the form of an adverse-inference jury instruction, making clear that it "did not take . . . lightly" defendants' conduct in destroying electronic files.  (Dist. Ct. Dkt. No. 159 at pp. 10-11).  In the second sanctions order (filed under seal), the District Court again found that defendants were subject to sanctions for willful destruction of discoverable electronic files and concluded that it could consider giving an adverse

      

inference instruction to the jury should it become apparent at trial that any relevant evidence was lost. (Dist. Ct. Dkt. No. 189 at p. 10).

24. The parties filed dozens of pretrial motions, including a lengthy motion for summary judgment filed by Debtors and the Individual Defendants that involved hundreds of pages of the factual record, as well as, motions *in limine*. The District Court has ruled on all of the pretrial motions including summary judgment. Based on Debtors' failure to timely produce evidence, the District Court granted Karma's motion *in limine* and ruled that Debtors could not introduce evidence at trial not already disclosed to Karma during the course of discovery. (Dist. Ct. Dkt. No. 439). *See* **Exhibit 2**.

25. Due to a health issue requiring the substitution of Debtors' damages expert, the District Court reset the commencement date for the trial from April 2023 to September 5, 2023. (Dist. Ct. Dkt. Nos. 510, 513). With respect to Debtors' request for a replacement damages expert, the District Court allowed Debtors to retain a replacement expert witness but ordered that the replacement expert's report "shall not exceed the factual limits of the [prior expert damages report] nor shall it be used to cure any substantive or methodological errors, if any, in the [prior expert damages report]." (Dist. Ct. Dkt. No. 510). *See* **Exhibit 3**.

26. The District Court has also approved the final pretrial order, which includes thousands of trial exhibits identified by the parties. To date, Karma, Debtors, and the Individual Defendants have identified ten (10) expert witnesses who are expected to testify at trial, along with an undetermined number of fact witnesses. Each side will have 26.5 hours for all direct and cross examinations, excluding *voir dire*, opening statements, and closing statements. (Dist. Ct. Dkt. No. 437, ¶ 3). Except for limited discovery and motion practice related to Debtors' replacement expert witness, the case is essentially ready to proceed to trial.

D.     **Debtors' Bankruptcy Filing.**

27.     Debtors commenced these bankruptcy cases on June 27, 2023 ("Petition Date").

On June 27, 2023, Debtors filed a Suggestion of Bankruptcy in the District Court Case (Distr. Ct.

Dkt. No. 537) which incorrectly asserted that the automatic stay also applied to the Individual

Defendants.  Based in part on Debtors' misrepresentation, the District Court orally stayed the

entirety of the District Court Case on June 27, 2023, but did not vacate the September 5, 2023 trial

date in order to permit Karma to seek relief from the automatic stay.  To date, none of the Individual

Defendants have filed for bankruptcy protection.

28.     Debtors have also filed a Sale Procedures Motion proposing a September 2023 sale

of all of Debtors' assets – presumably including Karma's stolen intellectual property.  (Dkt. No.

16).  The Sale Procedures Motion is set for hearing on July 27, 2023.  (Dkt. No. 73).  Karma

intends to object to Debtors' proposed sale to the extent it potentially includes any of Karma's

trade secrets.

## ARGUMENT

29.     The purpose of claim estimation is to avoid undue delay in administering the estate.

11 U.S.C. § 502(c).  "An estimation proceeding expedites the bankruptcy process so that key steps in

a reorganization that depend on the fixing of value may proceed."  *In re Stone & Webster, Inc*., 279

B.R. 748, 810 (Bankr. D. Del. 2002).  Nevertheless, "bankruptcy law's general rule is to liquidate, not

to estimate.  *In re Dow Corning Corp*., 211 B.R. 545, 563 (Bankr. E.D. Mich. 1997).  Thus, Section

502(c) is not meant to displace the ordinary claims liquidation process by which a creditor asserts a claim

under section 501(a).  Instead, as the case law indicates, claim estimation is most appropriate for plan

feasibility and voting rights determinations at a stage in the chapter 11 case when the parties have had

the opportunity to file proofs of claim and the pool of claimants is better understood.  *See In re Chemtura

Corp*., 448 B.R. 635, 649 n.46 (Bankr. S.D.N.Y. 2011) (noting estimating claims for allowance purposes

can raise due process concerns); *see also In re Adelphia Business Solutions, Inc.*, 341 B.R. 415, 418

(Bankr. S.D.N.Y. 2003) (refusing to use estimation to determine the allowability of a $71 million claim

because of the magnitude of the claim in the time frame, and only used estimation for purposes of gauging

feasibility); *In re MacDonald*, 128 B.R. 161, 164 (Bankr. W.D. Tex. 1991) (using estimation of

administrative claim to determine feasibility, but not ultimate allowance).

30.    "For estimation to be mandatory [ ], the delay associated with liquidation must be

'undue.'" *Id*.  Courts have defined "undue delay" as "excessive or unwarranted slowing of the

administration of a debtor's case" and unjustified.  *See John Q. Hammons*, No. 16-21142, 2017

WL 4638439, at *4 (Bankr. D. Kan. Oct. 13, 2017); *see also Dow Corning*, 211 B.R. at 563.

31.    Once a bankruptcy court decides to undertake an estimation proceeding, the principal

consideration in the Third Circuit "must be an accommodation to the underlying purposes of the

Code." *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 123 (D. Del. 2006) (quoting *Bittner v.

Borne Chem. Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982)).  Thus, while bankruptcy courts have wide

latitude to determine what procedures to use for estimating a claim, such estimation must be appraised

on the basis of what would have been a fair resolution of the claims in the absence of bankruptcy.  *See

Owens Corning v. Credit Suisse First Bost.*, 322 B.R. 719, 722 (D. Del. 2005).

I.    **The Estimation Motion Should Be Denied Because The Determination Of Property
      Rights Requires an Adversary Proceeding.**

32.    Debtors' primary motivation for filing the Estimation Motion is the sale of all of

Debtors' assets, including the disputed intellectual property that Karma alleges Debtors willfully

misappropriated, prior to a full determination of Debtors' property rights with respect to same.

However, pursuant to case law from the Third Circuit and Delaware bankruptcy courts, the

commencement of an adversary proceeding under Bankruptcy Rule 7001(2) is required to

determine whether disputed intellectual property assets are "property of the estate" before any sale

may proceed pursuant to Section 363. Therefore, Debtors cannot use claim estimation to achieve its goal of selling the disputed intellectual property. For this reason, the Court should deny the Estimation Motion.

33.     "Federal Rule of Bankruptcy Procedure 7001 sets forth matters that may only be resolved through an 'adversary proceeding,' including the determination of the "'validity, priority, or extent of a lien or other interest in property.'" *SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)*, 530 F.3d 230 (3d Cir. 2008). Accordingly, Delaware bankruptcy courts hold that an adversary proceeding is required to sell assets where a debtor's interest in them is subject to dispute. *Whitehall Jewelers Holdings, Inc*., No. 08-11261, LEXIS 2120, at *9 (Bankr. D. Del. July 28, 2008) (requiring compliance with Bankruptcy Rule 7001(2) to determine property interests in the assets before a debtor may sell them pursuant to Section 363); *Mansaray-Ruffin)*, 530 F.3d at 236 ("when an adversary proceeding is required under Rule 7001(2), courts are not free to disregard the Rule").

34.     In contrast, Section 363 of the Bankruptcy Code only permits a debtor to sell property of the estate. 11 U.S.C. § 363(b)(1) ("The trustee, after notice and a hearing, may use, sell, or lease … ***property of the estate*** …") (emphasis added). Section 541 Code defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." As such, "[a] bankruptcy court may not allow the sale of property as 'property of the estate' without first determining whether the property is property of the estate." *Whitehall Jewelers*, Case No. 08-11261 (KG), 2008 Bankr. LEXIS 2120, at *9; *see also Moldo v. Clark (In re Clark)*, 266 B.R. 163, 172 (B.A.P. 9th Cir. 2001) ("… the property that can be sold free and clear under section 363(f) is defined by subsections (b) and (c) of section 363 as 'property of the estate.'"); *In re Shelton*, 593 B.R. 755, 764 (Bankr. N.D. Ohio 2018) (finding denial of request to

sell stolen property pursuant to Section 363(f) appropriate where title obtained by a debtor is void under applicable State law and therefore not part of debtor's estate).

35.     The Sixth Circuit's decision in *Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922 (6th Cir. 2000) is also instructive. *Newpower* addressed whether a debtor's estate included stolen property obtained by the debtor through larceny and/or embezzlement. The *NewPower* court correctly determined that state law determines whether a debtor has a property interest for purposes of Section 541(a)(1). *Id*. at 928. The court the applied State law and determined that a debtor does not obtain title to property obtained through larceny or embezzlement. *Id*. at 928-31. As such, the court concluded the stolen property was not party of the debtor's estate. *Id*. Of course, to the extent property is not included in a debtor's estate, a debtor cannot use Section 363 to sell such property. Here, Karma alleges that Debtors stole its intellectual property through larceny and/or embezzlement. Under applicable California State law, a party that obtains property through larceny or embezzlement does not obtain title. *Suburban Motors, Inc. v. State Farm Mut. Auto. Ins. Co.*, 218 Cal. App. 3d 1354, 1361 (Cal. Ct. App. 1990) (finding that "good title cannot pass from a thief" and thus title was void); *see also Express Media Grp., LLC v. Express Corp.*, No. 06-3504, 2007 WL 1394163, at *5 (N.D. Cal. May 10, 2007) (citing *Suburban* and holding that domain name obtained through larceny carries with it void, not voidable, title).

36.     Thus, no sale can take place prior to conclusion of the District Court Case or an full adversary proceeding pursuant to Bankruptcy Rule 7001(2). As such, the Court should deny the Estimation Motion.

## II.     The Estimation Motion Should Be Denied Because Debtors Have Neither Alleged, Nor Established, Sufficient Facts To Establish Undue Delay.

37.     A simple showing of delay is insufficient for a court to order an estimation proceeding; the movant must prove *undue* delay. *See In re Dow Corning Corp.*, 211 at 563 (refusing to conduct

estimation proceeding despite recognition that adjudication of tort claims pending against debtor could take "several years," finding delay must be "unjustifiable"); *In re Apex Oil Co.*, 107 B.R. 189, 193 (Bankr. E.D. Mo. 1989) (denying debtor's motion for estimation, even though a plan and disclosure statement had been filed, and instead finding that the claim should be resolved on the merits in a pending litigation); *In re Bison Resources, Inc.*, 230 B.R. 611, 618–619 (Bankr. N.D. Okla. 1999) (denying estimation based on movant's failure to show undue delay); *In re RNI Wind Down Corp.*, 369 B.R. at 174 (denying estimation by finding administrator's fears that claim would grow to a full capped amount of $4.5 million did not involve undue delay and was not a legitimate basis for estimating the claim); *see also In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 520 (Bankr. E.D.N.Y. 1994) (noting it may be inappropriate to hold estimation proceeding if such estimation may itself cause undue delay).

38.     Here, the Estimation Motion fails to allege, let alone establish, any undue delay.  The simple facts show there is no delay, and especially, no undue delay.  To date, Debtors haven't filed schedules and have moved to extend the deadline to file them until August 1, 2023.  (Dkt. No. 109). The Court has not entered a claims bar date and Karma has not filed a proof of claim.  The Court has not entered any order with respect to Debtors' Sale Procedures Motion.  Nor is there any secured creditor pressing for an expedited sale timeline.  Debtors also have not filed a plan or disclosure statement.  Moreover, according to Debtors, their most valuable asset is its litigation claims against FoxConn, which will likely take years to fully litigate.

39.     Debtors' self-imposed sale milestones are also insufficient to establish "undue delay."  Debtors admit that they have already essentially halted the production of vehicles and let go the majority of its employees.  (Debtors' First Day Decl., Dkt. No. 15, ¶¶ 65-66).  Put another way, Debtors have essentially ceased operations after manufacturing a mere handful of vehicles, so

there is no urgency to complete a sale to preserve ongoing operations. Debtors also admit that they have been marketing themselves for sale since September 2021 and "has not received any actionable indications of interest." (*Id*. at ¶ 61). Similarly, Debtors' Sale Procedures Motion concedes there is no stalking horse bidder. In fact, Debtors' First Day Declaration paints a grim picture for the prospects of a sale stating: "If the Sale Process does not yield a buyer interested in the Company's ongoing programs, then the Company will take further actions, as necessary, to reduce administrative expenses other than those necessary to achieve the best result possible for stakeholders in a liquidation of the Company's assets." (*Id*. at ¶ 67). Therefore, Debtors' prospective sale efforts do not give rise to any concerns of undue delay.

(a).    <u>Modifying The Automatic Stay Would Prevent Delay</u>.

40.    Contrary to Debtors' assertions, the most expeditious manner to determine Karma's claims and Debtors' property interests is to modify the automatic stay to permit the September 5, 2023 trial to occur. The parties have spent nearly three years in litigation involving 12.5 million documents produced in discovery hundreds of millions of lines of source code produced in discovery, and 54 expert and fact witness depositions totaling several hundred hours of sworn testimony. The District Court Case is now nearly ready for a jury trial and involves claims for injunctive relief and damages against non-debtor Individual Defendants who are likely beyond this Court's jurisdiction.

41.    In contrast, estimating Karma's claims would undoubtedly result in undue delay and additional costs to Debtors' estate by forcing the parties to relitigate the District Court Action and would also require an adversary proceeding pursuant to Bankruptcy Rule 7001(2) to determine Debtor's property rights. It would be impossible to complete a claim estimation and adversary

proceeding prior to completion of the scheduled September trial in the District Court.[5]  A claim

estimation (and adversary proceeding) would also result in appeals to both the Delaware District

Court and the Third Circuit as a matter of right, resulting in further delay.  Whereas, completion of

the District Court Cause would only result in an appeal to the Ninth Circuit as a matter of right.

***

42.     As such, Debtors have failed to establish any undue delay related to the liquidation of

any future claim that may be asserted by Karma.  On the contrary, Debtors' request for an estimation

would create undue delays and increase costs to the estate by duplicating nearly three years of

litigation and requiring an adversary proceeding to determine Debtors' property rights before any sale

can proceed.  Therefore, the Estimation Motion should be denied.

### III.    The Estimation Motion Is An Improper Attempt To Forum Shop To Evade Prior Adverse Inferences And Orders Limiting Introduction Of Evidence Entered By The District Court.

43.     Estimation is not to be used as "a mechanism for reducing the amount of the

debtor's liability."  *See In re RNI Wind Down Corp.*, 369 B.R. 174, 191 (Bankr. D. Del. 2007)

(finding that plan administrator goal of limiting claim was not a legitimate basis for estimating the

claim without showing of undue delay).  Where, as here, "estimation will effectively limit the

allowed amount of the claims, where the need for dispatch is not particularly great, and where the

sums at stake are large—a procedure closer to the 'full-blown evidentiary hearing' is appropriate."

*In re Wallace's Bookstores, Inc.*, 317 B.R. 720, 725 (Bankr. E.D. Ky. 2004).  For this reason, use

of estimation procedures to determine the allowed amount of a creditor's claim is disfavored and

rare.

---

[5]  Moreover, even if the estimation proceeding occurs, Karma may nonetheless need to litigate the District Court Case to completion against the Individual Defendants, thus creating the possibility of inconsistent rulings.

44.     Here, Debtors seek to use the Estimation Motion to get a do-over in the District Court Case by freeing itself of the District Court orders limiting Debtors' replacement damages expert report, imposing adverse inference sanctions, excluding the introduction of evidence at trial based on, among other things, Debtors' and the Individual Defendant's willful failure to produce, and destruction of, evidence.  This improper purpose merits denial of the Estimation Motion.

45.     As more fully set forth in paragraphs 23-25 above, Karma has proven that Debtors and the Individual Defendants willfully concealed and destroyed relevant evidence.  Accordingly, the District Court twice sanctioned Debtors and the Individual Defendants.  (Dist. Ct. Dkt. Nos. 159, 189).  With respect to the first sanctions order, the District Court found it "undisputed" that the defendants willfully destroyed relevant electronic files and issued sanctions in the form of an adverse-inference jury instruction.  (Dist. Ct. Dkt. No. 159 at pp. 10-11).  In the second sanctions order, the District Court again found that defendants willfully destroyed electronic files and concluded that it could consider giving an adverse inference instruction to the jury should it become apparent at trial that any relevant evidence was lost.  (Dist. Ct. Dkt. No. 189 at p. 10).  In addition, based on Debtors' failure to timely produce evidence, the District Court granted a motion *in limine* filed by Karma and ruled that Debtors could not introduce evidence at trial not already disclosed to Karma during the course of discovery.  (Dist. Ct. Dkt. No. 439).  Finally, the Court entered an order limiting the scope of Debtors' replace damage expert report to the factual issues and methodologies set forth in the prior report.  (Dist. Ct. Dkt. No. 510).  It would be inappropriate to permit Debtors to utilize the estimation to purge itself of the prior rulings by the District Court while benefiting from the willful destruction and failure to timely produce relevant evidence.  For this reason alone, the Court should deny the Estimation Motion.

**IV.    The Estimation Motion Is Premature.**

46.    Debtors have not filed schedules and Karma has not filed a proof of claim.  Nor has the Court entered bar date order requiring the filing of such a proof.  Therefore, there is currently no claim to estimate.  This renders the Estimation Motion premature.  *See In re Lahman Mfg. Co., Inc.*, 31 B.R. 195, 200 (Bankr. D.S.D. 1983) ("The Court does not have an unliquidated or disputed proof of claim before it.  Without the claim, the Court cannot consider an objection or a question of estimation under § 502(c).").

47.    Furthermore, Debtors filed the Estimation Motion exceptionally early with respect to reported cases utilizing same.  Estimation proceedings traditionally take place later in a chapter 11 case, and typically after approval of a disclosure statement, following completion of a section 363 sale or closer to plan confirmation, when the restructuring landscape and the universe of claims is better understood and the need for estimation more apparent.  *See e.g.*, *In re Jacom Comput. Servs., Inc.*, 280 B.R. 570, 571, 573 (Bankr. S.D.N.Y. 2002) (motion to estimate filed after plan confirmation); *Beatrice Co. v. Rusty Jones, Inc.*, 153 B.R. 535, 536 (N.D. Ill. 1993) (same); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 740 (Bankr. S.D.N.Y. 1992) (estimation conducted at confirmation hearing).  However, in this case, Debtors seek estimation of Karma's right prior to entry to the filing of a plan or disclosure statement.  In fact, the Court has not yet entered a sale procedures order and Debtors admit that it has been attempting to market and sells its assets for since September 2021 without receiving any "actionable indications of interest".

## <u>RESERVATION OF RIGHTS</u>

48.     Karma specifically reserves its right to amend or supplement this Objection in all respects, including following the July 27, 2023 hearing.  Nothing herein is intended or shall be construed to: (a) constitute a waiver of Karma's rights to contest any objection by any party to any claim filed by Karma; (b) prejudice, waive or alter Karma's rights under contract, applicable law or otherwise (including its right to litigate the District Court Action) or (c) bind Karma to any claim amount.

*[Remainder of Page Intentionally Left Blank]*

## **CONCLUSION**

49.    For the reasons set forth above, Karma respectfully requests that the Court (a) deny the Estimation Motion in its entirely; (b) in the alternative, to the extent the Court declines to deny the Estimation Motion, permit the parties to submit additional briefing regarding the procedures and schedule for an estimation hearing; and (c) grant any further relief which the Court deems just and proper.

Dated:  July 20, 2023
Wilmington, Delaware

Respectfully submitted,

**CHIPMAN BROWN CICERO & COLE, LLP**

/s/ William E. Chipman, Jr.
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street Suite 5400
Wilmington, DE 19801
Telephone: (302) 295-0191
Email: chipman@chipmanbrown.com
          olivere@chipmanbrown.com

-and-

**SEYFARTH SHAW LLP**
Michael D. Wexler (admitted *pro hac vice*)
James B. Sowka (admitted *pro hac vice*)
233 South Wacker Drive, Suite 8000
Chicago, IL 60606-6448
Telephone: (312) 460-5000
Email: mwexler@seyfarth.com
          jsowka@seyfarth.com

Jesse M. Coleman (admitted *pro hac vice*)
700 Milam Street, Suite 1400
Houston, TX 77002-2797
Telephone: (713) 225-2300
Email: jcoleman@seyfarth.com

*Counsel to Karma Automotive LLC*