**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Lordstown Motors Corp., *et al.*, | Case No. 22-10831 (MFW) |
| Debtors.[1] | (Jointly Administered) |
| | **Objection Deadline: TBD** |
| | **Hearing Date: TBD** |

**MOTION OF HON HAI PRECISION INDUSTRY CO., LTD.**
**(A/K/A HON HAI TECHNOLOGY GROUP), FOXCONN EV**
**TECHNOLOGY, INC., AND FOXCONN EV SYSTEM LLC TO DISMISS,**
**OR, IN THE ALTERNATIVE, CONVERT THE BANKRUPTCY CASES**

Hon Hai Precision Industry Co., Ltd. (a/k/a Hon Hai Technology Group), Foxconn EV Technology, Inc., and Foxconn EV System LLC (collectively, the "Movants" or "Foxconn")[2] by and through their undersigned counsel, hereby move (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to section 1112(b) of the Bankruptcy Code, dismissing the chapter 11 cases (the "Chapter 11 Cases") of Lordstown Motors Corp., Lordstown EV Corporation, and Lordstown EV Sales LLC (collectively, "Lordstown" or the "Debtors") for cause, or, in the alternative, converting the jointly-administered Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. In support of the Motion, Foxconn states as follows:

---

[1]   The debtors and the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corp. (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101) (collectively, the "Debtors"). The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

[2]   The Movants are limited to those entities named in the Debtors' Adversary Complaint that are subject to the jurisdiction of this Court. At the appropriate time and if necessary, Foxconn will seek relief for those entities that are without the Court's jurisdiction.

## PRELIMINARY STATEMENT

1.      When the putative Debtors filed these Chapter 11 Cases,[3] they presented a story that depicts Lordstown as the innocent victims of a fraud perpetrated by Foxconn.  This is a fictitious narrative created by Lordstown solely for the purpose of obtaining a tactical litigation advantage.  The facts will show that Foxconn acted in good faith, complied with its contractual obligations, and did everything it reasonably could to support Lordstown.

2.      But bringing to light the true factual underpinnings of this dispute is for another day.  Foxconn filed this motion to demonstrate that these cases do not belong in chapter 11, and should be dismissed or converted pursuant to Section 1112(b) of the Bankruptcy Code.  There are two fundamental reasons for this: (a) the cases were filed in bad faith and without a valid bankruptcy purpose; and (b) the Debtors have a substantial or continuing loss to or diminution of the estate and there is an absence of a reasonable likelihood of rehabilitation.

3.      For the first reason, the Debtors' First Day Declaration starkly describes their stated purpose for filing these Chapter 11 cases.  In their own words, they filed to "pursue claims against Foxconn" in light of Foxconn's purported "fraudulent conduct[,] . . . its ongoing, repeated breaches of contractual commitments and its pattern of bad faith."  FDD ¶ 4.  And true to form, the Debtors proceeded to file their adversary proceeding against Foxconn on the very first day, alleging ten common law causes of action, along with one claim for equitable subordination, in what is a quintessential two-party state law lawsuit.

4.      Tellingly, Lordstown did not seek chapter 11 relief until it was prepared to file suit against Foxconn.  Lordstown did not seek chapter 11 protection when it was on the eve of a trade

---

[3]    Capitalized terms not defined in this preliminary statement have the meaning given to such terms in the remainder of the Motion or the First Day Declaration, as applicable.

secrets trial against a competitor in which it faced a potential judgment in excess of $900 million. Lordstown did not seek chapter 11 protection when it was facing multiple securities lawsuits based on the alleged fraudulent statements and disclosures of its former principals. Lordstown did not seek chapter 11 protection when it determined that it was fundamentally incapable of building and selling its sole product for a profit, and thus had to wind down operations. All of those circumstances were, in the view of Lordstown, surmountable. But when Foxconn rightfully refused to fund additional capital into Lordstown's failing business pursuant to Lordstown's flawed interpretation of the Investment Agreement, Lordstown decided only at that point that it was necessary to seek the benefits and protections of the Bankruptcy Code and sue Foxconn in a favored forum. This is the epitome of bad faith forum shopping and the Chapter 11 Cases should be dismissed or converted to cases under chapter 7 of the Bankruptcy Code because the Debtors' cases lack a valid bankruptcy purpose.

5.      Independent of the Debtors' bad faith and unwarranted attempt to litigate against Foxconn in bankruptcy, "cause" exists to dismiss the Chapter 11 Cases because the First Day Declaration makes clear there is no going concern to protect here. Once the Debtors complete delivery of a small handful of Endurance vehicles still in production (the Debtors sole product), they intend to stop all operations and focus their resources on a strategic transaction or sale of substantially all of their assets. Accordingly, preservation of a going concern is not at issue here. And, in any event, the prospects of a sale are illusory, as there is no viable business to sell.

6.      Moreover, the Chapter 11 Cases will not maximize the value of the Debtors' estates. Rather, the Debtors seek to drag their stakeholders along on an administratively expensive and purportedly reinvigorated sale process. The Debtors admit, however, that after twenty-two months and the assistance of Jefferies throughout, their strategic efforts to recapitalize or

3

consummate a strategic transaction have produced no actionable indications of interest. The Debtors are equally transparent about the current market outlook for this enterprise—forecasting their prospects as unlikely to change in the near future. The substantial costs of administering the Chapter 11 Cases will severely prejudice the Debtors' stakeholders given the market outlook and past failures of these Debtors. A bankruptcy forum will not fix a multi-year sale process that was unsuccessful outside of bankruptcy, and the Debtors should not be authorized to gamble with stakeholders' recoveries through an expensive and burdensome chapter 11 process that has no likelihood of success.

7.       Lastly, enumerated "cause" exists to dismiss or convert the Chapter 11 Cases under section 1112(b)(4)(A) because, once more, the Debtors admit that the estates continue to suffer substantial losses (as they always have), and are diminishing due to the costs of the Chapter 11 Cases, among other expenses. The Debtors cannot provide any evidence that there is a reasonable likelihood of rehabilitation under chapter 11. It is black letter law that reorganization is distinguishable from the rehabilitation contemplated under section 1112(b)(4)(A), and these Debtors concede that they come before the Court to liquidate, not rehabilitate a going concern. Dismissal or conversion for "cause," whichever is in the best interest of the Debtors' creditors, is the appropriate result.

## JURISDICTION

8.       The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Movants confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The predicates for the relief requested herein are section 1112(b) of the Bankruptcy Code and Rules 1017 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## **BACKGROUND**

11.     The Debtors' story is not a complicated one.  They have a fundamentally flawed and failed business model that, by the Debtors' own admission, has no prospect of a turnaround or return to operations.

## I.      THE DEBTORS LACK A VIABLE BUSINESS PLAN AND ARE WINDING DOWN OPERATIONS

12.     Lordstown was in the business of manufacturing a single product, an electric truck that it called the Endurance.  *See* Declaration of Adam Kroll in Support of Debtors' Chapter 11 Petitions and First Day Motions ¶ 1 (the "First Day Declaration" or "FDD") [D.I. 15].  Despite high hopes, Lordstown has entered bankruptcy having only manufactured 65 total vehicles.  *Id*. This is notable because Lordstown had projected that it would manufacture 31,600 trucks in 2022 alone, with another 65,000 in 2023.[4]

13.     Those projections were never even close to being realized.  As Lordstown has repeatedly (but only recently) admitted in its public filings, its production methods were not made

---

[4]     *See* LMC Investor Materials (August 2020), Ex. 99.2 to 8-K (filed August 3, 2020) at internal slide 19 (available at sec.gov/Archives/edgar/data/1759546/000121390020019762/ea124863ex99-2_diamondpeak.htm (last visited July 16, 2023)).

for scale.  Lordstown developed the Endurance "us[ing] soft tools that are intended for very low volumes."[5]  This required Lordstown to have to raise additional capital "to allocate funds to investments in hard tools that are designed for long term use and higher production volumes."[6]  But by early 2022, Lordstown still had not raised the necessary capital to make that transition.  It further was not clear that Lordstown's business model was independently robust enough for the acquisition of allegedly cost-saving hard tools to make a difference, as Lordstown admitted that it "continue[d] to evaluate the need and opportunity for design enhancements" that would further reduce the Endurance's build cost.[7]

14.    Lordstown's negative outlook with respect to its ability to bring down its production costs (the "bill of materials") was a theme of its ill-fated and short-lived period of operations.  As the First Day Declaration concedes, Lordstown's bill of materials cost "was significantly higher than anticipated" in the early days of production.  FDD ¶ 21.[8]  This was compounded by "operating and capital expenditures . . . meaningfully exceed[ing] projections."  *Id*.  Lordstown never came close to right-sizing its build costs, though.  By early 2022, it was telling the market that its "current bill of materials cost for the Endurance is well above [the] anticipated selling price" for the vehicle.[9]

15.    Even if Lordstown could fix the tooling and build cost issues noted above (and it could not), that was just the tip of the iceberg.  Lordstown stated publicly that it has "limited

---

[5]    LMC   2022   Form   10Q   (May   9,   2022)   at   internal   page   26   (available   at sec.gov/Archives/edgar/data/1759546/000155837022007666/ride-20220331x10q.htm  (last  visited  July  16, 2023)).

[6]    *Id.*

[7]    *Id.*

[8]    It is telling, but no coincidence, that the First Day Declaration never identifies what Lordstown's actual bill of materials is for the Endurance.  Foxconn is informed and believes that the Endurance's actual bill of materials is many multiples of Lordstown's planned retail price for the truck.

[9]    LMC 2022 Form 10Q (May 9, 2022) at internal page 26.

experience servicing the Endurance" which could leave it unable to timely repair trucks that experienced problems "relative to [Lordstown's] customers' expectations."[10]   Lordstown acknowledged this to be a significant impediment to commercial uptake.

16.     By earlier this year, Lordstown had come to the inevitable realization that it simply could not build the Endurance to commercial scale and had no hope of generating revenue:

> Given that our plan is to sell up to 500 units of the initial model of the Endurance, and our next vehicle program is unlikely to reach commercial production for at least several years, we will experience an extended period of time without any revenue. Further, based on customer acceptance, resolution of ongoing known and unknown quality issues, the identification of an OEM partner and other factors, the actual number of Endurance vehicles produced could be significantly below 500. If we are unable to achieve an appropriate level of consistent production and/or demand for the Endurance, our operations and production plans will be scaled back or curtailed and we may not realize any significant value from our assets and our financial condition and prospects will be adversely affected.[11]

Ultimately, Lordstown fell far short of that expectation and, as of the petition date, had produced only 65 trucks, despite having burned through approximately $750 million in capital—an astounding $11.5 million per truck.

17.     In response to its failed business model, Lordstown has effectively wound up operations.  FDD ¶ 66.  It has issued WARN notices and plans to liquidate.  FDD ¶¶ 65, 67.

## II.    THE DEBTORS LACK A CREDIBLE, VALUABLE ASSET THAT IS ACTUALLY SALEABLE

18.     As a stopgap to its inevitable liquidation, Lordstown has entered these Chapter 11 Cases with the purported aim of selling its assets.  It admits, however, that its lone asset that may interest a potential purchaser is the Endurance program.  FDD ¶ 67 (commenting that the Debtors'

---

[10]   LMC   2022   Form   10K   (March   6,   2023)   at   internal   page   36   (available   at sec.gov/Archives/edgar/data/1759546/000155837023002862/ride-20221231x10k.htm   (last   visited   July   16, 2023)).

[11]   *Id.* at internal page 32.

workforce will only stay on subject to "any potential buyers interest in the Endurance program");
*Id.* at ¶ 61 (noting that "the Company, its advisors, and potential [transaction] partners held numerous meetings and in-person evaluations of the Endurance").  In other words, the asset that Lordstown is attempting to sell is a vehicle production line that resulted in only 65 manufactured vehicles over two years at the cost of $750 million in expended capital.

19.    Moreover, Lordstown is attempting to sell an asset that it has already stated publicly it was abandoning with an eye toward future vehicle programs.  LMC 2022 Form 10K (March 6, 2023) at internal page 36 ("Given that our plan is to sell up to 500 units of the initial model of the Endurance, and our next vehicle program is unlikely to reach commercial production for at least several years, we will experience an extended period of time without any revenue.").

20.    Finally, the Endurance program utilizes intellectual property that is the subject of litigation between the Debtors and their officers and directors, and Karma Automotive LLC ("Karma").  *See* FDD ¶ 58.  If Karma prevails on its claims against Lordstown (the "Karma Litigation"), Karma will not only potentially obtain a judgment at or in excess of $1 billion, but it will forever encumber intellectual property that is material to Lordstown's lone asset. *See* Karma Automotive LLC's Motion for Relief from the Automatic Stay at ¶ 1 [D.I. 82].

21.    Notwithstanding the aforementioned challenges, Lordstown has been marketing itself for a transaction since the second half of 2021.  FDD ¶ 23.  Unsurprisingly, and consistent with the aforementioned challenges, it has never found the partner that it seeks.  Employing the same banker it has retained for its proposed in-case marketing and sale process, Lordstown embarked on an extensive prepetition marketing effort.  FDD ¶ 61.  Despite identifying "more than 50 potential investors and strategic OEM partners across the globe," Lordstown "has not received any actionable indications of interest." *Id.* Most tellingly of all, the U.S. government rejected a

loan request by Lordstown during the marketing process because, among other conditions, Lordstown "w[as] not able to satisfy . . . the requirement to demonstrate the Company's viability." *Id*. at n. 18.

**RELIEF REQUESTED**

22.     Pursuant to section 1112(b) of the Bankruptcy Code and Bankruptcy Rule 1017(f), Foxconn requests entry of the Order dismissing the Chapter 11 Cases for cause, or, in the alternative, converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

**BASIS FOR RELIEF**

23.     Section 1112(b) of the Bankruptcy Code provides that "on request of a party in interest . . . the court shall . . . dismiss a case . . . if the movant establishes cause." 11 U.S.C. § 1112(b)(1).  Although a list of items constituting "cause" is provided in section 1112(b)(4), the list is non-exclusive.  *In re Stone Fox Capital LLC*, 572 B.R. 582, 588 (Bankr. W.D. Pa. 2017). Dismissal of a chapter 11 petition is "committed to the sound discretion of the bankruptcy court or district court." *In re SGL Carbon Corp*., 200 F.3d 154, 159 (3d Cir. 1999) (citation omitted).

24.     If the movant establishes any basis for "cause," the burden shifts to the debtor to prove that it falls within the section 1112(b)(2) "unusual circumstances" exception to mandatory conversion or dismissal under section 1112(b)(1).  The Third Circuit instructs that "[c]ourts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization." *In re Brown*, 951 F.2d 564, 572 (3d Cir.1991) (citing *In re Canal Place Ltd. Partnership*, 921 F.2d 569, 577 (5th Cir.1991)); *see also In re American Capital Equipment, LLC*, 688 F.3d 145, 162 (3d Cir. 2012) ("A court 'is not bound to clog its docket with visionary or impracticable schemes for resuscitation.'") (citation omitted).  If cause to convert or dismiss is present, a court should then choose between conversion and dismissal based on "the best interest of creditors and the estate." *Id*. at 161.

9

25.     Here, the record demonstrates that cause exists to dismiss or convert the three

Chapter 11 Cases for two independent reasons:  (a) the petitions were filed in bad faith and without

a valid bankruptcy purpose in an effort to litigate a two-party grievance in this Court, and (b) the

estate is suffering substantial and continuing loss—severe diminution—and the Debtors have no

prospect of rehabilitation, much less a reasonable likelihood to return to operations.

## I.    THE DEBTORS' BAD FAITH IN FILING SOLELY TO OBTAIN LITIGATION ADVANTAGE AND WITHOUT A PROPER BANKRUPTCY PURPOSE ESTABLISHES CAUSE TO DISMISS OR CONVERT

### A.    Chapter 11 Filings Lacking Good Faith Must Be Dismissed

26.     Under section 1112(b) of the Bankruptcy Code, this Court must dismiss any chapter

11 case that is not filed in good faith. *In re LTL Mgmt., LLC*, 64 F.4th 84, 99 (3d Cir. 2023) (citing

15375 *Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009)). As the Third Circuit has

explained, a "lack of good faith constitutes 'cause'" under the meaning of section 1112(b), and

therefore requires dismissal.  *Id.*  Moreover, a bankruptcy petition must both serve a valid

bankruptcy purpose and not be "filed merely to obtain a tactical litigation advantage." *Id*. at 101.

27.     The burden to establish good faith is on the Debtors. *LTL Mgmt., LLC*, 64 F.4th at

100; *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004) (citation omitted);

*SGL Carbon Corp.*, 200 F.3d at 160; *In re Tamecki*, 229 F.3d 205, 208 (3d Cir. 2000) (explaining

that a debtor's failure to demonstrate good faith in filing the petition for relief is "cause" that

justifies dismissal of a petition under 11 U.S.C. § 707(a)); *15375 Mem'l Corp*., 589 F.3d at 618.

28.     Whether a petition is filed in good faith depends on the totality of facts and

circumstances. *See Integrated Telecom*, 384 F.3d at 119; *SGL Carbon*, 200 F.3d at 162.  The focus

of the inquiry is whether the petitioner sought "to achieve objectives outside the legitimate scope

of the bankruptcy laws" when filing for protection under Chapter 11.  *SGL Carbon*, 200 F.3d at

165 (citing *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994)).  The Third Circuit has focused on two

primary questions, namely, (a) whether the petition was filed to obtain a tactical litigation advantage; and (b) whether the petition serves a valid bankruptcy purpose ("*e.g.*, by preserving a going concern or maximizing the value of the debtor's estate").  *Integrated Telecom*, 384 F.3d at 120; *15375 Mem'l Corp.*, 589 F.3d at 618 (citing *SGL Carbon Corp*, 200 F.3d at 165).   Other factors courts consider include: (a) whether the case is a two-party dispute that can be resolved in state court; (b) whether there is a possibility of reorganization; and (c) whether there is an ongoing business and employees.  *See In re Primestone Inv. Partners L.P.*, 272 B.R. 554, 557 (D. Del. 2002) (citing *SGL Carbon*, 200 F.3d at 165; *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394-95 (11th Cir. 1988); *In re SB Props., Inc.,* 185 B.R. 198, 205 (E.D. Pa. 1995)). "[N]o single factor is determinative of a lack of good faith in filing a petition." *In re Tiffany Square Assocs., Ltd.*, 104 B.R. 438, 441 (Bankr. M.D. Fla. 1989).

29.     Here, the Chapter 11 Cases were filed as a litigation tactic against Foxconn, and the cases serve no valid bankruptcy purpose.  Lordstown has filed its petitions solely to gain certain tactical advantages against Foxconn, including staying all other litigation against the Debtors in order to focus its resources on pursuing Foxconn; litigating in the shadow of a purported sale process in an attempt to lend legitimacy to its false narrative; and holding themselves out as legitimate chapter 11 debtors (they are not) in order to obtain process advantages stemming from litigation in bankruptcy.  For all the reasons stated herein as to why this is an improper filing, the Chapter 11 Cases should be dismissed or converted.

**B.     Debtors Filed Voluntary Petitions Solely to Commence Litigation against Foxconn in Bankruptcy Court and Cannot Demonstrate Good Faith**

30.     A debtor files in bad faith if it uses chapter 11 protection solely for the purpose of gaining a tactical litigation advantage, particularly when it does so in the context of a two-party dispute between the debtor and a third party.

31.     Many cases from this district have held that bad faith is present when a debtor uses its bankruptcy filing "merely to obtain tactical litigation advantages." *SGL Carbon Corp.*, 200 F.3d at 165; *see, e.g.*, *In re 15375 Mem'l Corp.*, 2009 WL 187570, at *4 (D. Del. 2009); *see also In re C–TC 9th Avenue Partnership*, 193 B.R. 650, 654 (Bankr. N.D.N.Y. 1995) ("Where the primary purpose of the filing of a Chapter 11 case is as a litigation tactic, the petition may be dismissed for lack of good faith").

32.     This rule applies with special force when a chapter 11 case revolves around a two-party dispute that can, and should be resolved in a non-bankruptcy forum. *In re HBA East, Inc.*, 87 B.R. 248 (Bankr. E.D.N.Y. 1988) (dismissing chapter 11 cases).

> These Chapter 11 cases do not represent efforts pitched to a "business reorganization" or to "restructure a business's finances." They are essentially a two-party civil lawsuit involving non-bankruptcy law brought in the bankruptcy court in the guise of being a reorganization of some sort under Chapter 11. Chapter 11 was never intended to be used as a fist in a two party bout. The Chapter is entitled reorganization and not litigation.

*Id.* at 261.

33.     Courts typically dismiss Chapter 11 petitions where such abuse of the bankruptcy system is evident. *See In re Argus Grp. 1700, Inc.*, 206 B.R. 757, 765-66 (E.D. Pa. 1997) (dismissing bankruptcy case where debtors filed to "fabricate federal-court jurisdiction" for pending state court litigation); *Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983) ("The Bankruptcy provisions are intended to benefit those in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation."). This includes where a debtor initiates litigation offensively, filing a chapter 11 case only as an attempt to take advantage of what the debtor believes is a favorable forum. *See In re Stingfree Techs., Inc.,* No. 08-16232bf, 2009 Bankr. LEXIS 3023, at *31 (Bankr. E.D. Pa. Feb. 4, 2009) ("a bad faith chapter 11 filing may occur when a bankruptcy petition is filed simply to create a bankruptcy forum for a two-party

dispute based upon non-bankruptcy law, and no reorganization purpose is intended") ("*Stingfree*"), *aff'd sub nom. In re Stringfree Techs. Co.,* 427 B.R. 337 (E.D. Pa. 2010); *see also In re Springs Hospitality, Inc.,* No. 06-13331 HRT, 2006 WL 2458679, 2006 Bankr. LEXIS 1804, at *13, *16, *27 (Bankr. D. Co. Aug. 22, 2006) (case was "poster-child for bad faith" and typical two-party dispute where prepetition sale efforts had been unsuccessful; debtor had "long running operating deficits," and debtor brought "quintessential state law" claims in adversary proceeding) ("*Springs Hospitality*").

34.     *Stingfree* is instructive.  The debtor in *Stingfree* "had no intention of resuming any operations[,]" but had filed chapter 11 for two purposes: (a) pursuing a pre-confirmation sale of substantially all of its assets; and (b) prosecuting an adversary proceeding against shareholders of the debtor.  2009 Bankr. LEXIS 3023, at *27, 62-63.  It conceded that its bankruptcy case was "designed solely to liquidate" its assets and was filed before a significant hearing in a state court dispute, asserting that "it needed a breathing spell" from litigation and maintaining that its adversary proceeding claims were significant estate assets. *Id.* at 43-44.  The bankruptcy court, however, dismissed the case.

35.     The court first determined the case "was not filed to preserve any going-concern value" because, regardless of the outcome of the adversary proceeding, the debtor "ha[d] no intention of resuming any operations." *Id.* at 44-45.  The court next was equally dismissive of the adversary proceeding's purported import to the chapter 11 case, noting that "these claims could have been raised without the necessity of filing any bankruptcy petition." *Id.* at 45.  Like the debtor in *Stingfree*, here, the Debtors have made their purported chapter 11 strategy clear: (a) wind-down operations in anticipation of liquidation; (b) pursue a sale (without a stalking horse bidder) under section 363(b); and (c) bring baseless claims against a co-investing party that could have been

brought outside of the bankruptcy court.  This two-party dispute, like the chapter 11 case in *Stingfree*, should be dismissed.

36.     *Springs Hospitality* supports dismissal of the Chapter 11 Cases for the same reasons.  Like Lordstown, the debtor in *Springs Hospitality* had "operated at a loss for the past several years[,]" until "shareholders . . . declined to provide additional funds[.]" 2006 Bankr. LEXIS 1804 at *4-5.  The putative chapter 11 debtor filed an adversary proceeding against a manager who had "discontinued funding the [d]ebtor's operating losses," alleging claims under state law and the Bankruptcy Code (equitable subordination).  *Id.*  The debtor asserted that its chapter 11 case was filed in good faith because its assets could be sold, and its equitable subordination claim against the movant was a bankruptcy specific remedy.  *Id.* at *16-17.  But the court saw through the debtor's unsupported testimony that multiple buyers interested in the debtor's assets existed and a sale was likely to be accomplished quickly.  *Id.* at *19-22 (holding that if debtor or its owners "had the wherewithal to [execute a successful sale process] in a bankruptcy case, they would be able to do it outside of bankruptcy").  Additionally, the court found that the debtor's business was "long deceased," and the two-party dispute was "nothing more than a fight among insiders over . . . the ultimate failure of the [d]ebtor's business" that did not belong before the bankruptcy court.  *Id.* at *24, *27.

37.     Dismissal of the Chapter 11 Cases is appropriate here for many of the same reasons. The Debtors' business has never operated profitably, and they have elected to file a fundamentally state law complaint with this Court.[12]  This two-party dispute is indicative of the Debtors' bad faith, in that they are attempting to use the bankruptcy court to assert a tactical advantage over

---

[12]     *See* Adversary Complaint, No. 23-50414 [A.D.I. 1] (alleging ten common law causes of action and one claim for equitable subordination).

Foxconn.  Moreover, Debtors' own admissions belie any assertion that the Chapter 11 Cases are too complicated to be cabined as a "two-party" dispute.

38.    In addition, the Debtors were not facing any imminent financial threat, showing that they filed, as they concede, simply to sue Foxconn.  The Debtor has approximately $136 million in cash on hand and no funded debt obligations.  FDD ¶¶ 48-49.  Indeed, based on their current cash burn, the Debtors could wind-down and seek a strategic transaction *for more than two years*.  *Id.* at ¶ 64 (estimating monthly cash burn of approximately $5 million).  As to one of the Debtors' purported purposes for filing the cases—centralizing and efficiently resolving claims against the estates,[13] the Debtors' petitions and First Day Declaration again tell a different story.  The Debtors' top thirty creditors are all disputed trade payable claims, scheduled in the aggregate amount of approximately $20 million.  *See* Voluntary Petition for Lordstown Motors Corp., Official Form 204, at 16-19 [D.I. 1].  The Debtors have more than enough liquidity to resolve such claims outside of bankruptcy in the ordinary course of business.

39.    Further, the Debtors' ongoing litigation claims should not affect the result here.  The Debtors have been mired for years in the Securities Actions involving their endless failures to meet projections and the misconduct of their former leadership.  The primary defendants in the Securities Actions are the former D&Os, not the Debtors.  No judgment or substantial change in circumstances in those cases prompted the filing of these cases.  As for the Karma Litigation, which was set to proceed to trial on or around September 5, 2023, the Debtors devote *three sentences* to it in the First Day Declaration.  FDD ¶ 58.  Plainly, a litigation that warrants a passing paragraph in the Debtors' First Day Declaration does not form a substantial basis for the Debtors' petitions.  Moreover, Karma has moved to lift the stay on the Karma Litigation for purposes of

---

[13]    FDD ¶ 59.

completing the upcoming trial, which will come at substantial expense.  In addition, the Debtors have moved to estimate Karma's claim based on the Karma Litigation, which will entail a substantially similar commitment from the Debtors and Karma.  Finally, in opposing Karma's motion to lift the automatic stay, the Debtors have revealed their view that Karma's probable damages are "far closer to zero" than what Karma claims, (Debtors' Objection to Karma Automotive LLC's Motion for Relief from the Automatic Stay [D.I. 122] ¶ 36), and that defending the Karma Litigation through trial would cost approximately $2.5 million in fees and costs— roughly two percent of the Debtors' cash on hand. *Id.* at ¶ 24.

40.    Accordingly, and as established by the filing of the Complaint and the Debtors' inflammatory rhetoric in the First Day Declaration, the Debtors only filed to assert grievances and seek a litigation advantage against Foxconn.  That is quintessential bad faith, and requires dismissal.

C.    **Debtors Are Without a Proper Bankruptcy Purpose and Cannot Demonstrate Good Faith**

41.    Nor are these Chapter 11 Cases designed to serve any "valid reorganizational purpose."  The purpose of bankruptcy is to give "to the honest but unfortunate debtor . . . a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934); *see* Report of the Committee on the Judiciary, House of Representatives to Accompany H.R. 8200, H.R.Rep. No. 595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6179 ("The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders.").  As the Fifth Circuit (affirmed by the Supreme Court) noted in *Timbers of Inwood Forest*, "when there is no reasonable likelihood that the statutory objective of reorganization can

16

be realized . . . then the automatic stay and other statutory provisions designed to accomplish the

reorganization objective become destructive of the legitimate rights and interests of creditors, the

intended beneficiaries." *In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363, 373 (5th Cir.

1987) (en banc), *aff'd,* 484 U.S. 365 (1988).

42.     Thus, a petition lacks good faith when it is filed without a "valid reorganizational

purpose":

> Chapter 11 vests petitioners with considerable powers – the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc. – that can impose significant hardship on particular creditors.  When financially troubled petitioners seek a chance to remain in business, the exercise of those powers is justified. But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code . . . ***if a petitioner has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed.***

*SGL Carbon Corp.,* 200 F.3d at 165-66 (emphasis added).

43.     The Debtors fail to satisfy their burden of demonstrating that their filing serves a

valid reorganizational purpose and thus was made in good faith.  As set forth in the First Day

Declaration, the Debtors are a liquidating enterprise that failed at every turn to meet their

projections.  The Debtors have never been able to market a product and sell it above cost—there

is no going concern to preserve.  There is no funded debt to prime or post-petition financing being

sought.  There is no rehabilitation to maximize value for creditors because the administration of

the estate will only ***increase*** the Debtors' cash burn needlessly, to the detriment of all stakeholders.

44.     This Court's decision in *In re JER/Jameson Mezz Borrower II, LLC* is particularly

instructive.  461 B.R. 293 (Bankr. D. Del. 2011) (dismissing the chapter 11 case as a bad faith

filing) ("*JER/Jameson*").  There, the Court agreed with the movants that a "sale process . . . must

be designed to realize some value that would not be available outside of bankruptcy" if it was to

provide evidence of a valid bankruptcy purpose.  *Id.* at 303.  Like the debtors in *JER/Jameson*,

who had known for years of their need to address their capital structure or "sell the enterprise, [and] ha[d] made numerous efforts to do so, but ha[d] been unable to achieve either[,]" here, the Debtors inability to obtain additional funding or execute a strategic transaction pre-petition, even with Jefferies' significant assistance, is well-publicized.  Moreover, there is no evidence that the Chapter 11 Cases generally, or the Debtors' sale process, will do anything more than erode value by the incurrence of substantial administrative expenses. *See id.* at 303-304 (there was "no benefit to be gained by having [debtor] remain in bankruptcy" where there was "no evidence that a sale of the [debtor's] asset in bankruptcy will be more cost effective" than one sale outside of bankruptcy).  Just as in *JER/Jameson*, here, the Debtors cannot simply rely on conjecture that a sale process may be more successful in bankruptcy, when the evidence demonstrates that the Chapter 11 Cases will only further harm creditors and the estates.

45.     Here, the Debtors have left no room for doubt regarding the purpose behind their petitions.  The First Day Declaration provides one, and only one, purpose for the Debtors' filing: "The Debtors have filed these chapter 11 cases for the purpose of maximizing value for the benefit of their stakeholders given the fraudulent conduct by Foxconn, its ongoing, repeated breaches of contractual commitments and its pattern of bad faith."  FDD ¶ 4.  The First Day Declaration goes on to describe the plan for the Chapter 11 Cases, and the primary task identified is "to pursue claims against Foxconn."  *Id*.  Consistent with this purpose, the Debtors filed their adversary proceeding against Foxconn on the first day of the case, ***before they filed a single motion for substantive first day relief***.  *See* Adversary Complaint [D.I. 3].

46.     When the Debtors did get around to filing their first day motions, they included in the introduction of each a canned recitation of their allegations against Foxconn.  *See, e.g.*, D.I. 2, 3-14.  For example, even the Debtors' motion to approve the retention of a claims and noticing

18

agent recites the Debtors' Foxconn grievances and its bankruptcy purpose of pursuing claims against Foxconn. *See* Debtors' Application for Entry of an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective as of the Petition Date [D.I. 4]. Tellingly, there is no other explanation of any purported financial distress on the part of the Debtors.

47.     The Debtors' filings only allow for a single conclusion—that they improperly seek the Court's jurisdiction solely for the advantages of litigating against Foxconn in this forum. None of this changes the bad faith basis of Lordstown's filing, and the Court should dismiss the cases. *See LTL Mgmt.*, 64 F.4th at 102 (good faith filing is gating issue for bankruptcy jurisdiction).

## II.     DIMINUTION OF ESTATE AND ABSENCE OF REASONABLE LIKELIHOOD OF REHABILITATION ESTABLISHES CAUSE TO DISMISS OR CONVERT

48.     Pursuant to Bankruptcy Code Section 1112(b)(4)(A), cause exists to convert a case to Chapter 7 or dismiss it entirely if there is both (a) a "substantial or continuing loss to or diminution of the estate" and (b) an "absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112. Both elements are satisfied here.

### A.     <u>There Is Continuing Loss to the Estate, Which Is Diminishing</u>

49.     In considering whether the debtor incurred a substantial loss, or is continuing to incur losses, or the estate is continuing to diminish, courts "look at the track record of the Debtor to determine if it is suffering losses or making gains." *In re Gateway Access Sols., Inc.*, 374 B.R. 556, 562 (Bankr. M.D. Pa. 2007). The Debtors' track record here reflects that their estates are diminishing due to continuing losses and will continue to do so.

50.     First, as the First Day Declaration attests, the Debtors are currently winding down their operations and have functionally ceased vehicle production. FDD ¶¶ 65-67. As a result, the Debtors have planned a liquidation in the absence of a sale. *Id.* Second, the Debtors are facing

significant legal fees in defending actions that have either not been stayed or are threatened to resume. The burden of defense costs plus the additional costs of administering these Chapter 11 Cases in pursuit of an unrealistic and expensive sale process, which is itself nothing more than a liquidation, will continue to tax the estates and drain Lordstown's limited cash reserves.

### 1.    No Debtors Operate and Liquidation Is Planned

51.    Lordstown has never been a profitable enterprise. Lordstown admits that it is on the precipice of halting its only revenue-generating operations because it is fundamentally unable to produce its only product at a profit. In that context, Lordstown has no current or future prospects of returning to any form of operational health.

52.    Lordstown has admitted in this case and in prior public filings that it has all but given up on the Endurance. *See* LMC 2022 Form 10K (March 6, 2023) at internal page 32 ("Given that our plan is to sell up to 500 units of the initial model of the Endurance, and our next vehicle program is unlikely to reach commercial production for at least several years, we will experience an extended period of time without any revenue."). It has also forgone any hope of generating significant revenue for "an extended period of time." *Id.* Additionally, Lordstown readily admits that, after downsizing its employee base by nearly 50%, it intends to finalize a handful of existing orders of the Endurace and stop operations entirely. FDD ¶¶ 53, 65-67. This is because Lordstown is fundamentally incapable of building its own product and requires a contract-manufacturing partner to do so.

53.    In fact, Lordstown has always looked to third parties to attempt to prop up its failing enterprise. The First Day Declaration describes Lordstown's long attempt to build a relationship with General Motors ("GM") to no avail. The First Day Declaration elides a number of details, but the upshot is clear, GM no longer wanted to do business with Lordstown. Accordingly, Lordstown disclosed in its securities filings that by December 31, 2020, "GM was determined to

no longer be a related party" under agreements between Lordstown and GM that had been executed less than a year prior.  LMC 2023 Form 10Q (May 4, 2023).  Further, in the First Day Declaration, the Debtors admit that GM "pulled the plug" on its relationship with the Debtors months ago, notwithstanding that the term of GM's remaining supply contract concludes in December 2023.  FDD ¶¶ 16-18.

54.     As to strategic financing, partnerships, or recapitalization coming from the broader market, the Debtors are bearish on their prospects of finding any financing or a return to operations under any circumstances.  *See generally* FDD ¶¶ 59-67.  The Debtors admit that the interest rate and equity capital raise environment is against them.  *Id*. at ¶ 62.  They have no supplier to provide essential components for their only product. *See* LMC 2022 Form 10K (March 6, 2023), at internal page 32.  Lordstown does not have the financial wherewithal to hire talented employees and concedes that morale is low and the projections and promises of financial success have never come to fruition.  *See generally* FDD ¶¶ 3, 53, 63-67.  The Debtors' estates are not the proverbial melting ice cube—they are the puddle.

### 2.     The Estate Is Diminishing Under the Burden of Ongoing Legal Fees

55.     In addition to the substantial costs of administering the Chapter 11 Cases, particularly with a contemporaneously-filed adversary proceeding containing ambitious and sprawling allegations, Lordstown is also the subject of a years-long SEC Investigation[14] and has been sued for violations of the securities laws in multiple jurisdictions (the "Securities Actions").  These ongoing administrative and legal fees coupled with a complete lack of operational viability (or revenue) are more than enough to satisfy the "continuing loss" element under § 1112(b)(4)(A).  *See Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 515-16 (8th Cir. 2004) (stating that a "negative cash

---

[14]     *See* FDD, ¶ 55.

flow situation alone is sufficient to establish 'continuing loss to or diminution of the estate'"); *In re FRGR Managing Member LLC*, 419 B.R. 576, 581 (Bankr. S.D.N.Y. 2009) (debtor "continues to incur quarterly U.S. Trustee fees as well as legal fees, causing a continuing loss to the estate"). The substantial legal fees[15] facing the Debtors from (a) the Karma Litigation; (b) the SEC Investigation and Securities Actions; and (c) the Chapter 11 Cases threaten to further diminish the limited assets remaining in the estate, which supports conversion where there is no corresponding chance for rehabilitation and a complete lack of positive revenue.  The Debtors admit the present circumstances are dire, and the estate is rapidly diminishing to the detriment of creditors.  *See* Debtors' Motion for Entry of Orders (I) Establishing Procedures and Schedule for Estimation Proceedings and (II) Estimation of the Amount of the Claim Held by Karma Automotive LLC, [D.I. 108] at ¶ 1 ("Given the current financial state of the Company, time is of the essence.  There is currently no meaningful revenue from the Debtors' operations and a prolonged stay in chapter 11 will rapidly deplete the Debtors' cash on hand and potential recoveries to stakeholders."); *see also* Debtors' Objection to Karma Automotive LLC's Motion for Relief from the Automatic Stay, [D.I. 122] at ¶ 1 (same).

56.    Notwithstanding the Debtors' election only to include trade creditors on their petitions and list of top 30 creditors, the Debtors' alleged tort liability exposure should not be understated.  The Karma Litigation presents a credible threat of an approximately $1 billion judgment and trial is scheduled for September 5, 2023. *See* Karma Automotive LLC's Motion for Relief from the Automatic Stay [D.I. 82] at ¶ 1.  Karma has already filed a compelling motion for

---

[15]    The Debtors faced some of these legal fees prior to commencement of these Chapter 11 Cases but now, through their own actions, face these ongoing legal fees plus enhanced fees brought about through the required administration of these Chapter 11 Cases (e.g., court administered sale process and related objection to that sale process) and additional litigation brought on by virtue of the filing (e.g., Karma's motion to lift the automatic stay, the Debtors' motion to estimate Karma's claim and the filing by the class action litigants to oppose extending the scope of the automatic stay).

relief from stay. *Id.* If granted, the Debtors will have to fund a lengthy trial on complex issues which will further diminish cash available for distribution to creditors by at least $2.5 million in the Debtors' estimation.[16] Further, Karma has alleged that Lordstown has stolen its trade secrets and intellectual property. Thus, if Karma prevails at trial, the sole saleable asset that Lordstown purports to possess that may be of any value—its intellectual property[17]—will be encumbered and thus unsaleable due to having been unlawfully obtained. This is not the recipe for a reorganization, but a liquidation.

57.     The SEC Investigation and Securities Actions are also not stayed. As previewed during the first day hearing following an objection from Karma, actions against current and former Lordstown principals are proceeding and not subject to the automatic stay. These are matters for which the Debtors have indemnity and insurance obligations. Notably, the carrier for Lordstown's D&O policy has already refused to cover the fees associated with the SEC Investigation, which is not stayed by a bankruptcy filing.

58.     As a result, Lordstown will continue to incur significant legal fees in defending itself against these various matters, without any corresponding form of revenue to offset its cash burn.

### B.     No Reasonable Likelihood of Rehabilitation Exists

59.     The second element of the Section 1112(b)(4)(A) inquiry is easily satisfied here.

60.     "Rehabilitation" under Section 1112(B)(4)(A) "refer[s] to the debtor's ability to restore the viability of its business." *Loop Corp.*, 379 F.3d at 516. Rehabilitation under Section

---

[16]   Again, it is notable that the Debtors were content to proceed to trial against Karma in March, with the trial only being delayed due to a scheduling issue on Karma's side. Presumably, the Debtors were prepared to fund the trial from their cash reserves. The same reserves that are the only credible asset remaining for distribution to creditors.

[17]   Much of the Debtors' alleged intellectual property is merely licensed, with the Debtors purporting that they improve upon it. *See, e.g.*, FDD ¶ 11.

1112(b)(4)(A) does not mean a liquidating plan—instead, it contemplates whether the debtor is able to "restore the viability of the business." *See In re Herb Philipson's Army & Navy Stores, Inc.*, No. 18-61376 (DD), 2019 Bankr. LEXIS 3831, at *18 (Bankr. N.D.N.Y. Dec. 19, 2019); *see also In re 15375 Mem'l Corp.*, 386 B.R. 548, 552 (Bankr. D. Del. 2008), *reversed on other grounds*, 400 B.R. 420 (D. Del. 2008) ("Rehabilitation does not include liquidation," but rather it "means to reestablish a business."); *In re Gonic Realty Trust*, 909 F.2d 624, 627 (1st Cir. 1990) ("[W]ith no business left to reorganize, Chapter 11 proceedings were not serving the purpose of rehabilitating the debtor's business."); *Andover Covered Bridge, LLC v. Harrington*, 553 B.R. 162, 175 (B.A.P. 1st Cir. 2016) ("While it is true that a reorganization may include a liquidating plan, rehabilitation for purposes of § 1112(b) does not include liquidation.").

61.     The Debtors have left little doubt that they have no reasonable likelihood of rehabilitation within a reasonable time frame. *See In re Midwest Props. of Shawano, LLC*, 442 B.R. 278, 288 (Bankr. D. Del. 2010) (cause existed under 1112(b)(4)(A) where debtor was operating at a loss and could only provide testimony regarding a potential sale, which was only "unsubstantiated hopes for a successful reorganization") (internal quotation marks and citation omitted).  Debtors have established that a sale is unlikely, and that they must liquidate, sale or not.  Thus, even if Lordstown would be able to achieve a viable transaction, it would be in the form of a liquidating plan or a sale of substantially all of its assets (followed by a liquidating plan or conversion)—leaving no business left to rehabilitate.  The Debtors cannot rehabilitate.

### 1.     The Debtors Have No Path to Restoring Their Business

62.     The Debtors' sale prospects are illusory.  The record makes clear that there is no reasonable hope for a restoration of Lordstown's business through a marketing process—whether aimed at a sale or investment.  For *two years*, the Debtor has been attempting to locate any potential investors or buyers, including working with one of the preeminent investment banks in the world—

Jefferies LLC—to no avail.  FDD ¶ 61.  Rather, as the Debtors' commercial outlook has continued to degrade, along with the electric vehicle startup space, the Debtors have not found a single buyer or even "***actionable indications of interest***."  FDD ¶ 61 (emphasis added).

63.     As a result, after two years, the Debtors have come before this Court with nothing to suggest that the normal tools of a bankruptcy sale process can create interest in the Debtors' assets where it has been decidedly shown that none exists.  No quantum of administrative expenses will fix that.  Nor will the added gravitas and legitimacy of this Court, particularly in a case with no secured debt or other unique creditor constituency that requires a sale occur in court.  Indeed, Foxconn expects that this pattern will continue, and that the sale process will result in no actionable bids.  Or, if it does, the values will be far below anything that would justify either filing or keeping these case as chapter 11 proceedings.

64.     The Court is well-acquainted with bidding procedures, expedited sale processes, and hard fought stalking horse asset purchase agreements, all of which the Debtors make lip-service to in this case.  But the Court knows well the significant cost that accompanies these processes.  Throwing good money after bad, to the detriment of the Debtors' stakeholders, should not be countenanced here to pursue a sale process that has already proven to be a failure.

65.     It is further highly unlikely that Lordstown's circumstances will change any time soon due to prevailing market trends that are aligned against Lordstown.  Negative market conditions that show no sign of abating support a finding that a debtor has no reasonable prospect of rehabilitation.  *See, e.g., In re Whitney Lake, LLC*, No. 08-05729-JW, 2009 Bankr. LEXIS 4273, at *8 (Bankr. D.S.C. May 5, 2009) (where the Debtor was an owner and developer of real property, the Court found that "due largely to the downturn in the real estate market, [] there appears to be no reasonable likelihood of Debtor's rehabilitation"); *Gateway Access*, 374 B.R. at 562-64 (finding

"an absence of a reasonable likelihood of rehabilitation" existed based, in part, on the fact that the Debtor provided no documentary evidence of any purchase offers); *In re Hazelton Tr.*, 646 B.R. 855, 863 (Bankr. S.D. Fla. 2022) ("Debtor failed to assert any potential income or potential sale of assets with which to fund a reorganization, leaving the Court to conclude that there is an absence of a reasonable likelihood of rehabilitation.").

66.     Lordstown does not dispute, and in fact concedes that market conditions are unfavorable and show little sign of letting up:

> [T]he current market outlook ***makes it unlikely that the Company's prospects will change in the near future***. General market forces and outlooks, including rising interest rates and unemployment rates as well as forecasts of a near term recession will make raising capital extremely difficult. Moreover, those general hardships are even more pronounced in the electric vehicle sector.

FDD ¶ 62 (emphasis added).  With no buyer on the horizon and a bleak market outlook, there is no reasonable likelihood that Lordstown will be rehabilitated within a reasonable time frame and cause exists for dismissal or conversion under Section 1112(b)(4)(A).

### 2.     The Debtors Admit That They Must Liquidate.

67.     Irrespective of the prospects of the Debtors' sale process (and the prospects are dismal), there is no hope for rehabilitation.  Courts have found an absence of a reasonable likelihood of rehabilitation where, as here, a debtor's only outcome is a liquidation of assets.  *See, e.g.*, *Loop Corp.*, 379 F.3d at 516 (where a debtor intends to "liquidate their assets rather than restore their business operations, they [have] no reasonable likelihood of rehabilitation"); *In re BH S&B Holdings, LLC*, 439 B.R. 342, 347-48 (Bankr. S.D.N.Y. 2010) (finding the second prong of Section 1112(b)(4)(A) was met because "Debtors' intention to liquidate (rather than rehabilitate), demonstrates that there is no likelihood of rehabilitation"); *In re Brutsche,* 476 B.R. 298, 301-02 (Bankr. D.N.M. 2012) (distinguishing reorganization and rehabilitation, and noting that debtor's

plan to "sell[] various assets and pursue[] litigation to generate funds to pay creditors" was "in effect . . . a liquidation/litigation plan" that was "perfectly legitimate as a . . . 'reorganization' plan" but "not a 'rehabilitation'.").

68. As explained above, Lordstown has admitted that they have functionally ceased operations after building 65 Endurance vehicles following a total capital expenditure of $750 million—approximately $11 million per vehicle. In the absence of identifying a buyer for the Endurance production line—a production line that Lordstown does not itself manage and has abandoned as incapable of operating profitably—Lordstown admits it must liquidate.

69. Accordingly, because Lordstown suffers continuing losses and a significant diminution of the estate, and there is an admitted and complete absence of a reasonable likelihood of rehabilitation, cause exists to dismiss or convert the Chapter 11 Cases.

## III.   DISMISSAL OF THE CHAPTER 11 CASES WOULD BENEFIT CREDITORS

70. Once a court finds "cause," it will then determine whether "dismissal or conversion [is] in the 'best interests of creditors and the estate[.]'" *In re Calrissian LP*, No. 17-10356, 2018 WL 3854004, at *2 (Bankr. D. Del. Aug. 10, 2018). "The cases are uniform in holding that the decision to dismiss or convert is within the bankruptcy court's discretion and is based on the facts. It is a case-by-case decision." *Id.* (citing *In re Klaas,* 533 B.R. 482, 488 (Bankr. W.D. Pa. 2015)).

71. In exercising discretion to dismiss or convert, courts consider numerous factors, including: (a) whether there would be a loss of rights granted in the case if it were dismissed rather than converted; (b) the ability of a trustee in a chapter 7 case to reach assets for the benefit of creditors; (c) whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise; (d) whether any remaining issues would be better resolved outside the bankruptcy forum; (e) whether conversion to chapter 7 would result in benefits only to secured creditors; and (f) the preferences expressed by the debtor's creditors. *See In re 1121 Pier Vill.*

*LLC,* 635 B.R. 127, 139-40 (Bankr. E.D. Pa. 2022) (citations omitted).  Other courts simply analyze "the course of action that results in the largest number of creditors being paid the largest amount of money in the shortest amount of time."  *Id.*

72.     Dismissal is appropriate because the Chapter 11 Cases were filed in bad faith and without a valid bankruptcy purpose, as explained at length herein.  Because good faith is what makes a debtor eligible for bankruptcy in the first place, this Court cannot simply close its eyes to the Debtors' bad faith conduct. *See Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 373-41 (2007)  ("[A] ruling that [a debtor's bankruptcy] should be dismissed" because of "bad-faith conduct" is "tantamount to a ruling that the individual does not qualify as a debtor" and "is not a member of a class of 'honest but unfortunate debtor[s]' that the bankruptcy laws were enacted to protect"); *see also Integrated Telecom*, 384 F.3d at 128 ("[t]he question of good faith is therefore antecedent to the operation of" the Bankruptcy Code's powers, rights, and obligations).

73.     To the extent the Court determines that the petitions were filed by the Debtors in good faith but cause exists under section 1112(b)(4)(A) to dismiss or convert (it does), then either dismissal or conversion would be appropriate here and in the interest of the Debtors' stakeholders.

### A.     Dismissal Is Appropriate and Would Benefit Creditors

74.     Given the Debtors' intention to wind down operations and its significant cash on hand, dismissal in these cases should not prejudice any of the Debtors' stakeholders.  Rather, dismissal would aid the estate and creditors in avoiding substantial administrative expenses.  Moreover, the Debtors' most significant claimants—Karma and the Securities Litigation plaintiffs—are litigation creditors, and dismissal would permit them to pursue their rights in state and federal courts unabated.  The Debtors have already reserved approximately $35 million in connection with the Securities Litigations—less than a third of their cash on hand—and such funds may be used to settle causes of action against the estate.  Similarly, the Karma Litigation can also

proceed without hindrance outside of bankruptcy court, as it was prepetition.[18]  As discussed *supra*, the Debtors have only approximately $20 million in aggregate disputed trade payables across their purported thirty largest creditors.  Their wind-down and reductions in costs and head-count has been previewed to parties in interest; it is well underway and should continue outside of bankruptcy.  Given all of the foregoing, neither the estate nor creditors would be prejudiced by a return to the prepetition status quo.

### B.   Conversion Would Quickly Satisfy the Best Interests of All Creditors

75.   Many of the same elements that favor dismissal of the Chapter 11 Cases also support conversion.  First, the administrative expenses of a panel chapter 7 trustee would be substantially less than the costs of administering the estate in chapter 11.  This is not a "no asset" case or one where there is no equity, such that the chapter 7 estate would be run exclusively for the benefit of a secured creditor.  A chapter 7 trustee may expeditiously and fairly resolve the various disputed claims against the Debtors in a centralized forum and make distributions to all unsecured creditors and, potentially, to equity.

76.   Conversion is particularly beneficial where there is an absence of rehabilitation, but the powers provided by the Bankruptcy Code under chapter 7 would still benefit stakeholders, including when a putative chapter 11 debtor has significant litigation exposure.  *See, e.g.*, *In re Reserves Resort, Spa & Country Club LLC*, No. 12-13316, 2013 WL 3523289, at *2-3 (Bankr. D. Del. July 12, 2013) (finding conversion appropriate where debtor was "not being rehabilitated;" was "accruing administrative expenses . . . and [was] heavily engaged in litigation" outside of bankruptcy court and noting "trustee will bring an objective view and independent judgment as to whether there is any benefit from continuing the litigation").

---

[18]   The Karma Litigation may proceed to trial in any event, pending the outcome of Karma's lift stay motion.

77.    A chapter 7 trustee is also uniquely positioned to objectively analyze both offensive and defensive litigation, and it can fairly and dispassionately resolve claims against the estate and value causes of action, if any, the estate might hold against third-parties (however unmeritorious). As reflected in the First Day Declaration and First Day Motions, the Debtors' current management is tainted by its perspective of the Foxconn relationship and its desire to blame Foxconn for the sinking ship that management ran into the rocks.  A chapter 7 trustee should be in the best position to analyze the litigation against Foxconn as well as the Karma Litigation and Securities Litigation to determine the best course forward for all of the Debtors' stakeholders.  Should a chapter 7 trustee determine that the Complaint against Foxconn is meritorious, the trustee can retain professionals to adjudicate that dispute as necessary (even, potentially, the Debtors' current professionals).

78.    In sum, not only were the petitions filed in bad faith, and there is no valid bankruptcy purpose for these Chapter 11 Cases, either dismissal or conversion plainly provides the best results for the Debtors' stakeholders.  Tens of millions of dollars and months of efforts in the unrealistic hope of achieving a value-maximizing resolution of the Debtors' circumstances should not be wasted in a chapter 11 proceeding where the same result could be had, at greater value to creditors, in a chapter 7 proceeding.  There is no going concern to protect or rehabilitate. The Chapter 11 Cases will only burn the candle of the Debtors' assets faster, not maximize value for any stakeholders.  The Debtors' first day filings make clear that this case is a brazen effort to exert a litigation advantage over Foxconn, and this Court should not permit the cases to go forward on that basis.  For all the foregoing reasons, the cases should be dismissed or converted.

[*Remainder of the Page Intentionally Left Blank*]

## <u>CONCLUSION</u>

For the foregoing reasons, Foxconn respectfully requests this Court enter an order, substantially in the form attached hereto as **Exhibit A**, dismissing the Debtors Chapter 11 Cases or otherwise converting them to cases under chapter 7. In the alternative, the Court should appoint a chapter 11 trustee, to protect and oversee the Debtors' assets.

Dated: July 20, 2023
       Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Matthew O. Talmo*
Robert J. Dehney (No. 3578)
Matthew B. Harvey (No. 5186)
Matthew O. Talmo (No. 6333)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: rdehney@morrisnichols.com
      mharvey@morrisnichols.com
      mtalmo@morrisnichols.com

-and-

**PAUL HASTINGS LLP**
Matthew M. Murphy
Matthew Micheli
Michael C. Whalen
71 South Wacker Drive Suite 4500
Chicago, IL  60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
Email: mattmurphy@paulhastings.com
      mattmicheli@paulhastings.com
      michaelcwhalen@paulhastings.com

-and-

Kevin P. Broughel
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (312) 319-4090
Email: kevinbroughel@paulhastings.com

*Counsel to Foxconn*