1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3    IN RE:                      .  Chapter 11
                                 .
4    LORDSTOWN MOTORS CORP.,     .  Case No. 23-10831 (MFW)
     *et al.*,                   .
5                                .  (Jointly Administered)
              Debtors.          .
6    . . . . . . . . . . . . . . .
                                 .
7    LORDSTOWN MOTORS CORP.,     .  Adv. Pro. No. 23-50428 (MFW)
     *et al.*,                   .
8                                .
              Plaintiffs.        .
9                                .
          v.                     .
10                               .
     ATRI AMIN AND BENJAMIN      .
11   HEBERT, ON BEHALF OF        .
     THEMSELVES AND SIMILARLY    .
12   SITUATED STOCKHOLDERS OF    .
     LORDSTOWN MOTORS CORP.      .  Courtroom No. 3
13   (F/K/A DIAMONDPEAK HOLDINGS .  824 North King Street
     CORP.),                     .  Wilmington, Delaware 19801
14                               .
              Defendants.        .  Thursday, August 3, 2023
15   . . . . . . . . . . . . . . .  2:00 p.m.

16                    TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE MARY F. WALRATH
17               UNITED STATES BANKRUPTCY JUDGE

18   <u>APPEARANCES</u>:

19   For the Debtors:          Daniel DeFranceschi, Esquire
                               RICHARDS, LAYTON & FINGER, P.A.
20                             One Rodney Square
                               920 North King Street
21                             Wilmington, Delaware 19801

22

23

24   (APPERANCES CONTINUED)

25   Audio Operator:          Jermaine Cooper, ECRO

```
1   Transcription Company:    Reliable
                              The Nemours Building
2                             1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
3                             Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
4

5   Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.

6   _____

7   APPEARANCES (CONTINUED):

8   For the Debtors:          Jason Zakia, Esquire
                              WHITE & CASE LLP
9                             111 South Wacker Drive
                              Suite 5100
10                            Chicago, Illinois 60606

11                            Thomas Lauria, Esquire
                              WHITE & CASE LLP
12                            200 South Biscayne Boulevard
                              Suite 4900
13                            Miami, Florida 33131

14  For Karma
    Automotive LLC:           James Sowka, Esquire
15                            SEYFARTH SHAW LLP
                              233 South Wacker Drive
16                            Suite 8000
                              Chicago, Illinois 60606
17
    For Defendants:           Glenn McGillivray, Esquire
18                            BERNSTEIN LITOWITZ BERGER
                                & GROSSMANN LLP
19                            1251 Avenue of the Americas
                              New York, New York 10020
20
                              Henry Jaffe, Esquire
21                            PASHMAN STEIN WALDER HAYDEN
                              Court Plaza South, East Wing
22                            21 Main Street, Suite 200
                              Hackensack, New Jersey 07601
23
                              Samuel Adams, Esquire
24                            POMERANTZ LLP
                              600 3rd Avenue
25                            New York, New York 10016
```

1  APPEARANCES (CONTINUED):

2  For Foxconn:            Matthew Murphy, Esquire
                           PAUL HASTINGS LLP
3                          71 South Wacker Drive
                           Suite 4500
4                          Chicago, Illinois 60606

5  For the Committee:      Deborah Kovsky-Apap, Esquire
                           TROUTMAN PEPPER HAMILTON SANDERS LLP
6                          4000 Town Center
                           Suite 1800
7                          Detroit, Michigan 48075

8                          Francis Lawall, Esquire
                           TROUTMAN PEPPER HAMILTON SANDERS LLP
9                          3000 Two Logan Square
                           Eighteenth and Arch Streets
10                         Philadelphia, Pennsylvania 19103

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2   MOTIONS:                                              PAGE

3   Agenda
    Item 1: Debtors' Motion for Entry of an Order (I)      10
4           (A) Establishing Bidding and Auction
            Procedures, (B) Scheduling Certain Dates
5           with Respect Thereto, (C) Approving the
            Form and Manner of Notice Thereof, (D)
6           Approving Contract Assumption and
            Assignment Procedures, and (E) Granting
7           Other Related Relief; and (II) (A)
            Authorizing the Debtors to Enter into a
8           Definitive Purchase Agreement and (B)
            Granting Other Related Relief
9           [Docket No. 16; filed June 27, 2023]

10          Court's Ruling:                                22

11  Agenda
    Item 2: Debtors' Motion to Extend the Automatic        25
12          Stay and for Injunctive Relief Pursuant to
            11 U.S.C. § 105, and Request for Hearing Date
13          [Adv. Docket No. 2; filed July 5, 2023]

14          Court's Ruling:                               103

15

16  WITNESSES CALLED
    BY THE DEBTORS:                                       PAGE

17
        ADAM KROLL
18      Direct examination by Mr. Zakia                    29
        Cross-examination by Mr. McGillivray               38
19      Redirect examination by Mr. Zakia                  56
        Recross examination by Mr. McGillivray             57

20

21  WITNESSES CALLED
    BY DEFENDANTS:                                        PAGE

22
        ANKITA SANGWAN
23       Cross-examination by Mr. Zakia                    61
         Redirect examination by Mr. Adams                 69

24

25

1

<u>INDEX</u>

2

3

<u>EXHIBITS</u>:                                                          <u>PAGE</u>

4

Debtors' Exhibits A through L                        26

5

Ankita Sangwan Declaration                          59

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         (Proceedings commenced at 2:00 p.m.)

2             THE COURT:  Good afternoon.  This is Judge

3  Walrath.  We are here in the Lordstown Motors case.

4             I am going to turn it over to counsel for the

5  debtor to get us started.

6             MR. DEFRANCESCHI:  Good afternoon, Your Honor.

7  Dan DeFranceschi from Richards, Layton & Finger on behalf of

8  the debtors.  Thank you for the Court's indulgence today for

9  this hearing.

10            If it pleases the Court, I would like to turn it

11  over to co-counsel, Mr. Tom Lauria, from White & Case.

12            THE COURT:  All right.

13            MR. LAURIA:  Good afternoon, Your Honor.  My name

14  is Thomas Lauria.  I'm a partner at White & Case, we

15  represent the debtors in these Chapter 11 cases.  I would

16  like to first thank the Court for hearing us today.

17            Before we get to the two matters before the Court,

18  I would like to provide some explanation of how we got here.

19  I am the architect of this case and given last week's events

20  it's important to me personally that the Court understand the

21  case's premise.  It's my hope that we can begin the process

22  today of rehabilitation.

23            Your Honor, this Court has seen, and I have seen

24  over the last 37 years, numerous boards that have been able

25  to live in denial until it was too late to provide a recovery

1  to equity and until creditors had become impaired, frequently

2  deeply.  The board of Lordstown Motors is not one of these

3  boards.  Lordstown board accepted reality.

4          The company had been engaged in fundraising for a

5  long time.  When it became apparent that those efforts, which

6  were needed to cover the cost of getting to scalable

7  production, were unlikely to bear fruit the board took a step

8  back.  Recognizing that without meaningful revenue,

9  continuing full scale operation would only result in a

10  diminution of value over time and ultimately no distributable

11  value.

12          In recognition of their fiduciary duty to maximize

13  value and recovery for stakeholders the board made the

14  difficult decision to implement an orderly winddown of the

15  company's affairs.  Efforts were undertaken to see if we

16  could develop a strategy to quickly resolve the material

17  contingent and disputed claims and issues surrounding this

18  company either out of Court, or through a prepackaged plan,

19  or, at the very least, a pre-negotiated plan.

20          When those efforts failed, the decision was made

21  to file Chapter 11 in order to facilitate the reduction of

22  the cash burn that the company was suffering and to utilize

23  the unique tools provided by Chapter 11 to get to a

24  reasonable and responsible finish line as quickly as

25  possible.  The ability to quickly and efficiently get to a

1 finish line would be the driver of success which we interpret

2 as maximizing distributable value for all stakeholders,

3 whoever that value is supposed to go to.

4       In that regard, we were focused on two things,

5 Your Honor:

6       One, the ability to maximize the value of the

7 debtors' assets through a controlled reliable sale process

8 that would have a defined ending and a defined -- a defined

9 beginning and a defined ending with Court oversight and the

10 ability to provide protections unique to Chapter 11,

11 including selling the assets free and clear of all interests.

12       The other thing we focused on was the ability to

13 use the Bankruptcy Court as a centralized form for the

14 efficient and fair liquidation of all claims.  I don't think

15 either of these operational pillars are particularly novel.

16 I think they're blackletter law.  I think they're baked and

17 steeped in the policy of the bankruptcy code.

18       Of critical import we recognize that every day

19 that passed would cost this estate and, thus, our

20 stakeholders money.  This is true in or out of Court.  So,

21 the real difference maker here is the ability to use Chapter

22 11 to get to the finish line quickly.  This is true and it

23 would provide benefit for almost everyone involved in the

24 case including Karma.  Getting a massive award that would be

25 uncollectible would be of little value.  And an injunction to

1  prevent a dead company from using intellectual property would

2  be a largely moot point.

3           Now I did say it would be beneficial for almost

4  everyone.  Arguably, Foxconn is in a better spot if the

5  company just implodes.  They could buy the wreckage for

6  almost nothing and they would have no risk that somebody

7  would use the technology and equipment that had been

8  developed by this debtor at a cost of nearly a billion

9  dollars to compete against whatever business Foxconn

10  ultimately pursued in the electric vehicle space.

11          What is clear here though is that absent

12  bankruptcy this debtor faced a classic race to the courthouse

13  situation where the debtor would ultimately be dismembered,

14  what's left of it, in a disorderly fashion resulting in

15  unequal recoveries based strictly on who gets to the judgment

16  first.

17          To address all of this, to have a successful

18  outcome here, we recognize that we need the Court's help and

19  support.  And to get that I need your confidence.  One thing

20  I know for sure the debtor and its board should not be

21  punished for accepting reality and trying to do the right

22  thing for the benefit of all stakeholders.

23          So, Your Honor, before I turn to an update on the

24  bidding procedures motion, which is one of the two matters

25  before the Court today, I will pause and see if the Court has

1  any questions.

2          THE COURT:  I have no questions at this time.

3          MR. LAURIA:  Thank you, Your Honor.  One thing I

4  should note, I know how the Court sometimes is uncomfortable

5  with counsel just testifying from the podium.  Each of the

6  statements that I just made, except for those that are

7  clearly my own opinion and views, rely on evidence that has

8  been admitted into the record, principally the first day

9  declaration.  If it pleases the Court, I can follow up this

10 hearing with a list of citations to each of the statements.

11         THE COURT:  Okay.

12         MR. LAURIA:  So, Your Honor, if we may, I'd like

13 to turn to the bidding procedures motion.

14         THE COURT:  You may.

15         MR. LAURIA:  Thank you.  I would like to focus on

16 two things, which I believe are the two items that the Court

17 directed us to address at the close of the hearing last

18 Thursday.  Number one, to take measures to make sure that all

19 potential bidders are informed of the Karma issues and the

20 Karma situation.  Two, to update the Court on the process in

21 our bidding procedures at this time.

22         With respect to the first item, promptly after the

23 hearing on the morning of July 28th, that was the morning

24 after the last hearing, the debtors, through their investment

25 banker, Jefferies, uploaded the following documents or links

1 with detail regarding the Karma litigation to the VDR,

2 virtual data room: a copy of Karma's operative complaint

3 filed in the Karma action in the Central District of

4 California; a copy of Karma's objection to the debtors'

5 bidding procedure motion; copies of the debtors' latest

6 securities filings which include detailed disclosures

7 regarding Karma.  These are, in particular, Lordstown Motors

8 10-K for fiscal year ending December 31st, 2022 and Lordstown

9 Motors 12-Q for this first quarter of 2023.

10        We also provided a link to where all of the

11 company's public securities filings are located and a link to

12 the debtors' claims agent page where bidders give you all

13 pleadings filed on the Bankruptcy Court's docket.  Prior to

14 uploading these filings, the virtual data room had already

15 pointed bidders to the financial information and disclosures

16 on the debtor's website, which website includes links to the

17 debtors' latest security filings.

18        To ensure that all interested parties were aware

19 of the Karma assertions and the additional uploads, on July

20 28th, 2023 we also sent an updated process letter to all

21 parties under non-disclosure agreements.  By that I mean

22 parties from whom the debtors might receive an indication of

23 interest.  The revised process letter disclosed the Karma

24 issue on the first page and referenced the documents with

25 more detail regarding Karma's allegations that had been

1  uploaded into the virtual data room.

2          For full transparency the debtors also

3  specifically directed bidders to the Karma litigation in the

4  cover email conveying the updated process letter.  The

5  language added to the process letter was as follows:

6          "As disclosed in the company's filings, including

7  its 10-K's and 10-Q's since the third quarter of 2020, the

8  company has been involved in ongoing litigation with Karma

9  Automotive LLC in which Karma alleges claims against the

10  company and certain of its current and former employees

11  including misappropriation of trade secrets, conspiracy,

12  breach of non-disclosure agreements, interference with

13  employee contracts, and violation of computer fraud statutes

14  against the company, and certain of its current and former

15  executive officers and employees.

16          Karma's claims are pending in the United States

17  District Court for the Central District of California in the

18  matter styled *Karma Automotive LLC v. Lordstown Motors LLC,*

19  *et al.,* Case No. 20-02104-JVS-DFM, filed on October 30th,

20  2020.  On July 20th, 2023 Karma filed an objection with the

21  Bankruptcy Court to the company's motion for approval of the

22  bidding procedures.  In the objection Karma alleges that it

23  holds ownership interest in certain of the intellectual

24  property that Karma alleges was misappropriated by the

25  company and that the company would, therefore, be precluded

1  from selling subject assets pursuant to Section 363 of the

2  Bankruptcy Code prior to adjudication of the party's

3  respective rights.

4       If Karma prevails with respect to its asserted

5  intellectual property interests such an outcome could have an

6  impact on the assets available for sale including the virtual

7  data room are (1) links to the company's public filings which

8  include a description of the Karma litigation; (2) the

9  operative complaint filed in the Karma litigation and; (3)

10  the objection.

11       At a hearing on July 27th, 2023 the Bankruptcy

12  Court continued its ruling with respect to the company's

13  proposed bidding procedures to a yet to be determined date

14  and time during the week of July 31st, 2023.  Nevertheless,

15  all proposals are due at 5:00 p.m. ET on July 31st, 2023 on

16  the terms set forth below.

17       After sending the revised process letter, the

18  debtors' advisors continued to promptly respond to inquiries

19  from potential bidders including five inquiries related to

20  Karma, plus one more about ongoing litigation in general

21  which were fielded by phone or email inquiry after sending

22  the revised process letter.

23       Prior to the last hearing, litigation was often a

24  general topic of discussion and conversation with potential

25  bidders. Most were aware of the Karma litigation, but did not

1  appear to be focused on it, nor did they ask many questions

2  relating to Karma."

3         Your Honor, it is our hope that that disclosure

4  satisfies the Court's concerns about disclosing to potential

5  bidders the situation with Karma and the potential issues

6  that it presents.

7         THE COURT:  Okay.  Can you give me a status as to

8  whether any indications of interest were received Monday.

9         MR. LAURIA:  Yes, I can, Your Honor.  Thank you.

10        We have received a total of 13 indications of

11 interest.  Four of those are to acquire all or substantially

12 all of the company's assets as a going concern.  Four of them

13 are for different components of the company's assets.  Five

14 of them are from liquidators who would like to buy some or

15 all of the company's assets either for an upfront cash fee or

16 for a fee and a shared participation in the proceeds from

17 their sale.  Of those bidders only one has specifically

18 included a condition regarding Karma, but all are actively

19 going forward at this time.

20        Now, I will tell the Court that some of these

21 proposals have big issues and problems, and some of them are

22 more promising.  At this time we have not eliminated any of

23 the proposals from consideration and we are doing what I

24 think this Court would expect us to do which is to work with

25 the bidders, to respond to their questions, and work to get

1  either one bidder or some aggregation of bidders together to

2  provide a proposal that can be brought forward for stalking

3  horse protection by the deadline which I believe is August

4  17th for a submission for stalking horse proposals so that we

5  can proceed with the sale process.

6            THE COURT:  Well, that is the proposed deadline.

7            MR. LAURIA:  That is the proposed deadline which

8  is what we have been telling everybody to abide by.

9            THE COURT:  Okay.

10            MR. LAURIA:  In that regard, Your Honor, I'm glad

11  that you focused on that because that is certainly a point of

12  focus for us and has been something that we have given a lot

13  of thinking to since last Thursday.  Your Honor, I think the

14  important thing for this estate is to preserve optionality at

15  this point.  We currently have 13 interested parties who are

16  engaged in looking at a transaction to buy some or all of the

17  assets of the company.  If we were to hit the pause button

18  now and restart it later it's unclear how many, if any, of

19  those bidders would come back.

20            What is important, though, is that we do

21  everything we can to capture value when and if the

22  opportunity to do so presents itself.  I think that one thing

23  this Court knows from experience is that if there is a way

24  that we can capture value we will use all of our creativity

25  and resources to bring that opportunity to the Court for its

1  consideration.  And if we are not there by any of the

2  deadlines that are set forth in the proposed bidding

3  procedures we likely will be coming back to extend or modify.

4  If we don't get that decision right one thing that I know

5  from experience over the years, over the last 20 years with

6  this Court, is that you will tell us.

7          THE COURT:  I am not shy, Mr. Lauria.  You know

8  that.

9          MR. LAURIA:  I do.  I am resourceful, you know

10  that.

11          THE COURT:  I do.

12          MR. LAURIA:  So, Your Honor, under the

13  circumstances what we would like to request is that the Court

14  enter the order proving the bidding procedures and allow us

15  to move forward. The bidding procedures make clear that all

16  parties' rights are reserved, including Karma's.  And we are

17  assuring the Court that if we can't deliver a transaction, we

18  will not be trumped to deliver a transaction.

19          Things change.  This Court has frequently seen

20  situations where enemies become friends and vice-a-versa.  We

21  are constantly looking for a path.  And if we find that path

22  the deadlines and the timeframes set forth in the bidding

23  procedures are consistent with our objections of maximizing

24  value here.

25          THE COURT:  All right.  Well, let me hear if

1   anybody else wishes to be heard with respect to the proposed

2   deadlines.

3         MR. SOWKA:  Yes, Your Honor.  James Sowka on

4   behalf of Karma Automotive LLC.

5         Your Honor, notwithstanding the indications of

6   interest that were represented to the Court, Karma stands on

7   its prior objections and believes that it would be

8   inappropriate to proceed with the proposed timelines mainly

9   because Your Honor has not lifted the stay to permit the

10  trial in California to go forward.  To the extent the bid

11  procedures, as proposed, proceed it would potentially raise a

12  situation where the property interest could be at dispute

13  before this Court in some sort of contested sale hearing or

14  adversary proceeding while they're also at issue in

15  California.  We just think that that duplication of resources

16  isn't going to benefit any of the parties.

17        It may make sense to continue the hearing on the

18  sale procedures motion another week or two and see where the

19  debtors are at with respect to the stalking horse bidders.

20  To the extent they want to proceed with bidders that don't

21  implicate the issues that are pending in California, Karma

22  may have no objection at that point in time, but it sounds

23  like the debtors are still proposing a process where they may

24  attempt to sell assets that are at issue in the California

25  litigation and based on that Karma objects.

1          THE COURT:  All right.  Thank you.

2          Anybody else?

3          MS. KOVSKY:  Your Honor, Deb Kovsky, Troutman

4   Pepper, for the committee.

5          The committee does have concerns about extending a

6   process relating to a going concern sale in light of the

7   Karma issues.  That said, we think that the IOI's that came

8   in are substantial enough that we think it makes sense to

9   continue this process and continue marketing for some period

10  of time in order to determine is there actually going to be a

11  going concern offer that materializes.  (Indiscernible)

12  moving forward on an auction of the debtors' other assets or

13  remaining assets should occur in any event.

14         We had, in our comments that we worked out with

15  the debtors prior to the last hearing, included language in

16  the proposed order expressly reserving the committee's right

17  to come back into Court and seek an early termination of the

18  sale process if it appears that its going to be futile or a

19  waste of the estate's resources or if, perhaps, the debtors

20  ought to be pivoting to a sale of solely the hard assets that

21  would not implicate any IP issues.

22         So, the committee is keenly aware of the cash

23  situation in these cases.  We appreciate that the debtors

24  filed with substantial unencumbered cash.  We also appreciate

25  that the total unsecured creditor pool may in the end

1   substantially exceed that amount of cash that there is

2   significant burn.  We are supportive of any process that

3   generates additional value.  So, we are supportive of moving

4   forward with the sale process as proposed, but on a short

5   leash and subject to the committee's rights to pivot if

6   necessary.

7           THE COURT:  Anybody else?

8           MR. MURPHY:  Your Honor, its Matt Murphy of Paul

9   Hastings on behalf of Foxconn, if I may.

10          THE COURT:  You may.

11          MR. MURPHY:  So, Mr. Lauria, in his testimony from

12  the podium, alleges that we're trying to steal the assets or

13  waiting to steal the assets.  I think it's worth noting that

14  we did not object to the bid procedures. I think it's also

15  worth noting that we were in discussions on a prepetition

16  basis with the debtor, the now debtor, and I think the only

17  race to the courthouse that happened was by the debtor.

18          I encourage the committee, as a representative of

19  the creditor body, and I know they will, to stay in touch

20  with the cash burn, the 13-week cash flow forecast.  I think

21  it's the testimony from the last hearing that was roughly

22  $6.2 million a month without including committee

23  professionals.  I think there is a 77 day, or thereabouts,

24  timeline for the sale, ball parked at $15 million.

25          I just hope we're staying in touch with --

1  speaking of accepting reality, I hope we're staying in touch

2  with the process we're running here and if it's really a

3  process that's going to benefit creditors or it's a process

4  designed for other reasons.

5          Thank you.

6          MR. LAURIA:  Your Honor, if I may briefly be

7  heard.

8          THE COURT:  You may.

9          MR. LAURIA:  I'm prepared to stipulate on the

10  record that we will not use the sale process in any way as an

11  effort to end run the Karma litigation.  If we get to a point

12  where we have a proposal that requires resolution to Karma

13  issues, we will sort out a way to get that done without

14  coming to you to ask you to tread on the rights that the

15  Court has granted Karma with respect to the California

16  litigation.

17          THE COURT:  Let me ask counsel for Karma, has the

18  Court in California confirmed the trial date will proceed as

19  originally scheduled, September 5th?

20          MR. SOWKA:  Your Honor, the Court -- there is a

21  one-week delay.  So, the trial is scheduled to commence

22  September 12th.  We will proceed accordingly to the trial

23  schedule order that was previously entered.

24          THE COURT:  And that is approximately two weeks,

25  is that correct?

1       MR. SOWKA:  It is 26.5 hours per each side for,

2   you know, testimony and evidence.  So, we're projecting two

3   to three weeks, likely, to complete the trial.

4       THE COURT:  Mr. Lauria, did any of the potential

5   bidders, and maybe you need to refer to a witness for this,

6   have any concern about the timing of the sale process as

7   proposed by the debtors?

8       MR. LAURIA:  Your Honor, I don't specifically know

9   that.  I do believe --

10      THE COURT:  Does Mr. Kroll know the answer to

11  that?

12      MR. LAURIA:  I don't know.  What I was going to

13  say, Your Honor, is that I think they're all aware of the

14  proposed timeline and I think the ability to buy a certain

15  date come back in with stalking horse protection is going to

16  be important to getting people to put their best foot

17  forward.  It may be that we get bids that have conditions

18  around timing, I would expect that.  That all feeds into our

19  value maximizing algorithm.  There may be a scenario where we

20  have to seek to resolve certain disputes not by Court order,

21  but by negotiation and agreement in order to be able to

22  realize value.

23      You know, I think the thing that I can assure the

24  Court is that if that math shows that we need to be in a

25  position to bring a sale to this Court by a date and that the

1  Karma litigation won't be resolved by that date we are going

2  to have to do what we have to do. I think the Court knows

3  what I'm talking about to try to open the door.  We are not

4  going to come to this Court and say, hey, let's end run the

5  trial.  What we are going to have to do is find a path.

6           Again, I think as this Court knows, from past

7  experience, we have found paths in very difficult situations

8  to deliver value.  We will use all of that energy and

9  creativity to deal with the hearing.  We may fail.  We may

10 fail, but I think preserving the option is at no loss to

11 anybody.  It's only upside for the estate.

12          THE COURT:  Well, let me just say this, even in

13 the absence of the Karma issue I am concerned with the timing

14 of the sale process.  Given the debtors' cash on hand I am

15 not certain why it needs to proceed as quickly as the debtor

16 proposes.  I will make no suggestion as to any nefarious

17 reason for that, it just seems that it is too quick. I also

18 note that the debtor had suggested that I should not grant

19 relief from the stay to let the Karma case proceed because

20 they had to focus on the sale, but since relief has been

21 granted, I am wondering how the debtor can address both.

22          It appears that given the indications of interest

23 that the debtor has generated substantial interest in selling

24 its assets. I am not prepared to put a break on that at this

25 time.  And I think, at least, we need to see if a stalking

1  horse can be -- a stalking horse agreement can be realized,

2  but in the absence of that I think the parties who are

3  interested in the sale ought to see the debtors' proposed

4  form of order and form of asset purchase agreement.

5         I am not prepared to set an auction at this time

6  until we see, or at least until the Court sees, what are

7  viable bids and path forward as the debtor is describing it.

8  I would push the deadlines out one week -- well, let me see

9  when Labor Day is.  I would like to see an additional week,

10 the 24th of August, for stalking horse bids and the 8th of

11 September for a bid deadline.

12        Before there is any litigation or a proceeding to

13 a sale hearing I think the Court and all parties have to know

14 what the terms are of the bids that the debtor wishes to

15 proceed with.  So, a bid deadline and auction, and then I

16 think we need more time for parties to evaluate the proposed

17 winning bid that the debtor may select.

18        MR. LAURIA:  Your Honor, if I may make one

19 suggestion with respect to the sale hearing at the end.

20        THE COURT:  Yes.

21        MR. LAURIA:  As the Court well knows, it's a lot

22 easier to extend a deadline that has been noticed out or to

23 adjourn a hearing that has been noticed out then to set one

24 on short notice.  So, I would just ask that we have a holding

25 date.  And the Court can adjourn that hearing on its own

1  motion, or at our request, or at Karma's request, or at any

2  other party's request, but I'd like to have a date that we

3  can be working toward.  I think it helps us with the bidders.

4       I think deadlines are good, people tend to expand

5  the referred time permitted. I would like to have an outside

6  date, a sale hearing date recognizing at this moment it's not

7  clear that we will be able to go forward.  If we, at least,

8  have a hearing date we will have something that everybody can

9  think about and work toward.

10       THE COURT:  Well, your original sale hearing date

11  of 9/12 isn't going to work.

12       MR. LAURIA:  Understood.

13       THE COURT:  Well, I will ask the parties to look

14  at the first week of October.  If we say October 5th or 6th -

15  - let me confirm with Ms. Capp that I'm not scheduling

16  something -- October 6th is not good, but October 5th is

17  okay.

18       MR. LAURIA:  Your Honor, the debtors will make

19  that work for us.

20       THE COURT:  Why don't you do, why don't you

21  consult with the parties.  We will make it at 10:30. I am not

22  going to micromanage the reply and objection deadlines, but

23  if we work off of the August 24th to get to October 5th I

24  will ask the parties to consult about that.  Again, this is

25  subject to all of this being canceled, continued, adjusted

1  depending on what bids are, in fact, received and which path

2  the debtor elects to go forward with.

3           MR. LAURIA:  Understood.

4           THE COURT:  All right.  If you will submit a form

5  of order under certification of counsel.

6           MR. LAURIA:  Will do.  Thank you, Your Honor.

7  Your Honor, unless there is anything else on this matter I

8  will turn the microphone, screen, and podium over to my

9  partner, Jason Zakia, to address the second matter on the

10  agenda for today.

11          THE COURT:  All right.  Mr. Zakia.

12          MR. ZAKIA:  Good afternoon, Your Honor.  Jason

13  Zakia of White & Case for the debtors.

14          The second matter on the agenda is the debtors'

15  motion for preliminary injunction extending the automatic

16  stay and the main adversary proceeding.  If I could lay out

17  for the Court we have consulted with counsel for the

18  defendants. I am going to try not to screw that up because

19  the defendants are the plaintiffs, but the counsel for the

20  defendants in the adversary proceeding, the plaintiffs in the

21  underlying case, and I think we have an agreed path forward

22  with regard to the evidentiary portion which should be fairly

23  brief.

24          First, both parties have agreed to the admission

25  of all exhibits offered by each other with a couple of

1  qualifications.  So, for the debtors, Your Honor, we offered

2  Debtors' Exhibits A through L.  Those are all exhibits to the

3  Turetsky declaration that can be found in Adversary Docket

4  No. 4.  Exhibits A, B, C, D, and E are the operative

5  complaints in the various underlying litigations.  So, those

6  are, obviously, being offered only to establish the

7  allegations made in those cases and not for the truth of any

8  matter asserted.  And with that qualification I believe the

9  defendants are willing to stipulate to the admission of all

10 of the debtors' exhibits and I would ask that the Court admit

11 them at this time.

12          THE COURT:  Any objection?

13      (No verbal response)

14          THE COURT:  They will be admitted as described.

15      (Debtors' Exhibits A through L received into evidence)

16          MR. ZAKIA:  Thank you.  I will let defense counsel

17 handle it.  The debtors are going to also stipulate to the

18 admission of all the defendants exhibits, but I will let them

19 present that when their case comes up.

20          The debtors have one witness, Your Honor, that's

21 Adam Kroll who you may remember from last week.  We are going

22 to present his direct testimony live.  It will be very brief.

23 So, at this point I will call Adam Kroll.

24          THE COURT:  All right.  Well let me ask if the

25 respondents wish to move their exhibits in first.

1          MR. MCGILLIVRAY:  Good afternoon, Your Honor.

2  Glenn McGillivray from Bernstein Litowitz Berger & Grossmann

3  on behalf of defendants in the adversary proceeding.  My co-

4  counsel, Henry Jaffe, from Pashman Stein is here with me

5  today as well along with co-counsel from Pomerantz.

6          We can handle the moving of our exhibits which

7  were submitted with two declarations from Ankita Sangwan, and

8  we have reached agreement on the admission of those exhibits

9  as well.  The one caveat is there is an exhibit

10  (indiscernible) which is an email exchange to Ms. Sangwan's

11  declaration that the parties have agreed, again similar to

12  the pleadings in other cases, reflects the positions of the

13  parties and isn't being offered for the matter asserted.

14  With that caveat we would move to admit all of the exhibits

15  we submitted with those two declarations.

16          THE COURT:  All right, let me ask both parties, do

17  you wish to seal any of them?  I know there had been motions

18  to seal filed.

19          MR. MCGILLIVRAY:  We --

20          MR. ZAKIA:  So --

21          MR. MCGILLIVRAY:  Go ahead.

22          MR. ZAKIA:  I'm sorry.  I was going to say, Your

23  Honor, I believe that the parties have now filed redacted

24  versions that can be publicly disclosed of each of those

25  exhibits, and so there would be no need to seal the exhibits,

1  we can use the publicly-filed versions, which is all we

2  intend to use here.

3          MR. MCGILLIVRAY:  Yes, Your Honor, we agree with

4  that.  We filed public versions of any sealed exhibits

5  yesterday as well and we plan to use those.

6          THE COURT:  So it is those that are being admitted

7  then, just to clarify?  Okay.

8          MR. ZAKIA:  Yes, Your Honor.  Thank you very much

9  for the clarification.

10          THE COURT:  Okay.  Then --

11          MR. MCGILLIVRAY:  Yes, Your Honor.

12          THE COURT:  -- by agreement, I'll admit them then.

13          MR. ZAKIA:  So with that, Your Honor, debtors call

14  Adam Kroll.

15          THE COURT:  All right, Mr. Kroll, I'll have the

16  clerk swear you in.

17          THE CLERK:  Please raise your right hand.  Please

18  state your full name and spell your last name for the court

19  record, please.

20          THE WITNESS:  Adam B. Kroll, K-r-o-l-l.

21              ADAM B. KROLL, WITNESS, AFFIRMED

22          THE CLERK:  Your Honor?

23          THE COURT:  All right.  Mr. Kroll, could you state

24  your name and address for the record?

25          THE WITNESS:  Adam Kroll and it's 27000 Hills Tech

1  Court, Farmington Hills, Michigan.

2          THE COURT:  All right.  Mr. Zakia, you may proceed

3  with direct.

4          MR. ZAKIA:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6  BY MR. ZAKIA:

7  Q    Mr. Kroll, could you please introduce yourself to the

8  Court and tell us what you do for a living, sir?

9  A    Yes, I am our chief financial officer, also an executive

10  vice president.  So I oversee all the financial affairs of

11  the company and the cash management, treasury, all -- and

12  play a big role in the strategy and actions that were the

13  bankruptcy and so forth.

14  Q    And could you tell us, sir, when you first joined

15  Lordstown?

16  A    So I joined in late October of 2021.

17  Q    I'd like to focus now, sir, could you explain to the

18  Court your job as it relates to the tracking of actual or

19  forecast expenditures of the debtor?

20  A    Yeah, so we have a very tight process, we have for a

21  long time, where multiple times per week, in terms of

22  payments that are going out, we will -- I approve all of the

23  payments, so I review every single line item of the payments

24  to make sure that it's consistent with my knowledge of what's

25  going on in the company, who we should be spending money

1   with, what vendors are getting paid, and so forth, as well

2   as, similarly, all purchase orders over $7,500 require my

3   approval.

4        So we keep a tight lid on the actual commitments that

5   we're making and approve the spend.  And then, again, as I

6   started with, subsequently, when the invoices come in, my

7   team reviews them, gets the approval from the businessperson

8   who had requested the spend, make sure that the services were

9   provided or the goods were received, and then it goes into a

10  payment file for which I -- which I provide approval for

11  before the money can leave the company.  And then all of the

12  budgeting and forecasting rolls to me as well.

13       So, personally, I'm involved heavily in our 13-week cash

14  flow forecast that we've been doing like since before I got

15  here in terms of also then making sure we have visibility on

16  what we expect the spend to be.

17  Q   And please explain to the Court how this process works

18  specifically with regard to legal expenditures.

19  A   Yeah, so the legal expenses generally are managed by the

20  office of the general counsel.  So, in terms of individual

21  forecasts, they will get forecasts from the attorneys with

22  whom we're working from time to time to help us with our

23  forecasts.  You know, at the beginning of the year, we'll do

24  a standard kind of budgeting process to get what the look for

25  the year will be, but from time to time during the year then

1    the office of general counsel will seek those forecasts or

2    outlooks based on activity.  They'll certainly get updates

3    when there's any material changes.  You know, for example,

4    when we have a trial date and it gets moved, then, you know,

5    they'll relay that to me and to my team.  On a month-by-month

6    basis as we're closing books, my team works closely with the

7    office of general counsel to make sure that we've accrued all

8    the proper legal expenses in the -- in the financial

9    statements.

10   Q    And are you generally familiar, sir, with a number of

11   various shareholder-related litigations facing the company?

12   A    Yes.

13   Q    Okay.  Specifically, are you aware that there was a

14   group of shareholder class action cases that were

15   consolidated in the Northern District of Ohio?

16   A    Yes.

17   Q    And how about two shareholder class actions that were

18   consolidated in the Delaware Chancery Court?

19   A    Yes.

20   Q    Now, I want to talk to you briefly specifically

21   regarding expenditures related to those matters.  In a

22   declaration that you submitted in connection with the

23   debtors' motion and at your deposition that you gave earlier

24   this week, did you offer some testimony about expenditures

25   incurred by the debtors in connection with those matters?

1  A     I did, I did.  Both in my declaration and in my

2  deposition, I testified that our costs incurred to date were

3  $5.76 million.  I have --

4  Q     And --

5  A     -- subsequently learned -- sorry.

6  Q     No, that's okay --

7  A     So --

8  Q     -- I think you anticipated my next question.  You can go

9  ahead.

10  A     So I subsequently learned that we did miss a couple of

11  expenses in that estimate.  So that estimate actually is 6.2

12  million, a little over 6.2 million.  However, I had

13  understood at the time that that total, the five -- what was

14  $5.76 million, did not include any of the recoveries from the

15  insurance carriers because the costs of the Diamond Peak

16  directors in the Delaware case are covered by -- we've been

17  receiving coverage for those expenses, for their direct

18  expenses from the insurance carrier.

19       So it was my understanding at the time that that, which

20  represents about $1.5 million, was not included in the 5.76,

21  which is now 6.2.  I've subsequently learned it was actually

22  included.  So 6.2 million, what is 6.2 million, includes 1.5

23  million of payments or costs that were reimbursed or paid by

24  the insurance carriers, and then there's also another 500,000

25  for which we believe we are entitled to coverage that we will

1  seek to obtain reimbursement for.

2  Q    Now, could you explain for the Court why it is the

3  debtors have incurred any expenses in connection with the

4  costs of the individual D&O defendants in the Delaware

5  action?

6  A    Yeah, all of the document discovery is provided by the

7  company because the directors -- all the data and so forth is

8  held on the company's -- in the company's possession.  So

9  it's --

10  Q    Mr. Kroll -- I'm sorry, I didn't mean to cut you off.

11  I'm going to talk about the company expenses in a second, but

12  have the debtors incurred any or paid any expenses for the

13  representation of the individual defendants, the Ds and Os

14  themselves, in connection with that case?

15  A    I'm sorry.  So those are -- so far have been covered by

16  the carrier but for our $500,000 of self-insured retention.

17  Q    Okay.  And why with respect to the first $500,000 that

18  weren't covered by insurance did the debtors pay those

19  expenses, as opposed to having the individual Ds and Os pay

20  them themselves?

21  A    Well, we have an indemnity obligation.  We have both

22  indemnity agreements with the individuals, as well as being

23  part of our articles of incorporation to indemnify --

24  Q    And does that -- and does that indemnification run to

25  all of the defendants in the Delaware action?

1  A     Yes.

2  Q     Okay.  Now, you mentioned, sir, the fact that there was

3  D&O coverage with respect to the Delaware case?

4  A     Yes.

5  Q     Do you have an understanding as to what the limit of the

6  policies that are providing that coverage is?

7  A     Yeah, there's a $10 million first layer and then a $5

8  million excess.  So 15 million total after the first 500,000

9  of no protection.

10  Q     Do you have an understanding as to how much of that

11  coverage has been exhausted to date?

12  A     It would be the 1.5 million that I referred to earlier

13  that we've paid and, if we are successful, getting

14  reimbursement for the additional 500,000 that we believe we

15  were entitled to, that would make it two million of 15,

16  basically.

17  Q     Now, I want to talk about something that you alluded to

18  earlier.  Separate and apart from expenses that the company

19  has paid related to the representation of the director and

20  officer defendants, has the company incurred any of its own

21  expenses in connection with participated in the Delaware

22  lawsuit?

23  A     Yes.

24  Q     And what is the -- why has the company incurred its own

25  expenses?

1  A     Well, as I -- sorry, as I was saying earlier, we -- all

2  the document discovery has come from the company; not from

3  the directors, but from the company.  So that discovery needs

4  to happen through the company and, therefore, they're our

5  costs, they're not subject to reimbursement by the carriers.

6  Q     Does the company have a forecast of future expenses it

7  believes it will incur in connection with the Delaware case

8  if the case proceeds?

9  A     Yes, our outside counsel has guided us that it would be

10  about $2 million of company -- pure company costs to do

11  everything that's under subpoena.

12  Q     And could you explain to the Court what your

13  understanding is of the work that would drive that $2 million

14  expense?

15  A     Yeah.  So what I understand is there's something like

16  200,000 documents, something like a million pages that have

17  been delivered.  The lawyers are working on trying to figure

18  out what search terms would apply that we would have to turn

19  over.  So the documents I mentioned were what was provided to

20  the SEC for their investigation.  So what I understand is

21  there's still negotiations happening around what the search

22  terms would be and, therefore, you know, once they know the

23  search terms, then they can look at that 200,000 documents

24  and figure out what, how would you say -- what needs to be

25  turned over, I guess.  The lawyers have said and told me

1 that, you know, we needed a privilege review as well and make

2 sure that all the documents being turned over (indiscernible)

3 are appropriate.

4      And then what I understand is, I guess the subpoena had

5 provided for wide-ranging -- wide-ranging discovery and

6 potential deposition and testimony of company officers,

7 current company officers, so there would be the deposition

8 preparation and so forth.  And also I understand that there

9 isn't an agreement yet that the company wouldn't have to also

10 testify at trial, so that would then be incremental to that

11 as well.

12 Q    Now, switching topics, would you please describe for the

13 Court the role that the company management plays with respect

14 to supervising litigation matters?

15 A    Yeah, I mean, obviously, the litigation itself is

16 important to the company, it puts company resources at risk

17 because of the costs we will incur, it also puts, you know,

18 management's time, other members of the team throughout the

19 company will have to provide, you know, and support any kind

20 of discovery around the company.  So -- but the supervision

21 itself is really led by our office of general counsel

22 because, again, we have an important interest in it.  And so

23 our office of general counsel takes the lead, directs outside

24 counsel largely.  And then our executive chairman, who has

25 appropriate skills, you know, strong skills in that area,

1  also plays a significant role.

2  Q    Now, stepping away from litigation specifically, could

3  you describe for the Court currently what some of the tasks

4  that the senior management at the company are focused on with

5  regard to the bankruptcy case?

6  A    Well, I mean, the sell side process is taking up time,

7  of course, because we have to put the company into a position

8  and be able to articulate the story and have the data that a

9  buyer will need to know.  And I think I testified previously,

10 there's a lot of specialized skills that are necessary to

11 communicate the story and the details that their counterparts

12 would expect.

13      So there's that.  There's just certainly all the

14 bankruptcy reporting is heavy.  We had the MOR file to file

15 July 21st, we had the SOFAs and SOLA that went through on the

16 1st, and those are taxing the system.  Our head count is now

17 down since April more than 50 percent, you know, and a large

18 chunk of that is voluntary resignations that every day or

19 every week we have a few people resigning to take other

20 opportunities and many of those are important.  So then we

21 end up kind of scrambling to figure out what we need from

22 those people during transition periods and so forth, so that

23 we have and can be efficient as possible.

24 Q    And could you please describe for the Court how, if at

25 all, the continuation of the Delaware litigation will impact

1  the work of the debtors' management team?

2  A    Well, I mean, it's one more thing, I mean, it's one more

3  task to support.  And, again, I think, you know, while I

4  wouldn't be intimately involved, as I said, other folks will

5  be.  Obviously, Dan Ninivaggi, our executive chairman, and

6  our general counsel, Melissa Leonard, will be distracted with

7  that.  And of course some of those things -- or all of those

8  things take away from other activities.  I mean, we need to

9  be talking to our creditors, we have to be responsive to the

10 UCC, to the trustee, and so any more time away from those

11 things just taxes the system and taxes our people.

12          MR. ZAKIA:  Thank you, Your Honor.  At this time,

13 no further questions.

14          THE COURT:  Thank you.

15          Mr. McGillivray, you may cross.

16          MR. MCGILLIVRAY:  Yes, thank you, Your Honor.

17                    CROSS-EXAMINATION

18 BY MR. MCGILLIVRAY:

19 Q    Mr. Kroll, nice to see you again.

20 A    Likewise.

21 Q    So, before I begin, I just want to make sure we're using

22 the same terminology, some of which Mr. Zakia was using

23 during his direct.  When I refer to the Delaware class

24 action, I'm referring to the two shareholder class actions

25 that were consolidated in the Delaware Court of Chancery; is

1  that okay with you?

2  A    Yes.

3  Q    And then, with respect to the Ohio Federal Securities

4  class actions, I will refer -- filed in the Northern District

5  of Ohio -- I will refer to the consolidated Federal

6  Securities class action as the Ohio securities action; does

7  that work for you?

8  A    Yes.  Hopefully, I can keep them straight.

9  Q    So I'm trying to make it a little easier --

10 A    If they were numbers, I'm good with that, but --

11 Q    I'm trying to make it a little easier, but I'll only

12 really be focusing on the Delaware class action and the Ohio

13 securities action, okay?

14 A    Yes, sir.

15 Q    Since the bankruptcy filing, basically, all of your

16 focus at Lordstown has been on supporting the bankruptcy and

17 external reporting; correct?

18 A    Well, no, because -- I mean, yes, that is certainly a

19 big part of what I'm doing, but the sell side itself has

20 taken up time, and then figuring out the -- so, yes, the

21 schedules, right, which I think you would include as external

22 reporting, but it's also the Q&A that we get from the UST,

23 from the unsecured creditors committee, it's reviewing, you

24 know, the declaration or any of my declarations, of course,

25 contributing to the review of any other's declarations or

1  briefs, you know.  Court documents, not just financials, of

2  course, because many of our documents that we file have

3  financial references to them.

4      So that's certainly a big part of it.  And then

5  managing, you know, vendor -- vendor payments, vendor

6  communications, what are we saying, what are we doing, who's

7  getting paid, making sure that we're complying.  You know,

8  for all of us, this is our first time through this dance.  I

9  know my lawyer friends have been through this a lot, but

10 there's a lot of work figuring out -- making sure does this

11 payment comply with, you know, the order the way we

12 understand it, and, you know, working with our advisers as

13 well to make sure that we're doing everything properly.

14 Q   Mr. Kroll, I appreciate that thoughtful answer.  I am

15 going to try to keep my answers to yes-or-no questions and I

16 would appreciate if you --

17 A   Okay.

18 Q   -- would respond in turn, just because we have a lot to

19 get through and I want to make it quick and not take up too,

20 too much time

21     And so, broadly speaking, was that a yes to my question

22 that since the bankruptcy filing, your focus has been on

23 supporting the bankruptcy and external reporting?

24 A   Sorry, that's why I gave you kind of the long-winded

25 answer, I think the answer is no.  I --

1  Q    Okay, I --

2  A    -- I do those things, but that's not collectively

3  exhaustive of what I do.

4  Q    Understood, understood.

5       Since the bankruptcy filing, Lordstown is no longer

6  producing vehicles; correct?

7  A    No, that's not true, to make sure I'm answering you

8  completely.  We stopped -- to be clear, we stopped producing

9  after the petition date around the end of June.  So, shortly

10 after the filing, we stopped.

11 Q    Before the bankruptcy, you had a very limited role in

12 terms of managing Lordstown's pending litigations; correct?

13 A    It depended on -- depends on what -- which case it was,

14 but, yes, generally, that's true.

15 Q    And you had little to no involvement in Lordstown's

16 pending securities litigation; right?

17 A    Correct.

18 Q    Generally speaking, your involvement has been

19 particularly limited in the securities basis; correct?

20 A    Yes.

21 Q    You don't manage the recovery reimbursement for

22 Lordstown's D&O insurance policies; correct?

23 A    Correct.

24 Q    So you have no reason to know with certainty what D&O

25 insurance policies cover a specific litigation; correct?

1  A     Correct.

2  Q     At your deposition, you had not reviewed any of

3  Lordstown's D&O insurance policies; correct?

4  A     Correct.

5  Q     Lordstown's office of general counsel is in charge of

6  managing recovery reimbursement for Lordstown's D&O insurance

7  policies; correct?

8  A     Yeah -- I mean, they would take the lead on it, yes.

9  Q     And Lordstown's office of general counsel handles

10 discussions with insurers to determine what D&O insurance

11 policies cover a particular litigation; correct?

12 A     Yes, I think that actually is -- takes up a fair amount

13 of time.

14 Q     And you believe the office of general counsel handled

15 those discussions with insurers in connection with the

16 Delaware class action; correct?

17 A     I believe that they took the lead on that, yes, along

18 with our broker, talking to our broker and lawyers.

19 Q     And now I'll get into some substance that -- some of

20 which you covered with Mr. Zakia.

21      So it's your understanding that there are $15 million of

22 D&O insurance coverage available for the Delaware class

23 action; correct?

24 A     Yes.

25 Q     And the insurance relating to the Delaware class action

1  did not deny coverage; correct?

2  A    I am not aware that they have.

3  Q    And the defense costs of the individual defendants in

4  the Delaware class action are covered by D&O insurance;

5  correct?

6  A    Thus far they have been, yes.

7  Q    And the defense costs of Lordstown are not covered by

8  the D&O insurance policy that covers the Diamond Peak

9  defendants; correct?

10  A    That is my understanding, yes.

11  Q    And you mentioned this on direct, for the Delaware class

12  action, Lordstown paid a $500,000 SIR under the D&O insurance

13  policy that applies to the Delaware class action; correct?

14  A    Correct.

15  Q    And Lordstown has received reimbursement from the D&O

16  insurance policy covering the Delaware class action for

17  around $1.5 million in additional expenses on top of the

18  $500,000 deductible; correct?

19  A    Correct.

20  Q    And so I believe in your direct you testified that the

21  total expenses for the defendants in the Delaware class

22  action up to now was around $2 million; correct?

23  A    No, no, no, no, I didn't.  What I said was is that the

24  insurance essentially has two million.  So what I said is the

25  1.5 million has already been paid, we've incurred another

1  500,000 that we believe should be covered and intend to seek

2  recovery on, and that's just the insurance.

3      So there's 1.5 paid and another 500,000 we're going to

4  seek reimbursement for, so that's the reference to the two

5  million.

6  Q    Right, and all of those $2 million were incurred by the

7  defendants in the Delaware class action; correct?

8  A    Yes, plus -- and then plus the 500,000 retention.  So if

9  you're -- sorry, it's -- let me just -- so within the 6.2

10 million, there's about 2.7 million related expressly to the

11 Delaware actions.  And then there's been another -- there is

12 -- sorry -- there's 2.7 million, I believe is the number,

13 within the 6.2 that we're out-of-pocket -- we're out-of-

14 pocket 2.7 and, if we get the other 500,000 out of that, then

15 that would go down by 500,000.

16 Q    Mr. Kroll, at your deposition, you could not tell me a

17 breakdown between the Ohio securities class action and the

18 Delaware class action in terms of what parts of the, at that

19 point, $5.76 million were allocated to each case; correct?

20 A    Correct.

21 Q    And so, since your deposition, you have now received new

22 information regarding what amount of expenses in that total

23 is allocated to each case; correct?

24 A    Correct.

25 Q    Where did that information come from?

1  A    Our office of general counsel -- or Melissa Leonard.

2  Q    And --

3  A    And I know she got them from outside counsel, which is

4  generally the way.

5  Q    And, in your declaration, the total expense figure that

6  you provided was 5.76 million; correct?

7  A    Correct.

8  Q    And the figure that you provided during your direct to

9  Mr. Zakia was 6.2 million; correct?

10  A    Correct.

11  Q    And you received the $6.2 million number from the office

12  of general counsel; correct?

13  A    Correct.

14  Q    And can you tell me what the difference between the 5.76

15  million number is and the 6.2 million number?

16  A    Yeah, we had missed two invoices from two expert

17  witnesses for about $480,000.

18  Q    And do you know what those expenses were?

19  A    I don't.  I know they were expert witnesses, that's all

20  I know.

21       MR. MCGILLIVRAY:  Your Honor, I would just like the

22  Court to know, we weren't able to cross the witness on any of

23  this information at his deposition because he was not --

24       THE COURT:  I understand, but go ahead.

25       MR. MCGILLIVRAY:  I did want to make that clear.

1   Also, it appears to be hearsay that he's relying on, but I'm

2   fine to proceed forward with the new information that he has

3   received.

4            THE COURT:  Okay.

5   BY MR. MCGILLIVRAY:

6   Q    So with the $6.2 million total expenses, you said today

7   for the first time that 2.7 million of that is allocated to

8   the Delaware class action; correct?

9   A    Correct.

10  Q    And so, you're a numbers guy, what does that make

11  allocated to the Ohio class action?

12  A    The balance, so like two point -- I guess that would be

13  two point -- or three of that --

14           THE COURT:  All right, we can do the math.

15           THE WITNESS:  Yeah.

16  BY MR. MCGILLIVRAY:

17  Q    I guess 3.5?

18  A    Yeah.  Sorry, 3.5, yeah.  Three point five and two point

19  five is --

20  Q    So 3.5 million is allocated to the Ohio securities class

21  action; correct?

22  A    Yeah.

23  Q    Of the 2.7 million, again, today, for the first time,

24  you told us that that 2.7 million includes $2 million that is

25  500,000 on the deductible, that was paid, and 1.5 million

1  that was occurred by insurance; correct?

2  A    Yes.

3  Q    And so that leaves a balance of $700,000 that the

4  company was responsible for relating to the Delaware class

5  action; correct?

6  A    No, no, sorry.  So one point -- so of the 2.7 million,

7  1.5 of it has been reimbursed, so we've incurred 1.5 -- 1.7,

8  and then -- but we're seeking another 500,000 of recovery.

9  So there's --

10  Q    And sorry, again, doing math on the fly is difficult,

11  but you have --

12        THE COURT:  But, Mr. McGillivray, is this really

13  important?

14        MR. MCGILLIVRAY:  Nailing down the numbers is

15  important because during the deposition and in their brief

16  they represent that $5.76 million basically could be

17  allocated entirely to the Delaware class action, and we're

18  finding out for the first time that it's probably --

19        THE COURT:  All right, but he said 2.7 is allocated

20  to Delaware --

21        MR. MCGILLIVRAY:  And then --

22        THE COURT:  -- do we need the detail of that?

23        MR. MCGILLIVRAY:  I just am trying to cover what is

24  covered by insurance and what is not.

25        THE COURT:  Well, then ask that question.

1       MR. MCGILLIVRAY:  Yes, Your Honor.

2  BY MR. MCGILLIVRAY:

3  Q    And so 1.5 million of the 2.7 million is covered by

4  insurance; correct?

5  A    Yes, I think that's right.

6  Q    And then there's another 500,000 that was paid as a

7  deductible that you're going to seek reimbursement for;

8  correct?

9  A    No, no, no.  The 500,000 is additional legal costs that

10 are separate from the deductible.  So the deductible we have

11 to pay, you can't get recovery for the deductible.  These are

12 -- we've received invoices for a half a million dollars of

13 legal time that we think should be recovered, we think the

14 carrier should pay.

15 Q    Understood.  So there's an additional 500,000 of the 2.7

16 million that you are going to seek reimbursement for;

17 correct?

18 A    Yeah.

19 Q    And so that leaves around 200,000 that Lordstown would

20 be responsible for; correct?

21       THE COURT:  I don't think we need to get into this

22 level of detail, okay?  I'm going to --

23       MR. MCGILLIVRAY:  Yes, Your Honor, I'm --

24       THE COURT:  -- cut this short.

25       MR. MCGILLIVRAY:  Yes, Your Honor, my apologies.

1  We'll move on from this point.  I'm trying to do some of this

2  on the fly because it wasn't -- we weren't able to do it at

3  his deposition.

4  BY MR. MCGILLIVRAY:

5  Q    So another number that you mentioned on your direct was

6  a $2 million estimate of costs that you received from Baker

7  Hostetler regarding their representation of Lordstown in

8  connection with a subpoena in the Delaware class action;

9  correct?

10 A    Correct.

11 Q    And those are costs that would not be covered by D&O

12 insurance; correct?

13 A    Correct.

14 Q    And the substantial cost for Lordstown that is not being

15 covered by insurance proceeds in connection with the Delaware

16 class action would be that $2 million estimate; correct?

17 A    Yes.

18 Q    And you mentioned this in your direct, there's around

19 200,000 documents that Lordstown produced to the SEC and DOJ

20 that plaintiffs in the Delaware class action are seeking;

21 correct?

22 A    Yes.

23 Q    And Lordstown could reproduce all of those documents

24 that have already been collected, reviewed, and produced

25 basically at the push of a button; correct?

1   A    I can't speak to what it actually takes to hand over the

2   documents, if it's a push of a button or if it's setting up

3   a, you know, data room or -- that I'm not intimately familiar

4   with.

5   Q    But it wouldn't cost anywhere near $2 million to get

6   those documents over to the plaintiffs if they were just

7   going to reproduce them without any further work; correct?

8   A    Yeah, that -- sure, but the two million, by -- but I

9   think we've talked about this, the two million doesn't just

10  reflect document reviews, right?  And that was my testimony

11  as well.

12  Q    So I think your testimony during your deposition was

13  that the two million reflected discovery costs, but did not

14  include trial costs; correct?

15  A    It doesn't include trial costs, but it does include

16  preparation of officers for depositions, it's my

17  understanding the subpoena is to make management available

18  for depositions.  I think the scope, as I even understand it,

19  has been -- there's a lot of back and forth there.  So

20  there's testimony.

21      I understand that the plaintiffs have not confirmed that

22  they don't intend to call anyone from management to the

23  trial, so that would then -- there would be trial prep over

24  and above.  So it's -- I don't have a perfect breakdown of

25  the two million, but it's not just, you know, document

1  review.

2  Q    Understood.  And you're not aware of any depositions

3  being noticed in that case for Lordstown; correct?

4  A    No -- I mean correct.

5  Q    Mr. Kroll, you're not a lawyer; correct?

6  A    Correct.

7  Q    And you didn't write your declaration submitted in

8  connection with Lordstown's motion to stay the Delaware class

9  action; correct?

10 A    Correct.

11 Q    Lordstown's counsel wrote that; correct?

12 A    Yes, of course.

13 Q    And the declaration is not something you could have

14 prepared on your own; correct?

15 A    Well, not being a lawyer, sure, I wouldn't -- I mean,

16 you know, up until recently, I wouldn't have known where to

17 even start on what a declaration says, but what -- or what's

18 needed to be said for a legal matter and to have a

19 conversation in court about what the position of the company

20 should be.  I think that's what lawyers are for.

21 Q    And you did not review the complaint that was filed in

22 the Delaware class action; correct?

23 A    At the time of my deposition, I hadn't, but since you

24 asked a great deal of questions, I scanned over it to try to

25 understand it a little bit better, but, you know -- I mean, I

1  can't cite it chapter and verse, certainly not.

2  Q    And you hadn't reviewed it at the time of submitting

3  your declaration; correct?

4  A    Correct.

5  Q    And you have not reviewed any of the other filings in

6  the Delaware class action; correct?

7  A    Correct.

8  Q    And you have not reviewed the Ohio securities class

9  action, correct, complaint?

10  A    Again, since you asked a lot of questions about it in

11  our seven hours, I have since gone back and scanned it.  I've

12  scanned all of the cases, so that I tried to understand them

13  a little better.

14  Q    At the time of your declaration, you did not do a claim-

15  by-claim comparison of the Delaware class action and the Ohio

16  securities class action; correct?

17  A    Correct.

18  Q    And you're aware that David Hamamoto is the only

19  defendant that overlaps between the Delaware class action and

20  the Ohio securities action; correct?

21  A    Yes, sir.

22  Q    And Mr. Hamamoto is Lordstown's lead independent

23  director; correct?

24  A    Correct.

25  Q    And that means Mr. Hamamoto does not otherwise have a

1  position at Lordstown; correct?

2  A    Correct.

3  Q    You have not reviewed any of the derivative complaints

4  that have been filed by shareholders; correct?

5  A    Correct.

6  Q    And when you stated in your declaration that claims in

7  the Delaware class action implicate claims in the other

8  stockholder actions, that is your personal belief and not a

9  legal conclusion; correct?

10 A    Certainly.  I don't view myself as capable of making a

11 legal conclusion.

12 Q    And that statement is based on your general, non-lawyer

13 understanding of the cases; correct?

14 A    Yes.

15 Q    When you submitted your declaration, you were not aware

16 of the Court of Chancery's March 7th, 2022 opinion in the

17 Delaware class action denying the defendants' motion to stay

18 the Delaware class action in favor of the Ohio securities

19 class action; right?

20 A    Correct.

21 Q    And you did not review that opinion before submitting

22 your declaration; correct?

23          MR. ZAKIA:  Your Honor, sorry, if I could.  I tried

24 to be quiet, but at this point I'm going to object.  This is

25 well outside the scope of his direct testimony, which is the

1 testimony he gave today.

2         THE COURT:  And I'm struggling to see why it's

3 relevant to the motion to stay.

4         MR. MCGILLIVRAY:  Your Honor, the statements in the

5 declaration Mr. Kroll submitted, frankly, are largely

6 attorney-made statements saying the claims in this case

7 implicate claims in this case, and we have a witness, one,

8 who is not a lawyer; two, who had not --

9         THE COURT:  All right, that -- all right, you're

10 getting to argument, but really --

11         MR. MCGILLIVRAY:  I mean, one of the elements of

12 the argument and what they argue in their briefs is the

13 similarity between the cases, the risk that rulings in our

14 case will implicate claims in their case when the Delaware

15 Court of Chancery has already held that that's --

16         THE COURT:  All right --

17         MR. MCGILLIVRAY:  -- not a real --

18         THE COURT:  -- all right, try and sharpen your

19 questions then to make them exactly relevant.  You don't have

20 to --

21         MR. ZAKIA:  And, Your Honor, if I could be --

22         THE COURT:  -- ask three questions to get one point

23 across.

24         MR. ZAKIA:  If I could be helpful, Your Honor,

25 we're not offering this witness or his testimony in support

1 of the point about overlap between the cases, if that's

2 helpful.

3          THE COURT:  All right.  Have you even offered his

4 declaration into evidence or do you intend to?

5          MR. ZAKIA:  We do not, Your Honor.  We tried to do

6 the direct to avoid this, to kind of --

7          THE COURT:  Okay.

8          MR. ZAKIA:  -- avoid this whole issue.

9          THE COURT:  All right, then focus on what the

10 direct was.

11          MR. MCGILLIVRAY:  Yes, Your Honor, and I only have

12 a couple more points.

13 BY MR. MCGILLIVRAY:

14 Q    Mr. Kroll, at your deposition, you were aware of

15 settlement discussions regarding the Ohio securities class

16 action; correct?

17 A    Yes.  Yeah, my lawyers have kind of advised me of the

18 status.

19 Q    And you're aware that those settlement discussions were

20 more advanced; correct?

21 A    I said I -- I said I believe they are fairly advanced,

22 but I'm not entirely sure.

23 Q    And you also were aware that those settlements would

24 incorporate insurance; correct?

25          MR. ZAKIA:  Your Honor, at this point I'm going to

 1 | object to the substance of any settlement discussions, which
 2 | are not admissible.
 3 |         THE COURT:  Well, the question was it would
 4 | implicate the insurance?
 5 |         MR. MCGILLIVRAY:  It would include or incorporate
 6 | insurance.
 7 |         THE COURT:  I'll allow him to answer.
 8 |         THE WITNESS:  Just to clarify, could you repeat
 9 | your question.
10 | BY MR. MCGILLIVRAY:
11 | Q    Sure.  In the settlement that we heard discussions about
12 | would include insurance proceeds; correct?
13 | A    That is my understanding.
14 | Q    And at the time of your deposition you weren't aware
15 | that the plaintiffs in the Delaware class action had made a
16 | settlement demand to the defendants; correct?
17 | A    Correct.
18 | Q    And you weren't aware that Lordstown had not responded
19 | to that settlement demand; correct?
20 | A    Correct.
21 |         MR. MCGILLIVRAY:  No further questions, Your Honor.
22 |         THE COURT:  Any redirect, Mr. Zakia?
23 |         MR. ZAKIA:  Yeah, just very briefly, Your Honor.
24 |                     REDIRECT EXAMINATION
25 | BY MR. ZAKIA:

1  Q    Mr. Kroll, at the beginning of his cross-examination,
2  Counsel asked you about your role with regard to dealing with
3  insurers.
4       Do you recall that testimony?
5  A    Yes.
6  Q    And I think you said that, primarily, the Office of
7  General Counsel dealt Lordstown's insurers?
8  A    Yes.
9  Q    Okay.  Notwithstanding the fact that it's not your
10 primary responsibility, are you sure that the only insurance
11 policies that are providing coverage for the Delaware action
12 are the two policies and the $15 million you testified about
13 today?
14 A    That's what I'm aware of, yeah.
15            MR. ZAKIA:  No further questions, Your Honor.
16            THE WITNESS:  But those policies can cover other
17 cases, as well.
18            MR. ZAKIA:  Thank you.  No further questions, Your
19 Honor.
20            THE COURT:  Any recross?
21            MR. MCGILLIVRAY:  Just one question, Your Honor.
22                      RECROSS-EXAMINATION
23 BY MR. MCGILLIVRAY:
24 Q    Mr. Kroll, on direct, we talked about the numbers that
25 were being covered by -- in the Delaware class action and

1  based on your math, around $13 million would be remaining

2  under the D&O insurance covering the Delaware class action,

3  correct?

4  A      Correct.

5         And others that -- because they're the same defendants,

6  because, like I said, when I scanned the documents, I

7  understand that the defendants are also in the other cases

8  and the insurance did cover claims or damages in those cases,

9  as well.

10 Q     And one follow-up.

11        You mentioned on your direct that the lawyers told you

12 that we need to do a privilege review of the documents that

13 were produced to the SEC.  Were those documents produced

14 without a privilege review the first time around?

15              MR. ZAKIA:  Objection, Your Honor, to the extent

16 it's calling for attorney-client communications.

17              THE COURT:  I'm going to overrule that.

18              Can you answer?

19              THE WITNESS:  I don't know the answer.  I don't

20 know what they did the first time around.

21              MR. MCGILLIVRAY:  No further questions, Your

22 Honor.

23              THE COURT:  All right.

24              MR. ZAKIA:  Nothing from me, Your Honor.  Thank

25 you.

1          THE COURT:  Mr. Kroll, you may be excused.

2          THE WITNESS:  Thank you.

3      (Witness excused)

4          MR. ZAKIA:  Your Honor, that concludes the

5  debtors' evidentiary presentation, so at this point, the

6  debtors rest.

7          THE COURT:  All right.  Do the respondents wish to

8  present their witness?

9          MR. ADAMS:  Yes, Your Honor.  Good afternoon, Sam

10  Adams of Pomerantz LLP, counsel for defendants in the

11  adversary action, with Mr. Ameen (phonetic) and Mr. Herbert.

12          We previously submitted to the Court two

13  declarations on behalf of Ms. Sangwan:  the declaration of

14  Ankita Sangwan, as well as the supplemental declaration of

15  Ankita Sangwan.  We would move to admit both of those

16  declarations into evidence.

17          It's my understanding that all parties have

18  consented and in lieu of any direct testimony, we're prepared

19  to stand on the declarations of Ms. Sangwan.

20          THE COURT:  All right.

21          MR. ZAKIA:  No objection, Your Honor.

22          THE COURT:  All right.  They are admitted.

23      (Sangwan Declaration received in evidence)

24      (Sangwan Supplemental Declaration received in evidence)

25          MR. ZAKIA:  I did have a few questions, Your

 1  Honor.

 2          THE COURT:  All right.  Ms. Sangwan, I'm going to

 3  ask you to be sworn in by the clerk, then.

 4          THE CLERK:  Please raise your right hand.

 5          Please state your full name and spell your last

 6  name for the court record, please.

 7          THE WITNESS:  Ankita Sangwan.

 8          THE COURT:  All right.

 9       ANKITA SANGWAN, DEFENDANTS' WITNESS, AFFIRMED

10          THE WITNESS:  I do.

11          THE CLERK:  Your Honor?

12          THE COURT:  All right.  Could you spell your name

13  for the record.

14          THE WITNESS:  Sure.  A-n-k-i-t-a  S-a-n-g-w-a-n.

15          THE COURT:  All right.  Thank you.

16          Just for the record, are the statements made in

17  your two declarations that are being admitted true and

18  correct and do you have anything further to clarify any of

19  those statements in the record?

20          THE WITNESS:  They're true and correct to the best

21  of my knowledge, Your Honor.

22          THE COURT:  Okay.  Thank you.

23          You may proceed with direct, then -- excuse me --

24  with cross, Mr. Zakia.

25          MR. ZAKIA:  Thank you, Your Honor.

1                          CROSS-EXAMINATION

2   BY MR. ZAKIA:

3   Q     Ms. Sangwan, good afternoon.

4         Am I pronouncing your name correctly?

5   A     That's correct.

6         Good afternoon.

7   Q     Okay.  Thank you.

8         My name is Jason Zakia.  I'm one of the lawyers for

9   Lordstown.  I'm going to ask you a very few couple of

10  questions if that would be okay.

11        In your declaration, you make reference to a subpoena,

12  a third-party subpoena that's been served in the Delaware

13  action on the debtors; is that correct?

14  A     Yes.

15  Q     And just so that we're clear, you're one of the lawyers

16  representing the plaintiffs in the Delaware action who are

17  the defendants here, right?

18  A     Yes.

19  Q     And are you familiar with the subpoena that you refer

20  to in your declaration?

21  A     Yes.

22  Q     And am I correct that that subpoena is defendants'

23  Exhibit D that was offered into evidence can earlier in this

24  hearing?

25  A     Yes.

1    Q      Now, Ms. Sangwan, I'm going to ask you some general

2    questions.  If at any point, you would like to see that

3    exhibit, I'm happy to have it put up on the screen, but we'll

4    see if your memory may be sufficient so that that's not

5    necessary, but jest tell me if it is.

6          Am I correct that that subpoena directs 45 separate

7    requests for production of documents to the debtors?

8    A      That is correct, but I believe after the Chancery Court

9    order that was passed in June, now we are working with the

10   defendants.  We have to negotiate a third protocol --

11   Q      Okay.

12   A      -- so I'm not sure if all those requests are pertinent

13   and relevant.

14   Q      Do you have an understanding to how many of the

15   requests remain pertinent and relevant, following the

16   Chancery Court's ruling?

17   A      I haven't done an analysis, because we are still

18   negotiating -- we are still discussing a third protocol with

19   Lordstown's counsel, so I haven't done an analysis of exactly

20   how many requests.

21   Q      And I think you indicate that, in your declaration,

22   that the document production has not yet occurred, correct?

23   A      Yes, we have not received any documents until now.

24   Q      And so, I'm assuming it's safe that you don't know how

25   many documents will be produced in response to the subpoena?

1  A     We don't know, but we do believe that it will be part

2  of the documents that were already produced to the SEC and

3  the DOJ, so it will be less than whatever they produced to

4  them.

5  Q     Do you know what the volume of their productions to the

6  government was?

7  A     I think they produced around 200,000 documents, so I

8  believe it's around 900,000 pages' worth of documents --

9  Q     Okay.

10 A     -- approximately.

11 Q     I'm sorry, I didn't mean to cut you off.

12        Now, am I correct that the subpoena also includes a

13 request for a corporate representative deposition from the

14 debtors?

15 A     I believe that we will be -- I believe that we have to

16 look at the documents first.  We're not yet sure if we are

17 going to go into depositions, how many people we will be

18 deposing.  The list, I'm not yet sure about that, because we

19 haven't seen the documents.  I believe we haven't yet noticed

20 a 30(b)(6).  I think, on the Chancery rules it's required,

21 but I'm not --

22 Q     Okay.  I'm sorry, I didn't mean to cut you off, ma'am.

23        Please finish.

24 A     No, I'm just saying, I'm not yet sure if we have -- I

25 don't think -- we have definitely not noticed a deposition

1  notice, a separate deposition notice, but I'm not yet sure of

2  how many or if any.

3  Q    Okay.  If you could please --

4        MR. ZAKIA:  If I could ask my colleague -- Your

5  Honor, we may need to share the screen -- to put defendants'

6  Exhibit D up on the screen.

7        THE COURT:  All right.

8        MR. ZAKIA:  Thank you very much.

9  BY MR. ZAKIA:

10  Q    Ms. Sangwan, is this the -- sorry, if we could -- thank

11  you.

12        Ms. Sangwan, this is your declaration up here?

13  A    Yes.

14  Q    Okay.

15        MR. ZAKIA:  If we could go, please, to

16  Exhibit D -- defendants' Exhibit D, which is the subpoena.

17  BY MR. ZAKIA:

18  Q    Is this the subpoena that we were talking about that

19  was served on the debtors in the underlying Chancery Court

20  action?

21  A    Yes.

22  Q    Okay.  If we could please turn to page 34 of 93, if we

23  look at the top numbers, the court-filing numbers from this

24  docket.

25        Ms. Sangwan, is this -- this page 34 of 93 of the

1  subpoena includes a list of deposition topics; is that

2  correct?

3  A    It does --

4  Q    Okay.

5  A    -- but, again, because of the fact that it requires us

6  to look at requests and, you know, because of the Chancery

7  Court order and the third protocol that's being developed,

8  I'm not sure if the request will remain the same.  I assume

9  that a separate deposition notice will cover the requests

10  more in detail --

11  Q    Okay.

12  A    -- but I'm not sure about that.

13  Q    Sorry.

14       If I understand your testimony correctly, these are the

15  deposition topics that were included with the notice, but

16  you're not sure if those may or may not change in the future?

17  A    Only because these requests are not the same.  They'll

18  be less than that though, for sure, because some of these

19  requests are not relevant anymore because of the Chancery

20  Court order.

21  Q    Okay.

22  A    For example, one of the -- so, these requests may be

23  (indiscernible) down further.

24  Q    Okay.  As stated in the original request, one of the

25  requests was all -- a witness could testify with regard to

1  all of the matters covered by the documents produced in

2  response to the subpoena, right?

3  A     I'm sorry, I didn't get that question.  Could you

4  please repeat it?

5  Q     Yes, ma'am.

6        If we look at deposition topic one, any information

7  contained in the discovery materials --

8  A     Yes.

9  Q     -- produced in response to the requests set forth in

10 Exhibit A, that, at least as submitted at the time, would

11 mean a witness could testify as to all the matters covered in

12 the documents produced in response to your 45 requests,

13 right?

14 A     I would assume so.

15 Q     Okay.  And at this point, there's no way to know how

16 many witnesses would be necessary to meet the deposition

17 requests that the plaintiffs intend to make up the debtors in

18 the Delaware action, right?

19 A     Yes, I don't know at this time.

20 Q     And is it the case that the plaintiffs in the

21 underlying action will not seek any further discovery from

22 the debtors in the Delaware case, other than what's covered

23 by this subpoena, do you know?

24 A     I don't think so.  I think it's only the subpoena and a

25 deposition based on the subpoena.

1   Q      Now, you're aware that -- well, do you know whether the

2   defendants -- sorry -- the plaintiffs in the underlying

3   Delaware action, your clients, will seek discovery or seek to

4   take depositions of any former Lordstown directors that are

5   not defendants in the underlying Delaware case?

6   A      I'm not sure at this point.

7   Q      So, like, for example, do you know who Steve Burns is?

8   A      I do know who Steve Burns is.

9   Q      Mr. Burns is a former Lordstown director that was not

10  Diamond Peak director.

11  A      I do know, I said.  Sorry.

12  Q      Okay.  And he is not a Defendant in your case, right?

13  A      He is not.

14  Q      But he was involved in making certain of the statements

15  that underpin the complaint that you filed in the Delaware

16  case, right?

17  A      I'm not sure.  I think most of the statements were made

18  by the director -- the defendants, the director defendants

19  from Diamond Peak and Diamond Peak itself.

20  Q      So, have the plaintiffs made a determination as to

21  whether they intend to seek discovery or depositions from any

22  of the former Lordstown, legacy Lordstown directors?

23  A      I'm not sure at this time.

24  Q      So that may or may not happen?

25  A      We have to review documents that Lordstown provides.

1  We cannot make any statement without seeing those documents.

2  Q     Okay.

3  A     Or, at least, I cannot make those statements without.

4  Q     Okay.  Am I correct that -- well, have the plaintiffs

5  set forth the amount of damages they seek in connection with

6  the Delaware action?

7          MR. ADAMS:  And, Your Honor, if I can just jump in

8  here quickly?  I've tried to be quiet, but this question

9  about damages, now, we're very far afield of Ms. Sangwan's

10  deposition -- of her declaration and in the topics of her

11  declaration.  We're getting into legal conclusion and I

12  really feel that this is outside the scope of her

13  declaration.

14          THE COURT:  Why is it relevant, Mr. Zakia?

15          MR. ZAKIA:  Well, I just want to see if we can

16  determine whether the plaintiffs are seeking an amount that

17  would exceed the available insurance coverage, Your Honor,

18  since the defendants here have argued that there is no risk

19  to the company because there's $13 million of insurance.

20          THE COURT:  I'll allow you to ask that question.

21  BY MR. ZAKIA:

22  Q    Ms. Sangwan, am I correct the amount of damages sought

23  by the plaintiffs will exceed $13 million?

24  A     I don't know, because we haven't -- to my knowledge, we

25  haven't engaged a damages expert.  I'm not sure of that.  I

1   don't know what the total damages will be, so I can't give a

2   (indiscernible) answer to that question.

3           MR. ZAKIA:  Thank you, Your Honor.

4           I have no further questions.

5           THE COURT:  Any recross?

6           MR. ADAMS:  Yes, Your Honor, and I'll be very

7   brief.

8                    REDIRECT EXAMINATION

9   BY MR. ADAMS:

10  Q    Ms. Sangwan, you were asked a moment about -- about the

11  third-party subpoena served by your clients on Lordstown; do

12  you recall that?

13  A    Yes.

14  Q    And I believe there was also some discussion about the

15  200,000 documents, roughly, that the company has already

16  produced the SEC; do you recall that?

17  A    Yes.

18  Q    And is it your understanding that Lordstown could

19  simply reproduce the SEC production to your clients to

20  substantially comply with their obligations to produce

21  documents under your subpoena?

22  A    To my understanding, yes.  I think Mr. Kroll or

23  somebody has mentioned that -- or at least the

24  (indiscernible) with Lordstown's counsel, they don't want to

25  redo those documents.  We don't believe that's necessary

1  because we believe that, then, they would have produced it to

2  the authorities.  They would have been reviewed for privilege

3  and other (indiscernible) already, and so I don't think they

4  would require a re-review.  I think, again, this would

5  substantially bring down the costs if they can reproduce

6  those documents, since they've already been reviewed, we

7  would assume.

8  Q     And have you reviewed a copy of the subpoena that the

9  SEC served on Lordstown?

10 A     Yes, I have.

11 Q     And just to reiterate, to date, there have been

12 no 30(b)(6) depositions scheduled of Lordstown; is that

13 correct?

14 A     Nothing has been scheduled for now.  There has been no

15 notice for Lordstown.

16           MR. ADAMS:  I have no further questions, Your

17 Honor.

18           THE COURT:  Any further recross --

19           MR. ZAKIA:  Nothing from me.

20           THE COURT:  All right.

21           MR. ZAKIA:  Sorry, Your Honor.

22           THE COURT:  Thank you, Ms. Sangwan.  You may be

23 excused.

24           THE WITNESS:  Thank you, Your Honor.

25       (Witness excused)

1             THE COURT:  I'll hear argument.

2             Let me close the record.  I assume that's all the

3   evidence that's being presented?

4        (No verbal response)

5             THE COURT:  Okay.  I'll close the record and I'll

6   hear argument.

7             MR. ZAKIA:  Thank you, Your Honor.

8             Jason Zakia for the debtors.  Your Honor, last

9   week, I think you framed -- well, I may not have agreed with

10  Your Honor's ruling, I thought you framed the question

11  exactly correctly and I think that is applicable to the

12  matter before the Court today.  And what Your Honor said, I

13  think, quoting with your colleagues in Delaware, is that this

14  is really a common sense decision that the Court must make to

15  determine what is the sensible course forward.

16            And so what I'd like to do is review the facts

17  that speak to whether or not Your Honor should extend the

18  automatic stay to the Delaware action and give the debtors a

19  little bit of breathing room with regard to this piece of

20  litigation.

21            And as promised, Your Honor, this case does not

22  involve intellectual property or ownership of any debtor

23  assets.  So, what does the uncontested factual record tell us

24  concerning the relative harms to be suffered with respect to

25  the debtors versus the plaintiffs, as a result of what Your

1  Honor does here today?

2         Well, first, it is undisputed that the defendants

3  in the underlying action all have rights of indemnification

4  against the debtors.  It is further the case, and it is not

5  disputed, that the plaintiffs have asserted claims, which

6  include claims for breach of fiduciary of care, which could

7  lead to an indemnifiable claim.  One of the things that we

8  saw in the papers is the argument that if bad faith is found,

9  that could preclude an indemnification claim, and that is

10  true under Delaware law.

11         But the complaint, which is defendants -- or

12  sorry, Debtor Exhibit E, which was filed by these defendants

13  in the Delaware case, is clear -- and that's at paragraph 163

14  of Debtor Exhibit E -- you will see that among the claims

15  being asserted, it does include a breach of duty of care.

16  And so if a judgment were to be secured against the

17  defendants in the underlying action, it could trigger an

18  indemnity right against the debtors.

19         Second, it is undisputed that until a judgment is

20  entered, the indemnification rights, to the extent not

21  covered by insurance, could also give the defendants claims

22  against the debtors.

23         Now, it is also true that there is insurance

24  coverage that is covering the defendants in this action.  We

25  do not know, between now and the completion of the case, how

1   much of those expenditures, one, we can't be sure that

2   insurance will cover all of the expenses that's not giving

3   rise to a claim, although, we do acknowledge they, after the

4   satisfaction of the deductible, they have been covering most

5   of them; and, two, we can't be sure that the total costs

6   under the policy will not exceed the limit, although, I will

7   acknowledge with $13 million left, we are, at least, at some

8   period in the future before those costs would not be covered.

9          But we heard from counsel today that they haven't

10  determined the amount of the damages.  But whatever is left

11  at the end of a trial, will be substantially diminished from

12  the $13 million and there is certainly a substantial risk

13  that the damages being sought will be substantially more than

14  the available insurance.  So it creates the opportunity for

15  the defendant, should a judgment be entered against them, to

16  have a very large claim against the debtors.  So that's

17  another factor.

18         In addition to the indemnity, we have pointed out

19  that the -- while the legal claims are different -- this is a

20  breach of fiduciary duty claim under Delaware law, and that

21  is different than certain of the other, specifically the Ohio

22  Securities class action case, in which the debtor is a

23  party -- but it's not the legal claims that are important,

24  Your Honor.  It is the factual underpinnings that give rise

25  to the causes of action.

1       Because when we talk about evidentiary prejudice

2  or the risk of collateral *estoppel* or the risk of *res*

3  *judicata*, the question is:  Is the adjudication of this

4  lawsuit going to be determining issues that could prejudice

5  the debtors in other cases?

6       And it is undisputed, and we cite, Your Honor, in

7  the breach, overlap between the various complaints.  So, for

8  example, Your Honor, if the Delaware class action complaint,

9  which is Debtors' Exhibit E, they make multiple allegations

10 concerning Lordstown's proxy statements and the alleged

11 overstatement of production capabilities.  That's in

12 paragraph 12 of these plaintiffs' complaints.  It's also in

13 paragraph 186 and 410 of the Ohio Securities action, which is

14 Exhibit D.  It's in paragraph 57 of the Delaware Chancery

15 derivative action, which is Exhibit C.  It is in

16 paragraph 103 of the Delaware federal derivative action,

17 which is Exhibit B.  And it is in paragraph 52 of the Ohio

18 derivative action, which is Exhibit A.

19      There are also allegations concerning

20 overstatement or alleged overstatement of demand in the form

21 of preorders, and to the extent those preorders are alleged

22 to have been unreliable or unlikely to be converted to actual

23 sales, those allegations can be found in these plaintiffs'

24 complaints at paragraphs 12, 88, and 70.  And very similar

25 factual allegations can be found in the Ohio Securities

1 action at paragraph 278 and paragraph 5, in the Delaware

2 Chancery derivative action at paragraph 64, and the Delaware

3 State Court derivative action, which is Exhibit B, and in the

4 Northern District of Ohio federal derivative action, which is

5 Exhibit A.

6 　　　　　So, we cited in the briefs, Your Honor -- I'm not

7 going to make you suffer through all the factual overlap --

8 but all of these cases turn on alleged false statements made

9 by debtor representatives in connection with the merger.  And

10 that same factual threat runs throughout all of these cases,

11 which includes the Ohio class action, in which the debtors

12 are defendants, along with Mr. Hamamoto (phonetic), who is a

13 defendant in both, the Delaware derivative action, in which

14 we're here about today, and a co-defendant, along with the

15 debtors in the Ohio action.

16 　　　　　And the allegations also run through all of the

17 derivative claims, which are property of the estate.  And so,

18 there is a substantial risk, separate and apart, from

19 indemnification, there's a substantial risk that the

20 adjudication of these claims that are at issue in this case

21 could have an impact on other litigations to try them against

22 the debtor or which belong to the debtor.  And one of the

23 purposes of the automatic stay is to prevent that sort

24 prejudice and that is exactly the type of prejudice which

25 courts have used as a basis to extend the stay.

1        Three, it is also uncontroverted that the debtors

2    are incurring administrative expense in connection with

3    meeting discovery obligations that are personal to them, not

4    related to the indemnity that runs to the D&O defendants, but

5    which are directed at the debtors and to which the debtors,

6    if they actually proceed, will be required to respond.

7        Now, yes, counsel makes the point, they don't

8    need -- defense counsel doesn't need to look at the

9    documents.  If Your Honor looks at the vice chancellor's

10   decision, which has been submitted by the defendants as

11   Exhibit E -- it's the transcript of that argument -- the vice

12   chancellor clearly ruled that the defendants need not simply

13   turn over all the documents that were produced to the SEC and

14   the DOJ.

15       And the vice chancellor ruled that way because she

16   correctly understood that it is -- yeah, it's cheaper if you

17   don't look at the documents.  It probably would also be

18   cheaper if you sent a witness into a deposition unprepared or

19   without a lawyer or if you let the plaintiffs' lawyers just

20   come to your office and take what you want.  But that's not

21   the way litigation works.

22       And so, even though the debtors are interested in

23   preserving costs, they should not be forced to sacrifice the

24   best interests of their estates by producing irrelevant,

25   highly sensitive documents that are not directed.  And the

1  vice chancellor specifically ruled that there need not be a

2  turnover.

3          If the plaintiffs or the defendants in this action

4  or the plaintiffs in the underlying action have an issue with

5  the way discovery is being conducted by the debtors in the

6  underlying action, obviously, the vice chancellor has

7  jurisdiction over that case and they can go to her for

8  relief.  But to assert that the legitimate harm that the

9  debtors are trying to avoid of incurring substantial legal

10 fees in accordance with meeting their discovery obligations

11 can somehow be dismissed by just giving the plaintiffs free

12 ride over all of their documents, I think misses the mark.

13         And then, finally, Your Honor, in addition to the

14 costs, in addition to the risk of indemnification, in

15 addition to the evidentiary prejudice, there is an issue of

16 distraction of management and the focus that would be

17 necessary to address this litigation at the expense of a

18 number of other bankruptcy- and restructuring-related tasks,

19 which the debtors and their senior management are dealing

20 with right now, including the sale, and including all of the

21 things that a new debtor must deal with.  This, again, has

22 been widely recognized as a legitimate basis and a harm,

23 which the Court should consider when deciding whether to

24 extend the automatic stay.

25         Let's take a second and look at the flipside of

1  the coin.  What is the harm to be suffered by the defendants

2  here or the plaintiffs below -- I'm sorry, I keep saying

3  "below" -- it's not a lower court; it's just a different

4  court -- the plaintiffs in state court action, should the

5  Court grant us the relief that we seek.  All we're seeking,

6  Your Honor, is an order extending the automatic stay to pause

7  that action for the pendency of the bankruptcy case.

8          As you heard from everybody, and I'm sure Your

9  Honor agrees, this case needs to move quickly.  This is not a

10  case that is going to stay in bankruptcy or could stay in

11  bankruptcy for years.  We're talking about a limited number

12  of months in which these debtors are going to try and find a

13  value-maximizing solution that may include trying to find a

14  global resolution to the Securities litigations.

15          Like Mr. Lauria said with the sale, we can't

16  promise Your Honor that we will be successful, but we would

17  like the opportunity to try.  If we are successful, any

18  success will mean we came to a resolution that was approved

19  by this Court.

20          If we can't find a successful resolution, the

21  plaintiffs' claims will still be there in three or four or

22  five months when the bankruptcy process is completed and they

23  will have suffered a relatively short, temporary delay.

24          But we're not seeking any order that does anything

25  to impair, impinge, or take away their claims.  So we have a

1   litany of harms that the debtors may suffer balanced against

2   a relatively short delay to see if we could use the breathing

3   space, which is the purpose of the Bankruptcy Code, in order

4   to allow us to find a workable, global solution that's in the

5   best interests of these estates.

6           So, I think the relief that we're seeking is

7   limited, particularly, given the nature of these Chapter 11

8   cases, and the fact that this is not the type of case that's

9   going to last forever.  So we're seeking a relatively short

10  pause of litigation.

11          Now, Your Honor, I tried to focus on the factual

12  issues and how that fits into Your Honor's deliberations.  If

13  we look at all of those facts, they run throughout the legal

14  standard.  So we believe we've established an identity of

15  interests between the debtors, both as a basis of the

16  evidentiary prejudice and on the basis of the indemnification

17  risks, as well as establishing the 105 factors.

18          We are very early in the Chapter 11 case.  We are

19  just undergoing our sale process, so at this point, we

20  believe that we have met the Court's standards:  the

21  relatively low threshold the courts have set for a likelihood

22  of success on the reorganization, and then the other factors

23  that the courts consider go to the balancing of the competing

24  harms, which we believe we also satisfy with the reasons that

25  I explained.

1        So, with that, Your Honor, I'm happy to stop

2    talking and answer any questions that Your Honor may have for

3    me.

4        THE COURT:  I have no questions.

5        MR. ZAKIA:  Thank you.

6        THE COURT:  I'll hear from counsel for the

7    plaintiffs in the Delaware action.

8        MR. JAFFE:  Good afternoon, Your Honor.

9        Am I coming through loud and clear?

10        THE COURT:  You are.

11        MR. JAFFE:  Your Honor, this is Henry Jaffe from

12    Pashman Stein.  Your Honor, I am here today on behalf of the

13    plaintiff in the Delaware class action suit and I'm here to

14    oppose the preliminary injunction.

15        Your Honor, I want to start out by talking a

16    little bit about the nature of this action and what it

17    involves and then I'll branch out to discuss why there are no

18    unusual circumstances here for the Court to extend the stay,

19    nor is there reason for the Court -- extraordinary

20    circumstances for the Court to issue an extended stay

21    under 105.

22        Your Honor, the crux of this matter, the complaint

23    here talks about breach of fiduciary duty claims that arise

24    as a result of the unique nature of what they call an "SPAC

25    merger," which is special purpose acquisition company.

1          Here, Your Honor, the uniqueness of that action

2    creates a situation where there's an SPAC sponsor that

3    acquires its interests for a relatively (indiscernible)

4    amount, $25,000 or so in many cases -- and that was the case

5    here -- but have the opportunity when that SPAC merger is

6    (indiscernible) to have an enormous share in the reorganized

7    entity worth the amount of its original contribution.  So,

8    there's the incentive here for massive profits.

9          And what happened here, Your Honor, is there's

10   allegations and complaint of breach of fiduciary duty in that

11   with this incentive structure, representations were made to

12   shareholders that they relied on not to redeem their shares,

13   which they're entitled to do in an SPAC, but, instead,

14   receive merger consideration.  Here, the proxy that was put

15   out was allegedly misleading and false and had statements

16   regarding an inability of the debtor to be able -- false

17   statements regarding the ability of the debtor to

18   manufacturer products on time and also promises of orders.

19          Your Honor, it's very important to note, here, a

20   few critical things.  First of all, as you know, the debtors

21   are not defendants in this action.  This is not a derivative

22   action.  This action will not be directly binding on the

23   debtors in terms of collateral *estoppel*, number one.

24          Number two, Your Honor, not all of the defendants

25   are direct -- pardon me -- Diamond Peak directors,

1  predecessor to any directors.  All but one of them no longer

2  have any involvement in the debtor.  This is the classic case

3  against directors of a nondebtor.

4          Finally, Your Honor, we're not seeking any relief

5  against the debtors.

6          And lastly, Your Honor, the one defendant, there

7  is one crossover defendant between these two pieces of

8  litigation, and that crossover defendant is Mr. Hamamoto, who

9  is a director.  He is not an officer who would be distracted.

10 He is not an officer involved in the day-to-day

11 responsibilities for the company.

12         Quite literally, Your Honor, this action is not

13 subject to the automatic stay and the standards are not met

14 here for the Court to extend the stay.

15         But I want to talk about something that happened,

16 Your Honor, that was not in our initial papers, but in

17 preparing for this hearing, we identified that last year, the

18 Court of Chancery had an opportunity to hear almost exactly

19 the same arguments in connection with a motion by the

20 defendants in the Chancery action, to stay that action in

21 favor of the Ohio action.

22         And, Your Honor, the Court refused to do that and

23 it refused to do that for many of the same reasons why this

24 Court should not.  First, in addition to the fact that

25 there's almost a complete difference in defendants here, the

1  plaintiffs aren't the same.  There's mass amounts of

2  plaintiffs here related to the Securities action.  Your

3  Honor, the Securities action is a disclosure action; it deals

4  with disclosures that were made and it covers a much longer

5  time period concerning the purchase and sale of stock.

6        Our actions are redemption actions.  It's about

7  the narrow issue of what statements were made in connection

8  with the proxy and whether those statements were false and

9  misleading and whether, in reliance on that, the shareholders

10 didn't redeem their shares.  The other guilty people who

11 purchased and sold stock over much longer, broader periods of

12 time, number one.

13       Number two, and, Your Honor, this is absolutely

14 critical, the two actions the Court of Chancery found are

15 fundamentally different.  Although the Court noted that they

16 have facts in common, the issues are distinct.  The issues in

17 the Chancery action deal with narrow issues of breach of duty

18 of loyalty claims as to whether or not there was a duty of

19 loyalty owed, whether that duty was satisfied, and whether or

20 not if that duty wasn't satisfied in an interested-director

21 transaction, the burden shifts and becomes an issue of

22 (indiscernible).  Those are the issues in the redemption

23 action in the Court of Chancery.

24       And the other action, those are disclosure

25 actions.  The findings are not the same.  In our action, the

1  remedies are different than in the other action and the Court

2  of Chancery found that, too.  In addition, in terms of the

3  elements of the actions, they're very different.  In our

4  action, a duty of loyalty could be found as breached without

5  finding scienter.  In the Securities actions, scienter

6  absolutely must be found.

7          In terms of the remedies, the Court found the

8  remedies were entirely different.  The difference in recovery

9  in the Ohio action is the inflated prices paid by

10  shareholders for shares, as compared to their actual value.

11  The remedy in the Delaware action seeks to recover the

12  difference between the redemption price that would have been

13  offered and the merger consideration that was paid.  Very

14  important, Your Honor.

15          The Court found that the Delaware Chancery action,

16  it dealt with Delaware concerns -- and this is huge -- was

17  not a rebranding of Securities claims about material

18  misrepresentations, merely of fiduciary duty claims.  They're

19  very different.

20          Finally, Your Honor, the Court said that it had a

21  substantial interest in addressing the issues in the Delaware

22  action.  Another issue that wasn't mentioned by the Court of

23  Chancery, because it was a while ago, but is relevant here,

24  Your Honor, is that this action is much farther along than

25  the other action.  This action is almost through discovery

1  and a trial is scheduled for next year.  Nothing is emergent

2  or imminent in the sense of a decision, but we're far along.

3  The idea that this would be stayed while that matter, which

4  is still at the motion to dismiss stage, can just simply stay

5  in abeyance, is not fair or reasonable.

6        Your Honor, there are a number of issues that were

7  raised here in terms of whether the stay should be extended

8  and I think the testimony today of Mr. Kroll was very

9  helpful, because one of the issues here is that the debtor

10  has claimed that this Chancery action will somehow interfere

11  with their restructuring efforts.  But let me respond to

12  that.

13        Again, the defendants in that action are capably

14  represented.  The debtor is not a defendant in that action.

15  And in terms of ongoing distraction, Your Honor, Mr. Kroll

16  basically said, You know, it's another thing to deal with.

17  There was no (indiscernible).  There was no credible or real

18  testimony about what people would be doing day-to-day to deal

19  with it.  He only had half knowledge of the matter.  He only

20  read the complaints recently.  The idea from that testimony

21  that this case is anything more than having lawyers go do a

22  document review and maybe -- not definitely -- maybe prepare

23  witnesses is not something that is in any way going to

24  distract the debtors from their current tasks.

25        They've got -- the defendants have counsel.  The

1  debtors may have to produce some documents, but, Your Honor,

2  I will note, it's been almost two months since that motion to

3  compel was granted in large part and we sit here today and

4  there have been no documents produced.  The idea that the

5  debtors can sit here with a document production that they are

6  going to have to fulfill and that is not seriously

7  distracting on management in any credible may, that that

8  should be the reason for holding this up, particularly where

9  we know that this is an already-completed document

10  production.  I realize there may be some review by lawyers,

11  but this is not a case where everybody has to go back through

12  their files, figure things out, who's got the documents, what

13  server are they on; all of that was done in the DOJ and SEC

14  actions.  Those obligations have been met.  This is a matter

15  of lawyers going through reviewing documents.  The management

16  is not going to be doing that; their paid counsel is going to

17  be doing that.

18          In addition, in terms of this idea that the

19  defense costs here are really being borne by the estates,

20  that is, quite frankly, it's ridiculous.  The debtors paid a

21  $500,000 deductible.  Since then, all the testimony is when

22  they submit a bill with respect to the directors defendants'

23  costs and fees, those bills have been paid.  The defense

24  costs have been undertaken.  Those monies are being

25  reimbursed.  They're not coming out of the estate, number

1   one.

2          Number two, we are a long, long, long way from

3   exhausting those policy proceeds.  There are $13 million

4   left.  We don't know what the damages are yet, but we sure as

5   heck know there's a lot of money and there should be way more

6   than enough money to spare to get this through the trial and

7   there may be proceeds after that.

8          And something else I might note, too, you have to

9   remember these are actions against these defendants.  These

10  defendants may have had deep pockets in themselves.  The idea

11  that we're going to be stayed so that we can't go and access

12  policy proceeds, and if it turns out they're not enough,

13  basically go after the defense, some of whom may have

14  millions and millions of dollars, is not reasonable.

15          Now, Your Honor, while it's true that there are

16  these policies out there for Lordstown, there was some

17  allegation in the briefing that the policy proceeds were

18  estate proceeds.  I didn't hear counsel really make that

19  argument at oral argument; however, they are not.

20          The existing policy out there is for Diamond Peak;

21  that policy is for the benefit of officers and directors.

22  And this is important because it gets to some of the case law

23  we discussed.  The debtors are not claimants under those

24  policies and that's another reason why this should go

25  forward, notwithstanding the fact that the debtors may pursue

1  other claims, that these other parties may pursue other

2  claims.  This is not estate property that we are looking to,

3  to get -- to make sure advancement costs are being forwarded

4  and to make sure that there's money there at the end of the

5  day to pay a judgment.

6          Now, Your Honor, there's this whole idea there

7  about prejudice and *estoppel*, again -- and I'll get to the

8  issue about identity of interest in a moment -- but the

9  debtors are not parties to this litigation.  They will not be

10 stopped.  There are so many differences between the

11 defendants -- there's almost no overlap in the defendants at

12 all -- between defendants and relevant causes of action and

13 burdens of proof, the idea that this is going to unduly

14 prejudice the debtors or other parties in the litigation is

15 not reasonable and it's highly, highly speculative.

16         Your Honor, when you look at the test that this

17 Court has used, the four-part test to determine whether an

18 action can be pursued against an officer or director, you

19 really see how inappropriate it would be to extend the stay

20 here.  Let me -- the test is from Continental Airlines and

21 Midway Games.  There are four factors in that test.  First,

22 the involvement of directors and officers in the

23 reorganization process.  For four or five of them, there's no

24 involvement.  For the fifth, it's an independent director.

25 There is no burden there.

1         The burden imposed on them.  Again, there's no

2   great burden imposed on them.

3         The idea that the debtors' assets would be

4   depleted here.  There's a potential document production, and

5   by the way, the notion that it's going to cost $2 million to

6   do a document production and maybe prepare people to testify

7   at some depositions, it's astonishing.  That's roughly the

8   burn of the plaintiffs -- I'm sorry -- the defendants in the

9   D&O litigation thus far, which has been pending for a long

10  time.  The idea that the debtors are going to incur those

11  fees and expenses in this short period of time -- I know what

12  those projections are.  They don't seem reasonable, and by

13  estimate, they seem to be highly inflated.

14        In addition, Your Honor, the debtors' assets are

15  not going to be depleted here.  We've got fees and costs of

16  these parties covered.  Sooner or later, Your Honor, the

17  debtors are going to have to produce these documents.

18  They've dragged their feet thus far.  That's going to cost

19  what it's going to cost.  And might I add, there is clearly

20  money in the estate that is going to pay that, whether it's

21  now or later.  The fact that they don't want to have their

22  lawyers incur these fees now is not there.  They're really

23  trying to hold things up to try to put together some

24  settlement, which by the way, Your Honor, I will mention, we

25  are not part of, we haven't approved, we're not involved in.

1        And so, I don't want to hear, Well, we're doing

2   this for your benefit, because we're going to wrap things up.

3   Staying litigation against nondebtor defendants is not to our

4   benefit, especially here, where there are policy proceeds

5   available to satisfy those claims.

6        But you know what's interesting, Your Honor, if

7   you look at this four-part test and you take a step back,

8   what you see is this litigation, to me, it's not about

9   protecting the estate -- that's a false concern -- and it's

10  really not about prejudice.  It's, to my mind, about

11  protecting one common Diamond Peak Lordstown director,

12  Mr. Hamamoto, who's trying to thwart the plaintiffs' rights

13  against him and the rights of other -- the rights of the

14  plaintiffs against the other four Chancery defendants, who

15  are nondebtors and aren't even involved in this company

16  anymore.

17        Now, Your Honor, the debtors do make an argument

18  that there is some shared identity of interest.  First of

19  all, I completely agree with this notion that because there

20  may be similar facts, geez, you know, there's terrible

21  prejudicial effect.

22        As I laid out, and related to the Court's stay

23  opinion, there are substantial differences in this action in

24  every single way.  It's not necessarily going to be binding.

25  It's not necessarily going to have any type of effect on any

1  other litigation and the debtors will not collaterally be

2  *estopped*.

3  Second, Your Honor, and this is important, they've

4  talked about indemnification claims.  There is no argument

5  that there is a potential indemnification claim back against

6  the estate; however, if you look clearly at the allegations,

7  a breach of loyalty, there is a very substantial possibility

8  that when we finally get to where we're going, there could be

9  an allegation of bad faith.  And if there's an allegation of

10  bad faith, as a matter of law, under 8 Delaware Code 145 and

11  general corporate law, there will be no indemnification.

12  And because of this, this is not one of those

13  cases where a finding here will necessarily result in a

14  finding of indemnification, with respect to the plaintiffs'

15  claims, with respect to the director defendants' claims

16  against the debtor.

17  Now, Your Honor, the law supports our right to

18  proceed with this litigation and the stay should not be

19  extended.  Let me give you some examples.  Your Honor, in

20  both, Reliance Acceptance Group and Unimarts, which is Your

21  Honor's opinion, the Courts there -- and the Reliance was a

22  District Court opinion -- refused to extend the automatic

23  stay to claims against nondebtor parties, even though those

24  parties had potential indemnification claims back against the

25  debtors.

1          Your Honor, what's important about Unimarts, and I

2    think it's super relevant here, is that there, Your Honor

3    said, In making a determination as to whether a Court should

4    stay cases where there's an indemnification right, the Court

5    (indiscernible) a much more holistic approach, Your Honor.

6    You looked at whether the indemnification right and the

7    granting extending the stay would be consistent with the

8    purpose of the stay itself to suspend actions that posed a

9    serious threat to the debtor -- corporate debtor's

10   reorganization.

11         Your Honor, there is absolutely no serious threat

12   to the corporate reorganization here and for that reason,

13   there's every reason to deny this motion and allow the case

14   to proceed.

15         Your Honor, in Reliance, the District Court

16   reversed Judge Walsh's decision extending the stay there,

17   even though there were potential indemnification claims back

18   against the debtors, and also, by the way, possible insurance

19   claims and claims of prejudice and claims that there would be

20   *res judicata*.  The Court said, No, we are not going to extend

21   the stay.  We know there are these possible indemnification

22   claims out there.  We're not going to do it.

23         The FPSDA case that we cite, there, the Court also

24   refused to extend the stay to litigation against nondebtors,

25   even though those debtors had potential indemnification

1  claims against the debtors under Delaware law.  The Court

2  there found that, here, that the issue of enforcing of

3  indemnification rights to unresolved questions of the

4  nondebtor's conduct -- and that's what we have here --

5  unresolved questions of nondebtor's conduct, the Court did

6  not extend the stay.

7        So, no, notwithstanding the arguments you've heard

8  here today, notwithstanding the fact that there are some

9  cases that, in my view, wrongly say that the mere possibility

10 of indemnification rights is enough for a court to extend the

11 stay, it really isn't.

12       Now, in terms of the cases that the debtors cite

13 in their brief, Your Honor, those do not help their cause.

14 Let me give you a few examples.  SN Liquidation, in that

15 case, which is plainly distinguishable from this case, the

16 Court didn't extend the stay, dealing with claims against

17 nondebtors.  In that case, unlike the policies that we have

18 here that cover these losses, in that case, the debtors were

19 claimants against the policy.  So the Court said, You know

20 something?  Not only is the policy estate proceeds, not only

21 is the policy property of the estate, the proceeds are

22 property of the estate.

23       Your Honor, a bunch of the other cases the debtors

24 cite deal with situations like mass tort cases; cases where

25 competing mass claims, indemnification obligations, competing

1   rights to insurance policies.  That is the crux of those

2   cases.  In those cases, it is almost impossible to get to a

3   plan of reorganization without putting a stop of things,

4   figuring out who's indemnifying what.  That is the very heart

5   of those cases.

6           That's not this case.  This case doesn't turn on

7   the outcome of this case and the really minimal "it's just

8   some other thing I guess we have to do" disruption here is

9   not enough.  This is nothing to do and is in no way like

10   those mass tort cases.

11           Let me give you an example of a case that they

12   cite, which is W.R. Grace v Drakarian (phonetic).  In that

13   case, Your Honor, there was an indemnification claim back,

14   but in that case, unlike this case where it's not clear

15   whether those indemnification rights will arise, in that

16   case, the Court said, the indemnification right was absolute.

17   It's not absolute here.

18           They also cite Madoff case for the proposition

19   that, you know, you should put a hold on things and let us

20   sort things out while we try to figure out what insurance

21   rights are and try to come to some deal.  But, Your Honor,

22   Madoff had nothing to do with this case.

23           In Madoff, the plaintiff there is pursuing a

24   nondebtor to recover property that the trustee said the

25   proceeds were a fraudulent transfer; in other words, they

1 were trying to get estate property.  That's not this case.

2 Our clients are seeking estate property.

3          And it goes on and on.  In CD Liquidation, there,

4 the debtors have said, listen, CD Liquidation supports the

5 proposition that you shouldn't let these nondebtors usurp

6 litigation from the estate.

7          Well, first of all, we're not usurping anything.

8 In that case, the plaintiffs in that case were seeking to

9 pursue claims that were derivative claims.  Our claims aren't

10 derivative claims; they're direct claims.

11          So, Your Honor, the cases that we cite and the

12 facts support what we're doing and their cases, you can take

13 a little look at them, they don't.  If you look at the

14 totality of this case and whether or not there's a

15 (indiscernible) to reorganization, there isn't.  And that --

16 those issues, indemnification of interests, interference in

17 debtors' reorganization, not the case here.

18          We get into the last thing, which is the standards

19 for a preliminary injunction.  Your Honor, there are four

20 standards.  I won't get into the reorganization standard

21 because I know it's early in the case.  But the second

22 standard, and one someone needs to meet in order for the

23 Court to even consider the last two standards, are whether

24 there's irreparable harm.

25          Where is the irreparable harm here?  Like, they

1  want to talk about balance of harm -- and I think that favors

2  us, too -- you don't even get there until you find

3  irreparable harm.  Where is the irreparable harm in allowing

4  us to pursue nondebtor parties in claims against them in

5  litigation that's subject to insurance, where defense costs

6  are being covered and where the indemnification rights are,

7  at best, unclear?

8         There isn't irreparable harm.  And it isn't

9  immediate, by the way; our trial is not until March.  So my

10  view of this is since we're this far in the litigation, don't

11  pull the plug now.  Let us go -- if they want to -- what's

12  going to happen, Your Honor, is if you pull the plug now

13  here, what's going to happen in the settlement discussions,

14  we haven't been involved in those.  Clearly, they've been

15  going on.  If you pull the plug here, we won't be involved.

16  Something is going to happen and we're going to be presented

17  with a proposal that I suspect we aren't going to like a lot.

18         So if they want us to be involved in discussions,

19  they should be forced to make sure that their insurance

20  policies are there and the proceeds aren't estate proceeds,

21  are there to pay defense costs.  If they want to approach us,

22  let them approach us.  They haven't done it yet, but there's

23  no irreparable harm now.

24         In terms of balance of the harms, I disagree.  The

25  balance of the harms here favors us.  We are pursuing

1  nondebtor defendants and we have a right to go after them.

2         And by the way, this whole issue with the stay --

3  oh, just stop now -- why?  Why would we stop when it's being

4  defended?  Why would we stop when the debtor has a current

5  obligation to respond to a subpoena where it hasn't produced

6  a document in like a month and a half?  Like, we are being

7  held up and they should be required to produce those

8  documents -- by the way, it's going to be an attorney task --

9  and allow us to liquidate our claims.

10         And, by the way, one other thing about that,

11  again, the debtors are sitting on a ton of cash.  The idea

12  that they can't pay attorneys to do a document production is

13  ridiculous.

14         Finally, Your Honor, there's absolutely no

15  imminent harm here whatsoever.

16         In terms of the public interest, Your Honor,

17  again, it favors our client.  The public interest is that the

18  party has a claim against the nondebtor and sources of

19  recovery against non-estate proceeds and nondebtor parties,

20  they should be permitted to go forward.

21         And in ending, Your Honor, I want to emphasize

22  that in its opinion, the Chancery Court says Delaware -- and

23  I agree with this -- Delaware has a really significant

24  interest in having this SPAC merger, breach of loyalty claim

25  heard and decided, and for that reason and the other reasons

1   I just discussed, we request that Your Honor deny the motion.

2              THE COURT:  All right.  Any response, Mr. Zakia?

3              MR. ZAKIA:  Yes, please, Your Honor.  Thank you.

4              So, Your Honor, I'm a proud bankruptcy lawyer.

5   I'm not a Chancery Court lawyer.  And we're not here to try

6   to re-argue the motion to stay, which was decided by the vice

7   chancellor.

8              I will simply point out that the question that she

9   answered is fundamentally different than the question that

10  Your Honor is being asked to answer.  And I think that

11  actually was implicit in a number of the points counsel made.

12  So, as I tried to preview, the issue by the vice chancellor

13  focused on the legal elements of the claim, because the

14  motion presented before her argued that her case should be

15  stayed until the Ohio litigation was resolved because the

16  Ohio litigation would moot -- would answer the questions she

17  needed to answer and, therefore, it was the better forum.

18             That is fundamentally different than what Your

19  Honor is being asked to decide.  I acknowledge that there are

20  differences in defendants and I acknowledge that there are

21  differences in legal claims.  And that may have been

22  critically important to the argument being made to the vice

23  chancellor on the motion to stay.

24             But what counsel -- and I don't know if he meant

25  to acknowledge it or not -- but he said the Ohio case is a

1  disclosure case and then he pointed out that this case was

2  about redemption and it was about false statements made in

3  the proxy statements, and that is a hundred percent true.

4  And the false statements at issue in this case are the

5  debtors' statements, which are the same false statements --

6  and I won't make Your Honor make me go back and go through my

7  list of all the paragraphs -- but if you compare the factual

8  allegations, not the legal theories, which the Delaware

9  Chancery Court might be uniquely suited to answer a question

10  of Delaware law, I am not disputing that, but when you look

11  at the factual underpinnings of the case, the question of

12  whether or not the debtors' statements were false, why is it

13  at the heart of both of these claims?

14       So, the question is not as it was for the vice

15  chancellor, will the resolution of the other actions moot the

16  need to resolve this case -- it's going to answer all of our

17  questions.  The question here is, simply, will the

18  adjudication of these issues cause evidentiary prejudice to

19  the debtors if those answers are resolved?

20       And what's really interesting about this, Your

21  Honor, is we kind of have both sides on it.  On the one hand,

22  we are a defendant in the Ohio litigation, which accuses us

23  of making false and misleading statements, which are the

24  exact same statements which are issued in the Delaware

25  Chancery case.  And one of the defendants who's accused in

1   participating in that, and who in Ohio's actions are being

2   alleged to be imputed to the debtors, is a defendant in both

3   cases.  We also have a number of derivative claims, which

4   upon the filing of the bankruptcy, became property of the

5   bankruptcy estate, which are on the other side of the action.

6          So whatever happens with the adjudication of these

7   claims, it is possible that the answering of those factual

8   questions, which run throughout all of these cases, could

9   have an impact on the debtors and on the estates.  And,

10  again, Your Honor, that's why the relief being sought here is

11  very narrowly tailored, which is to give us a breathing spell

12  to put that action on hold so we can determine a path in

13  bankruptcy as to how to deal with that in Chapter 11.

14         I'm not going to respond to all the points that

15  counsel made with regard to what was really sounded like a

16  motion to compel production of documents in the underlying

17  case.  Should your, you know, should that case continue, the

18  vice chancellor can certainly deal with that.  And I don't

19  think any of that is relevant to this, except for one thing,

20  Your Honor.  What we heard from counsel is very clear:

21  Should this case proceed, there's going to be a lot of

22  litigation concerning the discovery obligations of this

23  debtor and that is going to cause a cost to the debtor

24  because it is the entity that is the repository of many of

25  these documents that are being sought.  So it's very easy for

1  counsel to say we have a bunch of cash and he doesn't think

2  it will actually cost $2 million, but there is no question

3  that the debtors are going to be at the center of producing

4  the evidence that will be central to the resolution of that

5  case.  And what it sounded like is there's going to be a lot

6  of dispute concerning that document production and every

7  dollar that goes to fund that budget is one dollar that this

8  estate never gets back.

9          I do agree with counsel on one thing.  I think

10  Your Honor should take a holistic approach, and that's where

11  I tried to start.  I think if you look at each of the issues

12  at issue in this case, so we have a risk of indemnification,

13  which would create, potentially, a very large claim against

14  these debtors should a judgment be secured.  LTL Management,

15  which we cite to in the papers, was very clear.  That was

16  also a Securities fraud case, in which the Court extended the

17  automatic stay to stop a Securities fraud case against

18  nondebtor defendants, recognizing that as with most

19  Securities fraud cases, there is a question, depending on how

20  the matter is resolved, as to whether indemnification will be

21  available or not available.  That is not yet been determined

22  and it's not knowable until after a decision is rendered, but

23  there's certainly a risk and it is not the case that there

24  has to be a certainty of indemnification for that to create

25  the identity of interest.

1        We do have a certainty of expenditure and wasting

2   of estate resources.  We do have a certainty of depletion of

3   the insurance proceeds.  And while it is true the proceeds at

4   issue in this case are not payable to the debtor, they do

5   cover individual defendants that are defendants in other

6   actions, including derivative actions, which, hypothetically,

7   if there were a judgment to be rendered on those actions,

8   those proceeds may be available to be recovered by the

9   estate.

10       And then, finally, there is the issue of the need

11  for the company to participate.  Current management, not just

12  Mr. Hamamoto, as a director, but current management's need to

13  participate and supervise the actions of its counsel with

14  regard to managing its involvement in this case, which,

15  again, is substantial.

16       So I think when you look at this holistically and

17  you compare it to the need to, you know, pause their action

18  for a few months, there is no question that the balance of

19  the harms favors the debtors, and we, therefore, ask the

20  Court to extend the automatic stay.

21       THE COURT:  Well, let me make my ruling.

22       The standard in seeking to extend the automatic

23  stay to nondebtors is different fundamentally from the Rexene

24  factors, which is just balancing the harms between a debtor

25  and a party who may be seeking relief from the stay so it can

1  pursue an action against the debtor.  And I think that the

2  debtor has a high burden in that case, higher than defending

3  a motion for relief from the stay.

4          The first element is whether the debtor shares a

5  common interest with the nondebtor defendants in the action,

6  such that the suit is, in reality, against the debtor, and

7  that the debtor is compelled to appear and defend it.  Not

8  because there's an indemnity, but because it will, in fact,

9  adversely affect the debtor.

10          It's clear on its face that the Delaware action

11  does not -- well, I won't say it's clear on its face, because

12  it isn't --  the argument is that the Delaware action does

13  not affect the debtors at all, other than to respond to

14  discovery.  I'm not convinced that that is correct.  The

15  Delaware action is premised on false statements and actions

16  of directors at a time when they were directors of the

17  debtors' predecessor, I guess.  And as the debtor argues,

18  those actions and statements could be attributed to the

19  debtor, which may not -- will not have any impact, perhaps,

20  in the Delaware action, but may have a negative impact on

21  other actions that are pending against the debtor.

22          And for that reason, the debtor feels it has to

23  appear and -- it has to take actions and assist the

24  defendants, I assume, in the defense, or at least its lawyer

25  has to be involved, but that is not entirely clear to me.

1  The testimony did not establish that.  Really, Mr. Kroll's --

2  the only testimony in support of what the debtors must do in

3  a Delaware action is simply to respond to the discovery

4  that's been pending for some time, and that there's minimal

5  involvement of the debtor or its management, in that, it will

6  really require, based on Mr. Kroll's testimony, the review by

7  counsel and the production by counsel.  And that even that

8  has been suggested as not really true, because these

9  documents have already been produced to the SEC and,

10  therefore, must have been reviewed by counsel.  And I accept

11  that, because I can't imagine that the debtor would have

12  permitted the production of documents without counsel review.

13        So, currently, I'm not convinced that the

14  debtor -- debtors' interests and the defendants' interest or

15  that the debtor and the defendants share a common interest in

16  the suit, such that the debtor feels it has to appear and

17  defend that suit.  The debtor argues that there is -- that

18  the defendants have indemnity claims against the debtor and,

19  therefore, the debtor will have to be involved, if only to

20  reduce costs or will have to be involved because it would

21  have to pay any claims of the defendants to defend and/or

22  pay.

23        I mean not clear that that is true because any

24  decision against the defendants in the Delaware action may be

25  such that it does not give rise to an indemnity claim.  But I

1   don't have to decide this.  I only have to decide that any

2   indemnity claim is covered by insurance.  The insurance

3   carriers are defending.  The insurance carriers have not

4   stated that they will not cover these claims and there's

5   $13 million of insurance left at this point, it's certainly

6   enough to allow the debtors to take the only action that is

7   imminently required of that, and that is to produce the

8   documents.

9          So, I do not find the third element or the fourth

10  element of irreparable harm to the debtor if the stay is not

11  extended at this time.  Again, the claim is covered by

12  insurance.  The debtor has little involvement at this date

13  and it's not clear that the Delaware action will give rise to

14  indemnity claims and the trial is not on the immediate

15  horizon.

16         Balancing the harms, I think that since this

17  action is against nondebtors, the plaintiffs do have the

18  right to proceed with that and would be harmed if they're not

19  permitted to proceed.  The harm to the debtor is less clear

20  to me.  It is not clear that any ruling in the Delaware case

21  could impact the derivative actions or the other pending

22  litigation.

23         But principally, I'm persuaded because at this

24  point, there's not going to be any ruling.  At this point,

25  we're still in discovery.  The trial is not until next

1  spring.  The debtors have plenty of insurance to cover its

2  minimal involvement at this time, which is just to respond to

3  discovery.

4         I am doing this on the assumption that there will

5  be deposition notices only of a 30(b)(6) witness necessary to

6  identify the documents or respond to questions about the

7  documents.  If that assumption is incorrect, the debtor is

8  free to file another request to extend the stay to these

9  defendants and, therefore, all that I understand that I am

10  doing at this point is denying a preliminary injunction,

11  rather than deciding the adversary completely.

12         The public interest, which is the last factor, I

13  think that's encompassed in others, I don't see that the

14  automatic stay or 105 provides a basis to extend the stay to

15  save the debtor from producing documents that have already

16  been reviewed in other litigation and can, in the Court's

17  opinion, be produced relatively easily.  I understand that

18  counsel will do its duty and review those documents again

19  because the prior production was in connection with other,

20  different requests, but I don't think it's going to exhaust

21  the insurance by any means, nor take an extended period of

22  time.  And based on Mr. Kroll's estimate, the cost of that

23  review is not expected to come anywhere close to the limits

24  of the insurance.

25         So, I'm going to grant -- excuse me -- I'm going

1  to deny the preliminary request to enjoin this and stop the

2  discovery, because I think that is all that is imminent.

3          MR. ZAKIA:  Understood, Your Honor.

4          THE COURT:  All right.  I'll ask the parties to

5  settle a form of order and submit it under certification of

6  counsel.

7          MR. ZAKIA:  Thank you, Your Honor.

8          THE COURT:  Mr. Lawall, I'm sorry, did you wish to

9  be heard?

10         MR. LAWALL:  Your Honor, it was on an unrelated

11 matter.  When you -- if you would give me two minutes after

12 you complete this matter?

13         THE COURT:  Okay.  I'm done with that matter.

14         MR. LAWALL:  Thank you, Your Honor.

15         Good afternoon, Fran Lawall on behalf of the

16 Committee with Troutman.

17         Your Honor, at the last hearing, you had raised

18 some concerns, which the Committee took to heart about the

19 Committee intervening in the (indiscernible) and we just

20 wanted to bring two issues to your attention, because we

21 don't want to do anything without you being advised.

22         After the hearing last week, the BakerHostetler

23 retention application was filed.  BakerHostetler has been

24 representing the debtor in connection with the Karma

25 litigation.  When we reviewed that retention app, we realized

1  that they were retained back in 2019 and they were

2  representing both, the debtor and the nondebtor defendants in

3  the action.

4         That gave us some concern based upon some public

5  allegations, with respect to possible actions by some of the

6  former officers or directors, which might creating a conflict

7  between the debtor and those officers and directors and so we

8  wanted to explore that a little bit further.

9         The second concern we had is, as Your Honor may

10 have heard, there was a protective order that was issued in

11 the California litigation, which is preventing the Committee

12 from reviewing any of the documents in the California

13 litigation.  The debtor, on behalf of the Committee, had

14 asked Karma to join with it, I believe, to lift that, so that

15 the Committee could at least review those documents, and at

16 this point, Karma has refused to do so.

17        But we're at a point where we're not able to

18 review the documents and we're still working through this

19 conflict issue with Baker.  Now, it may be resolvable, but it

20 is an issue that could give rise to the need for the

21 Committee to intervene in the California litigation, which we

22 don't want to do so, but we also recognize that if the

23 California litigation were to go awfully wrong, it could very

24 much dilute the unsecured creditor pool to the point where it

25 could have significant prejudice.

1          We've made no decision at this point, Your Honor,

2   but given your strong opinion last week, I just wanted to

3   bring this to your attention.  I don't believe that there's

4   any action item for this at the moment, but we are trying to

5   work through.  We're going to have a call this afternoon with

6   the Baker firm to see how we can work through the issue.

7   Hopefully, we'll be able to, but again, the protective order

8   also gives us some pause because we don't have any

9   transparency into the California litigation, but we are

10  working on it.

11          That's all I have, Your Honor.

12          THE COURT:  All right.  I don't think there's any

13  necessity for anybody to respond until there is a request

14  that I do anything differently.

15          All right.  Well, thank you for advising.

16          MR. LAWALL:  Thank you, Your Honor.  Thank you for

17  hearing me out.

18          THE COURT:  All right.  I think we're done, then,

19  Mr. Zakia?

20          MR. ZAKIA:  Thank you for your time, Your Honor.

21          THE COURT:  All right.  We'll stand adjourned,

22  then.

23          COUNSEL:  Thank you, Your Honor.

24      (Proceedings concluded at 4:43 p.m.)

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

/s/ William J. Garling                    August 4, 2023

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable

/s/ Tracey J. Williams                    August 4, 2023

Tracey J. Williams, CET-914

Certified Court Transcriptionist

For Reliable

/s/ Mary Zajaczkowski                     August 4, 2023

Mary Zajaczkowski, CET-531

Certified Court Transcriptionist

For Reliable