**<u>EXHIBIT B</u>**

Verified Amended Class Action Complaint, filed in *In re Lordstown Motors Corp. Stockholders Litig.*, 2021-1066-LWW (Del. Ch.) (July 29, 2022)

EFiled: Jul 29 2022 03:20PM EDT
Transaction ID 67883125
Case No. 2021-1066-LWW

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| IN RE LORDSTOWN MOTORS CORP. STOCKHOLDERS LITIGATION | CONSOLIDATED C.A. No. 2021-1066-LWW **PUBLIC [REDACTED] VERSION AS FILED ON JULY 29, 2022** |

## VERIFIED AMENDED CLASS ACTION COMPLAINT

Co-Lead Plaintiffs Atri Amin and Benjamin Hebert (each, a "Plaintiff" and, together, the "Plaintiffs"), on behalf of themselves and similarly situated stockholders of Lordstown Motors Corp. ("Lordstown")[1] f/k/a DiamondPeak Holdings Corp. ("DiamondPeak," or the "Company"), bring this Verified Amended Class Action Complaint asserting breach of fiduciary duty claims stemming from the Company's merger (the "de-SPAC Acquisition") with Lordstown EV Corporation ("Legacy LMC") against: (a) David Hamamoto, Mark Walsh, Andrew Richardson, Steven Hash, and Judith Hannaway, in their capacities as members of DiamondPeak's board of directors (the "DiamondPeak Board"); and (b) DiamondPeak Sponsor LLC, (the "Sponsor"), David Hamamoto, and Mark Walsh in their capacities as controlling stockholders.

The allegations are based on Plaintiffs' respective knowledge, and on information and belief, including counsel's investigation, review of publicly

---

[1] In the interest of clarity, Lordstown will refer to the combined entity after the de-SPAC Acquisition (defined below), while DiamondPeak will refer to the SPAC (defined below) before the de-SPAC Acquisition.

available information, and the review of certain books and records produced by Lordstown in response to Plaintiffs' demands made under 8 *Del. C.* § 220 (the "Section 220 Documents") as to all other matters.

## I.   NATURE OF THE ACTION

1.     Over the past few years, special purpose acquisition companies, or "SPACs," have emerged as a popular way for the public to invest in private entities. Despite certain structural differences between SPACs and operating businesses, SPACs that incorporate in Delaware are, in fact, Delaware corporations, and their fiduciaries are bound by the State's common law and statutory regime.  This action highlights how important it is to reinforce that principle, lest public investors continue to lose billions of dollars due to SPAC controllers' and directors' self-interested actions.

2.     After a SPAC goes public and investor capital is placed into a trust that will invest in government securities pending a business combination, the board of directors and the sponsor (*i.e.*, controller) of the SPAC have two jobs: (a) conduct a fair process and sound diligence to select an acquisition target; and (b) give the SPAC's public investors sufficient disclosure to informedly decide whether to exercise their right to redeem their shares for cash plus interest, or invest in the private company that will go public through the "de-SPAC transaction."

3.      This case arises because, despite having no operational responsibility and simply needing to find a proper target and disclose the "pros" and "cons" of a deal, the DiamondPeak Board and Sponsor completely abdicated and violated their duties.

4.      Rapidly approaching the two-year term limit of the DiamondPeak SPAC's window to identify an acquisition target, the DiamondPeak Board and Sponsor began to explore acquiring Legacy LMC, an electric truck startup business.

5.      As proven by Tesla, Inc. in the personal electric car space, occupying market share ahead of competitors is essential to success.  Thus, as the DiamondPeak Board and Sponsor each recognized, the viability of an electric truck startup's business model requires strong execution on two strategic imperatives: (a) enjoying the "first-mover advantage" and (b) having a strong backlog of demand.

6.      In soliciting approval of DiamondPeak's de-SPAC Acquisition of Legacy LMC, DiamondPeak convinced public investors not to redeem stock – and thus remain invested in the post-deal entity that was re-named Lordstown – based on public representations about beginning production of vehicles by late 2021, and a rapidly growing backlog of letters of intent for electric truck purchases.

7.      However, prior to the de-SPAC Acquisition, the DiamondPeak Board and Sponsor affirmatively learned (but did not disclose) (a) that Legacy LMC could not conceivably meet its own publicly reported production timeline of 2021 – and

hence likely would not enjoy "first-mover advantage," and (b) that a huge swath of its supposed order backlog was either merely unreliable or patently fabricated. Thus, the entire investment rationale for the de-SPAC Acquisition was built on a castle of sand.

8.      The DiamondPeak Board and Sponsor knew the importance of Legacy LMC's anticipated timing to market and order backlog and retained McKinsey & Company ("McKinsey") to conduct diligence into and provide analysis of the issues. McKinsey did as asked, reporting to the DiamondPeak Board and Sponsor that Legacy LMC █████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████

9.      While McKinsey was not asked to specifically review the *bona fides* of the Company's letters of intent, it noted that the growth in letters of intent required a close look and highlighted several red flags about the reliability of those deals.

10.     The DiamondPeak Board and Sponsor – not to be deterred and having no desire to come any closer to the two-year deadline for DiamondPeak SPAC to find an acquisition target – evidently decided to roll the dice that either (a) Legacy LMC could miraculously overcome McKinsey's warnings or (b) they could keep the truth about Legacy LMC hidden long enough, *i.e.*, just six months after the de-SPAC

Transaction, to cash out their shares at a huge profit. The de-SPAC Acquisition was then announced on August 1, 2020.

11.     The Proxy on the de-SPAC Acquisition, through which Legacy LMC would merge with and into a wholly-owned subsidiary of DiamondPeak, was issued on October 8, 2020 (the "Proxy").

12.     Bolstering representations of Legacy LMC's purported first-mover advantage, the Proxy stated that production was expected to commence in the ***second half of 2021***. Highlighting Legacy LMC's large and rapidly growing backlog of truck orders, the Proxy stated "[t]o date, Lordstown has received pre-orders primarily from fleet operators to purchase over 38,000 Endurance vehicles."

13.     The de-SPAC Transaction closed on October 23, 2020, with almost none of DiamondPeak SPAC's investors exercising their option to redeem shares for cash. They now certainly wish they had done so.

14.     Roughly five months after the deal closed, a buy-side market analyst report disclosed that Lordstown would miss the production deadline it had publicly represented as key to its head start on the competition. That report went further, stating that many of Lordstown's purported truck option contracts were completely fabricated and would never lead to binding purchase agreements.

15.     Plaintiffs' review of the Section 220 Documents uncovered precisely what happened. As noted, McKinsey's reports are irreconcilable with the Proxy's

public disclosures.  The DiamondPeak Board and Sponsor cannot show the fairness or adequacy of their process when they affirmatively knew that the Proxy misrepresented the time Lordstown needed to commence producing electric trucks.

16.    Moreover, through their review of Section 220 Documents, Plaintiffs did exactly what any board, officer, or controlling stockholder, acting loyally and in good faith, would have done:  review the actual letters of intent underlying Lordstown's purported order backlog.  The result of Plaintiffs' inquiry is mind-boggling.  For example: a single man signed ██████ truck orders, for companies which self-evidently could neither afford nor make use of █████ trucks.

17.    In sum, and as further detailed below, each member of the DiamondPeak Board and the Sponsor were deeply and personally conflicted with respect to the acquisition of Legacy LMC.   Acting on those conflicts, the DiamondPeak Board and Sponsor issued a Proxy portraying a business plan and opportunity conflicting with facts they knew or could have known with minimal effort.

18.    As a result of Defendants' breaches of duty, DiamondPeak SPAC investors who did not redeem when they had the right to do so were left holding stock now trading below the redemption value (the "Class").  Defendants should be held accountable to the Class for their breaches of fiduciary duty.

## II.    PARTIES AND RELEVANT NON-PARTIES

**A. Plaintiffs**

19.    Plaintiff Atri Amin has consistently held and has been the beneficial owner of DiamondPeak stock at all relevant times.

20.    Plaintiff Benjamin Hebert has consistently held and has been the beneficial owner of DiamondPeak stock at all relevant times.

**B.    Non-Party Lordstown and the Defendants**

21.    Non-Party Lordstown is a Delaware corporation originally formed as a SPAC.  Following the de-SPAC Acquisition, Lordstown designs, develops, and intends to manufacture an all-electric pick-up truck known as the "Endurance." Lordstown trades on the NASDAQ under the ticker "RIDE."

22.    Defendant Sponsor was a Delaware limited liability company.  The Sponsor was a joint venture between an entity controlled by Defendant Hamamoto and an entity controlled by Silverpeak.[2]

23.    Defendant David Hamamoto ("Hamamoto") served as Chairman and CEO of DiamondPeak from the time of DiamondPeak's inception until the de-SPAC

---

[2] "Silverpeak" includes SP SPAC Sponsor LLC, Silverpeak Real Estate Partners L.P., Silverpeak Strategic Partners LLC, Silverpeak Credit Partners LP, Silverpeak Renewables Investment Partners LP, and certain other affiliated entities.

Acquisition. He currently serves as a member on the board of directors of Lordstown.

24. Defendant Mark Walsh ("Walsh") served as a member of the DiamondPeak Board from DiamondPeak's inception until the de-SPAC Acquisition. Walsh is a Partner and Co-Founder of Silverpeak.

25. Defendant Andrew Richardson ("Richardson") served as a member of the DiamondPeak Board from DiamondPeak's IPO until the de-SPAC Acquisition.

26. Defendant Steven Hash ("Hash") served as a member of the DiamondPeak Board from DiamondPeak's IPO until the de-SPAC Acquisition.

27. Defendant Judith Hannaway ("Hannaway") served as a member of the DiamondPeak Board from DiamondPeak's IPO until the de-SPAC Acquisition.

28. Defendants Hamamoto, Walsh, Richardson, Hannaway, and Hash are referred to herein as the "Director Defendants."

29. Defendants Hamamoto, Walsh, and Sponsor are herein referred to as the "Controller Defendants."

### III.    SUBSTANTIVE ALLEGATIONS

**A. Overview of the Inherently Conflicted Structure of Most SPACs**

30. A SPAC is a publicly traded blank check company. It has no operations of its own and is formed with one goal – acquiring one or more operating companies (the "Target"). After a SPAC's initial public offering ("IPO"), money raised by the

SPAC is placed into a trust, which is later used to purchase the Target (the "de-SPAC"). The SPAC must typically complete the de-SPAC within two years of either its creation or the IPO. In the case of DiamondPeak, the last day for a de-SPAC transaction was March 4, 2021.

31. A SPAC is publicly traded before the de-SPAC transaction is completed, meaning that the SPAC itself is effectively just a place for investors to park cash while waiting for identification of the de-SPAC Target. The basis for SPAC investing is to enjoy an option to acquire equity interests in the formerly private Target.

32. Importantly, investors in a SPAC, unlike investors in a typical publicly traded operating company, are not required to sell shares into the market or continue with the investment post de-SPAC Acquisition. Instead, SPAC investors are given a contractual option to redeem their shares immediately prior to the de-SPAC Acquisition, and they can then receive their cash back, plus interest. Thus, the SPAC structure effectively allows investors to park cash, while collecting interest, in exchange for the option to participate in a future "IPO" of a private venture.

33. The SPAC and subsequent de-SPAC structure, however, differ substantively from the traditional IPO process. In the context of a traditional IPO, the investing public receives extensive disclosures on a specific company before deciding whether to invest in it. To complete a traditional IPO, a company must be

able to prepare adequate reporting systems equipped to meet the exacting reporting standards required by the Securities and Exchange Commission (the "SEC").

34.     SPACs offer an alternative route for companies to become publicly traded.  It starts with the people who plan to manage the SPAC creating a "sponsor" for the SPAC.  In the vast majority of SPACs, the sponsor capitalizes the SPAC by purchasing shares of Class B stock (commonly referred to as founder or sponsor shares) for a nominal amount (typically $25,000).

35.     The terms of the sponsor shares typically give the Sponsor and other holders of sponsor shares both complete control over the SPAC during its existence between the IPO and any de-SPAC transaction and the potential for an economic windfall if the de-SPAC is approved.

36.     Specifically, these sponsor shares are structured to provide a far greater financial payout opportunity for the Sponsor than is typically paid to bankers running an IPO (who can get up to a 5-7% commission) or even to hedge fund managers (who get paid up to 2% of the fund's net asset value ("NAV") plus 20% of any profits above the prior year's NAV).  Sponsor shares ultimately can convert into 20% of the SPACs total equity (*i.e.*, its NAV) at the time of the de-SPAC transaction.

37.     Sponsor shares come with a hitch, however.  Sponsor shares only convert into 20% of the SPAC's equity if a de-SPAC transaction is approved and closes.  SPACs also have a limited amount of time to complete a de-SPAC

transaction, often 24 months.[3]  Thus, after a SPAC has its IPO, founders have a strong incentive to find a deal, even if it is not a good deal, if they wish to receive a return.

38.    Once the SPAC is initially funded, officers and directors ("SPAC Insiders") are selected by the sponsor.  The SPAC Insiders are often compensated in sponsor shares or other shares contingent upon the completion of the de-SPAC transaction.

39.    Next comes the SPAC's IPO.  The process of registering a SPAC for an IPO is far simpler than registering an operating company, as the SPAC has no operations, and the risks to a particular SPAC are rarely unique.  As a result, preparing documents and obtaining the necessary approvals from the SEC are less burdensome for a SPAC than an operating company.[4]

40.    After completing its IPO (and receiving investors' money and placing it in a trust account typically investing in government securities), SPAC Insiders

---

[3] Recent federal litigation has challenged the propriety of SPACs employing a two-year period for investing in securities while seeking to identify and complete an Initial Business Combination.  That litigation is pending.

[4] On March 30, 2022, the SEC proposed new rules and amendments to enhance disclosure and investor protection in SPAC IPOs and in business combination transactions involving shell companies, such as SPACs, and private operating companies.

begin searching for a target (nearly always a private company).  When such a target is identified, SPAC Insiders negotiate a merger agreement.

41.    Because of the ability to turn $25,000 into 20% of the SPAC's equity immediately before the de-SPAC transaction occurs, SPAC Insiders are positioned to receive an economic windfall even if the stock price of the de-SPAC entity performs poorly.  To get their windfall, SPAC Insiders must overcome two threats to their big payday: (a) redemption rights and (b) a stockholder vote.  Thanks to the crafty capital structure engineering of SPAC designers, the former is a more meaningful threat than the latter.

42.    As noted above, SPACs are required to offer redemption rights due to listing requirements.  Redemption rights allow stockholders to elect to receive their pro-rata share of the assets held in trust, rather than remain invested in the de-SPAC company.  Accordingly, SPAC stockholders who do not believe in the investment opportunity of the proposed de-SPAC company can exercise a right to exchange their shares for a set amount of cash, usually the IPO price plus interest.  The redemption level can pose a risk to SPAC sponsors, however, because a common condition for SPACs to close their proposed de-SPAC transaction and receive the additional funding needed for the deal (which often comes through private investment in public equity ("PIPE") commitments) is having a certain level of cash

at closing. If too many investors redeem, the sponsor's ability to close can be challenged.

43.    Second, investors typically are asked to approve the de-SPAC deal through a stockholder vote. However, unlike a traditional stockholder vote, votes on SPACs are not a genuine indication of endorsement of the transaction by stockholders. This is because many SPAC investors (including many of the more sophisticated holders), hold both warrants and shares, rather than just shares, in the SPAC.

44.    As redemption only requires giving up shares, a stockholder who holds warrants as well as shares may well choose to approve the deal despite believing it is a bad one. This peculiar result occurs because the stockholder can redeem his or her shares for an amount modestly exceeding the initial investment, while maintaining cost-free warrants. Such warrants retain option value until and unless the Target goes bankrupt but would be rendered worthless if no transaction occurs.

45.    Provided enough stockholders either genuinely support the deal or choose to redeem their equity while voting for the deal in order to enjoy the option value of the warrants, the de-SPAC transaction occurs. Upon closing, the SPACs insiders receive their compensation (sometimes subject to certain lock-ups).

**B.**    **DiamondPeak is Formed and Raises $280 Million from Investors**

     i.    *The IPO of DiamondPeak*

46.    On November 13, 2018, DiamondPeak was incorporated in Delaware. DiamondPeak was "formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses" (the "Initial Business Combination").

47.    Shortly after DiamondPeak was formed, the Sponsor acquired 7,187,500 founder shares ("Founder Shares"),[5] for the nominal price of $25,000. The Founder Shares provided the Sponsor complete control over DiamondPeak, as well as the opportunity to convert into 20% of the SPAC's shares outstanding immediately before any de-SPAC Acquisition.

48.    On February 28, 2019, DiamondPeak filed its prospectus (the "Prospectus").  The Company planned to offer 25 million units in its IPO, with the potential for 28.75 million units if underwriters exercised their over-allotment option

---

[5] Founder Shares were also referred to as Class B Common Stock.

14

in full.[6]  Each unit would include one share of Class A Common Stock and one-third of a warrant.[7]

49.    Holders of the Founder Shares would exert additional influence over DiamondPeak by selecting the initial members of the DiamondPeak Board.  The DiamondPeak Board would be staggered with only a minority of the DiamondPeak Board being considered for election.  As DiamondPeak only had until March 4, 2021 to complete an Initial Business Combination (assuming the two-year period), this would give the holders of Founder Shares control over the DiamondPeak Board before any de-SPAC transaction.

50.    On March 4, 2019, DiamondPeak consummated its IPO.  Ultimately, the underwriters purchased 3 million units of their over-allotment option, meaning DiamondPeak's IPO sold 28 million units, raising a total of $280 million.  In connection with the IPO, the Sponsor purchased a total of 4,460,000 private

---

[6] For the avoidance of doubt, the 7,187,500 Founder Shares would represent 20% of shares if the over-allotment option were exercised in full.  However, if the underwriters' over-allotment option were not exercised in full, the holders of Founder Shares would forfeit Founder Shares accordingly so that Founder Shares made up 20% of shares outstanding.

[7] Each whole warrant would entitle the holder to purchase one share of Class A Common Stock at a price of $11.50 per share.

placement warrants (the "Private Placement Warrants")[8] for $1.50 per Private Placement Warrant.

51.     Accordingly, following DiamondPeak's IPO, there were 28 million shares of Class A Common Stock and 7 million Founder Shares, 6,187,500 of which were owned by the Sponsor.

52.     The $280 million raised was then placed into a trust account (the "Trust").  The Trust would be used to pay stockholders who exercise their option to redeem their shares in connection with the anticipated de-SPAC Acquisition, with the balance being used to finance all or part of the deal.

53.     With the completion of the IPO, the clock started ticking.  After March 4, 2019, DiamondPeak would have, at most, 24 months to complete a transaction.

**C.     DiamondPeak Merges with Legacy LMC Through an Unfair Process**

   i.   *DiamondPeak Identifies Legacy LMC as a Potential Merger Partner, But Due Diligence Uncovers Serious Flaws*

54.     On June 1, 2020, Goldman Sachs presented Legacy LMC (operating under the Lordstown name) as a potential acquisition target to the DiamondPeak Board.  Legacy LMC was an automobile company developing electric trucks,

---

[8] With limited exceptions, the Private Placement Warrants were identical to the warrants sold to the public in DiamondPeak's IPO.

primarily for fleet customers. Its flagship vehicle was the Endurance, a full-size electric pickup truck.

55.     On June 3, 2020, Defendant Hamamoto, DiamondPeak's CEO, and Stephen Burns ("Burns"), the CEO of Legacy LMC and later Lordstown, had an introductory teleconference. Over the next few weeks, the DiamondPeak Board and officers conducted modest diligence on Legacy LMC and began discussions regarding the de-SPAC Acquisition.

56.     By June 16, 2020, DiamondPeak and Legacy LMC entered into a Letter of Intent to merge. This Letter of Intent contemplated an enterprise value of $750 million to $950 million, with $380 million in proceeds going to the combined entity. The Letter of Intent provided an exclusivity period of 45 days, during which Legacy LMC could only negotiate with DiamondPeak.

57.     Over the following weeks, DiamondPeak did further diligence on Legacy LMC. The Proxy disclosed that, on June 26, 2020, "DiamondPeak engaged a leading technical consulting firm to assist DiamondPeak in the evaluation of [Legacy LMC] with respect to technical validation and comprehensive business plan assessment." Based upon the Section 220 Documents, this technical consulting firm was McKinsey.

58.     The Proxy stated that, in conducting its work, McKinsey "interviewed key members of Lordstown's management team, conducted extensive

investigations, and presented its assessments to DiamondPeak in a series of presentations and teleconferences over the following month." These assessments appear to have occurred on a weekly basis, starting on July 3, 2020. Over the next four weeks, McKinsey provided a series of reports on Legacy LMC.

59. On July 30, 2020, McKinsey provided a final summary report. This report shows the final diligence the DiamondPeak Board likely received before making its final recommendation in favor of the de-SPAC, as DiamondPeak and Legacy LMC entered into a merger agreement on August 1, 2020. McKinsey's report highlighted certain key problems that undermined the proposed merger.

60. *First*, while Legacy LMC publicly insisted that production of the Endurance would begin in October of 2021, McKinsey's research showed this goal to be mere fantasy. McKinsey projected that ███████████████████████ ████████████████████████████████████████████████████ ███████████████████ McKinsey predicted that if the startup company somehow were able to improve █████████████████████████████████████████ ████ McKinsey's deck showed:

## 8. The Endurance could have an ▮▮▮▮▮▮ SOP delay; compared to industry best practice timeline that could be reduced to ▮▮▮▮



Source: LMC Endurance Program Plan Draft 10-21-2021 SOP Scenario – Rev 6-11-2020, interviews with LMC

McKinsey & Company   21

Confidential

LMC_HERBERT0001172

## The LMC Endurance could have an ▮▮▮▮▮ risk to its Oct 2021 SOP when compared to industry best practice timeline



Source: LMC Endurance Program Plan Draft 10-21-2021 SOP Scenario – Rev 6-11-2020, interviews with LMC

McKinsey & Company   88

Confidential

LMC_HERBERT0001236

61.    McKinsey also considered when competition would enter the market. Early entry is extremely important for novel products, as the first companies to the market gain an initial advantage in obtaining market share, often called the "first-mover advantage."  DiamondPeak recognized this, stating in the Proxy that "[i]f Lordstown is unable . . . [to] leverage a 'first mover' advantage to build strong customer relationships, [Legacy LMC] may not be able to compete successfully."

62.    Securing this advantage was particularly crucial considering how established some competitors were (including Ford, GM, and Tesla).  Accordingly, the Proxy disclosed:

> [Legacy LMC] faces intense competition, including that Lordstown may not be the first to market with an electric pickup truck.  Many of [Legacy LMC's] competitors have significantly greater financial or other resources, longer operating histories and greater name recognition than Lordstown does and one or more of these competitors could use their greater resources and/or name recognition to gain market share at [Legacy LMC's] expense or could make it very difficult for Lordstown to establish significant market share.

63.    Because being early is crucial to achieving this advantage, the difference between production beginning in October 2021 (as the Proxy suggested) and ███████████████████████████████████████████, is critical.  To be sure, according to McKinsey's report, even an ███████ first production date ████████████████████████████████████████████ a high-risk

assumption considering that Legacy LMC had never mass-produced any type of truck before.

64.    McKinsey's diligence showed exactly how important this timeline would be, going so far as to highlight Legacy LMC's planned launch compared to known competitors.  If Legacy LMC began producing the Endurance in October of 2021, the launch was projected only to fall behind Rivian Automotive Inc. (which only began to produce trucks in September of 2021).  ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

65.    ████████████████████████████████████

████████████████████████████████████████████

██████  By delaying the launch, the Endurance would have to compete for market share with well-established automobile manufacturers, a difficult if not impossible task.  The following timeline highlights McKinsey's work:



66.    Second, DiamondPeak knew of problems with Legacy LMC's projections.  These projections were as follows based on the Proxy:

|                        | 2020E | 2021E | 2022E  | 2023E  | 2024E   |
|------------------------|-------|-------|--------|--------|---------|
| **Total Units Sold**   | 0     | 2,200 | 31,600 | 65,000 | 107,000 |
| **Revenue (in millions)** | $0 | $118  | $1,690 | $3,476 | $5,776  |

67.    McKinsey had highlighted that Legacy LMC's numbers were ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

McKinsey noted that to achieve the projected sales volume, Legacy LMC had to go

from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## LMC Endurance ████████████████████████████████████████████

Perspective on sales volumes

Information Source ■ IHS ■ Lordstown Motors

**Full size fleet pickup sales**
Selected nameplates[1], Thousand trucks

**Full size fleet pickup market share, %**

|  |  | 2019 | 2025 | 2019 | 2025 |
|---|---|---|---|---|---|
| ICE | Ford F-150 Series | 376 | 322 | 25% | 20% |
|  | Dodge Ram 1500 Series | 266 | 276 | 18% | 17% |
|  | Chevy Silverado | 266 | 213 | 18% | 13% |
|  | GMC Sierra | 104 | 100 | 7% | 6% |
|  | Toyota Tundra | 67 | 67 | 5% | 4% |
|  | Nissan Titan | 13 | 14 | 1% | 1% |
| EV |  |  |  |  |  |
|  | Tesla Cybertruck | 0 | 28 | 0% | 2% |
|  | GM EV Pickup | 0 | 26 | 0% | 2% |
|  | Rivian R1T | 0 | 16 | 0% | 1% |
|  | Ford F-150 EV | 0 | 13 | 0% | 1% |
|  | GM Hummer EV | 0 | 7 | 0% | 0% |
|  | Nikola Badger | Forecast unavailable |  |  |  |

| Preorder Volumes Announced | | Preorder Window | Deposit Requirements |
|---|---|---|---|
| Endurance | 12,869[2] | 9-7 months[5] | Non-binding LOI for fleets and $100 deposit for personal |
| Cybertruck | 650,000[3] | 9 months[6] | $100 pre-order refundable payment |
| Prime Van | 100,000[4] | Single Amazon order[7] | N/A |
| R1T | N/A | 20 months[8] | Refundable deposit of $1000 required |

1. Both light and heavy duty pickup truck segments included. Based on IHS sales forecasts adjusted to allocate overall volume to fleet vehicles.
2. LMC 3. Electrek 4. The Verge 5. LMC started taking preorders online for the Endurance in Nov. 2019 per Trucks.com and started scouting fleet orders in Jan. 2020. 6. Nov. 2019 to present 7. Sept. 2019 to present 8. Rivian marketing post indicates preorders for the R1T have been open since Dec. 2018

Source: IHS Automotive

McKinsey & Company    40

Confidential

LMC_HERBERT0001190

68.    ████████████████████████████████████████████████████████████████

████████████████████████████████████████



Confidential

69.    The chart above shows that Legacy LMC was assuming a historic launch.  However, there is little apparent justification for these numbers outside of dubious letters of intent, as discussed below in detail.

ii.    *Legacy LMC Padded Its Supposed Order Backlog With Obviously Unreliable Letters of Intent*

70.     Besides the anticipated time to production, potential investors also wanted to see a large backlog of pre-orders for the Endurance.  While investors and the DiamondPeak Board alike were well-aware that letters of intent for fleet orders were not binding, the Proxy overstated the extent to which these orders were reliable.  For example, the Proxy stated "[a]lthough these pre-orders are nonbinding and did not require any deposit, [Legacy LMC] believes they ***demonstrate clear demand***

that will lead to binding orders once the Endurance is complete and potential customers are able to see firsthand the value that it offers."

71.    In reality, huge percentages of the Endurance pre-orders were facially unreliable, if not fraudulent.  McKinsey's diligence showed that despite Legacy LMC "aiming for 100% conversion," in reality Legacy LMC's letters of intent were far less reliable than letters involving peers in the electric car industry.

72.    As there was no required deposit for fleet orders, customers could write any number of cars down, with zero obligation.  As shown below, this was not standard practice, as many competitors required a financial commitment to make a pre-order or sign a letter of intent.

## LMC's letter of intent & marketing approach provides a low level of commitment from potential customers in line with industry

Perspective on sales volumes

| LMC approach | | | Industry practices |
|---|---|---|---|
| Letter of Intent (LOI) elements | Terms of customer commitment[1] | • **12,041 fleet vehicles** committed in **non-binding LOI**<br>• **828 personal vehicles** committed with **$100/vehicle deposit** via LMC website | • **Rivian:** refundable deposit of $1000 required, with class action waiver<br>• **Tesla Cybertruck:** $100 pre-order payments are not deposit, but instead cover cost of vehicle configuration and final price sheet processing; upon delivery, payment is credit toward full price; may cancel prior to delivery<br>• **Workhorse:** UPS pre-order of 950 vans contingent upon first 50 vans functioning properly, with ability for UPS to cancel if issues |
| | Purchase price | Intended terms, non-binding basis: $52,500 per vehicle, $7,500 federal tax credit per vehicle, 2-year installment option available | Where provided, prices are typically noted as subject to change |
| | Timelines | Not specified in LOI; in dialogue with potential buyers:<br>• Earliest test vehicles to be available Q1-Q2 2021, with delay to 2022 possible<br>• SOP in Oct 2021 as planned | • **Volkswagen ID3:** allows choice of delivery date – "First-movers" must visit dealership for bug fixes but receive three months leasing free, "second-movers" must wait another quarter for second wave production but receive full functionality<br>• **Tesla Cybertruck:** does not guarantee vehicle will be delivered |
| Sales & marketing | Expected conversion | Team aiming for 100% conversion; pre-order marketing focused on fleet leadership team members and key industry influencers | • **Tesla Model 3:** saw an 88% conversion from pre-orders, with 63,000 total cancelled and 455,000 net reservations prior to launch |
| | Customer engagement | • Leading with personal networks across industries<br>• Updates via email and social media; continued refinement of marketing materials based on customer feedback to date: emphasize early SOP, low TCO, wheel hub motor concept and benefits | • **General:** ongoing email marketing and outreach via social media reveals, launches, and other engagement<br>• **Rivian:** Configuration (battery size, color) to be available ~1y to SOP<br>• **Volkswagen ID3:** "Pre-booker" perks incl. performance upgrade, 1y free charging (WeCharge), 100 kW DC and 11 kW AC charging, welcome box |
| | Resourcing | • Currently 2 individuals, with Climb2Glory augmentation (+3)<br>• Ramp-up to 14 salespeople by July 2021 | • **Rivian:** team includes marketing & sales, content managers, digital customer engagement team, with additional adjacent roles such as utility & public program managers which may enable greater adoption |

1.   LMC effort kickstarted Jan 2019

Source: Press search, OEM websites, fleet manager and OEM interviews

McKinsey & Company    42

Confidential

LMC_HERBERT0001192

73.     Demonstrating that a 100% conversion rate was fantasy, Tesla only had an 88% conversion rate from pre-orders to sales for the Model 3.  The Tesla Model 3 required a $1,000 deposit and was produced by an established car company, both of which would likely increase the rate of conversion to sales.

74.     Additionally, Plaintiffs' investigation of Section 220 Documents revealed numerous highly suspicious orders.  For example, the orders cited in the Proxy included some for thousands of trucks (at a cost of $52,500 per truck) by individuals with no clear ties to any business with a need for trucks.

75.     On August 14, 2020, several suspicious orders were placed.  One such order, covering 14,000 trucks (which would cost $735 million, if filled), came from a company called $E^2$ Energy Advisors.  According to a simple Lexis search, $E^2$ Energy Advisors has revenues of about $4.4 million and a total of 18 employees.  A second suspicious order for ▮▮▮ trucks (which would cost ▮▮▮▮▮▮▮ if filled) was placed the same day by ▮▮▮▮▮▮▮.  A search on LinkedIn shows a green energy company called ▮▮▮▮▮▮▮ as having between "1-10 employees," with a search for ▮▮▮ showing between "51-200 employees."[9]

76.     Besides appearing facially impossible, each of these orders have another thing in common – the same individual, Tim D. Grosse ("Grosse"), signed

---

[9] The Plaintiffs have not identified any other specific companies called ▮▮▮▮▮▮▮ ▮▮▮▮

for all three companies. While Plaintiffs can identify a relationship between Grosse and E2 Energy Advisors, Plaintiffs found no connection between ███████████ █ and Grosse.

77.    These facially suspicious purchases appear to have been material to the Company's projections. On July 30, 2021, McKinsey reported that letters of intent covered 12,041 Endurance orders and provided "a low level of commitment from potential customers in line with industry." The Proxy, however, notes 38,000 "pre-orders" on October 8, 2020. Accordingly, these ██████ orders placed by Grosse (for multiple companies with neither the business nor personnel to ever need such a high volume of electric trucks) appear to represent a sufficient number of orders to unilaterally cause this change. The purchase price for all of these trucks would be ███████████

78.    Thanks to McKinsey's diligence, DiamondPeak thus knew of several critical flaws in Legacy LMC's business plan. *First*, Legacy LMC's ability to produce the Endurance as scheduled was in serious doubt. *Second*, despite these production delays (the consequence of which involved losing the first-mover advantage), meeting Legacy LMC's sales projections would require more Endurance trucks to be sold over the first two years than nearly any new vehicle launch in history. *Third*, Legacy LMC knew or at least should have known that a majority of its letters of intent were not viable.

27

iii.    *DiamondPeak Approves the de-SPAC Acquisition with Legacy LMC*

79.    On August 1, 2020, DiamondPeak and Legacy LMC entered into a merger agreement (the "Merger Agreement").  The Merger Agreement would result in Legacy LMC becoming a fully owned subsidiary of DiamondPeak.

80.    As noted above, on October 8, 2020, DiamondPeak filed the Proxy.  By this time, the DiamondPeak Board had been given extensive diligence by McKinsey and would have had several months to assess Legacy LMC's projections, including letters of intent.  Despite the DiamondPeak Board's knowledge of specific, concrete risks that had already materialized or were likely to come to pass, the Proxy vaguely and abstractly spoke of general risk.  For example:

> [Legacy LMC's] future business depends in large part on its ability to execute on its plans to develop, manufacture, market and sell or lease the Endurance. Any delay in the . . . design, manufacture and launch of Endurance, including in the retooling of the Lordstown Complex, could materially damage [Legacy LMC's] brand, business, prospects, financial condition and operating results. Vehicle manufacturers often experience delays in the design, manufacture and commercial release of new products. To the extent [Legacy LMC] experiences delays in . . . the launch of the Endurance, [Legacy LMC's] growth prospects could be adversely affected. In addition, it could diminish the "first mover" advantage [Legacy LMC] aims to attain, prevent [Legacy LMC] from gaining the confidence of potential customers and open the door to increased competition.

81.    Based on the diligence by McKinsey, the risk in this case was far from general or abstract.  The DiamondPeak Board had information showing these risks were real and specific to Legacy LMC.  One example of such a situation is the

potential for delays.  Instead of telling stockholders that Legacy LMC, a startup,

███████████████████████████████████████████████████████████████

███████████████████████████████████████████, the DiamondPeak Board

opted to focus on general market risk of delays.  Even more, as discussed above, the

DiamondPeak Board had ***actual knowledge*** that delay was likely and had an ████

████████ risk to its production timeline:



**8. The Endurance could have an** ███████████ **SOP delay; compared to industry best practice timeline that could be reduced to** ████████████

82.     The general risk disclosures about potential delay become more

untenable when coupled with general risk disclosures about losing first mover

advantage.  While the DiamondPeak Board disclosed a truism in economics, that

losing the first-mover advantage has a detrimental impact on a business, the Proxy

did not disclose what Defendants already knew about the likelihood that Legacy LMC was losing such an advantage.  Indeed, McKinsey even prepared a visual aid:



83.    Additionally, the Proxy generously highlights lofty numbers in its projections indicating a strong demand for the Endurance.  For example, as shown above at ¶68, the Proxy projects massive growth in demand for the Endurance, projecting roughly 100,000 Endurance trucks would be sold in the first two years of production.

84.    However, much like the generalized risks associated with production concerns, these risks regarding future sales remained generalized.  The disclosures include concerns regarding the lack of historical data on the Endurance, the risk of

the manufacturer only having one model, incorrect estimations of demand, and other general concerns for any growing business.

85.    However, what the Proxy did not give stockholders was a chance to see what the DiamondPeak Board, the Sponsor, and management saw, namely that the lofty projections would require an unprecedented new truck launch. McKinsey even provided a chart showing how such a launch would have to be one of the best ever.

86.    McKinsey's slides demonstrated that the Endurance would have to dominate the fleet segment market, despite coming out later than many of the listed competitors and competing against more established brands, in order to attain its projected success, shown above at ¶¶64-67.

87.    The Proxy's characterization of "pre-orders" similarly shows the DiamondPeak Board's strategy of disclosing promising facts specifically, while disclosing risks generally, even if they were specific and already anticipated.

88.    The Proxy talks often about the "pre-orders," explaining the positives and negatives together, for example:

> [Legacy LMC] has received pre-orders primarily from fleet operators to purchase over 38,000 Endurance vehicles. These pre-orders are not binding and did not require any deposit, so there can be no assurance that [Legacy LMC] will successfully convert them into binding orders or sales.

89.    In some cases, such a disclosure might be sufficient. However, in this case, it certainly was not. As discussed above at ¶¶75-77, ████ of those orders

31

were signed for by *one individual*, Grosse, on behalf of companies with no plausible means to purchase those trucks (***totaling*** ███████). The fact that ██████ out of 38,000 letters of intent appear to rely on one man, who does not have the means to pay for them, is highly material and completely omitted.

90.     Other statements by Legacy LMC outside of the Proxy further touted future sales for investors. On September 28, 2021, Burns appeared with then-President Donald Trump ("Trump") on the South Lawn of the White House. When asked by Trump how many trucks a year would be sold when they get it going, Burns replied "we'll make north of 100,000 once we get going."

91.     These high projections fueled investor excitement for the de-SPAC Acquisition, which was already at a fever pitch due to Tesla's meteoric rise. Indeed, between DiamondPeak's IPO on March 4, 2019, and the day the de-SPAC Acquisition was consummated on October 23, 2020, Tesla's stock price soared 637%. Such growth caused investors to look for the next Tesla, a company that could be the first to produce a novel electric vehicle.

92.     From what investors could see, Lordstown had the inside track to do just that – beat all major auto manufacturers to produce an electric truck. Executing on this projection would allow Lordstown to capture market share when there were no competitors and the world looked for alternatives to fleets relying on internal combustion engines. The reality, however, was completely inconsistent.

93.    Investors were not able to see this reality despite it being presented to the DiamondPeak Board by McKinsey, a world class consulting firm.  Despite this diligence revealing fatal flaws in Legacy LMC's plans, these negatives were presented to DiamondPeak stockholders as a vague truism – "sometimes things don't work out."

94.    On October 20, 2020, investors had the last opportunity to elect to redeem their shares.  Stockholders could redeem their shares regardless of how they voted (including abstaining) at the October 22, 2020 special meeting (the "Special Meeting"), where stockholders voted on the de-SPAC Acquisition.  At the Special Meeting, 99.9% of stockholders voted in favor of the de-SPAC Acquisition.

iv.    *The de-SPAC Acquisition is Consummated*

95.    On October 23, 2020, the de-SPAC Acquisition was consummated after being overwhelmingly approved.  This constituted the Initial Business Combination DiamondPeak had to complete in order to avoid having to return stockholders' money, only a few months before their deadline of March 4, 2021.

96.    Only 970 shares of Class A stock, out of 28 million, were redeemed in connection with the de-SPAC Acquisition.  This redemption rate of .003% is unusual considering the mean rate of redemptions in SPACs is 58% and the median rate of redemption is 73%.

97.    Following the de-SPAC Acquisition, Legacy LMC became a wholly owned subsidiary of DiamondPeak, which changed its name to Lordstown Motors Corp.

98.    The de-SPAC Acquisition also provided a much-needed cash infusion to Lordstown, with the combined company gaining access to the assets held by the Trust, (roughly $284.4 million) as well as $500 million from PIPE investors.  This capital was crucial to Lordstown, which was quickly burning cash.  The Proxy made several of these costs clear, stating the following costs would be necessary over the next twelve months:

- approximately $120 million for retooling Lordstown's factory, completing the Endurance, and its supply chain;

- approximately $90 million for research and development for the Endurance; and

- approximately $130 million for operating and other expenses relating to hiring the necessary workforce.

99.    At this point, the Sponsor's shares were subject to a lock-up provision. At the time of the closing of the de-SPAC Acquisition, the Sponsor's lock-up could terminate as early as six months later, as Lordstown stock would only have to remain above $12.00 per share for 20 out of 30 consecutive trading days at least 150 days after closing.  The earliest such date would have been April 21, 2021 – still long before the first production date falsely projected in the Proxy.

100.   Reflecting that investors and the market believed the Proxy and the insiders' other disclosures, Lordstown's stock soared to $18.21 per share on the day the de-SPAC Acquisition closed.

**D.   Lordstown's Stock Soars Until a Short Seller Defuses the Stamina of the Endurance Rally**

101.   Immediately following the de-SPAC Acquisition, Lordstown's stock performed well, with CEO Burns and other executives touting Lordstown's letters of intent, including a supposed order for 14,000 Endurance trucks from $E^2$ Energy Advisors.

102.   In February, Lordstown stock peaked at above $30 per share.   On February 23, 2021, Burns bragged about having sold over 100,000 vehicles.

   i.   *The Hindenburg Report Highlights an Inconvenient Truth - Lordstown's Projections are Fiction*

103.   On March 12, 2021, buy-side stock research firm Hindenburg Research issued a report entitled "The Lordstown Motors Mirage: Fake Orders, Undisclosed Production Hurdles, And A Prototype Inferno" (the "Hindenburg Report").

104.   The Hindenburg Report reported on a variety of problems facing Lordstown, including: (a) highly uncertain demand, including impossible orders and (b) the impossibility of Lordstown's production timeline for the Endurance.

105.   **First**, the Hindenburg Report highlighted how the non-binding letters of intent for the Endurance appear to have been made by individuals who had little

to no ability to purchase those vehicles. Having investigated Lordstown's December 2020 announcement of new orders for 14,000 Endurance trucks, the Hindenburg Report alleged that the order came from a company called $E^2$ Energy Advisors, which had no ability to complete that purported $735 million purchase. The Hindenburg Report further alleged the address for $E^2$ Energy Advisors was the address for the apartment of its principal, Grosse.

106.   Plaintiffs independently identified several orders by Grosse during their investigation pursuant to 8 *Del. C.* § 220 (as discussed above at ¶¶75-77). This includes $E^2$ Energy Advisors order for 14,000 trucks, which appears to have been made on August 14, 2020. Additionally, Plaintiffs found that the address for $E^2$ Energy Advisors is the same as alleged in the Hindenburg report, which is associated with Grosse (perhaps even his apartment).

107.   Plaintiffs also identified another order for ███████ trucks that Grosse signed on August 14, 2020 (the same day as his orders for $E^2$ Energy Advisors), for ██████████████████ Plaintiffs have identified no connection between Grosse and ██████████████.

108.   The Section 220 Documents contain several other facially absurd orders.

109.   On January 8, 2020, ██████████████████████ signed a letter of intent for ████ trucks, which would cost ██████████ if filled. Plaintiffs have

36

found no record of such a company following a web search. However, the individual who appears to have signed the pre-order, ██████████████ claims to be a PhD student at ██████████ and the co-founder of a company called ████ based on his LinkedIn profile. However, according to LinkedIn, ████ has fewer than ten employees.

110. On March 26, 2020, Innervations, LLC signed a letter of intent for 1,000 trucks, which would cost $52.5 million if filled. According to LinkedIn, this company has fewer than 10 employees and the address given on the company website is the address of a Regus co-working space.

111. On June 12, 2020, ████████████████ ordered ████ trucks, which would cost ████████ if filled. Based on a web search, the company built charging locations. News reports reveal that when the company was acquired in ████████ it had ██ charging stations. While financial data is unavailable, such a large order of trucks seems impossible considering the scale of this company.

112. The Hindenburg Report also alleged that a company called Climb2Glory was paid $50 per pre-order to generate orders for the Endurance, which would incentivize the generation of pre-orders that would not materialize. While the Plaintiffs requested documents on this relationship, none were produced that would either confirm or rebut this claim. However, slides presented to the DiamondPeak

Board by McKinsey indicate that the DiamondPeak Board knew of Climb2Glory's involvement in selling the Endurance for Legacy Lordstown.

113. ***Second***, the Hindenburg Report claimed that the Company's purported plan to begin production in September 2021 made no sense, as employees reported the project as years behind. One former employee reported that such production was at least three to four years away. Additionally, the Hindenburg Report claimed that battery and motor production could not occur in-house, as claimed.

114. Sure enough, the presentations from McKinsey made clear that production in 2021 would not occur. The Section 220 Documents further show that unless Lordstown, a startup, ████████████████████████████████████ ███████████████████████████

ii. *The Gig is Up, After the World Sees What is Going on, Lordstown Goes From the Next Big Thing to a Potential Meltdown and Criminal Scene*

115. On March 15, 2021, Lordstown ***denied*** the allegations in the Hindenburg Report.

116. On March 17, 2021, Burns announced that there was an SEC inquiry into Lordstown. A special committee of Lordstown's Board (the "Special Committee") was also formed "[i]n response" to the Hindenburg Report.

117. On March 25, 2021, Lordstown's annual report disclosed this SEC inquiry began on February 17, 2021, before the Hindenburg Report was published.

118.   On June 8, 2021, Lordstown announced that it did not have sufficient funds to begin commercial production.  As a result, Lordstown risked no longer functioning as a going concern.

119.   On June 14, 2021, Burns and Lordstown's Chief Financial Officer, Julio Rodriguez, resigned from their positions.

120.   The same day, the Special Committee released the results of its investigation into the Hindenburg Report.  In main, the Special Committee **doubled down** on the continued, fraudulent denials of the allegations in the Hindenburg Report, opining "that the Hindenburg Report is, in significant respects, false and misleading," and that "its challenges to the viability of Lordstown Motors' technology and **timeline to start of production is not accurate**."

121.   Moreover, making their own false statements in light of their own access to the McKinsey reports, "[t]he Special Committee concluded that while various factors could lead to delays in the start of production, **the projected September 2021 start of production remains achievable with the expectation of delivery to customers in the first quarter of 2022**."

122.   The Special Committee, however, did narrowly walk back some claims in the Proxy regarding pre-orders, conceding that certain disclosures "were, in certain respects, inaccurate."  For instance, the Special Committee noted, without providing any meaningful detail: "One entity that provided a large number of pre-

orders *does not appear to have the resources* to complete large purchases of trucks. Other entities provided commitments that appear *too vague or infirm* to be appropriately included in the total number of pre-orders disclosed."

123.    In July 2021, Lordstown confirmed that the United States Department of Justice was investigating its business.  Thus, Lordstown faced potential criminal, as well as civil, consequences for its potential wrongdoing.  The scope of this investigation included the de-SPAC Acquisition.

124.    On September 30, 2021, Lordstown announced a deal with Hon Hai Technology Group ("Foxconn"), which would result in Foxconn purchasing Lordstown's factory for $230 million.  The deal closed in May 2022. A key part of the deal is an agreement between the parties to manufacture the Endurance. However, even with the help of an experienced manufacturer, Lordstown has not provided a clear timeline for production. Indeed, according to Lordstown's May 9, 2022 Form 10-Q filed with the SEC, Lordstown's "current level of cash and cash equivalents are *not* sufficient to execute [its] 2022 business plan and achieve scaled production of the Endurance . . ." Thus, it is unclear whether the Endurance will *ever* reach production.

125.    As of the day prior to the filing of this Amended Complaint, Lordstown's stock closed at $2.25 per share, a steep discount to the $10 per share

(plus interest) redemption price and implying value destruction of nearly $221 million.[10]

## E. Defendants' Divergent Interests in the Initial Business Combination

126.    Class A Common Stockholders, the holders of Founder Shares, and the DiamondPeak Board had divergent interests in the de-SPAC Acquisition.  While DiamondPeak's public Class A Common Stockholders would only be better off if a de-SPAC created value above the redemption price, holders of Founders Shares received a windfall in the event of nearly any de-SPAC.  Additionally, the DiamondPeak Board's compensation aligned their interests perfectly with the holders of Founder Shares.

i.    *Insider Goal – Step One Do a Deal, Any Deal; Step Two Don't Implode*

127.    After DiamondPeak's IPO, holders of Founder Shares represented 20% of the Company's total equity.  Based on the Proxy, the Sponsor held 6,187,500 (88.4%) of the Founder Shares.

128.    As the Founder Shares represented 20% of shares outstanding, Founder Shares had a material impact on any vote.  Since 88.4% of those shares were beneficially owned by DiamondPeak Board member and CEO Hamamoto and DiamondPeak Board member Walsh, these insiders controlled a great deal of the

---

[10] 28,000,000 shares $\times$ ($10.14 - $2.25) = $220,920,000.

voting power of the Founder Shares.  Hamamoto and Walsh would agree to vote all of their shares (including their Founder Shares and an additional 1 million shares of Class A Common Stock held by Hamamoto) in favor of the de-SPAC Acquisition.

129.  Founder Shares had the potential to be immensely valuable, representing 20% of DiamondPeak's equity, provided an Initial Business Combination occurred.  The Proxy notes that, upon the Initial Business Combination, the Founder Shares held by the Sponsor would be worth $133,711,875 as of October 7, 2020, a return of ***over 500,000%***.

130.  If an Initial Business Combination did not occur, the Founder Shares had no redemption rights.  Accordingly, those shares would be rendered worthless.

131.  The Sponsor had additional incentives to vote in favor of the de-SPAC Acquisition regardless of its strength or merit.  The Sponsor had purchased and held 4,460,000 Private Placement Warrants.[11]  Absent an Initial Business Combination, those Private Placement Warrants (purchased for $6,690,000)[12] would expire worthless.

---

[11]  Each Private Placement Warrant would entitle the holder to purchase one share of Class A Common Stock at a price of $11.50 per share.

[12]  4,460,000 Private Placement Warrants × $1.50 per Private Placement Warrant = $6,690,000.

132.   Accordingly, owners of Founder Shares had a major incentive to approve an Initial Business Combination due to their potential upside, even if it destroyed value for the investing public.  The chart below highlights this dynamic, showing the value of the shares as well as the return on investment for holders:[13]

| Stock Price | Class A Common Stock | | Founder Shares | |
|---|---|---|---|---|
| | Value of Class | Return | Value of Class | Return |
| $20 | $560,000,000 | 100% | $140,000,000 | 559,900% |
| $18 | $504,000,000 | 80% | $126,000,000 | 503,900% |
| $16 | $448,000,000 | 60% | $112,000,000 | 447,900% |
| $14 | $392,000,000 | 40% | $98,000,000 | 391,900% |
| $12 | $336,000,000 | 20% | $84,000,000 | 335,900% |
| $10 | $280,000,000 | 0% | $70,000,000 | 279,900% |
| $8 | $224,000,000 | -20% | $56,000,000 | 223,900% |
| $6 | $168,000,000 | -40% | $42,000,000 | 167,900% |
| $4 | $112,000,000 | -60% | $28,000,000 | 111,900% |
| $2 | $56,000,000 | -80% | $14,000,000 | 55,900% |
| $0.5 | $14,000,000 | -95% | $3,500,000 | 13,900% |

133.   Due to Hamamoto and Walsh's immense voting power (in large part by virtue of their Founder Shares) and leading roles in DiamondPeak, they were in an influential position to ensure an Initial Business Combination occurred.

134.   The remaining members of the DiamondPeak Board (not including Hamamoto and Walsh), Hannaway, Hash, and Richardson, were similarly

---

[13] The Founder Shares were purchased by the Sponsor for $25,000.  The 28 million shares of Class A Common Stock were purchased during the IPO in units for $280 million.  While such units included warrants as well, Plaintiffs utilize this value considering the Redemption Right of roughly $10 per share ($10.14).

incentivized to complete an Initial Business Combination.  Upon completion of the Initial Business Combination, each would receive 88,357 Founder Shares from the Sponsor.  The Proxy valued these shares at roughly $1.9 million per director.

135.    Suspiciously, it is unclear exactly when this award was determined, as it first appears in SEC filings on August 24, 2020, just months before the Proxy. Such timing raises questions about whether the compensation considered the need to ensure director support.

  ii.    *Public Stockholder Interests*

136.    While insiders may celebrate any transaction, Class A Common Stockholders do not make lavish returns regardless of performance.  Instead, they have to consider whether they are better off simply receiving their money back, rather than investing it in a new company.  This involves a few considerations.

137.    ***First***, the public stockholders must decide whether the company selected to go public is one they want to remain invested in.

138.    ***Second***, the stockholders must decide if the deal is worth the dilution they will face.  When Founder Shares account for 20% of the SPAC's equity but were issued for just $25,000, that value is syphoned from public investors, who put up nearly 100% of capital, but receive just 80% of the SPAC's equity.  Thus, public

stockholders should only support an Initial Business Combination if that deal will create more enterprise value than they lose to the Founder Shares.[14]

## F. The de-SPAC Acquisition Was Unfair to Unaffiliated Holders of Class A Stock

     i.   *Defendants Selfishly Expropriated Value to the Detriment of the Unaffiliated Holders of Class A Stock*

139.   The DiamondPeak Board knew they selected a Company entirely unfit to create long-term value for Class A Common Stockholders.  The DiamondPeak Board appears to have accepted this result in the hopes of realizing a windfall.

140.   During DiamondPeak's time as a SPAC, the electric car craze was pushing valuations for electric car manufacturers to historic levels.  Thus, ensuring the market did not see weakness in Lordstown was crucial.  Legacy LMC was a startup with disclosed financing needs of nearly $350 million in a 12-month period.  At the same time, Legacy LMC (and the combined company Lordstown) would receive no material revenue until the Endurance began production on a large scale.  Such a scenario would only occur years after the de-SPAC Acquisition closed.

---

[14] To illustrate this point, if an investor buys a share for $10 a share to capitalize the SPAC, the Sponsor obtains 20% of the SPAC's equity via sponsor shares, so the investor only has $8 in equity.  Accordingly, the value of the entity would have to increase by at least 25% for the investor to have equity equal to what the investor invested initially, as they would need the value of their $8 in equity to increase by $2 just to break even.

141.    By creating hype around Lordstown, the DiamondPeak Board could ensure Lordstown had as much cash on hand as possible and delay the day of reckoning – Lordstown running out of money and having to take on debt or dilutive financing, both of which would harm Lordstown's stock price.    Further, the DiamondPeak Board made it more likely the stock would stay above $12.00 a share and end the lock-up period after just six months.

142.    The Sponsor nearly ended its lock-up period, narrowly missing the opportunity to sell its shares for a massive profit.    After the de-SPAC Acquisition, Lordstown's stock did not drop below $12.00 per share until March 24, 2021, less than a month before the 180-day window ended, and nearly two weeks after the Hindenburg Report was published.

143.    Had the Sponsor been able to keep the market unaware of Lordstown's misrepresentations for another few weeks, it would have realized, at a minimum, roughly $74.2 million in returns on their $25,000 investment.[15]

---

[15] As the total value of the Founder Shares would be worth $84 million if the value of the shares of Class A Common Stock was $12 a share, the Sponsor's ownership of 88.4% of Founder Shares would be worth $74.256 million.    This is over $74.2 million more than the $25,000 that the Sponsor paid for the Founder Shares.

ii.    *Stockholders Did Not Have a Fully Informed Opportunity to Elect Whether to Redeem their Stock*

144.   By withholding specific details of the troubling path ahead for Lordstown, the DiamondPeak Board did not allow investors to properly assess one important question:  is this investment worth more than $10.00 a share?  The breaches of duty materially impacted investors' views of Lordstown's outlook and prevented investors from exercising their individual right to choose to redeem or not redeem.

145.   First, the DiamondPeak Board chose to make statements suggesting Lordstown would begin production in 2021 despite knowing that production date was simply not feasible based on McKinsey's expert diligence.  Investors should have been told that McKinsey reported that production would not occur until roughly ███████ under ***ideal*** circumstances and ***supreme*** execution.

146.   Such an omission is glaring based on the Proxy's own assertion that first-mover advantage would be crucial.  However, the DiamondPeak Board chose not to reveal their own diligence that showed exactly which cars would beat the Endurance to the market based on expected delays.

147.   Second, while the DiamondPeak Board shared lofty projections for future sales, they did not disclose that their own data revealed the launch of the Endurance would have to be historic to achieve such sales.  Such a disclosure is

especially important given that Lordstown was a startup and not an established carmaker like GM, Ford, or Tesla.  Moreover, the inability to achieve first-mover advantage would also hinder – if not destroy – any ability for Lordstown to achieve the high projections shown to investors by the DiamondPeak Board.

148.    Third, while the DiamondPeak Board made clear that the large number of letters of intent may not materialize, they did not disclose that one man signing on behalf of two (or possibly three) companies, represented over two thirds of those letters of intent.  They also did not disclose another important detail – that the purchasing entities facially had no viable way to pay for those trucks, amounting to ███████████  In all events, the Proxy should have disclosed that such a large percentage of orders is linked to one individual.

149.    Fourth, the DiamondPeak Board touted Legacy LMC's bold claims of converting nearly all letters of intent to orders.  The DiamondPeak Board, however, did not tell investors that, despite being an operating company and requiring financial commitment, even Tesla did not convert pre-orders to actual orders at such a rate.

150.    Yet despite all the problems McKinsey flagged and which were obvious upon any review of the pre-order letters of intent, the DiamondPeak Board eagerly touted Legacy LMC's statements about converting all these letters of intent to orders at an unprecedented rate.

151.   These omissions robbed investors of the opportunity to assess whether redeeming their shares at a price of $10 a share was in their best interest.  Instead, they were deceived into leaving their money in a doomed Company.

## CLASS ACTION ALLEGATIONS

152.   Plaintiffs, stockholders in the Company, bring this action individually and as a class action pursuant to Rule 23 of the Rules of the Court of Chancery of the State of Delaware on behalf of themselves and all record and beneficial holders of Company common stock who held such stock as of the closing of the de-SPAC Acquisition on October 23, 2020 (except for the Defendants named herein, and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants) to redress the Defendants' breaches of fiduciary duties and other violations of law.

153.   This action is properly maintainable as a class action.

154.   A class action is superior to other available methods of fair and efficient adjudication of this controversy.

155.   The class (the "Class") is so numerous that joinder of all members is impracticable.  Prior to the closing of the de-SPAC Acquisition, there were 28 million shares of Class A Common Stock.  The number of Class members is believed to be in the thousands, and they are likely scattered across the United States.

156.   Moreover, damages suffered by individual Class members may be small, making it overly expensive and burdensome for individual Class members to pursue redress on their own.

157.   There are questions of law and fact which are common to all Class members and which predominate over any questions affecting only individuals, including, without limitation:

   a.   whether the Controller Defendants controlled the Company;

   b.   whether Defendants owed fiduciary duties to Plaintiffs and the Class;

   c.   whether "entire fairness" is the applicable standard of review;

   d.   which party or parties bear the burden of proof;

   e.   whether Defendants breached their fiduciary duties to Plaintiffs and the Class;

   f.   the existence and extent of any injury to the Class or Plaintiffs caused by any breach;

   g.   the proper measure of the Class's damages; and

   h.   the appropriateness of any equitable, injunctive, and /or declaratory relief.

158.   Plaintiffs' claims and defenses are typical of the claims and defenses of other Class members and Plaintiffs have no interests antagonistic or adverse to the interests of other Class members.  Plaintiffs will fairly and adequately protect the interest of the Class.

159.   Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

160.   Defendants have acted in a manner that affects Plaintiffs and all members of the Class alike, thereby making appropriate injunctive relief and / or corresponding declaratory relief with respect to the Class as a whole.

161.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

## COUNT I

**(Direct Claim for Breach of Fiduciary Duty Against the Director Defendants)**

162.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

163.   As directors of DiamondPeak, the Director Defendants owed Plaintiffs and the Class the utmost fiduciary duties of care, loyalty, good faith, candor, and disclosure in their capacity as DiamondPeak directors.

164.    These duties required them to place the interests of DiamondPeak stockholders above their personal interests and the interests of the DiamondPeak Defendants.

165.    Through the events and actions described herein, the Director Defendants breached their fiduciary duties to Plaintiffs and the Class by agreeing to and entering into the de-SPAC Acquisition without ensuring that it was entirely fair to Plaintiffs and the Class.  The de-SPAC Acquisition was unfair, reflecting an unfair price and unfair process.

166.    The Director Defendants also breached their duty of candor by issuing the false and misleading Proxy.

167.    As a result, Plaintiffs and the Class were harmed by not exercising their redemption rights prior to the de-SPAC Acquisition.

168.    Plaintiffs and the Class do not have an adequate remedy at law.

## COUNT II

**(Direct Claim for Breach of Fiduciary Duty Against the Controller Defendants)**

169.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

170.    The Controller Defendants were DiamondPeak's controlling stockholders.  Specifically, the Controller Defendants held 88.4% of the Founder

Shares at the time of the Proxy, held key positions in the Company and DiamondPeak Board, selected the DiamondPeak Board, and set compensation for other members of the DiamondPeak Board.

171.    As such, the Controller Defendants owed Plaintiffs and the Class the utmost fiduciary duties of care, loyalty, good faith, candor, and disclosure.

172.    At all relevant times, the Controller Defendants had the power to control, influence, and cause – and actually did control, influence, and cause – the Company to enter into the de-SPAC Acquisition.

173.    The de-SPAC Acquisition was unfair, reflecting an unfair price and unfair process.  With ultimate control over the disclosures made to all stockholders, the Controller Defendants knew that the disclosures were false and misleading yet purposefully allowed such disclosures to be promulgated to enhance the chance that the deal was voted through, with minimal redemptions.

174.    Through the events and actions described herein, the Controller Defendants breached their fiduciary duties to Plaintiffs and the Class by agreeing to and entering into the de-SPAC Acquisition without ensuring that it was entirely fair to Plaintiffs and the Class.

175.    As a result, Plaintiffs and the Class were harmed by not exercising their redemption rights prior to the de-SPAC Acquisition.

176.    Plaintiffs and the Class do not have an adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment and relief in their favor and in favor of the Class, and against Defendants, as follows:

A. Declaring that this Action is properly maintainable as a class action;

B. Finding the Director Defendants liable for breaching their fiduciary duties, in their capacity as DiamondPeak Board members, owed to Plaintiffs and the Class;

C. Finding the Controller Defendants liable for breaching their fiduciary duties, in their capacity as DiamondPeak's controlling stockholders, owed to Plaintiffs and the Class;

D. Certifying the proposed Class;

E. Awarding Plaintiffs and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

F. Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

G. Awarding Plaintiffs and the Class such other relief as this Court deems just and equitable.

Dated: July 22, 2022

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

OF COUNSEL:

Mark Lebovitch
**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1400

*Co-Lead Counsel for Plaintiffs*

-and-

D. Seamus Kaskela
**KASKELA LAW LLC**
18 Campus Blvd., Suite 100
Newton Square, PA 19073
(484) 258-1585

*Counsel for Benjamin Hebert*

Gustavo F. Bruckner
Daryoush Behbood
**POMERANTZ LLP**
600 Third Avenue
New York, NY 10016
(212) 661-1100

*Co-Lead Counsel for Plaintiffs*

*/s/ Daniel E. Meyer*
Gregory V. Varallo (Bar No. 2242)
Daniel E. Meyer (Bar No. 6876)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
(302) 364-3601

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel E. Meyer, hereby certify that, on July 29, 2022, the foregoing *Public*

*[redacted] version of Verified Amended Class Action Complaint* was filed and

served electronically via File & Serve*Xpress* upon the following counsel:

| | |
|---|---|
| Raymond J. DiCamillo, Esq. | Michael A. Pittenger, Esq. |
| Kevin M. Gallagher, Esq. | Jonathan A. Choa, Esq. |
| Alexander M. Krischik, Esq. | Nicholas D. Mozal, Esq. |
| Alena V. Smith, Esq. | Justin T. Hymes, Esq. |
| RICHARDS, LAYTON | POTTER ANDERSON |
| & FINGER, P.A. | & CORROON LLP |
| 920 North King Street | 1313 N. Market Street, 6th Floor |
| Wilmington, DE 19801 | Hercules Plaza |
| | Wilmington, DE 19899 |

Derrick Farrell, Esq.
LABATON SUCHAROW LLP
300 Delaware Ave., Suite 1340
Wilmington, DE 19801

*/s/ Daniel E. Meyer*
Daniel E. Meyer (Bar No. 6876)