**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>Lordstown Motors Corp., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-10831 (MFW)<br><br>(Jointly Administered)<br><br>**Re: D.I. 131** |

# DEBTORS' OBJECTION TO FOXCONN'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, CONVERT THE BANKRUPTCY CASES

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corp. (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101). The Debtors' service address is 38555 Hills Tech Dr., Farmington Hills, MI 48331.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................ 1

BACKGROUND ........................................ 5

LEGAL ARGUMENT ........................................ 10

I. The Chapter 11 Cases Were Filed in Good Faith. ........................................ 10

A. The Debtors Filed the Chapter 11 Cases for a Valid Bankruptcy Purpose. .......... 12

B. The Debtors Did Not File the Chapter 11 Cases as a Litigation Tactic. ............... 16

C. The Debtors Are in Financial Distress. ........................................ 18

II. Dismissal Is Not Warranted Under Section 1112(b)(4)(A). ........................................ 22

A. Foxconn Fails to Prove Substantial or Continuing Loss to or Diminution of the Estate. ........................................ 23

B. Foxconn Fails to Prove Absence of a Reasonable Likelihood of Rehabilitation. ........................................ 25

III. Dismissal or Conversion is Not in the Best Interests of Creditors (Other Than Foxconn). ........................................ 28

A. Dismissal or Conversion Is Not in the Best Interests of Creditors. ...................... 28

B. There is a Reasonable Likelihood that a Plan Will Be Confirmed Within a Reasonable Period of Time. ........................................ 29

CONCLUSION ........................................ 30

AMERICAS 124474347

RLF1 29503717v.1

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Andover Covered Bridge, LLC v. Harrington*,
553 B.R. 162 (B.A.P. 1st Cir. 2016) ....27

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999) ....12

*Carolin Corp. v. Miller*,
886 F.2d 693 (4th Cir. 1989) ....11

*In re 1031 Tax Grp., LLC*,
374 B.R. 78 (Bankr. S.D.N.Y. 2007) ....25

*In re 15375 Mem'l Corp.*,
589 F.3d 605 (3d Cir. 2009) ....12, 16

*In re AIG Fin. Prods. Corp.*,
651 B.R. 463 (Bankr. D. Del. 2023) (Walrath, J.) ....13, 22, 26

*In re Am. Cap. Equip., LLC*,
296 F. App'x 270 (3d Cir. 2008) ....12

*In re BH S&B Holdings, LLC*,
439 B.R. 342 (Bankr. S.D.N.Y. 2010) ....27

*In re Brown*,
951 F.2d 564 (3d Cir. 1999) ....28

*In re Brutsche*,
476 B.R. 298 (Bankr. D.N.M. 2012) ....27

*In re Cohoes Indus. Terminal*,
931 F.2d 222 (2d Cir. 1991) ....11, 19, 21

*In re Crown Vill. Farm, LLC*,
451 B.R. 86, 93 (Bankr. D. Del. 2009) ....13

*In re E. End. Dev.*,
491 B.R. 633 (Bankr. E.D.N.Y. 2013) ....13

*In re EHT US1*,
630 B.R. 410 (Bankr. D. Del. 2021) ....10, 14, 26

*In re Gateway Access Sols., Inc.*,
374 B.R. 556 (Bankr. M.D. Pa. 2007) ....................22, 23

*In re Gen. Growth Props.*,
409 B.R. 43 (Bankr. S.D.N.Y. 2009) ....................10

*In re Gonic Realty Tr.*,
909 F.2d 624 (1st Cir. 1990) ....................27

*In re Herb Philipson's Army & Navy Stores, Inc.*,
No. 18-61376 (DD), 2019 Bankr. LEXIS 3831 (Bankr. N.D.N.Y. Dec. 19, 2019) ....................27

*In re Integrated Telecom Express, Inc.*,
384 F.3d 108 (3d Cir. 2004) ....................12, 13, 15, 19, 20

*In re James Wilson Assocs.*,
965 F.2d 160 (7th Cir. 1992) ....................15

*In re JER/Jameson Mezz II Borrower, LLC*,
461 B.R. 293 (Bankr. D. Del. 2011) (Walrath, J.) ....................11, 16, 25, 26

*In re LTL Mgmt., LLC*,
No. 23-12825 (MBK), 2023 Bankr. LEXIS 1884 (Bankr. D.N.J. July 28, 2023) ....................20

*In re Midwest Props. of Shawano, LLC*,
442 B.R. 278 (Bankr. D. Del. 2010) ....................27

*In re PPI Enters. (U.S.), Inc.*,
228 B.R. 339 (Bankr. D. Del. 1998) ....................16

*In re PPI Enters. (U.S.), Inc.*,
324 F.3d 197 (3d Cir. 2003) ....................13, 26

*In re Perlin*,
497 F.3d 364 (3d Cir. 2007) ....................10

*In re Photo Promotion Assocs., Inc.*,
47 B.R. 454 (S.D.N.Y. 1985) ....................25

*In re Pinnacle Land Grp., LLC*,
No. 17-23339 (GLT), 2018 Bankr. LEXIS 2764 (Bankr. W.D. Pa. Sept. 10, 2018) ....................29

*In re Primestone Inv. Partners L.P.*,
272 B.R. 554 (D. Del. 2002) ....................11

*In re S. & Headley Assocs., Ltd.*,
No. 14-7578 (MAS), 2015 WL 5112725 (D.N.J. Aug. 31, 2015) ....................16

*In re SGL Carbon Corp.*,
200 F.3d 154 (3d Cir. 1999).....11, 16, 19, 20, 21

*In re Springs Hospitality, Inc.*,
No. 06-13331 (HRT), 2006 Bankr. LEXIS 1804 (Bankr. D. Co. Aug. 22, 2006).....17, 18

*In re Stingfree Techs., Inc.*,
No. 08-16323, 2009 Bankr. LEXIS 3023 (Bankr. E.D. Pa. Feb 4, 2009).....17, 18

*In re Stone Res., Inc.*,
458 B.R. 823 (E.D. Pa. 2011), *vacated on other grounds*, 482 F. App'x 719 (3d Cir. 2012).16

*In re Tamecki*,
229 F.3d 205 (3d Cir. 2000).....10

*In re Tracey Serv. Co.*,
17 B.R. 405 (Bankr. E.D. Pa. 1982).....23

*In re Union Cty. Wholesale Tobacco & Cando Co.*,
8 B.R. 439 (Bankr. D.N.J. 1981).....23

*In re Wigley*,
557 B.R. 671 (B.A.P. 8th Cir. 2016).....29

*Loop Corp v. U.S. Tr.*,
379 F.3d 511 (8th Cir. 2004).....27

**STATUTES**

11 U.S.C § 363.....26

11 U.S.C. § 1107(a).....5

11 U.S.C. § 1108.....5

11 U.S.C. § 1112(b)(2).....28

11 U.S.C. § 1112(b)(4)(A)..... passim

11 U.S.C § 1123(a)(5).....6

11 U.S.C. § 1123(b)(4).....13, 22

**OTHER AUTHORITIES**

Bankruptcy Rule 1015(b).....5

Local Rule 1015-1.....5

7 COLLIER ON BANKRUPTCY ¶ 1112 ..... 20, 27

v

AMERICAS 124474347

RLF1 29503717v.1

The debtors and debtors in possession (collectively, the "**Debtors**" or "**Company**") in the above-captioned cases hereby submit this objection (the "**Objection**") to the *Motion of Hon Hai Precision Industry Co., Ltd. (A/KA Hon Hai Technology Group), Foxconn EV Technology, Inc., and Foxconn EV System LLC to Dismiss, or, in the Alternative, Convert the Bankruptcy Cases* [D.I. 131] (the "**Motion**"). In support of the Objection, the Debtors submit contemporaneously herewith the *Declaration of Jeffrey Finger in Support of Debtors' Objection to Foxconn's Motion* (the "**Finger Declaration**"), *Declaration of Daniel Ninivaggi in Support of Debtors' Objection to Foxconn's Motion* (the "**Ninivaggi Declaration**"), and *Declaration of Edward T. Hightower in Support of Debtors' Objection to Foxconn's Motion* (the "**Hightower Declaration**").

## PRELIMINARY STATEMENT

1. When it became apparent that there was essentially no reasonable prospect that the Company would be able to accomplish the fundamental pivot of its business model that was premised on deep collaboration with Foxconn, the Board faced a difficult decision: continue operations and fundraising efforts in the hopes of somehow finding a pathway to bring the Company's vision to reality; or commence the process of winding up the Company's affairs in an orderly fashion. The former could deliver returns on the $1 billion of equity capital invested in the business, but risked exhausting the Company's remaining cash resources and leaving it unable to pay creditors or provide any return of shareholder capital. The latter would maximize the likelihood of paying creditors in full and may even provide some return of capital to shareholders, but would require abandoning the vision and the upside associated therewith.

2. Unlike so many other boards who refused or failed to recognize reality, the Company's Board came to grips with it and did the right thing. It instructed management and its

advisors to develop an efficient plan to liquidate the Company's liabilities, many of which either contingent or the subject of pending litigation and pursue a transaction that would maximize the value of the Company's remaining assets. Recognizing that the passage of time would only serve to further diminish distributable value, the Board then decided to pursue what it viewed as the path most likely to maximize distributable value and to deliver that value to stakeholders in a fair and timely way: it decided to commence a chapter 11 case.

3. The Motion is an attempt by Foxconn to avoid the consequences of its actions that contributed directly to the Company's demise and to undermine the Debtors' efforts to maximize the value of their estates for the benefit of all stakeholders. When the Company began its partnership with Foxconn two years ago, the Company materially and irreversibly pivoted its entire business model to one based on deep collaboration with Foxconn and the "EV Ecosystem" that Foxconn claimed was a key strategic priority. The Company's partnership with Foxconn was to include not only critical funding but also—and more importantly—Foxconn's commitment to bring its expertise and global supply chain capabilities to help lower the production cost of the Endurance and to partner with Lordstown to jointly develop a new vehicle platform that would be truly scalable, unique and competitive. The Company was to be a "preferred vehicle development partner" of Foxconn in North America. The Company entered its partnership with Foxconn with high expectations but Foxconn ultimately failed to deliver on the promises it had made.

4. By the time it became clear that Foxconn would fail to live up to its commitments, the Company had no viable, stand-alone business model and its best option was to seek chapter 11 protection to pursue three main objectives: (i) undertake an efficient and value maximizing sale process for all or substantially all of the Company's assets under section 363 of the

Bankruptcy Code, (ii) use the breathing spell afforded by the Bankruptcy Code to stay significant pending litigation and claims against the Company and efficiently and fairly liquidate all claims in a centralized forum and (iii) reduce costs and minimize the Company's operating cash burn.

5. The Debtors are making significant progress on these objectives. The Debtors have recently resolved, subject to this Court's approval, one of the most significant litigations facing the Company for years and are in the midst of a sales process that will hopefully lead to one or more value-maximizing transactions. While a number of challenges remain to be overcome, the Debtors anticipate that they will be in a position to file a chapter 11 plan in the very near term that will provide a pathway for a value-maximizing quick and efficient exit from bankruptcy.

6. Rather than support these goals, or at least stay out of the way, Foxconn has worked to undermine them. Foxconn filed the Motion to take away the benefits and protections of chapter 11, disrupt the Debtors' sale process, and cause the Debtors to spend more time and money litigating. None of this maximizes the value of the Debtors' estates, benefits stakeholders (except perhaps Foxconn), or is otherwise productive. Instead, it is clearly calculated to bleed the Debtors with litigation expense, deprive them of any ability to meaningfully rehabilitate, and ultimately weaken their ability to pursue their claims against Foxconn.

7. The weakness of Foxconn's position is revealed by the Motion's internal inconsistency. On the one hand, Foxconn argues that the Court should dismiss or convert the Chapter 11 Cases because the Debtor is flush with cash, making this a two-party dispute that should be resolved in a non-bankruptcy forum. On the other hand, Foxconn acknowledges that the Karma Litigation, SEC Investigation and Securities Actions cause the Debtors to continue to incur significant legal fees that would "rapidly diminish[]" the estate to the detriment of

creditors, Mot. at 22, while also asserting the ongoing litigation claims should not affect the Court's analysis of financial distress, id. at 15. What Foxconn ignores is that the host of financial challenges facing the Debtors at the time they filed is exactly what chapter 11 is designed to address. And the fact that the Debtors have taken steps to resolve one of the largest, but by no means only, challenges proves the chapter 11 process is working, not that it should be dismissed or converted.

8. While Foxconn condemns the very Chapter 11 Cases it played a role in causing, neither its allegation of the Debtors' bad faith nor the assertion that the Debtors lack a reasonable likelihood of rehabilitation withstands scrutiny. Absent the protections afforded through chapter 11, the Debtors would face a "race to the courthouse" situation where the Debtors would be dismembered in a disorderly fashion and at great cost, resulting in significantly reduced and unequal recoveries for all stakeholders. Trade creditors would be competing with litigation plaintiffs, who would be competing with indemnification claimants, who would all be competing with the SEC. Creditors would recover, not in an orderly and fair way under a bankruptcy plan, but based on who could secure a judgment and seize the Debtors' assets first. This would prejudice creditors and would likely eliminate any chance of a recovery for equity.

9. Dismissing the Chapter 11 Cases would also mean that any effort to sell the Company's assets would not have the protection and benefits of chapter 11, benefits Foxconn itself recognized prepetition when it proposed buying all of the Company's assets through a 363 sale in bankruptcy. Foxconn made the rational and reasonable judgment that the best way to buy a distressed business such as this one is with a free and clear order issued by a bankruptcy court. Other potential buyers should not be deprived of the same opportunity. Foxconn's position that the Debtors' sale process is doomed to fail is telling. If Foxconn were truly interested in

maximizing the value of the Debtors' assets, there are any number of things it could do to assist in the process rather than disparaging the Company, its products and its people. The Company cannot predict the outcome of the sale process, which is ongoing. But the Debtors are committed to driving it to its conclusion to maximize the value of their business, whatever that might be.

10. Chapter 11 is designed to avoid exactly the type of mess that would result from granting Foxconn's Motion. By weakening the Debtors' ability to address their distress in an orderly fashion and thereby their ability to meaningfully hold Foxconn to account for its wrongdoing, the relief sought by Foxconn would benefit only one party, Foxconn. The Court should see this tactic for what it is and deny the Motion.

## BACKGROUND

11. On June 27, 2023 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). These Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On July 11, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed the official committee of unsecured creditors (the "**Committee**") for these Chapter 11 Cases. No trustee or examiner has been appointed in these Chapter 11 Cases.

12. The Company develops, manufactures and sells electric vehicles ("**EVs**") primarily to commercial fleet customers. Hightower Decl. ¶ 5. It is one of the only original equipment manufacturers ("**OEMs**") in North America focused solely on light-duty electric

vehicles for commercial fleet customers. *Id.* The Company's flagship vehicle is the "Endurance," a full-size, all-electric pickup truck. *Id.*

13. In September 2021, the Company entered into an agreement that led to a partnership with an affiliate of Hon Hai Precision Industry Co., Ltd., also known as Foxconn ("**Foxconn**"), the world's largest electronics manufacturer. The purpose of the Foxconn partnership was to allow the Company to shift its business strategy from a vertically integrated OEM to a less capital-intensive model, focused on developing, engineering, testing, and industrializing EVs in close partnership with Foxconn. *See* Hightower Decl. ¶ 8; Ninivaggi Decl. ¶ 7. What started out as a promising partnership devolved, over a two-year period, into a string of broken promises and, ultimately, these Chapter 11 Cases.

14. Designing and building a world-class, all electric vehicle in sufficient volume to earn a profit is no easy task. Hightower Decl. ¶ 8. Foxconn knew that when it agreed to partner with the Company to not only scale the Endurance but also to develop a new electric vehicle platform leveraging the Company's North American engineering and product development team's expertise and Foxconn's "EV ecosystem," a combination of Foxconn initiatives designed to accelerate electric vehicle innovation and bring vehicles to market faster and less expensively. *Id*. The Company's reliance on Foxconn's promises led the Company to sell its Lordstown, Ohio assembly plant to Foxconn and fundamentally change its business model, pivoted away from developing and manufacturing vehicles on a stand-alone basis. *Id*. ¶ 9; Ninivaggi Decl. ¶ 7. It went all in on its new business model, which was based on a deep collaboration with Foxconn and the "EV Ecosystem" that Foxconn claimed was a strategic priority. Ninivaggi Decl. ¶ 7. At the time the Company made this decision, it seemed like the best course. *Id*. With

the Company focusing on what it did best and Foxconn providing its expertise, global supply chain capabilities and capital, the Board believed that the enterprise could succeed. *Id*.

15. But when Foxconn failed to deliver on its promises, the Company was unable to continue on its own. Ninivaggi Decl. ¶ 7. Contrary to Foxconn's assertions, the Debtors are not blaming Foxconn for all of its challenges. Rather, those challenges were well understood by Foxconn and the Company's new leadership team from the inception of the partnership through the latest set of commitments Foxconn made in the November 2022 Investment Agreement. Hightower Decl. ¶ 10. When Foxconn attempted to improperly terminate the Investment Agreement months later (after the Company successfully completed an expensive and lengthy CFIUS approval process), the entire premise of the Company's business model—which relied on deep collaboration with Foxconn—faced irreparable damage. *Id*. Foxconn's actions damaged the Company's business relationships, employee morale and relations, and the Company's future prospects, stripping it of its ability to continue as a going concern on a stand-alone basis. Ninivaggi Decl. ¶ 7.

16. This left the Company in an impossible position: insufficient cash and no source of funding to profitably scale the production of the Endurance; highly-visible disputes with the contract manufacturing partner for the Endurance (Foxconn); the refusal by Foxconn to pursue an alternative future vehicle development platform (which was what Foxconn had agreed to do); no source of meaningful revenue; numerous ongoing litigations and claims that threatened to deplete the cash that the Company did have; and no viable, stand-alone business model. Ninivaggi Decl. ¶ 8. Faced with these circumstances, the Company's board of directors determined that its best alternative was to file these Chapter 11 Cases for the purpose of maximizing value for the benefit of their stakeholders and ensuring an orderly and fair

distribution of that value to all creditors and, hopefully, to equity holders. Ninivaggi Decl. ¶¶ 4, 9.

17. The Chapter 11 Cases were designed to allow the Company to deal with a variety of financial, operational and legal challenges it was facing in the period leading up to the filing. *Id.* ¶ 4. At that time the Company was facing an imminent "bet the company" trial with Karma. *Id.* ¶ 5. While the Company firmly believed that Karma's nearly $1 billion damage claim was grossly inflated, the trial court had denied summary judgment on nine of Karma's claims and had scheduled the case for a jury trial in early September 2023. *Id.* If the jury returned a verdict at anything remotely close to the damages sought and if that verdict survived post-trial motions and appeal, the consequences for the Company and its stakeholders would have been devastating. *Id.* The Company was also facing multiple securities lawsuits in several different courts, including class actions and derivative actions pending in the Northern District of Ohio, the District of Delaware, and the Delaware Chancery Court. *Id.* ¶ 6. The costs of those suits and the risk of judgments against either the Company or the Company's directors and officers that had indemnification rights were additional major threats. *Id.* In addition, the SEC has been investigating the Company and current and former officers and directors based on the same alleged wrongful conduct by former management that gave rise to the securities litigations. *Id.* And again, all of this was against a backdrop of Foxconn's ultimate failure to support the Foxconn-Lordstown partnership on which the Company had based its entire business model, meaning that a sale of the Company's assets was essential. The chances of the Company finding such a transaction outside of chapter 11 were remote insofar as it was highly unlikely that any party would be willing to transact without the protections of section 363 given the contingent liabilities the Company faced. Ninivaggi Decl. ¶ 9; Finger Decl. ¶ 12. In addition, the terms of

the Company's Investment Agreement with Foxconn prohibited the Company from pursuing a transaction without Foxconn's consent at the time and Foxconn itself was suggesting that it would want to buy the Company's assets pursuant to a section 363 sale. Thus, it seemed that chapter 11 would be needed for a sale process to have any prospect for success. Ninivaggi Decl. ¶¶ 8, 9. Finally, the Debtors do have claims against Foxconn and they asserted them in the this Court which, again, provides one centralized forum to address all of the Debtors' various financial and legal challenges. While Foxconn may not like these objectives, they are all legitimate reasons for filing chapter 11.

18. The Debtors are executing on their strategy. On the Petition Date, the Debtors filed a bidding procedures motion and initiated a timely and efficient chapter 11 marketing and sale process to pursue and consummate a value-maximizing sale of their assets for the benefit of all stakeholders. [D.I. 16] (the "**Bid Procedures Motion**"); Finger Decl. ¶ 8. The Debtors received a total of thirteen indications of interest from potential bidders ("**IOIs**"). Finger Decl. ¶ 9. While it is impossible to know what type of transaction will come out of the sale process, the Debtors and their investment bank, Jefferies, are working hard to drive the process towards the September 8 bid deadline. *Id.* ¶ 12; Bid Procedures Order at 5.

19. The Debtors were also able to negotiate a settlement of the Karma Litigation (the "**Karma Settlement**"), which will remove an immediate and substantial threat to the Debtors' sale process, their solvency, and recoveries to stakeholders. *See* [D.I. 248] (the "**Karma Settlement Motion**"); *see* Ninivaggi Decl. ¶ 11. While this settlement remains subject to Court approval, it is a major step towards accomplishing the Debtors' objectives and providing for a swift and efficient exit from chapter 11. Ninivaggi Decl. ¶ 11.

20. Nonetheless, although the Karma Settlement resolves a major challenge facing the Debtors, more remain. The Debtors must still execute on the ongoing sale process, resolve the size of their unsecured claims pool, address the securities litigation claims, and deal with any claim made by the SEC, while at the same time preserving any going-concern value of their business (including its core engineering team) and their valuable causes of action against Foxconn. Ninivaggi Decl. ¶ 12. The establishment of a claims bar date will provide additional clarity on resolution of these issues, and is an important bankruptcy tool that allows the Debtors to identify their creditors.

## LEGAL ARGUMENT

21. The Motion should be denied in its entirety because: (a) the evidence proves that the Debtors filed their Chapter 11 Cases in good faith with a valid bankruptcy purpose and not as a litigation tactic; (b) the Chapter 11 Cases will not result in substantial or continuing loss to or diminution of the estate or the absence of a reasonable likelihood of rehabilitation; and (c) the Debtors and their creditors would not be better served by dismissal.

### I. The Chapter 11 Cases Were Filed in Good Faith.

22. Bad faith should "not [be] lightly infer[red]" and dismissal based on lack of good faith is generally only appropriate in "egregious cases." *In re Perlin*, 497 F.3d 364, 373 (3d Cir. 2007) (quoting *In re Tamecki*, 229 F.3d 205, 208 (3d Cir. 2000)); *In re EHT US1*, 630 B.R. 410, 429 (Bankr. D. Del. 2021) ("Dismissal based on lack of good faith 'should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence.'") (citation omitted); *In re Gen. Growth Props.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y.

2009) ("[A] bankruptcy petition should be dismissed for lack of good faith only sparingly and with great caution.") (citing *Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989)).

23. Whether a bankruptcy case has been filed in good faith is a "fact intensive inquiry" in which the court must examine the "totality of facts and circumstances" and determine where a petition falls along the spectrum ranging from the "clearly acceptable to the patently abusive." *In re JER/Jameson Mezz II Borrower, LLC*, 461 B.R. 293, 298 (Bankr. D. Del. 2011) (Walrath, J.) (quoting *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999)). Determinations about whether a bankruptcy petition was filed in good faith, including whether the company was in distress, are to be made as of the petition date. *See SGL Carbon*, 200 F.3d at 164 ("Courts have allowed companies to seek the protections of bankruptcy when faced with pending litigation that posed a serious threat to the company's long term viability. In those cases . . . debtors experienced serious financial and/or managerial difficulties at the time of filing."); *In re Cohoes Indus. Terminal*, 931 F.2d 222, 228 (2d Cir. 1991) ("[I]t is clear that [the debtor] was encountering financial stress at the time it filed its petition.").

24. The non-exhaustive list of factors that this Court has applied in determining whether a case was filed in good faith is as follows:

> (a) single asset case; (b) few unsecured creditors; (c) no ongoing business or employees; (d) petition filed on eve of foreclosure; (e) two-party dispute that can be resolved in pending state court action; (f) no cash or income; (g) no pressure from non-moving creditors; (h) previous bankruptcy petitions; (i) prepetition conduct was improper; (j) no possibility of reorganization; (k) debtor formed immediately prepetition; (l) the debtor filed solely to create automatic stay; and (m) the subjective intent of the debtor.

*See JER/Jameson*, 461 B.R. at 298–99 (citing *In re Primestone Inv. Partners L.P.*, 272 B.R. 554, 557 (D. Del. 2002)). No single factor is determinative. *Primestone*, 272 B.R. at 558.

25. The Third Circuit focuses on two key inquiries when assessing whether a petition was filed in good faith: (i) whether the petition serves "a valid bankruptcy purpose," e.g., by preserving a going concern or maximizing the value of the debtor's estate, and (ii) whether the petition was "filed merely to obtain a tactical litigation advantage." *In re 15375 Mem'l Corp.*, 589 F.3d 605, 618 (3d Cir. 2009) (citations omitted).

26. Foxconn argues that the Debtors (i) do not have a valid business purpose, (ii) seek a litigation advantage in a two-party dispute, and (iii) are not in financial distress. These arguments ignore the reality of the Debtors' position and are contrary to the facts and the law.

**A. The Debtors Filed the Chapter 11 Cases for a Valid Bankruptcy Purpose.**

27. "[A]t its most basic level, bankruptcy is designed to handle the distribution problems arising when the system of individual creditor remedies harms the creditors as a group and there are not enough assets to go around." *15375 Mem'l Corp.*, 589 F.3d at 620; *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 121 (3d Cir. 2004) ("At its most basic level, the Bankruptcy Code maximizes value by alleviating the problem of financial distress.").

28. To address those distribution problems, the "two main functions of bankruptcy law are (1) preserving going concerns and (2) maximizing property available to satisfy creditors." *In re Am. Cap. Equip., LLC*, 296 F. App'x 270, 273–74 (3d Cir. 2008) (quoting *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)). A valid bankruptcy purpose includes preserving value that would otherwise be lost outside of chapter 11. *See Integrated Telecom*, 384 F.3d at 120 ("To say that liquidation under Chapter 11 maximizes the value of an entity is to say that there is some value that otherwise would be lost outside of bankruptcy.").

29. The Debtors easily meet these standards as material value will be lost outside of bankruptcy. The Company halted production of the Endurance until a value-maximizing transaction is identified in order to preserve its assets and turn its focus entirely to maximizing recoveries through the chapter 11 cases, including marketing and selling the Company and/or substantially all of its assets pursuant to the sale process. Ninivaggi Decl. ¶ 9 n.3. With the Court's approval, the Company has embarked on this sales process and attracted thirteen indications of interest. Finger Decl. ¶¶ 8–9.

30. Contrary to Foxconn's assertion that liquidation is not a valid bankruptcy purpose, courts, including the Third Circuit, consider maximizing value through the sale of all or substantially all of a debtor's assets to be a proper use of the Bankruptcy Code. *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 211 (3d Cir. 2003) (determining that reorganization is not the only "appropriate use of Chapter 11 since the Code clearly contemplates liquidating plans under 11 U.S.C. § 1123(b)(4), whereby a debtor may develop a Chapter 11 plan to sell off all of its assets"); *Integrated Telecom,* 384 F.3d at 120 n.4 ("Yet liquidation plans, no less than reorganization plans, must serve a valid bankruptcy purpose. That is, they must either preserve some going concern value, *e.g.,* by liquidating a company as a whole or in such a way as to preserve some of the company's goodwill, or by maximizing the value of the debtor's estate."); *see In re E. End. Dev.,* 491 B.R. 633, 642 (Bankr. E.D.N.Y. 2013) ("So long as the liquidating plan serves a valid purpose, which the Debtor's proposed plan does, the intent to liquidate assets in an orderly process is not evidence of bad faith."); *see also* 11 U.S.C. § 1123 (b)(4) ("[A] plan may . . . provide for the sale of all or substantially all of the property of the estate, and the distribution of proceeds of such sale among the holders of claims or interests."); *In re Crown Vill. Farm, LLC*, 415 B.R. 86, 93 (Bankr. D. Del. 2009) (finding proper purpose where "where

the Debtor will market the Crown Property and subject it to an auction process for sale to the highest and best bid."); *In re AIG Fin. Prods. Corp.*, 651 B.R. 463, 476–77 (Bankr. D. Del. 2023) ("[A] sale under section 363 is a valid bankruptcy avenue which will stem the Debtor's losses and allow for the orderly monetization of the Debtor's [assets]"); *In re EHT US1, Inc.*, 630 B.R. at 431 (Bankr. D. Del. 2021) ("[A] 363 sale followed by a plan is a legitimate bankruptcy purpose[]").

31. The unsupported nature of Foxconn's Motion and assertion of bad faith is further demonstrated by Foxconn's own pre-bankruptcy actions. For months, the Debtors attempted to engage Foxconn to reach a consensual resolution of the parties' disputes. Just prior to the Petition Date, rather than honor its contractual obligations, Foxconn proposed an alternative transaction in which it would acquire "all or substantially all the assets" of the Debtors "pursuant to a chapter 11 plan of reorganization . . . subject to a competitive sale process carried out in accordance with bidding procedures approved by Foxconn." Ninivaggi Decl. Ex. B (June 22 Letter) ¶¶ 1–2. This letter was offered after the parties failed to reach a consensual resolution of their disputes for nearly three months, was highly conditional and did not legally obligate Foxconn to execute the suggested transaction. Ninivaggi Decl. ¶ 9 n.3. Therefore, the Board did not believe that the proposal provided a sufficient basis for delaying a chapter 11 filing by the Company. *Id*. Foxconn understands the need for these Chapter 11 Cases, but it wants them run for its benefit rather than for the benefit of all stakeholder constituencies. The only party acting in bad faith is Foxconn.

32. Importantly, chapter 11 undoubtedly provides the tools needed to maximize the value of the Debtors' assets. It allows for the approval of efficient bid procedures, permits the Debtors to assume and assign contracts to a buyer that cannot be assumed and assigned under

non-bankruptcy law and provides buyers with assurances that assets can be purchased free and clear of claims. None of this is possible without a bankruptcy proceeding.[2]

33.     Foxconn's argument that the Debtors seek the process advantages afforded in bankruptcy is without merit. Mot. at 11. It is a "truism" that "it is not bad faith to seek to avail oneself of a particular protection in the Bankruptcy Code – Congress enacted such protections with the expectation that they would be used." *Integrated Telecom,* 384 F.3d at 128; *In re James Wilson Assocs.*, 965 F.2d 160, 170 (7th Cir. 1992) ("It is not bad faith to seek to gain an advantage from declaring bankruptcy – why else would one declare it?"). "[A] desire to take advantage of the protections of the Code cannot establish *bad* faith as a matter of law." *Integrated Telecom*, 384 F.3d at 128. The Debtors have sought the protections of the Bankruptcy Code to facilitate their proper chapter 11 goals, to commence a sale process for their assets, reduce their expenses, centralize and rapidly resolve claims, including their claims against Foxconn, and, ultimately, distribute maximum value to stakeholders. Ninivaggi Decl. ¶¶ 4, 10-11. These goals do not indicate bad faith. Not only is pursuing these goals in a chapter 11 proceeding a valid and proper purpose in seeking the protections of the Bankruptcy Code but the Chapter 11 Cases presented the only viable path forward for the Debtors to sell their assets insofar as (a) the Investment Agreement with Foxconn explicitly restricted the Debtors from selling all of their assets and (b) only through a section 363 sale could the Debtors sell assets free and clear of their substantial litigation overhang. Ninivaggi Decl. ¶¶ 7, 9.

---

[2] Foxconn ignores that it is a party to several important executory contracts which would not be assignable outside of a bankruptcy case, including a manufacturing agreement. Dismissal of the Chapter 11 Cases would provide Foxconn with substantial advantages in connection with any sale process. Further, many of the Debtors' assets are located at the manufacturing plant owned by Foxconn. A dismissal would allow Foxconn to limit a potential purchaser's access to the Debtor's property without any convenient forum to resolve disputes.

**B. The Debtors Did Not File the Chapter 11 Cases as a Litigation Tactic.**

34. For a chapter 11 case to be dismissed as a litigation tactic, the Third Circuit applies a strict standard: there must be "no doubt that the primary, if not sole, purpose of the filing was a litigation tactic." *SGL Carbon Corp.*, 200 F.3d at 165; *see 15375 Mem'l Corp.*, 589 F.3d at 625 (dismissal requires the filing be "merely" a litigation tactic). For a litigation tactic to be improper, it must involve a proposed debtor trying to gain an unfair advantage in the underlying litigation itself, such as by delaying an ongoing non-bankruptcy court proceeding or trying to establish a factual contention in such proceeding. *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998). Timing alone cannot result in a finding of bad faith. *In re Stone Res., Inc.*, 458 B.R. 823, 831 (E.D. Pa. 2011), *vacated on other grounds*, 482 F. App'x 719 (3d Cir. 2012); *see In re S. & Headley Assocs., Ltd.*, No. 14-7578 (MAS), 2015 WL 5112725, at *4 (D.N.J. Aug. 31, 2015) (stating that "filing just prior to foreclosure is not per se indicative of a litigation strategy" as timing is "not a definitive circumstance"); *JER/Jameson*, 461 B.R. at 299 (noting that no single *Primestone* factor, such as timing, is dispositive).

35. Here, there are no improper litigation "tactics" of any kind. The "certain tactical advantages" that Foxconn argues the Debtors obtained are vague, do not constitute bad faith, and make no sense: (1) staying all other litigation against the Debtors "in order to focus its resources on pursuing Foxconn," Mot. at 11, (2) litigating "in the shadow of a purported sale process in an attempt to lend legitimacy to its false narrative," *id.* at 11, and (3) "holding themselves out as legitimate chapter 11 debtors . . . in order to obtain process advantages stemming from litigation in bankruptcy." *Id.*

36. Foxconn's argument that the Debtors are staying other litigation in order to focus on pursuing Foxconn contradicts Foxconn's argument that this case is a two-party dispute and

makes clear that the Debtors are subject to significant disputes with multiple parties and need bankruptcy relief to preserve assets for their stakeholders. The Debtors' actions in these cases also completely undermine Foxconn's argument. To date, the Debtors have initiated a sales process and resolved a major claim against them, all while granting Foxconn significant extensions of time to respond to the Debtors' complaint against it. While the Debtors have sought a variety of relief from the Court, none of it has had anything to do with Foxconn. Ironically, the first substantive matter that this Court is being asked to adjudicate with respect to Foxconn is this Motion.

37. Foxconn's argument that the Chapter 11 Cases are a disguise for a two-party dispute is baseless given the many creditor groups competing for the Debtors' limited assets as of the Petition Date. *Id.* at 12. The Motion itself describes the Karma Litigation, SEC Investigation, and Securities Actions, *id.* at 21–22, and acknowledges the Debtors' failure to obtain additional funding. *Id.* at 18. As of the Petition Date, there were significant claims against the Debtors, including the litigation in which Karma sought nearly $1 billion in damages from the Company, a series of securities actions against the Company (including class actions and derivative actions pending in the Northern District of Ohio, the District of Delaware, and the Delaware Chancery Court), as well as a pending SEC investigation. Ninivaggi Decl. ¶¶ 5–6. There was also a host of litigation and potential claims against a number of the Company's current and former directors and officers, all of whom potentially have indemnification rights against the Company. The Debtors' efforts to address the claims against the Company as part of the chapter 11 process have already found success in resolving the most substantial claim facing the Company—the Karma Litigation—during these Chapter 11 Cases.

38. Nonetheless, Foxconn cites two cases—*In re Stingfree Techs., Inc.,* No. 08-16323, 2009 Bankr. LEXIS 3023 (Bankr. E.D. Pa. Feb 4, 2009) and *In re Springs Hospitality, Inc.,* No. 06-13331 (HRT), 2006 Bankr. LEXIS 1804 (Bankr. D. Co. Aug. 22, 2006)—to argue that the Debtors commenced these cases as a forum-shopping exercise for a two-party dispute. Mot. at 13–14. Neither case is applicable here. In *Stingfree,* the court found that the debtor was attempting to evade arbitration provisions in a settlement agreement, that the assets it planned to sell were encumbered, and that it had "no method of marketing" its assets. *In re Stingfree,* 2009 Bankr. LEXIS 3023, at *23. Here, by contrast, no arbitration provision prevents the Debtors from asserting their claims against Foxconn, the Debtors' assets are not encumbered, and the Debtors have embarked on a sales process with the aid of Jefferies—described by Foxconn as "one of the preeminent investment banks in the world," Mot. at 24–25—which has already attracted indications of interest.

39. In *Spring Hospitality*, the court determined that the petitioners who initiated an involuntary bankruptcy proceeding lacked any equity in the single-asset debtor and "clearly used the vehicle" of a bankruptcy "as an end run around the fact that the shareholder group as a whole rejected their efforts to authorize the filing of a voluntary petition." 2006 Bankr. LEXIS 1804, at *16. The court determined that the involuntary proceeding "merely open[ed] up yet another forum for the insiders to litigate" and found "no potential for any benefit to any non-insider party from allowing [the] case to continue because it appears there simply are no non-insider parties in interest in the case." *Id.* Here, by contrast, the Debtors have commenced voluntarily petitions to sell their assets and liquidate various claims for the benefit of all stakeholders, not to circumvent a governance dispute.

**C. The Debtors Are in Financial Distress.**

40. Foxconn argues that the Debtors "were not facing any imminent financial threat, showing that they filed . . . simply to sue Foxconn." Mot. at 15. Foxconn states that (1) the Debtors have approximately $136 million in cash on hand and no funded debt obligations, (2) based on "current cash burn" the Debtors could "wind-down and seek a strategic transaction ***for more than two years,"*** and (3) the Debtors "have more than enough liquidity" to resolve the trade claims outside of bankruptcy in the ordinary course. *Id.* Foxconn further argues that the Debtors' liquidity as a result of the $40 million Karma Settlement precludes a finding of financial distress. Aug. 15, 2023 Hr'g Tr. at 5:23–7:22.

41. "It is well established that a debtor need not be insolvent before filing for bankruptcy protection." *SGL Carbon Corp.*, 200 F.3d at 163; *Integrated Telecom*, 384 F.3d at 121 ("[A] debtor need not be *in extremis* in order to file such a petition.") (quoting *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 228 (2d Cir. 1991). Indeed, the Bankruptcy Code encourages "early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation." *SGL Carbon Corp.*, 200 F.3d at 163. Instead, a debtor need only "face such financial difficulty that, if it did not file at the time, it could anticipate the need to file in the future." *Id.* at 164. Financial distress is determined as of the date of the bankruptcy petition. *See SGL Carbon*, 200 F.3d at 164 ("Courts have allowed companies to seek the protections of bankruptcy when faced with pending litigation that posed a serious threat to the companies' long term viability. In those cases . . . debtors experienced serious financial and/or managerial difficulties at the time of filing."); *In re Cohoes Indus. Terminal*, 931 F.2d 222, 228 (2d Cir. 1991) ("[I]t is clear that [the debtor] was encountering financial stress at the time it filed its petition.").

42. Although the Debtors maintain sufficient cash to continue their limited operations in the near term, time is of the essence. *See* Ninivaggi Decl. ¶ 8. Foxconn even notes that the Debtors' "present circumstances are dire." Mot. at 22. The Company's lack of revenue, inability to obtain financing needed to carry the business forward, and pending lawsuits, including the Karma Action where Karma asserted a billion-dollar claim that was scheduled for a jury trial in September, exacerbate the "dire" circumstances. Absent a bankruptcy filing, the Company would have continued to burn cash at an accelerating rate as the Karma trial approached. The Delaware class action was moving towards trial, there were continuing direct costs and indemnification payments for the securities litigation and SEC investigation, the Company was incurring costs in connection with the Foxconn dispute, and the growing concern regarding the Company's financial viability started to lead to increased trade claims that would likely accelerate. Ninivaggi Decl. ¶ 6. But more fundamentally, once it became clear that Foxconn would not meet its obligations to the Company, the Company's business model became unsustainable and a bankruptcy became inevitable. *See* Ninivaggi Decl. ¶¶ 7–9. Foxconn cites no legal authority for the proposition that the Company should have delayed the filing and continued to burn cash simply because it could. Indeed, the law is to the contrary. *See SGL Carbon Corp.*, 200 F.3d at 163; *Integrated Telecom*, 384 F.3d at 121. As the bankruptcy court in the District of New Jersey recently noted, "companies [that] flounder too long without restructuring assistance face increased borrowing costs, diminished goodwill, and a lethal loss of leverage with vendors and lenders." *In re LTL Mgmt., LLC*, No. 23-12825 (MBK), 2023 Bankr. LEXIS 1884, at *24 (Bankr. D.N.J. July 28, 2023). While the *LTL* court ultimately held that dismissal of the bankruptcy case was appropriate because the *LTL* debtor's assets "exceed[ed]

the projected near term and aggregate talc liabilities," *id.* at *36, the Debtors are in a very different position.

43. Rather than preventing a chapter 11 filing, dismissal of these Chapter 11 Cases would only delay the inevitable, as the Debtors' cash burn (inclusive of all extraordinary costs and contingent liabilities) and lack of revenue will undoubtedly lead them to another trip to bankruptcy within a few months following such dismissal, only this time with less cash, fewer critical employees and less flexibility to conduct an orderly sale process for the benefit of the vast majority of the Debtors' stakeholders. *See* Ninivaggi Decl. ¶ 10. Foxconn suggests that the Debtors should have simply maintained the status quo outside of chapter 11, but the Board determined that given the circumstances faced by the Company, including its cash burn that averaged $10 and $15 million per month, the inability to obtain the financing required to scale production of the Endurance, no viable alternative vehicle platform without Foxconn's support, increasing trade claims, the need to sell its assets in an efficient manner and very significant (and increasingly imminent) contingent liabilities, there was no reason to wait until the Company's cash eroded further to begin the bankruptcy process. *Id*. ¶ 10. By filing when it did, with sufficient liquidity to execute a value maximizing restructuring process, the Company believed it would maximize distributions to all stakeholders. *Id*. Paying all creditors in full and providing a recovery to equity has always been the Company's objective what the bankruptcy process was designed to achieve. *Id*. While the thought of leaving the Company as an empty husk without the resources to maximize the value of its assets or pursue claims it has against Foxconn may be in Foxconn's best interests, it is not in the interests of any other stakeholders.

44. As previewed at a recent status conference before the Court, it appears Foxconn intends to try to punish the Debtors for taking steps to protect their estates by resolving the

Karma Litigation, arguing that there is no longer any financial distress. Aug. 15, 2023 Hr'g Tr. at 5:23–7:22. This is wrong as a matter of law. The Debtors' financial distress is determined as of the Petition Date. *See SGL Carbon*, 200 F.3d at 164; *In re Cohoes Indus. Terminal*, 931 F.2d at 228. This makes perfect sense as the goal of chapter 11 is to address and, hopefully, alleviate, the financial distress that led to the filing. If Foxconn's view of the law were right, no chapter 11 case could ever end in success, as it would be dismissed as a result of the steps taken to lead to a successful outcome. The very purpose of filing for bankruptcy would become the reason for dismissing the case. Moreover, while the Karma Settlement removed a major risk to the financial condition of the estate, many issues remain. Ninivaggi Decl. ¶ 12. The Debtors must still deal with, among other things, the general unsecured claims pool, the Securities Actions, the SEC Investigation, various indemnification obligations, the sale of their business and hopefully preservation of the Debtors' potentially valuable NOLs.

## II. Dismissal Is Not Warranted Under Section 1112(b)(4)(A).

45. Section 1112(b)(4)(A) of the Bankruptcy Code allows for dismissal or conversion of a chapter 11 case if there would otherwise be "substantial or continuing loss to or diminution of the estate **and** the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A) (emphasis added). Neither of these elements is met here. The analysis under section 1112(b)(4)(A) involves a two-fold inquiry: the court must determine (1) "whether, post-petition, the debtor has continued to experience a negative cash flow or declining asset values," and (2) whether there is any reasonable likelihood that the debtor, or another party, will be able to stop the losses and regain solid financial footing within a reasonable time." *AIG Fin. Prods. Corp.,* 651 B.R. at 475 (citing 7 COLLIER ON BANKRUPTCY ¶ 1112.04[6][a][ii]); *see also In re Gateway Access Sols., Inc.,* 374 B.R. 556, 562 (Bankr. M.D. Pa. 2007) (holding that the court

must (1) "look at the track record of the [d]ebtor to determine if it is suffering losses or making gains," and (2) "determine whether rehabilitation is likely given the evidence presented at hearing"). Both tests must be satisfied. *AIG Fin. Prods. Corp.,* 651 B.R. at 475.

**A. Foxconn Fails to Prove Substantial or Continuing Loss to or Diminution of the Estate.**

46. If the bankruptcy estate has sustained a substantial loss following the commencement of the case, or the debtor is operating with a sustained negative cash flow or diminution in asset value after the commencement of the case, these facts are sufficient to justify a finding of "substantial or continuing loss to . . . the estate." *Gateway Sols., Inc.*, 374 B.R. at 564. In considering this first prong of the section 1112(b)(4)(A) analysis, courts consider the debtor's "track record." *Id.* at 562. The burden of showing a substantial or continuing loss and diminution of the estate is on the creditor seeking relief. *In re Tracey Serv. Co.,* 17 B.R. 405, 409 (Bankr. E.D. Pa. 1982) (citing *In re Union Cty. Wholesale Tobacco & Cando Co.,* 8 B.R. 439 (Bankr. D.N.J. 1981)).

47. Foxconn stresses that the Debtors are not operating their business and face substantial legal fees due to the Karma Litigation, the SEC Investigation and Securities Actions, as well as the Chapter 11 Cases. Mot. 21–22. Foxconn argues that the "present circumstances are dire, and the estate is rapidly diminishing to the detriment of creditors" due to these administrative expenses. *Id.*

48. Foxconn ignores that the circumstances that drove the Debtors to seek chapter 11 relief in the first place included Foxconn's failure to satisfy its commitments to provide operational support and funding under the Investment Agreement, its failure to honor commitments in the parties' manufacturing agreement to help to reduce the production cost of

the Endurance, access Foxconn's supplier network and to assist in improving the commercial terms of procurement with suppliers, along with the other actions outlined in the complaint against Foxconn. Moreover, the impact of Foxconn's unfulfilled promises left the Debtors in a position where third parties would be unwilling to invest in a broken business model. And the Investment Agreement was specifically structured to prevent the Company from seeking a new partner to replace Foxconn. *See* Ninivaggi Decl. ¶ 7. This illustrates why Foxconn's arguments regarding the Debtors' "illusory" sale prospects and failure "to locate any potential investors or buyers" for two years rings hollow. Mot. at 24–25. The Debtors' prepetition efforts to raise financing tells us nothing about the likely outcome of the ongoing post-petition sale process. While the Debtors cannot guarantee that the sale process will be successful, it is certainly not illusory. The benefits of section 363 are clear, as Foxconn itself recognized when making such protections a condition of its expression of interest to acquire the Debtors' assets. Ninivaggi Decl. ¶ 9.

49. A Court-supervised sale process was not only appropriate but essential if the Debtors were going to have any prospect of selling their assets amidst the overhang of the litigation against them and of the Foxconn relationship. In filing the Motion less than one month after the Petition Date, Foxconn seeks to create a self-fulfilling prophesy.

50. Foxconn's assertion that the Debtors will be unable to create interest in selling the Debtors' assets "where it has been decidedly shown that none exists" is both disingenuous and wrong. Mot. at 25. As of August 3, 2023, the Debtors received a total of thirteen indications of interest from potential bidders ("**IOIs**"). Finger Decl. ¶ 9. Although much work remains to be done, and the Debtors cannot be certain what kind of transaction or transactions the sale process will yield, there is no basis to conclude that the process should be cut short. Instead of seeking to

terminate the Chapter 11 Cases before the sale process is complete and disparaging the Company, its people and its products, Foxconn should be supporting the sale process. But Foxconn wants the process to fail, so that the Debtors do not have the resources to pursue their valuable claims against Foxconn.

51. As the Debtors have no meaningful revenue and were experiencing cash burn, the Board determined there was no reason to wait until the Company's cash eroded further to begin the bankruptcy process. *See* Ninivaggi Decl. ¶ 10. The Board carefully weighed the costs and benefits of chapter 11 when deciding whether to file. *See id*. While bankruptcy costs are real, an efficient bankruptcy case provides benefits that outweigh those costs, including a higher likelihood of a successful sale process and an orderly and fair way to liquidate claims and make distributions to stakeholders. *See* Ninivaggi Decl. ¶ 10; Finger Decl. ¶ 12; Hightower Decl. ¶ 13. Foxconn's motion is a needless and wasteful distraction from the value maximizing purposes of chapter 11. Unlike the filing itself, the motion to dismiss benefits only Foxconn.

**B. Foxconn Fails to Prove Absence of a Reasonable Likelihood of Rehabilitation.**

52. "The fact that there is a continuing loss to the estate, due to the mounting administrative costs and the lack of any new business entering the estate, is insufficient to establish 'cause' within the meaning of [section] 1112(b)." *In re 1031 Tax Grp., LLC,* 374 B.R. 78, 93 (Bankr. S.D.N.Y. 2007). Movants must also establish that there is an absence of a reasonable likelihood of rehabilitation. *Id.* (finding no cause to dismiss or convert under section 1112(b)(A)(4) because the movant could not challenge the debtor's ability to rehabilitate, despite showing a continuing loss to the estate); *In re Photo Promotion Assocs., Inc.,* 47 B.R. 454, 458 (S.D.N.Y. 1985) (stating that a party moving under section 1112(b)(4)(A) must establish both the

continuing loss to or diminution of the estate *and* absence of a reasonable likelihood of rehabilitation).

53.     "Rehabilitation" is different from "reorganization."  Importantly, "rehabilitation . . . contemplates more than just a reorganization and embraces all the possible options for enhancing value under the Bankruptcy Code, including a sale." *Jer/Jameson*, 461 B.R. at 303; *PPI*, 324 F.3d at 211 ("[T]he Code clearly contemplates liquidating plans under 11 U.S.C. § 1123(b)(4), whereby a debtor may develop a Chapter 11 plan to sell off all of its assets.").  In *Jer/Jameson,* this Court specifically sanctioned an orderly liquidation process as a valid form of "rehabilitation":

> The Court does not agree with [movant's] blanket assertion that chapter 11 is not available to a debtor to conduct an orderly liquidation, as opposed to a piecemeal foreclosure process. The Code expressly contemplates the use of a bankruptcy case to sell the assets of the estate in such a manner. 11 U.S.C §§ 363 & 1123(a)(5).

461 B.R. at 303.  And again in *AIG Fin. Prods. Corp.*, this Court affirmed that "a sale under section 363 is a valid bankruptcy avenue which will stem the Debtor's losses and allow for the orderly monetization of the Debtor's derivative rights." 651 B.R. at 475–76.  The *AIG* debtor was able to demonstrate a reasonable likelihood of rehabilitation, in part, "because the Plan provides that the Debtor will conduct a simultaneous process to sell 'all or substantially all' of its assets to AIG or a third party under section 363." *Id.* at 475.  The Court also clarified that the "sale process contemplated in the bankruptcy case must be designed to realize some value that would not be available outside of bankruptcy." *Jer/Jameson*, 461 B.R. at 303.

54.     Foxconn essentially argues that the Debtors' intentions to liquidate rather than restore their business necessarily means that they cannot rehabilitate and thus these Chapter 11

Cases must be dismissed. Mot. 23–27. This argument ignores the abundant precedent of chapter 11 sales under section 363 and orderly liquidations which would, under Foxconn's theory, be improper. *See EHT US1,* 630 B.R. at 432 & n.93 ("The restructuring of the [d]ebtors through a 363 sale followed by a plan is a legitimate bankruptcy purpose[]."). Moreover, Foxconn knows that this is a valid use of the chapter 11 process, proposing only days before the Petition that Foxconn itself would purchase all of the Debtors' assets "pursuant to a chapter 11 plan of reorganization" so long as there were "bidding procedures approved by Foxconn." Ninivaggi Decl. Ex. B (June 22 Letter) ¶ 2.

55. Moreover, in each case Foxconn cites, either (1) the sale of assets had already occurred before the courts decided to dismiss or convert the bankruptcy case, or (2) the bankruptcy case had been pending for many months with no material progress. *See Loop Corp v. U.S. Tr.*, 379 F.3d 511, 513 (8th Cir. 2004) (stating that the debtors "successfully liquidated their two primary businesses as well as substantially all of their assets" in the months following the bankruptcy filing before the U.S. Trustee moved to convert); *In re Herb Philipson's Army & Navy Stores, Inc.*, No. 18-61376 (DD), 2019 Bankr. LEXIS 3831, at *7 (Bankr. N.D.N.Y. Dec. 19, 2019) (stating that the U.S. Trustee "table[d] the issue of conversion . . . to allow [d]ebtor to begin a wind-down and liquidation of its business" until all the debtor's retail inventory and certain furniture, fixture, and equipment were sold); *In re Gonic Realty Tr.*, 909 F.2d 624, 625 (1st Cir. 1990) (stating that during the course of the proceedings the debtor's principal assets and real property were sold); *Andover Covered Bridge, LLC v. Harrington*, 553 B.R. 162 (B.A.P. 1st Cir. 2016) (dismissing case after four months when the debtors' plan remained "speculative"); *In re Midwest Props. of Shawano, LLC*, 442 B.R. 278, 288 (Bankr. D. Del. 2010) (dismissing case without prejudice until environmental problem preventing sale of real estate was remedied); *In re*

*BH S&B Holdings, LLC*, 439 B.R. 342 (Bankr. S.D.N.Y. 2010) (finding inability to rehabilitate after two years of chapter 11 proceedings); *In re Brutsche*, 476 B.R. 298, 301-02 (Bankr. D.N.M. 2012) (finding inability to rehabilitate after one year of chapter 11 proceedings).

56. Simultaneous with the sale of all or substantially all of the Debtors' assets, the Debtors will continue to make efforts to resolve all material contingent and disputed claims and issues against the Debtors, and have resolved the largest claim—contingent or otherwise—against the Company. *See* Karma Settlement Motion [D.I. 248]. Given the substantial progress the Debtors have made since the Petition Date, Movants cannot establish an absence of a reasonable likelihood of rehabilitation.

57. Further, as with the first prong of the section 1112(b)(4)(A) analysis, the early stage of the Chapter 11 Cases may lead the Court to conclude that the second prong is not satisfied as well. *See In re Brown,* 951 F.2d 564, 572 (3d Cir. 1991) (noting that "the motion to dismiss was presented just a few weeks after the petition was filed and before the posture of the case was clear" and reversing dismissal of chapter 11 bankruptcy). With the Karma litigation settled, subject to Bankruptcy Court approval, and the sale process ongoing there is no basis to credit Foxconn's speculation that the sale process will fail.

## III. Dismissal or Conversion is Not in the Best Interests of Creditors (Other Than Foxconn).

58. Even if cause existed to dismiss these cases—it does not—section 1112(b)(2) still provides that a court "may not" convert or dismiss a chapter 11 case (i) "if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate," (ii) the debtor establishes that "there is a reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time," and

(iii) the cause for dismissal or conversion (other than under section 1112(b)(4)(A)), for which there exists a "reasonable justification," can be cured within a reasonable period of time. *See* 11 U.S.C. § 1112(b)(2); 7 COLLIER ON BANKRUPTCY ¶1112.01[3].

**A. Dismissal or Conversion Is Not in the Best Interests of Creditors**.

59. "Courts have much discretion in making the determination as to whether there are unusual circumstances that should prevent dismissal or conversion." 7 COLLIER ON BANKRUPTCY ¶1112.05[2]. Although a finding of unusual circumstances is within the court's discretion, the word "unusual" contemplates facts that are not common to chapter 11 cases generally. *Id.* "[A] determination of unusual circumstances is fact intensive and contemplates facts that are not common to [c]hapter 11 cases." *In re Pinnacle Land Grp., LLC,* No. 17-23339 (GLT), 2018 Bankr. LEXIS 2764, at *20 (Bankr. W.D. Pa. Sept. 10, 2018); 7 COLLIER ON BANKRUPTCY ¶1112.05[2].

60. Courts have found qualifying "unusual circumstances" where the likely outcome for creditors under chapter 11 would be vastly superior to dismissal or conversion. *See In re Wigley,* 557 B.R. 671 (B.A.P. 8th Cir. 2016) (affirming the bankruptcy court's denial of a motion to dismiss or convert, finding that the debtor was financially distressed and that the bankruptcy petition was filed for the valid bankruptcy purpose of maximizing the value of assets for all creditors and such assess would have significantly less value in a forced liquidation). Creditor recoveries under these Chapter 11 Cases would be vastly superior than their recoveries if the Chapter 11 Cases were dismissed or converted. Dismissal would leave creditors to engage in a free for all where they would each race to secure a judgment against the Debtors in an effort to ensure they get paid first. Trade creditors would be competing with securities plaintiffs who would be competing with directors and officers asserting indemnification claims, who would all

be competing with the SEC. Moreover, as explained above, the sale process would have little chance of success, thus eliminating a potential source of recovery. Conversion would likewise be of no benefit, leaving a trustee in the same position as the debtors but with the delay and cost associated with a trustee getting up to speed and hiring a new set of professionals.

**B. There is a Reasonable Likelihood that a Plan Will Be Confirmed Within a Reasonable Period of Time.**

61. Foxconn argues that the Debtors' proposed "sale process will result in no actionable bids," noting that for two years the Debtors tried to "create interests in the Debtors' assets where it has been decidedly shown that none exists." Mot. at 25. Again, Foxconn blatantly ignores the fact that prior to the petition date the Debtors never tried to sell their assets to a third party. Not only were they restricted from doing so by the Investment Agreement, but the partnership with Foxconn was, at that time, the key to the Company's business model. To attract new partners and financing prepetition, the Company needed to demonstrate the strength and value of the Foxconn partnership—in particular support on the Endurance and, even more importantly, the first new jointly developed vehicle platform. Hightower Decl. ¶ 10. Foxconn failed to deliver on various commitments with respect to the Endurance and the Company spent considerable resources on developing the new vehicle platform, with little support from Foxconn. *Id*. So even efforts to seek financing (which the Debtors could seek pre-petition) were, at that time, directed towards financing a business heavily dependent on a non-performing Foxconn and, in particular, the new vehicle program Foxconn failed to support. Now Foxconn is arguing that the Company's failure to attract substantial interest prepetition means its assets have little or no value. But the current sale process is nothing like any efforts the Company undertook prepetition: 1) it includes sale of all the Company's assets; 2) the Company is now free from

Foxconn's influence and control; 3) section 363 offers a host of benefits not available outside bankruptcy and 4) the Karma litigation has been settled.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court deny the Motion in its entirety.

Dated: August 21, 2023

Respectfully submitted,

*/s/ Daniel J. DeFranceschi*

**RICHARDS, LAYTON & FINGER, P.A.**

Kevin Gross (No. 209)
Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Amanda R. Steele (No. 5530)
Jason M. Madron (No. 4431)
Cory D. Kandestin (No. 5025)
One Rodney square
920 N. King Street
Wilmington, DE 19801
Telephone: (302) 561-7700
Facsimile: (302) 651-7701
gross@rlf.com
defranceschi@rlf.com
heath@rlf.com
steele@rlf.com
madron@rlf.com
kandestin@rlf.com

*Proposed Co-Counsel to Debtors and Debtors-in-Possession*

**WHITE & CASE LLP**

Thomas E Lauria
Matthew C. Brown
Fan B. He
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
tlauria@whitecase.com
mbrown@whitecase.com
fhe@whitecase.com

David M. Turetsky
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
david.turetsky@whitecase.com

Jason N. Zakia
111 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 881-5400
jzakia@whitecase.com

Roberto Kampfner
Aaron Colodny
Doah Kim
RJ Szuba
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700
rkampfner@whitecase.com
aaron.colodny@whitecase.com
doah.kim@whitecase.com
rj.szuba@whitecase.com

*Co-Counsel to Debtors and Debtors-in-Possession*