IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| Lordstown Motors Corp., *et al.*,[1] | Case No. 23-10831 (MFW) |
| Debtors. | (Jointly Administered) |
| | Re:  D.I. 131 & 281 |

**DECLARATION OF DANIEL NINIVAGGI IN SUPPORT OF
DEBTORS' OBJECTION TO FOXCONN'S MOTION**

I, Daniel Ninivaggi, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I submit this declaration (this "**Declaration**") in support of the *Debtors' Objection to Foxconn's Motion to Dismiss, or in the Alternative, Convert the Bankruptcy Cases*.

2. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information I have received from other members of the Debtors' management team, the Debtors' advisors, and discussions with certain other professionals at Jefferies LLC ("Jefferies").  If I were called to testify, I could and would testify competently to the facts set forth herein.

3. I am the Executive Chairman of the Company.  I previously served as the Chief Executive Officer of the Company from August 2021 to July 2022.  Prior to joining the Company,

---

[1] The Debtors in these chapter 11 cases (these "**Chapter 11 Cases**"), along with the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corp. (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101). The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

I served in executive positions with various companies, including as President and Chief Executive Officer of Icahn Enterprises L.P., a diversified holding company. I have experience in several senior leadership positions in the automotive and transportation industries, including at Lear Corporation and Federal Mogul Holdings Corporation. I have extensive experience as a director of public companies, including at Garrett Motion Inc., Icahn Enterprises, Motorola Mobility, CIT Group, Navistar International, Hertz Global Holdings and CVR Energy. I have an MBA from the University of Chicago Booth School of Business, a JD from Stanford Law School, and a BA from Columbia University.

4. The Debtors have filed these Chapter 11 Cases for the purpose of maximizing value for the benefit of their stakeholders and ensuring an orderly and fair distribution of that value to all creditors and, hopefully, to equity holders. The Chapter 11 Cases are designed to allow the Debtors to deal with a variety of different financial, operational and legal challenges they were facing in the period leading up to their filing.

5. At the time the Debtors filed their petitions, they were facing an imminent "bet the company" trial with Karma. While the Company firmly believed that Karma's nearly $1 billion damage claim was grossly inflated, the trial court had denied summary judgment on nine of Karma's claims and had scheduled the case for a jury trial for early September 2023. If the jury returned a verdict at anything remotely close to the damages sought and if that verdict survived post-trial motions and appeal, the consequences for the Company and its stakeholders would have been devastating.

6. The Company was also facing multiple securities lawsuits in several different courts, including class actions and derivative actions pending in the Northern District of Ohio, the District of Delaware, and the Delaware Chancery Court. The costs of those suits, and the risk of

judgments against either the Company or directors and officers that had indemnification rights, was another major threat. In addition, the SEC has been investigating the Company and current and former officers and directors based on the same alleged wrongful conduct by former management that gave rise to the securities litigations. The growing concern regarding the Company's financial viability also started to lead to increased trade claims that would likely accelerate.

7. In addition, the Company's existing business model could not work without the support Foxconn had failed to provide. When the Company entered into its partnership with Foxconn, it pivoted away from developing and manufacturing vehicles on its own. It went all in on its new business model, which was based on a deep collaboration with Foxconn and the "EV Ecosystem" that Foxconn claimed was a major corporate priority.[2] At the time the Company made this decision, partnering with the world's largest contract manufacturer, best known for producing the iPhone for Apple, with significant EV ambitions seemed like the best course. With the Company focusing on what it did best and Foxconn providing its expertise, global supply chain capabilities and capital, the Board believed that the enterprise could succeed. But when Foxconn failed to deliver, the Company was unable to continue on its own. Foxconn's actions damaged the Company's business relationships, employee morale and relations, and the Company's future prospects, stripping it of its ability to continue as a going concern on a stand-alone basis. In addition, the Investment Agreement with Foxconn, which is attached as Exhibit A, prohibited the

---

[2] According to their public announcements, dating back to 2019, Foxconn had a target of providing components or services for 10% of the world's EVs by between 2025 and 2027. In connection with Foxconn's plans, they had already announced joint ventures or commercial relationships with major global automotive OEMs, such as Stellantis and Geely (owner of such brands as Volvo Cars, Lotus and Polestar), and EV startups including Fisker, Byton and Faraday Futures.

Company from soliciting or entering into a proposal to sell the Company or its assets to any other potential partner without Foxconn's consent. Investment Agreement § 5.18(a).

8. This left the Company in an impossible position: insufficient cash and no source of funding to profitably scale the production of the Endurance; highly-visible disputes with the contract manufacturing partner for the Endurance (Foxconn); the refusal by Foxconn to pursue an alternative vehicle platform (which was what Foxconn had agreed to do); no source of meaningful revenue; numerous ongoing litigations and claims that threatened to deplete the cash that the Company did have; and no viable, stand-alone business model.

9. Based on all of these factors, chapter 11 was, and remains, the best course for the Company. Bankruptcy not only provides the Company with breathing space from its host of litigation and claims, but it also allows the Company to market its assets in a 363 sale, which gives buyers the opportunity to buy the assets free and clear of the Company's many contingent liabilities.[3] The Board did not believe there was a reasonable path to achieve such a transaction outside of bankruptcy, as evidenced by the fact that even when Foxconn made an offer to buy the Company prior to the petition date, one of the many conditions Foxconn identified was that any sale would have to be conducted in a chapter 11 case under section 363.[4]

10. It is true that the Company filed for chapter 11 with approximately $136 million of cash and cash equivalents. The Board determined, however, that given the circumstances faced

---

[3] The Company has halted production of the Endurance until a value-maximizing transaction is identified in order to preserve its assets and turn its focus entirely to maximizing recoveries through the chapter 11 cases, including marketing and selling the Company and/or substantially all of its assets in the sale process.

[4] Just prior to the Petition Date Foxconn sent a letter, which is attached as Exhibit B, proposing an alternative transaction in which Foxconn would acquire "all or substantially all the assets" of the Debtors "pursuant to a chapter 11 plan of reorganization . . . subject to a competitive sale process carried out in accordance with bidding procedures approved by Foxconn." This proposal was offered after the parties failed to reach a consensual resolution of their disputes for nearly three months, was highly conditional and did not legally obligate Foxconn to execute the suggested transaction. Therefore, the Board did not believe that the proposal provided a sufficient basis for delaying a chapter 11 filing by the Company.

by the Company, including its cash burn that averaged $10 to $15 million per month, the inability to obtain the financing required to scale production of the Endurance, no viable alternative vehicle platform without Foxconn's support, increasing trade claims, the need to sell its assets in an efficient manner and very significant (and increasingly imminent) contingent liabilities, there was no reason to wait until the Company's cash eroded further to begin the bankruptcy process.  By filing when it did, with sufficient liquidity to execute a value maximizing restructuring process, the Company believed it would maximize distributions to all stakeholders.   Paying all creditors in full and providing a recovery to equity has always been our objective.  That is what the bankruptcy process was designed to achieve.

11. Recently the Company entered into a $40 million settlement with Karma.  This is a major step towards achieving our goal of maximizing distributions to stakeholders.  The Karma litigation was set for jury trial beginning on September 12, 2023.  Karma sought nearly a billion dollars in damages.  While the Company firmly believes this damage figure is grossly overstated, there is no guarantee that a jury would agree.  The risk of a large adverse jury verdict was real, and the consequences of such an award could have greatly diluted other creditors and eliminated the prospect of any recovery for equity.  By settling the claim at $40 million, the settlement de-risks the estate.

12. But while the Karma settlement removes a major risk to the financial condition of the estate, a number of challenges remain.  The Company must confirm the size of its unsecured claims pool, which is why the Company has moved to establish a bar date (the motion remains pending and, if granted, the general bar date would be 40 days from the date of service of the bar date notice with the government bar date in December).  We also must resolve the various securities litigations, a potential claim by the SEC and a variety of potential director and officer

indemnification claims. And, of course, we hope that the sale process leads to a successful sale of the Company. The Company and its Board remain focused on dealing with each of these challenges so as to achieve our original goal of maximizing value with the hope of paying all creditors in full and returning value to shareholders.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 21, 2023

By: */s/ Daniel Ninivaggi*
Daniel Ninivaggi
Executive Chairman
Lordstown Motors Corp.