## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Lordstown Motors Corp., *et al.*, | Case No. 23-10831 (MFW) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: D.I. 131, 281, 286** |

### REPLY IN FURTHER SUPPORT OF MOTION OF HON HAI PRECISION INDUSTRY CO., LTD. (A/K/A HON HAI TECHNOLOGY GROUP), FOXCONN EV TECHNOLOGY, INC., AND FOXCONN EV SYSTEM LLC TO DISMISS, OR, IN THE ALTERNATIVE, CONVERT THE BANKRUPTCY CASES

Hon Hai Precision Industry Co., Ltd. (a/k/a Hon Hai Technology Group), Foxconn EV Technology, Inc., and Foxconn EV System LLC (collectively, the "Movants" or "Foxconn")[2] by and through their undersigned counsel, hereby submit this Reply in response to (a) the Opposition of Lordstown Motors Corp., Lordstown EV Corporation, and Lordstown EV Sales LLC (collectively, "Lordstown" or the "Debtors") (D.I. 281) (the "Opposition"), (b) the Official Committee of Unsecured Creditors' Statement of Position with Respect to Foxconn's Motion[3] to Dismiss or Convert the Bankruptcy Cases (D.I. 286), and (c) in further support of the Motion for entry of an order, pursuant to section 1112(b) of the Bankruptcy Code, dismissing the chapter 11 cases (the "Chapter 11 Cases") of the Debtors for cause, or, in the alternative, converting the jointly

---

[1]   The debtors and the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corp. (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101) (collectively, the "Debtors"). The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

[2]   The Movants are limited to those entities named in the Debtors' Adversary Complaint that are subject to the jurisdiction of this Court. At the appropriate time and if necessary, Foxconn will seek relief for those entities that are without the Court's jurisdiction.

[3]   Undefined capitalized terms shall have the meaning ascribed to them in the Motion, (D.I. 131). Unless otherwise stated, all emphasis is supplied and all citations and quotations are omitted.

administered Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code (D.I. 131).  In

support of the Motion, Foxconn states as follows:

**PRELIMINARY STATEMENT**

1.      In an effort to distract from their own failures and otherwise avoid dismissal, the

Debtors blame Foxconn for ███████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████         █████████████████████████

███████████████████████████████████████████████████

█████████████████████████████

2.      Less than two months prior to the Petition Date, however, the Debtors and their

counsel painted a strikingly different picture to the Company's Board of Directors.  The Debtors

warned, for example, that ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███   Making matters worse, the Debtors continued, it then appeared █████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

<hr>

4     ███████████████████

5     *Id.*

6     █████████████████████████████████████         Citations to "Ex." or "Exhibit" shall
refer to the exhibits annexed to the *Declaration of Michael C. Whalen*, dated August 25, 2023 and filed
concurrently herewith.

7     *Id.*

2

3.     And despite the outrage now manifest in their Opposition, the Debtors quietly concluded their summary to the Board by acknowledging that, because Foxconn █████████ ████████████████████ "the Company ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████ and Foxconn responded with an offer that matched those terms and achieved the Debtors' stated twin goals of paying all creditors and providing a return to equity. Inexplicably, however, the Debtors rejected Foxconn's proposal without any counter or explanation. Then, less than one week later, the Debtors commenced these proceedings—blaming Foxconn and Foxconn alone for their demise. The Debtors' hypocrisy in this regard not only highlights their own lack of credibility, but separately evidences the bad faith gamesmanship that motivated the Debtors' bankruptcy filing in the first instance.

4.     The Chapter 11 Cases should be dismissed for cause on two independent grounds. As an initial matter, dismissal is warranted here because the Debtors have failed to demonstrate that they filed their petitions in good faith and for a valid bankruptcy purpose. The Debtors commenced the Chapter 11 Cases with nearly $140 million in cash, no secured funded debt, and a total claims pool easily capable of being satisfied in full and out-of-court. Their filing was not driven by financial distress, rather their filing was driven by a desire to publicly attack Foxconn in these Chapter 11 Cases in an effort both to avoid responsibility for the Company's demise but also to extract value through a baseless adversary proceeding.

---

[8]    *Id.* █████████████████████████

[9]    █████████████████████████

5.     Realizing over time that they needed to justify their filing, the Debtors claim without substance or support that they were forced to seek this Court's jurisdiction in order to, among other things, (a) avoid a "race to the courthouse" scenario for their few, disparate creditors, despite having cash on hand to pay them all in full, (b) conduct a section 363 sale "free and clear" of encumbrances that do not presently exist, and (c) account for the mere possibility that they might "assume[] and assign[]" certain unidentified contracts to further an uncertain sale process on terms unknown to parties in interest.[10]

6.     None of these purported justifications withstands scrutiny, and the Debtors' overall lack of substance and conviction in this regard serves to highlight only their true purpose in commencing these Chapter 11 Cases:  *i.e.*, to exert undue leverage on Foxconn and consolidate state-law claims against all Foxconn entities in a supposedly favorable and heretofore unavailable forum for their otherwise two-party dispute.  The Debtors' transparent attempt to secure an unfair litigation advantage against Foxconn should respectfully be rejected, and the Chapter 11 Cases should thus be dismissed as having been filed in bad faith.

7.     The Chapter 11 Cases should separately be dismissed under section 1112(b)(4)(A) of the Bankruptcy Code because the unrebutted evidence establishes that (a) substantial or continuing loss to or diminution of the Debtors' estates is occurring postpetition, and (b) the Debtors, by their own admission, have no prospects for rehabilitation.[11]  The Debtors are operating postpetition at a significant loss, especially when one considers the substantial administrative costs of the Chapter 11 Cases.  Not surprisingly, however, rather than engaging with this stark reality in their Opposition, the Debtors attempt to justify their ongoing losses simply by blaming Foxconn

---

[10]    Opp., ¶¶ 8, 32.

[11]    This defect in the Debtors' cases is incurable, *see* 11 U.S.C. § 1112(b)(2)(B), and, thus, the Court should either dismiss or convert the Chapter 11 Cases.

4

for somehow "causing" the Company to have been in this position in the first place. The Debtors' assertions in this regard are as irrelevant as they are inconsistent with their own prepetition representations and, in addition to undermining their credibility in these proceedings, should be construed as a concession that their postpetition losses will only continue to worsen.

8.      The Debtors' attempt to demonstrate a path toward rehabilitation is equally specious. The Debtors concede that "'[r]ehabilitation' is different from 'reorganization[,]'"[12] but attempt to frame the Motion as broadly disavowing the validity of liquidating reorganizations that realize and maximize value unavailable to stakeholders outside of bankruptcy. This is not such a reorganization. And the Debtors' blatant mischaracterization of the Motion in this regard further highlights the need to promptly dismiss their bad faith filing.

9.      In all, given the Debtors' cash-rich position as of the Petition Date, their concession that their commencement of these Chapter 11 Cases ███████████████████████████████ ███████████████"[13] and their failure to demonstrate (as they must) a true need and purpose[14] for these proceedings, an exit from Chapter 11 would be in the best interest of all creditors—not just Foxconn. As such, even if the Court determines that the Debtors filed the Chapter 11 Cases for a valid bankruptcy purpose and in good faith (they did not), for all the reasons set forth herein and in the Motion, Foxconn respectfully submits that the Chapter 11 Cases should be dismissed or converted, which in either case would be in the best interest of all creditors.

---

[12]    Opp., ¶ 53.

[13]    ████████████████████████████████████████████████████████

[14]    In an apparent concession that their sale process is not going as smoothly as desired, the Debtors failed to secure a stalking horse bidder prior to the August 24, 2023 deadline.

**ARGUMENT**

## I.   THE DEBTORS FILED THE CHAPTER 11 CASES IN BAD FAITH AND WITHOUT A VALID BANKRUPTCY PURPOSE

10.    As the Debtors do not dispute, "[c]hapter 11 bankruptcy petitions are 'subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith.'" *See In re LTL Mgmt., LLC*, 64 F.4th 84, 100 (3d Cir. 2023) (citing *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004)).  And while a debtor's good faith generally depends on the "totality of the facts and circumstances," the Third Circuit focuses primarily on the extent to which a debtor can establish (a) that its petition serves a valid bankruptcy purpose, including by "preserving a going concern or maximizing the value" of the estate, and (b) that the bankruptcy cases were not otherwise filed to obtain a tactical litigation advantage.  *See Integrated Telecom*, 384 F.3d at 118–20 (citing *In re SGL Carbon Corp.,* 200 F.3d 154, 162, 165 (3d Cir. 1999)).

11.    Here, the Debtors have failed entirely to discharge their burden, (*see LTL Mgmt., LLC*, 64 F.4th at 100  ("Once at issue, the burden to establish good faith is on the debtor."); *SGL Carbon Corp.,* 200 F.3d at 162 n.10  (same); *see also* 7 Collier on Bankruptcy ¶ 1112.04 ("[I]f the issue is whether the petition was filed in good faith . . . the ultimate burden rests on the bankruptcy petitioner.")), and the Chapter 11 Cases should thus be dismissed for these reasons and those that follow.

### A.    The Debtors Are Not in Financial Distress

12.    The Chapter 11 Cases should be dismissed in the first instance because the Debtors, by their own admissions, cannot demonstrate "immediate financial difficulty" and therefore cannot discharge their burden of establishing that they filed for bankruptcy in good faith  *See In re SGL Carbon Corp.*, 200 F.3d at 163 (finding that SGL Carbon faced "no immediate financial difficulty" and concluding that SGL Carbon's ability to meet its debts is but one of the many factors

compelling the conclusion it did not enter Chapter 11 with a "valid reorganizational purpose."); *see also Integrated Telecom*, 384 F.3d at 112 (reversing the district court's order affirming the Bankruptcy Court's denial of dismissal of chapter 11 case where debtor entered bankruptcy for the purpose of selling a fully solvent company).

13.     Foxconn does not dispute that debtors "need not be insolvent before filing for bankruptcy protection," *SGL Carbon Corp.*, 200 F.3d at 163, nor does it take issue that, in certain cases, the Bankruptcy Code permits "early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation."  Opp., ¶ 41 (quoting *SGL Carbon Corp.,* 200 F.3d at 163).  Furthermore, Foxconn is not, contrary to the Debtors' assertions, arguing that "the Company should have delayed the filing and continued to burn cash simply because it could."  Opp., ¶ 42.

14.     Rather, Foxconn seeks to hold the Debtors to the same standards for which they advocate in their Opposition.  Under those standards, the Debtors' decision to petition for bankruptcy with millions of dollars in cash on hand simply "compel[s] the conclusion [that they] did not enter Chapter 11 with a valid reorganizational purpose."  *SGL Carbon Corp.,* 200 F.3d at 164.  Indeed, as they concede in their Opposition, the Debtors petitioned for bankruptcy with approximately $136 million in cash.  Instead of preserving that cash for the benefit of stakeholders, however, the Debtors *increased* their cash burn by preparing these cases to file and now administering them.

15.     The Debtors owe approximately $17 million[15] to their general unsecured creditors and $40 million to Karma, subject to the Court's approval of the Karma Settlement.  With respect to remaining litigation and regulatory exposure, the Debtors have taken a $39 million reserve for

---

[15]     *See* Voluntary Petition for Lordstown Motors Corp., Official Form 204, at 16-19 (D.I. 1).

claims arising out of the Securities Actions[16] and SEC Investigation (as such terms are defined in the First Day Declaration), for which, the Debtors have acknowledged, insurance may be available. *See* FDD ¶ 57.  The cost to resolve these matters will likely be significantly less than the Debtors' stated reserves.  Mr. Daniel Ninivaggi, Executive Chairman of the Company, testified that ██

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████

16.     Under these circumstances, and given the Debtors' admitted aim of liquidating in bankruptcy, the Chapter 11 Cases should be dismissed *not* because they were prematurely filed, but because they never should have been filed at all.  While Foxconn does not dispute that financial distress is measured as of the date of the petition, the Debtors' overall financial position and prepetition efforts to cut costs and settle their outstanding claims clearly demonstrate the pointlessness of a court-administered sale.

17.     After winding down their operations in anticipation of sale, the Debtors' cash burn rate dropped to roughly $4 million per month net of the (substantial) cost to administer this estate in bankruptcy.  *See* Ex. F, Transcript of July 27, 2023 Hearing, 16:3-8.  And as the Debtors do not dispute, this burn rate would have permitted the Debtors to pursue an out-of-court sale for *years*

---

[16] ████████████████████████████████████████████████████████████████████

[17]   Upon satisfaction of these outstanding claims, the first $30 million in remaining cash would be owed to Lordstown's preferred shareholders—i.e., Foxconn—and any remaining cash owed to Lordstown's common shareholders, with Foxconn constituting the single largest shareholder as of the Petition Date.   Corporate Ownership Statement, (D.I. 1) at 21.

given their substantial reserves.  But rather than using their nearly $140 million in cash to pay down their creditors and attempt to sell the business, the Debtors elected to subject those same creditors—Foxconn more than others, given its substantial interest in any remaining equity distributions—to the administrative cost of this proceeding, all with the hope of achieving an objective (i.e., sale of the company) that, to the extent possible *in* bankruptcy, was equally attainable *outside* of bankruptcy.[18]

18.    The Debtors' calculation in this regard cannot, by itself, justify their filing now, and their cash rich position renders them ineligible for the chapter 11 benefits they purportedly seek here.  *See In re SGL Carbon Corp.*, 200 F.3d at 165-66 (use of bankruptcy "powers" is justified where, unlike here, "financially troubled petitioners seek a chance to remain in business").  Accordingly, because the Debtors have the means to satisfy their debts in full, and because the Debtors seek *only* to liquidate their business through this proceeding, the Debtors have failed to discharge their burden of establishing a valid bankruptcy purpose and the Chapter 11 Cases must be dismissed.  *See id.* at 166 (finding "[t]he absence of a valid reorganizational purpose and the consequent lack of good faith" where, as in these Chapter 11 Cases, the debtor had a positive net worth and its "financial disclosure documents give no indication the company needed to reorganize under Chapter 11 protection); *see also Integrated Telecom*, 284 F.3d at 124 (holding "that the collapse of [the debtor's] business model does not support a finding of good faith" and that, because the debtor "was highly solvent and cash rich at the time of the bankruptcy filing," they were "not suffering financial distress" as of the petition date).

---

[18]    It's worth noting that even Karma was not racing to the proverbial courthouse.  As Mr. Ninivaggi testified, the Karma trial was rescheduled multiple times. ██████████████████████████████████████ ████████████████████████████████

**B.      The Chapter 11 Cases Lack a Valid Bankruptcy Purpose**

19.      The Debtors' alleged "reasons" for their petition are otherwise insufficient to state a valid bankruptcy purpose.  The Debtors rely heavily on bankruptcy buzzwords but fail to rebut Foxconn's well-supported assertions that the same aims could be achieved more cheaply and efficiently outside of court.  The Debtors weakly contend that they were compelled to petition for chapter 11 protection in order to (a) avoid a "race to the courthouse" scenario for their few, disparate creditors, (b) conduct a section 363 sale "free and clear" of certain non-existent and otherwise unidentified encumbrances, and (c) account for the possibility that they might "assume[] and assign[]"certain unidentified contracts.  Opp., ¶¶ 8, 32.  None of these purported justifications are sufficient to avoid dismissal here.

20.      *First*, the Debtors purported concerns regarding a creditor's "race to the courthouse" are without basis because—as the Third Circuit continually has recognized—"the system of individual creditor remedies may be bad for creditors *as a group*" only where "there are *not enough assets to go around*."  *In re LTL Mgmt., LLC,* 64 F. 4th at 102–3 ("[W]e cannot ignore that a debtor's balance-sheet insolvency or insufficient cash flows to pay liabilities (or the future likelihood of these issues occurring) are likely always relevant.  This is because they pose a problem Chapter 11 is designed to address: 'that the system of individual creditor remedies may be bad for creditors *as a* group when there are *not enough assets to go around.*'") (emphasis in original); *see also In re 15375 Memorial Corp. v. Bepco, L.P.*, 589 F.3d 605, 620 (3d Cir. 2009) ("[A]t its most basic level, bankruptcy is designed to handle the distribution problems arising when the system of individual creditor remedies harms the creditors as a group and there are not enough assets to go around.").

21.      Here, those concerns are not implicated because, as described *supra*, the Debtors held enough cash as of the Petition Date to satisfy *all* of their presently outstanding claims.  Under

these circumstances, and as the Third Circuit's decision in *In re 15375 Memorial Corp.* establishes, the Debtors' purported interest in using chapter 11 to facilitate distributions to creditors simply does not qualify as a good faith basis to file.  Indeed, in *15375 Memorial Corp.*, the debtors claimed to have filed for bankruptcy to "centraliz[e]" their claims and to "facilitate[e] an orderly liquidation" of the estate's assets.  589 F.3d at 620.  In affirming the district court's order of dismissal, however, the Third Circuit held that the debtor's purported interest in "an orderly distribution of assets" did not constitute a "valid bankruptcy purpose" because such efforts had no "hope of maximizing the value of the [Debtors' estates]."  *Id.* at 622.

22.    The same analysis compels dismissal of the Chapter 11 Cases here.  Having filed with enough cash on hand to satisfy all claims in full *outside* of court, the Debtors do not (because they cannot) establish that the centralization of such claims *in* court would result in a materially different outcome.  The Debtors thus cannot establish that their efforts here will do *anything* to "maximize[e] the value of [their estate]," and have thus failed to discharge their burden that the Chapter 11 Cases were filed to effect a valid bankruptcy purpose.  *See id.; see also Integrated Telecom,* 384 F.3d at 122 ("...we can identify no value for Integrated's assets that was threatened outside of bankruptcy by the collapse of Integrated's business model, but that could be preserved or maximized in an orderly liquidation under Chapter 11.").

23.    *Second*, the Debtors' interest in conducting a sale of some or all of their assets pursuant to section 363 is equally insufficient to justify their filing.  *See* Opp., ¶ 32.  Section 363(f) of the Bankruptcy Code is designed to facilitate "the sale of property of the estate free and clear of disputed interests so the liquidation of the estate is not unnecessarily delayed while the disputes are being litigated."  *In re NJ Affordable Homes Corp.*, No. 05-60442, 2006 WL 2128624, at *10 (Bankr. D.N.J. Jun. 29, 2006).  In most cases the "interests" implicated in section 363 pertain to

liens, encumbrances, or disputes regarding successor liability, and the benefit to the estate is that debtors typically will receive greater value in exchange for the sale of a cleaner asset. *See In re Trans World Airlines, Inc.*, No. 01-0056, 2001 WL 1820325, at *5 (D. Del. Mar. 27, 2001) ("Without the 'free-and-clear' language, prospective buyers would be unwilling to pay a fair price for the property subject to sale; instead, the price would have to be discounted, perhaps quite substantially, to account for the liabilities that the buyer would face simply as a result of acquiring the asset.") (citations omitted) *aff'd sub nom* 322 F.3d 283 (3d Cir. 2003).

24.     Here, however, the Debtors, which have no secured debt, have identified no such "disputed interest" on their property, and for that reason cannot assert that a section 363 sale would yield any greater value to the estate than a similar disposition out-of-court.[19]  The Debtors have already settled the Karma dispute, subject to the Court's approval, and thereby formally resolved any questions or concerns regarding the Debtors' ownership interest in the assets subject to any forthcoming sale.  As such, a sale pursuant to section 363 would no longer serve a valid bankruptcy purpose here.[20]  *See In re Crown Village Farm, LLC*, 415 B.R. 86, 92 (Bankr. D. Del. 2009) ("[C]ourts in this Circuit have made clear that even where the debtors are not attempting to preserve going concern, for example when a liquidation plan will be filed, they can still satisfy the good faith requirement, provided that the filing preserves 'some value that otherwise would be lost outside of bankruptcy.'"); *see also In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 303 (Bankr. D. Del. 2011) (dismissing the chapter 11 case as a bad faith filing and finding that "a

---

[19]     While the Debtors purport to expand the reach of section 363 even further – ██████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████

[20]     Without a stalking horse bidder, there can also be no guarantee that a section 363 sale process will be as "efficient" as the Debtors' first predicted, Opp., ¶ 4, which thus means that the Debtors will be subject to the comparatively higher cost of chapter 11 for longer than anticipated.

sale process … must be designed to realize some value that would not have been available outside of bankruptcy" if it were to provide evidence of a valid bankruptcy purpose).[21]

25.     The Debtors' suggestion that an in-bankruptcy sale of their assets may be necessary to address "shareholder approval" issues is equally meritless.   Finger Dec. ¶ 12 ("I understand from Debtors' counsel that the consummation of at least certain of the IOI's received to date would require shareholder approval which would likely cause delay and also raise the execution risk of any such transaction, both to the detriment of the Debtors and their ability to maximize the value of their assets.").   The Debtors' aims in this regard run contrary to the "fundamental right" of "stockholders of Delaware corporations" to vote on corporate transactions such as these, and the Debtors' interest in conducting such a sale in bankruptcy is insufficient to override the "justified expectations of [the Debtors'] common stockholders."   *See Esopus Creek Value LP v. Hauf*, 913 A.2d 593, 604 (Del. Ch. 2006) (finding inequitable Metromedia's plan to file for bankruptcy and "sell its interest in Magticom without complying with section 271's vote requirement").[22]

26.     *Finally*, the Debtors vaguely assert that chapter 11 is necessary because it "permits the Debtors to assume and assign contracts to a buyer that cannot be assumed and assigned under non-bankruptcy law . . . ."  Opp., ¶ 32.  But despite having the "burden [to demonstrate] that the bankruptcy petition serves a valid bankruptcy purpose," *In re GVS Portfolio I B, LLC*, No. 21-10690, 2021 WL 2285285, at *9 (Bankr. D. Del. Jun. 4, 2021), the Debtors failed to identify any contracts that they *actually intend* to assume and/or assign in connection with their anticipated sale

---

[21]     The Debtors do not appear to dispute this point and their cited authority is not to the contrary.  *See* Objection, ¶ 30 (citing *Integrated Telecom,* 384 F.3d at 120 n.4 ("Yet liquidation plans, no less than reorganization plans, *must serve a valid bankruptcy purpose.*") (emphasis added)).

[22]     Furthermore, while the Debtors assert that an in-bankruptcy sale is required because "the Investment Agreement with Foxconn explicitly restricted the Debtors from selling all of their assets," Opp., ¶ 33, the Debtors do not – because they cannot – allege that Foxconn's consent in this regard was sought and/or refused.  The Debtors did not attempt to do so because, as Foxconn submits herein, they maintained other aims for these Chapter 11 Cases beyond the "value-maximizing" transaction purportedly here sought.

process.  In fact, while the Debtors suggest that a shared manufacturing agreement with Foxconn may be ripe for assignment, the Debtors are ambivalent as to their intention to do so, and their concern that dismissal might "allow Foxconn to limit a potential purchaser's access to the Debtor's property," Opp., ¶ 32 n. 2., is directly inconsistent with the record evidence and Foxconn's ongoing cooperation with the Debtors' purported sale process. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

27.     For these reasons, the Debtors have thus failed to carry their burden of establishing that they petitioned for chapter 11 protection with a proper purpose in mind.

### C.     The Debtors' Commenced the Chapter 11 Cases in Bad Faith to Obtain an Unfair Litigation Advantage

28.     The record also demonstrates that the Debtors filed for bankruptcy in bad faith, particularly when construed in light of Debtors' complete absence of value-maximizing purpose in these Chapter 11 Cases.

29.     After acknowledging that Foxconn ████████████████████████████████ the Company began discussions with Foxconn regarding a deal structure in which Foxconn ████

████████████████████████████████████████████████████████████

████████████████  ██ ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

■  *Id.* ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

30.     The obvious implication from the Debtors' decision to rush to file a petition for bankruptcy is that they sought to inappropriately leverage Foxconn into a better deal through an adversary proceeding in this forum, which they filed against a suite of Foxconn entities on the same day they filed the petition.  Such conduct is plainly impermissible.  *See In re Stingfree Techs., Inc.,* 2009 Bankr. LEXIS 3023, at \*31 (Bankr. E.D. Pa. Feb. 4, 2009) ("a bad faith chapter 11 filing may occur when a bankruptcy petition is filed simply to create a bankruptcy forum for a two-party dispute based upon non-bankruptcy law, and no reorganization purpose is intended"), *aff'd sub nom. In re Stingfree Techs. Co.,* 427 B.R. 337 (E.D. Pa. 2010); *see also In re Springs Hospitality, Inc.,* No. 06-13331, 2006 WL 2458679, at \*4, \*5, \*8 (Bankr. D. Co. Aug. 22, 2006) (case was "poster-child for bad faith" and typical two-party dispute where prepetition sale efforts had been unsuccessful; debtor had "long running operating deficits," and debtor brought "quintessential state law" claims in adversary proceeding).

31.     Notwithstanding that the agreements purportedly at issue in the Adversary Proceeding were entered into only with Foxconn Ventures Pte. Ltd., the Debtors elected on the first day of these Chapter 11 Cases to file suit against the three Movants and an additional Foxconn entity, none of whom are party to the Investment Agreement.[24]  This is precisely the type of

---

[24] All of the defendants named in the Adversary Complaint expressly reserve and do not waive all defenses that may be applicable therein, including without limitation all rights to challenge the personal jurisdiction of this Court over certain defendants, the sufficiency of the Detbors' service of process, and/or raise any other defenses to the claims and allegations asserted by the Debtors therein.

offensive litigation tactic that bankruptcy courts routinely denounce, as such practices reflect an obvious abuse of the bankruptcy system overall. *See Argus Grp. 1700, Inc. v. Steinman*, 206 B.R. 757, 765-66 (E.D. Pa. 1997) (dismissing bankruptcy case where debtors filed to "fabricate federal-court jurisdiction" for pending state court litigation); *Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983) ("The Bankruptcy provisions are intended to benefit those in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation.").

32.     The Debtors' only response is to attempt to distinguish certain of the authority on which Foxconn relies. These attempts fail. With respect to *Stingfree*, for example, the Debtors contend that the bankruptcy court's decision is not "applicable" because, unlike here, "the debtor was attempting to evade arbitration provisions in a settlement agreement." In this regard, however, the Debtors simply miss the point. Much in the same way that the *Stingfree* debtors' pre-bankruptcy litigation options were limited by reason of the arbitration provision in their subject agreements, the Debtors here arguably had no grounds on which to commence a prepetition lawsuit against *all* Foxconn defendants in a single forum. *See id.* at *53 (concluding that "many of the claims in the adversary proceeding that serve[d] as the centerpiece of this chapter 11 case cannot be heard in this forum").

33.     Thus, just as in *Stingfree*, the Chapter 11 Cases must be dismissed because the Debtors—having "no intention of resuming any operations," and using chapter 11 for the "sole[]" and improper purpose of liquidation—will not advance a valid bankruptcy purpose and are simply using the bankruptcy process to obtain a convenient and heretofore unavailable forum for its two-party litigation against the Foxconn entities. That the Debtors are also subject to or implicated in other litigation raised by other parties does not change this conclusion—particularly where, as here, the Debtors have more than sufficient cash on hand to satisfy those claims outright.

II.    **SUBSTANTIAL OR CONTINUING LOSS TO OR DIMINUTION OF ESTATE AND ABSENCE OF REASONABLE LIKELIHOOD OF REHABILITATION ESTABLISH CAUSE TO DISMISS OR CONVERT**

34.    The Chapter 11 Cases are separately subject to dismissal under section 1112(b)(4)(A). Foxconn has established by unrebutted evidence (a) substantial or continuing loss to or diminution of the estate and (b) the absence of a reasonable likelihood of rehabilitation, and thus, the Motion should be granted.

35.    As to substantial loss, the Debtors' "track record,"[25] before and after Foxconn's engagement with the Debtors, speaks for itself. No amount of capital or know-how from Foxconn or any other party could right the Debtors' ship. With respect to rehabilitation, the Debtors concede that "'[r]ehabilitation' is different from 'reorganization[,]'"[26] but attempt to frame the Motion as broadly disavowing the validity of liquidating reorganizations that realize and maximize value unavailable to stakeholders outside of bankruptcy. This is not such a reorganization, and the Debtors' mischaracterization of the Motion is misguided. Here, the evidence before the Court establishes that Foxconn has satisfied both elements of section 1112(b)(4)(A) and the purported Chapter 11 Cases should be dismissed.

A.    **The Debtors Concede and Unrebutted Evidence Establishes Substantial and Continuing Loss to Estate, Which Is Diminishing**

36.    The parties agree that courts applying section 1112(b)(4)(A) should "look at the track record of the Debtor to determine if it is suffering losses or making gains." *In re Gateway Access Sols., Inc.*, 374 B.R. 556, 562 (Bankr. M.D. Pa. 2007); Opp., ¶ 46; Mot., ¶ 49. Yet, the Debtors erroneously focus instead on *Foxconn's* prepetition conduct rather than their own. They

---

[25]    Opp., ¶ 46.

[26]    *Id.*, ¶ 53.

bootstrap their meritless allegations against Foxconn, as "outlined in the complaint,"[27] to this contested matter, because no evidence exists to rebut the clear record that the estates are hopelessly diminishing and the Debtors have always and continue (postpetition) to operate at a significant loss.

### 1. *Debtors Concede Substantial or Continuing Loss to the Estate*

37.     The Debtors seemingly ignore the merits of the first element of section 1112(b)(4)(A), asserting instead that "prepetition efforts to raise financing tells us nothing about the likely outcome of the ongoing post-petition sale process[,]"[28] and argue by extension that a "Court-supervised sale process" is "essential" to chart a path forward.  Opp., ¶¶ 48-49.  But the Debtors' postpetition sale process is irrelevant to the "loss to or diminution of the estate" issue.  And because the Debtors present no rebutting evidence (or argument) as to loss to or diminution of the estate, this first element under section 1112(b)(4)(A) is easily met.[29]

38.     The Debtors' remaining argument in this regard—*i.e., that Foxconn and Foxconn alone is responsible for the Debtors' downfall*—is rebutted by their own prepetition admissions, as well as their testimony in this case to date.  .  ██████████████████████████████

██████████████████████████████████████████████████████████████████

---

[27]   Opp., ¶ 48.

[28]   *Id.*

[29]   The Debtors' admonishment and allegation that "Foxconn should be supporting the sale process" but instead "wants the process to fail" is specious.  Opp., ¶ 50.  Their contention that a dismissal "would allow Foxconn to limit a potential purchaser's access to the Debtor's property" without recourse is disingenuous and offensive.  *Id.*, ¶ 32 n.2.  Foxconn did not object to the Debtors' proposed bidding procedures and has even considered participating in the bidding and sale process.  Moreover, Foxconn has been cooperating with the Debtors and their advisors in connection with the sale process, including *by hosting interested parties at Foxconn's facilities* and providing tours of the production lines used to develop and build the Debtors' products.  *See* ████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
████████████

███████████████████████████████ In fact, the Debtors concede that ██████
██████████████████████████████████████████████████■ and, thus, for this

and other reasons, the Debtors have never come remotely close to operating as a profitable

enterprise.

39.      Well before the Debtors ever discussed or entered into an agreement with Foxconn,

the Debtors were already including going concern qualifiers in their public filings with the U.S.

Securities and Exchange Commission.[31]  In their Form 10-Q for the quarter ending September 30,

2021, for example, the Debtors admitted that, "as of and for the year ended December 31, 2020,"

the Company "believe[d] that [its] *current level of cash and cash equivalents [was] not sufficient*

to fund commercial scale production and the launch of sale of such vehicles," and that such

"*conditions raise[d] substantial doubt regarding [its] ability to continue as a going concern*.[32]

40.      The Company continued to acknowledge these concerns even after and

notwithstanding Foxconn's eventual investments in the Debtors, representing (a) in its Form 10-

Q for the quarter ending March 31, 2022, that, "[e]ven if the Foxconn Transactions are

consummated in accordance with the current terms," the Company would *still* "need additional

funding to execute [its] 2022 business plan and achieve scaled production of the Endurance";[33]

---

[30]  *Debtors' Objections and Responses to Foxconn's First Set of Requests for Admission to Debtor Lordstown Motors Corp.,* (Response to Request for Admission No. 6).

[31]  LMC 2021 Form 10Q (August 13, 2021) at internal page 24 (available at sec.gov/ix?doc=/Archives/edgar/data/1759546/000155837021011564/ride-20210630x10q.htm) (last visited August 25, 2023) ("We believe that our current level of cash and cash equivalents are not sufficient to fund commercial scale production and the launch of sale of such vehicles. These conditions raise substantial doubt regarding our ability to continue as a going concern for a period of at least one year from the date of issuance of the unaudited condensed consolidated financial statements included in this report.").

[32]  LMC 2021 Form 10Q (November 12, 2021) at internal page 36 (available at sec.gov/ix?doc=/Archives/edgar/data/1759546/000155837021015655/ride-20210930x10q.htm) (last visited August 25, 2023)) (emphasis added).

[33]  LMC 2022 Form 10Q (May 9, 2022) at internal page 10 (available at sec.gov/ix?doc=/Archives/edgar/data/1759546/000155837022007666/ride-20220331x10q.htm) (last visited August 25, 2023).

and (b) in its Form 10-K for the year ending December 31, 2022, that, "[e]ven if we are successful in developing our high-volume manufacturing capability and processes, ***in conjunction with Foxconn***, and in reliably sourcing our component supply, we cannot assure that we will be able to do so in a manner that avoids significant delays and cost overruns, including as a result of factors beyond our control such as problems with suppliers or failure to satisfy customer requirements."[34] To that same end, Mr. Ninivaggi expressly acknowledged at his deposition that, ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

41.     Most striking, however, was the Debtors' presentation to the Lordstown Board of Directors less than two months before filing for bankruptcy.   That presentation—ostensibly prepared in conjunction with the Debtors' chapter 11 counsel and advisors—makes clear ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████"[35] The Debtors' outlook as to

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████[36] And notwithstanding the Debtors' current litigation posturing,



---

[34]    LMC    2022    Form    10K    (March    6,    2023)    at    internal    page    32    (available    at sec.gov/ix?doc=/Archives/edgar/data/1759546/000155837023002862/ride-20221231x10k.htm    (last    visited August 25, 2023)) (emphasis added).

[35]    ██████████████████████████████████████████████████████████

[36]    *Id.*

the presentation also explained that, ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████ ██

42.     In light of these admissions, the Debtors' allegation that *Foxconn* is acting "in bad faith" is baseless.    Opp., ¶ 31.    As their own prepetition statements plainly demonstrate, the Debtors' problems and resulting failures necessarily pre-dated Foxconn's involvement, and the Debtors' effort now to blame Foxconn for its own "demise" is simply not credible when measured against the record.

### 2.     *Debtors' Estate is Diminishing Significantly*

43.     Since filing for bankruptcy, the Debtors cash burn rate has only increased.    ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ ██ The Cash Flow Table demonstrates that precious resources, which could be preserved in a cost-saving, out-of-court process for the benefit of the Debtors' stakeholders, are instead being burned at an alarming rate, primarily for the benefit of the Debtors' professionals.    ████████████████

██ █████████████████████████████████████████████████████████ ██

████████████████████████████████████████████████████████████████

████

---

[37]  *Id.,* ██████████████████████████████████████████
[38]  *See* ██████████████████████████████████

44. 

45.

46.    It is axiomatic that a "negative cash flow situation alone is sufficient to establish 'continuing loss to or diminution of the estate'" for the purposes of section 1112(b)(4)(A). *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 515 (8th Cir. 2004) ("*Loop*"); *see also In re Alston,* 756 Fed. App'x 160, 164 (3d Cir. 2019) (same, citing *Loop*); *In re Wen-Kev Mgmt.,* No. 14-2196, 2014 WL 7370050, at *3 (D.N.J. Dec. 29, 2014) (citing *Loop*) ("any negative cash flow—*including that resulting only from administrative expenses*—effectively comes straight from the pockets of the creditors") (emphasis in original).  And here, ██████████████████████████████████ ████████████ the Debtors concede that continuing loss to and diminution of the estate is unavoidable should these cases continue.

47.    Furthermore, based on the assumptions and figures provided in the Cash Flow Table, among other reasons, the arguments put forward by the Committee in its Statement of Position are unavailing.[42]  The Committee asserts that *In re TMT Procurement Corp.*, 534 B.R. 912 (Bankr. S.D. Tex. 2015) militates in favor of denying the Motion, but that decision is easily distinguishable.  First, as discussed above, the Debtors' estates are ████████████████████ ██████████████████████████████████ 534 B.R. at 920.  Second, the court in *TMT* limited its holding to the "individual circumstances of the debtor[]" in that case, where the debtor had only cash and shares to monetize after its sale process had concluded.  *Id.* at 919-20 (cabining holding to case where debtor "has few, if any, tangible assets remaining").  Here, ████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████.[43]

---

[42]    *See* Dkt. No. 286, ¶¶ 5 (conflating inability to rehabilitate under section 1112(b)(4)(A) with bad faith and improper purpose analysis); 6 ██████████████████████████████████████████████████████

[43]    Nor should it be overlooked that the court in *TMT* found that the movant satisfied the "rehabilitation" element of section 1112(b)(4)(A).  *Id.* at 920-21 ("Put simply, these Debtors have no business prospects. The Debtors exist

48.     This Court's recent decision in *In re AIG Fin. Prods. Corp.*, 651 B.R. 463 (Bankr. D. Del. 2023) is also distinguishable.  There, the Court denied relief under section 1112(b)(4)(A) because "the Debtor [had] established" that it was not experiencing substantial losses where the debtor's chapter 11 case had reduced expenses by eliminating interest due on a $37 billion revolving credit facility and pausing ongoing litigation expenses. 651 B.R. at 475-76.  Notably, the debtor in *AIG* had also filed a plan of reorganization on the petition date, and in connection therewith was conducting a concurrent sale process such that if confirmation was not achieved, the debtor could toggle to a 363 sale construct.  *Id.*  Here, unlike in *AIG*, the Cash Flow Table and the Debtors' admissions establish that the Chapter 11 Cases have exacerbated the Debtors' negative cash flow and losses after having already implemented operational cost reductions out of court.

██████████████████████████████████████████████████████████████

████████████████████████████████████████████ ██

49.     And without any funded debt to speak of, the Debtors have not eliminated any interest expense similar to the $133 million per month that was accruing in *AIG*.  Making matters worse, the Debtors have not filed a plan of reorganization, and instead creditors and other stakeholders are funding the Debtors' litigation stratagem against Foxconn and sale process directly from their own recoveries. As such, the circumstances and evidence here establish that the Debtors are suffering ***increased*** negative cash flow and losses postpetition than they were before filing these cases; rehabilitation is not reasonably likely—it is not at all likely; and thus, the Motion should be granted.

---

to conclude their own liquidation. [. . .] Accordingly, [movant] has established that there is no reasonable likelihood of rehabilitation").

44   A June 6, 2023 presentation to the Debtors' Board of Directors ██████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ .

### B.    No Evidence of a Reasonable Likelihood of Rehabilitation

50.    The Debtors' last argument to avoid dismissal under section 1112(b)(4) is their mischaracterization that Foxconn "essentially argues that the Debtors' intentions to liquidate rather than restore their business necessarily means that they cannot rehabilitate[.]"  Opp., ¶ 54.  The Debtors are wrong.

51.    Debtors rely on this Court's well-reasoned decision in *JER/Jameson* for the proposition that a liquidation process is a valid form of "rehabilitation" for the purposes of section 1112(b)(4).  That case, however, instructs that a liquidation *only* constitutes "rehabilitation" to the extent "the sale process contemplated in the bankruptcy case [is] designed to realize some value that would not be available outside of bankruptcy." Opp., ¶ 53 (citing *JER/Jameson*, 461 B.R. at 303).  This point is critical, and the Debtors fail to demonstrate that their proposed sale process will—with any certainty—realize some value that would not be available outside of bankruptcy. *See, e.g.,* Finger Decl., (D.I. 282) at ¶ 10 ("All ***potential*** bidders that have submitted an IOI ***appear to be*** proceeding forward with a ***potential*** sale process.")(emphasis added); *id.* at ¶11 ("[I]t is impossible to know what the outcome of the sale process will be").

52.    Although the Debtors claim that "abundant precedent" confirms that an uncertain sale process such as this one, followed by a to-be-determined liquidation (no plan has been submitted by these Debtors), is *prima facie* proper, they conflate authorities within and outside the Third Circuit that distinguish between a valid bankruptcy purpose, *i.e.* evidence of bad faith, and the statutory scheme provided by section 1112(b)(4)(A).  The only authority the Debtors affirmatively cite is inapposite. *See* Opp., ¶ 54. The movant in *In re EHT US1,* 630 B.R. 410, 431 (Bankr. D. Del. 2021) did not seek dismissal under section 1112(b)(4)(A), and the debtors there operated a nationwide hospitality portfolio during the chapter 11 cases that was successfully sold "for approximately $482 million," ***before*** the court's decision on the motion to dismiss. *Id.* at 414

25

("The core issue is whether a Singapore REIT . . . is a 'business trust' that is eligible to be a 'debtor' under the Bankruptcy Code."); *id.* at 431-32 ("Debtors have obtained [up to $125 million in postpetition] financing for the Debtors' operations during the Chapter 11 cases").[45]

53.    The Debtors' reliance on *EHT* simply reinforces the need to follow the result in *JER/Jameson* and dismiss the Chapter 11 Cases.  In *JER/Jameson*, no sale of assets had occurred nor had financing been obtained before this Court dismissed the chapter 11 case, and, the bankruptcy case there had been pending ***less than one week*** before the secured creditor moved to dismiss.  461 B.R. at 296-97, 303 (dismissing the case less than 65 days after it was filed because there was no evidence that filing would create value, rather, the bankruptcy case was eroding value "by incurrence of substantial administrative expense").  Although dismissal in *JER/Jameson* was based on a finding that the case was filed in bad faith and for no legitimate bankruptcy purpose, a similarly defective sale process is no more a valid bankruptcy purpose than it is "rehabilitation" under section 1112(b)(4)(A).

54.    As discussed above, the substantial administrative expenses of these cases is diminishing the estates rapidly; monthly cash burn—once the professional fees of the Committee (and possibly an equity committee) are accounted for—█████████████████████████  The Debtors concede, like the debtor in *JER/Jameson,* that extensive prepetition efforts to raise capital or find a strategic alternative were futile.  FDD ¶ 61. Here, the Debtors' assets are unencumbered;

---

[45]    In dicta, the court in *EHT* distinguished the facts in that case from those in *JER/Jameson*, acknowledging that a lack of "evidence that the debtors could conduct a sale process that would realize or preserve value that would not be available outside of the chapter 11 process" established cause for dismissal.  *Id.* at 432 n.93.

The Debtors ignore the substantial body of authorities recognizing that a reorganization may include a liquidating plan, but rehabilitation for purposes of section 1112(b)(4)(A) does not include liquidation. *See* Mot., ¶ 60; *see also In re BH S&B Holdings, LLC*, 439 B.R. 342, 347 (Bankr. S.D.N.Y. 2010) ("as to the second prong [of section 1112(b)(4)(A)], the Debtors' intention to liquidate (rather than rehabilitate), demonstrates that there is no likelihood of rehabilitation."); *In re TMT Procurement*, 534 B.R. at 920-21 ("Put simply, these Debtors have no business prospects. The Debtors exist to conclude their own liquidation. [. . .] Accordingly, [movant] has established that there is no reasonable likelihood of rehabilitation").

it is unclear if any interested party will even submit an actionable bid to purchase the Debtors as a going concern; and the Debtors' arguments that Foxconn's consent rights would be problematic outside of bankruptcy should be disregarded.  If the Debtors were serious about a prepetition sale process, they would have requested Foxconn's consent to pursue such a process prepetition.  Yet, no request was ever made.

55.    For these reasons, dismissal is warranted because the Debtors have failed to establish that the sale process will realize or preserve value that would not be available outside of the chapter 11 process.

## III.    DISMISSAL OF THE CHAPTER 11 CASES OR CONVERSION TO CHAPTER 7 WOULD BENEFIT CREDITORS

56.    Once a court finds "cause," it will then determine whether "dismissal or conversion [is] in the 'best interests of creditors and the estate[.]'"  *In re Calrissian LP*, No. 17-10356, 2018 WL 3854004, at *1-2 (Bankr. D. Del. Aug. 10, 2018).  "The cases are uniform in holding that the decision to dismiss or convert is within the bankruptcy court's discretion and is based on the facts. It is a case-by-case decision."  *Id.* at 2 (citing *In re Klaas,* 533 B.R. 482, 488 (Bankr. W.D. Pa. 2015)).[46]

57.    Foxconn submits that dismissal is in the best interests of creditors for multiple reasons.  First, creditors can be paid far more quickly outside of bankruptcy than pursuant to a proposed plan of reorganization, which, nearly two months after the Petition Date, the Debtors

---

[46]    In connection with their argument in this regard, the Debtors half-heartedly attempt to advance an argument that the case should not be dismissed under section 1112(b)(2).  The Debtors do not even attempt to address the statutory elements of this potential savings provision, which requires proof that, in addition to unusual circumstances not present here, the "cause" for dismissal was reasonably justified and will be cured within a reasonable period of time.  Accordingly, any argument that these Chapter 11 Cases may not be dismissed or converted under section 1112(b)(2) should be rejected out of hand.

27

have still yet to file.[47]  Second, a dismissal will preserve value for the benefit of all of the Debtors' stakeholders, which value would otherwise erode due to the substantial administrative costs the Debtors will continue to incur in chapter 11.  Further, Foxconn represents that it would consent to the Debtors continuing an out-of-court sale process for the benefit of the Debtors' stakeholders.

58.     Conversion to chapter 7 will not prejudice any parties in interest.  As the Debtors effectively concede, the sole objective in this proceeding is to facilitate a swift liquidation of some or all of their assets.  And while the Movants submit that the bankruptcy case should be dismissed outright because such a sale—to the extent attainable here—is equally attainable out of court, the cost savings inherent in chapter 7 proceeding would be substantial and inure to the benefit of all stakeholders alike.  Indeed, conversion to chapter 7 may be the *only* way for bankruptcy to maximize the value of the estates.

59.     For these reasons, and rather than to waste tens of millions of dollars on the mere hope of a value-maximizing transaction, the bankruptcy case—if not dismissed outright—should be converted so that a chapter 7 trustee may attempt to achieve the same aims at far lower cost to stakeholders.

## CONCLUSION

For the foregoing reasons, Foxconn respectfully requests this Court grant the Motion and dismiss the Debtors' Chapter 11 Cases or otherwise convert them to cases under chapter 7. In the alternative, the Court should appoint a chapter 11 trustee, to protect and oversee the Debtors' assets.

---

[47]   To that end, Foxconn has no objection to Karma, subject to the Court's approval of the pending settlement, and the Debtors' unsecured creditors being paid in full as part of a dismissal.

Dated: August 25, 2023
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Matthew O. Talmo*
Robert J. Dehney (No. 3578)
Matthew B. Harvey (No. 5186)
Matthew O. Talmo (No. 6333)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: rdehney@morrisnichols.com
          mharvey@morrisnichols.com
          mtalmo@morrisnichols.com

-and-

**PAUL HASTINGS LLP**
Matthew M. Murphy
Matthew Micheli
Michael C. Whalen
71 South Wacker Drive Suite 4500
Chicago, IL  60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
Email: mattmurphy@paulhastings.com
          mattmicheli@paulhastings.com
          michaelcwhalen@paulhastings.com

-and-

Kevin P. Broughel
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (312) 319-4090
Email: kevinbroughel@paulhastings.com

*Counsel to Foxconn*