**Exhibit F**

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                       .  Chapter 11
                                  .  Case No. 23-10831 (MFW)
 4   LORDSTOWN MOTORS CORP.,      .
     et al.,                      .  (Jointly Administered)
 5                                .
                                  .  Courtroom No. 4
 6                                .  824 Market Street
                                  .  Wilmington, Delaware 19801
 7                 Debtors.       .
                                  .  Thursday, July 27, 2023
 8   . . . . . . . . . . . . . .  .  9:30 a.m.

 9                  TRANSCRIPT OF SECOND DAY HEARING
                 BEFORE THE HONORABLE MARY F. WALRATH
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Daniel DeFranceschi, Esquire
                               RICHARDS, LAYTON & FINGER, P.A.
13                             One Rodney Square
                               920 North King Street
14                             Wilmington, Delaware 19801

15                             David M. Turetsky, Esquire
                               WHITE & CASE LLP
16                             1221 Avenue of the Americas
                               New York, New York 10020
17


18

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Mandy Bartkowski, ECRO

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording, transcript
25   produced by transcription service.
```

APPEARANCES (CONTINUED):

For the Debtors:              Jason Zakia, Esquire
                              WHITE & CASE LLP
                              111 South Wacker Drive
                              Suite 5100
                              Chicago, Illinois 60606

For Karma
Automotive LLC:               James Sowka, Esquire
                              SEYFARTH SHAW LLP
                              233 South Wacker Drive
                              Suite 8000
                              Chicago, Illinois 60606

                              Jesse Coleman, Esquire
                              SEYFARTH SHAW LLP
                              700 Milam Street
                              Houston, Texas 77002

                              William Chipman, Esquire
                              CHIPMAN BROWN CICERO & COLE LLP
                              1313 North Market Street
                              Suite 5400
                              Wilmington, Delaware 19801

For the Committee:            Tori Remington, Esquire
                              TROUTMAN PEPPER HAMILTON SANDERS LLP
                              Hercules Plaza
                              1313 Market Street
                              Suite 5100
                              Wilmington, Delaware 19801

                              Francis Lawall, Esquire
                              TROUTMAN PEPPER HAMILTON SANDERS LLP
                              3000 Two Logan Square
                              Eighteenth and Arch Streets
                              Philadelphia, Pennsylvania 19103

                              Deborah Kovsky-Apap, Esquire
                              TROUTMAN PEPPER HAMILTON SANDERS LLP
                              4000 Town Center
                              Suite 1800
                              Detroit, Michigan 48075

1                                INDEX

2    MOTIONS:                                            PAGE

3    Agenda
     Item 18: Debtors' Motion for Entry of an Order      78
4             (I) (A) Establishing Bidding and
               Auction Procedures, (B) Scheduling
5             Certain Dates with Respect Thereto,
               (C) Approving the Form and Manner of
6             Notice Thereof, (D) Approving Contract
               Assumption and Assignment Procedures,
7             and (E) Granting Other Related Relief;
               and (II) (A) Authorizing the Debtors to
8             Enter into a Definitive Purchase
               Agreement and (B) Granting Other Related
9             Relief
               [Docket No. 16; filed June 27, 2023]
10

11            Court's Ruling:                            93

12   Agenda
     Item 19: Karma Automotive LLC's Motion for Relief   95
13            from the Automatic Stay
               [Docket No. 82; filed July 5, 2023]
14

15            Court's Ruling:                            113

16

     WITNESSES CALLED
17   BY THE DEBTORS:                                     PAGE

18       ADAM KROLL
         Cross-examination by Mr. Coleman               15
19       Redirect examination by Mr. Zakia              25
         Recross examination by Mr. Coleman             28
20
         JEFFREY FINGER
21       Cross-examination by Mr. Chipman               31
         Redirect examination by Mr. Zakia              46
22       Recross examination by Ms. Kovsky              48
         Recross examination by Mr. Chipman             51

23

24

25

1                                INDEX

2    WITNESSES CALLED
     BY KARMA AUTOMOTIVE:                                    PAGE
3
         MICHAEL WEXLER
4    Direct examination by Mr. Sowka                   59
     Cross-examination by Mr. Zakia                   74
5    Cross-examination by Ms. Kovsky                  75

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings commenced at 9:30 a.m.)

2           THE COURT:  Good morning.  This is Judge Walrath.

3    We're here in the Lordstown Motors case.  I will turn this

4    over to counsel for the debtor to get us started on our

5    agenda.

6           MR. DEFRANCESCHI:  Morning, Your Honor.  Dan

7    DeFranceschi from Richards, Layton & Finger, proposed counsel

8    for the debtors.  Thank you for hearing us this morning.

9           We have with us today our friends from White &

10   Case and in particular, Mr. Turetsky and Mr. Zakia, who will

11   be handling the bulk of the hearing today.

12          Your Honor, I believe at this time it'd be

13   appropriate for me to turn the podium over to Mr. Turetsky to

14   start working through the items on the agenda, most of which

15   are either -- one is continued and virtually everything else,

16   Your Honor's entered orders.  But with that, Your Honor, I'll

17   turn it over to Mr. Turetsky.

18          THE COURT:  Thank you.

19          MR. DEFRANCESCHI:  Thank you.

20          MR. TURETSKY:  Good morning, Your Honor.  David

21   Turetsky of White & Case for the debtors.  Very nice to see

22   you again, and thank you for making time for us.  And thank

23   you for entering the various orders that were submitted on TOC

24   and CNO.  The company very much appreciates the relief that

25   was entered, and I think it should streamline things for

1  today's hearing, notwithstanding that we do have three items

2  that will be on the agenda.  So thank you for that.

3        Before proceeding into the agenda, I just want to

4  make some notes.  I am joined today, as Mr. DeFranceschi, has

5  said, by my partner, Jason Zakia, as well as other members of

6  the White & Case team.

7        Also joining us here today are Adam Cole, who is

8  the debtors' CFO.  I know that there are other members of the

9  debtors' management team who are on, who are listening, as

10  well as Jeff Finger of the Jefferies firm, which is the

11  investment banker.  Mr. Cole and Mr. Finger will be witnesses

12  with respect to the three motions that Your Honor will be

13  hearing today.

14        Before launching -- and I'd just like to lay out

15  an overall proposed approach for the hearing, if it pleases

16  Your Honor.  I think we would start with a brief update on

17  what has happened since the first day of hearing, followed by

18  a presentation of the evidence with respect to the three

19  motions that are up on the agenda.  This was something that

20  was discussed with both the committee and with counsel for

21  Karma.

22        We thought that it made sense to view the evidence

23  in one shot so that you're not hearing from witnesses back and

24  forth on the various motions and then launching (inaudible).

25  Does that make sense to Your Honor?

1          THE COURT:  That makes sense.  Thank you.

2          MR. TURETSKY:  Thank you, Your Honor.  So starting

3   with a brief update on July 11, the UST formed the Official

4   Committee of Unsecured Creditors   for these Chapter 11 cases.

5   The committee consists of three of the debtors' trade

6   creditors.  They are Barry Leonard and Company, Superior Tam,

7   and SA Automotive.  The committee has retained the Troutman,

8   Pepper, Hamilton Sanders firm as their counsel, and Huron

9   Consulting as their financial advisor.

10          The representations are being led by Ms. Deborah

11   Kovsky and Mr. Francis Lawall of the Troutman firm as Counsel

12   as well as Laura Marcero of Huron, and you will be hearing

13   from Ms. Kovsky and Mr. Lawall today, and I anticipate that

14   you'll be hearing from Ms. Marcero as these cases proceed.

15          Since their retention, the debtors have worked

16   closely with the Committee's advisors to get the Committee up

17   to speed and to resolve any concerns regarding the relief that

18   the debtors have been seeking.  And as Your Honor will have

19   seen, we were able to resolve the Committee's comments in a

20   very amicable and consensual fashion.  And I look forward, as

21   do the debtors, of working with the Chapter 11 (inaudible)

22   fashion.

23          In addition, we've also continued to work with Mr.

24   Hackman of the US Trustee's office to address his comments,

25   and we'd like to thank him, as well, for his consideration as

1 part of the Chapter 11 cases.

2          Moving to the cases themselves, the debtors have

3 worked hard and in many instances around the clock to quickly

4 advance the cases.  As Your Honor will recall from the first

5 day of hearing, the debtors have filed the cases facing major

6 distress that's threatened the financial conditions of the

7 debtors and the debtors' ability to operate.

8          I'm not going to rehash everything but these

9 issues (inaudible), multiple litigations that include not only

10 the Karma litigation that you'll be hearing about today, but

11 also various securities litigations and other matters.  And

12 there's the reality that the company would not be able to

13 operate in the long term, absent a near term transaction that

14 would inject funds.

15          And so the purpose of filing these cases was to

16 use the tools of Chapter 11 to effectively and quickly

17 maximize value for creditors and for stakeholders.  And that

18 really involves three work fronts at least.  But three that

19 we'll talk about here.

20          The first is a process to market and sell the

21 assets in an expedited but appropriate fashion, (inaudible)

22 process centralize the claims against the debtors before a

23 single court, before Your Honor, so that they can be

24 established and quickly resolved.  And then thirdly, address

25 the issues with Foxconn.

1           And it's notable that given the lack of operations

2    and the struggles with retaining an employee team of uncertain

3    futures, new obligations and duties as a result of bankruptcy

4    filings, time is of the essence.  So to that end on the sale

5    front, we did file our bidding procedures motion on the first

6    day.  The company has established a data room and signed up

7    NDAs with potentially interested parties who are in the data

8    room and doing work.

9           Assuming there are (inaudible) procedures, we

10   would envision that indications of interest would be due on

11   July 31st with definitive business on August 24 at a sale

12   hearing subject to Your Honor's availability in mid-September.

13          In addition, on the post front, the debtors are

14   pushing hard to file their schedules by August 1, and we will

15   be seeking to set a bar date shortly thereafter.  And that's

16   so that the claims pool can be quickly established.  We know

17   what we're dealing with in terms of liability (inaudible) the

18   resolution process can really begin.

19          Staying with the claims process, and this is

20   germane to today's hearing, you will have seen that Karma

21   filed a motion for lift-stay -- lift the automatic stay to

22   liquidate its claim in the Central District of California, and

23   the debtors have, of course, filed their estimation motion.

24   The parties have objected to each other's requests for relief,

25   and we'll be talking about that at today's hearing.

1        Stated simply, we think that litigating the claim

2   outside of this Court would unduly delay things, but we'll get

3   to that.  And then lastly, that puts us to Foxconn.  We've

4   noted that Foxconn filed a motion to dismiss or convert the

5   case.  The debtors will be objecting to that motion.  We've

6   been in discussions with Foxconn as to a schedule, and we will

7   revert to Your Honor as soon as that schedule is established.

8        So that's the debtors' update, at least at this

9   point, unless Your Honor has any questions.  I know that the

10  Creditors Committee counsel would like to make some comments,

11  but if Your Honor has any questions, I'm happy to answer them

12  now.

13       THE COURT:  No questions at this time.  Let me

14  hear from the Committee.

15       MS. KOVSKY:  Good morning, Your Honor.  Tori

16  KOVSKY with Trotman Pepper on behalf of the Official Committee

17  of Unsecured Creditors.  As counsel previously mentioned, my

18  colleagues Deb Kovsky and Francis Lawall are here on Zoom

19  today and will be handling the substantive matters on behalf

20  of the Committee.

21       THE COURT:  Thank you.  Mr. Lawall, you're muted

22  still.

23       MR. LAWALL:  This is Fran Lawall and Deborah

24  Kovsky on behalf of the proposed counsel for the Committee.

25  Your Honor, as we indicated in the papers that we filed with

1  the Court, we believe this is a pretty unique case.  There was

2  $136 million of unencumbered cash that was available at the

3  beginning of the case, and therefore the Committee has been

4  laser focused from the beginning to try and preserve that cash

5  to make sure that the case is administered efficiently and to

6  avoid any unnecessary litigation.

7          You can see some of that, Your Honor, with respect

8  to the modifications made to the second-day motions, where we

9  have gotten various information and other changes to the

10  second-day motions again, to try and preserve cash and to try

11  and move this case forward.

12          We do recognize, however, Your Honor, that the

13  assets of this company need to be marketed, need to be

14  marketed quickly, and need to be marketed in a way in which

15  the litigation does not get in the way of doing so.  We do

16  believe that the bid procedures themselves are procedural and

17  not substantive.

18          We also recognize the fact that here, Your Honor,

19  if there is going to be a scale as a going concern, it needs

20  to happen quickly, and we are in agreement with respect to the

21  debtors' proposed timetable.  We hope that there will be a

22  going concern sale, but we won't know.  But if there is a

23  going concern sale, we recognize it will be the preservation

24  of jobs, the creation of value, and maybe even the creation of

25  additional monies for Karma in the event that they are

1  ultimately determined to be a sale.

2            Therefore, Your Honor, from the Committee's

3  perspective, we would ask that the sale process continue on

4  the current timeline, that the stay remain in place, and this

5  case remain, in Chapter 11 for the moment because, Your Honor,

6  as you will hear, there are multiple litigations beyond just

7  simply the Karma and the Foxconn litigation, which are going

8  to have to be organized in a -- it's going to have to be dealt

9  with in an organized and an efficient manner.

10           The Committee is going to remain active throughout

11 this case, and the Committee is going to be laser focused in

12 terms of trying to make sure that remaining cash is not

13 burned.

14           One of the things that's on the forefront for us,

15 Your Honor, is the fact that the trade debt itself, as

16 mentioned in multiple papers filed with the Court, may be as

17 low as $20 to $30 million.  So to the extent that this case

18 moves forward, we want to make sure that there's a

19 preservation of that cash to ensure that the unsecured

20 creditors are paid in full, as they should be with interest in

21 this case.

22           Your Honor, going forward, Ms. Kovsky will be

23 handling the substantive matters with respect to the

24 litigation as it moves forward this morning.  Thank you.

25           THE COURT:  Thank you.  No other preliminary

1  comments?  Seems like that might have been part of the

2  substantive too, so I will reserve that for the substantive

3  hearings.

4          MR. TURETSKY:  Understood, Your Honor.  Let's get

5  -- David Turetsky.  I think that takes us to the evidentiary

6  enforcement of the hearing, and my partner, Jason Zakia will

7  be happily met, so I will cede the podium to Mr. Zakia.

8          THE COURT:  Thank you.

9          MR. ZAKIA:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MR. ZAKIA:  Jason Zakia, White & Case for the

12  debtors.  We have conferred with counsel to the Committee and

13  counsel to Karma as to a process.  As Mr. Turetsky previewed,

14  we propose, given the overlap, that we create one evidentiary

15  record for all three contested matters.  With respect to that

16  debtors have two witnesses, and I believe there is an

17  agreement that the direct testimony for those witnesses would

18  be taken by declaration subject to cross.  And counsel for

19  Karma has indicated they do intend to cross examine both

20  witnesses.

21          So if I can, I'm going to begin with our first

22  witness, Adam Cole, and ask Mr. Cole to turn his camera on.

23  Had a little problem with this on the first day, but hopefully

24  that's all ironed out.  Mr. -- sorry, Your Honor.

25          THE COURT:  Mr. Kroll's here.  Should I have the

1   clerk swear him in?

2           MR. ZAKIA:  Yes, Your Honor.  Thank you.

3           THE COURT:  Mr. Kroll.

4           THE CLERK:  Please raise your right hand.  Do you

5   affirm that you will tell the truth, the whole truth, and

6   nothing but the truth to the best of your knowledge and

7   ability?

8           MR. KROLL:  I do.

9           THE CLERK:  Please state your full name and spell

10  your last name for the record.

11          MR. KROLL:  (Inaudible).

12          THE CLERK:  Thank you.

13          THE COURT:  All right, please speak up, Mr. Kroll,

14  because it is breaking up a little bit.  But can you first,

15  for the record, state that the statements you made in your

16  declaration is true and correct, and you don't want to modify

17  any of it?  All right.  I can't hear you.

18          MR. KROLL:  Can you hear me now?

19          THE COURT:  I can hear you now.  Yes.  All right.

20          MR. ZAKIA:  Thank you, Honor.  And just for the

21  record, Your Honor, the declarations that Mr. Kroll is

22  testifying in support of can be found in docket number 123 and

23  156, and I'd offer them into evidence at this time.

24          THE COURT:  All right.  They are admitted subject

25  to cross examination.

1        MR. ZAKIA:  At this point, Your Honor, I'd cede

2    the podium to counsel for Karma for the cross.

3        MR. SOWKA:  Good morning, Your Honor.  James Sowka

4    on behalf of Karma Automotive LLC.  The cross examination of

5    Mr. Kroll will be handled by my partner Jesse Coleman this

6    morning.

7        MR. COLEMAN:  Morning, Your Honor.

8        THE COURT:  Thank you.  Who's going to go first?

9        MR. COLEMAN:  Your Honor, this is Jesse Coleman.

10   If it please Your Honor, I'll go ahead and proceed.

11       THE COURT:  You may.

12       MR. COLEMAN:  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14   BY MR. COLEMAN:

15       Q.   Mr. Kroll, I represent Karma Automotive.  You

16   understand that?

17       A.   Yes.

18       Q.   And you, in fact, in addition to the two

19   declarations that Mr. Zakia identified at 123 and 156, also

20   signed a declaration in support of first-day motions, debtors'

21   Chapter 11 petitions and first-day motions.  You recall that?

22       A.   Correct, yes.

23       Q.   And that would be found at ECF number 15 on the

24   record.  Mr. Kroll, as of the date of the petition, debtors

25   had approximately somewhere between 136 and $137 million in

1  cash, is that correct?

2      A.    Correct.

3      Q.    And the debtors are currently experiencing a cash

4  burn of approximately $5 million a month, is that correct?

5      A.    It's about six, I think in my declaration we said 4

6  million of operating costs, 2.2 of bankruptcy expenditures

7  without funding.  The cost of the Unsecured Creditor's

8  Committee have those estimates.

9      Q.    Okay.  So when you stated in your first-day

10  declaration, I point you to paragraph 64, do you have that in

11  front of you, sir?

12      A.    Yes.

13      Q.    In the middle of the paragraph says as of the

14  petition date the debtors have approximately $136 million in

15  cash and an estimated monthly cash burn of approximately $5

16  million, excluding extraordinary costs and contingent

17  liabilities.  What were you referring to there?

18      A.    That was the estimate at that time.  The later

19  declaration is updated to reflect the additional professional

20  fees that we incur.  So I think that the 5 million,

21  particularly, was prior to the expiration of the Warren Act.

22  So we've had some decrease in the five, plus we've slowed down

23  operation, curtailed activities which reduces the five to

24  about four.  And then that is supplemented with (inaudible).

25      Q.    I'm sorry, I'm having a hard time hearing you a

1   little bit.  You said it's supplemented with what?

2        A.   The bankruptcy costs.

3        Q.   You do reference elsewhere, you mention in your

4   reply in support of the estimation motion, which was one of

5   the declarations that Mr. Zakia identified.  And that would be

6   ECF 156.  You said that the debtors are projected to spend

7   approximately $6.2 million per month in these Chapter 11

8   cases; is that correct?

9        A.   Correct.

10       Q.   And so that 6.2 million would encompass the

11  operational costs of the organization plus $2.2 million in

12  legal spend?

13       A.   Yes.  For the cases without – or before we have the

14  estimations or the forecasts from the unsecured (inaudible).

15  So that 6.2 will go up.

16       Q.   Meanwhile, the debtors anticipate that the

17  attorney's fees, costs, and other expenses associated with

18  defending the Karma case through trial is approximately 2.5

19  million; is that correct?

20       A.   Correct.

21       Q.   So defending the Karma matter through trial would

22  cost approximately 40 percent of what Karma is already burning

23  through – or excuse me, that Lordstown is already burning

24  through in a month; is that right?  Approximately.  I'm sorry?

25  Is that correct?

1      A.   Yes, sir.  Yeah, it's in addition to forecasting.

2      Q.   Debtors expect to spend two and a half times the

3  amount on operations and legal fees in a month compared to

4  what is anticipated for defending and resolving at least to

5  trial the Karma litigation.  Is that correct?

6      A.   Yeah.  Although I think there's a distinction

7  between monthly burn rate and activities that are isolated to

8  reaching and getting through trial.  Right.

9      Q.   In fact, the $2.5 million represents a couple of

10 months of litigation at least.  There are anticipated

11 depositions, expert work.  So we're talking a couple of months

12 of Karma litigation at 2.5 million.  If we looked at a couple

13 of months of otherwise estimated cash burn on behalf of the

14 debtors, we're talking about $12.4 million at least, correct?

15     A.   Yeah.  If you're thinking the 6.2 times two, that's

16 12.4.

17     Q.   So in the same period of time, Lordstown is going

18 to be spending on bankruptcy, legal and other operations, four

19 times the amount than what it was going to spend if it has to

20 defend against the Karma litigation, approximately, correct?

21     A.   But again, the 2.5 is only to get to and through

22 the trial and none of the subsequent.

23     Q.   So the answer to my question is yes?

24     A.   Yeah (inaudible).

25     Q.   And at this time, Baker Hostettler has not been

1  engaged to represent the debtors in any adversary Karma

2  litigation as part of these bankruptcy proceedings; is that

3  right?

4       A.    Correct.  The application has not been approved.

5       Q.    Okay.  And Baker Hostettler has been the law firm

6  that has represented Lordstown through all of the Central

7  District of California lawsuit, is that correct.

8       A.    Correct.

9       Q.    And is it anticipated that they will be, or will

10 White & Case move forward?  Is that something that you know at

11 this time?

12      A.    I don't know.

13      Q.    If White & Case were proceeding to defend

14 Lordstown, they have to get up to speed on the whole case,

15 including the three years of extent litigation; is that right?

16      A.    I don't know to what extent they're already up to

17 speed, given that it's an integral part of these cases.

18      Q.    Is the 6.2 million, including reviewing the 50

19 depositions and the multiple 500 ECF notices, do you know to

20 what extent they've already gotten involved in getting up to

21 speed on three years of litigation?

22      A.    I don't know.

23      Q.    The debtors currently only have produced 65

24 vehicles; is that right?

25      A.    Closer to eight.

1      Q.   According to your declaration, first-day

2   declaration, you state page 2, paragraph 1.  As of the

3   petition date, the company is in its nascent stages, and only

4   approximately 65 Endurance vehicles have been manufactured,

5   correct?

6      A.   Yeah, that was as of the petition date, we

7   continued to build vehicles through the end of, I believe it's

8   about 20 that have been completed since that time.

9      Q.   Have they been sold?

10     A.   No, we've sold 37.

11          THE COURT:  Let him answer.  Finish the answer.

12   What was your answer, Mr. Kroll?

13          MR. KROLL:  We have sold 37 vehicles.

14   BY MR. COLEMAN:

15     Q.   And has the company finished finalizing this

16   limited number of additional vehicles, or are there still more

17   to be manufactured?

18     A.   We're done manufacturing.  There are several

19   vehicles that are incomplete.  They're not yet saleable due to

20   shortage of parts.

21     Q.   And once that process is complete, Lordstown

22   intends to halt production of the Endurance, correct?

23     A.   We have already halted those final sort of

24   incomplete vehicles at this time, we don't – we haven't made a

25   final conclusion that they would be done on site if

1  (inaudible).

2      Q.   So debtors have proposed a sale process that would

3  conclude with a sale hearing on or about September 12th.  Is

4  that your understanding?

5      A.   Yes, sir.

6      Q.   And you understand that the Karma litigation is

7  currently scheduled on trial if the stay is lifted for

8  September 5th, correct?

9      A.   Yes, sir.

10     Q.   So either way, management anticipates being in

11  litigation through that period of time, correct?

12     A.   I'm not sure I know what you mean.

13     Q.   Well, you represent that the process will be

14  resource intensive, either for the selling of the assets, the

15  sale process, or litigation.  So, either way, you've got a

16  resource intensive litigation process to go through in early

17  September.  Is that correct?

18     A.   I'm not sure I'm understanding the either/or that

19  you're referencing.  This whole process, in general, is

20  incredibly resource intensive, whether it's litigation and

21  bankruptcy.  Bankruptcy without litigation.

22     Q.   Mr. Kroll, the debtors intend to sell substantially

23  all of its assets, all of Lordstown's assets, as part of the

24  bankruptcy process; is that correct?

25     A.   Yes.

1        Q.    And that includes intellectual property associated

2    with the development of the Endurance vehicle?

3        A.    Yes.

4        Q.    That is, in fact, the primary asset that debtors

5    have remaining, is that correct, the intellectual property

6    associated with the manufacture and development of the

7    Endurance?

8        A.    I don't know that I would say primary.  I mean,

9    what consists of a vehicle is a full spectrum.  Right?  We've

10   invested $200 million in tooling, and we've spent a lot of

11   money on the battery line and the motor line.  So those are

12   manufacturing assets.  Those manufacturing assets go into

13   building a vehicle.  The vehicle is a design or an

14   architecture or platform.  All of that goes together.

15       So you have physical assets, you have design of the

16   vehicle.  You have the fact it is certified, which is an

17   important distinction from, say, a prototype.  So there's a

18   spectrum as to what's defined as (inaudible).

19       Q.    A substantial portion of the assets that Lordstown

20   is looking to sell as part of this bankruptcy process is the

21   intellectual property rights associated with the development,

22   manufacture of the Endurance vehicle.  Is that correct?

23       A.    Yeah, that's a fair statement.

24       Q.    And those intellectual property rights are

25   currently being disputed as to who owns them as part of the

1  Karma litigation.  Is that correct?

2       A.    Well, you'd have to get to the technicalities of

3  what Karma is claiming they own versus what has been developed

4  by the company, for example.  But the motor technology, we

5  licensed that from (inaudible).

6       Q.    You understand that – excuse me.  Go ahead.

7       A.    Would be part of (inaudible), so.

8       Q.    You understand that some of the intellectual

9  property rights that the debtors are seeking to sell as part

10  of this Chapter 11 bankruptcy include intellectual property

11  rights that are being disputed by Karma as belonging to them,

12  as being trade secrets that were misappropriated, that went

13  into the manufacture and development of the endurance vehicle,

14  correct?

15       A.    Yes, I understand that's (inaudible).

16       Q.    And as of the date of the petition, the company has

17  not received any actual and indications of interest in the

18  purchase of the company; is that correct?

19       A.    As of petition date, that's right.

20       Q.    And since then?

21       A.    Since then we've launched a full process.  By the

22  way, I think it's an important distinction when you draw on

23  we've not received any actionable offers to buy the company

24  leading up to the petition date, we were precluded under the

25  investment agreement with Foxconn from seeking buyers.  So we

1 could not in any way solicit a buyer leading up to the

2 petition day.  Since the petition date, we have organized the

3 business to be marketed (inaudible) absolutely, and we are

4 (inaudible).

5          THE COURT:  Excuse me, Mr. Kroll, I'm having real

6 difficulty.  You keep breaking in and out, so I'm going to

7 suggest that you disconnect and reconnect unless you have a

8 different suggestion.  I can't hear you at all now.

9          MR. KROLL:  Let me –

10          THE COURT:  Now, I can.

11          MR. KROLL:  Okay.  Is that better?  I'm so sorry.

12          THE COURT:  That's better.  Let's try that.  Okay.

13 Sorry to interrupt.  You were saying, since bankruptcy we have

14 –

15          MR. KROLL:  We've started a sale process, as we've

16 discussed, so that meant kicking off all the organization

17 associated with preparing to market the company.

18     Q.   And as of today, there are no offers to purchase

19 the company.  Is that correct?

20     A.   Correct.

21          MR. COLEMAN:  Your Honor.  Thank you.  I don't have

22 any other questions at this time.

23          THE COURT:  Any redirect by the debtor?

24          MR. ZAKIA:  Yes, Your Honor.  Just briefly.  Thank

25 you.

 1                     REDIRECT EXAMINATION

 2   BY MR. ZAKIA:

 3        Q.   Mr. Kroll, let's start at the end.  Counsel just

 4   asked you, as of today, do you have any offers, is there a

 5   process in place to solicit offers for the company?

 6        A.   Yes, absolutely.

 7        Q.   Okay.  And what is the timeline under which the

 8   debtors have proposed receiving such offers?

 9        A.   We've told bidders that bids are due next week on

10   July 31st.

11        Q.   So is it in any way surprising that the bidders

12   have not yet received such a bid?

13        A.   No, not at all.

14        Q.   I want to clarify something.  Counsel asked you

15   about whether as of today the debtors have ceased their

16   manufacturing operations.  Do you recall that testimony?

17        A.   Yes.  Yes.

18        Q.   Could you explain to the Court, given the fact that

19   manufacturing has ceased, why the debtors still need to employ

20   some of the engineering and other technical employees that

21   they still have on payroll?

22        A.   Yeah, I think it goes to the point I was making of

23   what you're selling.  If, you know, we are selling a vehicle

24   that is complex in nature, a buyer is going to expect to

25   understand all the componentry, how they fit together.  You

1  can't sell a vehicle as a finished puzzle and not explain to

2  anyone how to put the puzzle together.  And it's these

3  discrete engineers who have unique talent in their own systems

4  and subsystems that would be required to explain.  You know, a

5  car isn't just four wheels, and off you go.

6      Q.   And, Joe, could you please explain to Judge Walrath

7  what the impact, if any, on the sale process would be if those

8  employees were to leave the company?

9      A.   It'd be significant because you employ all these

10  specifically trained engineers in their -- with their domain

11  expertise.  And so you can't -- it's not like accounting.  I

12  could just find another accountant to explain how a journal

13  entry is done.  You need a specific engineer who understands

14  how the body works, how the tooling works, how the tooling was

15  designed for the body structure, why the body structure is

16  designed that way, why the folds in the metal are the way they

17  are to maximize efficiency.  And all of the history and trials

18  that the company's gone through in the prototype phase, you

19  learn a tremendous amount.

20      I mean, a lot of what is building a vehicle in prototype

21  phases is exactly what prototype stands for.  Right?  You're

22  testing and learning from what you've tried.  And so you have

23  to be able to articulate why things are the way they are

24  today, but also the history of how you got here, what you

25  tried that worked, what didn't, and so forth.  And it's not a

1  fungible skill set.  I mean, history is important, is

2  critically important, as is just the domain expertise.

3       Q.   And could you please explain to the court how, if

4  at all, an extension of the sale process timeline would impact

5  the company's ability to retain those employees?

6       A.   Yeah, I mean, we've been losing people over the

7  course of the year because they're uncertain about their

8  future.  And so if you delay the sale process, you're not

9  likely to get someone to show up from a bid perspective

10 because they don't know if they can buy the company.

11      So buyers will step back and say, well, unless I have a

12 timeline, I am not going to put forth my own resources towards

13 pursuing purchase.  So they back away.  Then we don't have

14 anyone step up and say, I like what you have.  I'm interested

15 in it.  And if you don't give our employees a place to look

16 forward to, then why stick around?  And so we will absolutely

17 lose people if we don't give them a reason to be here in an

18 optimistic future with the buyer.

19      Q.   One last topic.  You testified that the estimates

20 of the bankruptcy fees did not yet include fees associated

21 with the Creditors Committee.

22      A.   That's right.

23      Q.   Okay.  The $2.5 million estimate that you gave in

24 your declaration that counsel asked you about or the estimate

25 of if the stay is lifted taking the Karma litigation to trial,

1  did that estimate include any costs associated with the

2  possibility that the Creditors Committee could intervene in

3  the Karma litigation if the stay is lifted?

4       A.   No.  And then, just to be clear, the $2.5 million

5  estimate of cost that would be necessary to litigate the Karma

6  case, that is in addition to the $6.2 million burn rate you

7  talked about, correct?

8       A.   Correct.

9       Q.   Thank you.

10          MR. ZAKIA:  No further questions, Your Honor.

11          THE COURT:  All right, thank you.  Anybody else

12 wish to cross examine Mr. Kroll?

13          MR. COLEMAN:  Your Honor, if I might have a brief

14 redirect, if that's permitted at this stage.  If not, or a

15 recross, if not --

16          THE COURT:  That's fine, Mr. Coleman, you may.

17          MR. COLEMAN:  Thank you.

18                    RECROSS-EXAMINATION

19 BY MR. COLEMAN:

20      Q.   Just a couple of questions, Mr. Kroll.  You

21 mentioned Lordstown's need to maintain discrete engineers that

22 are needed to explain the vehicle, correct?

23      A.   Yes.

24      Q.   And they need to explain the technology of the

25 vehicle to potential buyers, how it works, the intricacies of

1  the technology associated with it; is that right?

2       A.   Correct.

3       Q.   Would that include the Infotainment system of the

4       A.   Yes, it includes all –

5       Q.   One of those engineers would be Joe Durie

6  (phonetic), correct?

7       A.   Correct.

8       Q.   He was a defendant in the Karma case, correct?

9       A.   Yes.

10      Q.   And a number of those discrete engineers are folks

11 that he solicited and brought over with him.  In fact, half

12 the Infotainment division is former Karma employees that he

13 solicited while he was working at Lordstown and Karma at the

14 same time.  Isn't that correct?

15      A.   I wasn't here – I wasn't at the company at the

16 time.  I can't speak to what Joe did or didn't do.

17      Q.   You understand those are the allegations in the

18 Karma case, correct?

19      A.   I believe so, yes.

20      Q.   And Joe Durie has testified that half of his

21 Infotainment division are former Karma employees?

22           MR. ZAKIA:  Objection, Your Honor.  I don't think

23 it's appropriate to ask this witness about the testimony that

24 another witness gave in another percent.

25           THE COURT:  Yeah, I don't think it's necessary to

1 get into that.

2         MR. COLEMAN:  Yes, Your Honor.

3 BY MR. COLEMAN:

4     Q.   You would agree, Mr. Kroll, that Lordstown can't

5 sell intellectual property it doesn't own, correct?

6         MR. ZAKIA:  Objection, Your Honor.  That is not

7 appropriate to ask this witness for a legal conclusion.

8         THE COURT:  Sustained.

9         MR. COLEMAN:  Thank you, Honor.  No further

10 questions.

11         MR. ZAKIA:  I have nothing further, Your Honor.

12         THE COURT:  All right.  Thank you, Mr. Kroll.  You

13 may be excused.

14         MR. KROLL:  Thank you, Your Honor.

15         MR. ZAKIA:  Your Honor, the debtors' second

16 witness is Jeffrey Finger from Jeffries.  Mr. Finger submitted

17 a declaration which is found at docket number 157.  Mr. Finger

18 should be on the Zoom and is available for cross-examination,

19 and we would offer his declaration at this time.

20         THE COURT:  All right, well, let's get Mr. Finger

21 up so he can be sworn.  There he is.  All right, I'll have him

22 sworn.

23         THE CLERK:  Mr. Finger, please raise your right

24 hand.  Do you affirm that you will tell the truth, the whole

25 truth, and nothing but the truth, to the best of your

1  knowledge and ability?

2       MR. FINGER:  I do.

3       THE COURT:  Please state your full name and spell

4  your last name for the record.

5       MR. FINGER:  Jeffrey Finger.  F-I-N-G-E-R.

6       THE CLERK:  Thank you.

7       THE COURT:  All right.  Again, Mr. Finger, are the

8  statements made in the declaration referenced by counsel for

9  the debtor true and correct to the best of your knowledge, and

10 do you want to amend any of them?

11      MR. FINGER:  They are true and correct, and I will

12 not amend them.

13      THE COURT:  All right, then you're subject to

14 cross.  Mr. Coleman?

15      MR. SOWKA:  James Sowka on behalf of Karma

16 Automotive.  This cross examination will be handled by our co-

17 counsel, Mr. Chipman.

18      THE COURT:  All right.  Mr. Chipman.

19      MR. CHIPMAN:  Good morning, Your Honor.  William

20 Chipman, on behalf of Karma Automotive.  Can Your Honor hear

21 me?

22      THE COURT:  I can.

23      MR. CHIPMAN:  Thank you, Your Honor.

24                     CROSS-EXAMINATION

25 BY MR. CHIPMAN:

1        Q.   Good morning, Mr. Finger.  My name is Jim Chipman.

2   I also represent Karma Automotive, and I'm going to ask a few

3   questions.  Mr. Finger, you're the managing director and co-

4   head of US debt advisory and restructuring in Jeffries,

5   correct?

6        A.   Yes, that's correct.

7        Q.   And you've been involved in financial restructuring

8   for over 20 years, correct?

9        A.   That is correct.

10       Q.   And you submitted declarations in support of the

11  debtors' bidding procedures motion and estimation motion,

12  right.

13       A.   In support of the bidding procedures.  I believe

14  that is correct.

15       Q.   And you were engaged by the debtors in September

16  2021 to explore restructuring alternatives, correct?

17       A.   No, not exactly.

18       Q.   Your retention declaration, would it surprise you

19  to learn that your retention declaration said that you were

20  engaged by the debtors in September 2021 to explore

21  restructuring alternatives for the debtor?

22       A.   So I was not a part of the team.  Yes, Jeffries was

23  engaged in September 2021 to explore alternatives.

24       Q.   So, Jeffries -- to correct the record, Jeffries was

25  engaged in 2021?

1      A.   Yes, that is correct.

2      Q.   All right.  And that engagement included marketing

3  the debtors' assets for sale, correct?

4      A.   That is not my understanding.

5      Q.   Would it surprise you to learn that your retention

6  declaration said that Jeffries was obtained to consider

7  restructuring alternatives, including a sale of the debtors'

8  assets?

9      A.   If I may clarify my understanding of what our

10 engagement was at that time?

11     Q.   Absolutely.

12     A.   It was to market the company to seek potential

13 partners, partnerships, and investment interest in a minority

14 in the company.  It was not an outright sale of the company.

15     Q.   So there was some marketing of the debtors to

16 potential investors and to potential purchasers or other folks

17 that may want to invest in the company.  Correct?

18     A.   Correct.  With a slight clarification, if you don't

19 mind.  Yes.  It was marketed to third parties interested in

20 making an investment in or partnering with the company.

21     Q.   And that process began two years ago.  Correct?

22     A.   Believe that, roughly speaking, based on the

23 calendar, I think that's right.

24     Q.   And during that time, Jefferies was unable to find

25 a buyer or investor for the company.

1       A.    Jeffries was unable to find an actionable third

2   party with which to transact.

3       Q.    Given the amount of time spent working with the

4   debtors, you are familiar with the debtors' corporate and

5   capital structure, management, business operations, and

6   assets, correct?

7       A.    Yes, I would say Jeffries and our team, broadly

8   speaking, the answer to that is yes.

9       Q.    Okay.  As part of your services to the debtors in

10  these cases, you are continuing to provide advice and

11  assistance in connection with a possible sale of all or

12  substantially all the debtors' assets, correct?

13      A.    Correct.

14      Q.    Okay.  And your monthly fee in this case is

15  $200,000, correct?

16      A.    That is correct.

17      Q.    All right.  And you're entitled to a transaction

18  fee of $3 million, less a credit of up to five monthly fees

19  upon the consummation of a sale transaction involving all or

20  substantially all of the debtors' assets, correct?

21      A.    I believe that was in the original retention

22  application.  It has since been modified, and the crediting

23  has been increased as negotiated with the Unsecured Creditors

24  Committee.

25      Q.    Okay.  What is that credit now?

1      A.   I believe it is a full credit of the monthly full

2  credit.

3      Q.   Okay.  Thank you for that clarification.  Isn't it

4  true that, however, that Jefferies will not earn any sale

5  transaction fees for de minimis asset sales or any other sales

6  that are not for all or substantially all the debtors' assets?

7      A.   My understanding is it is correct in respect to de

8  minimis asset sales.

9      Q.   Would it surprise you to learn that your retention

10  application also said that you would not earn the fee if you

11  don't sell substantially all of the debtors' assets?

12      A.   Believe it is substantially all of the debtors'

13  assets in one or more transactions, but I understand what the

14  language says.

15      Q.   Okay.  You understand that the debtor manufactures

16  or manufactured electric vehicles, correct?

17      A.   Yes.

18      Q.   And given Jeffries' two years of experience working

19  with the debtors and marketing their assets or marketing the

20  companies for investment, you are very familiar with the

21  debtors' assets?

22      A.   Yes.  Jeffries as an institution, it may not

23  surprise you.  Of course, I have a large team working with me,

24  including industry specialists.

25      Q.   Understand.  Thank you for that clarification.  So

1  either you or your team have a clear understanding of the

2  assets that are being marketed for sale, correct?

3      A.   I'd say they have a very good understanding.

4      Q.   Okay, and you would agree with me that in your

5  experience, a debtor can only sell assets that it owns,

6  correct.

7          MR. ZAKIA:  Your Honor, same objections to the

8  extent he's calling for a legal conclusion, Your Honor.

9          MR. CHIPMAN:  I'm not calling for a legal

10  conclusion.  I'm just asking if the witness understands

11  whether or not he can sell assets that belong to the estate.

12          THE COURT:  All right, I'll let him answer that

13  question.  Go ahead.

14      A.   Apologies, Your Honor.  We are selling all of the

15  available assets of the debtors'.

16      Q.   Selling all the available assets of the debtors

17  that belong to the debtors, correct?

18      A.   Believe that is correct, and I believe that would

19  be determined by the Court if there happens to be a dispute.

20      Q.   Do you believe generally that somebody can sell

21  assets that don't belong to somebody?

22          MR. ZAKIA:  Objection, Your Honor.

23          THE COURT:  Yes.  Sustained.

24  BY MR. CHIPMAN:

25      Q.   Turning to the dispute between Karma and the

1 debtors.  You're familiar with the dispute between Karma and

2 the debtors over the misappropriation of Karma's intellectual

3 property, correct?

4     A.   Yes, I'm generally familiar.

5     Q.   Okay.  You're aware that the dispute is set for

6 trial in September, correct?

7     A.   I believe that is the case.

8     Q.   Okay.  And given your familiarity with debtors'

9 assets, you have a clear understanding which assets Karma

10 asserts contain its source code and other intellectual

11 property, correct?

12     A.   I would say that I am not close enough to

13 understand what is black or what is white, but I have read

14 what the assertions are.

15     Q.   Are you're generally familiar about what property

16 asserts, source code, and other intellectual property.

17     A.   Generally.

18     Q.   Can you please, to the best of your ability,

19 identify for the Court the assets that Jeffries is marketing

20 for sale that contain the intellectual property that is in

21 dispute in the Karma litigation.

22     A.   I cannot specifically list out the assets.  I

23 understand it pertains to the input payment, as was noted

24 earlier.

25     Q.   Okay.  And is Jeffries currently marketing those

1  assets for sale?

2      A.   We are marketing all of the debtors' assets for

3  sale.  So explicitly as part of that, perhaps those assets

4  would be included.

5      Q.   And these are substantial assets, correct?

6          MR. ZAKIA:  Objection.  I don't know how the

7  witness could understand that question.

8          THE COURT:  Yes.  Sustained.

9  BY MR. CHIPMAN:

10     Q.   You understand what the Infotainment system in the

11  vehicle is, correct?

12     A.   Generally speaking.

13     Q.   And is the Infotainment system a part of the assets

14  that are currently being sold?

15     A.   As I stated earlier, we're marketing all of the

16  debtors' assets.  And so if somebody is purchasing the

17  business excuse me, the Endurance platform to produce a going

18  concern, vehicle and operation, then I suppose Infotainment

19  would be included.

20     Q.   Is the Infotainment system a major component of the

21  electric vehicle that is being sold?

22     A.   It's a component of the vehicle being sold.  I am

23  not a specialist to say if it is major or minor.

24     Q.   Do you know whether or not you're marketing the

25  power moding, bills of materials, electrical architecture as

1  part of the sale as well?

2      A.   I understand, I believe, what some of those items

3  are.  But as I stated earlier, my colleagues and I are

4  marketing all of the debtors' assets.

5      Q.   Is it correct to say that the Karma dispute over

6  the ownership of the intellectual property has made it more

7  difficult to sell these assets?

8      A.   To date, I would say the answer to that question is

9  no.

10      Q.   So the dispute with Karma over whether or not the

11  debtors own certain intellectual property has not made it more

12  difficult to sell these assets.  That's your testimony?

13      A.   That is correct.  In our discussions with

14  prospective buyers and purchasers, it has not been apparent.

15      Q.   In your extensive experience as an investment

16  banker, do you agree with me that it's difficult to sell

17  assets where there's a dispute as to who owns those assets?

18      A.   I would say it is possible that that could create

19  an obstacle to selling assets that are subject to dispute.

20      Q.   If the assets that contain -- if assets contain

21  intellectual property, if it's determined that assets contain

22  intellectual property not owned by the debtors and those

23  assets cannot be sold, that would limit the assets available

24  for sale, right?

25             MR. ZAKIA:  Objection, Your Honor.  I object to the

1    legal hypothetical.

2            THE COURT:  I'll allow the answer.  Can you answer

3    that?

4        A.    Sure.  Thank you, Your Honor.  Mr. Chipman, would

5    you mind repeating the question for me?

6        Q.    Sure, I'll try and repeat it.  If the assets that

7    you're selling contain intellectual property not owned by the

8    debtors, and it is determined that it cannot be sold by a

9    court, by Judge Walrath or another court, that would limit the

10   available assets for sale.  Correct?

11       A.    I believe what you were stating makes sense in the

12   sense that, by definition, if there is an asset that is

13   determined to be not the debtors' assets or they're not

14   permitted to sell, that would create an obstacle to the

15   process, yes.  I would also suppose that if another court were

16   to address that concern and rule over that, I would look To

17   Judge Walrath to determine how that would impact us in this

18   case.

19       Q.    Do you understand that Karma has alleged the

20   debtors have stolen intellectual property related to every

21   major component of the vehicle being sold?

22       A.    I am not close enough to the details of the

23   litigation to appreciate that.  Generally speaking, I

24   understand, but I'm not close enough to it.

25       Q.    So what assets would still be for sale, in your

1  general understanding, if the Karma assets are ultimately

2  excluded from the sale process?

3        A.   I suppose we would need to determine exactly what's

4  being excluded.  I'm not sure I appreciate the question.

5        Q.   Would you agree with me that if it turns out Karma

6  owns all or substantially all of the intellectual property

7  contained in certain of the debtors assets and the judge rules

8  they can't be sold, that would impact the sale process in a

9  negative way, right?

10       A.   It likely would.  Or excuse me, it likely could,

11  yes.

12       Q.   Would you agree that -- the current litigation with

13  Karma has placed a cloud on title or has put into question

14  whether some of the assets may or may not be sold?

15       A.   The pending litigation has not been the subject of

16  discussion with any of our prospective buyers to date.

17       Q.   Are you informing buyers that there's a potential

18  that future litigation between the debtors and Karma will

19  determine whether or not the buyer can actually buy the assets

20  you're trying to sell?

21       A.   We have not had explicit discussion with buyers to

22  explain to them the pending litigation.

23       Q.   You would agree with me that it would be better for

24  the sale process overall to have the Karma intellectual

25  property dispute resolved before marketing the assets,

1  wouldn't you?

2      A.   No, in the sense that I would not want to further

3  delay the process, given some of the risk that Mr. Kroll

4  outlined moments ago.

5      Q.   So your testimony, it's better to have a sale

6  process where there may be a title dispute than have a sell

7  process where there's no title dispute because of the ongoing

8  burn rate of the case.

9      A.   What I would say is we are in an unfortunate

10  situation.  We are in the middle of bankruptcy proceedings.

11  They are contested, they are costly, and we are trying to

12  maximize the value of these assets for all stakeholders.

13      Word it another way, perhaps, but it is unfortunately

14  not.  And so, therefore, I believe we need to continue the

15  sale process.  Unfortunately, the Karma litigation will need

16  to proceed in its own course, but we need to continue the sale

17  process, given the risk to the overall enterprise.

18      Q.   And you've been marketing these debtors' assets

19  since the petition date, correct?

20      A.   That is correct.

21      Q.   And to date, you haven't been able to find a buyer

22  willing to submit a stalking horse bid yet?

23      A.   Yes, you are correct.  We do not have a stalking

24  horse bid at this moment in time.  We continue to work with a

25  number of interested parties.  And as you know, the procedures

1  call for indications next week.

2      Q.   And the proposed bidding procedures contemplate a

3  sale to occur in September, correct.

4      A.   Correct.

5      Q.   And that's before the property ownership dispute

6  with Karma is resolved, either through estimation procedure as

7  proposed by the debtors, or the pending action in California,

8  correct?

9      A.   I understood the pending action in California was

10 in early September.  If my memory is incorrect, I apologize.

11     Q.   Right.  Let me take a step back.  The proposed

12 bidding procedures contemplate a sale to occur in September,

13 correct?  Right?

14     A.   Yes.

15     Q.   But that's going to be before the property

16 ownership dispute with Karma is resolved, either through the

17 estimation procedure or the pending California, correct.

18     A.   I'll defer to counsel on exactly when those will be

19 addressed.

20     Q.   Okay.  Your declaration states that the bidding

21 procedures set forth an appropriate process to test the value

22 of the debtors' assets within a reasonable time frame,

23 correct?

24     A.   That's correct.

25     Q.   But you can't test the value of assets that may not

1  be able to be sold.  Correct?

2      A.   We're managing a competitive sale process right

3  now.  We have a number of parties conducting diligence.  I

4  think the bid procedures themselves outline the process for

5  parties to engage in a competitive process and therefore test

6  the value.

7      Q.   Well, but if it's ultimately determined that assets

8  couldn't be sold, there's no one that could bid for those

9  assets.  Correct?

10      A.   If it is determined by the Court that the assets

11  cannot be sold, that would, of course, impact the process.

12      Q.   You further state in your declaration that bidding

13  procedures and the timelines set forth in the bidding

14  procedures are tailored to balance the needs to conduct a

15  fulsome marketing process for the debtors assets against the

16  costs of an extended Chapter 11 process, correct?

17      A.   That's correct.

18      Q.   Yet a marketing process where bidders are not

19  certain what assets can actually be sold is not fulsome, is

20  it?

21      A.   As I understand the question, to date, it continues

22  to be competitive and parties have not addressed or asked

23  questions about the concern around the Karma litigation.

24      Q.   But you testified just a moment ago that you

25  haven't alerted the bidders to the Karma litigation and the

1  potential ownership dispute.

2      A.   So while it is correct we have not outlined the

3  details of the Karma litigation to prospective bidders, it's

4  my experience doing this for a number of years that I would

5  expect any serious party would be aware of that litigation.  I

6  understand the litigation and the prospects of it has been

7  outlined in the company's public filings a few years ago, I

8  believe it was late 2020.  Forgive me if that's incorrect.

9  And of course outlined in the media and details of the court

10 proceedings as well.

11     Q.   The debtors' amended bidding procedures order

12 provides for a July 31st deadline for indications of interest.

13 Correct?  That's Monday.

14     A.   Correct.

15     Q.   Okay.  The debtors' interests in the intellectual

16 property won't be decided by Monday, correct?

17     A.   I don't believe so.  That's correct.

18     Q.   Wouldn't it be better for the marketing and sell

19 process if the debtors' ability to sell its assets were

20 promptly determined so you and potential buyers knew what was

21 actually included?

22     A.   I apologize.  Mr. Chipman, could you repeat the

23 question?  I think it went out for a second.

24     Q.   Sorry.  Wouldn't it be better for the marketing and

25 sale process if the debtors' ability to sell assets were

1  promptly determined so you and potential buyers knew what was

2  included?

3       A.   I think if there is a cloud of uncertainty and

4  concern among buyers, then I suppose, yes, it would be better

5  to have the answer at the same time as I mentioned, and I

6  apologize to restate it.  It has not yet been voiced the

7  concern.  And so we look forward to finding out what we have

8  that is actionable.

9            MR. CHIPMAN:  Your Honor, may I have a moment to

10 just check my notes?

11           THE COURT:  You may.

12           MR. CHIPMAN:  Thank you, Your Honor.  That's all

13 the questions I have at this time.  Reserve my right for

14 recross.  Thank you.

15           THE COURT:  Any redirect?

16           MR. ZAKIA:  Thank you Honor.  Just briefly.

17                    REDIRECT EXAMINATION

18 BY MR. ZAKIA:

19      Q.   Mr. Finger, you touched on this during your cross

20 examination, but could you please explain to Judge Walrath

21 what the differences are between the process that Jeffries

22 undertook prior to the bankruptcy and the current marketing

23 process you're undertaking now?

24      A.   Yes, I can.  Thank you.  So the prior process, as I

25 understand it, was a marketing process, as was noted.  It was

1   a marketing process which Foxconn, of course, was also aware,

2   as noted, to find partners to create partnerships for the

3   company as well as to find potential investors, but not -- and

4   it was not an outright marketing process to sell the company

5   and the company's assets.

6        I would also say that at the time, we, of course, were

7   not in bankruptcy.  The dynamics were somewhat different in

8   terms of the public condition around the company, et cetera.

9        Q.   Could you please explain to the Court what -- do

10  you believe that the differences between the pre-petition

11  process and the current process could cause there to be a

12  different result?

13       A.   I do.  For one, as we just discussed, we are

14  marketing the company as its assets for sale outright today,

15  which we were not then.  And two, in my experience, oftentimes

16  a bankruptcy sale process, as unfortunate as that may be,

17  turns up different types of buyers, different levels of

18  interest, both in dollar amount and otherwise.  And so I think

19  we have the ability to better find an alternative for the

20  company now versus before.

21       Q.   Thank you.  Counsel asked you some questions

22  concerning what, if anything, you had done to make bidders

23  aware of the existence of the Karma litigation.  And I just

24  want to make sure we understand.  I think you made reference

25  to disclosure of that in the company's public filings.  Could

1  you explain to us what you were referring to?

2       A.   Yes, I believe it was a subsequent event, and I'm

3  just trying to remember exactly when.  I think it was in late

4  2020.  That would have been one of the ten queues in late 2020

5  where a subsequent event summarized, and that was, I believe,

6  the first disclosure, the Karma litigation.  And I think since

7  then, it's been provided for in the company's public filing.

8       A.   And in your experience as an investment banker, do

9  you have an understanding as to what the standard practice

10 potential buyers would follow with regard to reviewing 10K's

11 and 10Q's of a public company they were interested in

12 acquiring?

13      A.   I would expect the buyer would review them.  Were I

14 advising buyer, and I have in the past, I would also review

15 them.

16           MR. ZAKIA:  Thank you.  No further questions, Your

17 Honor.

18           THE COURT:  Any recross?

19           MR. CHIPMAN:  Your Honor, two quick questions.

20           MS. KOVSKY:  If I could just ask you a couple of

21 questions.

22           THE COURT:  All right, Ms. Kovsky, you can go ahead

23 first.

24           MS. KOVSKY:  Appreciate it.

25                      RECROSS-EXAMINATION

1  BY MS. KOVSKY:

2      Q.   Mr. Finger, thank you for appearing today.  I

3  appreciate your time.  You were asked a number of questions

4  about the Infotainment center that is part of the Endurance

5  vehicle by Mr. Chipman.  Do you recall that?

6      A.   I do.

7      Q.   Is it your understanding that the Infotainment

8  center in the vehicle is effectively a commoditized or

9  productized component of that vehicle?

10          MR. CHIPMAN:  Your Honor.  Objection.  I'm not sure

11  he's an expert on these issues.  He barely knew what the

12  assets were.

13          THE COURT:  Yeah, I'll sustain that objection.

14  BY MS. KOVSKY:

15      Q.   Is it your understanding, based on your general

16  knowledge of the assets that are being sold, that a purchaser

17  could take all of the assets of debtors, but leave the

18  Infotainment Center behind?

19      A.   I suppose it is possible, yes.

20      Q.   So a bidder might come in and bid for assets that

21  don't even include the Infotainment Center.  Is that your

22  understanding?

23      A.   That's correct.  Each bidder will have its own view

24  of how to purchase a business.

25      Q.   You were asked a number of questions by Mr. Chipman

1  about whether it would be better for the sale process if

2  Karma's disputed issues were decided first.  Do you remember

3  those questions?

4       A.   Yeah.

5       Q.   And I believe Mr. Chipman asked you whether it

6  would be better to have a sale process with a title dispute or

7  a sales process without a title dispute.  Is it your

8  understanding that there would be a realistic possibility of a

9  going concern sale process if the Karma dispute were not fully

10 and finally decided for six months?

11      A.   We continue to have interest, and I suppose in

12 order to confirm a sale, it will have to be Court-approved.

13 And I think this Court will be that which determines that.

14      Q.   Let me clarify my question.  Is it your

15 understanding that – I believe you testified you understood

16 that the Karma dispute was set for trial in the district court

17 in California for September; is that right?

18      A.   Correct.

19      Q.   But that's just the beginning of trial.  Correct?

20 Is it your understanding that in litigation there's often

21 post-trial briefing that occurs?

22      A.   Yes.

23      Q.   Is it your understanding that sometimes after a

24 judgment is entered, there's an appeal?

25      A.   Yes.

1      Q.   If the entire process to fully and finally

2  determine Karma's disputed claims takes six months to a year

3  or more, at that point, would we still be able to come back,

4  in your opinion, had done this for a while, would we still be

5  able to come back and have a going concern sale here in the

6  bankruptcy a year from now?

7      A.   No, I believe that is an extensive delay

8      Q.   Mr. Chipman asked you some questions about whether

9  there's a stalking horse bidder in this process.  In your

10  experience as an investment banker, have you ever successfully

11  concluded a Section 363 sale without a stalking horse bidder?

12     A.   Yes.

13          MS. KOVSKY:  Thank you.  Nobody further questions.

14          THE COURT:  All right, Mr. Chipman, any recross?

15          MR. CHIPMAN:  Yes, Your Honor, a few quick

16  questions based upon redirect.

17                    RECROSS-EXAMINATION

18  BY MR. CHIPMAN:

19     Q.   Mr. Finger, your testimony is that the buyers need

20  to go to the SEC filings to learn of the Karma litigation.  Is

21  that correct?

22     A.   I believe they would be aware of it via the SEC

23  filings, as well as other media outlets and this Court's

24  docket.

25     Q.   But your testimony was that you have not explained

1  to potential bidders the scope of the Carmel litigation,

2  correct?

3       A.   Correct.

4       Q.   A few more questions.  Are the potential bidders

5  aware that the property rights dispute between Karma and the

6  debtors may not be resolved within the sale timeline proposed

7  by the debtors?

8            MS. KOVSKY:  Objection, Your Honor.  The witness

9  can't testify to what other parties might be aware of.

10           THE COURT:  Sustained.

11 BY MR. CHIPMAN:

12      Q.   Are you aware that the disputed intellectual

13 property goes well beyond the Infotainment system, Mr. Finger?

14      A.   I believe that is Karma's assertion.

15      Q.   Sorry, could you repeat that?  I couldn't hear you.

16      A.   I believe that is what Karma asserts, but I can't

17 opine.

18      Q.   And the Infotainment system is just one of the many

19 components fully integrated into the vehicle, correct?

20           MS. KOVSKY:  Objection, Your Honor, the witness is

21 not an expert, as Mr. Chipman already stated on the

22 intricacies of the vehicle.

23           THE COURT:  Sustained.

24 BY MR. CHIPMAN:

25      Q.   And sitting here today, Mr. Finger, you don't have

 1  any idea how long it can take for the bankruptcy court to

 2  resolve the intellectual property dispute, correct?

 3       A.   I don't believe it's my expertise to determine how

 4  long that should take.

 5            MR. CHIPMAN:  Thank you, Your Honor.  No more

 6  questions.  Thank you.

 7            THE COURT:  Thank you.  Anything further for Mr.

 8  Finger?

 9            MR. ZAKIA:  Not from us, Your Honor.

10            THE COURT:  All right.  Thank you, Mr. Finger.

11  You may be excused.

12            MR. ZAKIA:  Your Honor, So that completes the

13  debtors' evidentiary presentation with respect to the three

14  motions.  The debtors rest.

15            THE COURT:  The committee has no witness, I

16  assume?

17            MS. KOVSKY:  Correct, Your Honor.

18            THE COURT:  All right, then I'll look to Karma to

19  see if they want to present their witness.

20            MR. SOWKA:  Yes, Your Honor.  James Sowka, on

21  behalf of Karma Automotive.  Karma offers Mr. Wexler as a fact

22  witness in this case.  He proffered a declaration found at

23  docket number 83 with respect to the lift stay motion.  We

24  would also seek to proffer additional testimony beyond that

25  declaration relevant to the other two disputed matters here

1  today.

2          MR. ZAKIA:  Your Honor, if I could be heard.

3          THE COURT:  Yes.

4          MR. ZAKIA:  This is Jason Zakia.  Thank you, Your

5  Honor.  So we do not have a problem with the process of using

6  declarations for direct.  That's not the nature of the

7  objection.  However, this particular witness' declaration we'd

8  like to object to on the grounds that the witness is an

9  attorney who has no personal knowledge of the matters at issue

10  in the underlying dispute.  And the declaration really

11  addresses two points.

12          One are certain basic facts concerning things that

13  have happened in the district court litigation.  And as I

14  think Your Honor will hear from Karma, they intend to offer

15  documents from the docket which we do not intend to object to.

16  They can establish those facts.

17          But most of this declaration is really argument of

18  counsel in the form of testimony.  And we object the effort to

19  have, effectively, an advocate, through evidence, argue and

20  characterize evidence uncovered in the case.  So for example,

21  paragraphs eight, paragraph nine, paragraph ten, paragraph

22  eleven, this is really argument which counsel will have the

23  opportunity to make at the appropriate time as an advocate.

24  It is not evidence, and therefore we believe the declaration

25  as a whole should be not admitted.

1            MS. KOVSKY:  Your Honor, Deb Kovsky for the

2    Committee.  We join in the objection.  We believe that the

3    declaration is inadmissible hearsay.  It's improper opinion

4    testimony.  It basically is trying to usurp the Court to say

5    what the evidence means without actually putting any real

6    evidence in front of the Court.

7            We also think it's unnecessary.  To the extent

8    that Karma wants to put on the record what has occurred and

9    been filed in the district court, of course, the Court can

10   take judicial notice of another court's docket.  And to the

11   extent there's any concern about that, the Committee is

12   prepared to stipulate that the docket in the district court is

13   what it is and the filings say what they say, with the

14   exception of two exhibits that Karma seeks to offer into

15   evidence, which, if they do, we'll address at that time simply

16   because the Committee hasn't had an opportunity to see them.

17           But we do join in the debtors' objection to the

18   admission of this declaration.  We think it's improper.

19           THE COURT:  Mr. Sowka, do you want to --

20           MR. SOWKA:  Yes, Your Honor.  So Mr. Wexler is

21   offering fact testimony here, Your Honor, to inform the Court

22   regarding what has happened in the district court litigation,

23   what remains to be done for the case to go to trial, and what

24   would be required at trial.  This is part of the burden of

25   proof that Karma has with respect to its motion.

1          And the debtors have argued in their filings that

2   Karma has failed to put forth any evidence regarding the

3   three-pronged test.  Mr. Wexler's testimony is directly

4   relevant and probative to the lack of prejudice of the debtors

5   of lifting the stay.  The hardships that Karma would incur if

6   the Court didn't -- if the stay isn't listed, as well as the

7   likelihood of success of the merits of the litigation.

8          So we believe it's completely appropriate for Mr.

9   Wexler to provide a summation to the Court of what has

10  happened, what remains to be done in the district court so

11  Your Honor can understand these things, which are directly

12  relevant to the three-pronged test and the case law in this

13  circuit and the (inaudible) on lift-stay motions.

14         THE COURT:  Well, let's address the prong dealing

15  with the merits of the underlying action.  Mr. Zakia, do you

16  take the position they have to show they have a substantial

17  chance of prevailing in the underlying action?

18         MR. ZAKIA:  Your Honor, I think, as we acknowledge

19  in the papers, there is a requirement that a movement seeking

20  to lift the stay show that they have a reasonable likelihood

21  of success on the merits.  I think there are supports to talk

22  about that prong being maybe less important than some of the

23  others.

24         So I don't mean to quibble with Your Honor about

25  substantial, but to the extent Karma believes they need to

1 prove things related to the merits of the case, it's not

2 appropriate to do that by having a lawyer come in and say,

3 here is the evidence that we develop below.  Now, if they want

4 to argue that summary judgment was denied, certain of the

5 claims, we don't dispute that summary judgment was denied.

6 And one of the exhibits they want to offer is that opinion of

7 that court which says what it says.  We don't dispute that.

8          But I don't think there's any need for a lawyer to

9 come give a crossover in the argument as to why the Court did

10 that or what the evidence in the underlying case showed.  I

11 hope that answers Your Honor's question.

12          THE COURT:  It does.  Ms. Kovsky, do you want to

13 chime in on this standard and whether it's met by simply the

14 fact that the Court has denied, in part, summary judgment for

15 the defendants in that action?  In part, yes.

16          MS. KOVSKY:  They don't know what the standard is.

17 I'm not sure I'm prepared to go so far to say that the mere

18 denial of summary judgment shows a likelihood of success.  It

19 shows the existence of disputed facts.  I would certainly go

20 that far.  But whether or not Karma has an obligation to put

21 on evidence that the fact remains that this declaration isn't

22 it.  This is argument by an advocate who doesn't have personal

23 knowledge.

24          If he were sitting on the stand right now instead

25 of doing this by declaration, everything that he says in

1  paragraphs eight through eleven is inadmissible hearsay.  So

2  trying to get it in through declaration, I don't think they

3  can skirt the rules of evidence that way.

4        THE COURT:  All right, well, let me shortchange

5  this.  I have always taken the position and agreed with courts

6  that say that that prong of the stay relief burden is a low

7  bar to meet, and that I conclude that the denial, in part, of

8  a motion for summary judgment filed by the defendants in the

9  underlying case is.  Sufficient to meet that bar, to show that

10  there are substantial merits to the underlying case that might

11  warrant granting relief from the stay.

12        So to the extent that Mr. Wexler was going to

13  testify as to any of the evidence, I just don't think it's

14  appropriate in a motion for relief from the stay that the

15  bankruptcy court has to consider the evidence and rule on

16  evidence and the sufficiency of evidence to prove a claim.  I

17  think that the bar is substantially less than that.  So I've

18  ruled that the movement has met that bar.

19        So, Mr. Sowka, you want to proceed with either an

20  examination of Mr. Wexler or a determination of what, in his

21  declaration, you want to present as to the other two prongs,

22  or do we want to take a break at this point so you can narrow

23  your examination?

24        MR. SOWKA:  Your Honor, I'm prepared to proceed.

25  I would suggest let's proceed with the direct examination of

 1  Mr. Wexler, and we can handle any objections on a one-off

 2  basis.  Given Your Honor's ruling, I don't intend to elicit

 3  testimony regarding the likelihood of success of the merits.

 4  I understand that that's been satisfied based on the

 5  stipulation from debtors, that they acknowledge it.  That

 6  summary judgment has been denied in part.

 7              THE COURT:  All right.  Then we can proceed.

 8  First, Mr. Wexler, I'm going to ask the clerk to swear you in.

 9              THE CLERK:  Mr. Wexler, do you affirm that you

10  will tell the truth, the whole truth, and nothing but the

11  truth to the best of your knowledge and ability?

12              MR. WEXLER:  I do.

13              THE CLERK:  Please state your full name.  Spell

14  your last name for the record.

15              MR. WEXLER:  Michael Wexler.  W-E-X-L-E-R.

16              THE CLERK:  Thank you.

17                        DIRECT EXAMINATION

18  BY MR. SOWKA:

19       Q.   Mr. Wexler, what is your current profession?

20       A.   I am an attorney at Seyfarth Shaw.

21       Q.   And where are you licensed to practice law?

22       A.   I'm licensed in Illinois and then have various

23  admissions in federal courts throughout the country.

24       Q.   And do you specialize in any particular practice of

25  law?

1       A.    My primary practice is in trade secrets,

2  noncompetes, and related topics.

3       Q.    Do you hold any leadership positions with Seyfarth

4  Shaw?

5       A.    Currently I'm on what's called our Partner Board,

6  and I am the chair of the trade secret/noncompete group at

7  Seyfarth nationally.

8       Q.    And how long have you been the chair of the trade

9  secret/noncompete group at Seyfarth?

10      A.    It's a great question.  A number of years.  I don't

11 know the exact number.

12          MR. ZAKIA:  Your Honor, I don't want to be

13 difficult or interrupt, and I'm happy to hear about Mr.

14 Wexler's background.  I'm just hoping that they don't intend

15 to offer opinion testimony from this witness, since he's a

16 U.S. lawyer.  And Your Honor's the expert is the matters of

17 U.S. law.  So if this is just background, fine.  But to the

18 extent they're headed in the direction of expert testimony, we

19 would object to that.

20          THE COURT:  I don't know where they're heading, so

21 let's just wait and see.

22 BY MR. SOWKA:

23      Q.    Mr. Wexler, you've heard the testimony today

24 regarding the litigation between the debtors and Karma in the

25 California District Court, correct?

1          A.    Yes.

2          Q.    And you're familiar with that litigation?

3          A.    Yes.

4          Q.    And what is your familiarity with that litigation

5    based on?

6          A.    It's based on personally involved in litigation,

7    appearing in court, corresponding with opposing counsel, as

8    well as our team here, and participating in drafting motions

9    and participating in contested hearings.

10         Q.    And are you familiar with Karma's business.

11         A.    As a general matter?  Sure.

12         Q.    Can you tell us a little bit about what that is?

13         A.    They are in the, I'll say, the technology business

14   of electric vehicle technology, producing vehicles, as well as

15   converting vehicles, as well as having a business to business

16   aspect of their operations.  They provide technology to other

17   companies.

18         Q.    Thank you.  Mr. Wexler, could you please turn to

19   what's been marked as Karma's Exhibit No. 2 for today's

20   hearing?

21         A.    Sure.  Yes, I have that in front of me.

22         Q.    Are you familiar with this document?

23         A.    This appears to be the first amended complaint that

24   was filed on behalf of Karma in the Central District of

25   California against Lordstown and several individual

1  defendants.

2       Q.   And were you personally involved with drafting this

3  amended complaint?

4       A.   Yes.

5       Q.   Can you please briefly summarize the factual

6  assertions set forth in this complaint for the Court?

7       A.   The short answer is Karma had discussed with

8  Lordstown about providing technology to Lordstown.  Lordstown

9  then backed out of an agreement to have technology provided to

10 it.

11      In the interim, Lordstown hired individuals that worked

12 at Karma, hired them to work at Lordstown, some of those

13 individuals working at both companies at the same time.  And

14 it was then discovered that certain technology involving

15 Infotainment, electric architecture, power moding, building

16 materials, and Karma's process improvement systems, as well as

17 source code were discovered.  They've been taken and placed

18 within Lordstown's technology.

19      Q.   Thank you, Mr. Wexler, can you next please, briefly

20 summarize the legal causes of action asserted in the

21 complaint?  It's a lengthy document.

22      A.   As a general matter, there are federal and state

23 trade secret claims. There are federal computer fraud claims.

24 There are conspiracy claims, there's a RICO conspiracy claim,

25 there is tortious interference claims, there are California

1  penal code claims. I think I said breach of contract already.

2  Those are generally there's 20 some claims, a few of which

3  were dismissed in summary judgment, the majority of which were

4  upheld at summary judgment, and the Lordstown's motion was

5  denied in most respects.

6       Q.   Does the amended complaints include a claim for

7  injunctive relief?

8       A.   There is a claim for permanent injunctive relief in

9  the amended complaints as well as damage claims.

10      Q.   And can you please briefly summarize the defendants

11 named in the (inaudible)?

12      A.   There's Lordstown who's a defendant, and then

13 individually, there are approximately ten individual

14 defendants and one individual corporate defendant that are

15 also defendants in the matter.  And other than Lordstown,

16 these other individuals, they're not in these bankruptcy

17 proceedings.

18      Q.   I'm sorry, you cut out for me in a second.  Could

19 you just explain a little bit the individual defendants'

20 relationships between the Lordstown and Karma?

21      A.   Almost all, except for Mr. Burns, many of these

22 individuals were former Karma employees who went to Lordstown.

23 Mr. Burns, he's a former CEO of Lordstown.

24           MR. SOWKA:  Your Honor, I would move Karma's

25 Exhibit No. 2 into the evidence.

1           MR. ZAKIA:  Your Honor, my understanding is that

2    this is being offered to establish simply the claims that were

3    made and not the truth of the matter asserted.  That

4    limitation, I don't object.

5           THE COURT:  Right.  It is admitted with that

6    limitation.

7    BY MR. SOWKA:

8        Q.   Mr. Wexler, could you please turn to what's been

9    marked as Exhibit No. 6 in Karma's exhibit book?

10       A.   Yes, I'm there.

11       Q.   Are you familiar with this document?

12       A.   I am.

13       Q.   And what is this document?

14       A.   This is the ruling of U.S. District Court Judge

15   James Selna with regard to motions that were brought for

16   preliminary injunction and sanctions against Lordstown and

17   individuals in this matter.

18       Q.   And what was the basis for Karma seeking sanctions?

19       A.   The basis for sanctions was the destruction or

20   spoliation of evidence that took place with regard to

21   Lordstown, Mr. Durie, and Mr. Bond (phonetic), that virtually

22   upon filing of the lawsuit, there was destruction of numerous

23   files by the defendant in the matter.

24       Q.   And what was the Court's ultimate ruling with

25   respect to the motion for sanctions brought by Karma?

1          MR. ZAKIA:  Your Honor, objection.  Sorry.

2    Objection.  Your Honor, the Court order says what it said.

3    The judge's opinion could be read.  I don't think it's

4    appropriate to have this witness characterize it.

5          THE COURT:  I agree.  Do you want to admit that

6    document?

7          MR. SOWKA:  Yes, Your Honor, I would like to move

8    to admit document No. 6 into evidence.

9          MR. ZAKIA:  No objection.

10          THE COURT:  It is admitted.

11   BY MR. SOWKA:

12        Q.   Mr. Wexler, please turn to what's been marked as

13   Karma's Exhibit No. 7.

14        A.   I'm there.

15        Q.   And what is this document?

16        A.   This is another order of Judge Selna.  This is an

17   order regarding – motion for sanctions.

18        Q.   This is the second order for sanctions, correct?

19        A.   Correct.

20        Q.   And this order is under seal with the district

21   court; is that correct?

22        A.   I believe that's correct.

23        Q.   And what was the basis for Karma seeking sanctions

24   with respect to entry of this order?

25          MR. ZAKIA:  Same objection.  I believe the order

1 | speaks for itself.

2 |    MS. KOVSKY:  (Inaudible) objects because while the

3 | order does, I'm sure, speak for itself, the Committee has not

4 | been given an opportunity to review it.  And we object to the

5 | admission of any document that we haven't been able to see.

6 |    MR. SOWKA:  Your Honor, as I previously stated,

7 | this order is under seal with the district court.  And we

8 | reviewed the protective order entered in that case and the

9 | procedures, and we found no basis, legal basis, by which we

10 | could release this to nonparties in the litigation.  The

11 | debtor has seen it, has no objection to admission of the

12 | order.

13 |    So we were not able to share it with the Committee

14 | at this point.  To the extent that the district court permits

15 | it, at some point in the future, we would be able to share it.

16 | But based on the terms of the order right now, we don't see a

17 | legal basis to do so.

18 |    MS. KOVSKY:  Your Honor, the Committee is a party

19 | in interest here.  If Karma wanted to use a document in this

20 | litigation that the Committee is unable to see, it should have

21 | moved the district court for relief from that sealing order.

22 |    MR. SOWKA:  Your Honor, I have to add, as the

23 | parties pointed out earlier, this was entered by the district

24 | court, and the Court can take judicial notice of that fact.

25 |    THE COURT:  Well, I will take judicial notice of

1  the fact that the Court entered an order under seal with

2  respect to a motion for sanctions.  But I think, given the

3  inability of the Committee to review it, I won't do more than

4  that.

5          MR. SOWKA:  Understood.

6  BY MR. SOWKA:

7      Q.  Mr. Wexler, can you describe some of the background

8  circumstances with respect to entry of the second sanctions

9  order?

10          MR. ZAKIA:  Objection, Your Honor.  I don't think

11  it's appropriate for counsel as (inaudible) to characterize a

12  Court ruling.

13          MR. SOWKA:  Your Honor, he's summarizing the facts

14  surrounding entry of the order.  Your Honor is not taking the

15  order into evidence, so it doesn't speak for itself.  So it's

16  appropriate for Karma to be able to make a record with respect

17  to the factual predicate for entry of this order?

18          THE COURT:  Well, I think it's going to be

19  difficult to do that since it's under seal.  Is the motion for

20  sanctions under seal.

21  BY MR. SOWKA:

22      Q.  Mr. Wexler?  Is the motion for sanctions with

23  respect to this order under seal?

24      A.  I do not believe the motion is under seal.  I

25  believe there may have been some items of evidence that may

1  have been redacted pursuant to protective order, but the

2  motion itself, I believe, is on the docket.

3      Q.   Mr. Wexler, that would permit you to discuss the

4  portions of the motion that were not redacted?

5      A.   Yes, I could describe the basis as to why the

6  motion – the factual basis as to why the motion was brought

7  and granted.  Should I do that?  I'm sorry.

8           THE COURT:  I'll allow him to testify to that.

9           MR. WEXLER:  In short order here, the motion was

10  brought against Post and Lordstown with regard to destruction

11  of evidence by Mr. Post.  And in fact, there was a discovery

12  of files that were deleted, and the Court presented with the

13  motion for sanctions with regard to that.  And the Court

14  granted, in part, the motion for sanctions because of the

15  destruction of evidence as alleged in the motion that was –

16  that was brought.

17           THE COURT:  Okay.

18  BY MR. SOWKA:

19      Q.   Thank you, Mr. Wexler.  Please turn to what's been

20  marked as Karma of Exhibit No. 8.

21      A.   I have that in front of me.

22      Q.   Are you familiar with this document?

23      A.   I am.

24      Q.   And what is this document?

25      A.   This is Judge Selna's order on motions in limine

 1  that were brought by both sides in the matter by Lordstown and

 2  individual defendants, as well as brought by plaintiff Karma.

 3        Q.    And could you turn to page seven of this order,

 4  please?

 5        A.    Yes, I'm there.

 6        Q.    And do you see the first full paragraph starting

 7  with the word separately?

 8        A.    Yes, I'm familiar with that.

 9        Q.    Can you describe a little bit with respect to what

10  the motion was seeking that is referenced by this paragraph in

11  the order?

12              MR. ZAKIA:   Objection, Your Honor.   The order

13  speaks for itself.

14              MR. SOWKA:   Your Honor.   The order was entered in

15  response to Karma's motion.   I think it's appropriate for the

16  Court to understand the relief that was requested in the

17  motion propounded by Karma in the district court litigation,

18  especially considering the fact –

19              THE COURT:   I'll allow brief sorry discussion of

20  it.

21        A.    Karma brought motions in limine to prohibit

22  Lordstown and I suppose the individual defendants from putting

23  into evidence either the documents or witnesses testimony

24  regarding technology in the Endurance vehicle that had not

25  been disclosed prior to the close of discovery.   There were

1  numerous motions to compel that were brought.  Lordstown

2  stated that it would supplement, and that technology was

3  developing every day it was changing.

4      A motion was brought to bar them from essentially moving

5  the ball every day after close of discovery.  And the Court

6  agreed with the motion and granted the motion excluding any

7  evidence with regard to the Endurance vehicle that wasn't

8  disclosed prior to the close of discovery.

9      Q.   Thank you, Mr. Wexler.

10         MR. SOWKA:  Your Honor, Karma moved Exhibit No. 9

11  into evidence.

12         THE COURT:  Exhibit 8?  You mean 8?

13         MR. SOWKA:  Yes, sir.  I'm sorry.  Exhibit No. 8.

14         MR. ZAKIA:  That's correct.

15         THE COURT:  Any objection?

16         MR. ZAKIA:  No objection.

17         MS. KOVSKY:  No objection.

18         THE COURT:  Okay.

19  BY MR. SOWKA:

20      Q.   Mr. Wexler, please turn to what's been marked as

21  Karma's exhibit number nine.

22      A.   Yes.

23      Q.   And are you familiar with this order?

24      A.   I am.

25      Q.   And what is this order?

1    A.    This order is an order of Judge Selna along with

2  his oral ruling.  There's a transcript of that with regard to

3  relief sought by Lordstown and the individual defendants to

4  substitute in a new expert on damages because of what they

5  terminal illness of their first expert.

6           MR. SOWKA:  Your Honor, Karma asks that the Court

7  accept Exhibit No. 9 into evidence.

8           MR. ZAKIA:  No objection?

9           MS. KOVSKY:  No objection.

10           THE COURT:  It's admitted.

11  BY MR. SOWKA:

12    Q.    Okay.  Mr. Wexler, please turn to what's been

13  marked as Exhibit No. 12.  Are you familiar with this

14  document?

15    A.    I am.

16    Q.    And what is this document?

17    A.    This is a final pretrial conference order that was

18  submitted – I guess I'd say submitted to the Court by both

19  sides.  Order from the submission to the pretrial.

20    Q.    And is it correct that the terms of this order

21  would govern the scheduled September 5 trial?

22    A.    Yes.

23           MR. SOWKA:  Your Honor, I move that Exhibit No. 12

24  be accepted into evidence to the Court.

25           MR. ZAKIA:  No objection.

1          MS. KOVSKY:  No objection.

2          THE COURT:  It's admitted.

3  BY MR. SOWKA:

4       Q.   Mr. Wexler, what is the current posture of the

5  district court litigation post a bankruptcy filing by

6  Lordstown?

7       A.   The case is essentially ready for trial.  Each side

8  has been granted 26.5 hours, or a total of 52 hours to try the

9  case.  The pretrial is done.  Obviously, proposed jury

10 instructions have been exchanged by both sides.

11      The only thing that's left to do is Lordstown asked to

12 substitute an expert in.  And so the Court allowed that under

13 certain limited conditions, and those conditions were that the

14 new expert could not go beyond the scope of the prior expert's

15 report or, I guess, factual underpinnings of the prior report,

16 could not correct any mistakes, errors, anything like that,

17 and could not – could not (inaudible) any calculations.

18      The Court then said that the Plaintiff was permitted to

19 depose that person.  That person's name is Pampanella

20 (phonetic), that we would be permitted to depose that person.

21 And then also Mr. Kroll, who testified earlier, he would be

22 permitted to be deposed by plaintiff as well.  And that

23 plaintiff Karma's expert could provide a rebuttal report.  And

24 there was a schedule to do all that.  That was stayed when the

25 bankruptcy was filed.  So other than taking those couple of

1  depositions and a report, everything is ready for trial.

2  Ruled upon.  The pretrial has been set, the timing has been

3  set during, jury instructions been exchanged, everything is

4  ready to go.

5       And we also specifically asked the Court, are you

6  vacating September 5th trial date?  And the Court said, no,

7  I'm not.  Let's get an understanding of what the stay applies

8  to and what the bankruptcy court is going to do.  So he did

9  not vacate the trial date for September 5th.

10      Q.   And Mr. Wexler, could you briefly describe the

11  discovery that has taken place in the case to date for the

12  Court?

13      A.   Sure.  There have been approximately 12 million

14  documents exchanged, 54 depositions, I think, and I could be

15  correct if I missed – if I'm wrong, there's approximately 500

16  docket items, I believe.  There's approximately, if I remember

17  correctly, 12 to 14 experts, all of which have been deposed

18  and provided reports and all of that already, all those things

19  are done.  It's been about three years of litigation, and as I

20  said, millions of documents and numerous experts and numerous

21  depositions.

22      Q.   And Mr. Wexler, you testified earlier the

23  litigation also involved nonparty individual defendants,

24  correct?

25      A.   That's correct.

1      Q.   So if the bankruptcy court denied the motion to

2  lift the stay and adjudicated the claims between Karma and

3  Lordstown here, what would happen with respect to Karma's

4  claims against the individual defendants?

5      A.   As far as, I guess, from a jurisdictional court

6  perspective, there would be no resolution in the bankruptcy

7  court of the individual defendants' claims. So there's

8  essentially two proceedings out there.  I suppose there's

9  always a risk of inconsistent verdicts.  And there's also the

10 looming issue of injunctive relief that's been asked for in

11 the complaint, which I don't believe, If I'm corre't, can be

12 resolved by the bankruptcy court, would need to be resolved, I

13 suppose, by Judge Selna.  So there's a number of issues that

14 occur if the stay is not lifted and there's these separate

15 jurisdictional claims out there.

16          MR. SOWKA:  Thank you, Mr. Wexler.  No further

17 questions.

18          THE COURT:  Mr. Zakia, do you wish to cross?

19          MR. ZAKIA:  Just one question, Your Honor.  I'll

20 start at the end.

21                   CROSS-EXAMINATION

22 BY MR. ZAKIA:

23     Q.   Mr. Wexler, you don't dispute that Judge Walrath

24 can determine what is or is not property of the debtors'

25 bankruptcy estate, do you?

1          MR. SOWKA:  Objection, Your Honor.  Calls for a

2    legal conclusion.  Mr. Wexler is not a bankruptcy attorney.

3          THE COURT:  Sustained.

4          MR. ZAKIA:  That makes my cross very short, Your

5    Honor.

6          MS. KOVSKY:  No further questions, Your Honor.  I

7    just have a couple of quick questions, if I may.

8          THE COURT:  You may.

9                    CROSS-EXAMINATION

10   BY MS. KOVSKY:

11       Q.   Mr. Wexler, Deb Kovsky from Troutman Pepper for the

12   Committee.  It talked about this trial in September, correct?

13       A.   You broke up in the middle of that, as someone was

14   typing on a keyboard.  Could you just ask that again, please?

15   I'm sorry.

16       Q.   You testified that under the current final trial

17   conference order, the district court case would be ready for

18   trial in September, right?

19       A.   Yes.  Under the current pretrial, as long as those

20   other couple of depositions took place.  Yeah.

21       Q.   And that final pretrial conference order does not

22   take into account the Committee's right to intervene in the

23   district court case, does it?

24       A.   Because the Committee isn't a party to the case,

25   and it would not take that into account, not to mention if the

1  Committee had to go through 12 million documents and 54

2  depositions and experts, I don't see how anything could happen

3  in the bankruptcy court or the federal court in California in

4  any timely fashion at all with the Committee wanting to try to

5  intervene.

6       Q.   Even if the district court matter went to trial in

7  September, that doesn't necessarily mean that judgment would

8  be entered in September, does it?

9       A.   I believe that's not correct.  The case goes to a

10  jury.  The jury makes a decision.  Assuming the jury finds in

11  plaintiff's favor, awards damages, et cetera, judgment would

12  likely be entered the moment the jury verdict comes in.  So I

13  don't think that's a correct statement.

14       Q.   So in your experience as a trial lawyer, judgment

15  is automatically entered the moment a jury verdict comes in?

16       A.   In my experience, many judges will enter judgment

17  on a jury's verdict when it's issued.  There may be post-trial

18  motions, and there may be an amended judgment, or there may be

19  post-trial proceedings with regard to, for example, attorneys'

20  fees in which there'd be a further judgment.  But many times

21  I've seen a jury verdict, the judgment's entered on that

22  verdict when the verdict comes in.

23       Q.   But you have no knowledge as to whether this judge

24  would do that?

25       A.   I could not speculate on what the judge would or

1  would not do at that moment in time.

2      Q.   And you mentioned post-trial briefing motion

3  practice, so that could further delay a final judgment in the

4  case, correct?

5      A.   Well, it wouldn't delay judgment that was entered

6  on a jury verdict.  It may delay further judgment proceedings.

7  And I'm not a bankruptcy attorney, but I suppose the same

8  thing happens in the bankruptcy court if there's a

9  disagreement over what happens in an adversarial proceeding,

10  for example.  And if there's disagreement on that, my

11  understanding is that we appealed to the district court and

12  then to the appellate court after that.  So it's even a longer

13  proceeding, as I understand, in bankruptcy, if a contested

14  matter is taken in further post-trial proceedings than it

15  would in a straight litigation in federal court elsewhere.

16      Q.   And there's, of course, the possibility of appeal

17  in the district court case as well, isn't there?

18      A.   I think there's a possibility of appeal in

19  bankruptcy court as well as the district court, yes.

20          MS. KOVSKY:  Your Honor, I have no further

21  questions.

22          THE COURT:  Any redirect?

23          MR. SOWKA:  No, Your Honor.

24          MR. ZAKIA:  No.  Thank you.

25          THE COURT:  Thank you, Mr. Wexler.

1            MR. WEXLER:  Thank you for your time, Your Honor.

2            THE COURT:  All right.  I'm going to suggest we

3  take a ten-minute break, and then I'll hear arguments.  We

4  have no more witnesses, correct?

5            MR. ZAKIA:  Correct, Your Honor.

6            MR. SOWKA:  Correct, Your Honor.

7            THE COURT:  All right, let's take a break and

8  we'll come back for argument.

9            MR. ZAKIA:  Okay.  Yeah.

10       (Recess taken at 11:16 a.m.)

11       (Proceedings resumed at 11:25 a.m.)

12            THE COURT:  All right.  We're back on the record.

13  This is Judge Walrath.

14            I will hear arguments on the combined motions.

15            MR. TURETSKY:  Good morning, again, Your Honor.

16  David Turetsky of White & Case on behalf of the debtors. I

17  think what we will do is we will just go in the order of

18  bidding procedures first, followed by the motion to lift stay

19  and estimation if that works for Your Honor.

20            Does that work or are you still thinking about it,

21  Your Honor?

22            THE COURT:  Well, we can go in that order.

23            MR. TURETSKY:  So, that does take us to No. 18,

24  which is the debtor's motion for an order approving bid

25  procedures and certain related relief.  As we discussed with

1   the Court, one of the objectives here is to appropriately and

2   expeditiously market and, hopefully, sell all or some of the

3   debtor's assets.  The debtors will, of course, consider all

4   bids, but there is a view, as there often is in these cases,

5   that if we can achieve a going concern sale that could be a

6   value maximizing outcome, but we need to move quickly.

7           There is a lack of revenue coming in.  We need to

8   try and minimize the cash burn associated with the operation.

9   There are also some challenges associated with keeping

10  employees who may be critical to the sale of the business as a

11  going concern.  So, time is not a friend of the sale process

12  here and that is why we filed the bidding procedures, at

13  Docket No. 16, on the first day of the case.

14          The motion and bidding procedures are designed to

15  support an immediate marketing of the debtor's assets on a

16  timeline of getting to a sale hearing by mid-September.

17  Following the filing of the motion we did receive informal

18  comments from the U.S. Trustee, the committee, and Cigna.

19  Language has been incorporated into the revised proposed order

20  that was filed at Docket No. 159 along with a redline to the

21  original proposed bidding procedures that had been filed.

22          Like the original order that we submitted, the

23  proposed order establishes customary and reasonable bidding

24  procedures that were in the debtor's marketing and sale

25  process and continues to envision getting to a sale hearing in

1  September.  To be clear, the bid procedures does not approve –
2  - the order does not approve any sale to decide anyone's
3  property rights with respect to any assets or determine
4  (indiscernible) those rights.  Those are issues for another
5  day.

6          Nonetheless, we did receive an objection from Karma
7  which was filed at Docket No. 127.  In its objection Karma
8  argues that the bid procedures should not be approved because
9  Karma contends that it owns an infotainment system, a trade
10 secret IP it contends was misappropriated by the debtors.
11 Karma also contends that its ownership (indiscernible), which
12 had never been decided by any Court, must be litigated to
13 resolution as part of an adversary proceeding under Rule 7001
14 before the bidding procedures could (indiscernible).  We filed
15 our reply at Docket No. 154, which is supported by the
16 declarations of Mr. Kroll and Mr. Finger at Docket Nos. 156
17 and 157.

18          Your Honor, the debtors, unsurprisingly, object --
19 sorry, I believe that the objection is without merit and that
20 they should be overruled.  We based our arguments in support
21 of the motion, both in the motion and in the reply. I am not
22 going to rehash every point, but I would like to focus on a
23 few.

24          Let's start with the standard.  The decision to
25 market and sell assets is a business judgement. It's a

1  business to which the debtor's business judgment is entitled

2  to substantial deference.  Bidding procedures should be

3  approved if the debtors have articulated a reasonable business

4  justification.  Here, bidding procedures are appropriate, they

5  will promote an active process for the debtor's assets on a

6  timeline that meets the debtor's needs.  That is the testimony

7  of Mr. Finger.  Mr. Kroll testified to the risks of delay.

8  There is no contrary testimony and no party can reasonably

9  contest that the procedures are reasonable.  The bidding

10  procedures should be approved for that reason alone.

11          Second, the relief that the debtors are seeking as

12  part of the bid procedures order is purely for security. It

13  doesn't prejudice Karma or its asserted claims of ownership in

14  any way.  We actually thought it was clear to begin with, but

15  we actually added language to Paragraph 35 of the proposed

16  order that is now before Your Honor and I would like

17  (indiscernible) avoidance of any doubt, nothing in this order

18  shall constitute (A) approval of any sale, (B) a finding that

19  any property is property of the debtor's estates, (C) a

20  finding regarding the rights or interests that any property

21  may have with respect to property (indiscernible) or property

22  that is in the possession, custody or control of any debtor or

23  (D) a determination regarding whether a sale of any property

24  may occur absent an adversary proceeding pursuant to

25  Bankruptcy Rule 7001.

1        The rights of the debtors, the committee and all

2   other parties in interest are fully reserved with respect to

3   these issues.  Karma is, therefore, objecting to relief that

4   really has no impact on it in asking the Court to delay the

5   debtor's marketing and sales process.  There is no support for

6   that request and the Court should decline to do it.  We did

7   cite the Durango case in our reply in which the Court

8   overruled a bid procedures objection based on asserted

9   interests citing the procedural nature of the bid procedures.

10  We think the same outcome is warranted here.

11       Third, Karma's objection is, at best, a premature

12  sale objection and the Court need not and should not

13  (indiscernible).  The objection is premature both because

14  debtors are not seeking approval of a sale at this time and

15  also because the debtors don't know, nor does Karma, what

16  sale, if any, they are going to seek approval of.  Rule

17  7001(2) speaks to an adversary proceeding to determine

18  interest in property, but we don't know whether the debtors

19  are seeking to sell any property in which Karma claims to have

20  interest.

21       We are still in the early stages.  While there are a

22  number of parties doing work, indications of interest are due

23  until July 31st and final bids won't be due until August 24th.

24  So, in sum we don't know whether or not the (indiscernible)

25  for which Karma claims to have an ownership interest will have

1  any bearing on the sale that the debtors actually pursued, nor

2  do we know what the structure of such sale will be.  A bidder

3  could decide that it doesn't -- you know, even if it has some

4  interest in an infotainment system it may put in its own

5  infotainment system. It may say, you know, I've looked at the

6  Karma lease and I don't value it.  There are any number of

7  ways that this sale can be teed up.  And we don't need to

8  decide these issues today, particularly before we have

9  narrowed the issue of what the debtors are actually seeking to

10  sell as part of a transaction.

11       The debtors do own a number of assets over which

12  Karma simply cannot make that ownership interest.  Mr. Kroll

13  testified to it, including the hub motor.  These are all

14  assets that Karma just doesn't have a claim over, at least not

15  to my knowledge.  So, in sum, Karma's alleged claims of

16  ownership may just be irrelevant here.

17       Fourth, Karma's arguments that its purported rights

18  of ownership need to be decided as part of a precondition to

19  having bid procedures is both wrong and contrary to the

20  Bankruptcy Court.  Here, I will start with the proposition

21  that while we are not seeking approval of the sale today, the

22  bankruptcy code does permit sales notwithstanding the asserted

23  interest of other parties.  Section 363(f) provides that a

24  sale of property may be approved notwithstanding the bonafide

25  (indiscernible) other party's interest.  Section 363(p)

1  provides that the burden is on a non-debtor party to prove its

2  interest in the property, not the other way around.

3       This and other courts have approved sales of

4  intellectual property notwithstanding disputes about the

5  ownership of that property.  And the reason that these

6  provisions exist, as this court has recognized, is that

7  debtors are often in precarious financial positions and the

8  delay of a sale, while property interests are (indiscernible)

9  value.

10      Now the sale justifies, you know, moving forward it

11  certainly (indiscernible) approval of the bid procedures.  Its

12  contrary to the code to acquire such an adjudication

13  particularly (indiscernible).  And now Karma cites to the

14  Whitehall decision, that is notable because that was a sale

15  decision.  The Court had actually approved bidding procedures

16  in that case.

17      Finally, Karma argues that the Court should not

18  enter bidding procedures because there is not any urgency to

19  the debtor's Chapter 11 cases or to the sale process. I mean

20  that argument is contrary to the testimony that Mr. Kroll

21  provided, that Mr. Finger provided.  There is urgency.  It's

22  not the case that the debtors came in with $136 million that

23  there is no urgency to move forward.  There's cash burn here,

24  there is a risk of employee attrition, and that employee

25  attrition gets heightened the longer these cases and the sale

1  process, in particular, move on.  That can to lead to a

2  decline in the value.

3          That brings me back to where I started which is

4  business judgment standards.  The debtor's business judgment

5  and all of these factors warrant moving forward with the

6  bidding procedures now.  We can address Karma's issues at the

7  appropriate time and we would ask the Court to overrule the

8  objection.

9          If Your Honor has any questions about either my

10  argument or the nature of the bidding procedures themselves, I

11  am happy to take them at this time.

12          THE COURT:  No.  Let me hear from the other parties

13  first.

14          MR. TURETSKY:  I will reserve though -- obviously, I

15  will come back on the line if needed.

16          THE COURT:  That's fine.

17          MR. TURETSKY:  Thank you, Your Honor.

18          THE COURT:  Does the committee wish to be heard?

19          MS. KOVSKY-APAP:  Yes.  Thank you, Your Honor.

20  Deborah Kovsky, Troutman Pepper, for the committee.

21          Your Honor, the reality here is that there is going

22  to be a sale of the debtor's assets one way or another.

23  Whether it's a going concern sale broken into parts.  There is

24  really no other path here.

25          Now Karma's argument seems to be that since there is

1  not a perfect process to be had at the moment, there should be

2  no process at all.  The committee believes that that would be

3  disastrous and value destructive.  As the testimony that Your

4  Honor heard shows, if you want to have a shot at a going

5  concern sale it can't be put on hold through a jury trial,

6  post-trial briefing, entry of judgment, the full appeals

7  process, it's not just the reality of bankruptcy.

8          We are in a certain situation and we need to find a

9  way to move forward.  The committee's view is let's allow this

10 process to play out, let's see what bids actually come in,

11 let's see whether and to what extent they actually even

12 implicate any of the IP that Karma disputes because maybe we

13 don't even have an issue here.

14         As Mr. Turetsky pointed out, this is really a sale

15 objection, not a process objection.  We are not even going to

16 be able to figure out if we have a sale objection unless that

17 process moves forward.  And this is a little bit intertwined

18 with the estimation motion, so I am probably getting a little

19 ahead of the agenda, but we do believe that while the sale

20 process moves forward and while the debtors are generating

21 what value they can for the estates here, which the committee

22 is, obviously, very interested in seeing, you know, let's try

23 to get all of the stakeholders to the table and see if there

24 is a more economical consensual path forward as this process

25 plays out, but the process should not be delayed for a lengthy

1   time or possibly almost indefinitely while value arose,

2   employees leave, the possibility of a going concern sale

3   evaporates, that would just be destructive to the value that

4   the committee is laser focused on preserving.

5          THE COURT:  Okay.  I will hear from Karma.

6          MR. SOWKA:  Thank you, Your Honor.  James Sowka on

7   behalf of Karma Automotive LLC.

8          Your Honor, we heard some very troubling testimony

9   today from the debtor's representative and the debtor's

10  investment banker.  They acknowledged that they understand

11  that there is a dispute over the intellectual property and

12  that the debtor may not own it and may not be able to sell it.

13  Nevertheless, the investment bankers are not informing

14  prospective buyers about this issue. It is an incredibly

15  troubling issue.

16         Counsel has argued that, well, maybe buyers will

17  want to buy it.  Well, it's hard for them to make the

18  determination when it's kept secret to them and they're

19  pointing to some sale SEC disclosures from before the

20  bankruptcy and saying, well, there is some discussion there,

21  its up to buyers to figure out.

22         This is a very concerning process and I wonder aloud

23  if this may not potentially bring claims against estate

24  professionals for what they are not disclosing with respect to

25  what is going on in this case to potential buyers, Your Honor.

1  Moreover, the process is fundamentally flawed. They

2  acknowledged there is a dispute over the debtor's ownership.

3  This isn't about Karma's rights; this is about the debtor's

4  rights and whether they are property of the estate.  The bid

5  procedures process that they are setting forth doesn't provide

6  a timeline to resolve whether or not the property they are

7  seeking to sell is actually in the estate and belongs to the

8  debtors.  So, it's fundamentally flawed.  They can't go

9  forward.

10         As Your Honor is well aware, Bankruptcy Rule 7001(2)

11  in the Whitehall Jewelers decision makes clear that when the

12  debtor's interest in property is subject to dispute it has to

13  be resolved through an adversary proceeding.  That is a full

14  trial.  The debtor's efforts to shoehorn this into an

15  estimation proceeding don't work and the Court is either going

16  to have to lift the stay to allow the trial to be concluded or

17  conduct an adversary proceeding through 7001.

18         The debtor claims to be in a hurry to go forward

19  with the sale, but yet they don't want to proceed with the

20  determination of Karma's property rights interest. Instead,

21  they are trying to estimate and liquidate damages which

22  doesn't resolve whether or not the debtor owns any of the

23  intellectual property that Karma alleges was misappropriated.

24         Your Honor is well aware, Section 363(b)(1) allows a

25  debtor to sell property of the estate.  The debtor's sale

1  procedures motion concedes this point, sell property of the

2  estate.  Property of the estate includes all legal and

3  equitable interest of the debtor.  The Whitehall Jewelers

4  decision is on point on this and says that:

5          "A bankruptcy court may not allow the sale of

6  property of the estate without first determining whether the

7  property is actually in the estate."

8          They are not seeking to make this determination.

9  Instead, they point to, you know, potentially disputed

10 interest in Karma and point to 363(f).  That is a red herring

11 and besides the point. The issue is that the debtor's interest

12 are disputed.  This isn't a case where the debtor is trying to

13 sell real property that everyone agrees that the debtor owns

14 and there's a secured creditor with a disputed lien.  The

15 fundamental nexus of this dispute is whether or not the

16 debtors (indiscernible) what they are attempting to sell here.

17         Your Honor, the Sixth Circuit's decision in Kitchen

18 v. Boyd (In Re Newpower), 233 F.3d 922, Sixth Circuit 2000, is

19 instructive. We cite to this in our brief.  The Newpower Court

20 addressed an instance where there was property that was

21 misappropriated by a debtor pre-bankruptcy through larceny or

22 embezzlement. The court analyzed applicable state law and

23 found that the debtors obtained void title, and because title

24 was void it wasn't in the estate and the debtors couldn't sell

25 it.  That is precisely the fact pattern we are dealing with

1  here.

2          Karma has been litigating with the debtors for three

3  years now, alleging willful misappropriation of its

4  intellectual property. To the extent that Karma prevails on

5  those claims the debtor's title is void, it is not within the

6  contours of the estate and cannot be sold through Section 363.

7          So, the sale procedure process where they are hiding

8  the ball from buyers, not disclosing the property rights

9  issue, and proposing a timeline in which the property rights

10 issue can't and wouldn't be resolved its fundamentally flawed

11 and the Court shouldn't approve and enter into this process.

12 We believe it would unnecessarily dissipate and waive

13 professional fee assets in spending resources and pursuing a

14 sale that ultimately couldn't happen.

15         I have nothing further to add, Your Honor, unless

16 you have any questions.

17         THE COURT:  All right.  Any response?

18         MR. TURETSKY:  Yes, Your Honor.  David Turetsky of

19 White & Case on behalf of the debtors.

20         Karma is arguing as though their interests have

21 already been adjudicated.  Again, they are asserting interest

22 in intellectual property that has been incorporated -- that

23 they alleged was misappropriated and incorporated into their

24 vehicles. This is very different then the situation in

25 Whitehall.  Whitehall involved consignment of goods where the

1  decision that we are looking at looked at the consignment of

2  contracts and found that there was prima facie evidence that

3  the consigned goods belonged to the vendors, consignment

4  vendors in question because that is what the contract said.

5  And because there were SEC filings in which the debtors

6  acknowledged that the consigned goods were not property of the

7  estate.  What the Judge in the Court in that case did was it

8  said if you want to proceed with the sale, unless you are able

9  to provide adequate protection, which is a possibility, you

10  need to go and initiate an adversary proceeding.

11        Here, Karma is asserting a right, a misappropriation

12  that has never actually been litigated to completion.  They

13  are seeking to impose upon the debtors an obligation and a

14  burden of proof that the debtors simply don't have, not in the

15  California (indiscernible).  All of this is actually

16  premature.  This is a sale objection.  Again, these are

17  procedures.  To the extent that a bidder comes in with a bid

18  that hits on assets over which Karma has an interest, and we

19  will deal with it at that point and we can deal with it at

20  that point.

21        What we cannot do is put the entire process on hold

22  while these issues to be litigated over assets -- for assets

23  that may or may not implicate their issues while we risk

24  losing the employee team and burning estate assets.  I also

25  want to touch on the idea that the debtors are hiding the ball

1  from bidders.  That is simply not true.  You heard the

2  testimony which is the expectation that bidders who are

3  serious about this actually know and acknowledge what is in

4  the public filings and what is going on in the bankruptcy.

5  The idea that we're hiding the ball from people simply is not

6  true.

7          To the extent that Your Honor would like, you know,

8  to tell people or put a link to the docket we can do that or

9  the public filing we can do that.  I don't think there is any

10  hiding the ball here.  Frankly, if Karma had asked us to do

11  that we might have considered it.  They said file an

12  objection. They didn't engage on any procedures.

13          Lastly, I go back to where I started.  The issue

14  here is whether there is an appropriate exercise of business

15  judgment. We believe that is the debtor's business judgment.

16  The committee, which is the other fiduciary in the case, also

17  believes that these marketing procedures and bid procedures

18  are appropriate.  We don't believe that Karma, as an

19  individual creditor with its individual agenda, should be

20  allowed to upset things and delay the marketing and sale

21  process indefinitely while the estate loses money, and

22  potentially employees, and value.

23          THE COURT:  Okay.  Anybody else?

24          MS. KOVSKY-APAP:  Your Honor, Deb Kovsky for the

25  committee.  Everything that we've heard from Karma is

1  effectively a sale objection, not a procedures objection.  Mr.

2  Sowka says the Court can't approve a sale under these

3  circumstances, but there's obviously no request that the Court

4  approve a sale at this point.

5          The committee strongly believes that there needs to

6  at least be some process to move forward to see whether value

7  can be realized for the benefit of creditors of the estate and

8  it may be, as this process plays out, it may be that Karma's

9  IP is never even implicated in the assets that a purchaser

10 actually wants to take.  So it might not be an issue or a

11 purchaser might take subject to the disputed ownership

12 interest, or there could be a negotiated resolution in the

13 meantime while the sale process moves forward.  But to say

14 let's put this process on hold, let the estate continue to

15 burn unsecured creditors' cash while Karma disputes ownership

16 and doesn't even allow a determination to be made whether

17 those ownership interests are going to be implicated in the

18 sale just doesn't make any sense.

19          THE COURT:  All right.  Well, thank you.

20      Well, let me just say one thing.  We may want to wait

21 until next week, Monday, to see if there are any indications

22 of interest.  However, I think it is important that I let the

23 parties know now of my concerns about the bid procedures.

24          I am very concerned that Jefferies is not informing

25 the parties that there is a dispute about the title to assets.

1 I'm very concerned.  Jefferies is a representative of the

2 debtor, the debtor has a fiduciary interest and, as a party in

3 the court before me that is going to be asking for a sale

4 order at some point, I'm very concerned.  There was no

5 testimony that the public filings are in fact in the data

6 room.

7        My second concern is, quite frankly, I think that

8 the expedited nature of this is manufactured by the debtor.

9 There are no deadlines for sale or milestones imposed by any

10 secured creditor because there is no secured creditor.  The

11 unsecured creditors assert that they are concerned with the

12 erosion of the debtors' assets when there is over $130 million

13 in cash at the debtor and the trade creditors in the top 30

14 creditors are approximately 20 million.

15        The debtor asserts that it may lose employees

16 necessary to enter sale, any sale as a going concern, but

17 given the allegations of Karma it is unclear whether any

18 going-concern bid will be received.

19        In addition, the debtor ceased production, fired

20 much of its workforce before and after bankruptcy.  So, if

21 this is an emergency, it may be an emergency of the debtors'

22 own creation.  And, specifically, the time deadlines that the

23 debtor has given appear not to be based on any erosion of cash

24 or any concern of the loss of employees, but appears to be

25 designed solely to get this done before any Karma decision can

1 || be made in the California litigation.  I just don't see how,

2 || quite frankly, it is possible.

3 ||      The debtor asserts that it has property that is not

4 || implicated by the Karma lawsuit, but I don't know how that can

5 || be determined without a decision on exactly what Karma may or

6 || may not own that the debtor asserts it owns.  I agree with

7 || Karma that the debtor cannot sell something that the debtor

8 || cannot establish is the debtors' property.  All of the cases

9 || regarding 363(f)(4) deal with disputed issues of liens or

10 || other interest in property that the debtor admittedly owns.

11 ||      So I am going to continue a determination about the

12 || procedures that will be set for sale of the debtors' assets.

13 || I do want to see if any indications of interest come in Monday

14 || and I'm going to suggest that we have a continued hearing

15 || after they are received sometime next week.

16 ||      I am available Wednesday, Thursday, and Friday.

17 || I'll ask the parties to reach out to discuss this and to reach

18 || out to Ms. Farrell -- Ms. Capp is not in this morning,

19 || although she'll be in this afternoon -- but to reach out to my

20 || chambers to see about a continued hearing date on the sale

21 || procedures.

22 ||      MR. TURETSKY:  Thank you, Your Honor, we'll do that.

23 ||      THE COURT:  Let's talk about the relief-from-stay

24 || motion then.

25 ||      MR. SOWKA:  Thank you, Your Honor, James Sowka on

1  behalf of Karma Automotive again.

2       Your Honor, we believe that the Court should grant

3  Karma's motion to lift the stay to permit the California

4  District Court action to be litigated to conclusion, and to

5  liquidate the claims and determine the property rights

6  interest.

7       We believe, based on the evidence presented today,

8  that Karma has satisfied the three-prong test necessary to

9  establish cause for lifting the stay.  As Your Honor has

10 already ruled, Karma, based on the fact that it has survived

11 summary judgment, has established a likelihood of success in

12 the litigation sufficient to carry its burden.

13      Your Honor, with respect to the first prong, the

14 debtors will not be prejudiced by lifting the stay.  The

15 debtors have argued that they would be prejudiced by

16 distraction of their management and costs of completing the

17 trial.  However, distraction isn't an issue because they're

18 seeking to hold an expedited claim estimation hearing

19 contemporaneous with when the District Court trial would go

20 on.  So they're seeking to litigate it at the same exact time

21 anyway, the difference there being they want to start over

22 from the beginning with new counsel instead of complete a

23 trial which would be done by the end of September and is

24 essentially ready to go for trial but for two depositions, a

25 motion to strike, and an expert rebuttal report.

1          Your Honor, furthermore, as far as the cost

2  associated with it, the debtors estimate that the cost to

3  complete the trial would be $2.5 million in the California

4  District Court.  They have not submitted any cost estimate for

5  what it would cost to start over from the beginning and

6  litigate the entire case before Your Honor.  And they've

7  indicated that they're currently burning in excess of $2

8  million a month on bankruptcy administrative fees, and that

9  doesn't include the professional fees who are already

10 indicating that they seek to intercede to get involved in the

11 entirety of the litigation to (indiscernible) it's not clear

12 that there would be any benefit to anyone other than

13 committee's professionals for them to be able to participate

14 in that litigation.

15         So, Your Honor, we don't think there's any prejudice

16 whatsoever to the debtor on this.  And, again, their

17 opposition to the lift-stay motion ignores the fact that the

18 sale can't occur until the property rights issues are resolved

19 pursuant to Whitehall Jewelers.

20         They're saying there is an urgency to go forward

21 with the sale.  Your Honor has already found that that's a

22 debtor-created emergency, that it is not a true expedited

23 emergency.  There's no secured creditor here, there's no

24 substantial operations.  The sale doesn't need to proceed on

25 such an expedited path and, frankly, can't be consummated

1  until these property rights issues are resolved.

2       So there simply is no prejudice to the debtor in

3  resolving this.  As a matter of fact, we believe it's

4  beneficial to the estate and all creditors, including Karma

5  and the other trade creditors, to resolve the property rights

6  issues promptly and expeditiously and economically, and the

7  way to do that is to lift the stay to allow the trial to be

8  concluded.

9       Your Honor, we also -- as Your Honor has already

10 ruled, you know, the sale procedures are going to be postponed

11 to next week, we'll see if any indications of interest come

12 in, but, you know, if they don't receive any indications of

13 interest at that time, that's additional, you know, facts

14 showing that there is no emergency, no need to proceed on an

15 expedited basis with respect to, you know, adjudicating a

16 sale.

17      This trial should be allowed to go forward; it is

18 not a distraction to management.  There is no plan and

19 disclosure statement on file, no confirmation process has been

20 begun, there are, as Your Honor pointed out, no substantial

21 operations.

22      With respect to the second prong, Your Honor, the

23 hardship to Karma of maintaining the automatic stay, it would

24 significantly outweigh any hardships to the debtors.  Your

25 Honor, the parties have been litigating this for nearly three

1   years.   As Mr. Wexler testified, there have been over 50

2   depositions, more than 12 expert depositions, more than 12

3   million documents exchanged in discovery.   The parties have

4   already filed and the Court has ruled on motions *in limine*,

5   the parties have filed and the Court has ruled on summary

6   judgment.   The case is essentially ready for trial and would

7   have gone to trial already in April but for the debtors'

8   request to substitute their damages expert.

9         So we believe, you know, that the hardship to Karma

10  in postponing the trial, which it's ready to go, would

11  significantly outweigh any hardships to the debtor.

12         Moreover, the litigation in California involves

13  numerous non-debtor defendants.   To the extent this Court were

14  to retain jurisdiction over the dispute and decide it, it

15  would still leave Karma out there having to resolve its claims

16  against the other individual defendants.   These claims

17  include, as Mr. Wexler testified, injunctive relief because

18  the individuals were also in possession of the disputed

19  intellectual property, they were the ones that misappropriated

20  it, as shown in the filing, they transmitted it through

21  personal accounts and other means and were in personal

22  possession of it.

23         So it's important that Karma's claims against the

24  non-debtor defendants beyond this Court's jurisdiction also

25  have to get resolved, that would be an additional hardship to

1  Karma to the extent that the Court didn't modify the automatic

2  stay to allow the California District Court actions to be

3  litigated to conclusion.

4         Your Honor, and finally with respect to the

5  committee's joiner and concerns about, you know, their right

6  to participate.  Yes, the Code says they have a right to

7  participate in the litigation.  Of course, if Your Honor

8  modifies the stay, it would then be up to the District Court

9  Judge (indiscernible) to decide if he's going to allow them to

10 participate and in what capacity.  And, again, I have not

11 heard any showing on why it would benefit the estate in any

12 way, shape, or form for the committee to come in and

13 participate in litigation that's been going on for three

14 years.  So we just don't see any merit to them -- their

15 insistence that they be allowed to be a third wheel in this

16 litigation between two parties.

17         Your Honor, based on this, if you have no further

18 questions, I believe Karma has satisfied its burden of proof

19 and the Court should modify the stay.

20         THE COURT:  Thank you.

21         MR. ZAKIA:  Good afternoon -- or at least here in

22 Chicago, good morning, Your Honor, Jason Zakia of White & Case

23 for the debtors.  Let's take the different prongs one at a

24 time.

25         I'd like to address the prejudice to the debtors and

1  their other constituencies of lifting the stay.  And I think

2  it's important to note -- I heard what Your Honor said, but

3  the testimony was clear that the time frame upon which this

4  issue can get resolved is critical to the ability to preserve

5  the option of a going-concern sale.  Now, of course, nobody

6  can guarantee that a buyer will want to do that and we'll know

7  more in short order as to whether that's going to happen, but

8  Mr. Kroll did testify that, notwithstanding the cutbacks and

9  notwithstanding the layoffs that the debtors had made today,

10  they have preserved critical employees who would be necessary

11  in order to facilitate a handoff of this business as a going

12  concern to any buyer and should those people leave, that is an

13  option, a potentially value-maximizing option, that gets

14  destroyed.

15          And so we would submit, Your Honor, that that is a

16  real harm.

17          Also, the cost of the proceeding with a jury trial,

18  and the time and attention that it will take away, are also

19  real harms that courts have routinely recognized and accepted

20  as reasons to maintain a stay.  Indeed, if one looks at the

21  reason why the stay exists, it's to address exactly these

22  concerns.  It is to give the debtor breathing space.

23          This case has been in bankruptcy for a month, it has

24  a host of different litigation issues all around the country,

25  of which Karma is one.  And so putting a stop to those

1  litigations is a quintessential purpose of the automatic stay

2  and one of the primary tools available to debtors.

3          So there is this parallel question of the fact that

4  these issues may or may not, depending on what happens with

5  the sale, also have to be resolved by this Court.  And I think

6  that gets -- and I'm not here to criticize our jury system and

7  I'm certainly not here to criticize any court, but there is a

8  fundamental difference in the systems that are in place to

9  complete a jury trial from the way the Bankruptcy Courts work.

10  That's not to say one is good and one is bad, but they are

11  different, and Bankruptcy Courts are specifically built to

12  deal with these issues more quickly and efficiently than non-

13  Bankruptcy Courts.

14          And it's not the case, Your Honor, that you would

15  necessarily need to go back to the beginning and re-litigate

16  everything that's happened in California.  There are really

17  two different issues that this Court may have to grapple with

18  -- well, one, it would definitely have to grapple with, the

19  other one we don't know.  It's what's the Court going to do

20  with the sale.  Obviously, any sale that the debtors seek to

21  conduct under 363 has to be blessed by Your Honor before it

22  can go through.  We don't know at this point who the buyer is,

23  we don't know what the terms are, and so, therefore, it's very

24  hard to -- we don't know what the subject matter of the sale

25  is.  So at this point it's hard to judge what that dispute

1   looks like because, as Mr. Turetsky mentioned, this is all in

2   anticipation of a sale that we hope to achieve, but don't know

3   yet whether that will happen.

4          And there are different ways the Court could deal

5   with that in the context of a sale objection, in the context

6   if the Court determines it needs to do an adversary, but

7   that's one issue that the Court would have to resolve.

8          Estimation, Your Honor, deals with a separate

9   problem, which is Karma has asserted a billion-dollar claim

10  against this estate that is, if it were to be allowed in even

11  a fraction of that amount, by far the largest claim and would

12  have a dramatic impact on the recovery of other stakeholders,

13  be they creditors or equity; we don't know yet where the

14  waterfall falls.  And estimation could provide an efficient

15  and quick mechanism for the Court to put a number on that

16  claim, which is a separate question from whether the Court

17  could or could not approve a sale.  Those are two different

18  issues that the Court would have to grapple with.

19         If what Karma is suggesting, and I think it is, is

20  that Your Honor lift the stay to allow the jury trial to

21  complete and then wait for the conclusion of that process --

22  and as we note, Your Honor, there will be a jury verdict,

23  there will be post-trial briefing, there's then an appeal, so

24  this is not something that will be done in September.

25  Effectively, at that point, should we follow Karma's

1  suggestion, the uncontroverted testimony is that that would

2  eliminate the option for a going concern.  And, again, I can't

3  promise Your Honor that that's what's going to happen here, I

4  can't promise Your Honor that there's going to be a buyer that

5  does that, but the testimony is that there are people doing

6  diligence that could potentially be going-concern buyers and

7  we would urge the Court that it would cause substantial harm

8  to the debtors to chill that option at this point, this early

9  in the sale process, and we would urge the Court not to do

10 that.

11      If what Karma wanted to do was proceed to liquidate

12 their claim in the jury trial while this Court reserves the

13 right to determine what is or is not property of the estate  -

14 - and, to be clear, determining what is or is not property of

15 the estate is something that Bankruptcy Courts certainly have

16 jurisdiction to do and do routinely, and it falls within Your

17 Honor's core competencies -- while allowing a parallel

18 proceeding to go on in California, that's wasteful and harms

19 everybody.

20      So it seems like there are three options.  Your

21 Honor could keep the stay in place -- that doesn't need to be

22 forever -- keep the stay in place and Your Honor always has

23 the option of lifting it at a later date while things play out

24 and we see how the process falls.

25      Option two, Your Honor could lift the stay and allow

1    all of these issues that are essential to the ability of this

2    estate to sell its assets to be resolved in another court

3    that's going to take at least many months to resolve and

4    effectively eliminate the option of a going-concern sale.

5    And, you know, some -- Karma and others have argued that

6    there's nothing here to save, I would suggest that the

7    argument leads to a self-fulfilling prophesy, and what the

8    debtors and the committee and the other estate professionals

9    are trying to do is to avoid that and actually maximize value

10   for all stakeholders.

11           Or, three, if Your Honor were to hybrid and allow

12   them to go liquidate their claim in bankruptcy -- or outside

13   of bankruptcy while retaining the jurisdiction over the sale

14   and determining what's property of the estate, we create an

15   inefficient, wasteful dual-track process that I don't think

16   anybody wants.

17           And so I think at this point, Your Honor, with

18   regard to harm to the debtor, you really have to consider is

19   the Court at a point now where it is prepared to eliminate

20   that option and to pull the plug, effectively, on the thought

21   of a going-concern sale, and leave us in a situation where the

22   employees won't be there to transition the operations to a new

23   buyer, should a new buyer exist.  And of course, if that's

24   what happens, Your Honor, we'll do our best to sell the pieces

25   for as much as we can, but I don't think there is any basis to

1 | determine that that is an optimal result and I don't think

2 | there's any basis in the evidentiary record to determine

3 | that's an inevitable result.

4 | And so we would strongly urge the Court to heavily

5 | weigh that prejudice and that harm to be suffered by these

6 | estates should the stay be lifted at this point.

7 | On the flipside with regard to Karma, Karma, like

8 | all creditors -- and I don't blame them for this -- want to

9 | get paid.  They want to liquidate their claim and they want to

10 | do that as quickly as they can, I get that, Your Honor, but

11 | just like all creditors, there is a process through the

12 | bankruptcy to allow that to happen.

13 | We've offered estimation, which, you know, courts

14 | have recognized -- and we cited to two of them in our briefs,

15 | Your Honor, the Choice Enterprises case and the John Q.

16 | Hammons case -- that even if non-bankruptcy litigation is

17 | close to the end, so both of those cases involved situations

18 | such as here where most of the work in the trial court was

19 | done and you were a month or two away from trial and a lot of

20 | work had been done in the non-bankruptcy court, and those

21 | courts recognized that even in situations where a lot of work

22 | has gone into a non-bankruptcy forum, the Bankruptcy Court is

23 | uniquely suited to deal with these issues in an efficient way.

24 | You don't need to duplicate all of the discovery and all of

25 | the work, that can be imported, and it's not imported to

1  replicate a two-week jury trial.  As Your Honor is well aware,

2  be it in the context of a sale objection or be it in the

3  context of an estimation proceeding, the Bankruptcy Court has

4  the flexibility to deal with these things more efficiently

5  than a jury trial, and so that work can be narrowed.  And, as

6  both of those courts held, even in cases where you had a --

7  had a case that was close to trial-ready or on the verge of

8  trial, leaving the stay in place and resolving the issues that

9  needed to be resolved through the bankruptcy claims process

10  was in the best interest of those estates and we would suggest

11  Your Honor should find it's in the best interest of these

12  estates.

13       And, again, what I would urge Your Honor to consider

14  is, as this process unfolds, should Your Honor lift the stay

15  today, it's very difficult to foresee circumstances in which

16  that gets re-imposed in the future, and we're kind of off on

17  that path and we'll all live with the consequences of Your

18  Honor's decision, I understand.  If Your Honor keeps the stay

19  in place today, Your Honor always retains the discretion to do

20  what you want to do in the future as events warrant and unfold

21  and as we have more information.  And we would argue that

22  lifting the stay at this point is damaging to the estates and

23  we would urge to do it.

24       So I'm happy to answer any questions Your Honor has,

25  but with that I'll stop talking.

1              THE COURT:  No, thank you.  I understand your

2    position.

3              Does the Committee wish to be heard?

4              MS. KOVSKY-APAP:  Yes, thank you, Your Honor.

5              The Committee's perspective is, like, this is just

6    very premature, very early in the case.  The Committee has

7    just been appointed; its professionals have been in place for

8    about a week and while we're working as expeditiously as we

9    can, there's still a lot we need to get our arms around.  We

10   just haven't had the opportunity to do that.

11             And given the early stage of the case, the ongoing

12   sale process, the Committee thinks it's really critical to

13   give some breathing room, not just to the debtors, but,

14   really, to the Committee and to the unsecured creditors.  We

15   need time to get our arms around the issues in the case, dive

16   into the sale process, whatever form that may take, and figure

17   out how to best maximize value for the estates.

18             We're very concerned about value destruction if the

19   stay is lifted.  Notwithstanding Mr. Sowka's perspective that

20   there would be no value to the Committee's involvement in the

21   District Court case, the fact remains, it's a billion-dollar

22   "bet the farm" litigation that will mean the difference

23   between trade creditors getting paid in full with interest or

24   maybe getting pennies on the dollar.  And the exercise of the

25   Committee's fiduciary obligations, it's very hard to see how,

1  given our statutory right to intervene, we sit back and do

2  nothing.

3          All of the other litigants in this case had their

4  cases put on hold so that the bankruptcy case can take

5  priority.  Other cases we've seen, opioid cases, mass tort

6  cases, matters that are on the eve of trial are regularly

7  stayed to give the debtors, the Committee, constituents time

8  to try to figure out a better path.

9          The Committee believes that the district court

10  litigation will be a massive drain on the financial and human

11  resources of the estates from both, the debtor and the

12  Committee's perspective.

13          And Mr. Zakia said, The Court can always revisit

14  this issue later on in the case.  But the Committee's view, as

15  we noted in our papers, the throwing of this case back to what

16  is likely to be years of trial, post-trial briefings, appeals,

17  hard-fought litigation in district court, that's really the

18  last resort; other things should be tried first and we think

19  the Court has other options at its disposal that at least

20  warrants a try, before the stay is lifted and we're off to the

21  races with litigation.

22          THE COURT:  All right.  Any response?

23          MR. SOWKA:  Yes, Your Honor.  Mr. Sowka on behalf

24  of Karma Automotive.

25          Your Honor, with respect to the arguments regarding

1   the time frame for resolution, we have a    September 5th

2   trial date there.  You know, each side has been given 26.5

3   hours to present their case.  Mr. Wechsler testified it will

4   likely be resolved by the end of September.

5          To the extent that it's resolved in California,

6   yes, there's the possibility of one appeal, but to the extent

7   it's resolved here, we have to start over from the beginning

8   and create some process to do that.  We assert it would

9   require a fulsome adversary proceeding and, of course, in

10  bankruptcy, you have two-tier appellate rights.  So the

11  parties are ignoring the delay and the additional costs

12  associated with that.

13         As to the debtors' arguments regarding the

14  employees and the potential harm -- they may be lost if a sale

15  is delayed -- well, there's no bidders.  The debtors have been

16  marketing themselves for two years.  There's no bidders that

17  have come forward.

18         And the testimony wasn't that all the employees

19  would be let go or would leave.  It was that they could

20  possibly leave if they were delayed.

21         Of course, there are tools that the debtor has at

22  its disposal.  It has cash on hand available to use.  It could

23  propose a KERP or some other mechanism to the extent that it

24  really believes the going-concern value for the company and

25  maintaining the employees in place.

1          As to the cost and distraction issues that they

2    argued, again, they're proposing to do the same litigation at

3    the same time just before the Bankruptcy Court.  So there's

4    going to be costs.

5          The debtors didn't submit any evidence on what

6    their estimate would be to start the litigation over in the

7    bankruptcy court, nor did their fee estimates include the

8    Committee costs.  So we simply don't know, but I suspect it

9    would be exponentially more expensive to do the litigation

10   over from the beginning with White & Case here in the

11   bankruptcy court than it would be to finish the trial be Baker

12   Hostetler in California.

13         Moreover, Your Honor, Karma's claims is unsecured,

14   so the claim doesn't need to be liquidated in order for the

15   sale to proceed.  All that has to happen is it's the property

16   of rights issues.  But the debtor and the Committee are

17   avoiding that issue.  They're talking about liquidating the

18   damages claim, but they don't want to talk about deciding the

19   property rights issues, which have to be done through an

20   adversary proceeding.

21         So there's no benefit for proceeding with the claim

22   estimation, because it's not going to facilitate a sale; it

23   simply isn't helpful.  And delaying the Court's decision on

24   lifting the stay isn't going to help the debtors, who have

25   asserted that it's critical this they promptly get to a sale.

1          The only way we get to a sale is there an adversary

2    proceeding or completing the district court trial.   Karma

3    strongly believes it's best for all parties in interest to

4    complete the California trial.   We understand why they don't

5    want to go there; they've been sanctioned twice.   There's

6    adversary inference instructions that have been ordered by the

7    District Court.   They can't submit additional evidence

8    contrary to their arguments and the evidence that they've

9    already propounded at trial, they're trying to run from that.

10   And they also have limitations on the substitution of their

11   new damages expert, that they can't go beyond the substantive,

12   four corners of the prior report.

13          So, we understand they're trying to get a do-over

14   on this, but it simply is prejudicial to Karma to allow that

15   to happen.   And, again, you have nondebtors here that are

16   beyond the Court's jurisdiction.

17          The claims in California, with respect to the other

18   defendants, are going to have to be resolved one way or the

19   other.   We believe that it's in the best interests of the

20   debtor, the creditors, and the estate to allow this to go

21   forward.

22          And, finally, as far as the Committee's arguments

23   that it's harmful for creditors, we're surprise about that

24   because the Committee is not a committee of trade creditors;

25   it is a committee of unsecured creditors.   And that would

1   include litigation claimants, but they seem to be taking the

2   position that they want to have the claims of litigation

3   claimants reduced or disallowed while the claims of trade

4   creditors are allowed in full, and we don't think that's in

5   compliance with their fiduciary duties and what the Committee

6   was appointed for.  So, that's also a concern with respect to

7   the arguments they've raised and we don't think a valid

8   consideration the Court should take into account in its ruling

9   today.

10          And I ask, if Your Honor has no further questions,

11  I have nothing further to add.

12          THE COURT:  No, thank you.

13          All right.  Let me issue my ruling on the relief

14  from stay motion.  This case is not like the typical pre-

15  bankruptcy litigation that should remain stayed.  This is not

16  mass torts that only involve claims against the estate.

17          The critical issue in this case is whether the

18  debtors' own property that they want to sell.  And issue in

19  the California case is whether the property that the debtor

20  wishes to sell was stolen from Karma and, therefore, Karma has

21  title to that property and the debtor does not.

22          Given the debtors' and even the Committee's

23  argument that it is critical to proceed with a sale now, I

24  think it is critical to have that issue decided.  I think the

25  appropriate thing is for the California Court that has devoted

1  three years to conducting discovery, addressing pretrial

2  motions, and is fully familiar with these facts, should decide

3  those issues.

4         I can grant relief from the stay to allow the

5  California trial to proceed to verdict and the decision of

6  post-trial motions expeditiously.  I think that, in fact, if

7  the verdict is sufficient to address the title issue and the

8  post-trial motions don't involve that issue, it can come back

9  to me to decide how, and what property is owned by the debtor,

10 and how it can proceed with the sale process.

11        But the verdict will assist me.  Let me make it

12 clear:  I am not going to try that issue.  The issue involves

13 12 million documents.  It involves 54 depositions, 14 experts

14 who intend to testify.  I don't see how I can do it.

15        I don't think the estimation process is

16 appropriate.  The amount of the claim is not the issue here.

17 What is at issue is title to this process to the assets.

18        In addition, without evaluating or making any value

19 judgment, it is true the bankruptcy process is different.  It

20 is a summary process would the benefit of all of the facts,

21 all of the documents, all of the witness testimony.  I just

22 don't think it is appropriate for a bankruptcy court to

23 estimate whether or not the debtor has title and I'm not aware

24 that anybody has used the estimation process in that regard.

25        I think that judicial economy, contrary to the

1   debtors' argument, is best served by allowing the Court, the

2   California Court to proceed with this; again, because I cannot

3   do it even in a summary process easily.

4          In evaluating the Rexene factors, I have already

5   decided that success in the underlying suit is a low bar to

6   meet and is met here because the lower court -- I won't even

7   say lower court -- the District Court in California has

8   already decided a summary judgment motion and has denied, in

9   part, the motion filed by the defendants.  So there is some

10  merit to the claims of Karma.

11         Karma will be prejudiced if it cannot proceed in

12  California to adjudicate its claims to title to the IP after

13  three years of litigation.  And it has a right to proceed

14  against the nondebtor defendants, who are not covered by the

15  automatic stay.  They are not protected and Karma should not

16  have to try this case twice.  And it may not be able to get

17  full relief on its claims against the individual or nondebtor

18  defendants without the debtor participating.  The.

19         The debtors' assertions of prejudice are less

20  clear.  First, it says that management will be diverted and

21  have to deal with this trial, rather than the bankruptcy

22  process.  Debtors' management are going to have to deal with

23  this issue, whether it's tried in this court or it's tried in

24  California, so that is not prejudice to the debtor.

25         The debtor asserts that it's prejudiced because it

1  may lose employees if there's any significant delay.  I just

2  will note that there are means by which a debtor can protect

3  and preserve and retain its employees.  I have not seen a

4  retention motion here, a KERP motion, or any of the other

5  means by which debtors typically assure that employees remain

6  during critical processes, such as a sales process.

7          The debtor in its pleadings asserted that I have

8  exclusive jurisdiction to decide title to property.  While

9  that may be true, my decision on title to the property will be

10 greatly assisted by allowing the California Court to rule on

11 the specific claims of whether or not the individual

12 defendants and the debtor stole the intellectual property of

13 Karma and used that property to develop their own systems in

14 making the Endurance vehicle.

15         So, judicial economy supports letting that Court

16 decide the issues it has before it before I decide any title

17 to property of the estate.

18         The debtor asserts prejudice in the cost to

19 complete the trial.  I find that that's not supported by the

20 record.  The trial is estimated by the debtor to take $2 and a

21 half million to complete; again, the debtor has over    $130

22 million in cash and the debtor is going to have to spend

23 something close to that amount if it tries to go through an

24 estimation proceeding or any other summary proceeding here to

25 try to get me to decide the title issue.

1          The debtor also asserted that granting relief from

2    the stay is -- to allow the Karma litigation to proceed might

3    cause a race to the courthouse because there's a lot of other

4    litigation pending and they might want relief from the stay.

5    But to my knowledge, there's no other litigation pending

6    outside -- in other courts that implicates titles to the

7    debtors' property.  And if there is, I would like the debtor

8    to tell me.

9          Mr. Zakia?

10         MR. ZAKIA:  No, Your Honor.

11         THE COURT:  All right.  This is not, again,

12   deciding the amount of the claim; this is deciding what the

13   debtor owns and does not own.

14         Again, I think that allowing the California trial

15   to proceed, we should have a verdict sometime in September and

16   that is a couple of week push off of any sale process.  Quite

17   frankly, as I suggested, I think it might inform whether or

18   not the debtor gets any bids for its assets or gets any going-

19   concern bid.

20         So, I will wait to see, again, next week, what sale

21   process we can put together.  But I think in the meantime, I'm

22   going to quote one of my colleagues in talking about relief

23   from stay analysis.

24         Judge Goldblatt said:

25         That this analysis ultimately boils down to a

1 common sense judgment about whether it makes good sense to

2 have the case proceed in the court where it was pending, as

3 opposed to being heard in the bankruptcy court.

4         In this case, I find it makes good case to let the

5 Karma case proceed in California before I decide the title

6 issues that might be implicated by the sale process.

7         Let me talk about the Committee's point that it has

8 the right to intervene in California.  It is correct under the

9 Phar-Mor case, it may have a right to intervene as a right

10 under Section 1109, but I do want to caution the Committee to

11 seriously evaluate whether it wants to do that, because I'm

12 going to be the one deciding the Creditors Committee's

13 professional fees.  And I will not approve any fees that are a

14 mere duplication of what the debtors' professionals have and

15 are doing.

16         In this regard, it appears that the debtors'

17 interests align with those of the creditors and other

18 stakeholders in this case.  The debtor has a fiduciary duty to

19 vigorously defend the California action.  It says it is doing

20 so and there is no evidence that the debtors will not fulfill

21 their fiduciary duty in that regard.

22         So, at this point, I can see of no need for the

23 Committee to intervene.  With that caution, I will grant the

24 motion from the relief from the stay.

25         And I don't think we need to talk about the

1  estimation proceeding, because I think it's moot by this

2  decision.

3           MR. ZAKIA:  Understood, Your Honor.

4           THE COURT:  I would like the parties to consult

5  with each other regarding a proposed form of order for each of

6  my rulings.  I may not have to do it on the sale process; I'll

7  just continue that hearing until next week.

8           But for the relief from stay, I'd like the parties

9  to submit an agreed form of order under certification of

10 counsel, okay.

11          MR. ZAKIA:  Understood.

12          MR. SOWKA:  Thank you, Your Honor.

13          THE COURT:  All right.  Then we can stand

14 adjourned.

15          COUNSEL:  Thank you, Your Honor.

16          (Proceedings concluded at 12:28 p.m.)

17

18

19

20

21

22

23

24

25

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.


/s/ William J. Garling                    July 28, 2023

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable


/s/ Tracey J. Williams                    July 28, 2023

Tracey J. Williams, CET-914

Certified Court Transcriptionist

For Reliable


/s/ Mary Zajaczkowski                     July 28, 2023

Mary Zajaczkowski, CET-531

Certified Court Transcriptionist

For Reliable