```
1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3  IN RE:                      .  Chapter 11
                               .  Case No. 23-10831 (MFW)
4  LORDSTOWN MOTORS CORP. ,    .
   et al.,                     .  (Jointly Administered)
5                              .
                               .  Courtroom No. 4
6                              .  824 Market Street
                   Debtors.    .  Wilmington, Delaware 19801
7                              .
                               .  Monday, August 28, 2023
8  . . . . . . . . . . . . . .  .  10:30 a.m.

9                    TRANSCRIPT OF ZOOM HEARING
             BEFORE THE HONORABLE MARY F. WALRATH
10                UNITED STATES BANKRUPTCY JUDGE

11 APPEARANCES:

12 For the Debtors:           Daniel J. DeFranceschi, Esquire
                              RICHARDS, LAYTON & FINGER, P.A.
13                            One Rodney Square
                              920 North King Street
14                            Wilmington, Delaware 19801

15                            -and-

16                            Thomas E. Lauria, Esquire
                              WHITE & CASE, LLP
17                            200 South Biscayne Boulevard
                              Suite 4900
18                            Miami, Florida 33131

19 (APPEARANCES CONTINUED)

20 Audio Operator:           Alyce Doody, ECRO

21 Transcription Company:    Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
24
   Proceedings recorded by electronic sound recording,
25 transcript produced by transcription service.
```

<u>APPEARANCES (CONTINUED)</u>:

For the Debtors:          Jason N. Zakia, Esquire
                          WHITE & CASE, LLP
                          111 South Wacker Drive
                          Suite 5100
                          Chicago, Illinois 60606

For Foxconn EV
System, LLC:              Matthew O. Talmo, Esquire
                          MORRIS, NICHOLS, ARSHT
                            & TUNNELL, LLP
                          1201 North Market Street
                          16th Floor
                          Wilmington, Delaware 19801

                          -and-

                          Michael C. Whalen, Esquire
                          Matthew J. Micheli, Esquire
                          Matthew M. Murphy, Esquire
                          PAUL HASTINGS, LLP
                          71 South Wacker Drive
                          45th Floor
                          Chicago, Illinois 60606

For the Official
Committee of
Unsecured Creditors:      Deborah T. Kovsky-Apap, Esquire
                          TROUTMAN PEPPER HAMILTON
                            SANDERS, LLP
                          875 Third Avenue
                          New York, New York 10022

For Certain Equity
Holders:                  Shai Schmidt, Esquire
                          GLENN AGRE BERGMAN & FUENTES, LLP
                          1185 Avenue of the Americas
                          22nd Floor
                          New York, New York 10036

1                                INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 1:    Debtors' Motion Under Bankruptcy Rule 9019 for      5
4               Entry of an Order Approving the Settlement
                Agreement by and Among the Debtors and Karma
5               Automotive LLC
                [Docket No. 248; filed August 15, 2023]
6
                Court's Ruling:                                     --
7
     Agenda
8    Item 2:    Motion of Hon Hai Precision Industry Co., Ltd.      6
                (a/k/a Hon Hai Technology Group), Foxconn EV
9               Technology, Inc., and Foxconn EV System LLC to
                Approve the Manner of Notice of its Motion to
10              Dismiss, or, in the Alternative, Convert the
                Bankruptcy Cases
11              [Docket No. 278; filed August 21, 2023]

12              Court's Ruling:                                     8

13   Agenda
     Item 3:    Motion of Hon Hai Precision Industry Co., Ltd.      9
14              (a/k/a Hon Hai Technology Group), Foxconn EV
                Technology, Inc., and Foxconn EV System LLC to
15              Dismiss, or, in the Alternative, Convert the
                Bankruptcy Cases
16              [Docket No. 131; filed July 20, 2023]

17              Court's Ruling:                                    138

18

19

20

21

22

23

24

25

1                             INDEX

2   WITNESSES CALLED
    BY MOVANTS:                                          PAGE
3

4       DANIEL NINIVAGGI

5          Direct examination by Mr. Whalen              15

6          Cross-examination by Mr. Zakia               48

7          Redirect examination by Mr. Whalen           57

8

9       EDWARD T. HIGHTOWER

10         Direct examination by Mr. Whalen              60

11         Cross-examination by Mr. Zakia               72

12         Redirect examination by Mr. Whalen           81

13         Recross-examination Mr. Zakia                83

14

15   Transcriptionists' Certificate                     144

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 10:30 a.m.)

2                    THE COURT:  Okay.  We can get started.

3               Good morning.  This is Judge Walrath.  We're here

4     in the Lordstown Motors case.  This is -- I think I will turn

5     it over to counsel for the debtor just to run through the

6     agenda, some matters are off.

7                    MR. DEFRANCESCHI:  Thank you, Your Honor.  Dan

8     DeFranceschi from Richards, Layton & Finger.  We appreciate

9     Your Honor's time today.

10               If it pleases the Court, what I'd like to do is

11     hand it off to Mr. Zakia.  He will be going up first.  And

12     also, of course, Mr. Lauria will be heavily involved in the

13     hearing today.

14                    THE COURT:  All right.  Thank you.

15                    MR. ZAKIA:  Good morning, Your Honor.  Jason Zakia

16     of White & Case for the debtors.

17               Your Honor -- and it is with gratitude that I say

18     I think Your Honor stole my thunder with regard to Item

19     Number 1 on the agenda, which was the Karma settlement.  I --

20     if I am not mistaken, that order was entered by the Court a

21     few moments ago.  And for that, we are grateful.

22               So I guess we can dispense with -- unless Your

23     Honor had any issues with regard to that, we can dispense

24     with Matter 1.

25                    THE COURT:  No, I have no questions.

1          MR. ZAKIA:  Thank you very much, Your Honor.

2          And so then the remaining item on the agenda is

3   Foxconn's motion to dismiss or convert the cases.

4          THE COURT:  Okay.

5          MR. ZAKIA:  So I guess, at this point, I will cede

6   the virtual podium to counsel for Foxconn.

7          THE COURT:  Thank you.

8          UNIDENTIFIED:  (Indiscernible)

9          MR. MICHELI:  Good morning.  Matthew Micheli of

10  Paul Hastings on behalf of Foxconn.

11         The second matter on the agenda is Foxconn's

12  motion to limit notice of service of the motion to dismiss.

13  That motion appears at Docket Number 278.

14         Your Honor, as we set forth in our motion, this

15  matter was set for a hearing on August 15th, approximately 13

16  days ago.

17         The debtors' credit matrix is inclusive of

18  approximately 5,500 parties and there are more than 100,000

19  equity holders in the case.  Of the 100,000 plus equity

20  holders, 23,000 of those parties require hard copy service.

21  And in speaking with KCC, we determined that it would likely

22  take several weeks to complete that service.

23         That paper service would go through first

24  Broadridge.  Broadridge would then either directly serve

25  certain equity holders or indirectly serve the remaining

1   equity holders through their nominees.  And again, the

2   expectation is, is that process would have taken several

3   weeks at an extremely high cost.  And so most of those 23,000

4   parties would not have received notice by the time this

5   hearing started.

6           Your Honor, so what we did to address appropriate

7   service with respect to the motion is, on August 16th, we

8   filed our notice of hearing on this motion to dismiss, which

9   appeared at Docket Number 259.  And then, through KCC, on

10  August 16th, we served the creditor matrix.  The certificate

11  of service for that appears at Docket Number 327.

12          On August 17th, we completed electronic service on

13  approximately 77,000 of the equity holders.  Those -- it was

14  all of the parties that did require paper service.  And

15  again, that certificate of service is set at Docket 327.

16          And then, Your Honor, to address the parties that

17  required paper service, on August 21st, we published

18  notification of the hearing in the New York Times.  The

19  affidavit of service for that was filed this morning, Your

20  Honor, it appears at Docket Number 333.

21          In addition, Your Honor, we will note that, on

22  August 14th, 2023, the debtors filed their Form 10-Q for the

23  period ending on June 30th, 2023, and that 10-Q prominently

24  discussed the pending motion to dismiss and provided parties

25  the information to obtain additional documents related to the

1   motion to dismiss through the KCC website.

2          Based upon that, Your Honor, we believe that

3   service of the motion was adequate and appropriate under the

4   circumstances.  We are not aware of any objections that have

5   been filed.  And based upon that, we would request that the

6   Court enter the order attached to the motion as Exhibit A.

7          THE COURT:  All right.  Thank you.

8          Does anyone wish to be heard on that motion?

9          MR. LAURIA:  Your Honor, good morning.  This is

10  Tom Lauria with White & Case, counsel for the debtors.

11         I just wanted to confirm that the debtors do not

12  object to the relief requested in that motion.

13         THE COURT:  All right.  Thank you.

14         MS. KOVSKY-APAP:  Your Honor, Deb Kovsky of

15  Troutman Pepper on behalf of the committee.

16         The committee, likewise, does not object.

17         THE COURT:  All right.  I think the alternative

18  notice provided by the movant is appropriate and I will grant

19  the motion then.

20         MR. MICHELI:  Thank you, Your Honor.

21         At this point, I will turn it over to my colleague

22  Matt Murphy.

23         THE COURT:  I think you're still muted,

24  Mr. Murphy.

25         MR. MURPHY:  The double-mute got me again.  Good

1  morning, Your Honor.

2         THE COURT:  Good morning.

3         MR. MURPHY:  I will quickly cede the virtual

4  podium to our colleague Mike Whalen.

5         THE COURT:  Thank you.

6         MR. WHALEN:  And Your Honor, having received the

7  hot potato, I'll address the motion to dismiss item.

8         I think the debtors and Foxconn have made

9  substantial headway minimizing procedural issues which are

10 everyone's favorite to argue about.  But I think

11 (indiscernible) cleared them all the way.

12        Your Honor will have received, through chambers

13 and through Morris Nichols, an exhibit binder.  I'm happy to

14 say that the parties, as I understand it, have no objections

15 to any of those being received into evidence, so that we can

16 avoid any sort of evidentiary peccadilloes later.  Those will

17 all be submitted.

18        There are some confidentiality issues, as noted in

19 the exhibit list.  As we do it right now, those shouldn't

20 pose any issue during the evidentiary portion of the hearing.

21 There may arise an issue where we have to address briefly

22 some confidentiality with respect to Exhibit 12.  I think our

23 preference is, when we get to that point, that we will just

24 reference it, Your Honor has it, and we'll do everything we

25 can to avoid having that bog down the hearing.

1           THE COURT:  Okay.

2           MR. WHALEN:  With respect to the conduct of the

3  hearing, Foxconn and the debtors have agreed that we'll

4  handle this just like a normal contested matter hearing,

5  obviously subject to any of Your Honor's preferences.  We'll

6  do whatever Your Honor believes is best and most efficient.

7           But we thought it would be most efficient to take

8  evidence in the ordinary course right off the bat and then

9  have summations/argument afterwards.

10           With respect to the taking of evidence, it will be

11  fairly standard, except my understanding is that the debtors

12  wish to do live examination, so there will be no direct via

13  declaration.  And if Your Honor is comfortable with it, we

14  will call two of the witnesses adversely and then the

15  examination can be conducted by the debtors, subject then to

16  any further cross, if that's amenable to Your Honor.

17           THE COURT:  That's fine.

18           MR. WHALEN:  Your Honor may have seen that there

19  was a third witness on the witness list, Mr. Jeffrey Finger.

20  We have agreed to offer his testimony to the Court via

21  designation.  He's the one exception with the declarations.

22  His declaration will come in subject to the cross-

23  examination, which will be done via designation.  We are

24  preparing that as we speak.  It is in the queue of many

25  things being rushed through this weekend.  And we will have

1  it to your chambers we hope very, very shortly.  But he will

2  not have to testify live, I am sure to his great

3  satisfaction.

4          THE COURT:  Okay.

5          MR. WHALEN:  And if there's anything I missed,

6  I'll defer to Mr. Zakia.  But I think that is it for the

7  conduct of the hearing and preliminary matters.

8          MR. ZAKIA:  So, Your Honor, Jason Zakia for the

9  debtors.

10          I agree mostly with what Mr. Whalen stated, one

11  caveat.  While we do intend to question Mr. Ninivaggi and

12  Mr. Hightower live in the manner that Mr. Whalen indicated;

13  and so, therefore, the directs will not -- sorry -- the

14  declarations will not serve as directs, I believe the parties

15  have agreed, nevertheless, to streamline things, to the

16  admission of those declarations, as reflected by the fact

17  that those declarations are included on the agreed exhibit

18  list that counsel submitted to the Court.

19          So, with that one caveat, I think he laid out our

20  agreement correctly.

21          MS. KOVSKY-APAP:  Your Honor, Deb Kovsky for the

22  committee.

23          I don't believe the committee has received a copy

24  of the exhibit binder for today's hearing and we would

25  appreciate getting a copy of that as soon as possible.

1              THE COURT:  I might have not, either, so ...

2              MR. TALMO:  Good morning, Your Honor.  Matt Talmo,

3    Morris, Nichols, Arsht & Tunnell, on behalf of Foxconn.

4              So we just saw the committee's email about the

5    exhibit list.  You know, as Mr. Whalen mentioned, you know,

6    apologies, we were moving very fast this morning.  I just

7    forwarded that over to the committee, so the committee should

8    have that.

9              And for you, Your Honor, it was sent shortly

10   before the hearing to Ms. Capp, so it may still be making its

11   way through the internet tubes, but it was sent at around

12   10:25, so --

13             THE COURT:  So you --

14             MR. TALMO:  -- if you don't have it --

15             THE COURT:  You sent it electronically?

16             MR. TALMO:  I did, Your Honor, yes.

17             THE COURT:  Okay.  Let me check.  She hasn't --

18   let me see if she forwarded it.  Not yet.  When I get it,

19   I'll let you know.

20             MR. TALMO:  Okay.  Thank you.

21             MR. WHALEN:  And Your Honor, just briefly, if I

22   may, on the declarations?

23             THE COURT:  Yes.

24             MR. WHALEN:  We have no issue with them coming in.

25   I think just the normal caveats that you would hear in a

1  bench trial or a bench matter that we obviously take issue

2  with certain representations therein.  I don't think it's

3  productive for the parties to be bogged down in parsing those

4  declaration.  But we trust that Your Honor will take them,

5  again, subject to the weight of any cross-examination that is

6  conducted.  And you know, any evidentiary issues that might

7  be present therein, Your Honor can adequately weigh as you

8  see fit.

9           THE COURT:  All right.  Thank you.

10          MR. WHALEN:  With that, we're ready to proceed,

11 Your Honor.  If it makes sense to wait briefly until you have

12 the exhibits, but I don't know that that would materially

13 delay examination.  There may be one exhibit relevant to the

14 examination of one of the witnesses.  We can always show that

15 on the screen because that is not subject to any

16 confidentiality designation, if need be.

17          THE COURT:  Well, it looks like I have the joint

18 exhibit list.  But I don't have a ZIP drive of the actual

19 exhibits.

20          MR. TALMO:  Your Honor, Matt Talmo again for the

21 record.

22          So we sent it via share filing because the file

23 size of the exhibits was too large.  If you would like, we

24 could break it out piecemeal and send it as separate ZIP

25 files, whatever Your Honor would prefer.

1               THE COURT:  No, that's fine.  I just found it.  It

2  was a different --

3               MR. TALMO:  Okay.

4               THE COURT:  -- different email.

5               MR. TALMO:  Okay.  Great.

6               THE COURT:  All right.  You may proceed then.

7               MR. WHALEN:  Thank you, Your Honor.

8               For our first witness, Foxconn will call Mr. Dan

9  Ninivaggi.

10               MR. ZAKIA:  Can -- and I'm sorry.  So I don't

11  interrupt, I just want to make -- so the record is clear,

12  Mr. Whalen.  Are you going to put the exhibits in now?

13               MR. WHALEN:  Yes.  I would move to admit the

14  exhibits if there is no objection, which I understand there

15  not to be.

16               MR. ZAKIA:  We do not object, Your Honor.

17               THE COURT:  Okay.  All right.  Then they will be

18  admitted.

19          (Certain exhibits received in evidence)

20               THE COURT:  All right.  Mr. Ninivaggi is the

21  witness?

22               MR. WHALEN:  Yes, Your Honor.

23               THE COURT:  All right.  I'm going to ask you to

24  take the oath and I'll have my clerk administer it.

25               THE CLERK:  Raise your right -- raise your right

1  hand.  Do you affirm -- do you affirm --

2         THE COURT:  Turn off your mic.  Try it now.

3         DANIEL NINIVAGGI, MOVANT'S WITNESS, SWORN

4         THE CLERK:  Please state your full name and spell

5  your last name for the record.

6         THE WITNESS:  It's Daniel Ninivaggi.  My last name

7  is spelled N-i-n-i-v-a-g-g-i.

8         THE COURT:  All right.  You may proceed,

9  Mr. Whalen.

10         MR. WHALEN:  Thank you, Your Honor.

11                    DIRECT EXAMINATION

12  BY MR. WHALEN:

13  Q     Good morning, Mr. Ninivaggi.

14  A     Hi, Mr. Whalen.  How are you?

15  Q     Good.  Good to see you again.

16        Mr. Ninivaggi, you are the chairman of the debtors,

17  correct?

18  A     Correct.

19  Q     And you were formerly the debtors' CEO.

20  A     Correct.

21  Q     You joined the debtors in August of 2021.  Is that

22  right?

23  A     That's right.

24  Q     You moved from the CEO role to the executive chairman

25  role around July of 2022, correct?

1  A      Correct.

2  Q      And as the executive chairman of the debtors, you're

3  generally responsible for company strategy, which includes

4  the resolution and the handling of company litigation, right?

5  A      Correct.

6  Q      Now Lordstown or LMC -- and if I say "LMC," you'll

7  understand I'm referring to the debtors, correct?

8  A      Sure.

9  Q      So LMC was founded as a vertically integrated vehicle

10 OEM, correct?

11 A      Correct.

12 Q      And "OEM" means "original equipment manufacturer"?

13 A      Correct.

14 Q      Essentially, that just means that you're the company

15 that's making the cars, right?

16 A      The automaker, right.

17 Q      Right.

18       And "vertical integration" refers to the fact that LMC

19 intended to develop, manufacture, and sell vehicles all on

20 its own, correct?

21 A      Correct.

22 Q      But in 2021, LMC determined that it had to transition

23 away from a vertically integrated model, right?

24 A      Correct.

25 Q      And that's because it determined that being vertically

1  integrated was not an economically viable model, right?

2  A    Not for the company at the time, no.

3  Q    And part of that consideration is that the costs of

4  operating a huge assembly plant were just too steep for the

5  company to manage on its own, right?

6  A    That was part of it, as well as other capabilities.

7  Q    And also during 2021, when LMC was making this

8  determination to pivot away from the vertically integrated

9  model, it was issuing going concern warnings as part of its

10  public filings, correct?

11  A    Correct.

12  Q    A "going concern warning" is essentially a public

13  statement about the future viability of the company, right?

14  A    It -- technically speaking, it is a qualification to an

15  audit opinion or a disclosure that casts doubt on the bill --

16  the ability of the company to operate as a going concern for

17  at least 12 months.

18  Q    And those disclosures made their way into LMC's public

19  filings in 2021, correct?

20  A    That's correct.

21  Q    The decision to exit the vertically integrated model

22  led LMC to decide to sell its Lordstown manufacturing plant,

23  right?

24  A    Correct.

25  Q    And as a result, LMC sought a buyer for that plant.

1  A      That is correct.

2  Q      Ultimately, that buyer was Foxconn, right?

3  A      Yes, we chose Foxconn as that partner.

4  Q      Right.

5         And you agree it could have been any entity capable of

6  taking on that manufacturing facility, right?

7  A      That's correct.

8  Q      So, put differently, LMC was committed to selling the

9  plan irrespective of whether it was ultimately Foxconn that

10 purchased it.

11 A      That -- that's not correct.

12        So, in deciding whether to sell the plant and to whom,

13 we were looking at other elements of the transaction, as

14 well, including the terms of any contract or manufacturing

15 agreement, joint development agreement, and other -- and

16 other agreements.

17 Q      But the point is, Mr. Ninivaggi, that, irrespective of

18 whether it was Foxconn that was purchasing the plant, LMC had

19 decided to exit its vertically integrated model.

20 A      Only if we found the right partner.

21 Q      In addition to finding a manufacturing partner, LMC was

22 seeking partners in what we'd call "downstream" -- the

23 "downstream" (indiscernible) of producing a vehicle, correct?

24 A      I'm not sure what you mean by "downstream."

25 Q      Yeah.  So, put differently, one of the partners that

1  LMC was seeking was an OEM partner, right?

2  A    We were seeking OEM partners, commercial partners,

3  service partners, and then obviously a manufacturing partner

4  with Foxconn.

5  Q    So, as part of the pivot away from the vertically

6  integrated model, LMC was seeking a whole number of partners,

7  correct?

8  A    Correct.

9  Q    And the OEM partner specifically would co-develop

10  vehicles and help LMC with capital costs, right?

11  A    That's correct.

12  Q    Ultimately, LMC never found an OEM partner, correct?

13  A    That process is still continuing.  We've had

14  discussions with a number of potential OEM partners.  None --

15  none has reached a (indiscernible) obviously, a binding

16  agreement yet.

17  Q    Right.

18        LMC has been looking for an OEM partner since at least

19  twenty -- early 2022 and hasn't found one, correct?

20  A    Correct.

21  Q    You also mentioned that LMC was potentially seeking a

22  customer partner, right?

23  A    Or partners, correct.

24  Q    And that would have been a partner or partners to

25  commit to making bulk purchases of the Endurance vehicle,

1  correct?

2  A     The Endurance vehicle or the new vehicle program.  Most

3  of the commercial discussions were around the new vehicle

4  program, not the Endurance.

5  Q     But as with the OEM partner, LMC never actually found a

6  customer partner either, correct?

7  A     There was -- there was great interest by commercial

8  partners in a new program, but obviously we needed to define

9  the new program before we could get that support.

10  Q     LMC never entered into an agreement with a customer

11  partner, right?

12  A     We've sold vehicles to customers.  I -- you're talking

13  about a broad relationship with anchor customers?  No.

14  Q     So, notwithstanding the sale of the plant to Foxconn --

15  the APA that governed the sale of the plant was entered into

16  in November of 2021, correct?

17  A     Correct.

18  Q     And as part of entering into that agreement, Foxconn

19  made certain significant down payments (indiscernible)

20  A     Correct.

21  Q     And notwithstanding those down payments, LMC continued

22  to issue going concern warnings throughout 2022, as well,

23  correct?

24  A     Correct.

25  Q     And that's because LMC had a critical need for capital,

1  additional capital on top of whatever it had received from

2  Foxconn as part of the plant transaction, right?

3  A     So I -- I would characterize it this way:  For the

4  Endurance, we needed capital to lower the cost of the

5  product, but it was a bit of a catch 22 or a chicken and egg.

6  We needed capital to reduce the bond cost.  But at the

7  current bond cost, it was difficult to -- to attract capital.

8        With the new vehicle program, it really was a function

9  of our ability to do the pre-development work and show

10 customers the program.  And that was the purpose of the pre-

11 development funds that Foxconn had committed.

12 Q     Well, I'm focusing on the Endurance here,

13 Mr. Ninivaggi.

14       The company had a significant need to raise capital to

15 invest in hard tooling for the Endurance production in 2022,

16 correct?

17 A     In order to scale the Endurance, we would have to

18 invest in hard tooling, which is basically production

19 tooling, as opposed to lower volume, non-hard tooling.  So,

20 yeah, to -- to make it successful and profitable longer term,

21 we would have had to make additional investments in hard

22 tooling.

23 Q     Those investments in hard tooling ran in the hundreds

24 of millions of dollars, correct?

25 A     Correct.

1  Q     And LMC actually deferred -- intentionally deferred

2  those investments throughout 2022, correct?

3  A     Well, we made -- we made substantial investments in

4  hard tooling, but we did defer some.

5  Q     And there's still hundreds of millions of dollars in

6  hard tooling investments outstanding, correct?

7  A     Two -- yeah, we think it would be about two hundred to

8  250 million.

9  Q     And it was never contemplated that any amounts paid by

10 Foxconn would fund the investments in hard tooling for the

11 Endurance, correct?

12 A     That's not correct.

13 Q     What's not correct about that, Mr. Ninivaggi?

14 A     Well, Foxconn originally invested 50 million for

15 general corporate purposes and the additional investments in

16 common stock were for general corporate purposes, including

17 things like hard tooling.

18 Q     LMC had suspended its investments in hard tooling at

19 the time those investments were made by Foxconn, correct?

20 A     That's not correct.

21       The first investment by Foxconn was in September of

22 2021, and at that time we were investing in hard tooling.

23 You -- you can't use soft tools on every component, so some

24 level of hard tooling was required no matter what.

25 Q     But by 2022, when Foxconn made its follow-on

1  investments in the investment agreement, LMC had suspended

2  its investments in hard tooling, correct?

3  A    We had significantly diminished the investments, yes.

4  Q    And you would agree that LMC did not view Foxconn as a

5  silver bullet for its problems, correct?

6  A    Not a silver bullet, no.

7  Q    We spoke about LMC's efforts to attract an OEM or a

8  customer partner.  Do you recall that?

9  A    I do.

10  Q    And LMC retained the investment bank Jefferies to

11  assist in those efforts, correct?

12  A    Correct.

13  Q    And in addition to assisting with finding an OEM

14  partner or a customer partner, Jefferies was also assisting

15  with general capital-raising, correct?

16  A    Correct.

17  Q    And so it's fair to say that LMC was, in addition to

18  seeking those partnerships, attempting to raise capital in

19  more traditional manners throughout 2022, right?

20  A    That's correct.

21  Q    And those efforts continued into 2023, up until the

22  time of filing, right?

23  A    They continued well into 2023, I would say, yes.

24  Q    And apart from any equity-raises, open market equity

25  raises and the investments by Foxconn, LMC was not able to

1  raise that capital, correct?

2  A    As I -- as I mentioned, with the Endurance, it was the

3  chicken and egg issue.

4        With the new vehicle program, there was significant

5  interest in the program.  But until we defined the program

6  and could explain to customers what exactly it was, there was

7  no ability to raise money around it.

8  Q    Okay.  Slightly similar question, Mr. Ninivaggi.

9        LMC wasn't able to raise that capital, correct?

10 A    Again, it was -- we couldn't raise the capital without

11 explaining to people what the proceeds would be used for.

12 Q    And part of the reason that LMC wasn't able to raise

13 capital during this period was because the capital market

14 environment deteriorated significantly between 2021 and 2023,

15 correct?

16 A    That's correct.

17 Q    And this is particularly true for startups like LMC,

18 right?

19 A    Correct.

20 Q    And on top of that, LMC had litigation overhang during

21 the 2022 period, correct?

22 A    Correct.

23 Q    In fact, many of the same claims and causes of action

24 that are pending against it today were identically pending

25 against it in 2022 and impacting its capital-raise, right?

1   A    Almost all the -- I think all the claims have been

2   around since 2021, yes.

3   Q    November 2022, after being unable to raise capital in

4   the capital markets, LMC and Foxconn entered into the

5   investment agreement, correct?

6   A    We entered into the investment agreement in November

7   2022, after Foxconn had expressed a desire to restructure the

8   previous agreement.

9   Q    And the investment agreement included staged

10  investments by Foxconn into LMC in exchange for various

11  amounts and types of equity.  Is that right?

12  A    Correct.

13  Q    And those investments, however, were never intended to

14  be in lieu of the capital that LMC needed to raise to make

15  those significant hard tooling investments, right?

16  A    Well, again, the 70 million, roughly, of the investment

17  was in the form of common stock to be used for general

18  corporate purposes; 100 million was staged to fund pre-

19  development activities for the new vehicle program.

20  Q    And as --

21  A    The general --

22  Q    -- we've --

23  A    -- corporate purposes could have been anything.

24  Q    Yeah.  But as we discussed, the amount needed to invest

25  in hard tooling was at least $200 million, right?

1  A      Correct.

2  Q      And that's double what Foxconn was going to invest for

3  general corporate purposes under the investment agreement.

4  A      Oh, correct.  We -- we definitely would have needed to

5  raise more money.

6  Q      Agreed.  Thank you.

7         Now, again, going back to the hard tooling, you agree

8  with me that the estimated figure for investing in hard

9  tooling is between two and $250 million, right?

10 A      Roughly.

11 Q      But that figure is higher when you account for the

12 operating losses that either LMC or another entity would

13 incur in investing in and in deploying that hard tooling,

14 correct?

15 A      That's correct.

16 Q      And those can range -- those additional costs can range

17 anywhere from two hundred and fifty to 300 million additional

18 dollars, right?

19 A      It could, depending how -- on how long it took to

20 implement the hard tooling and where the hard tooling was

21 going to be located, what suppliers we would use.  So it's

22 a -- it's a ballpark number, but roughly correctly.

23 Q      So the number that LMC has been going to market with is

24 $500 million in additional investment.

25 A      That was a rough estimate, yes.

1          (Pause)

2    Q      We discussed that Foxconn and LMC entered into the

3    investment agreement in November of 2022.  And at that time,

4    there were some initial investments made in connection with

5    the signing by Foxconn, correct?

6    A      They funded the first tranche of preferred and common

7    stock.

8    Q      That was about $52.7 million total.  Is that right?

9    A      Correct.

10   Q      And 30 million of that went into preferred equity,

11   correct?

12   A      Correct.

13   Q      And your understanding is that, in general, preferred

14   equity holders, all else being equal, have a distribution

15   preference to common equity holders.

16   A      As a general principle, yes.

17   Q      So they would have to be paid back in full before any

18   money flows to common equity.

19   A      Again, as a general principle, yes.

20   Q      And the investment agreement contained a second common

21   equity investment that would occur in the first half of 2023,

22   correct?

23   A      Correct.

24   Q      And that investment was valued at approximately

25   $47 million.  Is that right?

1  A      Yeah.  The reason it was staged is we needed to get

2  CFIUS approval in order for Foxconn to acquire more than ten

3  percent, so the second tranche of common had to be

4  conditioned on CFIUS approval.

5  Q      Okay.  And that second tranche was able to come, at

6  some point, in the first half of 2023, right?

7  A      Within, I think, 10 days after CFIUS approval.

8  Q      And around April of 2023, Foxconn and LMC began

9  discussing an alternative transaction structure that would

10  potentially replace the investment agreement, right?

11  A      I believe it was late March.

12  Q      And it continued through April, correct?

13  A      Through early April.

14  Q      In fact, it continued in May, didn't it?

15  A      No, I wouldn't say those discussions continued in May.

16  In late March, the chief product officer of Foxconn,

17  Mr. Hsiao, told me that Foxconn wasn't comfortable or wasn't

18  happy, at least, about following through on the second common

19  stock closing, because our stock price had declined pretty

20  significantly from the time we agreed on the purchase price

21  until late March, and sort of inquired as to whether we would

22  be open to restructuring the transaction.

23        We basically said, Look, a deal's a deal, but if you

24  have something specific, a proposal, like, we can take it to

25  the Board.  Then, encouraged him to talk to the lawyers at

1  Paul Hastings and connect them with our lawyers to find out,

2  specifically, he had in mind.

3      That proposal came in early April, which was a proposal

4  to buy the company for not more than $48 million of cash.

5  There were some other terms that were a bit unclear.  At that

6  point, our lawyers were working together to figure out

7  exactly what that proposal was.

8          MR. WHALEN:  Your Honor, I'd move to strike that

9  as nonresponsive.  I think the question was whether the

10 discussions continued in May.

11         THE COURT:  Did they just -- you can answer, but I

12 won't strike the --

13         THE WITNESS:  I wouldn't say so.  The discussions

14 sort of terminated in April and then there were a series of

15 disputes between the middle of April and May and then the

16 discussions kind of resumed at that point, or at least a

17 discussion resumed at that point.

18 BY MR. WHALEN:

19 Q    Okay.  It sounds like a technical difference,

20 Mr. Ninivaggi.

21     Were you having discussions with Foxconn about the

22 resolution of the investment agreement in May of 2023?

23 A    I think the disconnect is those weren't continuing

24 discussions.  Foxconn went silent in mid-April and then

25 indicated an interest in meeting in late May, but there were

1  very few, if any, discussions between early, mid-April and

2  late May.

3  Q    Mr. Ninivaggi, on May 25th of 2023, actually, you sent

4  a transaction framework to Foxconn, correct?

5  A    So on or around May 20th, or so, Foxconn indicated an

6  interest in having a meeting with senior people on both

7  sides.  It took about a week to set up the meeting because

8  Foxconn did not want management of LMC to participate in it,

9  only outside directors.  We ultimately agreed on who would

10 participate in the meeting.  My recollection is we had about

11 an hour meeting on May 24th.  Foxconn's CFO had asked us for

12 some follow-up information.  We sent them that information, I

13 think, on the 25th.

14 Q    Mr. Ninivaggi, you're going to have an opportunity to

15 explore everything with your counsel, but my question is a

16 simple one.  It's a yes-or-no question.

17       Did you send, on May 25th, the transaction framework to

18 Foxconn, you, personally?

19 A    Yes, we did.

20 Q    Okay.  I want to look at that framework, which has been

21 admitted into evidence as Exhibit 13?

22            MR. WHALEN:  Your Honor, is it okay if I share my

23 screen to display the exhibit?

24            THE COURT:  Yes, but apparently I need a password

25 in order to open the exhibits that you sent to me.

1    MR. TALMO:  Your Honor, Matt Talmo, again, for the

2  record.

3    The password was included in the email, but I'm

4  happy to resend it.

5    THE COURT:  Well, let me find it.  I mean, geez.

6  Hold on.

7    (Pause)

8    MR. TALMO:  It should be in red text, Your Honor.

9    THE COURT:  Okay.  Got it.  Thank you.

10    Nope.  Wrong password.  Okay.

11    MR. WHALEN:  I'm sorry, I find, Your Honor, if

12  there's an accidental space at the end, that could interfere

13  with the process.

14    THE COURT:  Let me try it again, then.

15    (Pause)

16    THE COURT:  You better send it again because it's

17  saying -- but go ahead and share the screen.  We can --

18    (Pause)

19  BY MR. WHALEN:

20  Q    Mr. Ninivaggi, can you see my screen?

21  A    I can.

22    MR. WHALEN:  Your Honor, is my screen visible to

23  you, as well?

24    THE COURT:  Yes, I have it.  Thank you.

25  BY MR. WHALEN:

1    Q    Mr. Ninivaggi, we're looking at your May 25th email to

2    two individuals at Foxconn, correct?

3    A    Correct.

4    Q    And this email attaches a framework for a transaction

5    between LMC and Foxconn, correct?

6    A    Among other things, yes.

7    Q    I want to look at that attachment.  The first bullet

8    point on the first page of the statute says:  LMC is

9    providing a framework for the acquisition of LMC by Foxconn.

10        You see that, correct?

11   A    I do.

12   Q    And you'd agree with me that that's an accurate

13   statement about what LMC is doing, correct?

14   A    Yeah, we discussed this framework, but like I mentioned

15   to you in our deposition, there were a lot of communication

16   issues between us and them, so we wanted to put on paper

17   exactly what we thought we had discussed.

18   Q    And Mr. Ninivaggi, we'll get through everything and

19   you'll have time with your counsel, but my question for you

20   is that you agree that that is an accurate statement about

21   what LMC is doing, is that they're providing a framework for

22   the acquisition of LMC by Foxconn, correct?

23   A    Yes.

24   Q    And in LMC's view, this framework that's set out on

25   this page -- I will try to get it all onto one page -- this

1  framework set out here was an acceptable framework in LMC's

2  (indiscernible)?

3  A    Framework.  We, obviously, we hadn't agreed on numbers,

4  but the framework was an acceptable -- an acceptable.

5  Q    I want to go through some of the details of this

6  framework.

7       Part of it is that Foxconn would pay its preferred

8  equity in every transaction, correct?

9  A    Correct.

10          THE COURT:  Excuse me, Mr. Whalen.  Are we going

11  to try the adversary between the debtor and Foxconn or are we

12  going to address the motion to convert or dismiss today?

13          MR. WHALEN:  Your Honor, we have actually

14  endeavored as hard as possible to not litigate the adversary

15  and as you can probably appreciate, that is very hard for us

16  to avoid doing just by nature.  But we do think that this is

17  very much relevant to one of the prongs of our motion to

18  dismiss, which is the alleged bad faith of the debtor, which,

19  again, we would contend is bad faith of the debtor.  We'll

20  move quickly through this, Your Honor.

21          THE COURT:  Okay.

22          MR. WHALEN:  I think as you'll see in the

23  testimony, hopefully, we can tie it altogether and if I

24  can't, certainly, Mr. Murphy will at the end.  But we will be

25  quick.

1        THE COURT:  All right.  I'll give you some leeway,

2  but ...

3        MR. WHALEN:  All right.  Thank you, Your Honor.

4  BY MR. WHALEN:

5  Q    So, we just addressed the preferred interest,

6  Mr. Ninivaggi.

7        Another part of this framework sent by LMC is that

8  Foxconn would make a cash payment in lieu of the second

9  tranche of common stock funding, correct?

10 A    Correct, although the amount was not proposed.

11 Q    Sure.  But the second tranche of common are stock

12 funding was the $47 million that we were discussing?

13 A    Yeah, but what we meant there was the cash payment in

14 lieu of that, not that it would necessarily be the same

15 number.

16 Q    Sure.  But that's what it's referring to.  It's

17 referring to --

18 A    Correct.

19 Q    Okay.  A further part of this framework sent by LMC is

20 that the transaction would be executed through a 363 process

21 with LMC, right?

22 A    Correct.

23 Q    And another point of this framework stated that in

24 LMC's view, the parties would enter into a transaction where

25 LMC would commence litigation in the alternative (inaudible)?

1  A       It says the prospect of litigation, yes.

2  Q       Okay.

3  A       Sorry, I'm having a little difficulty reading it.

4  Q       And Mr. Ninivaggi, just to confirm, again, this was

5  sent to LMC to Foxconn on May 25th, 2023, right?

6  A       Correct.

7  Q       And LMC filed for Chapter 11 protections on June 27th,

8  2023?

9  A       Correct.  The second-to-last bullet point also talks

10 about timing, the need to move quickly.

11 Q       Yeah, but I didn't mean to take it down from you,

12 Mr. Ninivaggi, but I'm exhausting my (indiscernible)?

13 A       Yeah, I got it.

14 Q       Okay.  Great.

15         Now, Foxconn made an offer to LMC to acquire

16 substantially all of its assets on June 22nd, 2023, correct?

17 A       I wouldn't call it an offer, technically, but it was an

18 expression of interest, yes.

19 Q       You attached that -- I'll refer to it as an offer --

20 you attached that offer to your declaration in this

21 proceeding, correct?

22 A       Correct.

23 Q       And that offer included a cash payment of approximately

24 $47 million, correct?

25 A       Correct.

1  Q    It was the same figure that would have been associated
2  with the second tranche of common funding?
3  A    Correct.
4  Q    That offer also included the surrender of Foxconn's
5  $30 million in preferred equity, correct?
6  A    Correct.
7  Q    And the offer from Foxconn also called for the
8  transaction to be executed within bankruptcy, correct?
9  A    Correct.
10 Q    And that offer also contained a release of claims to
11 avoid litigation, right?
12 A    Correct.
13 Q    Okay.  And, again, that offer came to LMC less than a
14 month after you had sent this framework over, correct?
15 A    Correct.  Four weeks.
16 Q    And LMC did not accept Foxconn's offer; is that right?
17 A    We didn't accept the offer and proceeded with the
18 bankruptcy filing.
19 Q    You made reference here just before that your framework
20 was not meant to indicate that $47 million was an acceptable
21 cash payment for the common equity funding, correct?
22 A    We didn't propose a number, no.
23 Q    Okay.  You actually even went back to Foxconn with a
24 counteroffer of what you felt was an appropriate cash
25 payment, correct?

1  A     Our counsel went back to your colleagues at Paul

2  Hastings and says the number seemed light, but more

3  importantly, we needed more certainty.  We wanted something

4  that was binding.

5  Q     LMC never went back to Foxconn with a number that it

6  viewed was appropriate to get that deal done, correct?

7  A     Again, our counsel went back to Paul Hastings and

8  stressed the need to have something binding.  That was a

9  bigger issue than a number.

10 Q     Okay.  But I want to focus on my question about the

11 number.  You never went back to Foxconn with a number, did

12 you?

13 A     Not with a specific number, no.

14 Q     And when we spoke last Thursday, you couldn't recall

15 whether LMC's board of directors actually kept minutes of any

16 discussion of Foxconn's number, correct?

17 A     Yeah, I wasn't sure whether it was a board call or a

18 formal meeting.  I did go back and verify that it was a

19 formal meeting on June 25th to discuss Foxconn's proposal and

20 what impact it should have, if any.

21 Q     And as of last Thursday, LMC has received no binding

22 offers to acquire all or substantially all of its assets,

23 correct?

24 A     Yeah, we're still in the sales process and the binding

25 offers are due on September 8th.

1  Q      Yeah, but the stalking horse deadline was last
2  Thursday, correct?
3  A      Correct.
4  Q      And LMC did not file a stalking horse bid?
5  A      We did not.
6  Q      Okay.  And as noted, you ultimately filed these
7  Chapter 11 cases just five days after receiving the offer
8  from Foxconn, correct?
9  A      Correct.
10 Q      And as part of filing these cases, you also filed an
11 adversary proceeding against Foxconn in the very same day,
12 correct?
13 A      We did.
14 Q      But you concede you could have brought that litigation
15 at a later point in time in these bankruptcy cases, correct?
16 A      We could have, sure.
17 Q      There were no statute of limitations issues or other
18 procedural issues forcing you to bring that at the exact same
19 time, correct?
20 A      No.
21 Q      Yeah, I want to switch gears a little bit,
22 Mr. Ninivaggi, to the litigation facing the company.
23        You're familiar with the Karma litigation, correct?
24 A      I am.
25 Q      And I will ask if that was recently resolved.  It was

1  resolved this morning.

2       You're aware of that, correct?

3  A    I am.

4  Q    Okay.  And the terms of that settlement in broad

5  strokes -- I don't want to get too deep into it -- it was

6  just that it was a cash payment of $40 million from LMC to

7  Karma, correct?

8  A    Correct.

9  Q    In addition to the Karma litigation, LMC is also facing

10 securities class-action claims, correct?

11 A    Correct.

12 Q    And it's facing an investigation from the SEC?

13 A    Correct.

14 Q    And it's also facing derivative claims, correct?

15 A    Correct.

16 Q    And, in general, all those claims, the securities

17 claims, the SEC investigation, and the derivative claims

18 generally revolve around the same set of facts, right?

19 A    Yes.

20 Q    And certain directors and officers sued in the

21 securities cases have brought indemnification claims against

22 the company, right?

23 A    Correct.

24 Q    But currently, the insurance is covering the costs and

25 fees for those individuals, right?

1   A     That is not correct.

2         So, we've been covering the costs for all of the Ds and

3   Os.  The only thing insurance is covering is the Delaware

4   class action; they're covering those costs.  The company is

5   technically not a party to it.  So our costs we would incur,

6   the litigation costs, are being covered by the D&O policies

7   in that action.

8   Q     Okay.  But there are D&O policies with available

9   coverage for those cases, correct?

10  A     Yeah, it's eroding, but there's still coverage just for

11  the Delaware class action.  The insurers on all the other

12  cases have denied coverage.

13  Q     But there is insurance available if that denial of

14  coverage were to be reversed, correct?

15  A     I'm sorry, could you repeat it?

16  Q     There is insurance coverage available, it just happens

17  to have been preliminarily denied by the carriers, correct?

18  A     Well, they've issued formal denials of coverage based

19  on a prior act exclusion.  So, at this point, we have a

20  coverage dispute, but the insurers, the primary insurers on

21  the company policy have denied coverage.

22  Q     Right.  And you're disputing a denial as we stated?

23  A     We have not made a determination yet on how and when to

24  dispute it.  In the meantime, we've been incurring all the

25  costs with the D&O legal expenses.

1 Q      Now, prior to the resolution of the Karma case, the

2 company took an aggregate accounting reserve covering the

3 potential resolution of all of these litigation claims,

4 correct?

5 A      We had a -- if my recollection is correct, we had a

6 reserve for contingent liabilities of I think a little over

7 $75 million at the end of June.

8 Q      Prior to the period ending June 30th, 2023, that figure

9 was closer to approximately $36 million, correct?

10 A      That's correct.

11 Q      And that could just be found in your public filings,

12 correct?

13 A      Correct.

14 Q      So when Karma settled, the company revised that reserve

15 for the period ending June 30, 2023, upwards by about

16 approximately $39 million, correct?

17 A      That's not correct, actually.

18        So we had a reserve for Karma as of March 31st, a small

19 reserve, and we increased it as of June 30th to reflect,

20 basically, the settlement.

21 Q      The company reports an aggregate reserve, correct?  A

22 single figure covering all litigation claims?

23 A      Correct.

24 Q      And so that aggregate reserve increased from

25 approximately $36 million to $75 million as of the period

1   ending June 30th, 2023, correct?

2   A     Correct.

3   Q     Okay.  Again, the company filed for bankruptcy on

4   June 27th, 2023, correct?

5   A     Yeah, the point I'm making is there were some

6   (indiscernible) and takes.  It was not all Karma.

7   Q     That's fair, Mr. Ninivaggi, but you agree that that is

8   the degree to which the reserve moved in the period ending

9   June 30th?

10  A     Correct.  Correct.

11  Q     And the public disclosure for the period ending

12  June 30th, 2023, was filed after the resolution of the Karma

13  action, correct?

14  A     Correct.

15  Q     The company has been in settlement discussions with the

16  securities plaintiffs, correct?

17  A     Correct.

18  Q     And you'd agree that there's a settlement framework in

19  place with those groups?

20  A     No.  We have worked for the better part of the last six

21  or eight months to work out a settlement.  We thought we were

22  within range, but we were never able to finalize it.

23  Q     But substantial offers have been made, correct?

24  A     Offers have been made, but we haven't been able to

25  finalize it.

1  Q      And to be clear, Mr. Ninivaggi, I don't mean

2  substantial in terms of amount, but substantial in terms of

3  the progress that's been made towards a resolution?

4  A      Well, it's not resolved until it's resolved.  There's

5  still an outstanding, a fairly significant outstanding issue.

6  Q      Now, the company has also been in settlement

7  discussions with the SEC, correct?

8  A      Correct.

9  Q      And it received a settlement offer from the SEC; is

10 that right?

11 A      That is correct.

12 Q      And that offer came about four to five months agree; is

13 that right?

14 A      You know, it may have been.  I went -- I meant to go

15 back and look.  It may have been five or six months ago, but

16 in that time frame.

17 Q      Yeah.  So more than four months ago, right?

18 A      Correct.

19 Q      And the company hasn't responded to that offer yet,

20 right?

21 A      We've had discussions with the SEC, but we have not

22 formally countered, no.

23 Q      And that offer included the possibility of an offset of

24 any settlement with the SEC by amounts paid to resolve the

25 security cases?

1  A      No, that may have been a confusion in the deposition.

2         The indication from the SEC is that they would

3  entertain a counter, okay; of course, I have no idea how they

4  would respond to a counter.  And that there might be some

5  credit for amounts that we contributed to the securities

6  litigation, but by no means, like a dollar-for-dollar credit.

7         But, frankly, what the SEC does is what the SEC does.

8  We don't know.

9  Q     But they haven't ruled out the ability of crediting

10  settlement amounts paid to the securities claimants against

11  any settlements with the SEC?

12  A     Maybe some portion is kind of the indication we

13  received, but again, there was no formal agreement or

14  proposal on that point.

15  Q     And then currently, all the securities and derivative

16  cases are stayed, correct?

17  A      Well, the Delaware class action is not.

18  Q      But the other --

19  A      The Ohio securities litigation is stayed, pending the

20  motion to dismiss, so are the derivative claims.  But we

21  have, as I mentioned, incurred a decent amount of costs in

22  settlement negotiations.

23  Q      Apart from the Delaware class action where the company

24  is not a party, the cases are stayed pending a ruling in the

25  Ohio securities case, correct?

1  A     Correct.

2        Just one thing to clarify on the SEC action.  It's also

3  possible that the SEC will take enforcement action against

4  individuals.  We would also potentially have indemnification

5  obligations.

6  Q     Yeah, but there's been no indication that that's

7  actually going to happen, has there?

8              THE WITNESS:  Jason, I don't know --

9              MR. ZAKIA:  Your Honor, at this point, I'm not

10 quite sure whether or not what the witness is going to refer

11 to as confidential or not, and so in this public setting, I

12 prefer that he not go there.

13             MR. WHALEN:  And, Your Honor, if I may, briefly?

14             I don't know that we, Foxconn, care so much, but

15 if Mr. Ninivaggi is going to speak extemporaneously on other

16 matters, I mean, we want to explore them.  I mean, it could

17 have been avoided if we didn't go back to (indiscernible).

18             THE COURT:  Is it really relevant?

19             MR. WHALEN:  I don't know that it is.  If Your

20 Honor doesn't think it is, I don't think we think it is.

21             THE COURT:  All right.  Move on, then.

22             MR. WHALEN:  Okay.  Will do.

23 BY MR. WHALEN:

24 Q     The decision that -- in the Ohio securities case that

25 the other cases are awaiting is a decision on a motion to

1  dismiss, correct?

2  A     Correct.

3  Q     And that's been fully briefed and pending since 2022,

4  right?

5  A     Correct.

6  Q     One last time, I think, Mr. Ninivaggi, we discussed at

7  your deposition that prepetition, the debtors had engaged in

8  a number of cost-cutting measures, correct?

9  A     Correct.

10 Q     This included limiting protection of the Endurance,

11 right?

12 A     Correct.

13 Q     And you ramped down R&D and engineering costs, right?

14 A     Correct.

15 Q     And, again, prepetition, you reined in legal costs and

16 expenses?

17 A     As much as we could, yes.

18 Q     And you reduced headcount?

19 A     Correct.

20 Q     You agree that those could be -- could have been and

21 more implemented irrespective of bankruptcy filing?

22 A     Many of those actions were -- predated the bankruptcy

23 filing.  Some actions, you know, not so much.  So, for

24 example, indemnification obligations, trade claims, things

25 like that were impacted by the bankruptcy filing.

1  Q    But the ones that we just discussed, which you

2  identified as the material items in your deposition, those

3  could have and were implemented, irrespective of the

4  bankruptcy filing?

5  A    I said those were significant items; I didn't say there

6  weren't others.

7  Q    Yeah, but again, focusing on those significant items --

8  A    Yeah, I agree.

9  Q    Yeah.  You agree that they could have been and were

10 implemented irrespective of the filing?

11 A    Correct.

12 Q    And the one exception there is legal spend, which you

13 admit has increased for the company due to the bankruptcy,

14 right?

15 A    There have been increased, yeah, obviously, bankruptcy-

16 related costs.

17 Q    Your testimony was that legal spend has gone up because

18 of the bankruptcy, right?

19 A    Total legal spend?  Yeah, it has.

20         MR. WHALEN:  Nothing further at this point, Your

21 Honor.  I'll pass the witness.

22         MR. ZAKIA:  Thank you.

23         Your Honor, Jason Zakia for the debtors.  May I

24 proceed?

25         THE COURT:  You may.

1        MR. ZAKIA:  Thanks.

2                      CROSS-EXAMINATION

3  BY MR. ZAKIA:

4  Q    Okay.  Before we get to most of the questions, I don't

5  know if Judge Walrath had the same thought pop into her head

6  that I did, but before we start, we'll talk more about this

7  with Mr. Hightower, but what's BOM cost mean?

8  A    Bill of materials cost.  It's basically the direct

9  production costs for a vehicle.

10  Q    Okay.  Thank you.

11        Now, Mr. Ninivaggi, did the company's business model

12  change following your joining the company as, originally, CEO

13  and chairman?

14  A    Yes, we went from a vertically integrated model we had

15  discussed earlier to a model based more on partnerships and

16  on Foxconn, in particular.  So, we went from developing and

17  sourcing components for manufacturing and selling vehicles on

18  our own to doing that in close collaboration with Foxconn.

19  Q    And why did the company decide to make that change to

20  its business model?

21  A    We were too small a company.  I mean, being an auto

22  company requires a ton of capital and we didn't feel we could

23  raise the capital necessary to do that as a vertically

24  integrated company.  And Foxconn brought, at least we

25  thought, a significant capability, supply chain capabilities,

1  component capabilities, manufacturing expertise.  So we

2  thought the combination of our engineering and product

3  development, together with their supply chain and

4  manufacturing expertise would be a great combination.

5  Q     And during and that following this change to the

6  business model, did the company face financial challenges?

7  A     Yes.

8  Q     Can you explain to the Court what those financial

9  challenges were, please.

10  A     So, the whole current management team joined in the

11  latter half of 2021.  By then, the company had a flood of

12  lawsuits and had been impacted by a short seller report.  Our

13  stock price was down very significantly, so our financial

14  alternatives were limited.

15       Before I joined, we had a going-concern opinion and we

16  were trying to dig ourselves out of that hole from the time I

17  joined the company.

18  Q     Now, during the time the company was pivoting its

19  business model, was it attempting to raise capital?

20  A     It was.  So the business model itself was less capital-

21  intensive, so it lessened what we would need to raise.  And

22  our hope was that investors would see the strength and value

23  of the partnership and it would be easier to raise money from

24  both, traditional financing sources, as well as strategic

25  partners who might offer some business synergies.

1  Q      And did the company retain an investment banker to

2  assist in this process?

3  A      We did, Jefferies.

4  Q      And what was Jefferies' mandate at that point when they

5  were originally hired?

6  A      It was a broad mandate from the beginning.  We didn't

7  know exactly, you know, the path of these partnerships and

8  exactly how the Foxconn transactions would play out, so I'd

9  say we gave them a broad mandate to look for financing and

10 strategic partner alternatives since they've been involved

11 with the business model.

12 Q      Now, Mr. Ninivaggi, did the Jefferies mandate at that

13 time include selling the company?

14 A      No.

15 Q      Okay.  Could you explain why not.

16 A      We weren't interested in selling the company.  We were

17 actually focused on this collaboration with Foxconn and

18 improving the value of that business model.  Frankly, trying

19 to sell the company at the time without an established and

20 credible business model wouldn't have been fruitful.

21 Q      Now, was the company able to raise any money during

22 this period?

23 A      We raised money through equity issuances and through

24 Foxconn investments, but we did not raise money from

25 traditional financing sources, private financing sources.

1  Q      And why was that?

2  A      Again, I mentioned it with Mr. Whalen, on the

3  Endurance, we had a chicken-and-egg issue, and on the new

4  vehicle program with Foxconn, a number of investors thought

5  it was promising, but they wanted to see the program, the

6  details before investing in it.  So we just needed to do more

7  work before we could go out and raise money to run that

8  program.

9  Q     Now, Mr. Ninivaggi, I'd like to shift gears a little

10 bit and talk about the months leading up to the Chapter 11

11 filing.  What, if anything, happened to cause you and the

12 Board to consider filing for Chapter 11?

13 A      I mean, there were several factors.  One is the

14 business model with Foxconn appeared to be broken.  We got to

15 a point by May or June that we really didn't they we could

16 repair the damage that had been done with the Foxconn

17 business model, although, we had hoped to the bitter end to

18 do so.

19      We also had the litigation.  And while we worked very,

20 very hard to try to settle the litigation and the SEC

21 investigation, we hadn't made enough progress and our cash

22 balance was continuing to erode.  So, while we had a

23 significant enough cash balance to continue, we had fairly

24 significant contingent liabilities, legal expenses, core

25 operating costs.  Even after we cut costs, that, you know,

1  would diminish that cash balance.

2  Q     Now, sir, could you please explain for us how the

3  determination that the business model was broken related to

4  the decision to file for Chapter 11.

5  A     Well, we had sort of gone all in with this Foxconn-

6  dependent strategy and we, to be fair, we had had highs and

7  lows with Foxconn.  I was confident in March, April earlier

8  this year that we could patch things back up and get to a

9  consensual resolution, but after Foxconn made their initial

10 proposal to buy the company and then essentially went silent,

11 we had a dispute over a NASDAQ compliance issue.  Foxconn

12 threaten to terminate the agreement.  They later acknowledged

13 that they had no ability, no right to terminate the

14 agreement, but only after we had to go public and disclose

15 the termination threat to shareholders.  So that started, you

16 know, created a significant concern, almost a downward spiral

17 with our shareholder base.

18     And then once we cured the NASDAQ compliance issue,

19 Foxconn raised another issue relating to our reverse stock

20 split.  That also gave them the basis for not closing.  So --

21 and all those disputes were being played out publicly and at

22 that point, customers started to pull out, employees started

23 to quit, potential OEM partners wanted out.  So it just sort

24 of destroyed the whole premise of the business strategy in

25 our view.

1  Q      Now, when did the company take the decision to file for

2  Chapter 11?

3  A      Not to the end.  We formally approved the filing, I

4  think, on a June 25th meeting after we had received the

5  Foxconn term sheet and I think, you know, we filed on

6  June 27th.

7  Q      Now, I'll get to the term sheet in just a second.  I

8  just want to be clear.  You explained to the Court the

9  business model and the inability to implement the business

10  model.

11        Were there other factors that drove the company's

12  decision to file for bankruptcy?

13  A      Well, I would say the business model meant the only

14  real way to realize value from the assets was to have an

15  asset sale.  If we couldn't operate the assets on our own and

16  our business model was not viable, then we wanted to sell

17  assets and we thought the bankruptcy would facilitate that.

18        Liquidating all the claims, all the various litigation

19  claims, again, we had tried to do it out of court, but we

20  just couldn't get there.  We couldn't settle any of them.  I

21  do think, but we'll never know for sure, but, for example,

22  filing, I think, did help facilitate the Karma settlement

23  and, hopefully, it has the same effect on some of the other

24  claims.

25        And then, we're trying to balance the costs of

1   bankruptcy, including the additional restructuring -- you

2   know, the bankruptcy-related costs against the benefits of

3   bankruptcy, particularly, speed; the ability to resolve

4   claims and make distributions, maximize value to stakeholders

5   quickly.  And we're trying to avoid the situation dragging

6   out any longer and continuing to burn cash.

7        The new vehicle program, again, with Foxconn that we

8   would raise money around, basically, was not progress at all.

9   We had delivered the initial set of engineering pre-

10  development work to Foxconn in March and there was no

11  feedback, no meetings, no follow-up for three months after

12  that.

13  Q    Now, I think you mentioned a moment ago when you were

14  asked during your direct examination about a proposal that

15  Foxconn made to purchase the company on the eve of

16  bankruptcy.

17        Do you recall that testimony?

18  A    I do.

19  Q    Did the Board consider that proposal before making the

20  decision to file for bankruptcy?

21  A    It did.

22  Q    And when was the conclusion?

23  A    The conclusion was, essentially, that we didn't have

24  much confidence they would actually follow through on it.  We

25  had issues with the terms, to some extent, but it was really:

1   Would they follow through?

2       I had had conversations with Mr. Hsiao before Foxconn

3   delivered the proposal.  We were trying to settle it to the

4   bitter end.  And I said, Just, it has to have some teeth in

5   it.  There has to be some binding element because this has

6   just dragged on way too long.

7       At that point, we had been in sort of discussions

8   regarding a consensual resolution for nearly three months and

9   the proposal came in and it was viewed as highly conditional.

10  It also, as you mentioned, envisioned Chapter 11 in any

11  event, so we thought if Foxconn were interested in

12  participating in a sale process, it could do so without

13  necessarily needing to be the stalking horse bidder on day

14  one.

15  Q    And when you say, "highly conditional," what are you

16  referring to?

17  A    Well, it has a broad due diligence condition, which was

18  a red flag for us, because nobody knew the company better

19  than Foxconn, not only the Endurance side, but all the

20  materials, all the work we had done on the new vehicle

21  program.  So the fact that they felt they could do 30 days of

22  diligence on a business plan that they were part of just

23  struck us as potentially a delay tactic or they're not

24  serious.

25  Q    Now, you testified a moment ago that one of the things

1  that you've been able to accomplish in the Chapter 11 was the

2  Karma settlement.  Following the Karma settlement, is there

3  more work that needs to be done?

4  A    Sure.  I mean, the securities litigation is very

5  significant.  We'd like to settle that and, obviously, the

6  SEC claim.  It's all related.

7       Our view is that it might be easier to settle the SEC

8  claim after we settle the securities litigation.  But it's

9  really important that we get that done.

10 Q    And what's the current status of the sale process?

11 A    It's ongoing, as I think I mentioned.  The bid deadline

12 is September 8th and it's continuing.

13 Q    And could you describe for the Court what you believe

14 the consequences for the company would be if these Chapter 11

15 cases were to be dismissed today?

16 A    Yes.  I think the sales process would fall apart.  The

17 litigation would continue to be difficult to settle.  We'd

18 continue to burn cash.  Ultimately, we would, you know,

19 operate until we -- our cash balance eroded even further.  So

20 I don't think it would be a good outcome.

21        MR. WHALEN:  Your Honor, I'd like to object; move

22 to strike.  It's speculation with respect to what happened

23 with the sale process.  He's not the one attempting to sell

24 these assets.

25        THE COURT:  I'll overrule.  I think he's qualified

1  to answer that.

2           MR. ZAKIA:  On that note, Your Honor, I have no

3  further questions at this time.

4           THE COURT:  Any recross or redirect?

5           MR. WHALEN:  It's one of those two, but yes, Your

6  Honor.

7           MR. ZAKIA:  Hostile redirect.

8           THE COURT:  Thank you.

9       (Laughter)

10          MR. WHALEN:  It wouldn't be hostile with

11 Mr. Ninivaggi.

12      (Laughter)

13                    REDIRECT EXAMINATION

14 BY MR. WHALEN:

15 Q    Mr. Ninivaggi, the company entered bankruptcy with

16 $136 million in cash, correct?

17 A    Correct.

18 Q    And, also, you weren't able to identify a single signed

19 agreement that was broken in the spring of 2023 by virtue of

20 what you allege was Foxconn's misconduct, correct?

21          MR. ZAKIA:  Your Honor, now I object.  I feel like

22 that directly goes to the adversary that we're going to try

23 at a later time.

24          THE COURT:  Well, and it also calls for a legal

25 conclusion, I think, so I'll sustain the objection.

1              MR. WHALEN:  All right.  We'll move on, Your

2    Honor.  I'm just trying to address what came up before.

3    BY MR. WHALEN:

4    Q     You -- Mr. Ninivaggi, you agree with me that, well,

5    take a step back.

6          The Karma case was set to go to trial in the spring of

7    2023, before being delayed to September, correct?

8    A     Correct.

9    Q     And you agree with me that the company would not have

10   filed for bankruptcy in the spring just to avoid going to

11   trial with Karma, right?

12   A     That's correct.

13   Q     Okay.  I want to revisit the Foxconn proposal and just

14   touch on it.

15         Briefly, we discussed the economics of it:  30 million

16   in preferred and then the $47 million cash payment, correct?

17   A     Correct.

18   Q     And you would agree with me that absent any other

19   constraints on capital from unsecured creditors or secured

20   creditors, that would represent a total of $77 million in new

21   money for distribution to common equity, correct?

22   A     Correct.  Correct.

23             MR. WHALEN:  Nothing further, Your Honor.

24             THE COURT:  All right.  Thank you.

25             Anything further, Mr. Zakia?

1          MR. ZAKIA:  No, Your Honor.

2          THE COURT:  All right.  Thank you, Mr. Ninivaggi.

3          You're excused.

4          THE WITNESS:  Thank you, Judge Walrath.

5     (Witness excused)

6          MR. WHALEN:  Your Honor, I will defer to your

7   preference for cadence and whether the Court needs a break,

8   but otherwise, we can proceed with Mr. Hightower, who should

9   be the second and final witness.

10          THE COURT:  How long do you think you'll be with

11   Mr. Hightower?

12          MR. WHALEN:  Hard to predict, but I will be bold

13   and attempt to plead for Mr. Zakia and say I think we'll both

14   be shorter with Mr. Hightower, but I'm not sure.

15          THE COURT:  All right.  Well, let's proceed with

16   him and then maybe -- unless anybody else wants a break now?

17     (No verbal response)

18          THE COURT:  Let's proceed with Mr. Hightower and

19   I'll ask the clerk to swear him in.

20          THE CLERK:  Please raise your right hand.

21      EDWARD T. HIGHTOWER, MOVANT'S WITNESS, AFFIRMED

22          THE WITNESS:  I do.

23          THE CLERK:  Please state your full name and spell

24   your last name for the record.

25          THE WITNESS:  Edward, middle initial T.,

1   Hightower, H-i-g-h-t-o-w-e-r.

2          THE COURT:  All right.  You may proceed,

3   Mr. Whalen.

4          MR. WHALEN:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6   BY MR. WHALEN:

7   Q     Good morning, just barely, Mr. Hightower.

8   A     Good morning, Mr. Whalen.

9   Q     Mr. Hightower, you are the president and CEO of the

10  debtors, correct?

11  A     Yes, I am.

12  Q     And you joined the company as president in November

13  of 2021; is that right?

14  A     That's correct.

15  Q     You then ascended to the CEO position in July of 2022,

16  right?

17  A     Correct.

18  Q     And you also sit on the company's Board of Directors?

19  A     I do.

20  Q     And your job as CEO is to lead the day-to-day business

21  operations of the company, right?

22  A     Yes.

23  Q     Were you in court for Mr. Ninivaggi's testimony,

24  Mr. Hightower?

25  A     Yes.

1  Q     Okay.  I'll briefly recover some of the ground that we

2  covered with Mr. Ninivaggi, but I'll keep it shorter.

3  Lordstown was founded as a vertically integrated OEM, right?

4  A     (Inaudible.)

5            THE COURT:  Could you keep your voice up,

6  Mr. Hightower.

7            THE WITNESS:  Oh, I apologize.

8            Yes, it was.

9  BY MR. WHALEN:

10 Q     Thank you.  And in or around late 2021 and into 2022,

11 it pivoted to what you would describe as an asset-light

12 business model, correct?

13 A     That's correct.

14 Q     And the decision to undergo that pivot occurred prior

15 to you joining the company, right?

16 A     Just prior, yes.

17 Q     And one of the consequences of this pivot to an asset-

18 light model was that LMC was able to reduce its fixed costs,

19 correct?

20 A     Yes, the sale of the plant would reduce our fixed

21 costs.

22 Q     And that was -- the purpose of that, among other

23 initiatives, was to help scale the production of the

24 Endurance, right?

25 A     It was a small portion of that, but it was in that

1  direction.  A small OEM like us, owning a production facility

2  that could build approximately 300,000 per year was not

3  necessarily the best industrial logic, so we sought that

4  partnership with Foxconn and, yes, it would be -- it would

5  help us reduce the fixed costs, but other actions would be

6  needed to fully achieve scale (indiscernible).

7  Q    Right.  So, again, it was one of a bunch of other

8  factors that impacted LMC's ability to scale production of

9  the Endurance, right?

10  A    It was one step towards that, correct.

11  Q    And another key component of scaling the Endurance was

12  reducing the cost of production of the Endurance, correct?

13  A    That's correct.

14  Q    And Mr. Zakia mentioned BOM, or bill of materials, and

15  you understand that that means the cost of the materials that

16  goes into the vehicle?

17  A    Yes.  Yeah, bill of materials is another way to

18  describe the list of parts that go into a vehicle, yes.

19  Q    So when you look at all of the components that go into

20  the COGS, or the cost of goods sold, for the vehicle, that

21  include some other items beyond the bill of materials, right?

22  A    Yes, there's labor costs.  There's the (indiscernible)

23  costs, Your Honor, as an example, in addition to the cost of

24  the parts themselves.

25  Q    At the time that LMC sold the plant to Foxconn, the

1  cost to produce a single Endurance was in excess of $200,000,

2  correct?

3  A    Yes.

4  Q    In fact, that cost of production has not materially

5  deviated to this day, right?

6  A    It has come down a bit, but it is still materially

7  higher than our selling price, as is typical for a brand new

8  platform with lots of new technology and a new electric

9  vehicle comes down to market.

10  Q    But the BOM alone, the bill of materials, alone, is

11  $186,000, right?

12  A    Today, that's our -- that is our -- that is our current

13  cost to date, yes.

14  Q    And that doesn't include other items that are also put

15  into COGS, such as tariff costs, freight costs, et cetera,

16  right?

17  A    Right.

18  Q    Now, the LMC sold the manufacturing plant to Foxconn

19  for an all-in consideration of approximately $260 million; is

20  that right?

21  A    That's approximately correct, yes.

22  Q    And LMC retained two of its production lines that were

23  in that plant; those didn't convey to Foxconn, right?

24  A    The two lines I believe you're referring to,

25  Mr. Whalen, are the battery module pack line and the hub

1  motor line, which Lordstown installed into the plant.  We

2  started installing them before selling the plant to Foxconn

3  and completed the installation of the battery pack line and

4  the hub motor line before and during the launch of the

5  production (indiscernible) of the Endurance pickup.  And,

6  yes, we did retain ownership -- we do retain ownership of

7  that.

8  Q    Mr. Hightower, I'm having a little difficulty with your

9  audio.  I don't know if others are, as well.

10      If it's fine for everyone else, I can continue.  I just

11  wanted to --

12          THE COURT:  Just keep your voice up.

13          THE WITNESS:  Okay.  I will.

14  BY MR. WHALEN:

15  Q    And those two lines that you just referenced,

16  Mr. Hightower, are part of the assets that Lordstown is

17  attempting to sell in this proceeding?

18  A    Yeah, that's correct.

19  Q    And Lordstown's gain on selling the plant asset to

20  Foxconn is in excess of $200 million, correct?

21  A    Well, I didn't see it as a gain because it was

22  additional cash that went into completing the development,

23  the execution, the testing, and the launch of the Endurance,

24  which would benefit Lordstown and the Foxconn

25  (indiscernible).

1  Q     I think we went over that nuance at your deposition,

2  Mr. Hightower, and you agreed with me that the recognized

3  gain on the asset was in excess of $200 million; is that

4  correct?

5  A     Yes, I think where we disconnected, though, was on the

6  term "gain."  It was not like a cash capital gain, if you

7  will.  It went directly into completing the product that is

8  now on the market.

9  Q     Mr. Hightower, a key component of scaling the Endurance

10  is the acquisition of hard tooling, correct?

11  A     Yes, that is one of the key components.

12  Q     And you heard us discuss some of that with

13  Mr. Ninivaggi, right?

14  A     Yes, I did.

15  Q     And the company actually began deferring hard tooling

16  investments all the way back in 2021, correct?

17  A     We have $130 million in hard tools for the Endurance

18  and I believe some of that would still have been purchased

19  in 2021 and into 2022.  As I recall, we didn't really start

20  curtailing the purchase of hard tools until later into the

21  year of 2022 as we got closer to the production launch.

22  Q     Mr. Hightower, you told me on Friday when we were

23  together that Lordstown began deferring some of its hard

24  tooling purchases as early as 2021.

25       Do you have any reason to disagree with what you told

1 | me on Friday?

2 | A     So, what I -- I don't believe we looked at a complete

3 | schedule of why we bought -- when we bought each portion of

4 | hard tooling.  So if that was deferred early in 2021, it's

5 | certainly possible, because as we talked about on Friday,

6 | about two-thirds of our tooling is hard tools and about --

7 | excuse me -- about two-thirds of our tooling is soft tools

8 | and about a third part of our tooling is hard tools.

9 |      So, as most of the truck is built off of hard tools,

10 | yes, those decisions would have had to have been made

11 | in 2021.  But in terms of reducing the amount that we were

12 | spending on hard tools, I don't believe we backed off on that

13 | until later in the year.  But what we would have to do is

14 | look at a schedule for each tool, because, you know, there

15 | are about twelve or 1300 parts in the bill of materials in

16 | the Endurance and then some of those are subsystems and

17 | subparts, so it expands much further.

18 |      And each of those tools have a different build

19 | schedule.  Not attempting to, you know, get too

20 | (indiscernible), but since we built so much of the vehicle on

21 | soft tools, you're absolutely correct, some of those

22 | decisions would have had to have been made in 2021.  But our

23 | deciding to -- our decision to conserve cash by not spending

24 | more on hard tools, I believe that went further into 2022.

25 | Q     Yeah, and, in fact, in 2022, you made a public

1  statement to the market that LMC would no longer invest in

2  hard tools, subject to it finding an OEM partner to help make

3  that capital investment, correct?

4  A    Yes, I believe how we explained it, Mr. Whalen, is that

5  we were going to build a limited quantity of the Endurance

6  and thought it was important to complete the vehicle, launch

7  it, and get it into production and into market.  But it went

8  public that our BOM cost was materially higher than our

9  selling price, so we felt that we needed to bring on an OEM

10 partner, another OEM that could (indiscernible) a version of

11 the Endurance for and then their volume for that version of

12 the Endurance plus our volume would spread that hard tooling,

13 that two hundred to $250 million hard tooling investment

14 across a number, a larger number and make more business

15 rationale to do that.  So, that's what we did in mid-2022

16 (indiscernible).

17 Q    All right.  So, to clarify, in the middle of 2022, you

18 announced to the market that if you couldn't find an OEM

19 partner, you weren't going to invest anymore in hard tooling,

20 correct?

21 A    I don't believe we raised it as we weren't going to

22 invest anymore in hard tooling; what we said was we needed to

23 invest in additional hard tooling and we needed to raise the

24 two hundred to $250 million in order to do that.  I don't

25 think we made the hard commitment that we will not spend any

1  more on hard tooling.  What I said was, in order to bring

2  the BOM costs and in order to scale the Endurance, we would

3  need to make that investment and that investment would make

4  the most sense with the volume of another OEM, plus Lordstown

5  (indiscernible).

6  Q    Well, but just to move on from this, Mr. Hightower,

7  let's just simplify it.  You weren't going to scale the

8  Endurance unless you found an OEM partner, right?

9  A    That's correct.  That's correct.  We thought it

10 important to bring the vehicle to market, but given the cost

11 being higher than the selling price, we thought it would make

12 more sense to bring the cost down before scaling it and we

13 were actually going to pivot the new vehicle program that we

14 were developing in collaboration with Foxconn, and that would

15 be the core of our business, rather than the Endurance.

16 Q    You actually made this decision.  So the decision was

17 announced publicly in the middle of 2022, but you told me on

18 Friday that the company made this decision in early 2022,

19 correct?

20 A    Could you repeat the question, please?

21 Q    You announced publicly, we've established, that the

22 company was not going to scale without an OEM partner, but

23 that decision was made internally in early 2022, correct?

24 A    I believe that's correct, yes.

25 Q    Now, we just explored this with Mr. Ninivaggi, but just

1   to establish it here, the company was never able to raise the

2   capital necessary to make the significant hard tooling

3   investments it needed to make to scale the production, right?

4   A     Well, we saw that capital raise as linked to the

5   pursuit of an OEM partner. We saw that if an OEM partner

6   wanted us to do a version of the Endurance for them, that

7   would be one of the sources for the capital and

8   justifications of the capital spend on hard tooling and those

9   discussions are still ongoing. The fact that the vehicle is

10   now in marketplace and customers have it, we think is a

11   positive sign for it, but we continued with those actions up

12   until the filing. But we did not have any -- we had several

13   discussions -- excuse me -- as Mr. Ninivaggi said, but we did

14   not reach an agreement with any OEM to date.

15   Q     And now you're aware of the investment agreement

16   between Foxconn and LMC, correct?

17   A     Yes, I am.

18   Q     And that was signed in November of 2022. We won't

19   revisit old economics, but you agree, generally, with how it

20   was described in Mr. Ninivaggi's testimony; is that fair?

21   A     Yes.

22   Q     And you are aware that in the first half of 2023,

23   Foxconn made an offer to LMC to acquire all or substantially

24   all of its assets, correct?

25   A     I'm aware that the -- there was an offer made shortly

1  before our filing, but it was not binding and it had several

2  conditions and as a Board, we did not see it as actionable.

3  Q     You're aware of that offer, correct?

4  A     Yes.

5  Q     And you've just (indiscernible), and as you told me

6  last Friday, it came on the eve of debtors' bankruptcy

7  filing, correct?

8  A     Yes.

9  Q     And as part of LMC's bankruptcy filing, you filed a

10 lawsuit the exact same day against Foxconn, right?

11 A     Yes.

12 Q     And, Mr. Hightower, if you don't mind speaking up, I --

13 A     Yes.  Yes.

14 Q     -- want the --

15 A     Yes.

16 Q     And you approved LMC's bankruptcy filing before you

17 ever received Foxconn's offer, correct?

18 A     As I mention in our -- the deposition on Friday,

19 Mr. Whalen, we had several meetings leading up to the filing

20 and the eve of the filing with the Board and we -- you know,

21 the filing I believe occurred on a Monday and we had several

22 meetings the days leading up to it and, at one point -- at

23 some point, the Foxconn -- late Foxconn offer came in.  It

24 was after we had decided that we should make preparations to

25 file and -- but we did review the offer once it came in.

1    So, yes, we were preparing to file before it came in,

2  but once we reviewed that offer, we decided not to change

3  course because, as I mentioned in your last question, in

4  response to your last question, we did not see that as an

5  actual or serious offer from Foxconn.

6  Q    But, more importantly, Mr. Hightower, it's fair to say

7  that the decision to file for bankruptcy and

8  contemporaneously to Foxconn was made before the company

9  received the June 22nd, 2022 offer from Foxconn?

10         MR. ZAKIA:  Objection, Your Honor.  Asked and

11  answered.

12         THE COURT:  Overruled.  You can answer.

13         THE WITNESS:  I would say discussions and

14  preparations, yes, they did occur before receiving the offer.

15  But the decision to proceed to filing and actually execute

16  the file, as I recall, and as I said, there were several

17  meetings leading up to the filing, as I recall, that decision

18  was taken after we received the final offer.

19         The conditional ones were pending receiving

20  something from Foxconn that would suggest we should change

21  direction.

22         The -- what you referred to as an offer, when that

23  came in, we had another discussion and approved going forward

24  with the discussion -- with bankruptcy and lawsuit filing,

25  which we were already preparing for, after that.

1  BY MR. WHALEN:

2  Q    Mr. Hightower, I'm not sure that I heard a yes or no to

3  the question of -- that I asked.

4       So, is it fair to say the decision to file for

5  bankruptcy and contemporaneously sue Foxconn was made before

6  the company received the June 22nd, 2022 offer from Foxconn?

7  Yes or no?

8  A    I would say yes, it was made before that, subject to

9  any change in position from Foxconn which would make us re-

10  visit that and perhaps hold off on making that filing.

11            MR. WHALEN:  Nothing further, Your Honor.

12            THE COURT:  All right.  Mr. Zakia?

13                      CROSS-EXAMINATION

14  BY MR. ZAKIA:

15  Q    So, Mr. Hightower, what's the Endurance?

16  A    The Endurance is a full-size battery electric pickup

17  truck.  It's one of the first all-electric pickup trucks on

18  the market.  It's the first vehicle that was developed --

19  developed, engineered, tested, fully-certified and

20  homologated by Lordstown Motors and launched Lordstown

21  Motors.  It's something the team is very proud of and we were

22  actually a nominee, semi-finalist, and finalist for North

23  American Truck-of-the-Year for 2023, earlier this year.

24  Q    What does homologated mean?

25  A    I apologize.  I should've defined that.  Homologation

1    is part of the process where you receive all of the

2    certifications that the vehicle meets all of the local

3    requirements to be sold in a market.

4        So there are requirements around lighting, requirements

5    around safety, requirements around emissions, if you're in an

6    internal combustion engine vehicle, all of those are part of

7    the homologation process and we're proud that, you know,

8    we're one of the few OEMs, of the new EPOEMs to actually have

9    completed that and launch the vehicle.

10   Q    And could you describe for the Court the work that the

11   company put into the Endurance project?

12   A    Yes.  Our team was responsible for all of the design,

13   development, engineering, testing, the supplier selection and

14   sourcing, certification and homologation, the production

15   launch of the vehicle in the plant, and the sales, marking,

16   and service of those vehicles.

17       So we're the OEM -- we're the original equipment

18   manufacturer for the Endurance.

19   Q    Now, we had some talk about this in your direct

20   testimony.  Did the company ever get to the point where the

21   costs, the BOM costs of the Endurance were lower than the

22   selling price?

23   A    No.

24   Q    And why not?

25   A    For a couple of reasons.  As the new leadership team,

1 Mr. Ninivaggi, myself, and the others who joined the company

2 in the latter part of 2021, the BOM costs was materially

3 higher than the selling price.  We believe that it was

4 primarily due to a desire to get to market quickly with the

5 Endurance, which drove some -- a higher cost supply chain or

6 supplier selection, if you will, some higher costs designs,

7 and a greater focus on soft tools, which are more -- you

8 know, less expensive in an investment standpoint, but you

9 often pay a penalty in cost -- material costs.

10       All of those factors contributed to the BOM cost being

11 higher than the selling price.

12 Q    Now, did the company attempt to raise money in order to

13 scale the Endurance?

14 A    Yes we did.  As part of our OEM partner pursuit and

15 capital raising pursuit, that was one of our attempts to

16 raise that money for the hard-tooling and cost-reduction

17 actions which would make scaling the Endurance make more

18 sense, given that the BOM cost was materially higher than the

19 selling price.

20 Q    And what's the -- what is the relationship, if any,

21 between scaling and BOM costs?

22 A    Well, it doesn't make this logic to scale a product

23 when you're -- when it costs significantly more than it does

24 to sell it.  You know, when it costs more to build than to

25 sell, it doesn't necessarily make sense to scale that until

1  you have a path to bring that cost down and that's why we

2  were going to -- you know, but we still saw the benefit in

3  completing the product and launching the product.  We thought

4  it was a strong concept product, a good demonstration of the

5  capability at Lordstown Motors, our engineering team, our

6  product development team.  We thought it was a good

7  demonstration of our work with Foxconn, actually, and that

8  getting the product in the hands of consumers would be a good

9  indication of what our team can do and we're -- you know,

10 we're pleased with the response that we received from

11 customers on the product.

12 Q    Now, what was the outcome of the company's efforts to

13 find financing to scale the Endurance?

14 A    Well, we had several discussions with potential OEMs

15 where a version of the Endurance could've made sense in their

16 product portfolios, especially since it was one of the few

17 full-size pickup trucks and, you know, electric pickups are

18 the most profitable segment in the U.S. and it's the second

19 most popular market segment from a sales line standpoint.

20 But we did not have any firm offers to date.  There was

21 interest, but no firm offers to date.

22 Q    And does that mean that the Endurance project has been

23 a -- platform has been a failure?

24 A    No.  No.  It does not.  The feedback from customers has

25 been positive.  Even the feedback from those who were

1   considering it for a partnership was -- did not point to the

2   significant issues or concerns in the product.  It was -- no,

3   it does not at all mean that it is a failure.

4        Matter of fact, I think it's been a good demonstration

5   of how electric vehicles can reduce ownership costs with

6   the -- in the commercial fleet space and it is a good

7   demonstration of what our elite team was able to do.

8   Q    Now, was the Endurance the only product that the

9   company was developing?

10  A    No.  With the relationship with Foxconn, we were

11  actually planning on doing the early development work on a

12  new platform and multiple additional vehicles for a

13  commercial fleet market.

14       Our plan and a reason for developing the new platform

15  was so that we could develop it more efficiently at the

16  beginning so we wouldn't have the BOM cost issue that the new

17  leadership team, Mr. Ninivaggi and myself, found when we

18  joined the company, when we saw that as an opportunity to

19  build a more scalable vehicle platform on which we could

20  create multiple models and achieve that scale by greater

21  level of parts sharing and greater level of collaboration

22  with Foxconn or -- and collaboration with Foxconn's EV

23  ecosystem so that we could benefit from these EV components

24  that Foxconn weas looking to enter, those businesses they

25  were looking to enter.

1    We could be the OEM that would incorporate those

2  components into our new vehicle platform and use that scale

3  and share them across multiple models so we could share those

4  cost advantages with our customers.

5  Q    And what is the current status of the new vehicle

6  program?

7  A    We completed a fair amount of pre-development work, and

8  that's basically the planning, the engineering, the

9  architectural development, the development of staffing

10  requirements, initial BOM -- SBOM configurations, initial

11  discussions with suppliers.  We completed a fair amount of

12  that work between the fall and spring, fall of 2022 and

13  spring of 2023, but we put that on pause when it became clear

14  that Foxconn was not going to honor their commitment to be in

15  agreement around the new product program.

16         MR. WHALEN:  Your Honor, I'm going to object now

17  as this is now beyond the scope of relevance and getting into

18  the AP issues.  The new vehicle program isn't an asset for

19  sale and the bankruptcy First Day declarant said that they

20  are going to liquidate if they sell or do not sell and

21  they're only trying to sell the Endurance asset.  So I think

22  we're interested in the AP now.

23         THE COURT:  Yeah, Mr. Zakia, are we going far

24  afield?

25         MR. ZAKIA:  Okay.  I'll -- thank you, Your Honor,

1   for the guidance.

2   BY MR. ZAKIA:

3   Q     Could you tell the Court how many employees does the

4   company still employee?

5   A     Today we employ approximately 126 employees.

6   Q     And what is the status of the company's operations?

7   A     We -- we've had a fair number of -- we got a fair

8   number of layoffs since the dispute with Foxconn began in the

9   spring.  However, with these layoffs, we've worked to

10  maintain critical key level -- key areas on the old

11  engineering vehicle subsystems and engineering in each major

12  subsystem of the vehicle.

13       We still have a small team in purchasing, a small team

14  in advance manufacturing, finance, and sales and marketing.

15  We basically maintained our core operations to be able to

16  support the vehicles that are in customers' hands.  If any

17  issues arise, we have the technical capability to address

18  them and then also support the sale of the Endurance program

19  will be as a going concern of assets.

20  Q     When you say sell the company as a going concern, what

21  do you mean by that?

22  A     If I -- I meant to say sell the Endurance program

23  instead of going -- as a going concern, instead of assets.  I

24  meant our preferred buyer would be a buyer who wants the

25  entire program and needs the value of having the completed

1  vehicle program that is in production and in the hands of

2  customers; that it -- and that's what our preference would

3  be.  That's what I meant by that, sir.

4  Q    Now, what does the company have that a buyer night be

5  interested in buying?

6          MR. WHALEN:  Objection, Your Honor.  Calls for

7  speculation as to the interest of buyers.

8          MR. ZAKIA:  Let me rephrase.

9  BY MR. ZAKIA:

10 Q    What does the company have that it's currently trying

11 to sell?

12 A    We have the completed Endurance program and the IP

13 associated with it.  The fact that it is a completed vehicle

14 program and variants of that platform could be created, we

15 also have the hard-tooling assets that we spoke about, and we

16 also have the battery line and the HUB motor line in Ohio and

17 we also really have access to the team that was able to

18 successfully bring the product into production and all of the

19 institutional knowledge and best practices and learnings from

20 that.

21 Q    Now, sir, you are also, I believe you testified, a

22 member of the company's Board of Directors?

23 A    Yes.  Yes I am.

24 Q    And you approved the bankruptcy filing in these cases?

25 A    Yes I did.

1  Q     And could you explain to Judge Walrath why?

2  A     Your Honor, why I approved the process is with Foxconn

3  not fulfilling their commitment to the investor agreement, it

4  really made our pivot and our pivot to an asset-like business

5  model not sustainable because we -- you know, our plan was

6  the new product program to be the core focus of the business

7  and without that investment, that was not sustainable.

8       We needed -- realized we needed to sell our most

9  valuable assets in the most expeditious way and the Chapter

10 11 filing would allow us to do that, especially given that we

11 had the ongoing legal issues, the contingent liabilities, the

12 SEC matters and the derivative claims and the Carmen matter.

13 We saw the Chapter 11 process as a way to pull those together

14 and expeditiously conduct a sale that would be most valuable

15 to our shareholders.

16 Q     Now, there was quite a bit of back and forth on this

17 during your direct examination, but I just want to make sure

18 we're all crystal clear.  At the time you, as a member of the

19 Board of Directors, authorized the company to file these

20 Chapter 11 petitions, were you aware of the communication

21 from Foxconn concerning the -- you know, what it said about a

22 potential transaction to purchase the company?

23 A     Yes.

24 Q     Okay.  And did that communication from Foxconn cause

25 you to -- how did it impact your view as to whether the

1  Chapter 11 filing was in the best interest of these debtors?

2  A    I viewed that the Chapter 11 filing was still in the

3  best interest of the debtor.

4  Q    Why?  Why did that letter cause you to change your

5  mind?

6  A    Oh, no, it did not change my mind.  I thought it was in

7  the best interest before and I thought it continued to be in

8  the best interest of the company, or the debtors, because we

9  didn't see the offer as a -- as practical and, quite frankly,

10  you know, we kept going back and forth and it just

11  -- over the months with Foxconn and it appeared to be just

12  the latest delay tactic and, given the conditions and given

13  the fact that it wasn't binding, we saw it as just an attempt

14  to, you know, further delay the process and they weren't

15  committed and we didn't believe they'd go forward with it.

16           MR. ZAKIA:  Thank you.  No further questions, Your

17  Honor.

18           THE COURT:  Anything further by you, Mr. Whalen?

19           MR. WHALEN:  I think very, very brief, Your Honor.

20           THE COURT:  Okay.

21                    REDIRECT EXAMINATION

22  BY MR. WHALEN:

23  Q    Mr. Hightower, you mentioned that one of the key assets

24  the company is trying to sell is the Endurance program, is

25  that right?

A      Yes.

Q      And you said -- is the word -- a term, fully complete program?

A      Fully homologated, fully certified, and it's been launched into production.

Q      And the company is --

A      And sold to customers and we have a roadmap that would allow us to reduce costs and improve the industrialization which would make it appropriate to scale.

So those would be the next steps that we would recommend and support the new buyer in taking on.  But that was what I was attempting to convey.

Q      In the marketing process, the company has been conveying that it will take approximately an extra $500 million in investment in that Endurance program to achieve an ROI, correct?

A      I believe our management presentation says somewhere between 300 and 500 million, depending on the buyer and what we also convey that -- and that could be done in the approximately 18 months but, you know, having worked on a number of and led a number of vehicle programs in the auto industry, that is considerably less time and considerably less money if a -- versus an OEM doing it alone.

Q      And the company projects to a potential buyer that if they do make that 3 to $500 million investment, it'll take

1  six years to see a return on that -- seven years; I'm sorry,

2  to see a return on that investment, correct?

3  A     I believe that's what we have stated, yes.  Yes.

4  Q     The company has invested approximately $915 million

5  into getting the Endurance just where it is right now, right?

6  A     Right.

7  Q     And the company has only sold the Endurance to five

8  unique purchasers, correct?

9  A     We paused production and stopped -- yes.  We paused

10  production shortly after the dispute became -- shortly after

11  the filing we paused production.  So, yes, it is five unique

12  customers.

13  Q     All right.  Since the Endurance was commercialized, so

14  brought to the commercial market in 2022, you sold less

15  than 40, correct?

16  A     Correct.

17          MR. WHALEN:  Nothing further, Your Honor, other

18  than to say I should've said fewer than 40, but no further

19  questions.

20          THE COURT:  All right.  Thank you.  Anything

21  further, Mr. Zakia?

22          MR. ZAKIA:  One question, Your Honor.

23                          RECROSS-EXAMINATION

24  BY MR. ZAKIA:

25  Q     Mr. Hightower, does the amount of investment for the

1  time to recoup a positive ROI on that investment for the

2  Endurance, is that unusual when compared to other new vehicle

3  programs?

4  A    No it is not unusual.  The amount of investment is not

5  unusual or the time to recoup it.

6           MR. ZAKIA:  Thank you, Your Honor.

7           THE COURT:  All right.  Thank you, Mr. Hightower.

8  You may be excused.

9           THE WITNESS:  Thank you, Your Honor.

10          THE COURT:  Well, how long do the parties think

11 they need for argument?  Excuse me.  I assume the debtor

12 has -- does the debtor have any witnesses, other than the

13 declarations --

14          MR. ZAKIA:  So --

15          THE COURT:  -- that were moved?

16          MR. ZAKIA:  No, Your Honor.  Mr. Finger's

17 declaration has already been admitted into evidence and that

18 was our only additional witness.

19          MR. WHALEN:  Your Honor, briefly on that, I

20 believe you should be -- your chambers should be receiving

21 any minute the declaration of designations of Mr. Finger.

22 Those are combined designations.  They're -- I believe

23 they're fairly limited that will come up in summation, but we

24 would submit those into evidence in lieu of Mr. Finger's live

25 testimony as well.

1          MR. ZAKIA:  And as Mr. Whalen indicated, that

2  includes -- what Your Honor will be receiving includes theirs

3  and our counters as well.

4          THE COURT:  And this is designations of his

5  deposition?

6          MR. WHALEN:  Yes, Your Honor.

7          THE COURT:  All right.  I thought that was the one

8  I couldn't open but do the parties want to take a short break

9  or a longer break to hear argument then?

10          MR. MURPHY:  Your Honor, Matt Murphy, of Paul

11  Hastings, on behalf of the movant, Foxconn.

12          I think we're fine with either.  I think you

13  started to ask how long we will need.  I think that probably

14  depends on how fast or slow I talk.  So maybe pace it about a

15  half-an-hour for close, based upon what we've learned here

16  today.

17          THE COURT:  Mr. Zakia or Mr. Lauria, how long will

18  you be?

19          MR. LAURIA:  Your Honor, I think I probably need

20  about 15 minutes.

21          THE COURT:  All right.  Then why don't we do this?

22  Why don't we take a 15-minute break now and then we'll just

23  go straight ahead into argument?

24          MR. LAURIA:  Great.  Thank you, Your Honor.

25          THE COURT:  All right.  The hearing will remain

1  open but you can all mute yourselves and your videos.

2           All right.  We'll stand adjourned then until

3  about 20 of 1:00.  Thank you.

4        (Recess taken at 12:22 p.m.)

5        (Proceedings resumed at 12:46 p.m.)

6           THE COURT:  All right.  This is Judge Walrath and

7  we're back on the record in the Lordstown matter and I'll

8  hear argument.

9           Mr. Murphy, do you want to go first?

10          MR. MURPHY:  Excellent.  Great.  Thank you, Your

11  Honor.  For the record, Matt Murphy, of Paul Hastings, on

12  behalf of Foxconn.

13          We are here before Your Honor to present our

14  motion to dismiss or convert these Chapter 11 cases.

15          I realize that you are intimately familiar with

16  the legal standards, given your recent Opinion in <u>AIG</u>.  But,

17  for the record, under 1112(b), on request of a party in

18  interest, a court may dismiss or convert a case, whichever is

19  in the best interest of the creditors and the estate, if the

20  movant establishes cause.  As Your Honor knows, 1112(b)(4)

21  provides a non-exhaustive list of what may constitute cause

22  for dismissal or conversion.

23          As set forth in our papers, we believe these cases

24  should be dismissed or converted for two primary reasons.

25  First, the fact that the debtors have failed to demonstrate

1    that they filed their petitions in good faith and for a valid

2    bankruptcy purpose.  Second, the cases should be dismissed or

3    converted under Section 1112(b)(4)(a) because the evidence

4    establishes that there is a substantial and continuing loss

5    being suffered by the debtors and the debtors, by their own

6    admission, have no prospects for rehabilitation.

7             So turning to the good faith requirement, as this

8    Court stated in AIG, a threshold issue in determining a

9    debtor's eligibility to file for bankruptcy is whether it has

10   been filed in good faith.

11            The Third Circuit says, once the issue of good

12   faith is at issue, the burden falls upon the bankruptcy

13   petitioner to establish that the petition was filed in good

14   faith.  Whether it's been satisfied is a fact-intensive

15   inquiry in which the court must examine the totality of the

16   facts and circumstances.  And while not constrained to any

17   particular fact pattern, the Third Circuit, as set forth in

18   Integrated Telecom, focuses primarily on the extent to which

19   a debtor can establish (1) that its petition serves a valid

20   bankruptcy purpose, including by preserving a going concern

21   or maximizing the value of the estate and (2) that the

22   bankruptcy cases were not otherwise filed to obtain a

23   tactical litigation advantage.   So let's jump into those.

24            The valid bankruptcy purpose.  The debtor's

25   arguments on the valid bankruptcy purpose has shifted a bit

1 over time, Your Honor. At the First Day hearing, it was

2 primarily about blaming Foxconn for the company's demise and

3 then a brief mention of Karma and a description of the

4 associated securities litigation. I encourage the Court to

5 read a press release from June 27. It was pretty heavily

6 focused on the complaint against Foxconn.

7 At the Second Day hearing, shortly after we filed

8 our motion to dismiss, it seemed to me that there was an

9 attempt to identify a valid bankruptcy purpose and so the

10 debtor's explained the rationale and identified three key

11 points; the marketing and sale of the assets, which we've

12 talked a lot about, centralizing the claims before a single

13 court, and, of course, Foxconn.

14 Although today's examination, and I would submit

15 that both parties are a little bit guilty of this, but

16 Mr. Zakia certainly seemed intense on refocusing the issue on

17 blaming Foxconn, but let's focus on the marketing and the

18 sale of the assets.

19 First, whether the sale process was conducted pre-

20 petition or post-petition, it was going to be a challenge to

21 find buyers who would want to buy this business. There has

22 been a consistent message in the public filings over the

23 years that LMC was losing significant amounts of money and

24 had, at best, an uncertain future. We referenced the going

25 concern opinion earlier today. Mr. Ninivaggi testified to it

1 and the doubts on the ability for the company to continue is

2 a going concern.

3          These concerns -- they continued to acknowledge

4 these concerns even after the agreements were reached with

5 Foxconn and Foxconn Investments, stating in their 10-Q for

6 the quarter ended March 31st, 2022, that, "Even if the

7 Foxconn transactions are consummated in accordance with the

8 current terms, the company would still need additional

9 funding to execute its 2022 business plan and achieve scaled

10 production of the Endurance."

11          In its Form 10-K for the year ended December 31st,

12 2022, LMC identified that, even with an investment in the

13 much needed hard-tooling, the chances of success were

14 uncertain stating that, "Even if we are successful in

15 developing our high-volume manufacturing capability and

16 processes, in conjunction with Foxconn and then reliably

17 sourcing our component supply, we cannot assure that we will

18 be able to do so in a manner that avoids significant delays

19 and cost overruns, including as a result of the factors

20 beyond our control."

21          The struggles of the cash intensive business were

22 supported in testimony provided by Mr. Ninivaggi and Mr.

23 Hightower today.  They described that they were unable to

24 raise the necessary capital to ensure its long-term

25 existence; hence the going concern opinions.

1    They described the headwinds in capital markets.

2  They described the difficulties for start-ups, the litigation

3  overhang, litigation overhang that negatively impacts the

4  capital rate -- that negatively impacts the capital rate

5  continues to today.

6    It was admitted that the funding -- that funding

7  would be needed above and beyond the amounts in the

8  investment agreement; that we would "definitely need to raise

9  more money."  The point of this is that this business today

10  remains just as capital intensive as it was over the last few

11  years.  And why is so much investment needed?  How does that

12  play into the sale process that we're talking about?  We

13  talked about the bill of materials, or the BOM.

14    Mr. Hightower testified that the bill of

15  materials, or BOM, for the Endurance was over 200,000 in 2001

16  and is now about 186,000.  It sells for -- the Endurance

17  sells for $65,000.  That's approximately three times less

18  than the cost to build.

19    We talked about the tooling, how LMC has soft-

20  tooling and needs hard-tooling; soft-tooling, cheaper, low-

21  volume product, but that's about two-thirds of the tooling

22  that LMC has.  Hard-tooling, more expensive, high volume,

23  longer life cycle.  That's about a third of the tooling.

24    Mr. Hightower testified that they were going to

25  look to bring on an OEM partner to help defray the costs of

1   the acquisition of the hard-tooling to -- and scale the

2   Endurance.  But it's a difficult proposition when you go to a

3   partner and you ask to enter into an agreement to acquire

4   hard-tooling when you're producing -- you sold two cars in

5   2022.  You sold a total of 65, a far cry from the 100,000

6   promised by the end of 2023 in the prior public filings.

7           Mr. Hightower testified that they were not going

8   to be able to scale the Endurance without an OEM partner.

9   Jeffrey has also made clear the difficulty of selling these

10  assets.  After acquiring the LMC assets, a purchaser would

11  look forward to an 18-month plan and an investment of 3 to

12  500 million both in hard-tooling, engineering, and moving

13  production costs.

14          Mr. Ninivaggi testified that about 2 to 250

15  million would be needed for the hard-tooling.  Both the CIM

16  and Mr. Hightower mentioned that this could provide an

17  attractive return over seven years.

18          Mr. Finger -- and I just want to make clear I'm

19  not a litigator.  I mean I pretend to be one but -- so I

20  don't want anybody to think that just because his testimony

21  is designated that means less, right?  I think --

22          THE COURT:  No.  I know.

23          MR. MURPHY:  -- his testimony is very important

24  today.

25          THE COURT:  I did read --

1          MR. MURPHY:  Mr. Finger --

2          THE COURT:  I did read it during the break, so.

3          MR. MURPHY:  Excellent.  Excellent.  So then you

4  will recall that he testified that bidders dropped out

5  because of the additional capital that would be needed to

6  continue to develop and grow the Endurance and the fact that

7  the story around the situation was challenging and the EV

8  space was challenging, a highly competitive space.  He

9  testified that the business has partially shuttered itself

10 and that proposes a challenge in a sale process.

11         It's my understanding, by the way, based upon the

12 testimony of I believe of Mr. Hightower, that it's -- I don't

13 know what shuttered means, so maybe shuttered and a pause in

14 production means the same thing.  Rest assured, it's not

15 coming along.

16         Mr. Hightower also testified that there have only

17 been five unique customers and less than I guess 40 vehicles

18 actually sold, as opposed to produced.

19         It -- to me, it's not a surprise that there was

20 difficulty in filing [sic] a partner, OEM or otherwise, and I

21 think that feeds into the difficulty of the sale process.

22 Was -- is this a legitimate sale process is my question.

23         One could argue that Foxconn made the most sense

24 as a buyer given that the battery line and wheel hub motor

25 line was located within the facility that Foxconn now owns in

1  Lordstown, Ohio.  Those are lines, by the way, that,

2  according to Jeffries, would take six to eight months to

3  move.

4          Mr. Finger testified that Foxconn submitted a

5  prior bid -- that the fact that Foxconn submitted a bid prior

6  to the petition date and their knowledge of the business,

7  they would be an actual bidder for the business.

8          But even if we're a natural bidder, even if

9  Foxconn is a natural bidder, doesn't mean Foxconn was

10  interested in the business.  The debtors mischaracterize

11  Foxconn's interest in the assets.  They assert in their

12  objection that rather than honor its contractual obligations,

13  Foxconn proposed an alternative transaction and then, as was

14  their strategy, tying the asset sale to potential litigation,

15  the debtors further assert that, for months, the debtors

16  tried to reach a "consensual resolution of the parties'

17  disputes."

18          There's a few things to note here.  The debtors

19  wanted to sell Foxconn the assets but Foxconn wasn't

20  particularly interested and Foxconn certainly wasn't

21  interested in a shakedown based upon disputes that LMC has

22  created.

23          I'm not privy to all the back and forth between

24  Foxconn and LMC but I can tell you when I learned of it --

25  all of it.  On April 14th, I had a call with Mr. Lauria and

1 some of his colleagues about the potential transaction,

2 including a potential bankruptcy filing.  This is when I

3 learned that LMC was looking for a way to wind down and they

4 wanted Foxconn to be a part of it.

5         I'm not aware of any document in evidence

6 supporting the assertion that Foxconn made a proposal to

7 acquire these assets as part of a bankruptcy in April, as Mr.

8 Ninivaggi testified, and that would be a surprise to me,

9 considering in late April or early May, we had to advise our

10 client on what the heck a 363 sales process was.  What is a

11 plan of reorganization.  So maybe it's possible.  I haven't

12 seen it.

13         If I can, Your Honor, and I know you admonished my

14 colleagued, Mr. Whalen, which seems to be a popular thing for

15 people to do, I just want to walk through very quickly using

16 a demonstrative, comparing the framework that was sent to

17 Foxconn by LMC on I guess May 25th and compare that to

18 Foxconn's proposal submitted to LMC, and I promise to be

19 brief.  I just want to highlight a few things if we can bring

20 that up.

21         THE COURT:  Okay.  Do they still have shared

22 screen?

23         MR. MURPHY:  Oh, it's -- so Angelica Giogowski is

24 going to put the slide up, so I think if we can provide her

25 access.

1          THE COURT:  Okay.  She should have it now.

2          MR. MURPHY:  She's right across the hall, so I'll

3    share on from afar.

4          THE COURT:  There you go.

5          MR. MURPHY:  Okay.  Perfect.  So this, on the left

6    is the transaction framework for discussion, as provided to

7    Foxconn, and then on the right is our offer.  We can go to

8    the next slide, Angelica.

9          So the requested framework suggests acquiring

10   substantially all of the assets in the core engineering team

11   for a waiver of the first tranche of preferred stock and a

12   cash payment.

13         On the right, you see the letter proposes

14   acquiring substantially all of the assets of LMC and offering

15   employment to the core engineering team in exchange for a

16   waiver of the $30 million in preferred equity and 42.7

17   million in cash, 77.2 million.  Next slide, please, Angelica.

18         The framework suggests the transaction to be

19   implemented through a pre-arranged Chapter 11 proceeding that

20   would include a competitive sale process.  The letter

21   proposes affecting the proposed transaction pursuant to a

22   Chapter 11 plan of reorganization pursuant to which Foxconn

23   will acquire, subject to a competitive sale process the

24   acquired assets or substantially all the assets.  Next slide,

25   please.

1          The proposed framework then attempts to create

2     leverage by threatening Foxconn and asserting the disputes

3     with Foxconn have somehow caused the image to a business that

4     has had a going concern opinion issued since the end of 2020,

5     saying, in the alternative, the parties will face the

6     prospect of litigation.  Not surprisingly, at the end of the

7     letter, there's a request for relief and the request is a

8     hope of finally putting an end to the constant threats of

9     litigation.

10         The point here is that Foxconn -- it took time

11    because Foxconn didn't know how to react to this unsolicited

12    concept.  But, ultimately, did exactly what LMC wanted and

13    apparently it wasn't enough.  They ignored the offer of $77

14    million for their assets.  We can take this down, Angelica.

15    Thank you.  They ignored the offer for $77 million and

16    decided to take a chance at a bankruptcy filing and now

17    they're running a sale process and trying to sell an asset

18    class that requires up to $500 million more in an investment.

19         As established, there isn't a business to sell

20    here.  The company has left no stone unturned in trying to

21    cap the debt markets, capital markets, entering into

22    arrangements with OEMs or any other partner.  There's no

23    interest.  They were convinced they could shake down Foxconn

24    out of court.  Foxconn was moving too slowly and not agreeing

25    to give the debtors what they wanted so they decided to turn

1  up the leverage.  They filed for bankruptcy and day one to

2  Foxconn for no other reason than to obtain a tactical

3  litigation event, which we'll get to.

4        And as an added bonus, they've been able to use

5  the Bankruptcy Court as their public forum to point out a

6  scapegoat.  This all could've been out of court, all could've

7  been done out of court, especially now that Karma's been

8  resolved it can be done out of court.

9        We've heard the mantra that there's a need for a

10  free-and-clear order and that that's enough to justify this

11  sale process.  Well, that's certainly -- and I'm not telling

12  anybody on this call anything they don't know.  That's

13  certainly a common refrain to justify a 363 sale in many

14  other cases.  It's simply not applicable here.  There is no

15  evidence in the records to suggest there is an interest,

16  "interest" that exists that mandates a need for a free-and-

17  clear order, including the testimony from Mr. Finger.  His

18  testimony fails to point to a single -- point out a single

19  "interest" that would need to be addressed through a free-

20  and-clear order.

21        Mr. Finger testified that he is not aware of any

22  liens on the debtor's assets.  Mr. Finger testified that he

23  is not aware of any other "interests or encumbrances" that

24  would be affected by a free-and-clear sale.  Mr. Finger

25  testified that the company doesn't have any funded debt.

1   Mr. Finger simply pointed to the Karma in the securities

2   litigation as reasons to file for bankruptcy.  Karma has been

3   resolved.  The securities litigation has no bearing on the

4   sale of these assets.

5         Mr. Finger testified that he was speculating that

6   parties would not bid outside of bankruptcy.  In other words,

7   in this case, he doesn't know.  In addition to Mr. Finger's

8   testimony are the schedules of statements.  They don't

9   reflect any secured claims.  I think three are listed in an

10  amount of zero.

11        There's a blanket statement in the declaration

12  provided by Mr. Finger that says, "distressed -- buyers of

13  distressed assets typically desire and often insist on a

14  Section 363 sale order in order to provide the certainty of a

15  court order and also minimize the risk of subsequent

16  challenges to the sale."  Without an assessment of the facts

17  and circumstances of a particular case or evidence in the

18  record, this blanket statement should not be counted.

19        Mr. Finger wouldn't have known whether a buyer

20  would've been interested pre-petition; in other words,

21  without the benefit of a 363 sale order, because, as he

22  testified, he was not retained to market the assets on a pre-

23  petition basis.

24        It's worth noting, by the way, that Mr. Finger was

25  also not asked to evaluate Foxconn's pre-petition proposal

1   for the Board of Directors as its investment banker.

2          The Court, in Integrated Telecom, did not find a

3   sale inside a Chapter 11 and the oversight and protection

4   related thereto to be a valid reorganizational purpose,

5   particularly when the assets were not appropriately marketed

6   on pre-petition basis.  In that case, the marketing was

7   deficient and focused on insiders.  In this case, there

8   weren't any market -- there was no marketing at all.

9          So where are we in the sale process?  Let's look

10  at the Finger declaration.  He says in paragraph 10, all

11  potential bidders that have submitted an IOI appear to be

12  proceeding forward with a potential sale process.  Two

13  potentials and an appear in one sentence.

14          In paragraph 11, he says, while it is impossible

15  to know what the outcome of the sale process will be, it is

16  ongoing and the debtors have a chance to preserve the value

17  of its business and capture that value for the benefit of

18  stakeholders.  It is ongoing and they do have a chance.  But

19  there is -- there's no testimony that a sale of assets out of

20  court could not be accomplished or should not be

21  accomplished.

22          No stalking horse bidder has emerged.  Look, it's

23  possible that there's no going concern sale at all; that

24  these assets are, instead, sold off in parts for amounts that

25  are less than the costs of the case; certainly, I would guess

1  for less than the $77 million of consideration Foxconn was

2  willing to provide on June 22nd.

3       Moving on to the second stated reason to justify

4  the bankruptcy filing, the centralization of the claims.  The

5  debtors refer to it as a need and a valid bankruptcy purpose.

6       As an initial matter, the Third Circuit, in 15375

7  Memorial Corp., noted that, "The creation of a central forum

8  to adjudicate claims against the debtors is not enough to

9  satisfy the good faith inquiry.  The debtors must show that

10  bankruptcy has some hope of maximizing the value of the

11  debtor's estates."

12       Let's look at the claims though.  Let's start with

13  Karma.  The debtors tried to shake down Karma as well.  I

14  mean they started off -- the vigorously opposed lifting the

15  stay, they attempted to rip up two years of litigation and

16  estimate Karma's claim, and they were ultimately unsuccessful

17  and a settlement was reached a short time thereafter.

18  Frankly, it could've been reached outside of court as well.

19       The remaining litigation is all securities related

20  litigation.  Similar to the situation in the Integrated

21  Telecom case, the inescapable conclusion from the record is

22  that these class actions; there's that word, these securities

23  litigate -- the securities litigation, I'll say, do not

24  threaten any value of LMC that the Chapter 11 is seeking to

25  preserve.

1       A little more detail in brief.  Most of this is

2  taken from testimony from Mr. Ninivaggi.  Some of it is

3  publicly available, but just high level.

4       The Ohio securities class action has been fully

5  briefed for nearly two years and is awaiting the court's

6  scheduling of a hearing and ruling.  It's our understanding

7  that settlement discussions are indeed ongoing.  A Delaware

8  securities class action; the debtors are not defendants, they

9  have been required to provide them the discovery.  My

10  understanding the insurance is covering the costs associated

11  with that class action.

12       The derivative cases, the Northern District of

13  Ohio, the District of Delaware, the Delaware Chancery Court,

14  my understanding that those are -- there's evidence in the

15  record that those are all stayed pending resolution of the

16  Ohio securities class action motion to dismiss.  In any

17  event, those are all claims on behalf of the company for the

18  benefit of the stakeholders.

19       The SEC investigation, the debtors received a

20  settlement offer from the SEC five to six months ago but

21  haven't responded but, depending on the SEC's approach, the

22  SEC could continue its investigation on a post-petition basis

23  the same way it had on a pre-petition basis.  There's nothing

24  about this Chapter 11 that changes the dynamic with the SEC.

25  So what's the point?  The point is there's a thing about

1   these claims that require consolidation before this Court.

2   In some cases, the litigation has been stayed.  In others,

3   there's settlement discussions ongoing.

4           This is not a situation where a secured creditor

5   is on the verge of exercising remedies or some sort of mass

6   tort scenario.  Instead, this is a situation where the debtor

7   wanted to bring a claim, not consolidate claims against it.

8           That brings us to the third rationale for filing

9   to address the issues of Foxconn.  The debtors want to come

10  after Foxconn.  They've stated it publicly.  They've stated

11  it again here today.

12          In their examination, the debtors try to assert

13  that the business pivot happened only because of its

14  relationship with Foxconn.  Not relevant for today but,

15  ultimately, that will prove to be not true.

16          At this -- as it relates to this hearing, the

17  debtors assert that Foxconn has worked to undermine their

18  goals.  With respect to LMC's two stated goals, not involving

19  Foxconn, the sale of assets and consolidating the claims,

20  there's simply no evidence in the record supporting the

21  assertion that we are undermining the goals of these cases.

22          Now, I know everybody's saying it.  We got this

23  little motion to dismiss we're talking about.  I'll come back

24  to that.  But, as it relates to the sale and the claims,

25  Foxconn hasn't objected to the First Day relief.  Foxconn has

1  not objected to the bid procedures.  Foxconn has allowed the

2  parties to tour the Lordstown plant.  Foxconn has not

3  objected to any retention application.  Foxconn did not

4  object to the Karma settlement.  But the sale of the assets

5  and the consolidation of the claims aren't the debtor's goals

6  here.  Their real goal is to create leverage on Foxconn

7  through a dispute of their own creation and they want Foxconn

8  to overpay for assets that Foxconn doesn't really want.

9        This motion to dismiss is a defense against this

10 improper bankruptcy filing and Foxconn has a right to defend

11 itself in this regard.

12       In sum, Your Honor, there's no evidence in the

13 record to support the debtor's assertion of a valid

14 bankruptcy purpose.  Instead, only promises of anything can

15 happen at a sale and then coordinate the blame game in an

16 effort to shift the spotlight off the true reason why we're

17 here.

18       Tactical litigation advantage, let's begin with

19 that.  The Bankruptcy Code is intended to benefit those in

20 genuine financial distress.  It's not intended to be used as

21 a mechanism to orchestrate pending litigation.

22       Courts has dismissed bankruptcy cases where --

23 cases where debtors filed to fabricate federal court

24 jurisdiction.

25       A bad faith Chapter 11 filing may occur when a

1  bankruptcy petition is filed simply to create a bankruptcy

2  forum for a two-party dispute based upon non-bankruptcy law

3  and no reorganization purposes intended.  The posterchild for

4  bad faith is that two-party dispute where pre-petition sale

5  efforts have been unsuccessful.  That's the Springs case.

6  Here, there was no ability to raise financing and I think the

7  sale efforts post-petition.  We'll see how they turn out.

8        The debtor had a long-running operating deficit in

9  Springs, same case here, and the debtor brought

10  quintessential state law claims in an adversary proceeding

11  there.  Same case here.

12        Despite the fact -- and here's the issue.  The

13  agreement -- well, up until the petition date when there was

14  a ten-count complaint filed, it's our belief that there was a

15  dispute about the investment agreement.  I guess it's beyond

16  that.  But the investment agreement, Foxconn Ventures PTE,

17  Limited, is a party to that.  But the debtors elected to file

18  suit on the first day of these cases against all the Foxconn

19  entities, including those not otherwise amenable to service

20  of process outside of Chapter 11.  They sued anyone and

21  everyone and the way they could do that easily is by filing

22  these cases.  That's how they exerted their leverage.  That's

23  how they're trying to get us to pay more money for assets

24  that we don't necessarily want.

25        This is an obvious abuse of the bankruptcy system

1  but the debtors have disguised this with what they're calling

2  a "going concern sale process."

3        The evidence has shown -- Mr. Hightower testified

4  that LMC approved the lawsuit against Foxconn in conjunction

5  with the bankruptcy filing.  He testified that LMC made the

6  decision to file for bankruptcy and to Foxconn prior to

7  receiving the offer solicited from Foxconn.

8        Mr. Ninivaggi testified that there was no reason

9  to sue Foxconn on the first day.  There wasn't.

10 Mr. Ninivaggi -- as it relates to the Foxconn bid itself, by

11 the way, Mr. Ninivaggi and Mr. Hightower testified about the

12 concerns they had with the bid and it's conditionality, about

13 the need to do diligence is a red flag I think is what they

14 said.  The reason diligence needed to be done is because

15 Foxconn just didn't really know whether it was interested in

16 the assets, but here's the interesting part.  Everybody's

17 still doing diligence.  Jeffries testified that virtually all

18 the bidders are still conducting diligence.  I'm still

19 surprised that Jeffries testified that they weren't brought

20 in to evaluate the offer.

21        So what does all this mean?  Why the bankruptcy, I

22 guess.  That's the question, right?  Because it provides them

23 the narrative they want in terms of blaming Foxconn.  They

24 want to create leverage, as I mentioned.  Pay big money, buy

25 yourselves out of a dispute that we created.  This was never

1  about maximizing value received in exchange for the assets,

2  and we'll find out because, at some point, we're going to

3  compare that 77 million against what comes in.

4          Now let's turn to -- I'm sorry.  Before turning

5  to 1112(4)(a), I just want to touch very briefly on financial

6  distress.  Angelica, if you can throw up the -- put these

7  slides on financial distress, please.  Great.  Thank you.

8          So here, it's just -- it's a simple slide of the

9  schedules, showing the assets and liabilities of the debtors,

10  the three debtor entities.

11          SGL Carbon found that -- SGL Carbon states, "No

12  immediate financial difficulty and concluded that SGL

13  Carbon's ability to meet its debts, among other reasons,

14  compelled the conclusion that it did not enter Chapter 11

15  with a valid bankruptcy purpose.  I think it's a valid

16  reorganizational purpose, actually.

17          Similarly, in Integrated Telecom, the court

18  ordered dismissal of the Chapter 11 case where the debtor

19  entered bankruptcy not with the intent to reorganize, but the

20  purpose of selling a fully solvent company.  Next slide,

21  please, Angelica.

22          As you can see here, from a balance sheet

23  perspective, solvent.  The debtor's assets exceed their

24  liabilities.  Next slide, please.

25          Where are we from a cash flow perspective?  We'll

1   go over the 13-week in a minute.  They were able to meet --

2   satisfy their liabilities as they were coming due and were

3   going to be able to do so into the future, but what this

4   slide shows is that if you take the cash that was available

5   and you back out the claims as we know them from two slides

6   ago and you back out the litigation reserve and we do this as

7   of the petition date, and the litigation reserve as of the

8   petition date was $35.9 million, you have available cash of

9   $84.2 million.  Clearly enough to make a distribution to

10  equity.  If you factor in Karma, that takes you down to 44.2,

11  but Karma wasn't settled until post-petition.

12         Mr. Ninivaggi testified, I believe, that absent

13  something unforeseen on the claims pool, there would be a

14  distribution available for common equity.

15         I'm going to move on to 1112(b)(4)(a), Your Honor.

16         Foxconn also believes that cause exists

17  under 1112(b)(4)(a) because there is substantial or

18  continuing loss of value to the estate and there is an

19  absence of reasonable likelihood of rehabilitation.

20         In terms of substantial or continuing loss of

21  value to the estate, I think the parties in the briefing

22  agree that you should look to the track record of the debtor

23  to determine if it's suffering losses or making gains.

24         In this regard, the track record is clear.  The

25  debtors always have and continue to operate at a significant

1  loss.  Well before the debtors ever discussed or entered into

2  an agreement with Foxconn, they were making their going

3  concern qualifications in their public filing.

4       Mr. Ninivaggi acknowledged at his deposition, even

5  with the contemplated arrangement with Foxconn, the company

6  was still facing significant challenges with production,

7  financing, and its then outstanding going concern opinion.  I

8  think he even said that Foxconn wasn't a silver bullet.

9       There was a presentation to the Board of Directors

10  less than two months before the bankruptcy filing that drives

11  home the point of the substantial continuing loss, Your

12  Honor.  It's found at Exhibit 12 I think in your binder.  I

13  was going to put this up.  I'm not going to.  There were

14  concerns about confidentiality and I want to honor those.

15  But I just want to make a few points as it relates to this

16  particular slide.

17       This is a presentation of management to the Board

18  of Directors dated April 21st, 2023, so less than -- just

19  about two months -- just over two months before the filing,

20  and it acknowledges, in bullet 2, the significant challenges

21  and that management anticipates it will require at least

22  500 million in additional funding to scale production of

23  Endurance.

24       It also mentions that it's unlikely that LMC will

25  be able to raise any additional financing in the third

1 bullet.

2           In the fourth bullet, it references the investment

3 agreement and it acknowledges that additional financing

4 remains subject to closing conditions and may not be

5 forthcoming.

6           In the next bullet, there's an acknowledgment of

7 the cash burn that's ongoing and that without a strategic

8 transaction the company's cash position would continue to

9 erode.  It's worth noting, at that time, it was 176 million.

10           And then the last bullet, it mentions that, in

11 light of all of this, the company and Foxconn, they've

12 started discussions about the possibility of Foxconn

13 purchasing the company's assets at a price that would make --

14 that would pay creditors in full and provide a return to

15 equity.  That opportunity was there, but it wasn't enough.

16           Let's take a look at 13-week cash flow forecast.

17 This I think we can put up.

18           And, Angelica, hopefully, this is the one that --

19 yeah, perfect.  Thanks.

20           So a few points I want to make here is the debtors

21 project a cumulative negative cash flow of nearly 17 million

22 for the week of July 29th, 2023, through and including the

23 week of October 28th, 2023.  This includes, by the way, 2.1

24 million vehicle sales the week ending August 5th that I don't

25 believe will be reoccurring.

1           If you back out -- if you roll this forward a

2    week, if you back out, the vehicle sales in week one, the

3    operational burn for this company over the next 13 weeks in

4    this forecast is over $7.5 million.  That's operational burn;

5    that has nothing to do with professional fees.

6           We heard testimony that the projected monthly cash

7    burn is over six million per month.  That doesn't include

8    fees for the creditors committee or its advisers or, heaven

9    forbid, if we feel compelled to appoint a creditor and equity

10   committee.  This is over a million dollars, that burn of

11   six -- over six million is a million higher than the

12   prepetition cash burn noted in the first day declaration.

13          In terms of bankruptcy expenditures of 1.1 to

14   $1.2 million, that amount doesn't include the 20 percent

15   holdback.  That brings it to almost $13.5 million during

16   these 13 weeks, that's a million dollars a week.  Even I can

17   do that math.  Over -- the professional fees are over $8

18   million great than the operating expenses, $2 million greater

19   than the payroll and operating expenses combined.

20   Mr. Ninivaggi testified that the bankruptcy filing net-net

21   increased the legal spend because of the bankruptcy costs.

22          This case is distinguishable from Your Honor's

23   ruling in AIG.  There, you denied relief because the debtor

24   established that it was not experiencing substantial losses

25   where the debtor's Chapter 11 case had reduced expenses by

1  eliminating interest due on a $37 billion revolving credit

2  facility.  Stopping the interest accrual on that would

3  certainly save some money.  The filing also paused the

4  Connecticut litigation.

5          Here, the following has happened.  The debtor

6  wanted to pause the Karma litigation, but that failed.  It

7  settled, not an issue anymore.  The securities class actions

8  and the derivative claims have all been stayed pending the

9  outcome of the Ohio securities class action.  There's no

10 evidence in the record suggesting the SEC investigation is

11 any less of a cost or an intrusion now than it was before.

12         In addition, another distinguishing feature is

13 that the debtor in AIG had filed a plan on the petition date

14 and was prepared to toggle it, toggle to it if a 363 sale

15 process fell flat.  A plan hasn't been filed in these cases.

16 I'm sure a plan will be filed soon, I -- maybe it was -- you

17 know, we'll see what's in it; I guess we'll see third party

18 releases in it.  Here, unlike AIG, the 13-week cash flow and

19 the debtors' admissions establish that these cases have

20 exacerbated the debtors' negative cash flow and losses, after

21 having already implemented certain operational cost

22 reductions, as testified by Mr. Ninivaggi earlier today.

23 Those were all done out of court.

24         The filing of these cases and the automatic stay

25 didn't help reduce the burn, for example, no need to make an

1    interest payment on a secured credit facility; rather, it

2    massively increased the cash burn.  Whatever costs existed

3    prepetition that could have been reduced have been reduced

4    and they could have -- and that happened without the

5    necessity of increasing the costs because of this bankruptcy

6    filing.  It is axiomatic that a negative cash flow situation

7    alone is sufficient to establish a continuing loss or

8    diminution to the estate for purposes of 1112(b)(4)(A),

9    that's in Loop Corp.

10          And then, finally, and mercifully for many of you,

11   there is no evidence of a reasonably likelihood of

12   rehabilitation.  The evidence suggests that there's virtually

13   no likelihood for rehabilitation.  Mr. Hightower testified

14   that they weren't doing scale production of the Endurance

15   unless they found an OEM partner.  Mr. Finger testified to a

16   partially-shuttered business.  We've heard that production

17   has been paused.

18          From a legal perspective, the debtor is

19   mischaracterizing our arguments in their brief on this issue,

20   so I'll clarify.  Foxconn acknowledges that it's possible for

21   a liquidation to be a valid form of rehabilitation, but only

22   in the event that the liquidation follows a sale process that

23   realizes value that would not be available outside of a

24   bankruptcy.  Here, the sale could have been done outside of a

25   bankruptcy at a fraction of the costs that these estates are

1  now incurring.  There is no need for a free-and-clear order.

2  There is, I would submit, almost no prospect of a sale as a

3  going concern, this is a liquidation.

4         Your Honor, that concludes my argument.  I'll

5  answer any questions.  I respectfully request that this Court

6  either dismiss these cases or convert them.  In terms of

7  timing, if Your Honor is not inclined to dismiss, I'd

8  respectfully request the Court to delay ruling on conversion

9  until after the bid deadline, so the Court has the benefit of

10  seeing what bids have been submitted.

11         THE COURT:  All right.  Thank you.

12         Mr. Lauria?

13         MR. LAURIA:  Good afternoon, Your Honor, Tom

14  Lauria from White & Case, I'm here to speak on behalf of the

15  debtors.

16         As Counsel properly notes, the Foxconn motion

17  seeks dismissal or conversion for cause and, in pursuing that

18  relief, they make two arguments.  Number one, that the case

19  has been filed in bad faith.  And, in support of that, they

20  argue that there's no legitimate bankruptcy purpose behind

21  the filing and it is solely to obtain a tactical advantage in

22  a two-party dispute.

23         Separately and secondly, they argue that the

24  debtor is suffering substantial and continuing losses and

25  diminution in value, and that there's no reasonable

1  likelihood of rehabilitation.

2        Putting these two arguments side by side is kind

3  of interesting.  The first one is really that we're too

4  solvent for bankruptcy; the second one is that we're too

5  insolvent for bankruptcy.  In other words, according to

6  Foxconn, the Court has to make a decision not unlike the one

7  Goldilocks had to make when she was choosing which soup to

8  eat; not too hot, not too cold, just right.  Your Honor, I

9  submit that the decision to file bankruptcy is not passed

10 through such a narrow path.  Their arguments rely on a

11 misinterpretation of the law that are unsupported by fact

12        (Indiscernible) I'd like to address one thing.  I

13 feel that Foxconn is conflating and confusing the cause of

14 the bankruptcy versus the purpose of the bankruptcy.  Today,

15 Foxconn is saying that because we think that their breaches

16 of our various agreements caused the bankruptcy, that that

17 somehow means that the purpose of the bankruptcy is improper.

18 Your Honor, that's no different than Hertz Rent-A-Car saying

19 it filed bankruptcy due to the impact of the COVID pandemic

20 and Foxconn filed due to the breaches of a contract it had

21 with a third party.

22        The fact that we have someone to sue and that

23 Hertz did not is of no matter.  In fact, all of this evidence

24 about the disputes between Foxconn and the debtor, I think,

25 is a sideshow, and what it does is it confuses two important

1  issues, what do we think was the cause of the bankruptcy,

2  what put us in a position where we had to file for Chapter 11

3  relief, and what is the purpose of the Chapter 11 case.

4          Looking at the law, we obviously agree with

5  Foxconn on a couple of threshold points.  One, the

6  determination is within the Court's sound discretion and,

7  number two, it's to be based on a fact-intensive inquiry.

8  Where we do not agree is we believe the cases stand for the

9  proposition that dismissal is only to be applied in a case

10  where you have egregious circumstances.  Where we do not

11  agree is the fact -- the mere fact that the bankruptcy case

12  may provide a tactical benefit in the litigation -- and it's

13  entirely unclear here whether it will -- is not sufficient,

14  it must be the sole intention.  Moreover, where we also do

15  not agree is that the reorganization purpose includes an

16  orderly -- pursuit of an orderly liquidation.

17          Now, Counsel backed away from that position today

18  on the record, but if you go back and reread the briefs,

19  clearly, they have used against the debtor the fact that it

20  recognizes that it can't really reorganize as a basis for

21  dismissal of the case, that we have no hope of reorganizing.

22  Counsel said that again today.

23          Now, we do agree on a number of the facts.  Number

24  one, in its current configuration, the business is not

25  viable; number two, the business is currently losing money;

1  number three, there are multiple disputes and claims that

2  need to be resolved in connection with the wind-down of the

3  debtors' affairs; number four, we are conducting a sale

4  process that is ongoing.  Where we disagree is that, on those

5  facts, the debtor is not suffering financial distress, which

6  is Foxconn's position; we are.

7         We did not conduct, contrary to Foxconn's

8  allegations in its papers, a two-year sale process prior to

9  the bankruptcy.  We did seek investment, all shapes and

10 sizes, we were unable to attract it, but we did not conduct a

11 sale process and now we're being hung for that in the

12 argument.  But, you know, the reason we didn't conduct a sale

13 process is our agreements with Foxconn prohibited us from

14 conducting a sale process.  We would have had to breach the

15 Foxconn agreements, which were our lifeblood, to pursue a

16 sale process pre-bankruptcy.  Only when we gave up on hope of

17 a deal with Foxconn could we put it through a sale process in

18 bankruptcy.

19        So Foxconn argues about the costs of our current

20 problems.  We agree that the costs associated with the

21 attempt to get to scale production of the Endurance is a

22 significant problem.  Where we disagree is that we are

23 unable, in fact unable to raise the capital we needed to

24 continue with our second business line that was created as a

25 consequence of our agreements with Foxconn because of

1  Foxconn's unwillingness to go forward with the agreement.

2  We'll get to all that later, but the fact is this business is

3  in distress and there are multiple reasons for it to be

4  there.

5           This is not a two-party dispute.  I think the

6  Court has already seen that.  There are multiple parties that

7  we have disputes with and that the fact that we have

8  subsequently resolved the Karma dispute shouldn't go in the

9  negative box for the debtor, it should be a positive.

10          We do have continuing operations.  I think that's

11 come through in the testimony.  In fact, we have 126

12 employees and we're continuing with the Endurance program,

13 including in particular the battery in the wheel hub lines,

14 that we have the ability to sell those as going-concern

15 businesses.

16          And we disagree about whether or not there's any

17 benefit to the sale process from being in Chapter 11.

18 Counsel can speculate all he wants about whether or not

19 parties will pay more or pay at all without the protection of

20 a bankruptcy court order, but I think we all know from

21 experience that that is a level of insurance that has induced

22 many purchasers to the table at prices where they otherwise

23 wouldn't pay to be assured of the fact that they aren't going

24 to have to look in the rearview mirror.  It's not just a

25 matter of stripping liens and claims, it's a matter of

1 extracting the business from a look-back, it's a matter of

2 certainty that a transaction will close.

3        Outside of bankruptcy, how do we sell all or

4 substantially all of the assets of the debtor?  We'd have to

5 go through the process of having (indiscernible) well, we all

6 know that that's a complicated, expensive, and time-consuming

7 process that may or may not get approval, depending on what's

8 going to get to the shareholders at the end of the day.

9 Today, we're not in a position to assure the shareholders

10 there will be a recovery to them.

11        We've got the Karma resolution behind us, we've

12 got multiple securities class actions ahead of us, we've got

13 the SEC investigation claim, and we've got a $30 million

14 preferred claim in favor of Foxconn.  And we have a schedule

15 of what we think our trade claims are.  The bar date hasn't

16 passed yet.  We are in plan negotiations with the committees,

17 I think counsel to the committee can confirm, and we're

18 trying to come up with a number that we and they are

19 comfortable in using for what we think the unsecured claim

20 pot will ultimately be, but I don't think anybody is prepared

21 to say that that number isn't at risk of rising when we

22 (indiscernible) the bar date.  We've all seen all kinds of

23 claims come in that are above and beyond what's in the

24 debtors' schedule.

25        So as to bad faith filing, was there no proper

1  bankruptcy purpose?  I think that the evidence shows that

2  here the board's desire was to achieve an efficient

3  disposition of its assets and a liquidation of its

4  liabilities in a controlled Chapter 11 process with court

5  oversight that will ensure fair treatment of all and protect

6  the rights, as per the Code, of all stakeholders, starting

7  with the unsecured creditors, going to insider creditors,

8  going to the preferred, going to the securities claims, the

9  common stock.

10       And let's just remember, in Chapter 11, 510(b)

11  subordinates those security claims and makes them equal to

12  the security on whose behalf they're brought.  It's common

13  equity.  That is a key provision of the Code here that is

14  beneficial for the estate in the reorganization process and

15  the liquidation process that allows us to make early

16  distributions to unsecured creditors.

17       Outside of bankruptcy, those causes of action are

18  *pari passu*, and we wouldn't be able to make distributions to

19  unsecured creditors early until we had some resolution.  And

20  I think the Court knows from experience that these securities

21  class action litigations can go on and on and on.  They will

22  eventually get past a motion to dismiss, they will eventually

23  move forward in all likelihood.  And once the insurance is

24  spent on the Delaware action, guess how we pay for that

25  situation?  Outside of bankruptcy.

1          And we do have a definitive denial of coverage

2 with respect to the other securities class actions, so the

3 company is funding those litigations out of pocket.  Now, is

4 there a possibility that a dispute can be raised and perhaps

5 we would get to a point where insurance reversed course?

6 Yes, but today all we have is a denial of coverage.

7          But the fact is that the intention, the purpose

8 that the evidence shows the debtors filed this case for is

9 not only a proper bankruptcy purpose, it's a quintessential

10 bankruptcy purpose.  This is not a two-party dispute case.

11 Sure, we've got a big dispute with Foxconn, but that's not

12 why we filed bankruptcy; that's because of our financial

13 situation, but it's not -- we did not file bankruptcy for the

14 purpose of trying to get a benefit on Foxconn, and I will

15 come back to that point.

16          The Court has already seen and Foxconn admits that

17 we've got multiple disputed claims here:  Karma, multiple

18 securities class actions, derivative actions, an SEC

19 investigation, we're certain to have disputed trade claims.

20 Rather than being punished for filing for Chapter 11 relief

21 when we have $136 million of cash, when we think we can have

22 the chance of making a distribution to equity -- and, by the

23 way, the Bankruptcy Code protects equity interests every bit

24 as much as it protects creditor interests; sure, they're at

25 the end of the waterfall, but those are still protectable

1  interests.  Ford shouldn't be punished, Ford should be

2  commended.  Ford acted earlier than so many debtors we've

3  seen who pursued that dream to the end.  Delay here,

4  dismissal of the case would only likely result in a

5  subsequent bankruptcy filing, less money and worse outcomes

6  for our stakeholders.

7          Putting aside the speculation of Counsel on the

8  record earlier and the testimony, quite frankly, of Counsel,

9  I think what Foxconn is really saying, in the best case, they

10  just disagree with the decision we made.  But, if it was

11  their decision to make, they would have proceeded

12  differently.  They think we should have pursued their

13  eleventh hour letter of intent.

14          Now, the Court can go back and take a look at that

15  letter of intent, but it was highly conditional and it

16  required -- the only binding component of that letter was

17  that they wanted us to agree not to file for bankruptcy

18  protection for 30 days.  They wanted us to continue the

19  status quo for another 30 days, after on-and-off engagement

20  and discussion for three months.  The fact of the matter is

21  the board concluded, Mr. Hightower testified, that they did

22  not view that letter as actionable.  Mr. Ninivaggi testified

23  that he thought it was just another attempt by Foxconn to

24  cause delay.

25          Now, that's the best case, the best

1  characterization of Foxconn's argument that they just think

2  we made a bad decision, we should have decided otherwise.

3  That is not a basis for dismissal of the case.  But, in the

4  worst case, what Foxconn is really doing, they're trying to

5  pre-litigate the adversary proceeding.  I think the Court saw

6  that.  It's trying to disrupt our sale process.  It obviously

7  makes it difficult to sell assets under 363 when the prospect

8  of the case being dismissed looms.  We need to get that cloud

9  off of our heads so that we can really bring forward the best

10  offers on the best terms for the debtors' ongoing operations

11  and assets.

12          What Foxconn is also doing, it's kind of

13  interesting, they're criticizing us on the one hand for the

14  cost of the bankruptcy case, but a significant portion of

15  that cost has been defending their motion to dismiss.

16          We do have disputes with Foxconn, there's no

17  question about it, and they are significant and material.  We

18  believe that Foxconn's breaches materially harmed the

19  business and put us in a position where we really had no

20  alternative but to file.  There is no evidence that that was

21  our sole purpose or intention in filing Chapter 11.  If there

22  is a tactical benefit, and it's not clear that there is, it's

23  tangential, at best.

24          Foxconn stating over and over and over again the

25  conclusion that the only reason we filed was to get a

1  benefit, a tactical advantage on Foxconn, does not make it

2  true.  The fact is that the company was experiencing

3  financial distress; it was losing money, it had no viable

4  business plan, it faced multiple complex litigations.

5  Continuing forward without bankruptcy protection presented a

6  number of risks.  Further denigration of value, ultimately, a

7  race to the courthouse by our creditors.  We did face a trial

8  date in (indiscernible) September.  We had other disputes

9  that were percolating.  When people start to realize that

10  we're burning through money and that we don't have a stay in

11  place, everybody is going to jump to get ahead of the line to

12  collect what they're owed.  And we had, we believed, an

13  inability to preserve the operation of our existing business.

14  Our trade counterparties were getting more and more difficult

15  to work with.  And we believed that we had no real practical

16  ability to sell our assets other than in a fire sale

17  liquidation outside of bankruptcy.

18        Delay would have only resulted in all of our

19  problems getting worse and our cash shrinking, fewer

20  distributions to creditors, maybe even impairment of

21  creditors and no distribution to shareholders, and perhaps a

22  multi-hundred-million-dollar judgment by Karma.

23        Your Honor, if we tick through the factors quickly

24  that this Court has considered in JER/Jameson, citing to

25  Primestone, I think it's obvious that a preponderance of the

1   factors do not weigh in favor of dismissing or converting.

2          This is not a single-asset case.  There are

3   hundreds of unsecured creditors and thousands of

4   shareholders, all of whose interests are protected by the

5   Chapter 11 case.  We do have ongoing limited business

6   operations and over a hundred employees who are actively

7   engaged.  We were not on the eve of foreclosure, this was not

8   a bankruptcy filed to stop a foreclosure in the eleventh

9   hour; it is obviously not a two-party dispute.

10          We have cash to be able to pay our costs of

11  administration and to make distributions.  We were getting

12  substantial pressure from at least one creditor in the form

13  of the Karma litigation that we faced as of the petition date

14  and the decision regarding dismissal is to be made on the

15  basis of the facts and circumstances at the time of the

16  petition.  We don't get the benefit of 20/20 hindsight.

17          There was no previous bankruptcy here.  There is

18  no allegation whatsoever of any improper prepetition conduct

19  on the part of the debtor.

20          Yes, item ten, there's no real possibility of a

21  reorganization, but orderly liquidation is a proper

22  reorganization purpose.

23          The debtor was not formed to file the case and the

24  case was clearly not filed solely to access the stay to stop

25  something that otherwise should have happened.

1        So it comes down to an assessment of the board's

2   intent.  The intent to liquidate in an orderly fashion is not

3   evidence of bad faith.  Indeed, the Code explicitly

4   contemplates liquidation in Chapter 11.  1123(b)(4)

5   contemplates the sale of all or substantially all of the

6   debtors' assets under a plan.  And we know, as practical

7   people, from experience, there are numerous Chapter 11 cases

8   that have proceeded for the purpose of implementing an

9   orderly liquidation of the debtor's affairs.

10        Here, we soon will file a plan, as Counsel

11   speculated.  We are working actively with the committee to

12   get to agreement on the terms of that plan, and we expect

13   that that plan will enjoy broad creditor support.

14        Foxconn spends an inordinate amount of time

15   putting on the case that the business was failing and can't

16   be reorganized in Chapter 11.  I just think that's a sideshow

17   and I think it's probably part of their case pending the

18   adversary; it has nothing to do with what's before the Court

19   today.

20        Just because a debtor seeks to obtain the benefits

21   of the Bankruptcy Code is not a basis for dismissing the

22   case.  Those benefits wouldn't be there if it wasn't expected

23   that debtors would capitalize on them.  Nor is it a basis for

24   dismissal to say that the debtor is losing money.  If that

25   were really the case, how many cases that have been before

1  this Court would have been dismissed?  Now, that loss of

2  money may become relevant over time.  If we are unable to

3  propose a plan and move forward swiftly through the

4  reorganization process, as we intend to, the ongoing cash

5  burn may become an issue.  But to try to do that upfront

6  before we've gone through the exercise, that's not how it's

7  played.

8          Let's just look at three scenarios, Your Honor,

9  and I think I'm done.  What happens if we continue in the

10  Chapter 11 case?  We're going to continue with our sale

11  process.  We expect to have one or more purchasers free and

12  clear, and we have the opportunity -- and it's quite

13  premature to say that we will, but we have the opportunity to

14  get going-concern value for at least a part of our business.

15  We'll propose a plan, we'll implement the Chapter 11

16  waterfall, and it will provide for the treatment, as required

17  by the Code, of all claims and equity interests.  Unsecured

18  non-affiliate claims we think will be at the top, after

19  administrative expenses.  Behind that would come insider

20  claims, behind that, if allowed -- behind -- or not

21  subordinated -- behind that would come the preferred Foxconn

22  $30 million, unless it's equitably subordinated, which is one

23  of the remedies that we've sought in our adversary.  And

24  behind that comes the common, which includes securities class

25  action claims that are automatically subordinated to become

1   and under 510(b).

2          This plan will permit distributions to be made to

3   unsecured creditors on a timely basis as those claims are

4   resolved.

5          Now, let's say that we dismiss the case.  First of

6   all, we lose the committee as a negotiating vehicle to

7   represent the interests of all of the unsecured creditors.

8   We have everybody in one-offs, we have chaos.  We have

9   everybody getting concerned about whether or not they're

10  going to get paid and is somebody else going to get paid,

11  will there be money to pay them, where everybody is running

12  to court.  So you can envision claims and litigations all

13  over the place, everybody trying to recover their claim and

14  get to the head of the line.

15         We can't pay them because, outside of bankruptcy,

16  the securities class action claims are *pari passu* of all

17  those claims and they could be massive; we think they're not,

18  we hope they're not, but we're not in a position to opine

19  that those claims wouldn't have an impact and won't be

20  material.

21         The assets will be liquidated fire sale-style, no

22  doubt.  We won't have the ability to sell free and clear.

23  The litigation in millions will exhaust our insurance in

24  Delaware.  We may suffer a large judgment.  It will expose

25  all of our creditors to the risk of partial payment and will

1 expose our shareholders to the risk of no recovery

2 whatsoever.

3          And you know what?  We likely end up back in

4 bankruptcy, three months, six months, a year down the road,

5 just in a worse position.

6          What about a Chapter 7?  Well, a Chapter 7, we

7 stop the operations, we lose over a hundred jobs, we

8 eliminate the possibility of obtaining going-concern release,

9 and, importantly, in terms of the assets of this company are

10 predominantly IP-intertwined, the Chapter 7 -- the Chapter 7

11 trustee doesn't have the knowledge from years of work in

12 development in that IP, it's going to have almost no ability

13 to know what it's got or how best to dispose of it.

14          What we do is we put the estate in a position

15 where it's not going to get going-concern value, that's

16 foreclosed, where what we have to sell will be more difficult

17 to sell, and all we have is a distribution in respect to

18 claims that the Chapter 7 trustee may take ages to resolve.

19          So, Your Honor, I would just say there's no basis

20 to dismiss the case at this time.  And I think the Court

21 should keep an eye on our process and our progress.  We have

22 settled one of the largest disputed claims, we're working on

23 settling the others, we're working on a plan that will have

24 committee support, we hope, and we hope to progress this

25 process to conclusion within the calendar year.  Let's remove

1   the cloud and let the debtor do its job.

2           And we're under your oversight and supervision at

3   all times.  If things go off the rail, you'll tell us.

4           Thank you.

5           THE COURT:  Thank you.

6           Does the committee wish to chime in?

7           MS. KOVSKY-APAP:  Yes.  Thank you, Your Honor.

8   Deb Kovsky-Apap, Troutman Pepper, for the committee.

9           Your Honor has heard a lot of testimony elicited

10  today that seems to really focus on whether Foxconn bears any

11  responsibility for the debtors' ending up in bankruptcy.

12  Respectfully, the committee agrees with the debtors that that

13  testimony really misses the point.  Whether or not Foxconn

14  bears any culpability here, what's clear to the committee is

15  that on the filing date these debtors clearly had valid

16  reasons for needing the protection of Chapter 11.  The

17  company needed to sell its assets, but, as Mr. Finger

18  testified, it couldn't do so while it was bound by its

19  agreements with Foxconn.

20          We heard testimony or have seen testimony in the

21  deposition transcript of Mr. Finger's testimony that there

22  are buyers that may well want the comfort of this Court's

23  order regardless of whether a free-and-clear provision is

24  actually necessary.  And as Counsel for the entity that is

25  usually the one looking at fraudulent transfers and other

1  bases to challenge transactions entered into by a debtor and

2  certainly understand that if the debtors' financial distress

3  raises questions about its solvency, those buyers certainly

4  may not be at the table absent the prospect of a 363 order

5  from this Court.

6         Really importantly, and this was very much the

7  focus of the beginning of the case and much of the

8  committee's activities, the debtors needed to resolve the

9  Karma litigation.  That was an almost-billion-dollar

10 potential claim against the estates and the committee thinks

11 that it is not insignificant that, after three years of bare-

12 knuckle litigation, a settlement was able to be reached only

13 after bankruptcy was filed.  And that potential 900-plus-

14 million-dollar liability, which while it could have

15 materialized absent the bankruptcy, would have reduced

16 unsecured creditor recoveries to pennies on the dollar.

17 Thankfully, that risk is behind us, but there are a lot of

18 other issues facing these debtors that could impact creditor

19 recoveries.

20         The company was and is facing numerous shareholder

21 lawsuits and an SEC investigation.  As Mr. Ninivaggi

22 testified, the debtors have worked diligently to settle those

23 shareholder lawsuits, but as the committee only recently

24 learned, those efforts have been unavailing.  We also

25 understand that the debtors' insurers have denied coverage.

 1   So, as Mr. Lauria alluded to -- and this was really one of

 2   the focuses for the committee -- outside of bankruptcy, we

 3   would be facing competition from numerous claimants whose

 4   claims are subordinated in bankruptcy.

 5          So this is really a little bit of an unusual case

 6   that in Chapter 11 could, and we believe will, hopefully,

 7   provide a full recovery too general unsecured creditors due

 8   to the Bankruptcy Code's waterfall provisions, including

 9   Section 510(b).  But this company could well be insolvent

10   outside of bankruptcy, putting creditor recoveries at risk.

11          As the Court knows, the committee has been

12   singularly focused on getting unsecured creditors paid in

13   full as quickly as possible and with as much certainty as

14   possible.  As Mr. Lauria noted, the committee has already

15   begun negotiating the terms of a plan with the debtors, and

16   our goal is to get to a consensual plan that pays unsecured

17   creditors in full and allows them participation throughout

18   that process.  The committee believes that an expeditious,

19   consensual plan process is the best path to get unsecured

20   creditors paid in full.

21          Just to go back to Mr. Lauria's examples of what

22   happens if this case does get dismissed, not only do all of

23   the creditors who are going unpaid then after you -- well,

24   consider at least suing to receive the monies that they're

25   owed, but there's a pretty high probability that three of

1  them will figure out that they could band together and put

2  these companies right back into bankruptcy involuntarily and,

3  unfortunately, most likely on much worse terms, with the

4  debtors having less cash, less of the likelihood of being

5  able to sell their assets for significant value, and a likely

6  worse outcome for all creditors.

7          So, for the reasons that the debtors have stated,

8  for the reasons expressed in the testimony of the debtors'

9  witnesses, and those delineated in the committee's statement

10  of position with respect to the Foxconn motion, the committee

11  believes that at this point dismissal is not warranted, is

12  not in the interest of creditors, and that this case should

13  be allowed to progress under the Court's supervision.  And of

14  course, as Mr. Lauria said, if it goes off the rails, the

15  Court will step in.  Certainly the committee is keeping a

16  close eye on it as well.

17          THE COURT:  All right, thank you.

18          MS. KOVSKY-APAP:  Thank you.

19          THE COURT:  All right.

20          MR. SCHMIDT:  Your Honor, may I be heard, please?

21          THE COURT:  Yes, Mr. Schmidt.

22          MR. SCHMIDT:  Yes.  Good afternoon, Your Honor,

23  Shai Schmidt, Glenn Agre Bergman & Fuentes, on behalf of an

24  ad hoc group of shareholders of LMC.

25          We support the debtors' objection to Foxconn's

1  motion to dismiss.  We believe and, frankly, we think that

2  the presentations today showed that there is substantial

3  equity value that can be unlocked through the Chapter 11

4  cases, including a streamlined sale process with this Court's

5  oversight.  So, for that reason, we agree with the debtors

6  that the cases should remain in Chapter 11.

7                Thank you.

8                THE COURT:  Thank you.

9                Anybody else?

10        (No verbal response)

11                THE COURT:  Mr. Murphy, any response?  You're

12  still muted, double muted.

13                MR. MURPHY:  I need a sign.  Yes, I will endeavor

14  to be very brief in response, maybe less than five minutes,

15  maybe ten points.

16                As it relates to the consent to the sale, Your

17  Honor, Foxconn was never asked.  I don't -- I mean, it's just

18  a question, do you consent to a sale process, sure.

19                As to the shareholder meeting and the fact that,

20  you know, this bankruptcy process avoids the complexities

21  associated with a shareholder meeting, I don't -- I submit

22  that I'm not positive about this, but I don't think you can

23  file for bankruptcy for purposes of trying to avoid a

24  shareholder meeting.  And I don't know if it's the ESOPUS

25  Creek Value LP case or something else, I was trying to read

1  it quickly, but I just don't know that you can do that.

2          I do know, however, that another stated reason,

3  the efficient disposition of its assets, the debtors'

4  efficient disposition of its asset, under the Third Circuit's

5  ruling in 15375 Memorial, the court said using Chapter 11 to

6  facilitate distributions to creditors does not qualify as a

7  good faith basis to file.  Orderly distribution of assets is

8  not a valid bankruptcy purpose.  So I don't know that that

9  gets the debtor there.

10          As it relates to the 510(b) subordination of

11  securities claims, I mean, that's a tactical litigation

12  advantage play, right?  Not to make the argument for them,

13  but that's exactly -- especially when the debtor is solvent,

14  especially when the debtor should be operating out of court,

15  they're filing for -- that's a tactical litigation advantage.

16          You know, I can't -- both the committee and the

17  debtor keep talking about the multiple complex litigation and

18  the numerous lawsuits, but it's pretty simple.  It's Karma,

19  which is gone; the securities class action, which has been

20  stayed pending a ruling on the motion to dismiss; one is

21  proceeding because -- and the debtor is not a defendant, but

22  they have to provide some discovery after being compelled by

23  a court; the derivative claims are all stayed and the SEC

24  investigation, which the committee says they're diligently

25  working to resolve these issues, five to six months to

1 respond to the SEC doesn't seem necessarily diligent to me.

2           The board -- let's see, I've got to read this --

3 ah, the board filed early and, if these cases are dismissed,

4 we'll be right back.  So if you look at the SGL case, in that

5 case, the court says the attenuated possibility for filing is

6 not enough to establish good faith.  Early encouragement

7 doesn't trump the need for a valid bankruptcy purpose, it

8 just doesn't.

9           The race to the courthouse, this is another one.

10 This is -- I mean, this is -- like it's Bankruptcy 101, you

11 just use these catchphrases.  Karma, they were already at the

12 courthouse, they've been there for two years.  And oh, by the

13 way, when the case was going to proceed to trial in the

14 spring, they didn't file for bankruptcy.  So, you know, there

15 was no race -- that case was pending for a long time.  Same

16 with all the securities cases, the class action, the

17 investigation, for years.  Nobody was racing anywhere.  The

18 only person racing to the courthouse was the debtor and

19 they're racing to the courthouse to spend money that they

20 don't need to be spending.  Candidly, I think, at the end of

21 the day, the way this ends up, it's probably going to end up

22 being Foxconn's money.

23           The liquidation is contemplated in the Code.  Yes,

24 that's true, but -- and we've all done lots of cases where

25 you do a 363 sale followed by a plan of liquidation, a

1   hundred percent true.  The difference is, in those cases, the

2   363 sale process made sense.  You were either selling real

3   assets or you were going to garner more value by virtue of

4   that process than it costs to run it, or, potentially, more

5   value than a bid that you received on the eve of the

6   bankruptcy filing, which the investment banker actually never

7   looked at.

8            Let's look at Primestone.  Primestone, to me, is

9   now art; it's a piece of art because two people can look at

10  it so differently.

11           I mean, so it's a single-asset case, agreed.  Few

12  unsecured creditors.  I don't know, I think yes.  Mr. Lauria

13  has been involved in some of the biggest cases known to

14  humankind.  In this case, I would say there's few unsecured

15  creditors.

16           No ongoing business, I think he used the qualifier

17  limited.  I mean, we've heard that the businesses, they're

18  not manufacturing anything right now.

19           Petition on the eve of foreclosure, I agree with

20  him.

21           A two-party dispute that can be resolved in

22  pending state court action.  I think if the hearings before

23  this Court have shown you anything, Your Honor, is that this

24  is a two-party dispute because they're yelling at us and

25  we're yelling at them, and everybody else is just kind of

1  hanging out.  I view it as a two-party dispute.

2            No cash or income.  They have plenty of cash, way

3  more than their liabilities.

4            No pressure from nonmoving creditors.  There is no

5  pressure from nonmoving creditors, there was none.

6            Previous bankruptcy petitions, correct.

7  Prepetition conduct was improper, we'll find out.

8            No possibility of reorganization, correct, it's --

9  best-case scenario, it's a liquidation that's going to cost

10 more than if we did this out of court.

11           The debtor formed immediately prepetition, no.

12           Debtor filed solely to create the automatic stay,

13 that one kind of cuts both ways.  I actually don't -- I could

14 see that both ways.

15           Subjective intent of the debtor, I think I've made

16 my position clear on that one.

17           Dismissal -- so I think what I'll end on is -- so,

18 look, you know, there's this -- both the committee and the

19 debtor have mentioned a parade of horribles if this case was

20 dismissed.  I've read more cases over the weekend than I want

21 to ever read again and I don't remember seeing parade of

22 horribles as being a valid bankruptcy petition.  And if you

23 can't justify your filing in the first place, then it

24 shouldn't be in bankruptcy.

25           And if you look at the cash situation relative to

1  the liabilities -- and they talk about, well, if it's

2  dismissed, then, you know, what are we going to do with all

3  the trades?  Well, you could pay them, you could pay your

4  liabilities -- pay them all, pay everybody, and settle -- and

5  settle it all, you're still going to have enough and you're

6  going to do it more efficiently than what we're doing here

7  today.

8          And what I've heard is everything we've talked

9  about, the sales, the claims, you know, the trade was getting

10 antsy.  Do you know how you keep the trade from being antsy?

11 You pay them.  But nothing that I've heard today justifies

12 this case being in bankruptcy.  It could be done out of court

13 just as easily as it could be done in court, but do you know

14 what else?  It could be done just as easily and efficiently

15 in a Chapter 7.

16          That's all I have, Your Honor.

17          THE COURT:  All right.  Well, let me make my

18 ruling.

19          I guess I'll go through the Primestone factors

20 first, because you're right, everybody views these

21 differently.

22          It's not a single-asset case.  I don't think that

23 the few unsecured creditors is really significant here.  They

24 may be few in numbers, but there are creditors with

25 significant claims, and as noted by the debtor, the

1  securities litigation creditors, if successful, would have

2  unsecured claims.

3         There are employees, and although the debtor has

4  shuttered or partially shuttered its business, there is an

5  effort to sell the business as a going-concern.

6         The petition was not filed on the eve of

7  bankruptcy.  I don't view this as a two-party dispute.  It

8  appears there is a significant dispute between Foxconn and

9  the debtor, but the debtor faces disputes from a lot of

10  people, including Karma, and although the debtor did not file

11  on the eve of the Karma, the original Karma trial in April,

12  it appeared that the Karma litigation was a significant

13  pressure point for the debtor.

14         Yes, there's cash.  There's no significant income

15  and, in fact, the business was losing money and just not a

16  viable business.  I don't think, again, it's a -- I can't

17  conclude that there was no pressure from non-moving

18  creditors.  I mentioned that.

19         There's no previous bankruptcy petition.  I can't

20  say that the debtors' prepetition conduct was improper.

21  There's no allegation, for example, that management or the

22  debtor itself was committing fraud or anything of that

23  nature.

24         I'll address the no possibility of reorganization

25  later.

1          The debtor was not formed immediately prepetition.

2    The debtor did not file solely to create an automatic stay

3    and that relates to whether there's a two-party dispute and

4    an effort just to stay litigation by the other party.

5          But I think the broader implication of the Third

6    Circuit cases like SGL and LTL, even, although LTL said that

7    in it's a solvent debtor, you can't file bankruptcy unless

8    you're in imminent financial distress.  But LTL, also, the

9    Third Circuit in LTL also acknowledged that the debtor does

10   not have to wait until it is, in fact, out of cash to file

11   bankruptcy and in its business judgment, can file earlier.

12         And I think in this case, there was a valid

13   bankruptcy purpose.  That includes liquidations.  As counsel

14   for the debtor said, 1123(b)(4) specifically contemplates

15   liquidations in Chapter 11.  It doesn't mean a reorganization

16   in the form of a plan of reorganization, reorganizing the

17   debtor to continue to be held and owned by the debtor.  It

18   certainly contemplates a sale process that would allow

19   another entity to take advantage of the value of the business

20   as a going-concern through the sale process.

21         And I don't read the cases to require that a sale

22   process has to be started pre-bankruptcy in order for the

23   debtor to pursue that in bankruptcy.  And the debtor did

24   state that part of the reason for filing bankruptcy was

25   because they could not run a sale process without the consent

1   of Foxconn or the shareholders.  So that, I think, was a

2   legitimate purpose.

3            In addition, on the comment about whether or not

4   it's a legitimate purpose to create one forum to deal with

5   creditors' claims, I know there's a lot of cases dealing with

6   that in the context of mass torts.  We're not dealing with

7   mass torts here, and it's perfectly legitimate for a debtor

8   who's facing half a dozen lawsuits by shareholders and a

9   lawsuit by a company who asserted that the debtors' assets

10  were owned by it and not the debtor, I think that's a

11  legitimate purpose for filing bankruptcy, to try to resolve

12  those in the context of one case.

13           And the comment made by counsel for the debtor, as

14  well as counsel for the Committee, that Section 510(b) will

15  allow the general unsecured creditors to be paid more quickly

16  because there is no concept of them being *pari passu* with

17  shareholders who are suing for breach of sales agreements,

18  over any other misrepresentations, et cetera, by the debtor,

19  which is not true outside of bankruptcy.

20           I, in contemplating this, I also want to state

21  that it is not in the best interests of creditors in my mind,

22  to either confirm or dismiss.  Conversion would just require

23  a Chapter 7 Trustee to be brought up to speed on the sale

24  process, duplicate the debtors' efforts and, perhaps, not

25  have access to the knowledge of the employees necessary to

1  liquidate these assets.

2         With respect to the shareholder meeting suggestion

3  that it could have been held outside of bankruptcy to

4  authorize the sale, I don't think that precludes the filing

5  of a bankruptcy.  I think that, although the stay does not

6  preclude shareholders from seeking to have a shareholders'

7  meeting and make changes such as in the Board, I don't think

8  that addresses the question that's before the Court, so the

9  reference to those cases, I don't think was really relevant.

10         Again, I find it as a legitimate bankruptcy

11  purpose to purpose a sale, free and clear.  Even though the

12  debtor does not have liens, there is value to a court order

13  that allows a sale to close promptly without the possibility

14  of an appeal and without, perhaps, the possibility or

15  successor or other creditor claims that are against the

16  debtor remaining against the buyer.

17         In addition, the ability of a debtor to assume and

18  assign contracts in contemplation or as part of a sale is a

19  legitimate bankruptcy purpose.  So, I'm going to deny the

20  motion to convert or dismiss at this time and see if the

21  debtor can pursue this.

22         There's always the ability of the Court to take

23  action if anything changes, but at this stage, I think the

24  debtor has a legitimate reason to pursue the course of action

25  it is on and does not mandate dismissing this case.

1          All right.  Can I have a form of order submitted

2 under certification of counsel?

3          MR. LAURIA:  Absolutely, Your Honor.  Yes, Your

4 Honor.

5          THE COURT:  Okay.  Then, we'll stand adjourned.

6          MR. ZAKIA:  Your Honor?

7          THE COURT:  Mr. Zakia, you have something else?

8          MR. ZAKIA:  I had one cleanup item for your

9 docket.

10          We had filed a motion to seal one exhibit at

11 Docket 321.  We came to an agreement with Foxconn over the

12 weekend that that did not actually need to be filed under

13 seal, so we're going to withdraw the motion to seal and just

14 file the exhibit publicly.

15          THE COURT:  Okay.

16          MR. WHALEN:  Yes, Your Honor.  No objection from

17 Foxconn.  I think you actually heard all the material terms

18 of that exhibit today, so...

19          THE COURT:  Anyway.  All right, good.

20          MR. ZAKIA:  Thank you.

21          THE COURT:  We'll stand adjourned, then.

22          COUNSEL:  Thank you.

23      (Proceedings concluded at 2:15 p.m.)

24

25

1                           CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    August 28, 2023

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    August 28, 2023

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Coleen Rand                           August 28, 2023

18   Coleen Rand, CET-341

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25