**THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT TO DATE. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Lordstown Motors Corp., *et al.*,[1] | Case No. 23-10831 (MFW) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125 WITH RESPECT TO JOINT CHAPTER 11 PLAN OF LORDSTOWN MOTORS CORP. AND ITS AFFILIATED DEBTORS

---

[1]  The Debtors and the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corp. (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101).  The Debtors' service address is 27000 Hills Tech Dr., Farmington Hills, MI 48331.

**WHITE & CASE LLP**

Thomas E Lauria (*pro hac vice* admitted)
Matthew C. Brown (*pro hac vice* admitted)
Fan B. He (*pro hac vice* admitted)
200 S. Biscayne Blvd
Miami, FL 33131

David M. Turetsky (*pro hac vice* admitted)
1221 Avenue of the Americas
New York, New York 10020

Jason N. Zakia (*pro hac vice* admitted)
111 South Wacker Drive
Chicago, IL 60606

Roberto Kampfner (*pro hac vice* admitted)
Doah Kim (*pro hac vice* admitted)
RJ Szuba (*pro hac vice* admitted)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071

*Co-Counsel to the Debtors and Debtors in Possession*

**RICHARDS, LAYTON & FINGER, P.A.**

Kevin Gross (No. 209)
Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Amanda R. Steele (No. 5530)
Jason M. Madron (No. 4431)
One Rodney Square
920 N. King Street
Wilmington, DE 19801

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

# TABLE OF CONTENTS

Page

ARTICLE I INTRODUCTION ........................................................................................... 1
    A.    Definitions.......................................................................................................1
    B.    Exhibits ..........................................................................................................1
    C.    Purpose of this Disclosure Statement .............................................................1
    D.    Important Notices and Disclaimers.................................................................2
    E.    Brief Overview of the Plan .............................................................................4

ARTICLE II OVERVIEW OF THE DEBTORS ................................................................. 5
    A.    The Debtors' Background and Prepetition Business Operations...........................5
        1.    SPAC Merger ................................................................................... 6
        2.    Partnership with Foxconn................................................................. 7
    B.    The Debtors' Corporate Structure...................................................................8
    C.    The Debtors' Capital Structure .......................................................................8
    D.    The Debtors' Workforce and Facilities..........................................................10
    E.    Prepetition Litigation....................................................................................10
        1.    SEC Investigation and Securities Actions...................................... 10
        2.    Karma Litigation ........................................................................... 13
    F.    Circumstances Leading to the Commencement of the Chapter 11 Cases ............13

ARTICLE III OVERVIEW OF THE CHAPTER 11 CASES................................................ 15
    A.    Commencement of the Chapter 11 Cases......................................................15
    B.    First Day and Second Day Relief...................................................................15
        1.    Operational First Day Motions and Relief Granted ........................ 15
        2.    Procedural First and Second Day Motions...................................... 16
    C.    The Sale Process ..........................................................................................16
    D.    Retention of Debtors' Chapter 11 Professionals............................................18
    E.    Appointment of Creditors' Committee ..........................................................19
    F.    Schedules and Statements and Claims Bar Dates ..........................................19
    G.    Exclusivity ...................................................................................................20
    H.    The Foxconn Adversary Proceeding..............................................................20
    I.    Foxconn's Motion to Dismiss or Convert the Chapter 11 Cases.........................20
    J.    The Debtors' Preliminary Injunction Proceeding ..........................................21
    K.    Karma Developments and Settlement.............................................................21

ARTICLE IV THE PLAN ................................................................................................... 23
    A.    Overview of the Plan ....................................................................................23
    B.    Unclassified Claims ......................................................................................24
        1.    Unclassified Claims Summary ....................................................... 24
        2.    Unclassified Claims ....................................................................... 25
    C.    Classification and Treatment Under the Plan .................................................27
        1.    Summary of Classification of Claims and Interests ........................ 27
        2.    Classified Claims and Interests Details ........................................... 31

i

3.     Elimination of Vacant Classes ............................................................ 35

4.     Separate Classification of Secured Claims........................................ 35

5.     Voting Classes; Presumed Acceptance by Non-Voting Classes ............ 35

6.     Controversy Concerning Impairment. ................................................ 35

D.     Acceptance or Rejection of the Plan; Effect of Rejection By One or More Classes of Claims .............................................................................35

1.     Classes Entitled to Vote .................................................................... 35

2.     Class Acceptance Requirement ......................................................... 36

3.     Cramdown and No Unfair Discrimination ............................................ 36

E.     Means of Implementation of the Plan ..............................................................36

1.     Consolidation for Distribution Purposes Only .......................................... 36

2.     Post-Effective Date Status................................................................. 38

3.     Sources of Consideration for Distributions ............................................ 38

4.     Claims Administrator ........................................................................ 38

5.     Post-Effective Date Matters .............................................................. 40

6.     Board of Directors and Officers ........................................................ 41

7.     Vesting of Assets .............................................................................. 41

8.     Existing Securities ............................................................................ 41

9.     Preservation of Net Operating Losses ................................................ 41

10.     Preservation of Causes of Action ...................................................... 42

11.     Preservation of Insurance ................................................................. 43

12.     Indemnification Obligations............................................................... 43

13.     Setoffs and Recoupments ................................................................. 44

14.     Exemption from Certain Taxes and Fees ........................................... 44

15.     Approval of Plan Documents ............................................................ 44

16.     Effectuating Documents; Further Transactions.................................... 45

17.     Tax Matters...................................................................................... 45

18.     Settlements ....................................................................................... 45

19.     Equitable Subordination of Foxconn Interests ................................... 45

20.     GUTC Cash Pool Adjustment .......................................................... 46

21.     General Unsecured Trade Claim Recoveries ...................................... 46

F.     Provisions Regarding Distributions ..................................................................47

1.     Distribution Record Date................................................................... 47

2.     Cash Payments ................................................................................. 47

3.     Allocation of Distributions; Postpetition Interest on Claims .................. 47

4.     Delivery of Distributions ................................................................... 48

5.     Compliance with Tax Requirements ................................................... 48

6.     No Distribution in Excess of Allowed Amounts................................... 49

7.     Special Rules for Distributions to Holders of Disputed Claims and Interests ......................................................................................... 49

8.     Manner of Payment Under Plan ........................................................ 49

G.     Procedures for Disputed Claims ......................................................................50

1.     Allowance of Claims ........................................................................ 50

2.     Claims and Interests Administration Responsibilities............................ 51

3.     Estimation of Claims ........................................................................ 51

4.     Adjustment to Claims Register Without Objection................................ 52

ii

5.      Disallowance of Claims...................................................................... 52
6.      Reimbursement or Contribution .......................................................... 53
7.      Amendments to Proofs of Claim ......................................................... 53
8.      No Distributions Pending Allowance................................................... 53
9.      Disputed Claims Reserve. ................................................................... 53
10.     Distributions After Allowance. ........................................................... 53
11.     Single Satisfaction of Claims .............................................................. 54
H.      Settlement, Release, Injunction, and Related Provisions.......................................54
1.      Compromise and Settlement of Claims, Interests, and
        Controversies ...................................................................................... 54
2.      Discharge of Claims and Termination of Interests................................ 54
3.      Releases by the Debtors. ..................................................................... 55
4.      Releases by Holders of Claims and Interests ........................................ 56
5.      Exculpation......................................................................................... 56
6.      Injunction............................................................................................ 57
7.      Release of Liens .................................................................................. 58
I.      Executory Contracts .........................................................................................58
1.      Rejection of Executory Contracts......................................................... 58
2.      Time for Filing Rejection Claims......................................................... 58
3.      Reservation of Rights .......................................................................... 59
J.      Conditions Precedent to Confirmation and the Effective Date............................59
1.      Conditions to Occurrence of the Effective Date ................................... 59
2.      Waiver of Conditions to Confirmation and Effective Date.................... 60
3.      Effect of Failure of Conditions to the Effective Date ........................... 60
K.      Effect of Confirmation .....................................................................................60
1.      Deemed Consent.................................................................................. 60
2.      No Waiver ........................................................................................... 60
3.      Disallowed Claims and Disallowed Interests ....................................... 61
L.      Retention of Jurisdiction ..................................................................................61

ARTICLE V   CERTAIN TAX CONSEQUENCES OF THE PLAN ........................................ 64
A.      Certain Tax Treatment to Holders of Interests ....................................................65
B.      Certain Tax Treatment to Holders of General Unsecured Trade Claims...............65
C.      Certain Tax Consequences to the Debtors ...........................................................65
1.      Cancellation of Indebtedness Income................................................... 65
a.      In General............................................................................................ 65
b.      Limitation of NOL Carryforwards and Other Tax Attributes. .............. 66
i.      General Section 382 Annual Limitation................................................ 66
ii.     Special Bankruptcy Exception. ............................................................ 67

ARTICLE VI  SOLICITATION AND VOTING PROCEDURES............................................ 68
A.      Holders of Claims and Interests Entitled to Vote on the Plan ..............................68
B.      Voting Record Date ..........................................................................................68
C.      Solicitation Package ..........................................................................................68
D.      Voting on the Plan ............................................................................................69

AMERICAS 124924883

ARTICLE VII FACTORS TO CONSIDER BEFORE VOTING ................................. 70
    A.    Risk of Amendment, Waiver, Modification or Withdrawal of the Plan ...............70
    B.    Parties May Object to the Plan's Classification of Claims and Interests .............70
    C.    The Debtors May Not Be Able to Obtain Confirmation of the Plan ...................71
    D.    The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the
            Bankruptcy Code ...........................................................................................71
    E.    The Conditions Precedent to the Effective Date of the Plan May Not
            Occur ...........................................................................................................71
    F.    Holders of Claims and Interests May Recover Less Than Projected ...................71
    G.    The Allowed Amount of Claims May Differ from Current Estimates .................72
    H.    Valuation of the Assets Is Speculative ...............................................................72
    I.    Risks Related to Income Taxation .....................................................................73
    J.    The Sale Process May Not Result In Consummation of a Sale ...........................73
    K.    Certain Risks to Holders of Interests ................................................................73
    L.    Litigation .........................................................................................................73

ARTICLE VIII        ALTERNATIVES TO CONFIRMATION AND
            CONSUMMATION OF THE PLAN ................................................... 74
    A.    Liquidation under Chapter 7 or dismissal ..........................................................74
    B.    Alternative Chapter 11 Plan .............................................................................75

ARTICLE IX CONFIRMATION OF THE PLAN ........................................................ 75
    A.    Acceptance of the Plan .....................................................................................75
    B.    Best Interests Test ............................................................................................76
    C.    Feasibility ........................................................................................................76
    D.    Confirmation Hearing and Plan Objection Deadline ...........................................77
    E.    Payment of Statutory Fees ................................................................................79
    F.    Governing Law ................................................................................................79
    G.    Notice of Entry of Confirmation Order and Relevant Dates ...............................80
    H.    Modification of the Plan and Amendments ........................................................80
    I.    Revocation, Withdrawal or Non-Consummation of Plan ....................................80
    J.    Binding Effect ..................................................................................................80
    K.    Severability of Plan Provisions .........................................................................80
    L.    No Admissions .................................................................................................81
    M.    Dissolution of the Committee ...........................................................................81
    N.    Time ................................................................................................................81
    O.    Successors and Assigns .....................................................................................81
    P.    Conflict between Plan, Disclosure Statement and Plan Documents .....................82
    Q.    Substantial Consummation ...............................................................................82
    R.    Plan Exhibits ....................................................................................................82

ARTICLE X    CONCLUSION AND RECOMMENDATION ................................................. 83

## EXHIBITS

**EXHIBIT A**:  Joint Chapter 11 Plan of Lordstown Motors Corp. and its Affiliated Debtors

**EXHIBIT B**:  Organizational Chart

**EXHIBIT C**:  Liquidation Analysis

**EXHIBIT D**:  Foxconn Complaint

# ARTICLE I
## INTRODUCTION[2]

This is the disclosure statement (the "**Disclosure Statement**") of Lordstown Motors Corp. ("**LMC**") and its affiliated debtors (collectively, the "**Debtors**" or the "**Company**"), in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**") pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), filed pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**") and in connection with the *Joint Chapter 11 Plan of Lordstown Motors Corp. and its Affiliated Debtors* (the "**Plan**"), a copy of which is annexed to this Disclosure Statement as **Exhibit A**.  The Plan constitutes a separate chapter 11 plan for each Debtor; *provided that* the estates of the various Debtors shall be consolidated for the purposes of effectuating distributions under the Plan.

### A.  Definitions

Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan or as the context otherwise requires.

### B.  Exhibits

The following exhibits to this Disclosure Statement are incorporated as if fully set forth herein and made part of this Disclosure Statement:

- **Exhibit A** – Plan

- **Exhibit B** – Organizational Chart

- **Exhibit C** – Liquidation Analysis

- **Exhibit D** – Foxconn Adversary Complaint

### C.  Purpose of this Disclosure Statement

The purpose of this Disclosure Statement is to provide information that (i) summarizes the Plan, (ii) advises holders of Claims or Interests of their rights under the Plan, (iii) assists parties entitled to vote on the Plan in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

By Order dated [●] [Docket No. [●]] (the "**Disclosure Statement Order**"), the Bankruptcy Court approved the Disclosure Statement finding, among other things, that it contains "adequate information," as that term is used in section 1125(a)(1) of the Bankruptcy Code.  The Bankruptcy Court's approval of this Disclosure Statement is not an endorsement of the Plan.

---

[2]   This Disclosure Statement remains subject to ongoing revisions of the Debtors in all respects.

AMERICAS 124924883

The Debtors believe that confirmation and implementation of the Plan is in the best interests of the Debtors' estates, creditors, and equity interest holders.  The Debtors urge that all persons entitled to vote on the Plan vote to accept the Plan.

### D. Important Notices and Disclaimers

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ AND CAREFULLY CONSIDER THE ENTIRE DISCLOSURE STATEMENT, THE PLAN, AND ANY ATTACHMENTS, EXHIBITS, SUPPLEMENTS, AND ANNEXES RELATED TO THE PLAN BEFORE SUBMITTING BALLOTS IN RESPONSE TO SOLICITATION OF THE PLAN.  THE INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED PLAN AND RELATED DISCLOSURE STATEMENT.**

**THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT SUCH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL TERMS AND PROVISIONS OF THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  PERSONS TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN THE DEBTORS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DID NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.**

**IF THE PLAN IS NOT CONFIRMED, OR IS CONFIRMED BUT DOES NOT BECOME EFFECTIVE, THIS DISCLOSURE STATEMENT AND THE STATEMENTS**

**CONTAINED HEREIN SHALL HAVE NO FORCE OR EFFECT. NEITHER THE DISCLOSURE STATEMENT NOR ANY STATEMENT CONTAINED HEREIN CONSTITUTES AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, NOR ARE THEY ADMISSIBLE IN ANY COURT OR LEGAL FORUM FOR ANY PURPOSE WHATSOEVER. NOTHING IN THIS DISCLOSURE STATEMENT SHALL BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.**

**APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

**HOLDERS OF CLAIMS OR INTERESTS SHOULD CAREFULLY READ AND CONSIDER THE PLAN AND THIS DISCLOSURE STATEMENT. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, FINANCIAL AND TAX ADVISOR(S) WITH RESPECT TO MATTER CONCERNING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.**

**BALLOTS FOR VOTING TO ACCEPT AND REJECT THE PLAN MUST BE RECEIVED BY AT [●] AT 4:00 P.M. (PREVAILING EASTERN TIME). THE HEARING TO CONSIDER CONFIRMATION OF THE PLAN WILL BE HELD ON [●] BEFORE THE HONORABLE MARY F. WALRATH.**

The information contained in this Disclosure Statement has been obtained from the Debtors' books and records and from motions and other papers filed with the Bankruptcy Court by the Debtors. Reasonable efforts have been made to present accurate information and such information is believed to be correct as of the date hereof, unless otherwise specified. This Disclosure Statement is intended, among other things, to summarize the Plan and must be read in conjunction with the Plan and its exhibits.

---

**WHERE TO FIND ADDITIONAL INFORMATION**

LMC currently files annual reports with, and furnishes other information to, the SEC. Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link. Each of the following filings is incorporated as if fully set forth herein and is a part of this Disclosure Statement (but later information filed with the SEC that updates information in the filings incorporated by reference will update and supersede such information):

- Annual Report on Form 10-K for the fiscal year ended December 31, 2022, filed with the SEC on March 6, 2023;

---

- Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2023 and June 30, 2023 filed with the SEC on May 4, 2023 and August 14, 2023, respectively; and

- Current Reports on Form 8-K filed with the SEC between January 1, 2023 and August 29, 2023.

### E.  Brief Overview of the Plan[3]

The Debtors' have filed their bankruptcy cases to, among other things, sell their assets in an efficient and value maximizing manner, consolidate the resolution of claims in a single forum, prosecute their substantial claims against Foxconn and maximize Distributions to holders of Claims and Interests.  As a result, the Debtors have commenced a court-approved process to market and sell their assets, are working to resolve the material claims against them, and have filed a complaint against Foxconn in the Bankruptcy Court.  The Plan is consistent with these purposes. It provides for the liquidation of any assets remaining after the sale process, the continuation of the litigation against Foxconn, as well as any other causes of action of the Debtors, the resolution of claims against the Debtors, and for the distributions of the Debtors' Cash, including proceeds generated from the sale of assets and the litigation against Foxconn, to holders of Allowed Claims and Interests in accordance with the relative priority established by the Bankruptcy Code.  The Plan also preserves the ability of the Debtors to enter into one or more transactions after the Effective Date to monetize certain of their tax attributes.

The Plan contemplates the appointment of a Claims Administrator to disburse funds to Holders of General Unsecured Trade Claims.  The Claims Administrator will be authorized to administer a pool of cash that will be established under the Plan to pay Holders of General Unsecured Trade Claims, and to carry out and implement all provisions of the Plan delegated to the Claims Administrator.  The Claims Administrator will be selected by the Committee with the consent of the Debtors.  The identity of the Claims Administrator has not yet been determined and will be disclosed prior to confirmation.

As further described in Article IV below, the Plan classifies all Claims and Interests, except for Administrative Claims, in accordance with section 1123(a)(1) of the Bankruptcy Code.  The following table summarizes the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the full text of the Plan:

| Class | Claim / Interest | Status | Voting Rights | Est. Amount | Est. Recovery |
|-------|------------------|--------|---------------|-------------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | Estimated at $[●] | 100% |

---

[3]   This overview is qualified in its entirety by reference to the Plan.  The treatment of Claims and Interests under the Plan is not intended to, and will not, waive, compromise, or limit any rights, claims, or causes of action if the Plan is not confirmed.  You should read the Plan in its entirety before voting to accept or reject the Plan.

4

| Class | Claim / Interest | Status | Voting Rights | Est. Amount | Est. Recovery |
|---|---|---|---|---|---|
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | Estimated at $[●] | 100% |
| 3 | General Unsecured Trade Claims | Impaired | Entitled to Vote | Estimated at $[●] | [●]% to [●]% |
| 4 | Other Unsecured Claims | Impaired | Entitled to Vote | Estimated at $[●] | [●]% to [●]% |
| 5 | Foxconn Preferred Stock Interests | Impaired | Deemed to Reject | 300,000 shares | $0.00 |
| 6 | Intercompany Interests | Unimpaired | Deemed to Accept | N/A | N/A |
| 7 | Common Stock Interests | Impaired | Entitled to Vote | 15,953,212 shares | $[●] to $[●] per share |

## ARTICLE II
## OVERVIEW OF THE DEBTORS

### A.  The Debtors' Background and Prepetition Business Operations

The Debtors were founded for the purpose of developing, manufacturing, and selling electric vehicles ("**EVs**") primarily to commercial fleet customers.  The commercial segment, including government fleets, has been generally underserved, with very few light-duty EVs specifically geared towards the sector until recently.  The Company's mission of accelerating adoption of EVs by commercial fleets would meaningfully drive down tailpipe emissions insofar as commercial fleets account for a significant amount of vehicle miles driven.  As of the Petition Date, the Company was one of the only light-duty original equipment manufacturers ("**OEM**") focused solely on EVs for commercial fleet customers in the United States.  The Company's first vehicle, the Endurance, is a full-size, all-electric pickup truck, one of the first all-electric trucks sold in North America. As of the Petition Date, the Company, however, was still in its nascent stages, and only approximately 65 Endurance trucks were manufactured.  By the time the production of the Endurance ceased, shortly after the Petition Date, a total of approximately 80 Endurances had been manufactured.

5

The Endurance's most unique design attribute is its hub motor design, which features a propulsion hub motor in each wheel. The Company licenses certain of the non-proprietary intellectual property for the Endurance hub motors from an Eastern European company (Elaphe Propulsion Technologies Ltd.) that developed the base technology. The Company has made various enhancements to the base technology. The Company believes the core hub motor technology is not being pursued by any other light-duty OEM in the United States. The hub motor technology has certain design attributes that would make the vehicle even more attractive to potential customers. For example, it allows for a superior turning radius, maneuverability and traction.

The Debtors' business was initially exciting and attractive. LMC was able to become a publicly-traded company with an equity market capitalization that reached $5.3 billion. But, as is typical for most start-up businesses, the Company experienced some challenges that delayed its initial product launch. That is why, beginning in 2021, the Debtors forged what they thought would be a mutually beneficial partnership with Hon Hai Technology Group and Foxconn EV Technology, Inc. (collectively with their affiliates, "**Foxconn**"), the world's largest electronics manufacturer. As further explained in Article II.A.2 below, the purpose of the Foxconn partnership was to help address the Company's funding needs and allow the Company to shift its business strategy from a vertically integrated OEM to a less capital-intensive model, focused on developing, engineering, testing, and industrializing EVs in close partnership with Foxconn. What started out as a promising partnership devolved, over a two-year period, as Foxconn failed to satisfy its commitments to provide operational support and funding under the parties' investment agreement and failed to honor commitments in the parties' manufacturing agreement to help to reduce the production cost of the Endurance, access Foxconn's supplier network and to assist in improving the commercial terms of procurement with suppliers, along with the other actions outlined in the complaint against Foxconn. Foxconn's actions have damaged the Company's business relationships, employee morale and relations, and the Company's future prospects. Given these challenging circumstances and the fact that the Debtors' assets would only continue to erode otherwise, the Debtors filed the Chapter 11 Cases to maximize value for the benefit of their stakeholders. To achieve this end, the Debtors are engaging in a sale process to sell substantially all of their assets, are pursuing their claims against Foxconn, and are working to quickly and efficiently resolve material claims against them. The Debtors believe that this will result in substantial recoveries to Holders of Claims and, if funds are sufficient, potentially material recoveries to Holders of Interests.

### 1. SPAC Merger

On November 13, 2018, LMC was incorporated under the name DiamondPeak Holdings Corp. ("**DiamondPeak**").[4] DiamondPeak was a Delaware special purpose acquisition company, or SPAC, incorporated for the purpose of completing an initial public offering and, thereafter, effecting a business combination. In March 2019, DiamondPeak completed its initial public offering (the "**Initial Public Offering**").

---

[4]    DiamondPeak, as used herein, refers to the entity now known as Lordstown Motors Corp. prior to its name change.

AMERICAS 124924883

On April 30, 2019, the entity now known as Lordstown EV Corporation (*i.e.*, LEVC, which the Company refers to as "**Legacy Lordstown**") was incorporated in Delaware.  On October 30, 2020, Legacy Lordstown which, at that time, was called Lordstown Motors Corp., consummated a merger (the "**SPAC Merger**") with DiamondPeak and DPL Merger Sub Corp ("**Merger Sub**"). Pursuant to the SPAC Merger, Merger Sub merged with and into Legacy Lordstown, with Legacy Lordstown (post-merger, LEVC) surviving as a subsidiary of DiamondPeak.  In connection with the SPAC Merger, DiamondPeak changed its name to Lordstown Motors Corp. (such post-SPAC Merger entity, "**LMC**") and the surviving entity in the SPAC Merger became LEVC.

On October 29, 2020, the Company formed Lordstown EV Sales LLC ("**LMC Sales**") to sell vehicles directly to customers.  LMC Sales is the wholly owned subsidiary of LEVC which, in turn, is the wholly owned subsidiary of LMC.

## 2. Partnership with Foxconn

In the second half of 2021, in the face of significant liquidity needs to fund the expansion of its business at a time when the market for new capital, in size, for SPACs was proving more difficult to obtain, the Company made the decision to significantly change its business model to one that would focus on deep collaboration with one or more strategic partners, and began the search that ultimately resulted in its partnership with Foxconn.  The Company began its relationship with Foxconn in September 2021 after exploring other potentially attractive options. The purpose of the Foxconn partnership was to allow the Company to shift its business strategy from a vertically integrated OEM to a less capital-intensive model, focused on developing, engineering, testing, and industrializing EVs in close partnership with Foxconn.  Although the Company's partnership with Foxconn did not turn out as the Company had hoped (or had been led to believe), there were many good reasons for the Company to pursue this path. The Company believed that by pairing its innovation, technology, manufacturing expertise and global supply chain capabilities, the Company would be best positioned to thrive.

On September 30, 2021, the Company and Foxconn entered into an Agreement in Principle (the "**AIP**") to form a deep partnership and work jointly on electric vehicle programs.  The AIP contemplated that Foxconn and the Company would (a) enter into an asset purchase agreement by which Foxconn would buy the Debtors' manufacturing Plant in Lordstown, Ohio (the "**Plant APA**"), (b) enter into a manufacturing supply agreement (the "**Contract Manufacturing Agreement**" or "**CMA**") by which Foxconn would manufacture the Endurance, and (c) jointly collaborate on the development of future vehicle programs.   On November 10, 2021, the parties signed the Plant APA.  After a delay,  Foxconn closed the Plant APA on May 11, 2022, executed the CMA, and entered into a joint venture agreement (the "**JV Agreement**").

At Foxconn's request, the Company agreed, on November 7, 2022, to pivot away from the JV Agreement and, instead, the Company and Foxconn (through its subsidiary Foxconn Ventures Pte. Ltd.) entered into a direct investment agreement (the "**Investment Agreement**").   The Investment Agreement provided that the parties' respective obligations under the JV would be terminated, but would be replaced with even greater direct funding into the Company.[5]  Under the

---

[5] On April 21, 2023, a certificate of cancellation was filed with the State of Delaware dissolving the JV.

AMERICAS 124924883

Investment Agreement, Foxconn agreed to make necessary equity investments in the Company through the purchase of $70 million of Common Stock and up to $100 million in Series A convertible preferred stock, $0.0001 par value per share, issued by LMC ("**Preferred Stock**"), subject to certain conditions. Foxconn and the Company closed the initial investment under the Investment Agreement on November 22, 2022.

After the initial closing, however, Foxconn created delay and refused to honor its further obligations under the Investment Agreement, including the obligation to close on an additional $47.3 million investment into the Company (the "**Subsequent Common Closing**"), for which all funding conditions had been satisfied. As of the Petition Date, Foxconn continued to refuse to honor its obligation to consummate Subsequent Common Closing, starving the Company of needed capital Foxconn was required to contribute. As of the Petition Date, the Company continued to experience severe liquidity constraints and, in light of such constraints and the additional circumstances leading to the commencement of the chapter 11 cases discussed in Article II.F below, the Company determined that filing for chapter 11 protection was in the best interest of its creditors and stakeholders.

As discussed in more detail below, on the Petition Date, the Company filed the Foxconn Adversary Proceeding in the Bankruptcy Court seeking relief for fraudulent and tortious conduct as well as breaches of the Investment Agreement, the parties' joint venture agreement, the Plant APA, and the CMA that the Company believes were committed by Foxconn. The Company's adversary complaint against Foxconn (the "**Foxconn Complaint**"), attached as **Exhibit D**, sets forth additional detail regarding the Company's causes of action against Foxconn. As further described in the Foxconn Complaint, the Company believes that Foxconn's actions have caused substantial harm to the Company's operations and prospects resulting in significant damages.

### B. The Debtors' Corporate Structure

The Company is comprised of the three entities that are Debtors in these Chapter 11 Cases: (1) LMC; (2) Lordstown EV Corporation ("**LEVC**"); and (3) Lordstown EV Sales LLC ("**LEVS**"). LMC is the publicly traded parent of the other Debtors. LMC directly owns 100% of LEVC, which is the operating entity. In turn, LEVC owns 100% of LEVS, an entity created for the purposes of vehicle sales. An organizational chart depicting the Debtors' overall ownership structure is attached hereto as **Exhibit B**.

### C. The Debtors' Capital Structure

As of the Petition Date, none of the Debtors are borrowers or obligors with respect to any funded debt obligations. Instead, the Debtors' capital comes from the SPAC Merger, additional capital raises, and sales of LMC's Preferred Stock and Common Stock, as well as the sale of the Plant to Foxconn.

As of the Petition Date, the Debtors had approximately $136 million in cash on hand, which the Debtors believe was and is entirely unencumbered by any liens, with the exception of one

8

$100,000 account related to the Debtors' purchase card program, deposits with landlords, and customs bonds.[6]

In addition, as of December 31, 2022, the Debtors estimated that they had valuable tax attributes including, without limitation, (i) federal NOLs of approximately $629.6 million, which generated a deferred tax asset of $132 million, (ii) local NOLs of approximately $327 million, which generated a deferred tax asset of $3.7 million, and (iii) an indeterminate amount of net unrealized built-in loss.

As of the Petition Date, the Debtors estimated that there were 300,000 outstanding shares of Preferred Stock, all of which were held by Foxconn.[7]  As of the Petition Date, there were 15,952,991 shares of Common Stock either outstanding or in the process of being settled for equity awards that vested prior to the Petition Date, which reflects a 1:15 reverse stock split that the Debtors implemented on May 23, 2023.  As of the Petition Date, Foxconn held approximately 8.4% of the Common Stock, excluding the impact of conversion of any of its Preferred Stock into Common Stock, and there were no other holders that hold 5% or more of Common Stock.

Prior to the Petition Date, LMC's Common Stock traded on the NASDAQ Global Stock Market under the symbol "RIDE."  For the date prior to the Petition Date, the closing Common Stock share price was approximately $2.76.  On June 28, 2023, the Debtors received notification from Nasdaq that it was commencing a customary delisting process in light of the commencement of the Chapter 11 Cases. Trading of LMC's Common Stock was suspended at the opening of business on July 7, 2023 and a Form 25 was filed with the SEC on July 27, 2023 to delist the Common Stock from Nasdaq. The delisting became effective August 6, 2023.  As a result, LMC's Common Stock began trading on the OTC Pink Marketplace under the symbol "RIDEQ" on July 7, 2023, and such market is currently the only trading market for our Class A common stock.

---

[6]    The company maintains one encumbered bank account in connection with its purchase card program, which has an account balance of only $100,000 as of the Petition Date.

[7]    As discussed herein, The Company commenced an adversary proceeding against Foxconn in the Bankruptcy Court seeking relief for fraudulent and tortious conduct as well as breaches of the Investment Agreement, the parties' joint venture agreement, the Plant APA, and the CMA that the Company believes were committed by Foxconn.  In addition, through the Plan, which shall serve as a motion to equitably subordinate Foxconn's Interests, including its Preferred Stock Interests, the Company is seeking to subordinate Foxconn's Interests. Subject to these actions and the Company's other rights with respect to Foxconn's Interests, Preferred Stock ordinarily ranks senior to Common Stock with respect to dividend rights; distribution rights in the event of a liquidation or wind down; and redemption rights.  Absent challenge to such Interests (such as the Debtors' with respect to Foxconn's Preferred Stock Interests), Holders of Preferred Stock are entitled to receive cumulative dividends at a rate of 8% per annum, compounding on a quarterly basis to the extent they are not paid by the Company.  Pursuant to the Company's certificate of designation regarding Preferred Stock, shares of Preferred Stock are typically entitled to receive distributions in cash in the greater of (i) $100 per share plus accrued unpaid dividends or (ii) the amount the holder would have received had it converted such share into Common Stock immediately prior to the date of such liquidation event, before any distributions shall be made on any shares of Common Stock.

AMERICAS 124924883

### D.  **The Debtors' Workforce and Facilities**

As of the Petition Date, the Debtors had approximately 243 employees across three main locations in Lordstown, Ohio, Farmington Hills, Michigan, and Irvine, California.  Of these employees, approximately 225 were active full-time employees and approximately 18 were active hourly employees.

On May 9, 2023, the Debtors issued notices to 17 employees in the Farmington Hills, Michigan office location pursuant to the Worker Adjustment and Retraining Notification ("**WARN**") Act. 29 U.S.C. §§ 2101–09.  On May 18, 2023, the Debtors issued a second round of WARN notices (together with the notices issued on May 9, 2023, the "**WARN Notices**") to 98 employees, all located in the Farmington Hills, Michigan office location.[8]  The Debtors notified these employees that permanent layoffs could begin as early as July 8, 2023 and no later than July 21, 2023.  The Debtors also notified the relevant government authorities.  These layoffs are due to insufficient funding resulting primarily from a dispute with Foxconn regarding its contractual obligations to LMC.  As a result of the various WARN Notices and associated layoffs, the Debtors employ 119 employees as of the date of filing of this Disclosure Statement.

The Debtors operate out of the following leased facilities: (1) office space leased from Foxconn at the Plant in Lordstown, Ohio (from which fewer than 10 employees currently operate); (2) two sites in Farmington Hills, Michigan, including space for engineering, product development, vehicle inspection and benchmarking, labs for testing, validation and prototyping, and corporate offices (from which fewer than 85 employees currently operate); and (3) an engineering, vehicle development, and service center in Irvine, California, primarily for developing advanced electronic hardware and software for infotainment systems as well as vehicle cybersecurity, connected vehicle and fleet services systems (and from which fewer than 20 employees currently operate).  In addition, fewer than 10 of the Debtors' employees currently work remotely, serving in managerial, administrative, sales, and research and development roles.[9]

### E.  **Prepetition Litigation**

As of the Petition Date, the Debtors were party to numerous civil actions, including in various state and U.S. federal courts and investigations by the SEC (collectively, the "**Prepetition Litigation**"), as described below.

#### 1.  **SEC Investigation and Securities Actions**

In February 2021, the SEC initiated an investigation (the "**SEC Investigation**") related to the SPAC Merger with DiamondPeak and LMC's reported pre-orders for vehicles, production timeline and certain other matters.  Following the initiation of the SEC Investigation, a series of plaintiffs brought class action and derivatives suits against LMC, certain of its current and former

---

[8]  Some of these employees have been placed on administrative leave.  Therefore, they are not reporting to work but are continuing to be paid.

[9]  All employee estimates in this paragraph are as of the date of filing of this Disclosure Statement.

AMERICAS 124924883

directors and officers ("**D&Os**") and/or employees.  The class actions and derivative actions include the following:

- **Ohio Securities Class Action**.  A consolidated securities fraud class action that was pending in the U.S. District Court for the Northern District of Ohio prior to the Petition Date, captioned *In re Lordstown Motors Corp. Sec. Litig.*, No. 4:21-cv-616-DAR (N.D. Ohio).  This matter consists of six consolidated putative securities fraud class action lawsuits in which certain putative class plaintiffs[10] assert claims against LMC, Lordstown EV Corp., and certain D&O defendants[11] for violations of Section 10(b), Section 14(a), Section 20(a), and Section 20A of the Securities Exchange Act of 1934 ("**Exchange Act**") and SEC Rule 10b-5 promulgated thereunder.  On November 9, 2021, the Debtors and D&O defendants filed a motion to dismiss the Ohio Securities Class Action.  The motion has been fully briefed since March 3, 2022 and was awaiting the court's scheduling of a hearing and ruling as of the Petition Date.  Discovery was stayed pending resolution of the motion to dismiss.  As of the Petition Date, no deadline had been set for plaintiffs to seek class certification and no trial date had been set.

- **Delaware Shareholder Class Action**.  A consolidated stockholders class action pending in the Delaware Court of Chancery prior to the Petition Date, captioned *In re Lordstown Motors Corp. Stockholders Litig.*, C.A. No. 2021-1066-LWW (Del. Ch.).  This matter consists of two consolidated putative class action lawsuits filed by plaintiffs Benjamin Hebert and Atri Amin, respectively, asserting breach of fiduciary duty claims against certain D&O defendants.[12]  On February 3, 2023, the D&O defendants filed an answer to the amended complaint.  Discovery has commenced.  While the Debtors were not named as a defendant, defendants have asserted indemnification rights against the Debtors and, on June 9, 2023, the chancery court granted, in part, a motion to compel document discovery from Debtor LMC.  On July 21, 2023, the plaintiffs filed a motion for class certification.  On August 21, 2023, the defendants in the action filed their answering brief.  A trial date has been set for March 11, 2024.

  As described in more detail below (in Article III.J), the Debtors brought an adversary proceeding to extend the automatic stay to the current and former directors and officers named in the Delaware Class Action. In the adversary proceeding, the Debtors sought a preliminary injunction to extend the automatic stay, which motion the Bankruptcy Court denied without prejudice.

- **Ohio Derivative Action**.  A derivative action pending in the U.S. District Court for the Northern District of Ohio prior to the Petition Date, captioned *Thai v. Burns et al.*, No.

---

[10]  The plaintiffs are: Jesse Brury, FNY Managed Accounts LLC, Robert Palumbo, Matthew Rico, Raymond Romano, George Troicky, and Sulayman Zuod.

[11]  The D&O defendants are: Stephen S. Burns, Shane Brown, Caimin Flannery, David T. Hamamoto, Julio Rodriguez, Phil Richard Schmidt, and Darren Post.

[12]  The D&O defendants are: David Hamamoto, Mark Walsh, Andrew Richardson, Steven Hash, and Judith Hannaway.  DiamondPeak Sponsor LLC, a non-debtor entity that was involved in the SPAC Merger, was also named as a defendant, but was dismissed, without prejudice, by order entered by the chancery court on June 21, 2023.

AMERICAS 124924883

4:21-cv-01267 (N.D. Ohio). On June 30, 2021, Derivative Plaintiff An Thai brought this shareholder derivative lawsuit on behalf of LMC, as nominal defendant, against nineteen D&O defendants [13] asserting violations of Sections 14(a), 10(b), and 20(a), and for contribution under Sections 10(b) and 21D, of the Exchange Act, as well as claims for breach of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. On October 21, 2021, the Court entered a stipulated stay of the action and scheduling order relating to defendants' anticipated motion to dismiss and/or subsequent motion to stay that is conditioned on the resolution of the motion to dismiss in the Ohio Securities Class Action. Discovery had not yet commenced, and no trial date had been set. From and after the Petition Date, the Ohio Derivative Action was stayed by operation of the automatic stay.

- **District of Delaware Derivative Action**. A consolidated derivative action pending in the U.S. District Court for the District of Delaware prior to the Petition Date under lead case captioned *In re Lordstown Motors Corp. Shareholder Derivative Litigation*, No. 21-00604-SB (D. Del.). The matter consists of four consolidated shareholder derivative lawsuits filed between April 28, 2021 and July 9, 2021 by certain plaintiffs [14] on behalf of LMC, as nominal defendant, against certain D&O defendants [15] asserting violations of Section 10(b), Section 14(a), Section 20(a), and contribution for violations of Sections 10(b) and 21D, of the Exchange Act, as well as breach of fiduciary duty, insider selling, and unjust enrichment derivatively for the benefit of LMC. On May 9, 2023, the Court re-issued a stay in the action pending resolution of the motion to dismiss in the Ohio Securities Class Action, discussed above, given the similarity in issues raised by the actions. As of the Petition Date, discovery had not yet commenced and no trial date had been set. From and after the Petition Date, the District of Delaware Derivative Action was stayed by operation of the automatic stay.

- **Delaware Chancery Derivative Action**. A consolidated derivative action pending in the Delaware Court of Chancery prior to the Petition Date under lead case captioned *In re Lordstown Motors Corp. Stockholder Derivative Litigation*, C.A. No. 2021-1049-LWW (Del. Ch.). The matter consists of two consolidated shareholder derivative lawsuits filed on December 2, 2021 and February 18, 2022 by derivative plaintiffs David M. Cormier [16] and Janelle Jackson asserting derivative claims for breach of fiduciary duty and unjust

---

[13] The D&O defendants are: Stephen S. Burns, Phil Richard Schmidt, Julio Rodriguez, Angela Strand Boydston, Shane Brown, Michael Fabian, Keith A. Feldman, Michael D. Gates, David T. Hamamoto, Judith A. Hannaway, Steven R. Hash, Mickey W. Kowitz, Darren Post, Jane Reiss, Andrew C. Richardson, Martin J. Rucidlo, Dale G. Spencer, Chuan D. "John" Vo, and Mark A. Walsh.

[14] The derivative plaintiffs are: Daniel J. Cohen, David M. Cohen, Alicia Kelley, Claude L. Patterson, Evaristo Sarabia, and Herbert Stotler.

[15] The D&O defendants are: Stephen S. Burns, Phil Richard Schmidt, Julio Rodriguez, Michael Fabian, David T. Hamamoto, Mark A. Walsh, Andrew C. Richardson, Steven R. Hash, Judith A. Hannaway, Keith A. Feldman, Jane Reiss, Dale G. Spencer, Michael D. Gates, Mickey Kowitz, Angela Strand Boydston, and Martin J. Rucidlo.

[16] Lead plaintiff David M. Cormier has been replaced with lead plaintiff Ed Lomont in the Delaware Chancery Derivative Action.

enrichment against certain D&O defendants.[17]  The matter is stayed pending resolution of the motion to dismiss in the Ohio Securities Class Action.  As of the Petition Date, discovery had not yet commenced and no trial date had been set.  From and after the Petition Date, the Delaware Chancery Derivative Action was stayed by operation of the automatic stay.

### 2.  Karma Litigation

On October 30, 2020, Karma commenced a suit against LMC and certain of its current and former executive officers and employees in the California District Court, Case No. 20-cv-02104 (the "**Karma Action**"), generally alleging misappropriation of trade secrets and intellectual property, conspiracy, breach of the parties' non-disclosure agreement, interference with Karma's employment contracts, RICO conspiracy, and violation of computer fraud statutes, and for injunctive relief and monetary damages based on a variety of claims and theories asserting very substantial losses by Karma and/or improper benefit to the Debtors.  On April 20, 2021, Karma filed an amended, operative complaint (the "**Karma Complaint**"). Karma has asserted its damages related to the complaint could exceed $900 million.

As discussed in more detail in <u>Article III.K</u>, the Debtors and Karma reached a settlement of the Karma Action and related matters, which the Bankruptcy Court approved on August 28, 2023.  The Debtors have made a $40 million settlement payment to Karma to resolve the disputes among the parties.

### F.  <u>Circumstances Leading to the Commencement of the Chapter 11 Cases</u>

The Debtors filed the Chapter 11 Cases to maximize value by conducting a court-supervised sale process, reducing their cash burn to preserve resources, and centralizing the claims asserted by and against the Debtors to efficiently resolve those claims and provide meaningful recoveries to their creditors and, if sufficient, their shareholders.

As discussed in more detail in the Foxconn Complaint, attached as **<u>Exhibit D</u>**, Foxconn ultimately failed to live up to its commitments to (i) support the Endurance, including by using its purchasing and supply chain capabilities to reduce the production cost of the vehicle, (ii) fund and work with the Company on future vehicle product development and be a preferred vehicle development partner in North America, and (iii) provide funding for general corporate purposes through the purchase of LMC's stock.

Moreover, leading up to the Petition Date (including in light of Foxconn's failure to fulfill its stock purchase commitments), the Company's need for additional capital to remove the uncertainty surrounding the Company's ability to execute its business plan and scale the Endurance became preeminent.  While Foxconn is contractually obligated to provide a meaningful amount of capital and critical operational support, it had repudiated its obligations.  Further, the Company

---

[17]  The D&O defendants in the Delaware Chancery Derivative Action are: Keith A. Feldman, Michael D. Gates, David T. Hamamoto, Mickey Kowitz, Jane Reiss, Martin J. Rucidlo, Dale G. Spencer, Angela Strand, Shane Brown, Stephen S. Burns, Caimin Flannery, Darren Post, Julio Rodriguez, Phil Richard Schmidt, Chuan D. "John" Vo, Judith Hannaway, Steven R. Hash, Andrew C. Richardson, and Mark A. Walsh.

AMERICAS 124924883

did not believe that sufficient capital from other sources was available.  Previously, in September 2021, the Company retained Jefferies LLC ("**Jefferies**") to explore market alternatives, primarily relating to securing an OEM partner or investor (as opposed to an outright sale of some or substantially all of the Company's assets, as is contemplated by the current sale process before the Bankruptcy Court).  Through that separate prepetition capital raise process, the Company and Jefferies, in consultation with Foxconn, prepared a list of more than 50 potential investors and strategic OEM partners across the globe to be contacted.  While there was engagement from numerous potential parties, the prepetition capital raise process did not result in any actionable transactions.  Meanwhile, prior to the Debtors' aggressive cost cutting actions taken shortly before the Petition Date, and ceasing production of the Endurance, the Debtors' average cash burn had ranged from $10 million to $15 million per month.[18]

The market outlook as of the Petition Date, combined with the other factors discussed herein, made it unlikely that the Company's prospects would change in the near future.  General market forces and outlooks, including rising interest rates and the availability of credit, as well as forecasts of a near term recession made raising capital extremely difficult.  Moreover, those general hardships were even more pronounced in the electric vehicle sector.  As evidenced by the Debtors' prepetition capital raise and marketing process, there is a broadly negative investor sentiment towards publicly traded startup companies, and especially electric vehicle manufacturers.  Indeed, there have been almost no traditional marketed equity sales of size among small capitalization EV companies in over a year and every start-up EV company has sustained massive declines in market capitalization.  Moreover, from January 1, 2022 to April 19, 2023, even the largest U.S. OEMs (Ford, GM, and Tesla), experienced market capitalization declines of 45%, 47% and 57%, respectively, in comparison to only a 21% decline of the Russell 2000 index.

The Debtors also faced additional challenges to raising capital.  Chief among these challenges was the lack of progress with the Debtors' new vehicle program with Foxconn, the prepetition disputes with Foxconn, and the substantial uncertainty related to the outcome of the Prepetition Litigations.  That uncertainty contributed to the generally negative prepetition investor sentiment toward the Company, driving LMC's stock price down over the past two years.  As of June 30, 2023, the Company reported a $75.0 million reserve accrued on account of the Prepetition Litigations, including for potential settlements, noting that the full range of possible outcomes could result in significantly higher liability.  The threat of this potentially significant loss, the Company's need to divert resources to defending the Prepetition Litigations, and the lack of aid from insurers, and perhaps most importantly, the ongoing disputes with Foxconn, together created a significant obstacle to raising capital in size prior to the Petition Date.

Although the Company successfully reduced its cash burn—outperforming its liquidity forecasts in every fiscal quarter of 2022—and maintained sufficient cash to continue operations in the near term as of the Petition Date, time was and remains of the essence.  As of the Petition Date, the Debtors had approximately $136 million in cash and cash equivalents.  As of August 25, 2023, the Debtors estimated monthly cash burn was approximately $6.7 million (excluding extraordinary costs and contingent liabilities).

---

[18]    As of the Petition Date, the Debtors had reduced their estimated monthly cash burn to approximately $5 million (excluding extraordinary costs and contingent liabilities).

AMERICAS 124924883

When it became clear that Foxconn would ultimately fail to live up to its commitments, the Company had no viable, stand-alone business model and its best option was to seek chapter 11 protection to pursue three main objectives: (i) undertake an efficient and value maximizing sale process for all or substantially all of the Company's assets under section 363 of the Bankruptcy Code, (ii) use the breathing spell afforded by the Bankruptcy Code to stay significant pending litigation and claims against the Company and efficiently and fairly liquidate all claims in a centralized forum, and (iii) reduce costs and minimize the Company's operating cash burn. The Company filed these Chapter 11 Cases to execute an expeditious strategic transaction and preserve as much value as possible for all stakeholders.

Shortly after the Petition Date, the Debtors finished the process of producing a limited number of Endurances that were still in production and ceased further meaningful production activities in order to preserve assets. The Debtors have turned their focus to identifying one or more transactions to maximize recoveries through the chapter 11 cases, including marketing and selling the Company and/or substantially all of its assets pursuant to the sale process (the "**Sale Process**") contemplated by the Bidding Procedures (defined below), which Sale Process is discussed in more detail in Article III.C below.

## ARTICLE III
## OVERVIEW OF THE CHAPTER 11 CASES

### A. Commencement of the Chapter 11 Cases

On June 27, 2023 (the "**Petition Date**"), the Debtors commenced the Chapter 11 Cases. The Debtors continue managing their properties and operating their businesses as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

### B. First Day and Second Day Relief

#### 1. Operational First Day Motions and Relief Granted

On the Petition Date, the Debtors filed operational motions with the Bankruptcy Court seeking various forms of relief designed to facilitate a smooth transition for the Debtors into chapter 11 (collectively, the "**First Day Motions**"). The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered, among others, orders:

- Authorizing, but not directing, the Debtors to continue using their cash management system and other related relief, both on an interim [Docket No. 57] and a final basis [Docket No. 187];

- Authorizing, but not directing, the Debtors to pay employee wages and related obligations, both on an interim [Docket No. 75] and a final basis [Docket No. 178];[19]

---

[19] Prior to entry of the final order granting such relief, the court entered an amended interim order [Docket No. 106].

AMERICAS 124924883

- Authorizing, but not directing, the Debtors to pay critical vendors, both on an interim [Docket No. 58] and a final basis [Docket No. 185];

- Authorizing, but not directing, the Debtors to pay certain taxes, both on an interim [Docket No. 59] and a final basis [Docket No. 177];

- Authorizing, but not directing, the Debtors to pay certain customer obligations, both on an interim [Docket No. 62] and a final basis [Docket No. 186];

- Establishing procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service, both on an interim [Docket No. 60] and a final basis [Docket No. 183];

- Authorizing, but not directing, the Debtors to maintain their insurance programs, both on an interim [Docket No. 61] and a final basis [Docket No. 179]; and

- Establishing notice and hearing procedures for trading in equity securities in the Debtors, both on an interim [Docket No. 63] and a final basis [Docket No. 180].[20]

## 2. Procedural First and Second Day Motions

On and after the Petition Date, the Debtors also filed various procedural motions and applications regarding procedural issues in connection with the Chapter 11 Cases. The Bankruptcy Court granted substantially all of the relief requested in those procedural motions and entered, among others, orders:

- Directing the joint administration of the Chapter 11 Cases for procedural purposes only [Docket No. 53];

- Confirming the worldwide automatic stay and certain other debtor protections under the Bankruptcy Code [Docket No. 78];

- Extending the time to file schedules of assets and liabilities and statements of financial affairs [Docket No. 173];

- Establishing procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals [Docket No. 181]; and

- Establishing procedures for the retention and compensation of professionals used by the Debtors in the ordinary course of their business [Docket No. 182].

### C. The Sale Process

One element of the Chapter 11 Cases is the implementation of a marketing and sale process designed to result in the sale of all, substantially all, or some of the Debtors' assets in a value

---

[20] In addition to the above-listed relief, on the Petition Date, the Debtors filed the Bidding Procedures Motion (defined below), as discussed in more detail in Article III.C below.

maximizing manner.  The Debtors have retained Jefferies to serve as their investment banker.  In addition, the Debtors filed their *Motion for Entry of Orders (a) Establishing Bidding and Auction Procedures; (b) Scheduling Certain Dates with Respect Thereto; (c) Approving the Form and Manner of Notice Thereof; (d) Approving Contract Assumption and Assignment Procedures; and (e) Granting Other Related Relief* [Docket No. 16] (the "**Bidding Procedures Motion**") to obtain Bankruptcy Court approval and establishment of certain procedures relating to the sale process (the "**Bidding Procedures**").  On July 27, 2023, the Court held a hearing to consider the Bidding Procedures Motion, and continued the hearing to August 3, 2023.  On August 8, 2023, the Court entered an order approving the Bidding Procedures Motion (the "**Bidding Procedures Order**"). [Docket No. 237].  The Bidding Procedures Order provided the following deadlines related to the sale:

| Event or Deadline | Date and Time[21] |
| --- | --- |
| Indication of Interest Deadline | July 31, 2023, at 5:00 p.m. (ET) |

---

[21]    All dates and deadlines are subject to Bankruptcy Rule 9006.

AMERICAS 124924883

| Event or Deadline | Date and Time[21] |
|---|---|
| Deadline for Debtors to file the Cure Notice | As soon as reasonably practicable after Indication of Interest Deadline |
| Deadline to object to the Cure Notice | Fourteen (14) calendar days after service of the Cure Notice at 4:00 p.m. (ET) |
| Stalking Horse Notice Deadline | August 24, 2023, at 5:00 p.m. (ET) |
| Deadline to object to the Stalking Horse Notice | Five (5) business days after the service of the Stalking Horse Notice at 4:00 p.m. (ET) |
| Bid Deadline | September 8, 2023, at 5:00 p.m. (ET) |
| Deadline for the Debtors to notify all Qualified Bidders of the highest or otherwise best Qualified Bid | September 12, 2023 |
| Deadline to object to the Sale | September 14, 2023, at 4:00 p.m. (ET) |
| Auction (if required) | September 19, 2023, at 10:30 a.m. (ET) |
| Deadline for objection to Successful Bidder and adequate assurance of future performance | September 26, 2023, at 4:00 p.m. (ET) |
| Deadline to file replies in support of Sale | 4:00 p.m. (ET) on the date that is two (2) business days prior to the Sale Hearing |
| Sale Hearing | On or about October 5, 2023, at 10:30 a.m. (ET) |

Pursuant to the Bidding Procedures, the Debtors' investment banker, Jefferies, has contacted a wide range of potential buyers. To date, the Debtors have received a number of non-binding indications of interest, including indications of interest to acquire all or substantially all of the Debtors' assets as a going concern. The Debtors did not select a stalking horse with respect to their assets. The deadline to submit bids is September 8, 2023 and the auction, if any, is scheduled for September 19, 2023. Each of the dates outlined in the Bidding Procedures is subject to change and the sale process may be cancelled in accordance with the procedures approved by the Bankruptcy Court.

### D. Retention of Debtors' Chapter 11 Professionals

On July 6, 2023, the Debtors filed applications to retain certain professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases. [Docket Nos. 87, 88, 89, 90, 91]. The Debtors' professionals include: (i) White & Case LLP as bankruptcy counsel; (ii) Richards, Layton & Finger ("**RLF**") as proposed co-counsel; (iii)

AMERICAS 124924883

Silverman Consulting Inc., as financial advisor; (iv) Jefferies LLC as investment banker; and (v) Kurtzman Carson Consultants, LLC as administrative agent and solicitation agent.  On July 27, 2023, the Bankruptcy Court entered the orders approving the retention of White & Case LLP, Silverman Consulting Inc., Jefferies LLC and Kurtzman Carson Consultants, LLC.  [Docket Nos. 174, 175, 176, 188].

On August 15, 2023 and August 18, 2023, respectively, the Bankruptcy Court approved the Debtors applications to retain Baker & Hostetler LLP as special litigation and corporate counsel for the Debtors and to retain KPMG LLC to provide audit services to the Debtors.  [Docket Nos. 254, 265].

On August 18, 2023, the U.S. Trustee filed an objection to the Debtors' application to retain RLF.  [Docket No. 267].  The hearing to consider the retention application of RLF has been adjourned and is pending scheduling.

### E.  Appointment of Creditors' Committee

On July 11, 2023, the U.S. Trustee appointed the Committee, pursuant to section 1102 of the Bankruptcy Code, to represent the interests of unsecured creditors in the Chapter 11 Cases. [Docket Nos. 96, 99].  The members of the Committee are: (a) Barry L. Leonard & Co. Inc., (b) Superior Cam Inc., and (c) SA Automotive Ltd.

On August 23, 2023, the Bankruptcy Court entered orders approving the Committee's applications to retain Troutman Pepper Hamilton Sanders LLP as counsel and to retain Huron Consulting Group Inc. as Financial Advisor [Docket No. 294, 295].

### F.  Schedules and Statements and Claims Bar Dates

On August 1, 2023, the Debtors filed their schedules of assets and liabilities and statements of financial affairs [Docket Nos. 211-217].

On August 4, 2023, the Debtors filed a motion [Docket No. 228] (the "**Bar Date Motion**") requesting that the Bankruptcy Court establish certain deadlines to filing proofs of claim. No party objected to the Bar Date Motion.  On August 24, 2023, the Bankruptcy Court entered an order granting the Debtors' Bar Date Motion and established the following deadlines for parties to file proofs of claim:

(i) October 10, 2023 at 5:00 p.m. (ET) as the deadline for all persons and entities (excluding governmental units as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**General Bar Date**");

(ii) December 26, 2023 at 5:00 p.m. (ET) as the deadline for governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**Governmental Bar Date**");

(iii) The later of (a) the General Bar Date or the Governmental Bar Date (if a governmental unit is the counterparty to applicable executory contract or unexpired

AMERICAS 124924883

lease) and (b) 5:00 p.m. (ET) on the date that is 30 days after the service of an order of the Bankruptcy Court authorizing the Debtors' rejection of the applicable executory contract or unexpired lease; as the deadline for all Holders of a claim that arises from the Debtors' rejection of an executory contract or unexpired lease to file proofs of claim in the Chapter 11 Cases ("**Rejection Damages Bar Date**"); and

(iv)    the Amended Schedule Bar Date (as defined in the Bar Date Order, and together with the General Bar Date, the Governmental Bar Date, and the Rejection Bar Date, the "**Bar Dates**") as the later of (a) the General Bar Date or the Governmental Bar Date (if the applicable amendment relates to a claim of a Governmental Unit) and (b) 5:00 p.m. (Prevailing Eastern Time) on the date that is 30 days after the claimant is served with notice of the applicable amendment or supplement to the Bankruptcy Schedules.

## G.  Exclusivity

Exclusivity Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days after the commencement of a chapter 11 case during which a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Plan Period**"). In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods. The Exclusive Periods currently remain in effect. The current Exclusive Plan Period is to and through October 25, 2023, and the current Exclusive Solicitation Period is to and through December 26, 2023. Each is subject to further extension.

## H.  The Foxconn Adversary Proceeding

Concurrently with the commencement of the Chapter 11 Cases, the Debtors filed an adversary proceeding against Foxconn, captioned *Lordstown Motors Corp. et al. v. Foxconn Ventures Pte. Ltd. et al.*, Adv. Proc. No. 23-50414 (MFW) (Bankr. D. Del.) (the "**Foxconn Adversary Proceeding**"). The Debtors intend to vigorously prosecute the Foxconn Adversary Proceeding. The Plan expressly permits the Post-Effective Date Debtors to continue to pursue all of the Causes of Action set forth in the Foxconn Adversary Proceeding. On August 29, 2023, the Bankruptcy Court approved the parties' *Stipulation Extending Response Deadline* to extend the Foxconn's deadline to respond to the Foxconn Complaint to September 29, 2023. [Adv. Pro. Docket No. 7-1].

## I.  Foxconn's Motion to Dismiss or Convert the Chapter 11 Cases

On July 20, 2023, Hon Hai Precision Industry Co., Ltd. (a/k/a Hon Hai Technology Group), Foxconn EV Technology, Inc., and Foxconn EV System LLC filed a motion to dismiss the Chapter 11 Cases or to convert the cases under chapter 7 of the Bankruptcy Code [Docket No. 131] (the "**Foxconn Motion to Dismiss**"). The movants alleged that the Debtors filed the Chapter 11 Cases

in bad faith, that the Debtors do not have a reasonable likelihood of rehabilitation, and that dismissal or conversion would benefit the Debtors' creditors.

On August 21, 2023, the Debtors filed an objection to the Foxconn Motion to Dismiss. [Docket No. 282]. On August 22, 2023, the Committee filed a statement in response to the Foxconn Motion to Dismiss stating the reasons it believes that dismissal or conversion of the Chapter 11 Cases is not warranted at this time. [Docket No. 286]. On August 27, 2023, Foxconn filed a reply in further support of the Foxconn Motion to Dismiss. [Docket No. 330].

At a hearing before the Bankruptcy Court on August 28, 2023, the Bankruptcy Court denied the Foxconn Motion to Dismiss and found that there was no evidence that the Chapter 11 Cases were filed in bad faith, the Debtors had a legitimate bankruptcy purpose in commencing the Chapter 11 Cases, and that it would not be in the best interest of creditors or equity holders to dismiss or convert the Chapter 11 Cases. On August 29, 2023, the Bankruptcy Court entered an order denying the Foxconn Motion to Dismiss. [Docket No. 348].

## J. The Debtors' Preliminary Injunction Proceeding

On July 5, 2023, the Debtors filed a complaint for injunctive relief [Adv. Proc. Case No. 23-50428, Adv. Docket No. 1] initiating an adversary proceeding (the "**Stay Extension Adversary**") to extend the automatic stay to claims against certain of the Debtors' current and former directors and officers in the Delaware Class Action, which action is described in more detail above in Article II.E.1. Concurrently with filing the complaint, the Debtors filed a motion and brief in support thereof [Adv. Proc. Case No. 23-50428, Adv. Docket Nos. 2 & 3], seeking a preliminary injunction extending the automatic stay to the non-debtor defendants in the Delaware Class Action. At a hearing before the Bankruptcy Court on August 3, 2023, the Bankruptcy Court denied the request to extend the automatic stay to non-Debtor entities. The court entered an order memorializing the ruling on August 17, 2023. [Adv. Proc. Case No. 23-50428, Adv. Docket No. 34]. On August 28, 2023, the court entered an order approving the parties' stipulation to stay the Stay Extension Adversary Proceeding. [Adv. Proc. Case No. 23-50428, Adv. Docket No. 36].

## K. Karma Developments and Settlement

As detailed above in Article II.E.2, the Debtors and certain of their current and former directors, officers, and employees are party to the prepetition Karma Action, which seeks injunctive relief and damages against the defendants in the Karma Action in excess of $900 million related the defendants' alleged misappropriation of trade secrets and intellectual property, conspiracy, breach of contract, tortious interference with contract, and violation of the computer fraud statutes.

On June 27, 2023, LMC filed a suggestion of bankruptcy and notice of automatic stay in the California District Court Action, which was amended on June 28, 2023. In light of the Chapter 11 Cases, the California District Court orally stayed the California District Court Action, but did not vacate the September trial date.

On July 5, 2023, Karma filed, with the Bankruptcy Court, a motion for relief from the automatic stay [Docket No. 82] (the "**Stay Relief Motion**"), seeking relief from the automatic stay to continue the California District Court Action in the California District Court, to which the Debtors filed an objection on July 19, 2023 [Docket No. 122] and the Committee filed an objection on July 20, 2023 [Docket No. 128].  On July 13, 2023, the Debtors filed a motion to establish procedures and a schedule to estimate the amount of the claim held by Karma [Docket No. 108] (the "**Estimation Motion**").

On July 20, 2023, Karma filed an objection to the Estimation Motion [Docket No. 126] and the Bidding Procedures Motion [Docket No. 127].  In connection with its objections to the Estimation Motion and the Bidding Procedures Motion, Karma alleged that the Debtors had misappropriated Karma's trade secrets and intellectual property, had incorporated such intellectual property into the Debtors' alleged property and products, and that neither the Bidding Procedures nor any Sale should be approved absent a judicial determination of the parties' respective property rights pursuant to an adversary proceeding under Bankruptcy Rule 7001.

On July 24, 2023, Karma filed its reply in support of the Stay Relief Motion [Docket No. 144], and the Debtors filed replies in support of Bidding Procedures Motion [Docket No. 154] and the Estimation Motion [Docket No. 155].

On July 27, 2023, the Court held a hearing on the Stay Relief Motion, the Bidding Procedures Motion, and the Estimation Motion, among other matters.  At such hearing, the Court (a) continued the hearing with respect to the Bidding Procedures Motion, (b) granted Karma's Stay Relief Motion, and (c) determined that the Estimation Motion was moot.  On July 31, 2023, the Court entered the order granting the Stay Relief Motion [Docket No. 206] (the "**Stay Relief Order**"), thereby permitting Karma to proceed with the Karma Action through a jury verdict, judgment, and post-trial motions.  Absent resolution, the Karma Action was set to proceed to trial beginning on September 12, 2023 in the United States District Court for the Central District of California.

On August 14, 2023, the Debtors and Karma entered into a Settlement Agreement and Release memorializing an agreement to consensually resolve the claims asserted in the Karma Action (the "**Karma Settlement Agreement**").  On August 15, 2023, the Debtors filed a motion [Docket No. 248] with the Bankruptcy Court seeking approval of the Settlement Agreement (the "**Karma Settlement Motion**").  A copy of the Karma Settlement Agreement is attached to the Debtors' proposed order approving the Settlement Agreement filed with the Bankruptcy Court [Docket No. 248-2].  Subject to the terms and conditions set forth in the Karma Settlement Agreement and its exhibits, the settlement terms include: (i) a $40 million settlement payment by the Company to Karma (the "**Karma Settlement Payment**"), of which $5 million is allocated to a royalty with respect to the license described in (ii) of this paragraph, (ii) a worldwide, non-exclusive, transferable, royalty-free (except for the full Karma Settlement Payment including the License Payment or Royalty therein (as defined in the Settlement Agreement)), fully paid-up, sublicensable, perpetual and irrevocable license granted by Karma to the Company and any of the Company's assignees, which license will permit the Company or its assigns to use the intellectual property and technology, including patents, copyrights, software rights, know-how, design rights, database rights, and trade secrets, which Karma alleges in the Karma Action that the Company has

misappropriated, (iii) mutual releases, and (iv) dismissal of the Karma Action, with prejudice as to all defendants after an approval order by the Bankruptcy Court is final and no longer subject to any appeal.

On August 28, 2023, with no objections to the Karma Settlement Motion, the Bankruptcy Court entered an order granting the Karma Settlement Motion and approving the Karma Settlement. [Docket No. 334]. The Company made the Karma Settlement Payment on August 28, 2023.

## ARTICLE IV
## THE PLAN

### A.  Overview of the Plan

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTING THE PLAN AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT AND TO THE EXHIBITS ATTACHED THERETO.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST.

HOLDERS OF CLAIMS AND INTERESTS SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

A central component of the Plan is to liquidate some or all of the Debtors' assets, to provide distributions to Holders of Claims and Interests, and, to the extent not liquidated immediately, to maximize value of the Debtors' assets for the benefit of stakeholders (including by pursuing the Foxconn Adversary Proceeding and other Causes of Action). The purpose of the Plan is to maximize recoveries to the Debtors' creditors and equity holders, and the Plan provides for a fair allocation of the Debtors' Assets.

In general, a chapter 11 plan (a) divides claims and equity interests into separate classes, (b) specifies the consideration that each class is to receive under the plan and (c) contains other

23

provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class. Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (a) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (b) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class. Under the Plan, Classes 3, 4, 5, and 7 are Impaired, and Holders of Claims or Interests in Classes 3, 4, and 7 are entitled to vote to accept or reject the Plan *unless* a Holder's Claim is subject to an objection filed by the Debtors. Ballots are being furnished herewith to all Holders of Claims in Classes 3, 4 and 7 that are entitled to vote to facilitate their voting to accept or reject the Plan.  Holders of Interests in Class 5 are deemed to reject the plan. Classes 1, 2, and 6 are Unimpaired under the Plan and therefore deemed to accept the Plan.

The Plan provides for full payment of all Allowed Administrative Claims, Allowed Priority Tax Claims, if any, Allowed Priority Claims, if any, and Allowed Secured Claims, if any, in accordance with the provisions of the Bankruptcy Code as well as payment to Allowed General Unsecured Trade Claims from the GUTC Cash Pool Account and Other Unsecured Trade Claims from the Non-Trade Pool Assets with recoveries to such creditors to be determined.  The Plan further provides for additional value to Interests to the extent sufficient value remains after satisfaction of other Claims.

Following confirmation of the Plan, the Plan will become effective (as such term is used in section 1129 of the Bankruptcy Code) on the first Business Day on which all the conditions to the occurrence of the Effective Date, as specified in Article X.A of the Plan have been satisfied or waived in accordance with the provisions of Article X.B of the Plan.  The satisfaction of certain of the conditions to the occurrence of the Effective Date is beyond the control of the Debtors, and there is no assurance that the Debtors will waive or extend the deadline for the occurrence of the Effective Date or any other condition.  Thus, it is possible that the Plan will not be confirmed and consummated in the time contemplated.

## B.  Unclassified Claims

### 1.  Unclassified Claims Summary

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims and Priority Tax Claims) have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in Article II of the Plan.  The Claim recoveries for such unclassified Claims are set forth below:

| Claim | Plan Treatment | Projected Plan Recovery |
|---|---|---|
| Administrative Claims | Paid in Full in Cash | 100% |
| Professional Fee Claims | Paid in Full in Cash | 100% |
| Priority Tax Claims | Paid in Full in Cash | 100% |

AMERICAS 124924883

2. **Unclassified Claims**

    (i) *Administrative Claims*

    Pursuant to section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Claims are not classified and are not entitled to vote. The Debtors have concluded that based upon current estimates, the Assets of the Debtors are sufficient to satisfy these Claims. Except with respect to Professional Fee Claims and Priority Tax Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor, or after the Effective Date, such Holder and the applicable Post-Effective Date Debtor agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (i) if such Administrative Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date; or (ii) if such Administrative Claim is not Allowed as of the Effective Date, upon entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter; *provided that*, if an Allowed Administrative Claim arises from liabilities incurred by the Debtors' Estates in the ordinary course of business after the Petition Date, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

    Except as otherwise provided in <u>Article II.A</u> of the Plan or the Bar Date Order, and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Post-Effective Date Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date; provided, that the Administrative Claims Bar Date does not apply to Professional Fee Claims.

    The Post-Effective Date Debtors or the Claims Administrator may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. With respect to timely-Filed and properly served Administrative Claims, the Debtors, the Post-Effective Date Debtors, or the Claims Administrator, as applicable, may also choose to object to any Administrative Claim no later than the Administrative Claims Objection Deadline, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors, the Post-Effective Date Debtors, or the Claims Administrator (or other party with standing) object to a timely-Filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors, the Post-Effective Date Debtors, or the Claims Administrator object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS OR THEIR PROPERTY, AND**

**SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE**.

(ii) *Professional Fee Claims*

a.   Final Fee Applications

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Allowed Professional Fee Claims are not classified and are not entitled to vote.  The Debtors have concluded that based upon current estimates, the Assets of the Debtors are sufficient to satisfy these Claims.  All final requests for allowance and payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is forty-five (45) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.  Any objections to Professional Fee Claims shall be Filed and served no later than twenty-one (21) days after the filing of final requests for allowance and payment of Professional Fee Claims.

b.   Professional Fee Claims Estimate

Professionals shall estimate in good faith their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services compensable by the Debtors' Estates before and as of the Effective Date and shall deliver such reasonable, good faith estimate to the Debtors no later than five (5) Business Days prior to the Effective Date; *provided that* such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

c.   Professional Fee Escrow

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash based on their evaluation of the Professional Fee Claims Estimates, and no Liens, Claims, or Interests shall encumber the Professional Fee Escrow in any way.  The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors or the Post-Effective Date Debtors and (ii) shall be held in trust for the Professionals and for no other Person or Entity until all Professional Fee Claims have been irrevocably paid in full; *provided that* funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full shall revert to the Post-Effective Date Debtors.  Allowed Professional Fee Claims shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; provided that the Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow by the Post-Effective Date

Debtors without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

### d. Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors, the Post-Effective Date Debtors, or the Claims Administrator, as applicable, may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors, the Post-Effective Date Debtors, and the Claims Administrator , as applicable.

Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention, compensation for services rendered, or reimbursement for expenses incurred on or after such date shall terminate, and the Debtors, the Post-Effective Date Debtors, or the Claims Administrator, as applicable, may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### e. Priority Tax Claims

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Allowed Priority Tax Claims are not classified and are not entitled to vote. The Debtors have concluded that based upon current estimates, the Assets of the Debtors are sufficient to satisfy these Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim and the applicable Debtor agree (whether before or after the Effective Date) to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

### C. <u>Classification and Treatment Under the Plan</u>

#### 1. Summary of Classification of Claims and Interests

All Claims and Interests, except for Administrative Claims, including Professional Fee Claims and Priority Tax Claims, are classified in the Classes set forth in <u>Article III</u> of the Plan for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent

AMERICAS 124924883

that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests pursuant to the Plan is as set forth below. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.B of the Plan.  The Plan shall constitute a separate Plan for each of the Debtors *provided that*, the estates of the various Debtors shall be consolidated for the purpose of effectuating distributions under the Plan.  For all purposes under the Plan, where applicable, each Class contains a sub-Class for each Debtor. Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.C of the Plan. Voting tabulations for recording acceptances or rejections of the Plan shall be conducted on a Debtor-by-Debtor basis as set forth above.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as detailed in the table below.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE PLAN'S CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim or Interest | Treatment of Claim or Interest | Est. Amount | Est. Recovery |
| 1 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of such Allowed Other Priority Claim, or such Allowed Other Priority Claim has been paid or otherwise satisfied, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash, from the Non-Trade Pool Assets, in an amount equal to such Allowed Other Priority Claim, without interest, on or as soon as practicable after the latest to occur of (i) the Effective Date; (ii) the first Business Day after the date that is ten (10) Business Days after the date such Claim becomes an Allowed Other Priority Claim; and (iii) the date or dates agreed to by the Post-Effective Date Debtors and the Holder of the Allowed Priority Claim. | Estimated at $[●] | 100% |
| 2 | Secured Claims | Except to the extent that a Holder of an Allowed Secured Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable classification and treatment, at the option of the Post-Effective Date Debtors or the Claims Administrator, as applicable, in the exercise of the applicable parties sole and absolute discretion, one of the following treatments shall be provided to each Holder of an | Estimated at $[●] | 100% |

28

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim or Interest | Treatment of Claim or Interest | Est. Amount | Est. Recovery |
| | | Allowed Secured Claim secured by a valid lien: (i) the Holder of such Allowed Secured Claim shall retain its lien on its collateral until either such Holder receives the Cash set forth in Section 2(b)(ii) or such Holder's collateral is abandoned to it as set forth in Section 2(b)(iii) below; (ii) on or as soon as practicable after the later of (x) the Effective Date, or (y) the date upon which the Bankruptcy Court enters a final order determining or allowing such Secured Claim, or as otherwise agreed between the Holder of such Allowed Secured Claim and the Post-Effective Date Debtors, the Holder of such Allowed Secured Claim will receive Cash, from the Non-Trade Pool Assets, in an amount equal to the amount of its Allowed Secured Claim in full satisfaction, release, and discharge of such secured claim; or (iii) the collateral securing such Allowed Secured Claim shall be abandoned to such Holder, in full satisfaction, release, and discharge of such secured claim. Any portion of any Secured Claim that is not secured by collateral or the proceeds thereof shall constitute a General Unsecured Trade Claim to the extent it is allowed. | | |
| 3 | General Unsecured Trade Claims | On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claims, each Holder of an Allowed General Unsecured Trade Claim against a Debtor shall receive its *Pro Rata* share of the GUTC Cash Pool Amount without regard to the particular Debtor against which such Claim is Allowed. In the interest of clarity, it is expressly acknowledged that the sole source of recovery for Holders of General Unsecured Trade Claims shall be the GUTC Cash Pool Amount. Any GUTC Cash Pool Amount remaining after the payment of all Allowed General Unsecured Trade Claims and all Claims Administrator Expenses shall be, first, used to pay each Holder of an Allowed General Unsecured Trade Claim its *Pro Rata* share of postpetition interest at a rate equal to the *lower* of (i) the Federal Judgment Rate, and (ii) the Contract Rate and, second, in the event there is excess remaining following the payment of interest in full to Holders of Allowed General Unsecured Trade Claims as set forth herein, | Estimated at $[●] | [●]% to [●]% |

29

| **SUMMARY OF EXPECTED RECOVERIES** |
|---|---|---|---|---|
| **Class** | **Claim or Interest** | **Treatment of Claim or Interest** | **Est. Amount** | **Est. Recovery** |
| | | shall be returned to the Debtors or the Post-Effective Date Debtors and become Non-Trade Pool Assets. | | |
| 4 | Other Unsecured Claims | Except to the extent that a Holder of an Allowed Other Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, and release of each Allowed Other Unsecured Claim, each Holder of such Allowed Other Unsecured Claim shall be paid the Allowed amount of such Claim in Cash, from the Non-Trade Pool Assets (including from the liquidation of any non-Cash Non-Trade Pool Assets) on a Pro Rata basis, after (i) the satisfaction of the Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Secured Claims, (ii) the Professional Fees Escrow Account is funded or all Professional Fee Claims are satisfied, and (iii) the GUTC Cash Pool Account is funded in the amount of the GUTC Cash Pool Amount. To the extent that aggregate Distributions are sufficient to pay all Allowed Administrative Claims, Allowed Other Priority Claims, Allowed Secured Claims, and fund the GUTC Cash Pool in full, Holders of Allowed Other Unsecured Claims shall be entitled to postpetition interest at the lower of (i) the Federal Judgment Rate, and (ii) the Contract Rate. | Estimated at $[●] | [●]% to [●]% |
| 5 | Foxconn Preferred Stock Interests | As set forth in <u>Article V.S</u> of the Plan, on the Effective Date, any and all rights of the Holders of Allowed Foxconn Preferred Stock Interests to receive Distributions under the Plan shall be subordinated in their entirety to the rights of the Holders of Common Stock Interests to receive such Distributions and the Holders of Allowed Foxconn Preferred Stock Interests shall not receive any distributions on account of such Foxconn Preferred Stock Interests. | 300,000 shares | $0.00 |
| 6 | Intercompany Interests | Intercompany Interests shall be reinstated and be Unimpaired in all respects. | N/A | N/A |
| 7 | Common Stock Interests | On the Effective Date, all Allowed Common Stock Interests in the Debtors shall remain in effect and, except to the extent that a Holder of an Allowed Common Stock Interest agrees to less favorable treatment,  each Holder of such Allowed Common Stock Interest shall receive distributions in Cash | 15,953,212 shares | $[●] to $[●] per share |

AMERICAS 124924883

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim or Interest | Treatment of Claim or Interest | Est. Amount | Est. Recovery |
| | | from the Non-Trade Pool Assets (including from the liquidation of any non-Cash Non-Trade Pool Assets), on a *Pro Rata* basis after (i) the satisfaction of the Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Secured Claims, and Allowed Other Unsecured Claims (and any interest owed thereon), (ii) the Professional Fees Escrow Account is funded or all Professional Fee Claims are satisfied, (iii) the GUTC Cash Pool Account is funded in the amount of the GUTC Cash Pool Amount and (iv) the funding of the Post-Effective Date Debtor Amount; *provided that*, any Distributions in respect of Common Stock Interests held by Foxconn shall be subordinated to the Distributions made to other Holders of Common Stock Interests, as set forth in Article V.S of the Plan. | | |

### 2. Classified Claims and Interests Details

Each Holder of an Allowed Claim or Allowed Interest, as applicable, will receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by: (a) the Debtors and (b) the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, will receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

(i) *Class 1 – Other Priority Claims*

(a) *Classification*: Class 1 consists of all Other Priority Claims against the Debtors.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of such Allowed Other Priority Claim, or such Allowed Other Priority Claim has been paid or otherwise satisfied, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash, from the Non-Trade Pool Assets, in an amount equal to such Allowed Other Priority Claim, without interest, on or as soon as practicable after the latest to occur of (i) the Effective Date; (ii) the first Business Day after the date that is ten (10) Business Days after the date such Claim becomes an Allowed Other Priority Claim; and (iii) the date or dates agreed to by the Post-Effective Date Debtors and the Holder of the Allowed Priority Claim.

31

      (c)    *Voting*: Class 1 is Unimpaired, and Holders of Other Priority Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Secured Claims are not entitled to vote to accept or reject the Plan.

(ii)    *Class 2 – Secured Claims*

      (a)    *Classification*: Class 2 consists of all Secured Claims against the Debtors.

      (b)    *Treatment*: Except to the extent that a Holder of an Allowed Secured Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable classification and treatment, at the option of the Post-Effective Date Debtors or the Claims Administrator, as applicable, in the exercise of the applicable parties sole and absolute discretion, one of the following treatments shall be provided to each Holder of an Allowed Secured Claim secured by a valid lien:

          i    the Holder of such Allowed Secured Claim shall retain its lien on its collateral until either such Holder receives the Cash set forth in Section 2(b)(ii) or such Holder's collateral is abandoned to it as set forth in Section 2(b)(iii) below;

          ii    on or as soon as practicable after the later of (x) the Effective Date, or (y) the date upon which the Bankruptcy Court enters a final order determining or allowing such Secured Claim, or as otherwise agreed between the Holder of such Allowed Secured Claim and the Post-Effective Date Debtors, the Holder of such Allowed Secured Claim will receive Cash, from the Cash Non-Trade Pool Assets, in an amount equal to the amount of its Allowed Secured Claim in full satisfaction, release, and discharge of such secured claim; or

          iii    the collateral securing such Allowed Secured Claim shall be abandoned to such Holder, in full satisfaction, release, and discharge of such secured claim.

          Any portion of any Secured Claim that is not secured by collateral or the proceeds thereof shall constitute a General Unsecured Trade Claim to the extent it is allowed.

      (c)    *Voting*: Class 2 is Unimpaired, and Holders of Secured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Secured Claims are not entitled to vote to accept or reject the Plan.

(iii)    *Class 3 – General Unsecured Trade Claims*

AMERICAS 124924883

(a)    *Classification*: Class 3 consists of all General Unsecured Trade Claims against the Debtors.

(b)    *Treatment*: On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claims, each Holder of an Allowed General Unsecured Trade Claim against a Debtor shall receive its *Pro Rata* share of the GUTC Cash Pool Amount without regard to the particular Debtor against which such Claim is Allowed. In the interest of clarity, it is expressly acknowledged that the sole source of recovery for Holders of General Unsecured Trade Claims shall be the GUTC Cash Pool Amount.

Any GUTC Cash Pool Amount remaining after the payment of all Allowed General Unsecured Trade Claims and all Claims Administrator Expenses shall be, first, used to pay each Holder of an Allowed General Unsecured Trade Claim its *Pro Rata* share of postpetition interest at a rate equal to the *lower* of (i) the Federal Judgment Rate, and (ii) the Contract Rate and, second, in the event there is excess remaining following the payment of interest in full to Holders of Allowed General Unsecured Trade Claims as set forth herein, shall be returned to the Debtors or the Post-Effective Date Debtors and become Non-Trade Pool Assets**.**

(c)    *Voting*: Class 3 is Impaired, and Holders of the General Unsecured Trade Claims are entitled to vote to accept or reject the Plan.

(iv)    *Class 4 – Other Unsecured Claims*

(a)    *Classification*: Class 4 consists of all Other Unsecured Claims against the Debtors.

(b)    *Treatment*: Except to the extent that a Holder of an Allowed Other Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, and release of each Allowed Other Unsecured Claim, each Holder of such Allowed Other Unsecured Claim shall be paid the Allowed amount of such Claim in Cash, from the Non-Trade Pool Assets (including from the liquidation of any non-Cash Non-Trade Pool Assets) on a *Pro Rata* basis, after (i) the satisfaction of the Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Secured Claims, (ii) the Professional Fees Escrow Account is funded or all Professional Fee Claims are satisfied, and (iii) the GUTC Cash Pool Account is funded in the amount of the GUTC Cash Pool Amount.

To the extent that aggregate Distributions are sufficient to pay all Allowed Administrative Claims, Allowed Other Priority Claims,

33

Allowed Secured Claims, and fund the GUTC Cash Pool in full, Holders of Allowed Other Unsecured Claims shall be entitled to postpetition interest at the *lower* of (i) the Federal Judgment Rate, and (ii) the Contract Rate.

(c)     *Voting*: Class 4 is Impaired, and Holders of the Other Unsecured Claims are entitled to vote to accept or reject the Plan.

(v)     *Class 5 – Foxconn Preferred Stock Interests*

(a)     *Classification*: Class 5 consists of all Foxconn Preferred Stock Interests in the Debtors.

(b)     *Treatment*:  As set forth in <u>Article V.S</u> of the Plan, on the Effective Date, any and all rights of the Holders of Allowed Foxconn Preferred Stock Interests to receive Distributions under the Plan shall be subordinated in their entirety to the rights of the Holders of Common Stock Interests to receive such Distributions and the Holders of Allowed Foxconn Preferred Stock Interests shall not receive any distributions on account of such Foxconn Preferred Stock Interests.

(c)     *Voting*: Class 5 is Impaired by the Plan and Holders of Foxconn Preferred Stock Interests shall be deemed to have rejected the Plan.

(vi)    *Class 6 – Intercompany Interests*

(a)     *Classification*: Class 6 consists of all Intercompany Interests.

(b)     *Treatment*: On the Effective Date, all Intercompany Interests shall be reinstated and be Unimpaired in all respects.

(c)     *Voting*: Class 6 is Unimpaired by the Plan, and Holders of Intercompany Interests shall be deemed to have accepted the Plan.

(vii)   *Class 7 – Common Stock Interests*

(a)     *Classification*: Class 7 consists of all Common Stock Interests in the Debtors.

(b)     *Treatment*: On the Effective Date, all Allowed Common Stock Interests in the Debtors shall remain in effect and, except to the extent that a Holder of an Allowed Common Stock Interest agrees to less favorable treatment,  each Holder of such Allowed Common Stock Interest shall receive distributions in Cash from the Non-Trade Pool Assets (including from the liquidation of any non-Cash Non-Trade Pool Assets), on a *Pro Rata* basis after (i) the satisfaction of the Allowed Administrative Claims, Allowed Priority Tax Claims,

34

Allowed Other Priority Claims, Allowed Secured Claims, and Allowed Other Unsecured Claims (and any interest owed thereon), (ii) the Professional Fees Escrow Account is funded or all Professional Fee Claims are satisfied, (iii) the GUTC Cash Pool Account is funded in the amount of the GUTC Cash Pool Amount and (iv) the funding of the Post-Effective Date Debtor Amount; *provided that*, any Distributions in respect of Common Stock Interests held by Foxconn shall be subordinated to the Distributions made to other Holders of Common Stock Interests, as set forth in <u>Article V.S</u> of the Plan.

(c)    *Voting*: Class 7 is Impaired by the Plan, and Holders of Common Stock Interests are entitled to vote to accept or reject the Plan.

**3.    Elimination of Vacant Classes**Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**4.    Separate Classification of Secured Claims**Each Secured Claim, to the extent secured by a Lien on collateral different from the collateral securing another Secured Claim, shall be treated as being in a separate sub-Class for purposes of receiving distributions under the Plan.

**5.    Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

**6.    Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**D.    <u>Acceptance or Rejection of the Plan; Effect of Rejection By One or More Classes of Claims</u>**

**1.    Classes Entitled to Vote**

Holders of General Unsecured Trade Claims (Class 3), Other Unsecured Claims (Class 4), and Common Stock Interests (Class 7) are entitled to vote on the Plan.  Any Holder of a Claim that has been objected to may file a motion pursuant to Bankruptcy Rule 3018 for an order temporarily allowing such Claim solely for purposes of voting to accept or reject the Plan in accordance with the procedures to be set forth in the order approving the Disclosure Statement, including any

35

deadlines set forth therein. Class 5 is deemed to have rejected the Plan. Class 1, Class 2, and Class 6 are deemed to have accepted the Plan.

The Debtors have requested that the Bankruptcy Court adopt a presumption that if no Holder of a Claim or Interest in a Class of Claims or Interests eligible to vote in a particular Class timely submits a timely Ballot to accept or reject the Plan, then the applicable Class will be deemed to have accepted the Plan. Accordingly, if any Holder of a Claim or Interest in Class 3, Class 4, or Class 7 does not wish such a presumption to apply with respect to any Class for which such Holder holds a Claim, then the Holder should timely submit a Ballot accepting or rejecting the Plan for any such Class.

### 2. Class Acceptance Requirement

Class 3 and Class 4 shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims or Interests in such Class that have voted on the Plan. Class 7 shall have accepted the Plan if the Class is accepted by at least two-thirds (2/3) in amount in such Class that have voted on the Plan.

### 3. Cramdown and No Unfair Discrimination

In the event that any impaired Class of Claims or Interests rejects the Plan or is deemed to have rejected the Plan, the Debtors hereby request, without any delay in the occurrence of the Confirmation Hearing or Effective Date, that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief.

### E. Means of Implementation of the Plan

### 1. Consolidation for Distribution Purposes Only

The Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Debtors' Chapter 11 Cases for the limited purpose of making Distributions. For all other purposes, this Plan is being proposed as a joint chapter 11 plan of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor in all respects other than for Distributions. Upon the entry of the Confirmation Order, the claims register maintained in the various Chapter 11 Cases shall be deemed consolidated into a single claims register in respect of the consolidated Estate. Further, Claims asserted against multiple Debtors, including Claims based on joint and several liability and guarantee and/or surety Claims shall be deemed to constitute a single Claim against the consolidated Estate. Notwithstanding the substantive consolidation for the limited purpose of making Distributions contemplated herein, on and after the Effective Date the Debtors will each continue as separate post-effective date entities after emergence from the Chapter 11 Cases.

AMERICAS 124924883

The doctrine of substantive consolidation is a construct of federal common law, which has been accepted in the Third Circuit. *See In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).[22] A bankruptcy court's statutory authority to affect a substantive consolidation derives from its general equitable powers under Bankruptcy Code section 105(a).   In order to establish that substantive consolidation is appropriate in the Third Circuit (absent consent), proponents of substantive consolidation must show either "(1) prepetition [the debtors] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (2) postpetition [the debtors'] assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."  *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005). The Third Circuit stated that "the benefit [of consolidation] to creditors should be from cost savings that make assets available rather than from the shifting of assets to benefit one group of creditors at the expense of another."  *Id.* at 214.

The Debtors submit that substantive consolidation is appropriate under the law and the facts present here.  Prior to the Petition Date, the Debtors operated as a single entity.  Among other things, the Debtors: kept consolidated books and records (and did not keep separate books and records for each entity), did not track intercompany transactions or balances, reported their operations on a consolidated basis, held bank accounts solely at LEVC to fund the expenses of all of the Debtors despite the fact that substantially all of the Debtors' cash was raised by LMC, and did not track or distinguish the Debtor entities with which creditors and counterparties had relationships. Furthermore, LEVC was formerly known as Lordstown Motors Corp. (i.e., LMC's current name), the directors and officers of LMC are the same as those of LEVC, and LMC and LEVC conducted joint Board meetings. Furthermore, insofar as the Debtors maintained and reported their financials on a consolidated basis (and not separately), creditors could not have relied on the separateness of the entities and had to have relied on the assets and liabilities of the consolidated entity.   All of these factors support consolidation for purposes of making Distributions.  Further, it would be inefficient and costly to attempt to retroactively disentangle the affairs of the Debtors, if disentanglement was even possible.

Moreover, because the Debtors conducted their operations as a single unit, creditors may not have known the identity of the specific Debtor entity with which they transacted.  This could lead to disputes regarding which entity such creditors' claims were against and from which entity they should receive Distributions under a Plan that did not provide for the limited substantive consolidation.  The substantive consolidation provisions of the Plan, therefore, operate as a settlement of such potential disputes of creditors.

For the foregoing reasons, the Debtors submit that they meet the standard for substantive consolidation for Distribution purposes only, and that such consolidation is appropriate under the Plan, which the Debtors believe is in the best interests of the Debtors' estates and the holders of Allowed Claims and Interests under the Plan.

---

[22] *Accord, Reider v. F.D.I.C.* (*In re Reider*), 31 F.3d 1102, 1107-08 (11th Cir. 1994); *Woburn Assoc. v. Kahn* (*In re Hemingway Transport Inc.*), 954 F.2d 1, 11-12 (1st Cir. 1992); *First Nat'l Bank of El Dorado v. Giller* (*In re Giller*), 962 F.2d 796, 798-99 (8th Cir. 1992); *Union Sav. Bank v. Augie/Restivo Banking Co.* (*In re Augie/Restivo Baking Co.*), 860 F.2d 515, 518 (2d Cir. 1988); *Drabkin v. Midland-Ross Corp.* (*In re Auto-Trian Corp.*), 810 F.2d 270, 276 (D.C. Cir. 1987).

### 2. Post-Effective Date Status

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each of the Debtors shall continue to exist as a Post-Effective Date Debtor and as separate corporations, limited liability companies, or other form of entity, as the case may be, pursuant to applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed. Each Post-Effective Date Debtor shall retain all of its corporate, limited liability company or other entity powers under applicable non-bankruptcy law, and without prejudice to any right to amend its charter, dissolve, merge or convert into another form of business entity, or to alter or terminate its existence.

On and after the Effective Date, subject to the terms and conditions of the Plan, the Post-Effective Date Debtors shall be permitted to conduct new business without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules. In addition, the Post-Effective Date Debtors and the Claims Administrator, as applicable, shall be authorized to implement the terms of the Plan as set forth herein, including, without limitation, to liquidate the Debtors' remaining Assets into Cash and otherwise administer the affairs of the Estates.

### 3. Sources of Consideration for Distributions

Following the Effective Date and the funding of the GUTC Cash Pool Account, the Post-Effective Date Debtors shall be authorized, in their sole discretion, to liquidate or otherwise convert the non-Cash Non-Trade Pool Assets to Cash. The Post-Effective Date Debtors shall fund Distributions to Holders of Claims and Interests (other than Holders of Claims in Class 3 (General Unsecured Trade Claims)), from the Non-Trade Pool Assets, which include (i) Cash on hand as of the Effective Date (after the GUTC Cash Pool Account has been funded), (ii) proceeds from the sale of the Debtors' assets, (iii) proceeds from the Foxconn Causes of Action and other Causes of Action and (iv) insurance proceeds received by the Post-Effective Date Debtors. In addition, the Post-Effective Date Debtors shall be authorized to reserve the Post-Effective Date Amount to fund the Post-Effective Debtors. The Post-Effective Date Amount shall be used to pay all expenses incurred by the Post-Effective Date in performing its duties hereunder and may be used to fund operational expenses, including expense incurred in connection with one or more transactions to monetize the value of the net operating losses or similar tax attributes of the Debtors and Post-Effective Date Debtors' Estates.

### 4. Claims Administrator

#### (i)    *Appointment of Claims Administrator*

The Claims Administrator's retention shall commence on the Effective Date and shall continue until: (i) the Bankruptcy Court enters an order closing the Chapter 11 Cases; (ii) the Bankruptcy Court enters an order removing the Claims Administrator for cause (as defined below); (iii) the Claims Administrator voluntarily resigns, upon notice filed with the Bankruptcy Court, and a successor Claims Administrator is appointed in accordance with the Plan; or (iv) the GUTC Cash Pool Account has been exhausted.

AMERICAS 124924883

(ii)    *Authority of Claims Administrator*

Subject to this Article V.D of the Plan, the Claims Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement the following duties related to the administration of General Unsecured Trade Claims and the GUTC Cash Pool Account:

a.    subject to Article VII of the Plan, including but not limited to, Article VII.A of the Plan, except to the extent General Unsecured Trade Claims have been previously Allowed, control and effectuate the reconciliation process with respect to General Unsecured Trade Claims in accordance with the terms of this Plan, including to object to, seek to subordinate, compromise or settle any and all General Unsecured Trade Claims against the Debtors, *provided that* the Claims Administrator shall consult with the Post-Effective Date Debtors prior to entering into any Material Claims Settlement as set forth in Article V.D.3 of the Plan;

b.    make Distributions to holders of Allowed General Unsecured Trade Claims in accordance with this Plan;

c.    prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Claims Administrator as described herein, including by filing and prosecuting objections to General Unsecured Trade Claims;

d.    retain professionals to assist in performing its duties under the Plan;

e.    maintain the books and records and accounts with respect to the GUTC Cash Pool Account;

f.    incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Claims Administrator;

g.    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the GUTC Cash Pool Account that are required hereunder, by any Governmental Unit or applicable law;

h.    perform other duties and functions that are consistent with the performance of the Claims Administrators duties and implementation of the Plan; and

i.    effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan.

All rights not expressly delegated to the Claims Administrator under Article V.D of the Plan are expressly reserved to the Post-Effective Date Debtors, including, without limitation, all rights set forth in Article V.E and Article V.G of the Plan.  For the avoidance of any doubt and without limiting the foregoing, the Claims Administrator shall have no authority to prosecute the Foxconn Causes of Action or any other Retained Causes of Action, receive or compromise any

39

deposits (except pursuant to setoff or recoupment in connection with a General Unsecured Trade Claim), administer any tax assets of the Post-Effective Date Debtors or have any corporate governance function in connection with any post-effective date business carried on by the Post-Effective Date Debtors.

(iii)    *Reporting and Consultation Obligations of the Claims Administrator*

The Claims Administrator shall report all material matters concerning the reconciliation of or Distributions on account of General Unsecured Trade Claims to the Post-Effective Date Debtors, which reporting shall include, without limitation: (i) a list of the Claims that have been Allowed, Disallowed, or Expunged during the applicable reporting period, (ii) a list of Disputed Claims that have yet to be resolved, (iii) the aggregate amount of Distributions during the applicable reporting period, and (iv) the aggregate amount of expected Distributions during the next reporting period.  Without limitation to any consultation or consent obligations of the Claims Administrator specified herein, the Claims Administrator shall consult with the Post-Effective Date Debtors on all material decisions concerning the reconciliation of or Distributions on account of General Unsecured Trade Claims.

The Debtors or the Post-Effective Date Debtors, as applicable, and the Claims Administrator shall cooperate with respect to administration of the Disputed General Unsecured Trade Claims.  Prior to reaching a Material Claims Settlement with respect to any Disputed General Unsecured Trade Claim, the Claims Administrator must provide ten (10) business days' written notice to the Post-Effective Date Debtors containing the material terms of such proposed settlement or compromise.  To the extent the Post-Effective Date Debtors object to the proposed compromise or settlement, the Post Effective Date Debtors may file a pleading with the Bankruptcy Court objecting to such settlement or compromise.  Pending resolution of any such objection, the Claims Administrator shall not make any distribution on account of the subject Disputed General Unsecured Trade Claim.

(iv)    *Indemnification of Claims Administrator*

Each of the Post-Effective Date Debtors shall indemnify and hold harmless the Claims Administrator solely in its capacities as such for any losses incurred in such capacity, except to the extent such losses were the result of the Claims Administrator's bad faith, gross negligence, willful misconduct or criminal conduct.

### 5.  Post-Effective Date Matters

After the Effective Date, the Post-Effective Date Debtors may, subject to applicable non-bankruptcy law and consistent with the implementation of the Plan, engage in post-Effective Date operations in their discretion, including, without limitation, entering into one or more transactions to monetize the value of the net operating losses or similar tax attributes of the Debtors and Post-Effective Date Debtors' Estates.  Any costs incurred in connection with such operations may be funded from the Post-Effective Date Debtor Amount.

40

Further, on and after the Effective Date, the Post-Effective Date Debtors shall be authorized to implement the Plan in all respects, subject to the delegation of duties to the Claims Administrator set forth in Article V.D.2 of the Plan.  Without limiting the generality of the foregoing, the Post-Effective Date Debtors shall be authorized to prosecute and resolve all Causes of Action, including the Foxconn Causes of Action and any Causes of Action against insurers.

### 6.   Board of Directors and Officers

Except as otherwise provided in the Plan or the Confirmation Order, the directors and officers of the Post-Effective Date Debtors constituting the New Board and management shall be those individuals identified in the Plan Supplement.  The New Board shall, among other things, oversee and direct the administration of the Post-Effective Date Debtors' Estates in accordance with the Plan.  On the Effective Date, or as soon as is reasonably practicable thereafter, the New Board shall establish such procedures and protocols as it deems necessary to carry out its duties. The officers of the Post-Effective Date Debtors shall have the rights and responsibilities set forth in the organizational documents of the Post-Effective Date Debtors.

### 7.   Vesting of Assets

Except as otherwise provided in the Plan, on and after the Effective Date, all Assets of the Debtors and the Estates, wherever located, including, without limitation, all claims, rights, Causes of Action (including, but not limited to, the Foxconn Causes of Action), "net operating losses" or similar tax attributes, and rights in respect thereof, and any other property, wherever located, and whether acquired by the Debtors under or in connection with the Plan or otherwise, shall vest in the Post-Effective Date Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests.  For the avoidance of any doubt, the GUTC Cash Pool Account shall be funded in the amount of the GUTC Cash Pool Amount from the Assets of the Debtors as set forth in the Plan.

### 8.   Existing Securities

Neither the Common Stock Interests, Foxconn Preferred Stock Interests, nor any other Interests (including any outstanding warrants) in and to the Debtors shall be cancelled pursuant to the Plan or Confirmation Order. All such Interests shall be preserved in Post-Effective Date LMC and governed in accordance with the Plan, the Confirmation Order and the applicable organizational documents thereof.

### 9.   Preservation of Net Operating Losses

The Bankruptcy Court will enter one or more orders, which may be the Confirmation Order, to facilitate preservation of "net operating losses" of the Debtors, including by restricting further trading of Foxconn Preferred Stock Interests and Common Stock Interests, which may also be provided for in the applicable organizational documents of the Post-Effective Date Debtors.

For the avoidance of any doubt, and notwithstanding the substantive consolidation of the Debtors for the limited purposes of Distributions contemplated pursuant to the Plan, on and after the Effective Date, each of the Post-Effective Date Debtors will continue to exist as a separate entity and shall retain all of the powers of corporations or limited liability companies (as

41

applicable) under applicable non-bankruptcy law, and without prejudice to any right to amend its charter, dissolve, merge or convert into another form of business entity, or to alter or terminate its existence. As detailed in Article V.D of the Plan, except as otherwise provided in the Plan, all Assets of the Debtors (including net operating losses or similar tax attributes) will vest in the Post-Effective Date Debtors free and clear of all Claims, Liens, charges, other encumbrances ant Interests.

The Debtors estimate that their net operating loss ("**NOL**") carryforwards, as of December 31, 2022, included: (i) federal NOLs of approximately $629.6 million, which generated a deferred tax asset of approximately $132 million, (ii) local NOLs of approximately $372 million, which generated a deferred tax asset of $3.7 million, and (iii) an indeterminate amount of net unrealized built-in loss. It is contemplated (although there can be no assurance) that the Post-Effective Date Debtors would be entitled, under the Plan, to use their existing net operating loss carryforwards in future years to eliminate taxes on a significant amount of their income or otherwise monetize their preserved NOLs, subject to any applicable limitations due to change in ownership, the alternative minimum tax, and limitations under applicable state and local tax laws.

The present value of the tax savings that could be generated by the existing net operating loss carryforwards cannot be determined with any certainty, as use of the carryforwards may be subject to the limitations described in the paragraph immediately above, is dependent on the Post-Effective Date Debtors having sufficient future income or otherwise engaging in a transaction that could utilize the value of the NOLs, and may be subject to other limitations. As of the date hereof, the Debtors have not identified sources of future income or any particular post-effective date transactions.

## 10. Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Post-Effective Date Debtors shall retain and the Post-Effective Date Debtors may enforce all rights to commence and pursue, as appropriate, any and all of the Debtors' Causes of Action, whether arising before or after the Petition Date, including, (i) the Foxconn Causes of Action, (ii) any Cause of Action based in whole or in part upon any and all insurance contracts, insurance policies, occurrence and claims made policies, occurrence and claims made contracts, and similar agreements to which any Debtor or Post-Effective Date Debtor is or was a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, including the Insurance Policies, (iii) any Causes of Action against any of the Debtors' Directors and Officers that are identified as Excluded Parties, and (iv) all other Causes of Action listed or described in the Schedule of Retained Causes of Action filed in connection with the Plan Supplement. The Post-Effective Date Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. **The Post-Effective Date Debtors expressly reserve all rights to prosecute any and all Causes of Action**.

AMERICAS 124924883

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Post-Effective Date Debtors shall not pursue any and all available Causes of Action against it. Unless such Causes of Action against any Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan or a Final Order, all such Causes of Action shall be expressly reserved by the Debtors and the Post-Effective Date Debtors for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to any Cause of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

The Post-Effective Date Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The Post-Effective Date Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.

For the avoidance of any doubt, to the extent not expressly waived, relinquished, exculpated, released, compromised, assigned, or settled prior to the Effective Date by Final Order entered through the Bankruptcy Court or pursuant to the Confirmation Order or Article VIII of the Plan; all Avoidance Actions shall be retained by the Debtors and the Post-Effective Date Debtors, may be pursued by the Post-Effective Date Debtors and shall not be waived, relinquished, exculpated, or released until all Allowed General Unsecured Trade Claims are paid in full or such Avoidance Actions are settled, compromised, assigned or otherwise liquidated or resolved by the Post-Effective Date Debtors.

**WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE POST-EFFECTIVE DEBTORS EXPRESSLY RESERVE THE RIGHT AND FULLY INTEND TO VIGOROUSLY PROSECUTE THE FOXCONN ADVERSARY PROCEEDING AND THE CAUSES OF ACTION SET FORTH THEREIN AFTER THE EFFECTIVE DATE OF THE PLAN.**

### 11. Preservation of Insurance

Nothing in the Plan or the Confirmation Order alters the rights and obligations of the Debtors (and their Estate) and the Debtors' insurers (and third-party claims administrators) under the Insurance Policies or modifies the coverage or benefits provided thereunder, or the terms and conditions thereof, or diminishes or impairs the enforceability of the Insurance Policies. The Debtors shall be deemed to have assumed all Insurance Policies. All of the Debtors' rights and their Estates' rights under any Insurance Policies to which the Debtors and/or the Debtors' Estates may be beneficiaries shall vest with the Post-Effective Date Debtors for the benefit of the Post-Effective Date Debtors and all of the beneficiaries of such policies.

### 12. Indemnification Obligations

Except as otherwise provided in the Plan and the Confirmation Order, or as otherwise assumed by the Debtors pursuant to a Final Order entered by the Bankruptcy Court, any and all indemnification obligations of the Debtors (including any indemnification obligations to Former Directors and Officers), whether pursuant to a contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document, or other document or applicable law, shall be rejected as of the Effective Date of the Plan; *provided that*, any indemnification obligations that are expressly assumed by the Debtors pursuant to a Final Order entered by the Bankruptcy Court, shall continue in effect on the terms set forth in the Plan, Confirmation Order, the applicable organizational documents of the Post-Effective Date Debtors, or applicable Final Order with respect to any such indemnification obligations.

### 13. Setoffs and Recoupments

The Debtors, Post-Effective Date Debtors, or the Claims Administrator (with respect to General Unsecured Trade Claims), may, but shall not be required to, setoff or recoup against any Claim (for purposes of determining the Allowed amount of such Claim on which a Distribution shall be made), rights, or Causes of Action of any nature whatsoever that the Debtors or Post-Effective Date Debtors may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim shall constitute a waiver or release by the Debtors, Post-Effective Date Debtors, or the Claims Administrator (with respect to General Unsecured Trade Claims) of any such Claim, right or Cause of Action the Debtors or Post-Effective Date Debtors may have against the Holder of such Claim.

### 14. Exemption from Certain Taxes and Fees

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any Securities, instruments, or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property or transfer of beneficial ownership of property pursuant to the Plan or the Plan Supplement, (iv) any assumption, assignment, or sale by the Debtors of their interests in Executory Contracts pursuant to section 365(a) of the Bankruptcy Code, and (v) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

### 15. Approval of Plan Documents

The solicitation of votes on the Plan shall be deemed a solicitation for the approval of the Plan Documents and all transactions contemplated hereunder. Entry of the Confirmation Order shall constitute Bankruptcy Court approval of the Plan Documents and such transactions. On the

AMERICAS 124924883

Effective Date, the Debtors and the Post-Effective Date Debtor shall be authorized to enter into, file, execute and/or deliver each of the Plan Documents and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further corporate, board or shareholder action.

### 16. Effectuating Documents; Further Transactions

Any applicable Debtor or Post-Effective Date Debtor, or the Claims Administrator (with respect to the administration of General Unsecured Trade Claims) shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions contained herein.

### 17. Tax Matters

The Post-Effective Date Debtors and the Claims Administrator (with respect to the administration of General Unsecured Trade Claims) shall (A) be authorized to exercise all powers regarding the Debtors' tax matters, including filing tax returns, (B) complete and file the Debtors' federal, state, and local tax returns, (C) request an expedited determination of any unpaid tax liability of the Debtors under section 505(b) of the Bankruptcy Code for all tax periods of the Debtors ending after the Petition Date through the liquidation of the Debtors as determined under applicable tax laws, to the extent not previously requested, and (D) represent the interest and account of the Debtors before any taxing authority in all matters, including, but not limited to, any action, suit, proceeding, or audit.

### 18. Settlements

To the extent a settlement is reached with respect to any Claim prior to the Effective Date and such settlement is approved by the Bankruptcy Court and provides for payment outside of the Plan, such Claim shall be paid as set forth in the applicable settlement documents and the order of the Bankruptcy Court approving such settlement.

### 19. Equitable Subordination of Foxconn Interests

The Plan shall serve as, and shall be deemed to be, a motion for entry of an order equitably subordinating the rights of the Holders of Foxconn Preferred Stock Interests and the rights of Foxconn as a Holder of Common Stock Interests to receive Distributions under the Plan to the rights of non-Foxconn Holders of Common Stock Interests to receive such Distributions (such subordination, "**Foxconn Subordination**"). As a result, Foxconn will receive no distributions on account of its Interests.

If no objection to equitable subordination is timely Filed and served on or before the deadline to object to Confirmation of the Plan, or such other date as may be fixed by the Court, the entry of the Confirmation Order shall constitute an order to subordinate the rights of the Holders of Foxconn Preferred Stock Interests and the rights of Foxconn has a Holder of Common Stock Interests, as set forth herein. If any such objection is timely Filed and served, the Bankruptcy Court shall adjudicate such objection at the Confirmation Hearing.

AMERICAS 124924883

The Debtors submit that Foxconn Subordination is appropriate under the law and the facts present here.  Courts in the Third Circuit generally recognize the following three-factor test for equitable subordination under section 510(c) of the Bankruptcy Code: "(1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *See In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 411 (3d Cir. 2009) (internal citation omitted); *see also In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 69 (Bankr. D. Del. 2002) (same); *In re UD Dissolution Corp.*, 629 B.R. 11, 37–38 (Bankr. D. Del. 2021) (same); *In re Washington Mut., Inc.*, 461 B.R. 200, 256 (Bankr. D. Del. 2011), *vacated in part*, No. 08-12229 MFW, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012).

Here, the Debtors have outlined Foxconn's misconduct, as well as the injury to the Debtors and their estates resulting from that misconduct, in detail in the Foxconn Complaint, attached hereto as **Exhibit D**.  Moreover, the Foxconn Subordination is consistent with the Bankruptcy Code and the test that courts have applied to equitably subordinate claims and interests. Accordingly, the debtors submit that the Foxconn Subordination is appropriate, and the Debtors believe such Foxconn Subordination is in the best interests of the Debtors' estates and all other holders of Allowed Claims and Interests under the Plan.

## 20. GUTC Cash Pool Adjustment

No later than five (5) days after the expiration of the Bar Date, either the Debtors or the Committee may send written notice to the other party (an "**GUTC Cash Pool Adjustment Notice**") of its intent to seek an adjustment to the GUTC Cash Pool Amount (the "**GUTC Cash Pool Adjustment**").  Any such notice shall set forth the amount of the proposed GUTC Cash Pool Adjustment and a short description of the reasons for such adjustment.  The party receiving the GUTC Cash Pool Adjustment Notice shall have five (5) days from the receipt of such notice to agree to the requested adjustment.  If an agreement is reached, the GUTC Cash Pool Amount shall be adjusted as set forth in such GUTC Cash Pool Adjustment Notice or in such other amount as may be agreed upon by the parties.  If the parties do not reach agreement on a proposed adjustment within such five (5) day period, either party may seek an order from the Bankruptcy Court adjusting the GUTC Cash Pool Amount as set forth in the applicable GUTC Cash Pool Adjustment Notice or in such other amount as any such party may request.  The final amount of the GUTC Cash Pool Amount, if adjusted as set forth herein, shall be set forth in the Confirmation Order.

## 21. General Unsecured Trade Claim Recoveries

On or prior to the Effective Date, the Debtors shall establish and fund the GUTC Cash Pool Account with the GUTC Cash Pool Amount.  The Cash in the GUTC Cash Pool Account shall be used by the Claims Administrator to pay the Claims Administrator Expenses and to make the Distributions to Holders of General Unsecured Trade Claims required by Article III.B.3.b on the terms and conditions set forth in the Plan.  Any Cash remaining in the GUTC Cash Pool Account after the payment of Claims Administrator Expenses and the making of the Distributions required by Article III.B.3.b shall be repaid on the Post-Effective Debtors and shall, upon such payment, constitute a Non-Trade Pool Asset.  The Cash held in the GUTC Cash Pool Account (i) shall be

held in trust to fund Distributions on account of Allowed General Unsecured Trade Claims, as provided herein and (ii) shall not be encumbered by any Liens, Claims, or Interests in any way.

All parties to the Plan shall (i) treat the GUTC Cash Pool Account as a "disputed ownership fund" within the meaning of Treasury Regulations Section 1.468B-9(b)(1) for U.S. federal income tax purposes, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All taxes imposed on assets or income of the GUTC Cash Pool Account will be payable from the assets of the GUTC Cash Pool Account.

## F. Provisions Regarding Distributions

### 1. Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their agents shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests. The Post-Effective Date Debtors and the Claims Administrator (with respect to General Unsecured Trade Claims) shall have no obligation to recognize any transfer of any Claims or Interests occurring on or after the Distribution Record Date. The Post-Effective Date Debtors and the Claims Administrator (with respect to the administration of General Unsecured Trade Claims) shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date.

### 2. Cash Payments

Cash payments made pursuant to the Plan shall be in U.S. funds, by the means agreed to by payor and payee, including by check or wire transfer or, in the absence of an agreement, such commercially reasonable manner as the Debtors, the Post-Effective Date Debtors, and the Claims Administrator (with respect to the administration of General Unsecured Trade Claims), as applicable, shall determine.

### 3. Allocation of Distributions; Postpetition Interest on Claims

Post-petition interest shall not be paid to Holders of Claims and Interests unless otherwise provided by the Plan. To the extent a Holder of a Claim is entitled to post-petition interest pursuant to the Plan and such interest is not already included in the Allowed amount of such Claim pursuant to Section 506 of the Bankruptcy Code and the provisions of the Plan, Distributions on account of such Claims shall be allocated, first, to the principal amount of such Claim (as determined for federal income tax purposes), and, second, to the extent of any excess, to the remainder of the Claim, if applicable.

For the avoidance of any doubt, Administrative Claims of tax authorities (including any Administrative Claims of the Internal Revenue Service for any federal taxes, which shall accrue interest at the rate and in the manner established under 26 U.S.C. §§ 6621 and 6622), shall accrue interest at the rate and in the manner specified by the applicable tax regulation. Nothing herein shall be deemed an admission of the Debtors or the Post-Effective Date Debtors that any such Claim is an Allowed Claim and the parties reserve all rights with respect to such determination.

47

### 4.  Delivery of Distributions

Subject to Bankruptcy Rule 9010, any Distribution or delivery to a Holder of an Allowed Claim shall be made at the last known address of such Holder as set forth (a) in the Schedules filed with the Bankruptcy Court unless the Debtors have been notified in writing of a change of address, including by the filing of a Proof of Claim by such Holder that contains an address for such Holder different from the address reflected in such Schedules for such Holder, (b) on the Proof of Claim filed by such Holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or (d) in any notice served by such Holder giving details of a change of address.  If any Distribution or other communication from the Debtors is returned as undeliverable, no Distribution shall be made to such Holder unless the Debtor, Post-Effective Date Debtor, or the Claims Administrator (with respect to General Unsecured Trade Claims), as applicable, is notified of such Holder's then current address within ninety (90) days after the later of (i) the Effective Date, (ii) date the communication from the Post-Effective Date Debtor, or the Claims Administrator (with respect to the administration of General Unsecured Trade Claims) was returned or (iii) the date such Distribution was returned.  After such date, if such notice was not provided, a Holder shall have forfeited its right to such Distribution, and such undeliverable distributions shall be returned to the Post-Effective Date Debtors or (with respect to General Unsecured Trade Claims) the Claims Administrator, and be distributed in accordance with the Plan.

### 5.  Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Post-Effective Date Debtors, and the Claims Administrator (with respect to the administration of General Unsecured Trade Claims), as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Post-Effective Date Debtors, and the Claims Administrator (with respect to the administration of General Unsecured Trade Claims), as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Post-Effective Date Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

The Post-Effective Date Debtors and the Claims Administrator (with respect to the administration of General Unsecured Trade Claims) may require, as a condition to receipt of a distribution, that the Holder of an Allowed Claim provide any information necessary to allow the distributing party to comply with any such withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, including but not limited to Form W-8 or Form W-9 (as applicable).  If the Post-Effective Date Debtors or the Claims Administrator make such a request and the Holder fails to comply before the date that is one hundred and eighty (180) days after the request is made, the amount of such distribution shall irrevocably revert to the Post-

48

Effective Date Debtors or the Claims Administrator (with respect to the administration of General Unsecured Trade Claims), as applicable, and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Post-Effective Date Debtor or its respective property.

### 6. No Distribution in Excess of Allowed Amounts

No Holder of an Allowed Claim shall receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim, except to the extent such Holder is entitled to postpetition interest pursuant to the Plan.

### 7. Special Rules for Distributions to Holders of Disputed Claims and Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties:  (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all such disputes in connection with such Disputed Claim or Interest have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim or Interest and a Disputed Claim or Interest shall not receive any distribution on the Allowed Claim or Interest unless and until all objections to the Disputed Claim or Interest have been resolved by settlement or Final Order or the Claims or Interests have been Allowed or expunged.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

For the avoidance of any doubt, the Debtors dispute that the Holders of Foxconn Preferred Stock Interests are entitled to Distributions under the Plan.  The Debtors also dispute that Foxconn, in its capacity as a Holder of any Interests, including Common Stock Interests, is entitled to Distributions under the Plan. Among other things, the Debtors (i) are seeking to equitably subordinate the Foxconn Preferred Interests and any Common Stock Interests held by Foxconn in their entirety to non-Foxconn Common Stock Interests under the Plan, (ii) reserve the right to seek disallowance of any and all Interests and Claims held by Foxconn, and (iii) believe that any Distributions to Foxconn are also subject to the Debtors' setoff and recoupment rights as a result of the Foxconn Causes of Action.  As a result, any Distributions in respect of Foxconn Preferred Stock Interests or any other Interests in and to the Debtors held by Foxconn shall be subject to Article V.S of the Plan and the resolution of the Foxconn Causes of Action.

### 8. Manner of Payment Under Plan

Unless otherwise provided herein, any Cash payment to be made hereunder may be made by a check or wire transfer.

49

(i)      *Minimum Distributions.*  The Post-Effective Date Debtors, and the Claims Administrator, as applicable, shall not be obligated to make any payment of Cash of less than fifty dollars ($50) to any Holder of an Allowed Claim or Interest.  Notwithstanding anything contained herein to the contrary, if, on the final date of Distribution there remains $10,000 or less available for distribution to Holders of Allowed Claims, in lieu of making any further distributions to the Holders of such Claims, the Post-Effective Date Debtors or the Claims Administrator, as applicable, shall distribute such Cash to The Henry Ford Museum of American Innovation, Dearborn, Michigan.

(ii)      *Time Bar to Cash Payments.*  Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for reissuance of any voided check shall be made directly to the Claims Administrator by the Holder of the Allowed Claim or Interest to whom such check was originally issued.  Any Claim or Interest in respect of such a voided check shall be made within ninety (90) days after the date of issuance of such check.  If no request is made as provided in the preceding sentence, any Claims in respect of such voided check shall be discharged and forever barred.

## G.  Procedures for Disputed Claims

### 1.  Allowance of Claims

After the Effective Date, each of the Post-Effective Date Debtors shall have and retain, and the Claims Administrator shall be entitled to assert (with respect to General Unsecured Trade Claims), any and all rights and defenses that the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date, including by virtue of any Causes of Action retained by the Debtors (i) relating to such Claim or Interest (or the facts, circumstances, agreement(s), arrangements, or transactions giving rise to such Claim or Interest) or (ii) against the Holder of such Claim or Interest.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim unless and until such Claim or Interest is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim; *provided, however*, that the Plan Administrator may affirmatively determine to deem Allowed any General Unsecured Trade Claim (other than a General Unsecured Trade Claim asserted by Foxconn) notwithstanding the fact that the period within which an objection may be interposed has not yet expired; *provided further that*, any determination by the Claims Administrator to deem to Allow a General Unsecured Trade Claim must comply with the Plan Administrator's notice and consultation obligations, including as set forth in Article V.D.3 of the Plan, which obligations are not superseded by this provision in any respect.  Except as otherwise expressly specified in the Plan (including as provided in Article III.B.3.b and Article III.B.4.b of the Plan with respect to Allowed General Unsecured Trade Claims under certain circumstances detailed in such provision) or any Final Order, and except to the extent such interest, fees, costs or charges are Allowed pursuant to section 506(b) of the Bankruptcy Code, the amount of an Allowed Claim shall not include any interest, fees, costs or charges arising from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim or Interest, there shall be deducted therefrom an amount equal to the amount of any Claim that the

50

Debtors may hold against the Holder thereof, to the extent such Claim or Interest may be offset, recouped, or otherwise reduced under applicable law.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes.  For the avoidance of any doubt, a Proof of Claim Filed after the applicable Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.

2. **Claims and Interests Administration Responsibilities**Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019 or section 1123 of the Bankruptcy Code, after the Effective Date, the Post-Effective Date Debtors or, with respect to General Unsecured Trade Claims, the Claims Administrator shall have the authority: (i) to File, withdraw, or litigate to judgment objections to Claims; (ii) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court (provided that any Material Claims Settlement is subject to the terms of Article V.D.2.a of the Plan); and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

For the avoidance of any doubt, except as otherwise provided herein, from and after the Effective Date, each Post-Effective Date Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Retained Causes of Action.

All objections to Claims (other than (i) Administrative Claims and (ii) Professional Fee Claims) shall be Filed on or before the Claim Objection Deadline as the same may be extended by the Bankruptcy Court upon a motion filed by the Post-Effective Date Debtors or the Claims Administrator on or before the Claim Objection Deadline, with notice only to those parties entitled to notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002 as of the filing of such motion. The Filing of a motion to extend the Claim Objection Deadline shall automatically extend the Claim Objection Deadline until a final order is entered by the Bankruptcy Court. In the event that such a motion to extend the Claim Objection Deadline is denied, the Claim Objection Deadline shall be the later of the then-current Claim Objection Deadline (as previously extended, if applicable) or thirty (30) days after entry of a Final Order denying the motion to extend the Claim Objection Deadline.

3. **Estimation of Claims**

Before or after the Effective Date, the Debtors or the Post-Effective Date Debtors or (with respect to General Unsecured Trade Claims) the Claims Administrator, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of

51

whether any party previously has objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection; *provided that*, for the avoidance of any doubt, no Claim or Interest Allowed under this Plan shall be considered a Disputed Claim or Disputed Interest.  In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions), and the Debtors, or the Post-Effective Date Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.   Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

If the Debtors determine that (i) one or more Disputed General Unsecured Trade Claims are capable of estimation by the Bankruptcy Court, (ii) estimation will materially improve Effective Date distributions to Holders of Allowed General Unsecured Trade Claims, and (iii) estimation is otherwise in the best interests of the Estates, the Debtors shall File one or more motions to estimate such Disputed General Unsecured Trade Claims, which motion(s) shall be Filed and noticed to be heard by the Bankruptcy Court before the Effective Date (or such other date as determined by the Bankruptcy Court).

4. **Adjustment to Claims Register Without Objection**Any duplicate Claim or Interest, any Claim (Filed or scheduled) or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, the Post-Effective Date Debtors, or (with respect to General Unsecured Trade Claims) the Claims Administrator, as applicable, upon stipulation or any agreement in writing, including email correspondence, between the parties in interest without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

5. **Disallowance of Claims**Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Post-Effective Date Debtors or (with respect to General Unsecured Trade Claims) the Claims Administrator.

All Proofs of Claim must be Filed on or before the applicable Bar Date.  If Proofs of Claim are not Filed on or before the applicable Bar Date, except in the case of certain exceptions explicitly set forth in the Bar Date Order, the Holders of the underlying Claims shall, absent further Order of the Bankruptcy Court Allowing such Claims, be barred from asserting such Claims against the Debtors and precluded from voting on the Plan and/or receiving Distributions from the Debtors on account of such Claims in the Chapter 11 Cases.

6. **Reimbursement or Contribution** If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (i) such Claim has been adjudicated as non-contingent; or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim is no longer contingent.

7. **Amendments to Proofs of Claim** On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim or Proof of Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court, the Post-Effective Date Debtors, or (with respect to General Unsecured Trade Claims) the Claims Administrator, and any such new or amended Claim or Proof of Claim Filed after the Effective Date shall be deemed Disallowed in full and expunged without any further action or notice to the Bankruptcy Court; *provided that* the filing of an unauthorized amendment shall not affect the underlying Claim or Proof of Claim.  Nothing in this paragraph shall remove any claimant's ability to seek leave from the Bankruptcy Court to amend a Claim or Proof of Claim.

8. **No Distributions Pending Allowance**

For the avoidance of any doubt, notwithstanding any other provision in the Plan, no Distributions shall be made with respect to all or any portion of a Disputed Claim or Interest unless and until all objections to such Disputed Claim or Interest is settled or withdrawn or is determined by Final Order, and the Disputed Claim or Interest, or some portion thereof, has become an Allowed Claim or Interest.

9. **Disputed Claims Reserve**

The Claims Administrator and the Post-Effective Date Debtor, as applicable, may establish reserves for the payment of Disputed Claims by withholding up to 100% of the Distributions to which Holders of such Disputed Claims would be entitled if such Disputed Claims were Allowed Claims.

10. **Distributions After Allowance**

53

Subject to Article VII.H hereof, after such time as a Disputed General Unsecured Trade Claim, Common Stock Interest, or Foxconn Preferred Stock Interest becomes, in whole or in part, an Allowed Claim or Interest, the Post-Effective Date Debtors or (with respect to General Unsecured Trade Claims) the Claims Administrator shall distribute to the Holder thereof the reserved Distributions, as applicable, if any, to which such Holder is then entitled under the Plan. Any such distributions shall be made in accordance with the Plan. To the extent such Disputed General Unsecured Trade Claim, Common Stock Interest, or Foxconn Preferred Stock Interest is Disallowed, the corresponding reserved amount shall be distributed to other Allowed Claims or Interests as provided for in the Plan.

> **11. Single Satisfaction of Claims** Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed one hundred (100) percent of the underlying Allowed Claim plus applicable interest, if any.

### H. Settlement, Release, Injunction, and Related Provisions

#### 1. Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan. In accordance with the provisions of and except as set forth in the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, Post-Effective Date Debtors or the Claims Administrator (with respect to General Unsecured Trade Claims, and subject to the terms provided in Article V.D.3 of the Plan) may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

#### 2. Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be

54

in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, any Claims for withdrawal liability that relate to services performed by employees of the Debtors before the Effective Date or that arise from a termination of employment, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default or "*event of default*" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan so long as such cure does not cause such Claim to be Impaired.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring; *provided that*, notwithstanding anything in the foregoing, Interests treated pursuant to the Plan shall receive such treatment as specified in the Plan.

### 3.   Releases by the Debtors

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, the Debtors and their Estates, the Post-Effective Date Debtors and each of their respective current and former Affiliates (with respect to non-Debtors, to the extent permitted by applicable law), on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, in each case, whether prepetition or postpetition (including any derivative Claims asserted or that may be asserted on behalf of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the conduct of their business (in each case, whether prepetition or postpetition), the formulation, preparation, dissemination, negotiation of the Plan, the Disclosure Statement, any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (in each case, whether prepetition or postpetition) related or relating to the foregoing.**

55

Notwithstanding anything to the contrary in the foregoing, the releases set forth in **Article VIII.C** of the Plan shall not release (i) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, or (ii) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement executed to implement the Plan.

### 4. Releases by Holders of Claims and Interests

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged each Debtor, Post-Effective Date Debtor, and other Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (in each case, whether prepetition or postpetition), including any derivative Claims asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the conduct of their business (in each case, whether prepetition or postpetition), the formulation, preparation, dissemination, or negotiation of the Plan, the Disclosure Statement, any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (in each case, whether prepetition or postpetition) related or relating to the foregoing . Notwithstanding anything to the contrary in the foregoing, the releases set forth in this **Article VIII.D** of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, (ii) releasing any post-Effective Date obligations of or under (A) any party or Entity under the Plan, (B) any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to Final Order, or (C) any document, instrument, or agreement executed to implement the Plan, or (iv) releasing any rights to distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order.

### 5. Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from, any Cause of Action for any claim related to any act or omission from the Petition Date to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, in whole or in part, the Debtors, the formulation, preparation, dissemination, negotiation, of the Plan, the

AMERICAS 124924883

Disclosure Statement, any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan or the distribution of Cash under the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to the fullest extent permitted by law to reasonably rely upon the advice of counsel with respect to their duties and responsibilities.  The Exculpated Parties have, and upon Consummation of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

## 6.  Injunction

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR DISTRIBUTIONS REQUIRED TO BE PAID OR DELIVERED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE (1) BEEN RELEASED PURSUANT TO ARTICLE VIII.C OR ARTICLE VIII.D OF THE PLAN, (2) SHALL BE DISCHARGED PURSUANT TO ARTICLE VIII.D OF THE PLAN, OR (3) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.E OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO ARTICLE VIII.E WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT (WHICH MAY BE A PROOF OF CLAIM) FILED WITH THE BANKRUPTCY COURT IN

AMERICAS 124924883

**ACCORDANCE WITH THE TERMS OF THE PLAN EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.**

> 7. **Release of Liens** Except (i) with respect to the Liens securing, to the extent elected by the Debtors with respect to an Allowed Secured Claim in accordance with <u>Article III.B.2</u> of the Plan; or (ii) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors, the Post-Effective Date Debtors, or the Claims Administrator, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors' Estates and their successors and assigns.

## I.  Executory Contracts

### 1.  Rejection of Executory Contracts

Any Executory Contract which has not been assumed with the approval of the Bankruptcy Court on or prior to the Confirmation Date shall be deemed a rejected Executory Contract by the applicable Debtor effective on the Confirmation Date.  The Plan shall constitute a motion to reject such Executory Contracts and the Debtors shall have no liability thereunder, except that any Claim arising from the rejection of an Executory Contract shall be treated as a General Unsecured Trade Claim subject to filing of a Proof of Claim pursuant to <u>Article II.B.3</u> of the Plan.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejection pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejection is in the best interest of the applicable Debtor, its Estate, and all parties in interest in the Chapter 11 Cases.  For the avoidance of any doubt, notwithstanding anything in the foregoing, the Debtors shall remain bound by any outstanding indemnification obligations owed to Chapter 11 Directors and Officers that it has assumed pursuant to any Final Order entered by the Bankruptcy Court.

### 2.  Time for Filing Rejection Claims

Claims arising from the rejection of Executory Contracts pursuant to <u>Article IX.A</u> of the Plan must be filed with the Claims and Noticing Agent within thirty (30) days after the service of

the Effective Date notice.  Any Claims for which a proof of claim is not filed and served within such time will be forever barred from assertion and shall not be enforceable against the Debtors or their Estates, Assets, properties or interests in property.  All proofs of Claims arising from the rejection of Executory Contracts that are timely filed as provided herein shall be treated under the Plan as General Unsecured Trade Claims upon their Allowance.

### 3.  Reservation of Rights

Nothing contained in the Plan, including Article IX.C of the Plan shall constitute a waiver of any Claim, right or Cause of Action that the Debtors or the Post-Effective Date Debtor, as the case may be, may hold against the insurer under any policy of insurance or insurance agreement.

## J.  **Conditions Precedent to Confirmation and the Effective Date**

### 1.  Conditions to Occurrence of the Effective Date

The Effective Date of the Plan shall not occur unless and until each of the following conditions has occurred or has been waived pursuant to Article X.B of the Plan:

a. the Bankruptcy Court shall have entered the Confirmation Order, in form and substance materially consistent with the Plan and otherwise reasonably acceptable to the Debtors and such order shall not have been stayed pending appeal; without limiting the generality of the foregoing, the Confirmation Order shall subordinate the rights to receive Distributions of Holders of Foxconn Preferred Stock Interests and of Foxconn as a Holder of Common Stock Interests as required by Article V.S of the Plan;

b. the Professional Fee Escrow Account shall have been established and fully funded as set forth herein;

c. the GUTC Cash Pool Account shall have been established and funded in Cash in accordance with Article V.T and Article V.U of the Plan;

d. the Claims Administrator shall have been appointed;

e. all Plan Documents, agreements and other instruments which are exhibits to the Plan or included in the Plan Supplement shall be acceptable to the Debtors and shall have been executed and delivered by the parties thereto;

f. all actions, documents and agreements necessary to implement the Plan and the transactions contemplated by the Plan shall have been effected or executed; and

g. all appropriate notices shall have been given and all other appropriate actions shall have been taken to preserve all applicable Insurance Policies, including any "tail policy," notices required to be provided.

AMERICAS 124924883

## 2. Waiver of Conditions to Confirmation and Effective Date

The conditions to the Effective Date set forth in <u>Article X.A</u> of the Plan may be waived by the Debtors, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided*, that the Debtors may not waive the condition set forth in <u>Article X.A.3</u> or <u>Article X.A.4</u> of the Plan without consent of the Committee.

## 3. Effect of Failure of Conditions to the Effective Date

In the event the conditions specified in <u>Article X.A</u> of the Plan have not been satisfied or waived in accordance with <u>Article X.B</u> of the Plan, and upon notification submitted by the Debtors to the Bankruptcy Court (a) the Confirmation Order shall be vacated; (b) no Distributions shall be made; (c) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (d) all of the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person (and any government, governmental agency or any subdivision, department or other instrumentality thereof) or to prejudice in any manner the rights of the Debtors or any other Person (and any government, governmental agency or any subdivision, department or other instrumentality thereof) in any proceedings further involving the Debtors. Neither the Disclosure Statement, any statement contained in the Disclosure Statement nor the Plan may be used in these Chapter 11 Cases, or in any action, other than in connection with confirmation of the Plan. In the event that the Plan is not confirmed, or is confirmed but does not become effective, the Disclosure Statement, any statements contained in the Disclosure Statement and the Plan shall have no force or effect, and neither the Disclosure Statement, any statements contained in this Disclosure Statement nor the Plan shall be admissible in any court or legal forum for any purpose whatsoever.

## K. <u>Effect of Confirmation</u>

## 1. Deemed Consent

By voting to accept the Plan or accepting any Distributions under the Plan, and not opting out from granting the releases in <u>Article VIII.D</u> of the Plan, each Holder of a Claim will be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the exculpations, releases and injunctions set forth in the Plan.

## 2. No Waiver

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, CONFIRMATION OF THE PLAN SHALL NOT RELEASE, NOR BE DEEMED TO RELEASE, ANY CLAIM OR CAUSE OF ACTION THAT ANY DEBTOR MAY HOLD AGAINST ANY PERSON OR ENTITY (INCLUDING ANY RELEASED PARTY) RELATED TO, ARISING UNDER, OR IN ANY WAY WITH RESPECT TO ANY OF THE RETAINED CAUSES OF ACTION.

AMERICAS 124924883

### 3.  Disallowed Claims and Disallowed Interests

On and after the Effective Date, Post-Effective Date Debtors and the Claims Administrator shall be fully and finally discharged of any and all liability or obligation on a Disallowed Claim or a Disallowed Interest, and any Order disallowing a Claim or an Interest which is not a Final Order as of the Effective Date solely because of any Person's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.  The Confirmation Order, except as otherwise provided herein, shall constitute an Order: (a) disallowing all Claims and Interests to the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims and Interests, and Claims for unmatured interest and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

## L.  Retention of Jurisdiction

On and after the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over all matters arising in, arising under, or related to the Chapter 11 Cases, or that relate to any of the following:

a.  To Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or Allowance of Claims or Interests; *provided that*, for the avoidance of any doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or the Post-Effective Date Debtors, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters.

b.  To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof.

c.  To hear and determine all applications for the payment of Professional Fee Claims.

d.  To resolve any matters related to (i) the assumption, assumption and assignment or rejection of any Executory Contract to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or any other matter related to such Executory Contract;  (ii) the  Post-Effective Date  Debtors  amending,  modifying,  or supplementing, after the Confirmation Date, the schedule of Executory Contracts

to be assumed or rejected pursuant to <u>Article IX</u> of the Plan; and (iii) any dispute regarding whether a contract or lease is or was executory or unexpired.

e.      To adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims.

f.      To hear and determine any dispute or reconcile any inconsistency arising in connection with the Plan, any of the Plan Documents or the Confirmation Order or the interpretation, implementation or enforcement of the Plan, any of the Plan Documents, the Confirmation Order, any transaction or payment contemplated hereby or any agreement, instrument or other document governing or relating to any of the foregoing.

g.      To hear and determine any matter concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

h.      To adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code.

i.      To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

j.      To hear and determine any rights, Claims or Causes of Action, including without limitation Claims or Causes of Action identified on the Schedule of Retained Causes of Action, held by, transferred to or accruing to the Post-Effective Date Debtors pursuant to the Bankruptcy Code, including any settlement or compromise thereof.

k.      To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person (and any government, governmental agency or any subdivision, department or other instrumentality thereof) with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court.

l.      To take any action, and issue such orders as may be necessary or appropriate, to construe, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation.

m.      To resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan.

n.      To ensure that all Distributions are accomplished as provided in the Plan.

o.      To allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim.

AMERICAS 124924883

p.      To enter, implement or enforce such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated.

q.      To enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code.

r.      To recover all Assets of the Estates, wherever located.

s.      To hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code.

t.      To determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code.

u.      To enter a final decree closing the Chapter 11 Cases.

v.      To resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan.

w.      To determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date.

x.      To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Plan and these Chapter 11 Cases.

y.      To hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge.

z.      To determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, any of the Plan Documents or any other contract, instrument, release or other agreement or document related to the Plan or the Disclosure Statement.

aa.     To adjudicate the Foxconn Causes of Action.

bb.     To adjudicate any other adversary proceedings pending before the Bankruptcy Court as of the Petition Date or any other disputes relating to any Retained Cause of Action that the Post-Effective Date Debtors may bring thereafter.

cc.     To hear and determine any dispute or suit regarding setoff or recoupment.

63

## ARTICLE V
## <u>CERTAIN TAX CONSEQUENCES OF THE PLAN</u>

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain Holders of Claims and Interests. The following summary does not address the U.S. federal income tax consequences to Holders of Claims not entitled to vote to accept or reject the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "**IRC**"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the IRS, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax exempt organizations, small business investment companies, persons who are non-U.S. persons, controlled foreign corporations, passive foreign investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, U.S. Holders (as defined herein) whose functional currency is not the U.S. dollar, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, the Common Stock, or any other consideration to be received under the Plan, as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the IRC). This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any ramifications such arrangements may have on the treatment of a Holder under the Plan). This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

For purposes of this discussion, a "**U.S. Holder**" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons has authority to control all substantial

64

decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN INTEREST OR A CLAIM. ALL HOLDERS OF INTERESTS AND CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

### A. <u>Certain Tax Treatment to Holders of Interests</u>

In accordance with the Plan, Holders of Common Stock Interests and Foxconn Preferred Stock Interests may not receive any recovery under the Plan. To the extent a Holder of an Interest in LMC will not receive any recovery under the Plan, such Holder will generally recognize a loss in an amount equal to such Holder's adjusted tax basis in such Interest in LMC. Capital losses are subject to various limitations under the Internal Revenue Code ("**IRC**").

### B. <u>Certain Tax Treatment to Holders of General Unsecured Trade Claims</u>

In accordance with the Plan, Holders of General Unsecured Trade Claims may not receive full recovery under the Plan. To the extent a Holder of a Claim will not receive full recovery under the Plan, such Holder generally will be able to recognize a bad debt loss in an amount equal to the excess of (i) such Holder's adjusted tax basis in such Claim over (ii) the fair market value of the amount recovered under the Plan. Such loss generally will be ordinary in character to the extent such Claim was held by such Holder in its trade or business.

### C. <u>Certain Tax Consequences to the Debtors</u>

#### 1. Cancellation of Indebtedness Income

##### a. In General

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new

65

consideration (including stock of the debtor) given in satisfaction of such satisfied indebtedness at the time of the exchange.

Under section 108 of the IRC, a debtor is not, however, required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.   163(j) Carryforwards are not subject to reduction under these rules.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.  The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

### b.   Limitation of NOL Carryforwards and Other Tax Attributes

After giving effect to the reduction in tax attributes pursuant to excluded COD Income and the worthless stock deduction rules described above, Debtors' ability to use any remaining tax attributes post-emergence may be subject to certain limitations under sections 382 and 383 of the IRC. No determination has yet been made as to whether the transactions would trigger limitations under section 382.

### i.   General Section 382 Annual Limitation

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and, if the corporation has an overall "net unrealized built in loss" in its assets, and certain other tax attributes of the Debtors allocable to periods prior to the Effective Date (collectively, "**Pre Change Losses**") that may be utilized to offset future taxable income generally are subject to an annual limitation.  This discussion refers to the limitation determined under section 382 of the IRC in the case of an "ownership change" as the "**Section 382 Limitation**."

However, if the transactions did trigger the Section 382 Limitation and if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

66

In general, the annual Section 382 Limitation on the use of Pre Change Losses in any "post-change year" is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs).  If the corporation has an overall "net unrealized built-in gain" as determined pursuant to IRS Notice 2003-65, the Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change (or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65).  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

### ii.  Special Bankruptcy Exception

An exception to the foregoing annual limitation rules generally applies when so called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, together with existing shareholders with respect to their stock, at least 50 percent of the vote and value of the stock of the Debtors (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**382($l$)(5) Exception**").  Under the 382($l$)(5) Exception, the Debtors' Pre Change Losses are not limited on an annual basis but, instead, the Debtors' NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of all debt converted into stock in the reorganization.  If the 382($l$)(5) Exception applies and the Debtors undergo another ownership change within two years after consummation, then the Debtors' Pre Change Losses are eliminated in their entirety.

Where the 382($l$)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382($l$)(5) Exception), a second special rule may apply (the "**382($l$)(6) Exception**").  When the 382($l$)(6) Exception applies, the annual limitation will be calculated by reference to the lesser of (a) the value of the Common Stock (with certain adjustments) immediately after the ownership change or (b) the value of the Debtors' assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382($l$)(6) Exception differs from the 382($l$)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre Change Losses.

AMERICAS 124924883

The Debtors have not determined whether, if section 382 applies to the transactions, they will be eligible for the 382(l)(5) Exception and, if eligible, whether the Debtors will decide to affirmatively elect out of the 382(*l*)(5) Exception so that the 382(*l*)(6) Exception instead applies.

> **THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE VI
## SOLICITATION AND VOTING PROCEDURES

The solicitation procedures attached to the Disclosure Statement Order (the "**Solicitation Procedures**"), which are incorporated into this Disclosure Statement by reference and summarized below, will be used to collect and tabulate votes on the Plan. The Disclosure Statement Order establishing the Solicitation Procedures should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan. In the event of any conflict between the Solicitation Procedures and this Disclosure Statement, the Solicitation Procedures will control.

### A. <u>Holders of Claims and Interests Entitled to Vote on the Plan</u>

As discussed above, Holders of Claims in Class 3 (General Unsecured Trade Claims), Class 4 (Foxconn Preferred Stock Interests), and Class 5 (Common Stock Interests) (collectively, the "Voting Classes") are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes are entitled to vote on the Plan and should refer to the Disclosure Statement Order and Solicitation Procedures attached thereto for further instructions on voting.

### B. <u>Voting Record Date</u>

The Record Date for determining whether Holders of Claims or Interests are entitled to vote on the Plan and receive the Solicitation Package (as defined below) in accordance with the Solicitation Procedures is [●].

### C. <u>Solicitation Package</u>

The package of materials (the "**Solicitation Package**") to be sent to Holders of Claims and Interests in the Voting Classes contain:

AMERICAS 124924883

1. a cover letter from the Debtors describing the contents of the Solicitation Package and urging the Voting Classes to vote to accept the Plan;

2. a copy of this Disclosure Statement, together with the exhibits hereto, including the Plan, attached as Exhibit A;

3. a copy of the Disclosure Statement Order entered by the Bankruptcy Court;

4. a copy of the notice of the Confirmation Hearing, the Confirmation Objection Deadline, and the Voting Deadline (the "**Confirmation Hearing Notice**");

5. an appropriate form of Ballot with return instructions and a prepaid, return envelope; and

6. any other materials ordered by the Bankruptcy Court to be included as part of the Solicitation Package.

In addition, the following materials will be sent to Holders of Claims not in the Voting Classes (*i.e.*, Classes 1 and 2) as of the Voting Record Date and Holders of Unclassified Claims as of the Voting Record Date:

1. a copy of the Confirmation Hearing Notice; and

2. a notice informing such Holders that are not entitled to vote under the terms of the Plan.

The Plan, the Disclosure Statement, all Plan Documents, including the Plan Supplement, will be made available online at no charge at the website maintained by the Debtors' Voting Agent at https://www.kccllc.net/lordstown.  The Debtors will provide parties in interest (at no charge) with hard copies of the Plan and/or Disclosure Statement, as well as any exhibits thereto, upon request to the Voting Agent electronically at www.kccllc.net/lordstown/inquiry or by telephone at (877) 709-4757 or (424) 236-7235 (International).

### D.  Voting on the Plan

**The voting deadline to accept or reject the Plan is [4:00 p.m.] (Prevailing Eastern Time) on [●], 2023, unless extended by the Debtors (the "Voting Deadline").**  You may submit your Ballot via first class mail, overnight courier, or hand/personal delivery at the address listed below or online at the KCC website listed below.  Ballots will not be accepted by facsimile, email, or other electronic means of transmission.  Additional details on voting are discussed herein and set forth in Ballots delivered to Holders of Claims or Interests entitled to vote on the Plan.

**For your vote to be counted, you must return your properly completed Ballot in accordance with the voting instructions on the Ballot on that it is *actually received* by Kurtzman Carson Consultants, LLC (the "Voting Agent"), on or before the Voting Deadline.**

<div style="border:1px solid black;">

**DELIVERY OF BALLOTS BY MAIL**

**Lordstown Ballot Processing**
**c/o KCC**
**222 N. Pacific Coast Highway**
**Suite 300**
**El Segundo, CA 90245**

**ONLINE SUBMISSION OF BALLOT**

**Submit your Ballot via the Voting Agent's online portal at**
**www.kccllc.net/lordstown. Click on the "Submit Electronic Ballot (e-Ballot)"**
**section of the website and follow the instructions to submit your Ballot.**

</div>

Special procedures are set forth in the Disclosure Statement Order and Solicitation Procedures for beneficial holders who hold securities through a broker, dealer, commercial bank, trust company, or other agent or nominee ("**Nominee**"). If you received a Solicitation Package addressed to or sent from your Nominee, please return your Ballot to your Nominee allowing enough time for your Nominee to cast your vote on a Ballot or Master Ballot before the Voting Deadline. Please review the Disclosure Statement Order and Solicitation Procedures for further information concerning such special voting instructions.

## ARTICLE VII
## FACTORS TO CONSIDER BEFORE VOTING

### A.  Risk of Amendment, Waiver, Modification or Withdrawal of the Plan

The Debtors and the Post-Effective Date Debtors, as applicable, reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules and consistent with the terms of the Plan, to amend the terms of the Plan or waive any conditions thereto if and to the extent that such amendments or waivers are necessary or desirable to consummate the Plan.

The potential impact of any such amendment or waiver on the holders of Claims and Interests cannot presently be foreseen, but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

### B.  Parties May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with this requirement.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that parties will not object to the proposed classification.

AMERICAS 124924883

## C.  The Debtors May Not Be Able to Obtain Confirmation of the Plan

The Debtors may not receive the requisite acceptances to confirm the Plan.  In the event that votes with respect to Claims in the Class entitled to vote are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court.  However, if the requisite acceptances are not received, the Debtors may not be able to obtain Confirmation of the Plan. Even if the requisite acceptances of the Plan are received, the Bankruptcy Court might not confirm the Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under section 1129 of the Bankruptcy Code has not been met

.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan of liquidation would be on terms as favorable to Holders of Allowed Claims as the terms of the Plan. In addition, there can be no assurance that the Debtor will be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtors' creditors.

## D.  The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

The Bankruptcy Court denied the motion filed by Foxconn to dismiss or convert the Chapter 11 Cases. Nevertheless, if the Bankruptcy Court finds at a later date and pursuant to another motion to dismiss or covert that it would be in the best interest of Holders of Claims and Interests or upon the showing of cause, the Bankruptcy Court may convert the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code.  In such event, a Chapter 7 trustee would be appointed or elected to liquidate our assets for distribution in accordance with the priorities established by the Bankruptcy Code. Although the value, if any, that would be available to any of the Debtors' various stakeholders (including creditors and stockholders) would be uncertain in any bankruptcy proceeding, the Debtors' believe that liquidation under Chapter 7 would result in significantly smaller distributions being made to our stakeholders than those we might obtain under Chapter 11 primarily because of the likelihood that the assets would have to be sold or otherwise disposed of in a distressed fashion over a short period of time rather than in a controlled manner and as a going concern.

## E.  The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not occur.

## F.  Holders of Claims and Interests May Recover Less Than Projected

Recoveries to Holders of Claims and Interests of the Debtors will be affected by numerous factors.  First, the Cash available for Distributions is uncertain and will depend, in part, on the outcome of the sale process, the Foxconn Adversary Proceeding, any other Causes of Action pursued by the Debtors, and any other efforts to monetize and realize value from the Debtors' assets.  The sale process may not generate any additional proceeds for the Debtors estates.  Further,

71

although the Debtors believe that the Causes of Action set forth in the Foxconn Adversary Proceeding have merit, litigation is inherently uncertain and the outcome is hard to predict. The Debtors could expend considerable resources prosecuting the Causes of Action in the Foxconn Adversary Proceeding without obtaining a favorable outcome.

In addition, Holders of General Unsecured Trade Claims will be paid on a *pro rata* basis solely from a pool of Cash described in the Plan as the GUTC Cash Pool Account. Among other things, recoveries to Holders of General Unsecured Trade Claims could be reduced if the amount of General Unsecured Trade Claims ultimately Allowed against the Debtors and/or the amount of costs and expenses incurred by the Claims Administrator are higher than projected by the Debtors.

Further, recoveries to Holders of Claims and Interests other than General Unsecured Trade Claims also will be affected by the amount of Claims and Interests ultimately Allowed against the Debtors. The Debtor's expenses could be higher than projected and Distributions could be reduced by, among other things, the prior payment of fees, costs, and expenses of the Debtors or the costs to administer the Plan. Further, recoveries to a Holder of a Claim or Interest in a particular class will be affected by the amount of Allowed Claims required to be paid by the Debtors pursuant to the Plan, which are *pari passu* or senior to the Claim or Interest held by such Holder.

Although the Debtors have made commercially reasonable efforts to disclose projected recoveries in this Disclosure Statement, as discussed above, it is possible that the amount of Allowed Claims will be materially higher than any range of possible Allowed Claims the Debtors have considered to date, and thus recoveries could be materially reduced or eliminated. In addition, the timing of actual distributions to holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guarantee the timing of any Distributions.

## G.  The Allowed Amount of Claims May Differ from Current Estimates

There can be no assurance that the estimated Allowed Claim amounts set forth in the Plan and herein are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated in the Disclosure Statement. Furthermore, a number of additional claims may be Filed, including on account of rejection damages for executory contracts and unexpired leases rejected pursuant to the Plan. Any such claims may result in a greater amount of Allowed Claims than estimated in the Disclosure Statement.

## H.  Valuation of the Assets Is Speculative

Any valuation of any of the assets to be distributed under the Plan is necessarily speculative, and the value of such assets could potentially be zero. Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Debtors' creditors, including Holders of Claims and Interests in the voting classes.

AMERICAS 124924883

### I.   Risks Related to Income Taxation

There are several income tax considerations, risks and uncertainties associated with the Plan. Interested parties should read carefully the discussions set forth in Article VII of the Disclosure Statement regarding certain United States federal income tax consequences of the transactions proposed by the Plan.

### J.   The Sale Process May Not Result In Consummation of a Sale

As detailed above, on August 8, 2023, the Bankruptcy Court approved the Bidding Procedures for conducting a comprehensive marketing and sale process for some or substantially all of the Debtors' assets.  There is no assurance that the Company will be able to successfully complete any such dispositions, the timing or pricing and other terms of any such transactions. The Karma claims exacerbated the challenges faced by the Company as it pursues the sale process because they interfered with the Company's ability to assure potential buyers that they will acquire good title to the assets.  However, the Debtors and Karma reached the Karma Settlement Agreement, which has now been approved by the Bankruptcy Court.

The failure to consummate a sale of some or substantially all of the Debtors' assets or to generate substantial proceeds, may have a material impact on the ultimate recovery for stakeholders, including creditors.

### K.   Certain Risks to Holders of Interests

Under the Plan, the Holders of Interests (other than Section 510(b) Claims) will continue to hold their Interests after the Effective Date of the Plan and the Debtors are authorized to operate after the Effective Date. Such operations could include efforts by the Debtors to enter into one or more transactions to maximize the value of their tax attributes. The nature and result of any post-Effective Date operations is speculative and uncertain. In addition, in order to preserve the tax attributes of the Debtors, Holders of Interests may be restricted by the Debtors' organizational documents, the Confirmation Order or other order of the Bankruptcy Court from transferring their Interests after the Effective Date.  Even if no such restriction is implemented, the market for trading Interests after the Effective Date may be limited.  Further, there can be no assurance that the Debtors will be able to identify or consummate a transaction that monetizes their tax attributes. As a result, the value of Interests after the Effective Date is highly uncertain.

### L.   Litigation

As is the case with most litigation, the outcomes of any litigation involving the Debtor, or any other Retained Cause of Action commenced, or preserved, prior to the Effective Date, are difficult to assess or quantify.

AMERICAS 124924883

## ARTICLE VIII
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the Debtors' alternatives include (i) seeking a liquidation of the Debtors under chapter 7 of the Bankruptcy Code or dismissal of the Chapter 11 Cases, or (ii) the preparation and presentation of an alternative chapter 11 plan.

### A. **Liquidation under Chapter 7 or dismissal**

If the Plan is not confirmed and consummated, the Debtors' alternatives include (i) seeking a liquidation of the Debtors under chapter 7 of the Bankruptcy Code or dismissal of the Chapter 11 Cases, or (ii) the preparation and presentation of an alternative chapter 11 plan.

The Debtors believe that the Plan is the best alternative available to creditors and interest holders because the Plan provides for an orderly liquidation of the Assets. Furthermore, the Debtors believe that the Plan also provides creditors and interest holders with a degree of certainty that would not exist if the Assets were subject to liquidation outside of the Plan and eliminates the risks and expenses of the marketplace and continual administration of the Debtors. In this regard, in the event of a liquidation under Chapter 7, general unsecured creditors would likely not receive distributions in as large of an amount as they will likely be entitled to under the Plan and equity Interests would likely not be entitled to any recovery, and the following is likely to occur:

  i.  Additional administrative expenses, including trustee's commissions, fees for trustee's accountant, attorneys and other professionals likely to be retained, would be incurred with priority over General Unsecured Trade Claims under section 507(a)(1) of the Bankruptcy Code and would materially reduce creditor recovery.

  ii. Distributions would likely be substantially delayed, while expenses of administration would continue to grow.

Accordingly, it is the Debtors' belief that in a Chapter 7 liquidation of the Debtors, the unsecured creditors would not receive a distribution. Accordingly, the Debtors believe that the Plan is in the best interests of creditors. *See* Liquidation Analysis attached hereto as **Exhibit C**.

If the Plan is not confirmed, the Estates may lack sufficient funds to continue the Chapter 11 Cases or return a meaningful recovery to stakeholders, and they could be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate and distribute the Debtors' Assets to creditors in accordance with the priorities established by the Bankruptcy Code. In addition, the Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (i) the increased costs and expenses under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisers to such trustee, and (ii) the time required to make distributions in a chapter 7 case. Alternatively, the Debtors could seek to dismiss the Chapter 11 Cases. The Debtors believe that recoveries to creditors would be meaningless under such a scenario. Moreover, they believe that obtaining Bankruptcy Court approval of a structured dismissal is an uncertain outcome.

AMERICAS 124924883

Accordingly, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim or Interest with a recovery that is not less than the amount such holder would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

B. **Alternative Chapter 11 Plan** If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different chapter 11 plan. Alternatives to the Plan may include differing treatment to General Unsecured Creditor or Holders of Interests. If an alternative plan is pursued, creditors and equity holders would lose the recoveries derived from the Plan. Accordingly, the Debtors believe that the Plan enables creditors and equity holders to realize the highest recoveries under the circumstances.

## ARTICLE IX
## CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan is (A) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (B) in the "best interests" of the Holders of Claims and Interests impaired under the Plan; and (C) feasible.

### A. Acceptance of the Plan

The Bankruptcy Code defines "acceptance" of a plan by a class of (i) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the Plan and (ii) Interests as acceptance by interest Holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the Plan. Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

If any impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code. The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed

75

amount of the claims in such class.  As to the dissenting class, the test sets different standards that must be satisfied in order for the Plan to be confirmed, depending on the type of claims or interests in such class.  The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the plan:

- **Secured Creditors**.  Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**.  Either (a) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (b) the Holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**.  Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the Holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.**

### B.  Best Interests Test

The Bankruptcy Code requires that each holder of an impaired claim or interest either (1) accepts the plan or (2) receives or retains under the plan property of a value, as of the effective date, that is not less than the value such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is customarily referred to as the "best interests" test.  The Debtors believe that the value of any distributions to Holders of Allowed Claims and Interests in a chapter 7 case would be less than the value of distributions under the Plan.

### C.  Feasibility

The Bankruptcy Code requires that a chapter 11 plan provide for payment in full of all administrative and priority claims unless holders of such claim consent to other treatment. Each Holder of an Allowed Other Priority Claim will receive payment in full in Cash or other treatment rendering such claim Unimpaired, unless such Holder agrees to less favorable treatment. The Debtors therefore believe that the Plan is feasible.

AMERICAS 124924883

### D.  **Confirmation Hearing and Plan Objection Deadline**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  The Confirmation Hearing is scheduled for **[●], 2023 at [●] (Prevailing Eastern Time) (the "Confirmation Hearing")**, or as soon thereafter as counsel may be heard, before the Honorable Mary F. Walrath, United States Bankruptcy Judge.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.  The Bankruptcy Court has directed that any objections to confirmation of the Plan be filed and served on or before **[●], at 4:00 p.m. (Prevailing Eastern Time) (the "Plan Objection Deadline")**.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the local rules of the Bankruptcy Court, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefor, and must be Filed with the Bankruptcy Court and served upon all of the below parties in accordance with the Bankruptcy Rules and the local rules of the Bankruptcy Court.

If to the Debtors, to:

Lordstown Motors Corp.
27000 Hills Tech Ct.,
Farmington Hills, MI 48331
Attn: Melissa Leonard

-and-

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Attn: Kevin Gross
Attn: Paul N. Heath
Attn: Daniel J. DeFranceschi
Attn: Amanda R. Steele
Attn: Jason M. Mardon
    gross@rlf.com
    defranceschi@rlf.com
    heath@rlf.com
    steele@rlf.com
    madron@rlf.com

White & Case LLP
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Attn: Thomas E Lauria
Attn: Matthew C. Brown
Attn: Fan B. He
    tlauria@whitecase.com
    mbrown@whitecase.com
    fhe@whitecase.com

-and-

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Attn: David M. Turetsky
    david.turetsky@whitecase.com

White & Case LLP
111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606
(312) 881-5400
Attn: Jason N. Zakia
    jzakia@whitecase.com

-and-

White & Case LLP
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Roberto Kampfner
Attn: Roberto Kampfner
Attn: Doah Kim
Attn: RJ Szuba
    rkampfner@whitecase.com
    doah.kim@whitecase.com
    rj.szuba@whitecase.com

AMERICAS 124924883

If to the Committee, to:

| | |
|---|---|
| Troutman Pepper Hamilton Sanders LLP | Troutman Pepper Hamilton Sanders LLP |
| Hercules Plaza | 875 Third Avenue |
| 1313 N. Market Street, Ste 5100 | New York, NY 10022 |
| Wilmington, DE 19801 | Attn: Deborah Kovsky-Apap |
| Attn: David M. Fournier |     deborah.kovsky@troutman.com |
| Attn: Marcy J. McLaughlin Smith | |
| Attn: Tori L. Remington | -and- |
|     david.fournier@troutman.com | |
|     marcy.smith@troutman.com | Troutman Pepper Hamilton Sanders LLP |
|     tori.remington@troutman.com | 4000 Town Center, Suite 1800 |
| | Southfield, MI 48075 |
| -and- | Attn: Sean McNally |
| |     sean.mcnally@troutman.com |
| Troutman Pepper Hamilton Sanders LLP | |
| 3000 Two Logan Square 18th & Arch Streets | |
| Philadelphia, PA 19103-2799 | |
| Attn: Francis J. Lawall | |
|     francis.lawall@troutman.com | |

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### E. <u>Payment of Statutory Fees</u>

All fees payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid on or before the Effective Date.  All such fees that arise after the Effective Date shall be paid by the Estates, the Post-Effective Date Debtors, or the Claims Administrator in the ordinary course. The Post-Effective Date Debtors and the Claims Administrator shall have the obligation to pay quarterly fees to the Office of the United States Trustee pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Case is closed, dismissed or converted. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to section 1930 of title 28 of the United States Code.

### F. <u>Governing Law</u>

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a document in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

AMERICAS 124924883

### G. <u>Notice of Entry of Confirmation Order and Relevant Dates</u>

Promptly upon entry of the Confirmation Order, the Debtors shall file on the docket and serve upon parties who have entered their appearance a notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan.

### H. <u>Modification of the Plan and Amendments</u>

The Plan may only be amended, modified or supplemented in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code.

### I. <u>Revocation, Withdrawal or Non-Consummation of Plan</u>

If the Debtors revoke or withdraw the Plan with respect to any one or more of the Debtors, or if confirmation or consummation of the Plan does not occur as to any Debtor, then, as to such Debtor, (a) the Plan shall be null and void in all respects and (b) any settlements and compromises embodied in the Plan, and any document or agreement executed pursuant the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained in the Plan and no acts taken in preparation for consummation of the Plan shall (i) constitute or be deemed to constitute a waiver or release of any Claims against or Interests in such Debtor or any other Person, (ii) prejudice in any manner the rights of any of the Debtors or any other Person in any other further proceedings involving such Debtor or (iii) constitute or be deemed to constitute an admission of any sort by the Debtors or any other Person.  None of the filing of the Plan, the taking by the Debtors or other party in interest of any action with respect to the Plan or any statement or provision contained in the Plan shall be or be deemed to be an admission by the Debtors or other party in interest against interest, or be or be deemed to be a waiver of any rights, Claims or remedies that the Debtors or other party in interest may have, and until the Effective Date all such rights and remedies are and shall be specifically reserved.  In the event the Plan is not confirmed and the Confirmation Order is not entered, the Plan and the Plan Documents and any document contained in the Plan Supplement, and any statement contained in the Plan or such documents, may not be used by any Person (and any government, governmental agency or any subdivision, department or other instrumentality thereof) against the Debtors and other parties in interest.  The Debtors shall consult with the Committee with respect to the revocation or withdrawal of the Plan with respect to any one or more of the Debtors.

### J. <u>Binding Effect</u>

The Plan shall be binding upon and inure to the benefit of the Debtors and the Post-Effective Date Debtors and the Holders of all Claims and Interests and their respective successors and assigns.

### K. <u>Severability of Plan Provisions</u>

If, prior to the Effective Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors in consultation with the Committee, shall have the power to alter and interpret such term or provision

AMERICAS 124924883

to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### L.   No Admissions

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTION, THE PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

### M. Dissolution of the Committee

On the Effective Date, the Committee shall dissolve and all members, ex officio members, employees, attorneys, financial advisors, other Professionals or other agents thereof shall be released from all rights and duties arising from or related to the Chapter 11 Case or the Plan and its implementation, and the retention or employment of the Committee's attorneys and financial advisors and other agents shall terminate, *provided*, *that*, the Committee shall continue in existence and its Professionals shall continue to be retained with respect to (i) applications Filed or to be Filed pursuant to sections 330 and 331 of the Bankruptcy Code and (ii) any appeals of the Confirmation Order.

### N.   Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 as in effect on the Petition Date shall apply. With regard to all dates and the periods of time set forth or referred to in the Plan, time is of the essence.

### O. Successors and Assigns

The rights, benefits and obligations of any Person (and any government, governmental agency or any subdivision, department or other instrumentality thereof) named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person (and any government, governmental agency or any subdivision, department or other instrumentality thereof).

AMERICAS 124924883

**P.   Conflict between Plan, Disclosure Statement and Plan Documents**

In the event of any conflict between the terms and provisions in the Plan and the terms and provisions in the Disclosure Statement, any Plan Document or any document in the Plan Supplement, the terms and provisions of the Plan shall control and govern.

**Q.   Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**R.   Plan Exhibits**

Any and all exhibits to the Plan or other lists or schedules not filed with the Plan shall be filed with the Clerk of the Bankruptcy Court at least seven (7) Business Days prior to the Plan Objection Deadline, unless the Plan provides otherwise.  Upon such filing, such documents may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Holders of Claims or Interests may obtain a copy of any such document upon written request to the Debtors in accordance with Article I.H of the Plan or online at https://www.kccllc.net/lordstown.  The Debtors explicitly reserve the right to, in the exercise of its sole and absolute discretion, modify or make additions to or subtractions from any schedule to the Plan and to modify any exhibit to the Plan prior to the Plan Objection Deadline.

AMERICAS 124924883

## ARTICLE X
## <u>CONCLUSION AND RECOMMENDATION</u>

The Debtors believe the Plan is in the best interests of all stakeholders and urge Holders of Impaired Claims entitled to vote in favor of the Plan.

Dated: September 1, 2023
Wilmington, Delaware

Respectfully submitted,

LORDSTOWN MOTORS CORP. AND ITS
AFFILIATED DEBTORS


By: _____
     Name:
     Title: Authorized Officer

83