## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

Lordstown Motors Corp., *et al.*,[1]

Debtors.

Chapter 11
Case No. 23-10831 (MFW)
Jointly Administered

**Hearing Date:  Oct. 18, 2023 at 10:30 a.m. (EDT)**
**Objection Deadline: Oct. 6, 2023 at 4:00 p.m. (EDT)**
**Re:  D.I. 361, 467**

## LEAD PLAINTIFF'S OBJECTION TO THE DEBTORS' DISCLOSURE STATEMENT AND DISCLOSURE STATEMENT MOTION

George Troicky ("Lead Plaintiff"), the court-appointed lead plaintiff in the securities class action captioned *In re Lordstown Motors Corp. Securities Litigation*, Case No. 4:21-cv-00616 (DAR) (the "Securities Litigation"), pending in the United States District Court for the Northern District of Ohio (the "District Court"), alleging violations of Sections 10(b), 14(a), 20(a), and 20A of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder, for himself and on behalf of the putative class that he represents in the Securities Litigation (the "Class"), hereby submits this objection to the motion [D.I. 467] (the "Motion") of the debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") for approval of their proposed (i)  disclosure statement [D.I. 361] (the "Disclosure Statement") for the *Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors* [D.I. 360] (the "Plan") and (ii) procedures for soliciting votes on the Plan (the "Solicitation Procedures").  As and for this Objection, Lead Plaintiff respectfully states as follows:

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corp. (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101). The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

## PRELIMINARY STATEMENT[2]

1.      The Disclosure Statement, Plan, and Solicitation Procedures together create a paradigm that would deprive Lead Plaintiff and the Class of their right to participate in the confirmation process and summarily dismiss their claims brought in the Securities Litigation—in an Article III court, against the Non-Debtor Defendants.  Yet, the Disclosure Statement contains virtually no information, let alone adequate information, to enable Lead Plaintiff or a member of the Class—to the extent members of the Class are aware they have claims at all—to understand the treatment of their claims against the Debtors, or the fact that if they are solicited, the Plan threatens to release their claims against the Non-Debtor Defendants.

2.      The Disclosure Statement also cannot be approved because it describes a Plan that is patently unconfirmable.  The Plan improperly (i) misclassifies and treats Section 510(b) Claims in violation of the Bankruptcy Code, and (ii) potentially releases claims of members of the Class against the Non-Debtor Defendants in the Securities Litigation—claims that are entitled to adjudication in an Article III court.  The Plan cannot be confirmed, and thus, solicitation should not be permitted, unless and until Section 510(b) Claims, such as the Class Claims, are classified separately from (but treated *pari passu* with) the Interests of present Holders of common stock, and the claims against Non-Debtor Defendants in the Securities Litigation are carved out of the Third Party Release.

3.      Changes to the Disclosure Statement are also necessary, in addition to providing disclosures relating to the above, to (i) permit Lead Plaintiff and members of the Class to ascertain their potential recovery under the Plan, (ii) describe how the Plan will provide for preservation of evidence potentially relevant to the Securities Litigation after confirmation of the

---

[2]      Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed herein.

Plan, (iii) describe how the Plan will preserve claims against the Debtor Defendants to the extent of insurance coverage, and (iv) fully disclose the scope of the Third Party Release and the factual and legal justifications therefor.

4.      Finally, the Solicitation Procedures must be revised to recognize Lead Plaintiff's inherent authority (or authorize Lead Plaintiff, to the extent such authorization is necessary) to opt out of the Third Party Release on behalf of the Class, to the extent claims against the Non-Debtor Defendants are not carved out of the Third Party Release.

5.      Unless the Debtors modify the Plan to address the fatal defects that will prevent its confirmation, augment the Disclosure Statement with fulsome disclosure regarding each of the issues above, and remedy the related defects in the Solicitation Procedures, the Disclosure Statement and Solicitation Procedures should not be approved.

## BACKGROUND

### A.      The Securities Litigation

6.      Beginning on or about March 18, 2021, six putative securities class action lawsuits were filed in the District Court against Debtor Lordstown Motors Corp. and Debtor Lordstown EV Corporation (together, the "Debtor Defendants"), as well as certain individual directors and officers of the Debtors (the "Non-Debtor Defendants" and together with Debtor Defendants, the "Securities Litigation Defendants").    In June 2021, the District Court consolidated the class action lawsuits into the Securities Litigation.

7.      On June 16, 2021, the District Court entered an Order appointing George Troicky as Lead Plaintiff and approving Labaton Sucharow LLP as lead counsel to Lead Plaintiff.

8.      On September 10, 2021, Lead Plaintiff filed the operative consolidated amended class action complaint in the Securities Litigation.

9.      Prior to the Petition Date (defined below), the Securities Litigation Defendants filed a motion to dismiss the Securities Litigation.  The motion was fully briefed in March 2022, and was awaiting the District Court's scheduling of a hearing and ruling as of the Petition Date.

10.     Pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA"), discovery was stayed in the Securities Litigation pending resolution of the motion to dismiss.

11.     On August 28, 2023, due to the pendency of these Chapter 11 Cases, the District Court denied the Securities Litigation Defendants' motion to dismiss, without prejudice to their filing another motion at a later date.

**B.      The Chapter 11 Cases**

12.     On June 27, 2023 (the "Petition Date"), the Debtors commenced these voluntary Chapter 11 Cases.

13.     Through these Chapter 11 Cases, the Debtors intend to sell some or all of their assets.  *See* Disclosure Statement, Art. III.C.

14.     On September 24, 2023, the Court entered an *Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim, Including Claims Arising Under Section 503(b)(9) of the Bankruptcy Code, (B) Approving the Form, Manner, and Procedures of Notice Thereof, and (C) Granting Related Relief* [D.I. 319] (the "Bar Date Order").

15.     Pursuant to the Bar Date Order and the *Notice of Deadlines for Filing Proofs of Claim, Including Claims Arising Under Section 503(b)(9) of the Bankruptcy Code, Against Debtors* [D.I. 335] filed on August 28, 2023, the deadline for filing proofs of claim against the Debtors is October 10, 2023 (the "Bar Date").  It is not inconsequential that the Bar Date will not occur until after the deadline for objections to the Motion and Disclosure Statement.

16.     Lead Plaintiff intends to timely file proofs of claim against the Debtors on behalf of himself and the Class.

17.     On September 29, 2023, the Debtors filed the *Notice of (I) Selection of Successful Bidder, (II) Cancellation of Auction, and (III) Sale Hearing* [D.I. 488].  A hearing on approval of the proposed sale is scheduled for October 18, 2023.

**C.     The Plan, Disclosure Statement, and Solicitation Procedures**

18.     On September 1, 2023, the Debtors filed the Plan and the Disclosure Statement.

19.     On September 22, 2023, the Debtors filed the Motion.[3]

*Classification and Treatment of Claims and Interests*

20.     The Plan defines "Section 510(b) Claim" as "any Claim against a Debtor subject to subordination pursuant to Section 510(b) of the Bankruptcy Code."  Plan, Art. I.A.112.

21.     Lead Plaintiff and the Class hold Section 510(b) Claims.  *See id.*

22.     Through the Plan, the Debtors divide claims and interests into seven different classes: (i) Other Priority Claims, (ii) Secured Claims, (iii) General Unsecured Trade Claims, (iv) Other Unsecured Claims, (v) Foxconn Preferred Stock Interests, (vi) Intercompany Interests, and (vii) Common Stock Interests.  Plan, Art. III.A.

23.     The Plan defines "Common Stock Interests" as "Interests in Common Stock in LMC."  *Id.* Art. I.A.28.

24.     The Plan defines "Interests" to include "common stock . . . and any Section 510(b) Claim related thereto."  *Id.* Art. I.A.76.  Thus, the Plan appears to classify the Section 510(b) Claims of Lead Plaintiff and the Class as Class 7 Common Stock Interests.

---

[3]     Capitalized terms not defined herein shall have the meanings set forth in the Plan, Disclosure Statement, and Motion, as applicable.

25.     The Plan provides that Holders of Class 7 Common Stock Interests will be treated as follows:

> On the Effective Date, ***all Allowed Common Stock Interests in the Debtors shall remain in effect and***, except to the extent that a Holder of an Allowed Common Stock Interest agrees to less favorable treatment, each Holder of such Allowed Common Stock Interest shall ***receive distributions in Cash from the Non-Trade Pool Assets*** (including from the liquidation of any non-Cash Non-Trade Pool Assets), on a Pro Rata basis after (i) the satisfaction of the Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Secured Claims, and Allowed Other Unsecured Claims (and any interest owed thereon), (ii) the Professional Fees Escrow Account is funded or all Professional Fee Claims are satisfied, (iii) the GUTC Cash Pool Account is funded in the amount of the GUTC Cash Pool Amount and (iv) the funding of the Post-Effective Date Debtor Amount; provided that, any Distributions in respect of Common Stock Interests held by Foxconn shall be subordinated to the Distributions made to other Holders of Common Stock Interests, as set forth in Article V.S of the Plan.

*Id.* Art. III.B.7.b. (emphasis added).

26.     The Plan defines "<u>Non-Trade Pool Assets</u>" as "all of the Assets of the Debtors or Post-Effective Date Debtors' Estates, other than the Cash used to fund the General Unsecured Cash Pool Account." *Id.* Art. I.A.86.  The amount of the General Unsecured Cash Pool Account has not yet been determined, *see id.* Art. I.A.63, and thus it is impossible to ascertain what the Non-Trade Pool Assets actually are.

27.     Common Stock Interests in Class 7 are impaired, and the Holders thereof are entitled to vote to accept or reject the Plan.

### *The Third Party Release and Injunction*

28.     The Plan contains an injunction (the "<u>Injunction</u>") that permanently enjoins "commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests. . ." that are subject to any release, discharge, or exculpation pursuant to the Plan.  Plan Art. VIII.F.

29.     Article VIII of the Plan also contains a deemed release (the "Third Party Release") of numerous non-Debtors' claims against the Debtors and myriad of other non-Debtors, as follows in relevant part:

> each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged each Debtor, Post-Effective Date Debtor, and other Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (in each case, whether prepetition or postpetition), . . . whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the conduct of their business . . .

*Id.* Art. VIII.D.

30.     The "Releasing Parties" deemed to grant the Third Party Release include:

> (iii) all Holders of Claims or Interests that vote to accept the Plan; (iv) all Holders of Claims or Interests that are entitled to vote on the Plan who vote to reject the Plan and do not affirmatively opt out of the third party releases provided for in Article VIII.D by checking the box on the applicable Ballot or form indicating that they opt not to grant such releases in the Plan submitted on or before the Voting Deadline.

*Id.* Art. I.A.108.

31.     The Plan is clear in one respect:  Creditors and holders of Interests who do not vote at all are not Releasing Parties.  However, the Motion and certain exhibits thereto, including the proposed forms of ballot for voting classes (including Class 7) (the "Ballots"), suggest that creditors who are entitled to vote, but abstain from voting, will also be deemed to grant the Third Party Release.  If that language were in the Plan, it would add to the impropriety of the Plan.  Its inclusion in only the Motion and Ballots should not have any substantive effect, but introduces significant confusion about what Lead Plaintiff and members of the Class must do to avoid having their rights improperly taken away.

32.     The "Released Parties" against whom claims and causes of action will be released by the Third Party Release include the Debtors and their "current and former directors, managers, officers, predecessors, successors, and assigns", such as the Non-Debtor Defendants. *See id.* Art. I.A.107.

***Solicitation Procedures Relating to Section 510(b) Claims***

33.     The Debtors seek approval of Solicitation Procedures whereby the rights of Holders of Common Stock Interests, such as Lead Plaintiff and the Class, to vote "is based on the number of shares owned as reflected in the DTC's books and records as of the Voting Record Date." Solicitation Procedures § IV.A.3.

34.     The proposed Ballot for holders of Interests in Class 7 provides a checkbox, buried on page 7 of the Ballot, to opt out of the Third Party Release.  *See* Motion, Ex. 2-4.  As discussed above, the prefatory language to the Ballot checkbox incorrectly states that creditors who abstain from voting but do not opt out will be deemed to grant the Third Party Release. This contradictory language will only add confusion for members of the Class (to the extent they somehow become aware of the Chapter 11 Cases and the rights that may be forfeited), should be given no substantive effect, and must be deleted from the Ballots (and from any Ballot newly created for Section 510(b) Claims once reclassified).

## OBJECTION

35.     The Disclosure Statement cannot be approved because the Plan is unconfirmable. Even if the Plan were not fatally flawed, the Disclosure Statement cannot be approved because it lacks adequate information with respect to key terms of the Plan.  Further, the Solicitation Procedures, as currently proposed, include misleading Ballots and potentially deprive Lead Plaintiff and the Class of the opportunity to meaningfully participate in the solicitation process or opt out of the Third Party Release (if such opt out mechanism is proper in the first instance).

I.    **THE DISCLOSURE STATEMENT CANNOT BE APPROVED BECAUSE THE PLAN IT DESCRIBES IS PATENTLY UNCONFIRMABLE.**

36.    A disclosure statement describing a plan that cannot be confirmed likewise cannot be approved, regardless of the amount of disclosure it contains. *See, e.g.*, *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012); *see also In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (denying approval of disclosure statement where plan could not be confirmed); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures.") (citations omitted). The purpose behind this rule is pure common sense: Courts will not permit a bankruptcy estate to incur the costs of soliciting votes for a plan that, even if unanimously accepted by creditors, could never be confirmed. *See, e.g.*, *In re Main Street AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999); *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, on the face of the plan, the plan could not be confirmed, then the court will not subject the estate to the expense of soliciting votes and seeking confirmation.").

37.    Such is the case here. For the reasons described below, the Plan cannot be confirmed in its present form even with additional disclosures. Permitting the Debtors to proceed with the solicitation of votes on a Plan that cannot be confirmed would be a waste of estate resources. Accordingly, the Disclosure Statement cannot and should not be approved and the Debtors should not be authorized to solicit votes on this Plan.

A.    **The Plan's classification and treatment of the Class Claims violates Section 1123(a)(4) of the Bankruptcy Code by classifying current holders of common stock and holders of Section 510(b) Claims in a single class.**

38.    Lead Plaintiff and the Class hold Section 510(b) Claims (the "Class Claims"), which are subordinated pursuant to section 510(b) of the Bankruptcy Code.

39.     The Plan and Disclosure Statement classify Section 510(b) Claims, which will be denominated in dollars once liquidated, and the Interests of current Holders of common stock ("Current Equity Holders"), which are residual equity interests denominated in shares, in a single class (Class 7).

40.     The Class Claims, denominated in dollars, are equal in priority to Interests of the Current Equity Holders, but are not interests denominated in shares. *See* 11 U.S.C. § 510(b); *see, e.g.*, *Bodenstein v. Lentz (In re Mercury Fin. Co.)*, 240 B.R. 270, 278–79 (N.D. Ill. 1999) (section 510(b) of the Bankruptcy Code does not convert securities claimants into equity holders).

41.     The Plan and Disclosure Statement provide that Holders of Common Stock Interests shall (i) maintain their Common Stock Interests and (ii) receive distributions in Cash from the Non-Trade Pool Assets.  Plan, Art. III.B.7; Disclosure Statement, Art. IV.C.2.vii.

42.     However, because holders of the Class Claims (in their capacity as such[4]) do not hold common stock, they have no Interests to retain.  The Disclosure Statement makes no attempt to explain how Current Equity Holders will maintain their current common stock *and* receive a pro rata distribution of the Non-Trade Pool Assets, while Lead Plaintiff and members of the Class, with claims that are denominated in dollars but are entitled to share pro rata with the Interests of Current Equity Holders, will receive a pro rata distribution of the Non-Trade Pool Assets.

43.     By classifying dissimilar Common Stock Interests and Section 510(b) Claims in the same class, the Plan violates section 1122(a) of the Bankruptcy Code and cannot be confirmed.  *See* 11 U.S.C. § 1122(a) ("[A] plan may place a claim or an interest in a particular

---

[4]     Any Holders of Section 510(b) Claims who also hold common stock are entitled to separate treatment of such Interests.

class only if such claim or interest is substantially similar to the other claims or interests of such class.").  In addition, to the extent Common Stock Interests and Section 510(b) Claims are effectively receiving different treatment under the Plan, the Plan violates Section 1123(a)(4) of the Bankruptcy Code and cannot be confirmed.  *See* 11 U.S.C. § 1123(a)(4) (requiring that a plan "provide the same treatment for each claim or interest in a particular class").

44.    This discrimination, in both purpose and effect, renders the Plan unconfirmable and makes approval of the Disclosure Statement and solicitation of votes a wasteful exercise.

45.    Section 510(b) Claims, such as the Class Claims, must be classified and treated separately from, but *pari passu* in terms of distribution with, Interests of the Current Equity Holders.  Assuming the Debtors correct the improper classification and ambiguous treatment of Section 510(b) Claims, the Disclosure Statement must be revised to clearly, accurately, and concisely advise holders of such claims of their Plan treatment.

**B.    The Third Party Release is impermissible.**

46.    The Third Party Release is improper to the extent it purports to release direct claims of Lead Plaintiff and the Class against the Non-Debtor Defendants.  Lead Plaintiff and the Class are entitled to have their claims against the Non-Debtor Defendants—claims arising under a separate federal statutory scheme—adjudicated by an Article III Court.  The Third Party Release short-circuits that constitutional right and threatens to strip Lead Plaintiff and the Class of a significant source of compensation—the Securities Litigation against the Non-Debtor Defendants.  As discussed below, this Court lacks constitutional and/or statutory authority to release those claims and, in any event, there is no factual or legal basis for such a release, and none is provided.

47.    The Plan purports to require certain holders of claims to take the affirmative step of opting out of the Third Party Release to salvage their claims against any Released Parties.

Under the Plan, that obligation runs only to creditors who vote to reject the Plan. However, the Motion and Ballots suggest that *all* creditors who are entitled to vote on the Plan are subject to the opt-out requirement. In any event, the opt-out requirement would improperly place the onus on some or all of the Debtors' defrauded investors to locate and review the Plan, interpret the Third Party Release, and ascertain that they must take affirmative steps to preserve their rights against the Released Parties.

48.     As a matter of fundamental fairness, parties that vote to accept the Plan should not be deemed to grant releases to the Non-Debtor Defendants, who have failed to provide any consideration to the Debtors' estates, or otherwise demonstrated that they are entitled to a release under applicable law, as discussed below. Similarly, it is illogical that the default provisions of the Plan provide that parties who vote *against* the Plan are also deemed to grant releases to the Non-Debtor Defendants, unless such parties take affirmative steps to opt out of granting the release. Taken together, these Plan provisions create traps for the unwary that are designed to facilitate the forfeiture of valuable claims against the Non-Debtor Defendants, in exchange for no consideration. They should be stricken from the Plan, and the Disclosure Statement amended accordingly.

49.     Moreover, many members of the Class likely no longer hold the Debtors' securities and thus are unlikely to be aware of the Plan, the voting deadline, or the Chapter 11 Cases generally. Because the Securities Litigation was in its nascence on the Petition Date, members of the Class almost certainly do not yet realize they have claims against the Debtors or any of the Non-Debtor Defendants, or that any such claims could be adversely impacted by the Third Party Release. Accordingly, placing the burden of locating and interpreting complex legal documents on individual members of the Class is fundamentally inequitable and legally unjustified.

50.     As applied to Lead Plaintiff and the Class, the opt-out provision in the Plan and Solicitation Procedures, and the illusory "consent" supposedly created thereby, effectively transform the Third Party Release into a *de facto* nonconsensual release.  While the Third Circuit has suggested, in dicta, that nonconsensual third party releases might be permissible if supported by specific factual findings that such releases are fair and necessary to a debtor's reorganization, *see Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000), the Third Party Release falls far short of that standard.

51.     Further, the Non-Debtor Defendants are contributing nothing to the Plan.  If the Third Party Release were to release the claims of Lead Plaintiff and/or the Class against the Non-Debtor Defendants, the release would be both highly prejudicial and entirely gratuitous, while serving no legitimate purpose in furtherance of the Plan—the antithesis of the "fair and necessary" touchstone identified in *Continental*.

52.     Even if the Plan's opt-out mechanism could be described as consensual with respect to Lead Plaintiff and the Class, no reasonable, fully informed member of the Class would ever voluntarily relinquish its independent, direct claims against the insured and presumably solvent Non-Debtor Defendants, or anyone else, in exchange for *absolutely no consideration* from the Non-Debtor Defendants.  *See In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).  Members of the Class—to the extent they are even aware of the Plan or the Chapter 11 Cases at all—have no reason to know they must find and decipher a convoluted Third Party Release whose operative mechanics are spread across multiple Plan provisions.  As noted by Judge Wiles in *In re Chassix Holdings, Inc.*, the proposed opt-out mechanism is simply a means of engineering illusory "consent" to a release where no rational member of the Class would ever knowingly or voluntarily consent at all.  *Id.*; *see also In re Wash. Mut.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (holding that an "opt out mechanism is not sufficient to support the

third party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place") and that "[f]ailing to return a ballot is not a sufficient manifestation of consent to a third party release").

53.     Third, the Third Party Release renders the Plan unconfirmable because this Court lacks jurisdiction, constitutional adjudicatory authority, or both to release any direct, non-bankruptcy, non-core claims asserted by Lead Plaintiff and the Class against the Non-Debtor Defendants in the Securities Litigation.  Lead Plaintiff and the Class are constitutionally entitled to adjudication of those claims in an Article III tribunal (the District Court), and thus they cannot be released or otherwise adjudicated by this Court.

54.     To correct these fatal defects that will prevent the eventual confirmation of the Plan, the Plan must expressly exclude Lead Plaintiff and the Class, and their claims against the Non-Debtor Defendants in the Securities Litigation, from the Third Party Release and the Injunction.  Absent such revisions, the Disclosure Statement and Solicitation Procedures should not be approved.

55.     To that end, Lead Plaintiff suggests that the following should be added to the definition of "Released Parties" in the Plan, with a corresponding disclosure in the Disclosure Statement, to clarify that the Non-Debtor Defendants, in their capacity as such, are not Released Parties, as follows:

> , provided that the non-Debtor defendants now or hereafter named in the securities class action captioned as *In re Lordstown Motors Corp. Securities Litigation*, Case No. 4:21-cv-00616 (DAR), pending in the United States District Court for the Northern District of Ohio, in their capacity as such, shall not be Released Parties.

56.     Finally, for the avoidance of any doubt or ambiguity otherwise created by the language of the Third Party Release, the Plan should expressly indicate as follows, with a corresponding disclosure in the Disclosure Statement:

Notwithstanding anything to the contrary in this Plan or the Confirmation Order, nothing herein or therein does, shall, or may be construed to release, enjoin, or otherwise adversely impact the claims and causes of action asserted against any non-Debtor defendant now or hereafter named in the securities class action captioned as *In re Lordstown Motors Corp. Securities Litigation*, Case No. 4:21-cv-00616 (DAR), pending in the United States District Court for the Northern District of Ohio.

57.     Absent the foregoing revisions, the Plan is not confirmable and thus the Disclosure Statement and Solicitation Procedures should not be approved.

58.     Accordingly, unless the Third Party Release is modified to clarify that the non-Debtor Defendants (and any other non-debtor defendants now or hereafter named in the Securities Litigation) are excluded from its scope, it is impermissible and precludes confirmation of the Plan.  In addition, the Ballots should be revised to make clear that creditors who abstain from voting on the Plan are not deemed to grant the Third Party Release.

## II.     THE DISCLOSURE STATEMENT CANNOT BE APPROVED BECAUSE IT DOES NOT CONTAIN ADEQUATE INFORMATION.

59.     A chapter 11 debtor may only solicit votes to accept or reject a chapter 11 plan of reorganization once the court has approved the debtor's written disclosure statement for that plan as containing "adequate information."  11 U.S.C. § 1125(b).  The Bankruptcy Code defines "adequate information" as

information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to . . . a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.]

11 U.S.C. § 1125(a).

60.     The Third Circuit has emphasized the importance of adequate disclosure, stating that, given the reliance creditors and bankruptcy courts place on disclosure statements, "we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"   *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988).   Although courts assess adequacy on a case-by-case basis, a disclosure statement must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible . . . alternatives so that [creditors] can intelligently accept or reject the Plan." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).   In essence, a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

61.     The information presented in a disclosure statement should not be interpretive, speculative, or opinion, but instead must be "uncontested, concrete facts" from which voting claimants can make their own informed decisions how to vote. *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 99–100 (Bankr. D. Del. 1999); *see also In re Unichem Corp.*, 72 B.R. 95 (Bankr. N.D. Ill. 1987); *In re Ligon*, 50 B.R. 127 (Bankr. M.D. Tenn. 1985); *In re Egan*, 33 B.R. 672 (Bankr. N.D. Ill. 1983); *In re Civitella*, 15 B.R. 206 (Bankr. E.D. Pa. 1981).

62.     Because the Disclosure Statement does not provide adequate information for holders of claims and interests in impaired, voting classes (including Lead Plaintiff and members of the Class, assuming they are even solicited), the Disclosure Statement cannot be approved.

**A.**     **The Disclosure Statement does not provide adequate information for Lead Plaintiff or members of the Class, if they are aware of the Plan and Disclosure Statement, to ascertain the potential recovery by Lead Plaintiff and the Class related to the Securities Litigation.**

63.     The Plan provides that Lead Plaintiff and the Class, based on their Section 510(b) Claims, shall receive pro rata distributions in Cash from the Non-Trade Pool Assets.  Plan, Art. III.B.7.b (emphasis added).

64.     However, (i) because the amount of Non-Trade Pool Assets first requires a determination of the General Unsecured Cash Pool Amount—which remains unknown, and (ii) the value of Class 7 Interests for the purpose of pro rata allocation with Section 510(b) Claims has not been ascertained, it is impossible for a Holder of a Section 510(b) Claim to understand or predict its recovery under the Plan.

65.     As a result, the Disclosure Statement does not provide adequate information for holders of Section 510(b) Claims—if they are even solicited—to decide whether to vote in favor of or against the Plan.

**B.**     **The Disclosure Statement does not adequately describe the post-confirmation obligations of the Debtors to preserve evidence that is potentially relevant to the Securities Litigation.**

66.     Certain of the Debtors were named as defendants in the Securities Litigation prior to the filing of the Chapter 11 Cases.  At this time, those Debtor Defendants remain as defendants, although the automatic stay under section 362 of the Bankruptcy Code presently prevents the continued prosecution of the Securities Litigation with respect to those Debtor Defendants.

67.     As parties, the Debtors are obligated to preserve evidence relevant to the Securities Litigation.  *See, e.g.*, Fed. R. Civ. P. 37(e) (defining remedies for failure to preserve electronically stored information that should have been preserved in anticipation of litigation); *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) ("A party's destruction of evidence

qualifies as willful spoliation if the party has 'some notice that the documents were *potentially* relevant to the litigation before they were destroyed.'") (emphasis in original) (quoting *U.S. v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002)).

68. Further, as the issuer of the common stock of LMC that is the subject of the Securities Litigation, and as the current and/or former employer of the non-Debtor Defendants, the Debtors undoubtedly have books, records, electronically stored information, and other evidence potentially relevant to the Securities Litigation in their possession, custody, and/or control (the "Potentially Relevant Books and Records").

69. The Securities Litigation is subject to the PSLRA, which mandates that

> any party to the action with actual notice of the allegations contained in the complaint shall treat all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in the custody or control of such person and that are relevant to the allegations, as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(b)(3)(C)(i).  This mandatory requirement is subject to "sanction for willful violation."  15 U.S.C. § 78u-4(b)(3)(C)(ii).

70. The Debtors, as Securities Litigation Defendants, are subject to the document preservation requirements under the PSLRA.  Preservation of the Potentially Relevant Books and Records is absolutely crucial to avoid prejudice to Lead Plaintiff and the Class, which prejudice would be magnified if the fact that the Debtors filed for bankruptcy protection were to obviate the Debtors' document preservation obligations under the PSLRA.

71. Notwithstanding the Debtors' duty to preserve evidence that is potentially relevant to the Securities Litigation, the Plan does not (i) contain any requirement that the Post-Effective Date Debtors or any custodian of documents take any action to preserve evidence potentially relevant to the Securities Litigation for the duration of the Securities Litigation or

require notice to Lead Plaintiff of any proposed destruction or other disposition of any Potentially Relevant Books and Records, or (ii) explain what, if any, measures the Post-Effective Date Debtors will implement to ensure such evidence is retained and preserved through the completion of the Securities Litigation.

72.     This has been a continuing source of concern for Lead Plaintiff throughout the Chapter 11 Cases, as first described in *Lead Plaintiff's Limited Objection to Sale Approval* [D.I. 425].

73.     To resolve this objection, the Plan, or any other plan put forth for a vote in these Chapter 11 Cases, should provide as follows, along with related disclosures in the accompanying disclosure statement:

> Until the entry of a final and non-appealable order of judgment or settlement with respect to all defendants now or hereafter named in the litigation captioned as *In re Lordstown Motors Corp. Securities Litigation*, Case No. 4:21-cv-00616 (DAR) (N.D. Ohio) (the "Securities Litigation"), the Post-Effective Date Debtors, any purchaser of the Debtors' assets, and any transferee or custodian of the Debtors' books, records, documents, files, electronic data (in whatever format, including native format), or any tangible object or other item of evidence potentially relevant to the Securities Litigation, wherever stored (collectively, the "Potentially Relevant Books and Records"), shall preserve and maintain the Potentially Relevant Books and Records as though they were the subject of a continuing request for production of documents and/or a subpoena, and shall not destroy, abandon, transfer, or otherwise render unavailable such Potentially Relevant Books and Records.

74.     Absent the foregoing language or a provision of substantially similar import, the Plan creates the risk of irreparable harm to Lead Plaintiff and the Class and cannot be confirmed.

**C.     The Disclosure Statement violates Bankruptcy Rule 3016(c) by failing to adequately disclose the scope of the Third Party Release and the Injunction.**

75.     Bankruptcy Rule 3016(c) provides that

> [i]f a plan provides for an injunction against conduct not otherwise enjoined under the [Bankruptcy] Code, the plan and disclosure

> statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction.

Fed. R. Bankr. P. 3016(c); *see also In re Lower Bucks Hosp.*, 471 B.R. 419, 460 (Bankr. E.D. Pa. 2012).

76. The *Lower Bucks* court noted that although Bankruptcy Rule 3016(c) purports to address only injunctions, "[i]ts purpose is to alert parties in interest that the plan purports to restrict their rights in ways that ordinarily would not result from confirmation of a plan." *Lower Bucks*, 471 B.R. at 460. "Whether 'enjoined' or merely 'released,' in this case, the Plan was designed to deprive [third parties] of their right to prosecute a claim against a non-debtor." *Id.* Thus, Bankruptcy Rule 3016(c) applies to the presentation of both the Third Party Release and the Injunction in the Plan and Disclosure Statement. *See id.*

77. As a glaring example, the Disclosure Statement does not make specific reference to the fact that the Third Party Release and Injunction might release and enjoin the prosecution of the claims asserted against the Non-Debtor Defendants in the Securities Litigation. Even more problematic, the Ballots are inconsistent with the Plan in describing who is subject to the opt-out mechanism in the Third Party Release. Even if a hypothetical member of the Class was aware of the Plan and located and reviewed the Disclosure Statement, there is nothing whatsoever in the Disclosure Statement to inform that Class member of the potential impact the Third Party Release and Injunction could have on his, her, or its claims against the Non-Debtor Defendants.

78. Rather, to ascertain the types of claims the Third Party Release would release, and thus, that the Injunction would bar after the effective date of the Plan, a hypothetical party must first ascertain whether a particular claim or remedy is one released pursuant to the Plan. If the answer to that inquiry is "Yes," then the Injunction would enjoin the creditor from asserting the claim. In practice, the analysis is remarkably convoluted. To ascertain whether a claim has been

released under the Plan, a creditor must determine (a) that the creditor holds a claim against a non-Debtor in the first instance, (b) whether that claim is among the potential categories of claims listed in the Disclosure Statement, and (c) whether the party against which they seek to assert the claim is a "Released Party," a definition with no explanatory disclosure in the Disclosure Statement. Even then, the Plan and the Ballots make conflicting statements regarding who must opt out of the Third Party Release to avoid being bound by it.

79.     It is essentially impossible for members of the Class, many of whom are likely not even aware that they might have claims against the Debtors or the Non-Debtor Defendants, to ascertain from the Disclosure Statement the full universe of Released Parties and claims impacted by the Third Party Release and the Injunction. The exercise is daunting even after an exhaustive analysis of the Plan. A hypothetical creditor likely will have no idea what claims against non-Debtors are impacted by the Third Party Release, particularly where the definition of "Released Parties" identifies such parties (other than the Debtors) solely by category and where the Disclosure Statement makes no effort to explain the Third Party Release or the Injunction.

80.     Absent appropriate revisions to the Disclosure Statement and Plan to remedy the defects and issues relating to the scope and appropriateness of the Third Party Release and Injunction, the Disclosure Statement and Solicitation Procedures should not be approved. To be clear, though, the fatal defects in the Third Party Release cannot be cured simply by additional disclosure.

**D.      The Disclosure Statement fails to provide any legal or factual basis for the Third Party Release or the Injunction, particularly as they relate to Lead Plaintiff, the Class, and the Securities Litigation.**

81.     As discussed above, there is no legitimate factual or legal basis for the Debtors' failure to expressly exclude the Non-Debtor Defendants, and the direct claims of Lead Plaintiff and the Class against the Non-Debtor Defendants, from the scope of the Third Party Release.

82.     Moreover, if the Non-Debtor Defendants are Released Parties, the Third Party Release may operate as an impermissible *de facto* final judgment dismissing the claims of Lead Plaintiff and the Class against the Non-Debtor Defendants, even though those claims *cannot* be adjudicated outside of the District Court unless Lead Plaintiff and the Class consent to Bankruptcy Court adjudication.  Lead Plaintiff and the Class do not, and will not, consent to this Court's adjudication (or *de facto* adjudication through the Third Party Release) of their claims against the Non-Debtor Defendants in the Securities Litigation.  Despite these glaring flaws, the Disclosure Statement does not even attempt to provide any justification for the gratuitous Third Party Release—because one does not exist.  Of course, explicitly excluding the Non-Debtor Defendants from the definition of Released Parties, and excluding the claims of Lead Plaintiff and the Class against the Non-Debtor Defendants from the scope of the Third Party Release, would eliminate this issue.

**E.     The Disclosure Statement does not disclose whether the claims of Lead Plaintiff and the Class against the Debtor Defendants will be preserved to the extent of available insurance coverage.**

83.     The Debtors' prepetition directors' and officers' liability insurance policies are left intact by the Plan and deemed assumed to the extent they are executory contracts.  *See* Plan, Art. V.K.  Thus, the claims of Lead Plaintiff and the Class against the Debtors should remain unaffected to the extent a recovery is available from available insurance.  However, the Disclosure Statement does not explain whether or how the Plan would permit Lead Plaintiff or the Class to access coverage under such policies in connection with their claims against the Debtors to the extent of available insurance coverage, which would have no impact on the Debtors' estates.

**III.    THE  SOLICITATION  PROCEDURES  SHOULD  BE  MODIFIED  TO ACKNOWLEDGE LEAD PLAINTIFF'S AUTHORITY TO OPT OUT OF THE THIRD PARTY RELEASE ON BEHALF OF THE CLASS.**

84.     As currently proposed, the Solicitation Procedures deprive Lead Plaintiff and the Class of a meaningful opportunity to participate in the plan confirmation process.[5]  As a result, unless the Plan is revised, with corresponding changes to the Disclosure Statement and Solicitation Procedures, the Motion and Disclosure Statement cannot be approved, and ultimately, the Plan cannot be confirmed.

85.     The Plan must expressly recognize Lead Plaintiff's authority to opt out of the Third Party Release on behalf of the Class.  Lead Plaintiff, like all class representatives in federal class-action litigation, is a fiduciary for all absent members of the Class.  *See, e.g.*, *In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) ("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed."); *Schick v. Berg*, No. 03 Civ. 5513 (LBS) 2004 WL 856298, *4 (S.D.N.Y. Apr. 20, 2004) ("The general rule is that the named plaintiff and counsel bringing the action stand as fiduciaries for the entire class, commencing with the filing of a class complaint.") (citation omitted).

86.     As a fiduciary for the Class, Lead Plaintiff not only has the *ability* to take necessary actions to protect the rights of absent members of the Class, including by opting out of the Third Party Release on their behalf, he may have an affirmative *obligation* to do so.  The same duty applies to lead counsel, which "must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

87.     Nowhere are these duties more essential than in connection with the Third Party Release, which threatens to eviscerate the claims of Lead Plaintiff and the Class against numerous solvent Non-Debtor Defendants.  To enable Lead Plaintiff to fulfill his fiduciary duty,

---

[5]     Indeed, the Plan does not currently provide Holders of Section 510(b) Claims the right to vote.  For this reason alone, Holders of Section 510(b) Claims, such as Lead Plaintiff and members of the Class, should not be Releasing Parties.

the Court should find in any order approving the Solicitation Procedures that Lead Plaintiff has inherent authority (or, absent such a finding, expressly authorize Lead Plaintiff) to opt out of the Third Party Release on behalf of the entire Class.

88.     Such a finding is also consistent with Lead Plaintiff's inherent powers as a court-appointed lead plaintiff.  For instance, even prior to certification of the Class,[6] Lead Plaintiff has the ability to amend the complaint in the Securities Litigation, defend against dispositive motions, take and defend discovery, and engage in numerous other litigation-related activities to preserve the claims of the Class.  Where the Third Party Release and Injunction would have essentially the same practical effect as an order dismissing the complaint with prejudice with respect to most or all of the Non-Debtor Defendants,[7] the ability to opt out of that release is no different from Lead Plaintiff's inherent ability to defend against a motion to dismiss.

89.     The ability to opt out on behalf of the entire Class does not expand Lead Plaintiff's rights in any way or prejudice the Debtors or the Non-Debtor Defendants.  On the contrary, it simply enables Lead Plaintiff to fulfill his duties under Federal Rule of Civil Procedure 23 and the PSLRA, and to take the necessary steps to avoid the manifest injustice threatened by the Third Party Release.  By opting out of the Third Party Release on behalf of the entire Class (to the extent the opt-out mechanism is allowed to remain in the Plan with respect to holders of Section 510(b) Claims), Lead Plaintiff can prevent the Debtors from artificially "deeming 'consent' to exist in situations where no affirmative consent ha[s] actually been manifested," and where, if given the option to affirmatively consent, no rational class member

---

[6]     Lead Plaintiff intends to seek certification of the Class at the appropriate time pursuant to Bankruptcy Rule 7023.

[7]     For the avoidance of doubt, Lead Plaintiff respectfully submits that this Court lacks jurisdiction and/or constitutional adjudicatory authority to approve the Third Party Release and Injunction with respect to the claims of Lead Plaintiff and the Class against the Non-Debtor Defendants (or any other non-Debtor party), and reserves the right to oppose confirmation of the Plan on any basis, including but not limited to the inability of this Court to enter a final order releasing or enjoining such claims.

would ever knowingly and voluntarily consent at all. *See Chassix*, 533 B.R. at 78. Recognizing Lead Plaintiff's ability to opt out on behalf of the Class will preserve and protect the rights and claims of class members so they can decide for themselves whether to participate in the Securities Litigation when the time comes.

## **RESERVATION OF RIGHTS**

90.    Neither the filing of this Objection nor anything contained herein are intended to limit, prejudice, or otherwise impact any rights of Lead Plaintiff or the Class in connection with the filing, solicitation, or confirmation of the Plan (or any other plan) or approval of the Disclosure Statement and the Solicitation Procedures.  Lead Plaintiff, on behalf of himself and the Class, hereby reserves all such rights, including but not limited to the rights to (a) object on any and all grounds to (i) approval of the disclosure statement and solicitation procedures for any plan and (ii) confirmation of any plan, (b) vote on any plan, and take any other action permitted or required under the Bankruptcy Code and other applicable law, on behalf of himself and the Class, and (c) seek, on behalf of himself and the Class, any other relief in connection with the foregoing.

91.    For the avoidance of doubt, this Objection does not, shall not, and shall not be deemed to:

- constitute a submission by Lead Plaintiff, either individually or for the Class or any member thereof, to the jurisdiction of the Bankruptcy Court;

- constitute consent by Lead Plaintiff, either individually or for the Class or any member thereof, to entry by the Bankruptcy Court of any final order in any non-core proceeding, **which consent is hereby withheld unless, and solely to the extent, expressly granted in the future with respect to a specific matter**; or

- waive any substantive or procedural rights of Lead Plaintiff or the Class or any member thereof, including but not limited to (a) the right to challenge the constitutional authority of the Bankruptcy Court to enter a final order or judgment on any matter, (b) the right to have final orders in non-core matters entered only after de novo review by a District Court judge, (c) the right to trial by jury in any proceedings so triable herein, in the

Debtors' Chapter 11 Cases, including all adversary proceedings and other related cases and proceedings (collectively, "Related Proceedings"), in the Securities Litigation, or in any other case, controversy, or proceeding related to or arising from the Debtors, their chapter 11 cases, any Related Proceedings, or the Securities Litigation, (d) the right to have the reference withdrawn by a United States District Court in any matter subject to mandatory or discretionary withdrawal, or (e) all other rights, claims, actions, arguments, counterarguments, defenses, setoffs, or recoupments to which Lead Plaintiff or the Class or any member thereof are or may be entitled under agreements, at law, in equity, or otherwise, all of which rights, claims, actions, arguments, counterarguments, defenses, setoffs, and recoupments are expressly reserved.

92.     **For the avoidance of doubt, Lead Plaintiff, on behalf of himself and the Class and the members thereof, does not consent, and expressly objects, to (a) the Third Party Release and Injunction and (b) this Court's entry of any final order or judgment that this Court lacks jurisdiction or statutory and/or constitutional adjudicatory authority to enter without the affirmative and knowing consent of all parties affected thereby.  Lead Plaintiff, on behalf of himself and the Class and the members thereof, further reserves all rights to object to confirmation of the Plan, or any other plan proposed in the Chapter 11 Cases, on any basis, including but not limited to the fact that the Court lacks constitutional adjudicatory authority pursuant to *Stern v. Marshall*, 564 U.S. 462 (2011), and its progeny to approve a release of the claims of Lead Plaintiff and the Class against the Non-Debtor Defendants.**

*[ signature page follows ]*

WHEREFORE, Lead Plaintiff respectfully submits that the Disclosure Statement and Solicitation Procedures should not be approved unless the Plan, Disclosure Statement, and Solicitation Procedures are revised as set forth in this Objection.

Dated: October 6, 2023
      Wilmington, Delaware

**CROSS & SIMON, LLC**

*/s/ Christopher P. Simon*
Christopher P. Simon (No. 3697)
1105 North Market Street, Suite 901
Wilmington, DE 19801
Telephone: (302) 777-4200
Facsimile: (302) 777-4224
csimon@crosslaw.com

*- and -*

**LOWENSTEIN SANDLER LLP**
Michael S. Etkin, Esq.
Andrew Behlmann, Esq.
Scott Cargill, Esq.
Collen M. Restel, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone 973-597-2500
metkin@lowenstein.com
abehlmann@lowenstein.com
scargill@lowenstein.com
crestel@lowenstein.com

*Bankruptcy Counsel for*
*Lead Plaintiff and the Class*