**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Lordstown Motors Corp., *et al.*, | Case No. 23-10831 (MFW) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: D.I. 360, 361 & 467** |

**OBJECTION OF FOXCONN PARTIES TO DEBTORS'
DISCLOSURE STATEMENT WITH RESPECT TO JOINT CHAPTER 11
PLAN OF LORDSTOWN MOTORS CORP. AND ITS AFFILIATED DEBTORS**

Hon Hai Precision Industry Co., Ltd. (a/k/a Hon Hai Technology Group) ("Hon Hai"), Foxconn EV Technology, Inc. ("Foxconn Technology"), Foxconn Ventures Pte. Ltd. ("Foxconn Ventures"), Foxconn Ltd. (Far East) ("Foxconn Far East") and Foxconn EV System LLC ("Foxconn System," together with Hon Hai, Foxconn Technology, Foxconn Ventures and Foxconn Far East, "Foxconn" or the "Foxconn Parties"), by and through their undersigned counsel, submit this objection (this "Objection") to: (a) *Debtors' Motion for Entry of an Order (i) Approving the Disclosure Statement and the Form and Manner of Notice, (ii) Approving Plan Solicitation and Voting Procedures, (iii) Approving Forms of Ballots, (iv) Approving Form, Manner, and Scope of Confirmation Notices, (v) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (vi) Granting Related Relief* [D.I. 467] (the "Motion"),[2] and (b) approval of the *Disclosure Statement Pursuant to 11 U.S.C. § 1125 with respect to Joint Chapter 11 Plan of Lordstown Motors Corp. and its*

---

[1] The debtors and the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corp. ("LMC") (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101) (collectively, the "Debtors"). The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion or the Disclosure Statement, as applicable.

*Affiliated Debtors* [D.I. 361 & 362] (the "<u>Disclosure Statement</u>").[3]  In support thereof, the Foxconn

Parties respectfully state as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      The Disclosure Statement should not be approved because it describes a Plan

confirmation process that cannot be achieved and a Plan that cannot be confirmed.  The Debtors

kicked off these cases by filing an eleven-count adversary complaint against the Foxconn Parties,

attempting to pin blame on Foxconn for their failures in order to divert attention from their own

mismanagement, misrepresentations to investors, and repeated inability to execute on their

business plans.  The complaint comprises ten state law legal claims for "billions of dollars" in

damages, including breach of contract, fraud, and torts, and an eleventh catch-all count seeking to

equitably subordinate Foxconn's preferred and common stock interests (the "<u>Foxconn Interests</u>"),

including Foxconn's $30 million preferred stock liquidation preference, on the same basis as the

foregoing state law claims.

2.      Now, through the Plan, the Debtors attempt to end-run their own complaint, subvert

Foxconn's due process protections in the Adversary Proceeding, and litigate the equitable

subordination remedy at plan confirmation, divorced from the legal claims and the factual

allegations giving rise to the equitable subordination remedy in the first place.  This cannot be

done, including because it is black letter law that the Debtors cannot obtain an equitable remedy

such as equitable subordination without first exhausting their legal remedies.  It would also

unnecessarily and improperly prejudice Foxconn's substantive and procedural due process rights,

including by attempting to short-circuit Foxconn's arbitration rights and its due process rights in

---

[3]   On September 22, 2023, the Debtors filed the Motion and set the objection deadline to the Disclosure Statement
and Motion as October 6, 2023.  *See* D.I. 467.  Foxconn has accepted October 6, 2023 as the proper objection
deadline.  *C.f.* D.I. 361 (suggesting deadline of October 4, 2023).

the Adversary Proceeding.  The Debtors' proposed approach would create the risk of claim or issue preclusion, waste judicial resources, and could lead to inconsistent rulings on the legal claims and equitable subordination claim, particularly because the Court lacks jurisdiction and constitutional power to finally adjudicate the state law legal claims.

3.      There simply is no compelling reason that the equitable subordination claim needs to be resolved in connection with Plan confirmation.  The Debtors are liquidating.  There is no operational, business, or reorganizational need to resolve equitable subordination.  Distributions to creditors will not be delayed.  The Debtors can and should do what countless liquidating debtors do and confirm a liquidating plan as expeditiously as possible while deferring significant litigation to be dealt with post-confirmation.

4.      The Plan and Disclosure Statement bear further crucial defects and lack adequate information.  They make no provision for how the Foxconn Interests are to be treated if and when equitable subordination fails, nor do they even address the Debtors' likelihood of success or any range of probable outcomes.  When the court rejects equitable subordination, the proposed treatment of the Foxconn Interests under the Plan will fail to satisfy several confirmation requirements, including the "best interests" test and the absolute priority rule.  As a result, the Plan will need to be modified and re-solicited to treat Foxconn's $30 million liquidation preference.  Re-solicitation will materially and adversely impact both the Foxconn Parties and other holders of Common Stock Interests who are currently voting on a Plan that assumes none of the Foxconn Interests are entitled to any distribution.  These and other significant treatment, confirmation, and disclosure issues described below are not even mentioned.

5.      For these reasons and the reasons discussed below, the Court should deny approval of the Disclosure Statement or condition its approval on changes consistent with this Objection.

## RELEVANT BACKGROUND

**A.  Bankruptcy Filing and Adversary Proceeding Against the Foxconn Parties.**

6.      On June 27, 2023 (the "Petition Date"), the Debtors each commenced a voluntary case under chapter 11 of the Bankruptcy Code in this Court.

7.      On the same day, before even filing any of their "first day" motions, the Debtors filed an adversary complaint (the "Complaint")[4] and commenced an adversary proceeding (Adv. Pro. No. 23-50414 (MFW)) (the "Adversary Proceeding") against the Foxconn Parties.  The Complaint contains eleven counts, including:  (i) one count for common law fraud against each of Hon Hai and Foxconn Far East Limited; (ii) four counts for breach of contract under the Investment Agreement against Foxconn Ventures; (iii) one count for breach of contract under the Limited Liability Agreement of MIH EV Design, LLC; (iv) one count for breach of contract under the Asset Purchase Agreement against Foxconn Technology and Foxconn Far East; (v) one count for breach of contract under the Contract Manufacturing Agreement against Foxconn System; (vi) one count of tortious interference with contract against Hon Hai; and (vii) one count for the remedy of equitable subordination based on the foregoing counts against each of the Foxconn Parties.  *See generally* Complaint ¶¶ 80–163.

8.      All eleven counts are premised on the same baseless allegations that the Foxconn Parties participated in a scheme in which they "sabotaged the Debtors' business, starving it of cash and causing it to fail" and thereby "forc[ing] [Lordstown] to shut down so that it can take over [Lordstown's] assets . . . ."[5]  *See* Complaint ¶¶ 7, 78.  The equitable subordination count is

---

[4]    Capitalized terms in this section not otherwise defined herein shall have the meanings given to them in the Complaint.

[5]    Notably, Foxconn declined to bid for the Debtors' assets in these chapter 11 cases, showing that the Debtors' central thesis of their Complaint—that Foxconn "sabotaged" the Debtors in order to "take over" their assets—is, like the rest of the Complaint, totally meritless.

explicitly dependent on the same factual premises and issues as the other ten counts.  *See* Complaint ¶ 161 (incorporating the allegations made throughout the Complaint and stating "[t]he actions of the Debtors complained of herein constitute inequitable misconduct that harmed the Debtors, their estates, and the Debtors' other creditors . . .").

9.      On September 29, 2023, Foxconn filed a motion to dismiss each of the counts set forth in the Complaint.  [Adv. Pro. D.I. 8] (the "Motion to Dismiss").  As discussed in the Motion to Dismiss, the claims set forth in the Complaint are subject to mandatory arbitration and must not be adjudicated in the context of Plan confirmation.

**B.  The Plan and Disclosure Statement.**

10.      On September 1, 2023, the Debtors filed the Plan and the Disclosure Statement. The Plan is a liquidating plan that provides for sale or liquidation of all the Debtors' assets, pursuit and defense of claims and litigation, and distribution of cash to creditors and interest holders.

11.      The Plan classifies the Foxconn's Preferred Stock Interests in Class 5 (Foxconn Preferred Stock Interests) and Foxconn's Common Stock Interests with other common shareholders in Class 7 (Common Stock Interests).  Plan §§ III.B.5, III.B.7.  With respect to the Foxconn Preferred Stock Interests, the Plan provides that Foxconn's rights "to receive Distributions under the Plan [including on account of their $30 million liquidation preference] shall be subordinated in their entirety to the rights of Holders of Common Stock Interests to receive such Distributions and the Holders of Allowed Foxconn Preferred Stock Interests shall not receive any distributions on account of such Foxconn Preferred Stock Interests."  *Id*. § III.B.5.b.  Likewise, although all other holders of Common Stock Interests would receive their *pro rata* share of remaining cash after payment of certain senior claims or funding of other specified amounts, "any Distributions in respect of Common Stock Interests held by Foxconn shall be subordinated to the

Distributions made to other Holders of Common Stock Interests . . . ." *Id.* § III.B.7.b. In other words, the Plan's objective is plain—it attempts to disallow the Foxconn Interests and prevent Foxconn from receiving *any* distributions at all from the Debtors' assets, no matter the amount of proceeds realized from the sale of the Debtors' assets pursuant to the Court-approved sale process, the realization of value from the Debtors' tax attributes, any potential proceeds from claims against third parties, or cash on hand. *Id.* § V.S.

12.    Under the Plan, Foxconn (along with all other equity holders) will be permanently enjoined from selling any of the Foxconn Interests. Moreover, although not entirely clear, the Debtors seemingly intend to try to restrict Foxconn's (and other Holders of Interests') ability to take a worthless stock deduction on account of its necessarily worthless stock if the Debtors succeed in equitable subordination attempts. Plan § V.I. The Plan provides no alternative treatment for Foxconn if and when the Debtors are unsuccessful in establishing that equitably subordination of the Foxconn Interests.

13.    The Plan also provides that the Debtors "may," but does not require them to, reserve cash on account of claims that remain in dispute as of the Effective Date of the Plan. Plan § VII.I. There is no provision in the Plan for the Debtors to reserve distributions to which Foxconn would be entitled on account of its Preferred Stock Interests and Common Stock Interests in the event that the Debtors' attempt to equitably subordinate the Foxconn Interests fails.

14.    In addition, the Plan provides for a discharge of all claims and interests against the Debtors and an injunction. Plan § VIII.B; VIII.F. The Plan does so despite the fact that the Debtors have by their own admission effectively ceased operations, are currently in the process of selling all or substantially all of their assets and, if that fails, intend to "take further actions, as necessary, to reduce administrative expenses other than those necessary to achieve the best result possible for

stakeholders in a liquidation of the Company's assets."  First Day Declaration ¶¶ 66–67.  The

Debtors reserve the right to "engage in post-Effective Date operations in their discretion," but the

Plan provides for no ongoing operations or business.  *See* Plan § V.E.

### C. Proposed Solicitation Procedures and Confirmation Schedule.

15.    On September 22, 2023, the Debtors filed the Motion, seeking, among other things,

approval of the Disclosure Statement, approval of procedures to solicit votes on the Plan from

creditors and interest holders, and to set a schedule for confirmation of the Plan.  The Debtors have

asked the Court to schedule a hearing on confirmation of the Plan, including equitable

subordination of the Foxconn Interests, on December 15, 2023—that is, in less than two months

after the hearing on the Motion.  Motion ¶ 4.

## OBJECTION

### I. The Debtors Cannot Obtain Equitable Subordination Through the Plan in Light of Their Pending Legal Claims.

#### A. Equitable Subordination Is Not Available to the Debtors While Their Legal Claims Against Foxconn Remain Unresolved.

16.    As the Supreme Court has recognized, the necessary prerequisite to maintain suit

for an equitable remedy is the absence of an adequate remedy at law.  *See*, *e.g.*, *Dairy Queen, Inc.*

*v. Wood*, 369 U.S. 469, 478 (1962) ("The necessary prerequisite to the right to maintain a suit for

an equitable accounting, like all other equitable remedies, is . . . the absence of an adequate remedy

at law.").

17.    Equitable subordination is no different.  As this Court has found, "equitable

subordination is a remedy available only when damages cannot be reasonably ascertained."

*Century Glove, Inc. v. Iselin* (*In re Century Glove, Inc.*), 151 B.R. 327, 332 (Bankr. D. Del. 1993).

It is "well-settled that equitable subordination is an alternative to a monetary recovery . . . and [a

claimant] cannot recover damages and equitably subordinate a claim based on the same wrong."

*In re Bernard L. Madoff Inv. Sec. LLC*, 515 B.R. 117, 160 (Bankr. S.D.N.Y. 2014); *see, e.g.*, *In re Granite Partners, L.P.*, 210 B.R. 508, 517 (Bankr. S.D.N.Y 1997) ("[E]quitable subordination mirrors an identical claim for legal relief, and is merely an alternative remedy for the same wrong." (internal citations omitted)).

18.     Equitable subordination also is remedial in nature, rather than penal.  *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 234 (3d Cir. 2003) ("Because equitable subordination is remedial rather than penal, a claim should be equitably subordinated only to the extent necessary to offset the harm suffered by the debtor and its creditors as a result of the inequitable conduct.").  The remedy can only be employed to the extent of unremedied harm.  *See id.*

19.     Where legal damages are pleaded, the court cannot ascertain the extent of unremedied harm until the legal claims (and availability of damages as a remedy) are resolved. *See, e.g.*, *In re Centennial Textiles, Inc.*, 227 B.R. 606, 611 (Bankr. S.D.N.Y. 1998) ("[A] trustee cannot recover damages and equitably subordinate a claim based on the same wrong. . . . If [the creditor] pays the judgments, the estates will be made whole.  In that event, the trustee will not be entitled to the remedy of equitable subordination." (internal citations omitted)).

20.     The Debtors filed the Complaint with ten legal claims for damages and an additional, alternative count for the equitable remedy of equitable subordination.  The equitable subordination count is based on the same alleged wrongful conduct (i.e., breach of contract, fraud, and tort) as the Complaint's ten legal claims for damages.  The Debtors' request for the equitable remedy of equitable subordination cannot be adjudicated unless and until the Court has determined that no adequate remedy at law exists.  But that would require the Court (or an arbitrator or court of appropriate jurisdiction) to first fully adjudicate the legal claims in the Debtors' Complaint.  The

Court, of course, cannot adjudicate those legal claims in connection with confirmation, and, if it were ever to do so at all, it would have to adjudicate those claims in the Adversary Proceeding. These legal claims are subject to mandatory arbitration, as argued in the Motion to Dismiss and discussed below, and, even if not arbitrable, are non-core and outside the Court's constitutional power to finally adjudicate.

21.    Put simply, the law does not permit the Debtors to end-run their own Complaint's legal claims and seek adjudication of an equitable remedy in advance of those legal claims. Moreover, because equitable subordination is remedial rather than penal, the Court could not ascertain the extent of subordination required to remedy any alleged harm absent having first determined the availability of money damages.

**B.    Adjudicating Equitable Subordination at Confirmation Would Prejudice Foxconn's Substantive and Due Process Rights and Create the Risk of Inconsistent Rulings.**

22.    The Court should not reach equitable subordination before the Debtors' legal claims are adjudicated (even if it could) because doing so would impermissibly and unfairly prejudice Foxconn's substantive and due process rights and create the risk of inconsistent rulings.

23.    As set forth in the Motion to Dismiss, all eleven of the Debtors' claims in the Adversary Complaint, including the equitable subordination claim, are subject to mandatory arbitration pursuant to bargained-for arbitration clauses in certain of Foxconn's contracts with the Debtors.  *See* Motion to Dismiss at p. 2.  The contractual right to arbitrate is a substantive right. *See In re Currency Conversion Fee Antitrust Litig.,* 361 F. Supp. 2d 237, 255 (S.D.N.Y. 2005) ("It is well settled that a contractual agreement to arbitrate creates a substantive right to an arbitral forum.") (citing *Southland Corp. v. Keating,* 465 U.S. 1, 11–13, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); *Bernhardt v. Polygraphic Co. of Am.,* 350 U.S. 198, 201–02, 76 S.Ct. 273, 100 L.Ed. 199

(1956)).   Resolving the remedy seeking equitable subordination at this time would require the

Court to wade into resolution of arbitrable claims and make fact or legal determinations that would

trample on Foxconn's substantive right to have those claims arbitrated.

24.     Moreover, even if the Court were to determine that none of the claims are arbitrable,

all ten state law legal claims (*i.e.*, all claims in the Adversary Proceeding other than equitable

subordination) are claims that are *required* to be adjudicated through an adversary proceeding

pursuant to Bankruptcy Rule 700l.   Fed. R. Bankr. P. 7001(1) (requiring that "a proceeding to

recover money or property" be an adversary proceeding); *In re Forever 21, Inc.*, 623 B.R. 53, 60

(Bankr. D. Del. 2020) (finding claims for damages against non-debtor properly fit within

Bankruptcy Rule 7001(1)); *In re Dean*, 359 B.R. 218, 221 (Bankr. C.D. Ill. 2006) ("As a general

rule, damages are not available in a contested proceeding."); *see also In re Trans World Airlines,

Inc.*, 2001 WL 1820325, at *9 (Bankr. D. Del. March 27, 2001) (stating "an adversary proceeding

is required for those actions listed in Fed. R. Bankr. P. 7001"); *In re Mansaray-Ruffin*, 530 F.3d

230, 242 (3d Cir. 2008) ("[W]e hold only that, where the Rules require an adversary proceeding .

. . to resolve a particular issue, a creditor has the due process right not to have that issue resolved

without one.").   An adversary proceeding is "essentially a self-contained trial—still within the

original bankruptcy case—in which a panoply of additional procedures apply . . . giving an

adversary proceeding all the trappings of traditional civil litigation."   *Id.* at 234 (noting that the

adversary rules are binding and courts must abide by them unless there is an irreconcilable conflict

with the Bankruptcy Code).

25.     Among other things, the following Federal Rules of Bankruptcy Procedure apply

in an adversary proceeding but not in a contested matter such as confirmation of a plan:

|  | Protections |
|---|---|
| Fed. R. Bank. P. 7012 | Provides for methods of presentation of defenses, including through a motion to dismiss or for judgment on the pleadings |
| Fed. R. Bank. P. 7013 | Provides for assertion of mandatory and permissive counterclaims and crossclaims |
| Fed. R. Bankr. P. 7014 | Provides ability for defendants to bring in third party defendants |
| Fed. R. Bank. P. 7016 | Provides for pre-trial conference; requires issuance of scheduling order |
| Fed. R. Bank. P. 7018 | Permits joinder of claims |
| Fed. R. Civ. P. 26(a)(1) - (3)<br><br>(as applied through Fed. R. Bank. R. 7026) | Mandates disclosures related to parties with discoverable information, experts and witnesses and exhibits |

Further, unlike the plan confirmation process, an adversary proceeding requires a complaint, an answer or other responsive pleading, and the due process and time afforded parties in civil litigation, including to conduct discovery, file dispositive pre-trial motions, and, if necessary, hold a plenary trial.

26.    The Debtors chose to proceed through an Adversary Proceeding to seek "billions of dollars" in damages from Foxconn for the benefit of their estates.  Complaint ¶¶ 85, 94, 102, 114, 122, 129, 136, 145, 151, 157.  They should not be allowed to skirt the procedural and substantive protections afforded to Foxconn by forcing this Court to make a decision that is not required regarding equitable subordination through the plan confirmation process.  The Debtors' objective is to force Foxconn to litigate the remedy of equitable subordination (and, by proxy, the merits of the underlying legal claims) on an underdeveloped factual record and an abbreviated timeline to prejudice Foxconn's ability to defend itself with respect to the Complaint's remaining claims.

27.     Additionally, it would be prejudicial, imprudent, and wasteful and create the risk of inconsistent rulings to adjudicate equitable subordination in advance of the legal claims.  Any adjudication of equitable subordination of the Foxconn Interests will necessarily require development of the same factual record and, at least in part, the resolution of legal issues, that will be required to adjudicate the Complaint's ten legal claims.  The Debtors initiated the Adversary Proceeding with numerous claims all tied to a common set of facts.  *See* Complaint ¶ 161 ("The actions Defendants complained of herein constituted inequitable misconduct that harmed the Debtors, their estates, and the Debtors' other creditors, and has conferred an unfair advantage on Defendants.").  The Disclosure Statement, when describing the basis for seeking equitable subordination, cross-references to the same factual allegations in the Complaint and indeed incorporates the Complaint by attaching it as an exhibit.  *See* Disclosure Statement at p. 46 (stating in reference to the grounds for equitable subordination, "the Debtors have outlined Foxconn's misconduct, as well as the injury to the Debtors and their estates resulting from that misconduct, in detail in the Foxconn Complaint . . .").  Put simply, the Debtors' Complaint makes plain that the equitable subordination claim hinges on resolution of facts and legal issues underlying the legal claims, and resolving the Complaint's legal claims is inextricably tied to resolution of the equitable subordination issues.

28.     This creates the risk of serious prejudice to Foxconn and is perhaps part of the Debtors' intent in pressing the equitable subordination claim through confirmation.  Fact findings or other rulings by the Court in the context of Plan confirmation could subject Foxconn to issue or claim preclusion in the Adversary Proceeding or arbitration, as the case may be.  Though Foxconn would argue against any preclusive effects, there remains a risk that a subsequent court could find

claim preclusion[6] or issue preclusion[7] given the overlap of factual and legal issues. Foxconn will therefore be prejudiced in having to defend factual and legal issues not central to elements of Plan confirmation (although a central feature of the Debtors' Plan in its current form) to prevent potential preclusive effects. Doing so would force Foxconn to forgo its procedural and substantive due process rights.

29.    Even without the risk of preclusion, resolving equitable subordination at Plan confirmation would be a waste of judicial resources and create the risk of inconsistent rulings on fact and legal issues because those same issues will need to be arbitrated or tried at a later date.

### C. There Is No Pressing Need in the Circumstances of These Cases to Determine Equitable Subordination in the Plan Process.

30.    There is no pressing, compelling need to resolve equitable subordination now. The Debtors are liquidating, and there is no business, operational, or reorganizational reason that the equitable subordination claim needs to be resolved with Plan confirmation. Creditors' distributions will not be unreasonably delayed, and distributions to stockholders (if any) will not occur until claims are fully administered, including the numerous pending stockholder claims and lawsuits. In any event, any delay in timing of distributions to stockholders is an inherent risk in owning stock. *See In re Kaiser Grp. Int'l, Inc.*, 260 B.R. 684, 688 (Bankr. D. Del. 2001) (noting, in context of determining subordination under section 510(b) of the Bankruptcy Code, the

---

[6]  The Third Circuit has set forth the following requirements for applying claim preclusion: "(1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action." *Bd. of Trs. of Trucking Emps. of North Jersey Welfare Fund, Inc.-Pension Fund v. Centra*, 983 F.2d 495, 504 (3d Cir.1992).

[7]  The Third Circuit has set forth the following requirements for applying issue preclusion: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action The Third Circuit also considers whether the party being precluded had a full and fair opportunity to litigate the issue in question in the prior action." *In re Quorum Health Corp.*, No. 20-10766 (BLS), 2023 WL 2552399, at *12 (Bankr. D. Del. Mar. 16, 2023) (quoting *Sprint Commc'n Co. L.P. v. Charter Commc'n, Inc.*, No. 17-1734-RGA, 2021 WL 982726, *2 (D. Del. Mar. 16, 2021)).

enhanced risk of non-payment of shares in an insolvency context) (quoting *In re Granite Partners, L.P.*, 208 B.R. 332, 336 (Bankr.S.D.N.Y.1997)).   Resolving equitable subordination as part of confirmation simply is not an imperative.

31.     In this way, the Debtors are no different than countless liquidating debtors that come before this Court.  And in those countless cases it is customary to defer significant litigation to the post-confirmation period to allow expeditious confirmation of a liquidating plan while not prejudicing the rights of the parties to the litigation.  These Debtors can achieve the same result here without prejudicing the rights of anyone, including Foxconn.

## II. The Disclosure Statement Cannot Be Approved Because the Plan's Equitable Subordination of the Foxconn Interests Renders It Patently Unconfirmable.

32.     Courts in this Circuit have long recognized that soliciting votes on a Plan that has no prospect of confirmation should not be permitted.  *See In re American Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) (bankruptcy courts have "an obligation not to subject the estate to the expense of soliciting votes and seeking confirmation of [a] plan" where the disclosure statement "on its face relates to a plan that cannot be confirmed . . . .") (quoting *In re Dakota Rail, Inc.,* 104 B.R. 138, 143 (Bankr. D. Minn. 1989)); *see also In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("Not only would allowing a nonconfirmable plan to accompany a disclosure statement, and be summarized therein, constitute inadequate information, it would be misleading and it would be a needless expense to the estate.").   A plan is patently unconfirmable when "(1) confirmation defects cannot be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing."  *American Capital Equip.*, 688 F.3d at 151 (internal citations omitted).

33.     A plan must be feasible to be confirmable.  11 U.S.C. § 1129(a)(11).  "Even a planned liquidation 'must be feasible.' . . . Although § 1129(a)(11) does not require a plan's success to be guaranteed . . ., the plan must nevertheless propose 'a realistic and workable framework[.]'"  *Id.* at 155-56 (internal citations omitted).  "In considering feasibility, 'a bankruptcy court must evaluate the possible impact of the debtor's ongoing civil litigation[.]' . . . A plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely."  *Id.* at 156 (internal citations omitted).  Although *American Capital Equipment* dealt with the potential outcome of asbestos litigation, the principles underlying the findings in that case apply equally here.

### A.  The Plan Cannot Be Confirmed When Equitable Subordination Fails.

34.     The Plan is not feasible since the Debtors have designed the Plan to make the equitable subordination of the Foxconn Interests an all or nothing proposition. The Plan as currently constructed is dependent on the Debtors succeeding in equitably subordinating the Foxconn Interests and makes no provision for what happens when that effort fails.  The Plan provides for the equitable subordination of all of Foxconn's rights to receive distributions with respect to its Class 5 Foxconn Preferred Stock Interests and Class 7 Common Stock Interests to the distributions to holders of all other Common Stock Interests.  *See* Plan §§ III.B.5.b, III.B.7.b, V.S.  Moreover, the Plan makes equitable subordination of the Foxconn Interests a condition to the Effective Date.  Plan § X.A.1.  There is no alternative treatment contained in the Plan if and when the Debtors fail to meet their heavy burden to equitably subordinate the Foxconn Interests.

The absence of any alternative treatment of the Foxconn Interests will violate the Bankruptcy Code, thereby rendering the Plan unconfirmable, when the Debtors fail to meet their heavy burden.

35.     Absent equitable subordination, the Plan will have to be materially modified and will adversely change the treatment of holders of Class 7 Common Stock Interests to conform the treatment of the Foxconn Interests to that required by the Bankruptcy Code's priority scheme to meet the absolute priority rule under section 1129(b)(2)(C) of the Bankruptcy Code and the "best interests" test under section 1129(a)(7) of the Bankruptcy Code.

36.     As the Plan is currently constructed, Class 5 Foxconn Preferred Stock Interests are impaired and deemed to reject the Plan.  Plan § III.B.5(c).  Accordingly, the Debtors will be required to demonstrate they meet the cramdown standards under Section 1129(b) of the Bankruptcy Code.  Section 1129(b)(2)(C) states that:

> [w]ith respect to a class of interests—(i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

11 U.S.C. § 1129(b)(2)(C).  If the Foxconn Preferred Stock Interests are not equitably subordinated to all other Interests, the liquidation preference in the amount of $30 million attached to Foxconn's Class 5 Preferred Stock Interests must be paid in full before any Class 7 Common Stock Interests receive any distribution whatsoever.  *See, In re ADPT DFW Holdings LLC*, 577 B.R. 232, 251 (Bankr. N.D. Tex. 2017) (holding that "requiring holders of [preferred equity interests] to be paid in full before holders of [common interests] receive any distributions is appropriate" pursuant to section 1129(b)(2)(C)).  The Plan in its current form clearly fails to meet this test as it provides for no distribution in any scenario on account of Foxconn's Class 5 Preferred Stock Interests.

37.     Further, pursuant to the "best interests" test under section 1129(a)(7), each holder

of an impaired interest under the Plan is entitled to "receive or retain . . . on account of such . . .

interest property of a value . . .  that is not less than the amount that such holder would so receive

. . . if the debtor were liquidated under chapter 7 of this title on such date."  11 U.S.C. 1129(a)(7).

Here, unless the Class 5 Foxconn Preferred Stock Interests are equitably subordinated to other

Interests, in a chapter 7 liquidation, Foxconn would be entitled to payment in full on account of

the $30 million liquidation preference attached to the Foxconn Preferred Stock Interests before

Class 7 Common Stock Interests may receive a distribution.   Yet, the Plan provides for no

distribution in any scenario to the Class 5 Foxconn Preferred Stock Interests and has distributions

in all scenarios being made to holders of Interests in Class 7 Common Stock Interests other than

Foxconn—a clear violation of the best interests test and section 1129(b)(2)(C)(ii).

38.     In addition, the Plan's treatment of Foxconn's Class 7 Common Stock Interests,

which stock represents approximately 8.4% of all Common Stock Interests, also violates the best

interests test when the Debtors fail in their equitable subordination attempts.   In such event,

Foxconn's Class 7 Common Stock Interests would share in the *pro rata* distributions to holders of

all other Class 7 Common Stock Interests.   Yet again, the Plan provides for no distribution in any

scenario to Foxconn on account of its Class 7 Common Stock Interests—another clear violation

of sections 1129(a)(7) and 1129(b)(2)(C).

39.     Failure here will most certainly require re-solicitation of votes, a costly and

wasteful extra step.   The modifications needed to bring the treatment afforded to the Foxconn

Interests in line with the requirements of the Bankruptcy Code will result in a reduction of

$30 million on account of Class 5 Preferred Stock Interests in the estimated distributions to holders

of Common Stock Interests and a dilution of their *pro rata* share of any distributions equal to the

share of Foxconn's Common Stock Interests.  As such, when the Debtors fail in their equitable subordination attempts, they will necessarily be required to resolicit the votes of holders of Class 7 Common Stock Interests on the Plan.  *See* Fed. R. Bankr. P. 3019 (providing that prior acceptances of a plan may only be used if a "proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder"); 9 *Collier on Bankruptcy* ¶ 3019.01 (16th Ed. 2023) ("Clearly, a reduction in consideration would be an adverse change in treatment" that would require re-solicitation of votes); *In re Frontier Airlines, Inc.*, 93 B.R. 1014, 1024 (Bankr. D. Colo. 1988) (requiring resolicitation of creditor votes where modifications of the plan resulted in larger amount of claims sharing a reduced pool of assets). Resolicitation would be especially costly here where the relevant Class is publicly held stock that requires coordination with nominees to reach beneficial holders.

**B. The Plan Is Patently Unconfirmable As It Fails to Provide Adequate Means of Implementation with Respect to Treatment of Foxconn's Claims and Interests If and When the Debtors' Attempts to Subordinate or Effectively Disallow Them Fails.**

40.    Section 1123(a)(5) of the Bankruptcy Code requires that "a plan . . . provide adequate means for the plan's implementation . . . ."  The Plan, however, does not adequately provide for the treatment of the Foxconn Interests when the Debtors' attempt to equitably subordinate the Foxconn Interests fails.

41.    Although the Debtors are not seeking to equitably subordinate Foxconn's claims through the Plan,[8] the Debtors are—through the Adversary Proceeding—seeking to equitably subordinate any of Foxconn's claims, regardless of their basis, amount, or merit.  *See* Complaint ¶¶ 162–63 ("any and all proofs of claim filed by [Foxconn] . . . should be equitably subordinated

---

[8] *See* Plan §§ III.B.5.b, V.S (limiting equitable subordination to the Foxconn Interests).

pursuant to 11 U.S.C. § 510(c)."). The Debtors also have indicated that they intend to dispute Foxconn's rights to receive distributions under the Plan. *See* Plan § VI.G; Disclosure Statement at p. 49. However, the Plan and the Disclosure Statement do not adequately account for the likelihood of those disputes being resolved in Foxconn's favor.

42. The Plan lacks any provisions that ensure appropriate cash reserves are maintained such that, when Foxconn's claims and interests are allowed and their current priority is upheld, there will be sufficient funds to make distributions to which Foxconn is entitled. With respect to Claims, the Plan provides that the Claims Administrator "may establish reserves for the payment of Disputed Claims by withholding up to 100% of the Distributions to which Holders of such Disputed Claims would be entitled if such Disputed Claims were Allowed Claims." Plan § VII.I (emphasis added). However, providing an option to reserve, rather than making reservation mandatory, does little to ensure funds will be available to distribute upon allowance of a Claim. With respect to Interests, there is no provision in the Plan that addresses reservation of distributions for holders of disputed Interests.

43. Reserving an appropriate amount for distributions is crucial to protect Foxconn, as one of the largest shareholders of the Debtors and the holder of Preferred Stock Interests with a substantial liquidation preference ($30 million). Determinations regarding equitable subordination of any of the claims asserted by or against Foxconn, including Foxconn's claims that may form the basis for setoff or recoupment,[9] may not be determined for a substantial period of time after the Effective Date. This is even more critical where, as here, the Debtors are liquidating and will have limited sources of funds for later distributions. *See* Plan § V.C (describing sources of cash for distributions to be "Non-Trade Pool Assets, which include: (i) Cash on hand as of the Effective

---

[9] Foxconn objects to the Debtors' attempt to wipe out any setoff or recoupment right of Foxconn. *See* Plan § VIII.F.

Date (after the GUTC Cash Pool Account has been funded); (ii) proceeds from the sale of the Debtors' assets; (iii) proceeds from the Foxconn Causes of Action and other Causes of Action; and (iv) insurance proceeds received by the Post-Effective Date Debtors" and noting that certain funds will be reserved exclusively for post-Effective Date operational expenses). The failure to sufficiently provide for distributions to which Foxconn would be entitled if the Foxconn's claims and the Foxconn Interests cannot be equitably subordinated renders the Plan not feasible at this stage in the process and, so, unconfirmable.

44. A determination of whether to grant the Debtors' request for an equitable remedy to subordinate the Foxconn Interests is for another day. As will be demonstrated either in the context of arbitration, the Adversary Proceeding, or if required by the Court, at the confirmation hearing, the Debtors will not be able to prove that Foxconn's conduct meets the high standard— "egregious conduct such as fraud, spoilation or overreaching . . ."[10]—for equitably subordinating the Foxconn Interests under section 510(c) of the Bankruptcy Code. With no alternative treatment for the Foxconn Interests in the Plan when the Debtors' fail to meet their burden, the Plan is not feasible and, thus, patently unconfirmable.

### C. There Are Available Alternatives That Protect Foxconn's Rights and Allow the Debtors to Confirm a Plan in the Near Term.

45. There is a straightforward way to avoid the numerous issues and prejudice to Foxconn that adjudicating equitable subordination at confirmation necessarily present. The Plan could easily be modified to provide alternative treatment of the Foxconn Interests based on the Court's resolution of the equitable subordination claim in arbitration or the Adversary Proceeding, whichever the case may be. With such alternative treatment presented in the Plan, Common Stock

---

[10] *In re Epic Cap. Corp.*, 290 B.R. 514, 524 (Bankr. D. Del. 2003), *aff'd*, 307 B.R. 767 (D. Del. 2004) (quoting *Ansel Properties v. Nutri/System of Florida Associates (In re Nutri/System of Florida Associates)*, 178 B.R. 645, 657 (E.D. Pa. 1995)).

Interest Holders would have the opportunity to vote with a clear view of the possibility that if the Foxconn Interests are not equitably subordinated, they would receive distributions only after a $30 million liquidation preference is paid to Foxconn and their *pro rata* recoveries on account of their Common Stock Interests would be diluted in the amount of Foxconn's Common Stock Interests.

### III. The Disclosure Statement Fails to Provide Adequate Information as Required under 11 U.S.C. § 1125.

46.     Section 1125(b) of the Bankruptcy Code prohibits the solicitation of votes on a chapter 11 plan "unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure statement . . . containing adequate information."  *See* 11 U.S.C. § 1125(b).  Because creditors and the Court alike must rely on information in a disclosure statement, the "importance of full disclosure . . . cannot [be] overemphasize[d]." *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988).  Adequate information is defined in section 1125(a) of the Bankruptcy Code as "information of a kind, and in sufficient detail . . . that would enable a hypothetical reasonable investor . . . to make an informed judgment about the plan." *See* 11 U.S.C. § 1125(a)(1); *see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003) (plan proponent has "an affirmative duty to provide creditors with a disclosure statement containing 'adequate information' to 'enable a creditor to make an informed judgment'" about the proposed plan).

47.     For the further reasons set forth below, the Disclosure Statement does not contain adequate information within the meaning of section 1125(b) of the Bankruptcy Code and, therefore, should not be approved.

**A. The Disclosure Statement Provides Insufficient Information Regarding the Plan's Effect on Holders of Interests' Property Rights.**

48.     The Foxconn Interests, consisting of all of LMC's Class A preferred stock and approximately 8.4 percent of LMC's Common Stock Interests, makes Foxconn a significant stakeholder in LMC's capital structure.  However, the Debtors fail to disclose fundamental information regarding the effect that the Plan will have on the Foxconn Interests, and for that matter, the other holders' Common Stock Interests.  This includes not accounting for the effects of equitably subordinating the Foxconn Interests and risks associated therewith, or the outcome when the Debtors fail in their bid to equitably subordinate the Foxconn Interests.

49.     The Plan states that "[n]either Common Stock Interests, Foxconn Preferred Stock Interests nor any other Interests (including any outstanding warrants) in and to the Debtors shall be cancelled" and that "[a]ll such Interests shall be preserved in Post-Effective Date LMC and governed in according with the Plan, the Confirmation Order and the applicable organizational documents."  Plan § V.H.  However, neither the Plan nor the Disclosure Statement provide an indication of whether stockholders will have any right to participate in the governance of the post-effective date Debtors.  The Disclosure Statement does not address whether Post-Effective Date LMC will continue to be a public reporting company, as it was prior to the Petition Date, or whether it will become a private company under applicable securities laws.  If the latter, the Disclosure Statement says nothing as to the steps it must take to do so.  The Disclosure Statement also fails to explain the legal basis to restrict the trading of the Common Stock Interests, in particular if they remain publicly traded post-Effective Date.  *See* Plan § V.I.

50.     Moreover, the Plan and the Disclosure Statement are silent with respect to the terms that will apply to the Foxconn Interests post-Effective Date.  The Plan states that Foxconn's rights to "receive Distributions under the Plan" will be subordinated to "the rights of non-Foxconn

Holders of Common Stock Interests to receive such Distributions." *See* Plan § V.S.  That is all it says.  It does not state when, if ever, the Post-Effective Date Debtors will cease making "distributions under the Plan" or if, for instance, the Debtors "engage in post-Effective Date operations at their discretion," Foxconn will be excluded from any proceeds of such operations. *See* Plan § V.E.  It also fails to provide any information regarding what rights Foxconn will have as a shareholder, including the right to vote its shares or otherwise participate in the governance of the Post-Effective Date Debtors' affairs in a manner commensurate with its significant holdings. If the Debtors intend to strip Foxconn of all of its rights under the Foxconn Interests while also purporting to "preserve" those interests solely for the Debtors' use of its net operating losses, the Plan should say so clearly and the Disclosure Statement must explain why that is permissible under the Bankruptcy Code and Delaware corporate law in order to meet the adequate information requirements under section 1125 of the Bankruptcy Code.

### B. The Disclosure Statement Fails to Provide Adequate Information Regarding the Amount of General Unsecured Claims to Enable Equity to Understand if It May Receive Distributions.

51.     Under the Plan, there are two Classes of general unsecured claims: (i) Class 3 (General Unsecured Trade Claims) and Class 4 (Other General Unsecured Claims), each of which have the same priority and are set to receive different treatment.  *See* Plan § I.A.66, I.A.87.  The Plan provides that holders of Allowed Class 3 General Unsecured Trade Claims will receive their *pro rata* share of the GUTC Cash Pool Amount, a pool of cash to be funded on the Effective Date. Plan § I.A.63, III.B.3.b.  Both the GUTC Cash Pool Amount and the amount of General Unsecured Trade Claims are conspicuously excluded from the Plan and the Disclosure Statement.  There is no indication whether the GUTC Cash Pool Amount is intended to satisfy the Allowed General

Unsecured Trade Claims in full before equity is to receive a distribution.  *See* Plan § I.A.63; Disclosure Statement at p. 29.

52.     Separately, holders of Class 4 Other Unsecured Claims will receive their *pro rata* share of "the amount of such Claim in Cash, from the Non-Trade Pool Assets (including from the liquidation of any non-Cash Non-Trade Pool Assets)" after satisfaction of certain administrative, secured and priority claims and the funding of the GUTC Cash Pool. Plan § III.B.4.b.  "Non-Trade Pool Assets" is defined as all of the Debtors' assets other than the cash funded into the GUTC Cash Pool. Plan § I.A.86.  There is no information regarding the total amount of Allowed Class 4 Other Unsecured Claims or the amount of the Non-Trade Pool Assets.  Foxconn and other equity holders have no information that would allow them to judge the amount of Claims that must be paid before they can receive distributions nor the value of assets from which those distributions may be paid.  Absent the inclusion of such fundamental information, the Disclosure Statement should not be approved.  *Cf. In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991). ("In short, a proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution.").

### C.  The Plan and Disclosure Statement Fail to Classify and Treat Section 510(b) Claims.

53.     The Debtors have cited the pendency of numerous stockholder and securities claims against them as one of the reasons they sought chapter 11 protection[11] and touted section 510(b) of the Bankruptcy Code's mandatory subordination of such claims as a benefit being in chapter

---

[11]     *See Declaration of Adam Kroll in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [D.I. 15], ¶¶ 55–57 (describing five pending "SEC Investigations and Securities Actions").

11.[12]  Yet, the Plan and Disclosure Statement are almost entirely silent on those claims and their treatment.  Though the Plan creates a defined term for "Section 510(b) Claims" (*see* Plan § I.A.112), the Section 510(b) Claims not classified in their own Class or any Class, nor does the Plan or Disclosure Statement address the subordination and treatment of those claims.

54.    This is a material and significant omission given that the Section 510(b) Claims in this case must be subordinated to the level of Common Stock Interests and therefore have the potential to significantly dilute recoveries to holders of Common Stock Interests.  Nor do the Debtors even attempt to explain how they will address treating Section 510(b) Claims, which are denominated in dollars, on par with Common Stock Interests, which are denominated as a percentage ownership—a task that one bankruptcy court described as entailing a "fiendish level of complexity."  *In re Orange Cnty. Nursery, Inc.*, 2013 WL 3776320, at *6 (Bankr. C.D. Cal. July 17, 2013) ("Difficulty arises in determining the actual mechanics of granting, as § 510(b) directs, equal priority to a claim (which is denominated in dollars) and equity (which is denominated in a percentage.) . . . In this case, equity is retaining its interest in Debtor, so the only conceivable way to treat the Minority's claim on parity with equity is to distribute some amount of common stock to the Minority on account of its subordinated claim. The real issue is *how* and *when* to value Debtor's equity to determine what percentage of the Debtor's equity the claim of the Minority should receive.") (internal citations omitted), *rev'd on other grounds*, 523 B.R. 692 (C.D. Cal. 2014).

---

[12]  *See* Tr. of Hr'g held Aug. 28, 2023 at 119:10–16 (Debtors' counsel arguing that: "And let's just remember, in Chapter 11, 510(b) subordinates those security claims and makes them equal to the security on whose behalf they're brought. It's common equity.  That is a key provision of the Code here that is beneficial for the estate in the reorganization process and the liquidation process that allows us to make early distributions to unsecured creditors.").

55.     The Debtors totally avoid even mentioning, let alone addressing, this issue even though it has the potential to significantly dilute recoveries to holders of Common Stock Interests. The Plan, therefore, violates section 1123(a)(3) of the Bankruptcy Code, 11 U.S.C. § 1123(a)(3) (requiring a plan to "specify treatment of any class of claims or interests that is impaired" under the plan), and the disclosure requirements of section 1125 of the Bankruptcy Code.

### D.    The Disclosure Statement Fails to Provide Adequate Information with Respect to Releases of Directors and Officers.

56.     The Debtors proposed releases of third parties must be analyzed under the five-factor test articulated in *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994).  *See In re Washington Mutual, Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011).[13]  The Debtors have provided no information to allow parties in interest to determine whether those factors have been met and the releases are justifiable.

57.     The Plan contains broad releases in favor of "Released Parties."  The definition of Released Parties is almost infinitely expansive, including the Debtors in their prepetition, current, and post-Effective Date forms and each of the Committee members, ***plus each of their*** current and former Affiliates, ***plus each of their*** current and former directors, managers, officers, predecessors, successors, and assigns, subsidiaries, ***plus each of their*** respective current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives and other professionals.  Plan §

---

[13]    Specifically, the following five factors are to be considered when determining whether a debtor's release of a non-debtor is justified: (i) an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources; (ii) a substantial contribution to the plan by the non-debtor; (iii) the necessity of the release to the reorganization; (iv) the overwhelming acceptance of the plan and release by creditors and interest holders; and (v) the payment of all or substantially all of the claims of the creditors and interest holders under the plan.  *Wash. Mutual*, 442 B.R. at 346.

I.A.107.  There is simply no way for any party to identify the extent of releases that cast their net this broadly across multiple layers of parties, which is in and of itself reason to reject them. However, the Disclosure Statement utterly fails to provide any information or explanation for why all of those parties are being released or how it benefits the Debtors and their estates in any way.

58.     Moreover, there is no indication that current and former directors and officers have provided any substantial contribution to these cases.  As previously noted by this Court, involvement in negotiating the Plan is not enough to justify a release.  *See Wash. Mutual*, 442 B.R. at 354 ("Those activities are nothing more than what is required of director and officers of debtors in possession (for which they have received compensation and will be exculpated); they are insufficient to warrant such broad releases of any claims third parties may have against them."). Additionally, there is no disclosure or rationale provided for why releasing directors and officers is necessary in these cases.  The Plan is a liquidating Plan and there is no apparent need for the services of these directors and officers going forward.  The same deficiencies exist with respect to the numerous other Released Parties under the Plan.

59.     The Disclosure Statement also provides no description of what, if any, investigation has been conducted into claims that the Debtors may have against such individuals.  *See In re Voyager Digital Holdings, Inc.*, 649 B.R. 111, 132 (Bankr. S.D.N.Y. 2023) (rejecting releases that were "deliberately as broad and all-encompassing as possible, untethered to any actual review of many of the claims that would be subject to the release" and approving modified releases to cover only claims "limited to matters that the Special Committee actually investigated").  This is especially notable for current and former directors and officers where the Debtors acknowledge facts, including failure to maintain corporate separateness and poor accounting practices (*see* Disclosure Statement at p. 37), and numerous suits filed based on alleged misrepresentations made

by management (*see* Disclosure Statement at pp. 10–12) that indicate potential mismanagement, breach of fiduciary duty or worse by certain current or former directors and officers.   The Disclosure Statement must articulate a justification for the Debtors' proposed releases of non-debtor parties in order to provide adequate information.

### E. The Disclosure Statement Does Not Include a Liquidation Analysis.

60.     As of the date of this Objection, the Debtors have not filed a liquidation analysis that demonstrates that the Plan's treatment of creditors and interest holders complies with section 1129(a)(7) of the Bankruptcy Code's requirement of meeting the best interests test (*see* ¶ 29 *supra) (i.e.*, each rejecting creditor and interest holder may not receive less than such party would in a hypothetical chapter 7 liquidation).   Absent such an analysis, the Disclosure Statement cannot be approved. *See In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990) (holding that a disclosure statement should contain a liquidation analysis that sets forth the estimated return that creditors would receive under chapter 7); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 292-300 (Bankr. S.D.N.Y. 1990) (finding inadequate a disclosure statement that ignored recent bids for the debtors' business and its viability as a going concern even though the court believed the best interests test was satisfied for confirmation).   Foxconn reserves all rights with respect to any liquidation analysis that the Debtors file following the filing of this Objection, including the right to request an appropriate adjournment to provide an opportunity to review the analysis and, if necessary, supplement this Objection with respect to the liquidation analysis and the assumptions on which it is based.

### IV. Additional Grounds on Which the Plan Cannot be Confirmed.

61.     In addition to the above, the following is a non-exclusive list of confirmation objections Foxconn anticipates asserting in connection with the Debtors' proposed confirmation.

62.     ***Impermissible Discharge and Injunction Provision***:   The Plan includes an impermissible discharge and injunction despite being a liquidating plan.  *See* Plan §§ VIII.B, VIII.F.  Liquidating debtors in a chapter 11 case are not entitled to a discharge.  *In re Midway Gold US, Inc.*, 575 B.R. 475, 515 (Bankr. D. Colo. 2017) (liquidating chapter 11 plan not permitted to provide for discharge of a debtor or injunction against actions against estate property).   Under section 1141(d)(3) of the Bankruptcy Code, "confirmation of a chapter 11 plan does not discharge a debtor if - (A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (C) the debtor would be denied a discharge under section 727(a) . . . if the case were a case under chapter 7 of [the Bankruptcy Code]," which applies to any non-individual.  11 U.S.C. § 1141(d)(3); *see also In re Sis Corp.*, 120 B.R. 93, 96 (Bankr. N.D. Ohio 1990) (section 1141(d)(3)(A) "clearly prevents the Debtors from obtaining any type of discharge since their intent under the Plan is to sell all or substantially all of their estate property.").

63.     Although the Debtors do not call the Plan a liquidating Plan, the Debtors' statements throughout these cases and the nature of Plan indicates they are doing nothing more than liquidating their assets and distributing the proceeds to creditors and interest holders.  *See*, *e.g.,* Disclosure Statement at p. 4 (stating the Plan "provides for the liquidation of any assets remaining after the sale process, the continuation of the litigation against Foxconn, as well as any other causes of action of the Debtors, the resolution of claims against the Debtors, and for the distributions of the Debtors' Cash . . . to holders of Allowed Claims and Interests in accordance with the relative priority established by the Bankruptcy Code"); Disclosure Statement at p. 23 ("A central component of the Plan is to liquidate some or all of the Debtors' assets, to provide distributions to Holders of Claims and Interests, and, to the extent not liquidated immediately, to

maximize value of the Debtors' assets for the benefit of stakeholders . . ."); Disclosure Statement at p. 74 ("The Debtors believe that the Plan is the best alternative available to creditors and interest holders because the Plan provides for an orderly liquidation of the Assets."); First Day Declaration at p. 67 (stating that the Debtors will try to sell all of their assets as a going concern or if that fails "take further actions, as necessary, to reduce administrative expenses other than those necessary to achieve the best result possible for stakeholders in a liquidation of the Company's assets.").

64.    Although the Debtors say in one place that they reserve the option to engage in post-Effective Date operations (*see* Disclosure Statement at p. 40), it is clear that they are strictly maintaining this option to preserve possible transactions to monetize their tax attributes (*see* Plan § V.E (listing only "one or more transactions to monetize the value of the net operating losses or similar tax attributes" when discussing post-Effective Date operations)); Plan § V.C (same); Disclosure Statement at p.4 ("The Plan also preserves the ability of the Debtors to enter into one or more transactions after the Effective Date to monetize certain of their tax attributes.").[14]

65.    ***Overly Broad Retention of Jurisdiction***.  The Plan provides for the Court's retention of exclusive jurisdiction following the Effective Date of an extremely broad swath of matters, including both core and non-core matters.  Plan § XII.  Among those matters that are included are adjudication of the "Foxconn Causes of Action", which are defined as the state law claims and the remedy of equitable subordination asserted in the Adversary Proceeding. Plan § I.A.58, XII. 27.  The Debtors provide no authority for why such matters should be subject to the exclusive jurisdiction of the Court, especially when they are subject to mandatory arbitration under the parties' contracts as explained in detail in the Motion to Dismiss.

---

[14]   To the extent the Debtors assert the Plan is not a liquidating plan, they have failed to include any information in the Disclosure Statement that demonstrates feasibility. Notably, the Post-Effective Date Debtor Amount, which is the amount reserved to fund future operational expenses, is of an indeterminate amount that is to be reasonably determined by the Debtors.  Plan § I.A.96, V.C.

66.     ***Plan Interpretation Inconsistencies***:   The Plan is internally inconsistent with respect to whether the Plan or Plan Supplement controls when there is a conflict between them. Plan § I.G provides that "[i]n the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order)."   In contrast, Plan § XIII.N provides "[i]n the event of an inconsistency between the terms and provisions of the Plan and the terms and provisions of the Disclosure Statement, any Plan Document or any document in the Plan Supplement, the terms and provisions of the Plan shall control and govern."

67.     ***Unjustified Substantive Consolidation for Distribution Purposes***:   The Plan provides for the substantive consolidation of the Debtors' estate for distribution purposes.  *See* Plan §§ V.A.  Substantive consolidation is "extreme (it may affect profoundly creditors' rights and recoveries) and imprecise" and, as a result, "should be rare and, in any event, one of last resort after considering and rejecting other remedies." *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2007).  A proponent of consolidation must establish that the entities (1) disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (2) post-petition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. *Id.* at 199–200.

68.     The Debtors state that they operated as a single entity.  That they were able to prepare schedules and other disclosures in these cases—on a debtor-by-debtor basis—belies their stated rationale for proposed consolidation under the Plan.

## OBJECTION TO AND OPT OUT OF THIRD PARTY RELEASES

69.     The Plan also provides for the release of the Released Parties by holders of Claim and Interest holders.  *See* Plan § VIII.D.  The definition of "Releasing Parties" does not appear to

include holders of impaired Claims or Interests that are not entitled to vote on the Plan, as Foxconn is with respect to its Preferred Stock Interests. *See* Plan § I.A.108. However, for the avoidance of doubt, each of the Foxconn Parties hereby objects to and opts out of any and all releases set forth in the Plan, including those provided for in Plan § VIII.D.

## RESERVATION OF RIGHTS

70.     This Objection is submitted without prejudice to, and with a full reservation of, Foxconn's rights to supplement and amend this Objection, and to further object to the Motion, on any grounds that may be appropriate, in advance of, or in conjunction with, the hearing to approve the Motion and the Disclosure Statement, and/or confirmation of the Plan (if the Court is inclined to grant the Motion).

## CONCLUSION

**WHEREFORE**, the Foxconn Parties request that this Court (i) deny the Debtors' request to approve the Motion and the Disclosure Statement; and (ii) grant the Foxconn Parties such other and further relief as appropriate.

Dated: October 6, 2023
       Wilmington, Delaware

| | |
|---|---|
| **MORRIS, NICHOLS, ARSHT & TUNNELL LLP** | **ALLEN & OVERY LLP** |
| | Daniel J. Guyder (admitted *pro hac vice*) |
| */s/ Matthew O. Talmo* | Robin Spigel (admitted *pro hac vice*) |
| Robert J. Dehney (No. 3578) | Christopher Newcomb (admitted *pro hac vice*) |
| Donna Culver (No. 2983) | Joseph Badtke-Berkow (admitted *pro hac vice*) |
| Matthew B. Harvey (No. 5186) | Jacob R. Herz (admitted *pro hac vice*) |
| Matthew O. Talmo (No. 6333) | |
| | 1221 Avenue of the Americas |
| 1201 North Market Street, 16th Floor | New York, New York 10020 |
| P.O. Box 1347 | Telephone: (212) 610-6300 |
| Wilmington, DE 19899-1347 | Facsimile: (212) 610 6399 |
| Telephone: (302) 658-9200 | daniel.guyder@allenovery.com |
| Facsimile: (302) 658-3989 | robin.spigel@allenovery.com |
| rdehney@morrisnichols.com | chris.newcomb@allenovery.com |
| dculver@morrisnichols.com | joseph.badtke-berkow@allenovery.com |
| mharvey@morrisnichols.com | jacob.herz@allenovery.com |
| mtalmo@morrisnichols.com | |
| | -and- |
| | |
| | Noah Brumfield (admitted *pro hac vice*) |
| | |
| | 1101 New York Avenue, NW |
| | Washington, D.C. 20005 |
| | Telephone: (202) 683-3800 |
| | Facsimile: (212) 610-6399 |
| | noah.brumfield@allenovery.com |

*Co-Counsel to the Foxconn Parties*