# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LORDSTOWN MOTORS CORP., *et al.,* | : | Case No. 23-10831 (MFW) |
| | : | |
| | : | Hearing Date: October 18, 2023, at 10:30 a.m. |
| Debtors. | : | Objection Deadline: extended to |
| | : | to October 12, 2023, at noon |

## OBJECTION BY THE UNITED STATES TO THE DEBTORS' SALE MOTION

The United States, on behalf of the Department of Transportation and its National Highway Traffic Safety Administration ("NHTSA"), through undersigned counsel, objects to the Debtors' Motion for Entry of an Order (I)(A) Establishing Bidding and Auction Procedures, (B) Scheduling Certain Dates with Respect Thereto, (C) Approving the Form and Manner of Notice Thereof, (D) Approving Contract Assumption and Assignment Procedures, (E) Granting Other Related Relief; and (II)(A) Authorizing the Debtors to Enter into a Definitive Purchase Agreement and (B) Granting Related Relief ("Sale Motion"). [Docket No. 16]. In support of its objection, the United States avers as follows:

## BACKGROUND

1. On June 27, 2023, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. [Docket No. 1].

2. On June 27, 2023, the Debtors filed the Sale Motion. The Sale Motion set out the mechanics of the sale process but is almost devoid of information about the assets to be sold.

3. On August 10, 2023, the Court entered the Order (A) Establishing Bidding and Auction Procedures, (B) Scheduling Certain Dates with Respect Thereto, (C) Approving the Form and Manner of Notice Thereof, (D) Approving Contract Assumption and Assignment Procedures, and (E) Granting Related Relief ("Procedures Order").  [Docket 237].

4. On September 29, 2023, the Debtors filed the Notice of (I) Selection of Successful Bidder, (II) Cancellation of Auction, and (III) Sale Hearing ("Sale Notice").   [Docket 488]. Attached to the Sale Notice is a proposed sale order ("Sale Order"), a blackline of the Sale Order ("Blackline Order") and the Asset Purchase Agreement ("APA").  [Docket 488, Exhibit A, B and D].

5. On August 24, 2023, the Court established December 26, 2023, as the deadline for filing government claims ("Governmental Bar Date").  [Docket 319].

6. The Debtors design and engineer a full-size, all electric pickup truck, the Endurance.  In 2021, the Debtors began manufacturing beta and pre-production vehicles in preparation for the full commercial production and sale of the Endurance truck.  Commercial production of the Endurance truck began in 2022.  As of the Petition Date, approximately 65 Endurance trucks have been manufactured and sold to the commercial fleet market.  [Docket 15, ¶ 1].

7. The Debtors' business is regulated by NHTSA.  The National Traffic and Motor Vehicle Safety Act ("Safety Act") gives NHTSA the authority to issue vehicle safety standards and to require manufacturers to recall vehicles that have safety-related defects or do not meet Federal safety standards.  49 U.S.C. § 30101 et seq.  Manufacturers voluntarily initiate many of these recalls, while others are either influenced by NHTSA investigations or ordered by NHTSA and enforceable via the courts.  If a safety defect is discovered, the manufacturer must notify NHTSA,

as well as vehicle or equipment owners, dealers, and distributors. The manufacturer is then required to remedy the problem at no charge to the owner. NHTSA is responsible for monitoring the manufacturer's corrective action to ensure successful completion of the recall campaign.

8. Manufacturers are responsible for carrying out certain open recalls that have been mandated by NHTSA. A manufacturer is defined in the Safety Act as a person (A) manufacturing or assembling motor vehicles or motor vehicle equipment; or (B) importing motor vehicles or motor vehicles for resale. [49 U.S.C. § 30102(a)(5)]. There are currently three open recalls involving the 2023 Lordstown Endurance truck:

- NHTSA Recall No. 23V-114
  - A high-voltage cable assembly between the inverter and the motor may lose high-voltage isolation between the busbar and conductive shield, causing an unexpected reduction of power and eventual loss of propulsion. The vehicle may experience reduction and eventual loss of propulsion without prior warning if the fault occurs. Once the vehicle is stopped, it may automatically shift into Neutral. Once the vehicle is shut off, it cannot be restarted. Each of these conditions could result in an increased risk of a crash.
  - Number of vehicles potentially involved: 19
- NHTSA Recall No. 23V-144
  - The electric park brake calipers (EPB) may have been built with washers that had not been properly heat treated by the supplier. As a result, these washers could wear excessively over time, eventually leading the EPB to lose effectiveness and clamping force at grade. The clamping force of the EPB may degrade over time, which could allow the vehicle to roll after being parked, especially if on a high grade, which could increase the risk of a crash.
  - Number of vehicles potentially involved: 7
- NHTSA Recall No. 23V-304
  - Under certain circumstances, the vehicle's driver information display (DID) may freeze upon vehicle start up and cannot be reset with additional key cycles. If the malfunction occurs, information such as the speedometer, the battery charge gauge and certain indicator lamps and warning messages, as well as acoustic warnings would not be available, potentially increasing the risk of a crash.
  - Number of vehicles potentially involved: 5

9. The Buyer's future operations may be subject to additional NHTSA recall obligations.

10. The Sale Notice disclosed that the Debtors received one qualified bid prior to the bid deadline. The winning bidder is LAS Capital, and Stephen S. Burns, an individual, as guarantor ("Buyer"). [Sale Notice, page 3]. Mr. Burns, whom the Debtors understand is the majority equity holder of LAS Capital, was the founder and former Chief Executive Officer and a member of the board of directors of Lordstown Motors Corp. ("LMC"), and Mr. Julio Rodriguez whom the Debtors understand is one of the indirect managers of LAS Capital was the Chief Financial Officer of LMC. Mr. Burns and Mr. Rodriguez resigned from their positions, as of June 14, 2021, and each ceased being employed by and has no management role with LMC since that time. According to the Debtors, in connection with the Debtors' sale process, LAS Capital, including Mr. Burns and Mr. Rodriguez have not had and do not currently have any affiliation with the Debtors, other than as a third-party bidder in the Debtors' Court-approved sale process. [Sale Notice, FN 3].

11. On the same day, September 29, 2023, that the Debtors filed the Sale Notice, they filed an 8-K disclosure with the United States Securities and Exchange Commission. For a purchase price of $10 million, the Buyer agreed to acquire specified assets of the Debtors related to the design, production and sale of electric light duty vehicles focused on the commercial fleet market. [SEC Form 8-K, Item 1.01]. Specifically, the Buyer is acquiring all items of machinery owned by the Debtors, including the hub motor assembly lines, the battery module assembly lines, the battery pack assembly lines and related or associated machinery, intellectual property, all inventory, computers and books and records. [Sale Notice, Exhibit B, Article II, Section 2.1].

## OBJECTIONS

12. **No extinguishment of certain government interests.** The Sale Order provides in pertinent part:

4

> Pursuant to sections 363(b), 363(f) and 365 of the Bankruptcy Code, the Purchased Assets shall be transferred to the Buyer at closing free and clear of all Interests…. [Sale Order, ¶ 10].

> Except to the extent the Buyer has specifically agreed in the Asset Purchase Agreement, the Buyer shall not have any liability, responsibility or obligation for any Interests, claims, Liabilities or other obligations of the Debtors or their estates, including any Interests, claims, Liabilities or other obligations related to the Purchased Assets prior to the Closing Date. Under no circumstances shall the Buyer be deemed a successor of or to the Debtors for any Interests against, in or to the Debtors or the Purchased Assets. For the purposes of this paragraph of this Order, all references to the Buyer shall also include the Buyer Parties [Sale Order, ¶ 18].

13. Based on the description of assets to be purchased, the APA does not appear to contemplate a piecemeal sale of assets. Instead, it suggests the Buyer will be a manufacturer. The Blackline Order, filed eight business days ago, contains the following now deleted provision:

> The Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and, to the extent provided for under the Asset Purchase Agreement, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are directed to be, transferred to the Buyer as of the Closing Date. Any dispute with respect to any such transfer or the vesting of such license, permit registration or governmental authorization or approval in the Buyer not raised by the Sale Objection Deadline is hereby waived. [Blackline Order, (deleted) ¶ 15].

14. The Sale Order specifically provides that the Buyer has no liability to Governmental Units for any matters not related to conditions existing on or after the closing that require remediation or compliance under applicable non-bankruptcy law by the owner or operator of the applicable Purchased Assets, regardless of who is responsible for the condition or when it arose. [Sale Order, ¶ 56].

15. The Endurance trucks are presently the subject of recalls. It is possible there will be more recalls on these vehicles in the future and the Buyer will be subject to the provisions of the Safety Act. The Buyer is seeking to insulate itself from future liability to Governmental Units

through injunctive language in the Plan. Future relief sought by NHTSA against the Buyer is not an "interest in property" and thus the Buyer cannot escape liability through the Bankruptcy Code section 363 sale process.

16. The Second Circuit discussed these types of successor liability claims in a case involving switch defects in cars:

> We agree that successor liability claims can be ''interests'' when they flow from a debtor's ownership of transferred assets. *See* 3 *Collier in Bankruptcy* ¶ 363.06[1], [7]; *Trans World Airlines*, 322 F.3d at 289. But successor liability claims must also still qualify as ''claims'' under Chapter 11. Though § 363(f) does not expressly invoke the Chapter 11 definition of ''claims,'' *see* 11 U.S.C. § 101(5), it makes sense to ''harmonize'' Chapter 11 reorganizations and § 363 sales ''to the extent permitted by the statutory language.'' *Chrysler*, 576 F.3d at 125; *see Lionel*, 722 F.2d at 1071 (''[S]ome play for the operation of both § 363(b) and Chapter 11 must be allowed for.'').**23** Here, the bankruptcy court's power to bar ''claims'' in a quick § 363 sale is plainly no broader than its power in a traditional Chapter 11 reorganization. *Compare* 11 U.S.C. § 363(f) (''free and clear of any interest in such property''), *with* § 1141(c) (''free and clear of all claims and interests''). We thus consider what claims may be barred under Chapter 11 generally. **[19, 20]** Section 101(5) defines ''claim'' as any ''right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.'' 11 U.S.C. § 101(5). A claim is (1) a right to payment (2) that arose before the filing of the petition. *See Pension Ben. Guar. Corp. v. Oneida Ltd.*, 562 F.3d 154, 157 (2d Cir. 2009). *In Matter of Motors Liquidation Co.*, 829 F.3d 135, 156 (2d Cir. 2016).

The Delaware District Court recently held that a Bankruptcy Court order approving the sale of a debtor's assets free and clear cannot be used as a "bankruptcy loophole" to shield the purchaser from successor liability arising out of its post-sale conduct. *CCX, INC.*, No. 22-cv-01563 GBW, pgs. 26, 28 (Sept. 18, 2023). To determine post-sale conduct, the Delaware Court found the reasoning adopted by the Nevada District Court persuasive when it rejected a buyer's contention that the sale order immunized it from successor status under the NLRA. *Overstreet v. Apex Linen Holdings, LLC,* 618 F. Supp 3d 1014 at 1027-28 (D. Nev. 2022]. "Congress has entrusted the Board, not the bankruptcy court, with the authority to determine whether an unfair

6

labor practice has occurred ... Whether a business is a successor 'normally falls within the [NLRB]'s primary jurisdiction.'" *Id.* at 1027 (quoting *Erica Inc.,* 344 NLRB at 801). The court observed that the successorship inquiry in the "labor-law context is much broader than the strict corporate-law sense of successorship.'" *Id.* (quoting *Resilient Floor Covering Pension Trust Fund Bd. of Trustees* v. *Michael's Floor Covering, Inc.,* 801 F.3d 1079, 1099 (9th Cir. 2015)). Agreeing with the Fifth Circuit, the *Apex* court noted that while a bankruptcy court's order "might discharge duties that arose before the bankruptcy petition," "a successor's post-sale conduct can create a new duty to bargain" under labor law. *Id.* (quoting *Erica Inc.,* 200 Fed. App'x at 347). The *Apex* court ultimately concluded that the sale order at issue there "does not preclude a post-sale finding by the [NLRB] that Apex Holdings is a successor." *Id.* ...."[T]he factors that govern successorship under labor law did not materialize until after the sale was complete and [the purchaser] took over the business." *See id.* at 1027-28. "Only then could it be determined whether there was a substantial continuity of the same business operations and use of the same plant workers, jobs, machinery, supervisors, and service." *Id.* at 1028. Likewise, as the *Apex* court observed, "the question of whether a majority of Apex Holdings' bargaining unit employees previously worked for Apex LLC could not be determined until after the sale was completed and Apex Holdings made its hiring decisions." *Id.* Thus, while the purchaser in *Apex* did not rely on § 363(f), the court's decision is consistent with the general principle that, notwithstanding a bankruptcy court's authority pursuant to §363(f) to extinguish liabilities incurred prior to the sale of the debtor's assets, the court cannot insulate a purchaser from liability for claims that arose after the sale due to the purchaser's own conduct. *CCX, INC.*, No. 22-cv-01563 GBW, pgs. 25 and 26 (Sept. 18, 2023).

17. NHTSA is responsible for the health and safety of the American public. In accordance with CCX and Motors, the United States objects to the Sale Motion to the extent the Debtors seek to enjoin any post-sale actions by NHTSA that it would be otherwise entitled to take under applicable non-bankruptcy law. Future recall obligations cannot be subject to a sale of free and clear of interests because such obligations are completely unknown and depend entirely on the fortuity of future occurrences.

18. The Sale Order purports to approve the assumption and assignment of Assumed Contracts to the Buyer pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code. [Sale Order, ¶ 23]. The Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with the respective terms notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assumed Contracts after such assignment to and assumption by the Buyer, except as provided in the Asset Purchase Agreement. [Sale Order, ¶ 26]. All counterparties to the Assumed Contracts shall be deemed to have consented to such assumption and assignment under 365(c)(1) of the Bankruptcy Code and any other applicable law. [Sale Order, ¶ 30].

19. The United States is unaware of having any contracts with the Debtors. In an abundance of caution, because the Governmental Bar Date has not yet passed, the United States objects to the assumption and assignment of any federal contracts. Under 11 U.S.C. § 365(c)(1) the Debtor "may not assume or assign any executory contract or unexpired lease of the debtor…if applicable law excuses such a party, other than the debtor, to such a contract or lease from

accepting performance from or rendering performance to any entity other than the debtor or the debtor in possession." The Federal Anti-Assignment Act, 41 U.S.C. § 6305, prohibits the Debtors' transfer of the federal interests without the consent of the United States. *In re West Electronics, Inc.,* 852 F.2d 79, 83 (3d Cir. 1988). The United States does not consent to the transfer or assignment of any federal contract to the Buyer and both the Buyer and the Debtors must comply with all applicable non-bankruptcy law in the assumption and assignment process. The United States objects to the Sale Motion to the extent it fails, with respect to federal interests, to meet the criteria in sections 363 and 365 of the Bankruptcy Code.

20. **Section 525.** The Sale Order states that to the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke or suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets on account of the filing or pendency of the Chapter 11 Cases or the consummation of the transactions contemplated by the Purchase Agreement or any of the other Transaction Documents, including the Sale Transaction and the transfer of the Purchased Assets and the assumption and assignment of the Assumed Contracts. Each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction set forth in the Asset Purchase Agreement. [Sale Order, ¶ 14]. The United States objects to this provision as being well beyond the scope of section 525 of the Bankruptcy Code.

21. **Releases.** Given that the Buyer is comprised of former officers of the Debtors, the United States objects to the mutual releases to the extent such releases are prejudicial to the interests of the United States.

22. **No waiver**.  The Sale Order is made effective immediately upon its entry by providing that the stays under Bankruptcy Rules 6004(h), 6006(d), or any applicable provisions of the Local Rules are waived and shall not apply.  [Sale Order, ¶ 59].  The United States does not consent to the truncation of its statutory protections.  This provision negatively affects the United States' appeal rights.  If the Sale Order is immediately effective, the Debtors are essentially requesting that the Court shorten the time for appeal afforded by the federal bankruptcy rules.  Pursuant to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, unless otherwise ordered by the Court, an automatic fourteen-day stay is imposed from the date of entry of the order.  Under the Debtors' proposed scheme, if the United States is unable immediately to obtain a hearing before the appropriate Court to seek a stay, its appeal may be contended to be moot.  Particularly in light of the appellant being a government agency, with a chain of command to be consulted, this unilateral ability of the Debtors to shorten the stay period would be unfair and prejudicial to the government.

## Conclusion

On September 13, 2023, the United States, through undersigned counsel, proposed that the following language be included in the Sale Order:

> Notwithstanding any provision in the Sale Motion, the Asset Purchase Agreement, this Order, and any implementing sale documents (collectively, "Sale Documents"), nothing shall: (1) authorize the  assumption, sale, assignment or other transfer to the Purchaser of any federal (i) grants, (ii) grant funds, (iii) contracts, (iv) property, including but not limited to, intellectual property and patents, (v) leases, (vi) agreements, (vii) certifications, (viii) applications or other interests of the federal government (collectively, "Federal Interests") without compliance by the Debtors and the Purchaser with all terms of the Federal Interests and with all applicable non-bankruptcy law; (2) be interpreted to set cure amounts or to require the government to novate, approve or otherwise consent to the assumption, sale, assignment or other transfer of any Federal Interests; (3) waive, alter or otherwise limit the United States' property rights, including but not limited to, inventory, inventions, records, patents, intellectual property, licenses, and data; (4) affect

the setoff or recoupment rights or defenses of a governmental unit (as defined in 11 U.S.C. § 101(27)); (5) authorize the assumption, transfer, sale or assignment of any assets subject to the jurisdiction of federal non-bankruptcy recall laws without the assumption by the Purchaser of all recall obligations required, but not yet performed by the Debtors at the time of such assumption, transfer, sale or assignment, including recall obligations that arise after the assumption, transfer, sale or assignment of such assets; (6) authorize the assumption, transfer, sale or assignment of any governmental unit's (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements, obligations and approvals under non-bankruptcy laws; (7) release, nullify, preclude or enjoin the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the manufacturer, owner or operator of property; (8) confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); (9) divest any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order; or (9) expand the scope of 11 U.S.C.§ 525.  For the avoidance of doubt and without limiting the foregoing, notwithstanding any provision in the Sale Documents, nothing shall impair, affect, alter or modify any statutes (including, but not limited to, Title 49 of the United States Code), regulations, rules, guidelines, standards, policies and procedures of the Department of Transportation, including but not limited to, the National Highway Traffic Safety Administration.

The Debtors declined to add the Proposed language into the Sale Order without a proviso that substantially undermined the relief sought by the United States.  The inclusion of the Proposed Language in the Sale Order would resolve the issues raised by the United States in this objection.

**WHEREFORE**, the United States requests that the Court deny the relief requested in the Sale Motion and grant such other and further relief as the Court deems necessary and just.

                    DAVID C. WEISS
                    United States Attorney

       BY: */s/ Ellen Slights*
                    Ellen W. Slights (DE Bar No. 2782)
                    Assistant United States Attorney

Dated:  October 12, 2023