**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>Lordstown Motors Corp., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-10831 (MFW)<br><br>(Jointly Administered)<br><br>Re: Docket Nos. 16, 338, 349, 368, 369, 389, 424, 425, 486, 519, 540, 542, 545<br><br>Hearing Date:<br>October 18, 2023 at 10:30 a.m. (EDT) |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF**
**DEBTORS' PROPOSED SALE OF CERTAIN ASSETS**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") submit this reply (this "**Reply**") to the objections to the *Debtors' Motion for Entry of an Order (I) (A) Establishing Bidding and Auction Procedures, (B) Scheduling Certain Dates With Respect Thereto, (C) Approving the Form and Manner of Notice Thereof, (D) Approving Contract Assumption and Assignment Procedures, and (E) Granting Other Related Relief; and (II) (A) Authorizing the Debtors to Enter Into a Definitive Purchase Agreement and (B) Granting Other Related Relief* [Docket No. 16] (the "**Motion**").[2] In further support of the Motion and this Reply, the Debtors incorporate by reference the *Declaration of Ryan Hamilton in Support of the Debtors' Proposed Sale of Certain of the Assets* (the "**Hamilton Declaration**"), and *Declaration of Stephen S. Burns in Support of the Debtors' Proposed Sale of Certain Assets* (the "**Purchaser Declaration**"), filed concurrently herewith, and respectfully state as follows:

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corporation (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101). The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

AMERICAS 125334706

**PRELIMINARY STATEMENT**

1. The Debtors filed these Chapter 11 Cases, in part, to conduct an orderly and value maximizing sale of some, all, or substantially all of their assets. To accomplish this objective, the Debtors sought and obtained Court approval of bidding procedures, which were carefully crafted to meet the Debtors' goals. In compliance with the bidding procedures, Jefferies LLC ("**Jefferies**"), the Debtors' investment banker, distributed sales materials, established a data room and aggressively marketed the Debtors' assets, contacting 175 carefully selected prospective purchasers. Of these, 42 parties executed non-disclosure agreements to access confidential diligence materials, including the data room, and 9 parties submitted bids (or proposals). The Debtors and Jefferies engaged with these parties in a timely manner, including by responding to all diligence requests and negotiating with all potential bidders on an arms' length basis. At the conclusion of the sales process, the Debtors, in consultation with their professionals and the official committees appointed in these chapter 11 cases, determined in their business judgment that the bid submitted by LAS Capital, LLC (together with, its Assignee (as defined below), the "**Purchaser**")[3] was the highest and best bid, selected such bid as the prevailing bid, and executed an Asset Purchase Agreement with the Purchaser.

2. The Purchaser's Bid provides for (a) a $10 million payment in exchange for certain of the Debtors' assets and (b) the assumption of certain liabilities, including the assumption and assignment of certain executory contracts. Importantly, the Purchaser's Bid is the only "Qualified Bid" that was received by the Debtors and was heavily negotiated on an

---

[3] The Purchaser has notified the Debtors in writing that it will assign prior to Closing its rights under the Asset Purchase Agreement to its Affiliate (as defined in the Asset Purchase Agreement), LandX Motors Inc., a Delaware corporation (the "**Assignee**"). References herein to Purchaser shall also refer to the Assignee.

2

arms' length basis.[4]  Indeed, the Debtors negotiated several improvements to the Purchaser's bid prior to the execution of the Asset Purchase Agreement.  As a result of the foregoing, the Debtors believe that consummating the sale of assets set forth in the Asset Purchase Agreement will maximize the value of the Debtors' assets and is in the best interests of all parties in interest.

3. In short, the Purchaser's Bid was procured pursuant to a vigorous sales process and is the highest and best bid that was received.  As a result, the Debtors believe, in their reasonable business judgment, that the proposed sale to the Purchaser should be approved and respectfully request the entry of the order attached hereto as **Exhibit B** (the "**Proposed Sale Order**").[5]

## FACTUAL BACKGROUND

### A. The Sales Process

4. One of the Debtors' principal objectives in these Chapter 11 Cases has been to sell all or some of their assets in a competitive, value maximizing manner.  In order to achieve this objective, the Debtors filed the Motion on the first day of these cases to obtain Bankruptcy Court approval of certain procedures relating to the sale process (the "**Bidding Procedures**").  On July 27, 2023, the Court held a hearing to consider the Motion and continued the hearing to August 3, 2023.  On August 8, 2023, the Court entered an order approving the Motion (the "**Bidding Procedures Order**") [Docket No. 237].

---

[4] The Debtors understand that the majority equity holder of both LAS Capital LLC and LandX Holdings, Inc. ("**Holdings**") (the parent of the Assignee) is the former Chief Executive Officer and a former board member of the Debtors.  Further, one of the indirect managers of LAS Capital LLC and an equity holder of Holdings is the former Chief Financial Officer of the Debtors.  Nevertheless, such individuals have not held any management role in the Debtors since resigning from their positions with the Debtors in 2021 and are not current insiders of the Debtors.  They also had no influence or control over the Debtors during these Chapter 11 Cases, including the sale process.  As a result, the Debtors do not believe that the Purchaser qualifies as an insider.

[5] Blackline of the Proposed Sale Order against the form of such document previously filed on the docket is attached hereto as **Exhibit C**.

5. Pursuant the Bidding Procedures Order, the Debtors, with the assistance of Jefferies and other professionals, worked diligently to market the Debtors' assets. As part of the marketing process, Jefferies, on behalf of the Debtors, contacted 175 potential purchasers (collectively, the "**Interested Parties**"). Of those Interested Parties, 42 signed non-disclosure agreements (each, a "**NDA**") and conducted due diligence to explore potential transaction with the Debtors. To facilitate the conduct of due diligence and bid preparation by the Interested Parties, Jefferies established a virtual data room providing the Interested Parties with access to documents detailing Debtors' operations, assets, and other information the Interested Parties would need to submit a proposed bid. Additionally, Jefferies also facilitated calls between Interested Parties and the Debtors' management and tours of the Debtors' facilities.

6. Pursuant to the Bidding Procedures Order, the Debtors established September 8, 2023 as the initial Bid Deadline. The Debtors received, through Jefferies, bids or proposals from five parties (collectively, the "**Bidders**"), ahead of the initial Bid Deadline, including a bid from the Purchaser. The Debtors, in consultation with their advisors and with professionals for each of the Committees[6] appointed in the Chapter 11 Cases, diligently evaluated the submitted bids and proposals against the requirements for being a "Qualified Bid" set forth in the Bidding Procedures and discussed them with the respective Bidders. The Debtors, in consultation with their advisors and the Committees, determined that none of the bids received constituted a "Qualified Bid" pursuant to the Bidding Procedures. In addition, certain Interested Parties indicated that they needed additional time to submit bids to the Debtors. Accordingly, the Debtors, in consultation with their advisors and the Committees, determined that an extension of the Bid Deadline and certain other deadlines would provide Interested Parties additional time to

---

[6] The "**Committees**" are the Official Committee of Unsecured Creditors appointed on July 11, 2023 and Official Committee of Equity Security Holders appointed on September 7, 2023.

submit additional offers and allow the Debtors and their advisors to further negotiate with the Bidders to improve their bids. The Debtors filed a notice extending the Bid Deadline to September 18, 2023, continuing the Auction to September 27, 2023, and postponing the Sale Hearing to October 18, 2023 [Docket No. 418].

7. Thereafter, the Debtors, with the assistance of Jefferies, engaged with the Bidders to negotiate improvements to the terms of their respective bids. By the extended Bid Deadline, the Debtors received improved bids from certain Bidders, including the Purchaser. The Debtors also received two additional bids from Interested Parties. However, the Debtors, in consultation with their advisors and the Committees, determined that the bids still did not meet the requirements of Qualified Bids. Thus, on September 19, 2023, the Debtor filed a notice further extending the Bid Deadline to September 22, 2023, to continue their negotiations with the Bidders [Docket No. 434].

8. The ongoing negotiations with the Bidders, including the Purchaser, resulted in further improvements to the terms of certain bids, and two additional bids were received from Interested Parties by the extended Bid Deadline, resulting in a total of nine bids received. Nevertheless, the Debtors and their professionals did not believe that any of the bids received constituted a Qualified Bid and believed that it was appropriate to provide additional time to develop potential Qualified Bids. On September 26, 2023, following consultation with each of the Committees, the Debtors filed a notice further extending the Bid Deadline to September 28, 2023 and continuing the Auction to September 29, 2023 [Docket No. 475]. Following further negotiations with the Purchaser and discussions with certain other parties submitting bids, and after extensive analysis, the Debtors, in consultation with the Committees, determined in their business judgment that the Purchaser's Bid was both the only Qualified Bid and the highest and

best of the bids submitted.  Because the Purchaser's Bid was the only Qualified Bid, the Debtors, in their business judgment and consultation with their advisors and the Committees, selected the Purchaser as the Successful Bidder and cancelled the Auction.  The Debtors also executed an Asset Purchase Agreement with the Purchaser, which has been filed with the Court as described below.

### B. The Purchaser's Bid

9. On September 29, 2023, the Debtors filed a *Notice of (I) Selection of Successful Bidder, (II) Cancellation of Auction, and (III) Sale Hearing* (the "**Notice of Successful Bidder**") [Docket No. 488].  The notice disclosed the selection of the Purchaser as the Successful Bidder, subject to Court approval, and attached both a fully-executed Asset Purchase Agreement[7] and proposed form of order approving the Asset Purchase Agreement.  The Notice of Successful Bidder also notified parties that the Bankruptcy Court would hold a hearing (the "**Sale Hearing**") on October 18, 2023 at 10:30 a.m. (ET) to consider approval of the sale, the Asset Purchase Agreement and the Proposed Sale Order.

10. Pursuant to the Asset Purchase Agreement, the Purchaser has agreed to acquire specified assets of the Debtors related to the design, production and sale of electric light duty vehicles focused on the commercial fleet market (collectively, the "**Assets**") free and clear of liens, claims, encumbrances, and other interests, and assume certain specified liabilities of the Selling Entities (collectively, the "**Liabilities**" and such acquisition of the Assets and assumption of the Liabilities together, the "**Transaction**").  The total cash purchase price is $10 million (the "**Purchase Price**").[8]  The Debtors are responsible for paying cure amounts in respect of the

---

[7] If any party in interest wishes to review the disclosure schedules of the Asset Purchase Agreement, the Purchaser may provide such access subject to execution of a mutually agreeable confidentiality agreement.

[8] All descriptions of the Asset Purchase Agreement are qualified in their entirety by the terms of the Asset Purchase Agreement, filed with the Court on September 29, 2023 [Docket No. 488-1].

assumed executory contracts originally set forth in the schedules to the Asset Purchase Agreement. The Debtors do not believe that any material cure amounts are outstanding.[9]

11. The Asset Purchase Agreement contains customary representations, warranties, and covenants of the parties for a transaction involving the acquisition of assets from a debtor in bankruptcy. None of the representations, warranties or pre-closing covenants contained in the Asset Purchase Agreement survive the Closing nor does the Asset Purchase Agreement provide for indemnification for any breach of such representations, warranties or covenants. The completion of the Transaction is subject to a number of customary conditions, which, among others, include the entry of an order of the Bankruptcy Court authorizing and approving the Transaction, the performance by each party of its obligations under the Asset Purchase Agreement and the accuracy of each party's representations.

12. The Sale Order also contains limited releases by the Debtors in favor of the Purchaser (including the Assignee) and certain related parties, including Mr. Steven S. Burns and Mr. Julio Rodriguez (respectively, the Debtors' former CEO and CFO), relating to the Transaction. Importantly, the Sale Order does **not** release any claims that the Debtors may have against Mr. Burns or Mr. Rodriguez (or any other party) arising from their former roles as officers and/or directors of the Debtors.

13. The Debtors may terminate the Asset Purchase Agreement if it is breached by the Purchaser and, in certain circumstances, the Purchaser will be required to pay the Debtors a termination fee of $4 million. *See* Asset Purchase Agreement §§ 3.2(b), 9.2. Mr. Burns has guaranteed the obligations of the Purchaser under the Asset Purchase Agreement, subject to a

---

[9] Elaphe Propulsion Technology Ltd. ("**Elaphe**") has objected to the Debtors' proposed cure amount in connection with that certain License Agreement dated March 16, 2020, as amended. Although the parties have not reconciled the cure amount, the Debtors and Elaphe are continuing to work to consensually resolve the appropriate cure amount. The Debtors are hopeful that the parties will reach agreement on the issue prior to the Sale Hearing.

cap on such guarantee equal to the Purchase Price plus expenses incurred enforcing the terms of the Asset Purchase Agreement.

### C. Good Faith

14. Mr. Burns, an individual, is the guarantor of certain obligations of the Purchaser under the Asset Purchase Agreement, and the majority equity holder of both LAS Capital LLC and Holdings. Mr. Burns is also the founder and former Chief Executive Officer of Lordstown Motors Corp. ("**LMC**") and was a member of the board of directors of the Debtors. Mr. Rodriguez, one of the indirect managers of LAS Capital LLC and an equity holder of Holdings, is a former Chief Financial Officer of the Debtors. Mr. Burns and Mr. Rodriguez each resigned from their respective positions with the Debtors on as of June 14, 2021, and, since such time, each ceased being employed by, and has had no management role with, the Debtors. Further, the Purchaser is not an equity holder of, nor a lender to, any of the Debtors. Based on the foregoing, the Debtors do not believe that any of the Purchaser, Mr. Burns or Mr. Rodriguez are insiders of the Debtors.

15. As set forth with greater specificity in the Hamilton Declaration, the negotiations concerning the sale and the Asset Purchase Agreement were extensive, hard fought and conducted at arms' length and in good faith. Without limiting the foregoing, as further noted the various declarations filed in support of this Motion, there was no collusive conduct between the Purchaser and any person or entity, including the Debtors, with respect to the proposed sale and there are no agreements between the Purchaser, Mr. Burns and Mr. Rodriguez, on one hand, and the Debtors, on the other, except for those that have been filed with the Court.

AMERICAS 125334706

### D. Notice

16. The Debtors provided notice of the Motion, the Bidding Procedures, the Auction, the Sale Hearing, the sale, and the relevant objection deadlines and continuances, the Assumption and Assignment Procedures, executory contracts and unexpired leases that the Purchaser may assume and assign, with proposed cure amounts, and the selection of the Purchaser as the Successful Bidder. [Docket Nos. 100, 270, 350, 353, 369, 415, 530, 547, and 548]. The *Notice of Auction and Sale Hearing* [Docket No. 241] (the "**Sale Notice**") and Notice of Successful Bidder were served on all stakeholders and interest holders. [Docket Nos. 270, 353, 547]. With respect to entities whose identities are not reasonably ascertained by the Debtors, the Debtors also published the Sale Notice in the national edition of *The Wall Street Journal* on August 11, 2023, and *Automotive News* on August 14, 2023, and posted the Sale Notice on the Debtors' restructuring website, each of which were sufficient and reasonably calculated under the circumstances to reach such entities. [Docket No. 344].

17. On October 13, 2023, the Debtors provided notice of LAS Capital LLC's intended assignment of its rights under the Asset Purchase Agreement to LandX to certain contract counterparties, whose executory contracts may be assumed and assigned to the Purchaser pursuant to the Asset Purchase Agreement [Docket No. 553]. Those contract counterparties also had an opportunity to object to the intended assignment to LandX.

### OBJECTIONS

18. The Debtors received only a few limited objections to the sale. Certain additional parties did not object to the sale, but, rather, to the Debtors' proposed cure amounts. As described below, the Debtors have fully resolved all but four of the sale and cure objections, with the resolutions described in the chart attached hereto as **Exhibit A** and on the terms set forth in

the revised Proposed Sale Order. The Debtors are in the process of resolving the remaining reservation of rights to the proposed cure amount with respect to the Elaphe license agreement, and the Debtors believe that Elaphe does not object to entry of the Sale Order, with the understanding that all rights of the Debtors and Elaphe with respect to the cure amount are reserved. Additionally, the Debtors are negotiating in good faith with the Northern Ohio Securities Litigation Class Action Plaintiffs to resolve the *Lead Plaintiff's Limited Objection to Sale Approval* [Docket No. 425] (the "**Lead Plaintiff Objection**"), and the *Joinder to Lead Plaintiff's Limited Objection to Sale Approval* [Docket No. 486] (the "**RIDE Joinder**") filed by Bandol Lim, Nico Gatzaros, and Richard Dowell (the "**RIDE Investor Group**"). The parties are working towards consensual language to be included in the Proposed Sale Order that would resolve the Lead Plaintiff Objection and the RIDE Joinder.

19. Accordingly, the single outstanding objection to the sale is the *Objection by the United States to the Debtors' Sale Motion* [Docket No. 545] (the "**NHTSA Objection**") by the United States, on behalf of the Department of Transportation ("**DOT**") and its National Highway Traffic Safety Administration ("**NHTSA**"). The NHTSA Objection argues that the sale should not be approved to the extent that it provides for the assumption, sale or assignment of any federal grants, grant funds, contracts, property, leases, agreements, certifications and other federal interests. The NHTSA Objection also seeks to prevent the sale to the Purchaser from broadly affecting any other federal rights. The NHTSA Objection also indicates that the inclusion of certain language in the Proposed Sale Order (the "**NHTSA Language**") would resolve the NHTSA Objection. The NHTSA Objection should be overruled, because, as detailed below, the sale to the Purchaser does not impact the concerns articulated in the NHTSA Objection. Specifically, the Debtors are not transferring any federal contracts and are not selling

AMERICAS 125334706

any interest in vehicles owned by third parties. Moreover, the NHTSA Language was already included in the proposed sale order that the Debtors filed with the Notice of Successful Bidder and is still included in the revised version attached as Exhibit B hereto, but each with additional language that clarifies that the inclusion of the NHTSA Language does not imply or constitute an admission that the matters set forth are applicable to the Sale or the Purchased Assets (effectively reserving all rights of all parties as to these matters).

## **REPLY**

### A. The Proposed Sale Is a Proper Exercise of the Debtors' Business Judgment

20. Under section 363(b)(1), a debtor is permitted to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in this district approve asset sales where the sale "constitutes a reasonable and sound exercise of the Debtor's business judgment[.]" *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC), 2007 WL 7728109, at *5 (Bankr. D. Del. Aug. 15, 2007); *In re Montgomery Ward Holding Co.*, 242 B.R. 147, 153 (D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test.'").

21. The Third Circuit has made clear that a debtor's business judgment is entitled to substantial deference. *See, e.g.*, *Stanizale v. Nachtomi* (*In re Tower Air, Inc.*), 416 F.3d 229, 234 (3d Cir. 2005) (indicating the "business judgment rule is a presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest") (internal quotations omitted); *see also, In re Metaldyne Corp.*, 409 B.R. 661, 667 (Bankr. S.D.N.Y. 2009) (emphasizing that "the Court should not substitute its business judgment for that of the

Debtors"). "Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task" that may only be accomplished "by showing either irrationality or inattention" so as to establish "that a decision was so egregious as to constitute corporate waste." *In re Tower Air, Inc.*, 416 F.3d at 238-39.

22. An asset purchaser is also required to act in good faith during the court-approved sale proceedings. *In re Abbott Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986). A purchaser acts in good faith by not taking any action that "involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.*

23. The Debtors have met the standard required for approval of the Transaction and the entry of the Proposed Sale Order. The Debtors have exercised their business judgment in a fair, reasonable and responsible manner throughout the sale process. At the beginning of the Chapter 11 Cases, the Debtors sought and obtained the entry of the Bidding Procedures Order and retained Jefferies to serve as investment banker. Thereafter, the Debtors established a data room, instructed Jefferies to distribute sales materials to a large number of parties, provided diligence in a timely manner, and negotiated at arms' length and in good faith to obtain the highest and best bid possible under the circumstances. A detailed description of the Debtors' marketing activities is detailed in the Hamilton Declaration. At the conclusion of this process, it was clear that the Purchaser's Bid was the highest and best bid. Indeed, despite substantial efforts by the Debtors to generate other bids, the Purchaser's Bid was ultimately the only "Qualified Bid" received.

24. Importantly, the Transaction will generate $10 million in proceeds for the Debtors and provides for the assumption of certain liabilities that would otherwise be owed by the

AMERICAS 125334706

Debtors.  The Asset Purchase Agreement also preserves claims against the former directors and officers that are principals of the Purchaser to the extent the claims are not related to the sale transaction, and does not contain any indemnification obligations for the Debtors.  The alternative is for the Debtors to liquidate their assets for far less consideration.  Under these circumstances, the Transaction should be approved and the Proposed Sale Order should be entered.

B. **The Proposed Sale was Negotiated in Good Faith**

25. The Purchaser is entitled to a finding that the Transaction was negotiated in good faith.  As disclosed in the Notice of Successful Bidder and the Buyer Declaration, the majority equity holder of LAS Capital LLC and Holdings is Mr. Burns, the founder and former Chief Executive Officer and a former member of the board of directors of the Debtors, and one of the indirect managers of LAS Capital LLC and an equity holder of Holdings is Mr. Rodriguez, the former Chief Financial Officer of the Debtors.  Both Mr. Burns and Mr. Rodriguez resigned from their respective positions, as of June 14, 2021, and each ceased being employed by and has no management role with the Debtors since that time.  *See* Hamilton Declaration at ¶¶ 14; Purchaser Declaration at ¶¶ 5-11.  In connection with the Debtors' sale process, the Purchaser, including Mr. Burns and Mr. Rodriguez, have not had and do not currently have any affiliation with the Debtors, other than as a third-party bidder in the Debtors' Court-approved sale process.  *See* Hamilton Declaration at ¶¶ 14-17; Purchaser Declaration at ¶¶ 5-11.

26. Even though Mr. Burns and Mr. Rodriguez were former director and officers of LMC, they have no current management role with the Debtors and have no control or influence on the Debtors' decisions.  The Purchaser, Mr. Burns and Mr. Rodriguez, are no different than any other third-party buyer in the Court-approved sale process.  Additionally, the terms of the

Asset Purchase Agreement and Proposed Sale Order do not release any claims against former directors and officers for their prepetition actions. Moreover, the Debtors have consulted with each of the Committees throughout the sale process, and each Committee has advised the Debtors, through its respective counsel, that it supports the proposed Transaction with the Purchaser on the terms set forth in the Asset Purchase Agreement. Tellingly, the parties in interest that have objected to the Motion do not rebut the Debtors' business judgment or argue that the sale is not an arm's length transaction.

27. The Debtors seek authorization to consummate the arm's-length transaction with the Purchaser that represents the Debtors' best option to maximize value of the estates for the benefit of all stakeholders. The proposed sale to the Purchaser is a sound exercise of the Debtors' reasonable business judgment. As such, the Debtors respectfully submit that the Court enter the Proposed Sale Order and approve the Asset Purchase Agreement.

### C. The NHTSA Objection Should be Overruled

28. Although the Debtors and the Purchaser have diligently sought to negotiate consensual language to preclude an objection, the United States, on behalf of the DOT and NHTSA, has objected to the Transaction based on alleged concerns regarding the purported extinguishment of, or otherwise prejudicial impact on, governmental interests. None of these concerns are applicable here. First, under the Asset Purchase Agreement, the Purchaser is purchasing the specified Purchased Assets; the Purchaser is **not** purchasing the Debtors' operating business as a going-concern or any vehicles that are in the hands of third parties.[10]

29. The NHTSA Objection focuses on the fact that the Endurance trucks are currently the subject of recalls. To the extent the United States believes there are recalls or other related

---

[10] To the extent the Purchaser does purchase Endurance trucks from a third party, it will be liable for all customer warranty, product liability and recall obligations. *See* Asset Purchase Agreement Sec. 2.3(a), 2.4.

liabilities with respect to the Endurance trucks (or any of the other assets of the Debtors), the DOT and NHTSA may, as they acknowledge, file a proof of claim against the Debtors prior to the Governmental Bar Date.

30. Moreover, nothing in the Proposed Sale Order impairs the DOT's or NHTSA's ability to enforce regulations with respect to pending recalls nor does it impact their police or regulatory powers with respect to vehicles that may be produced by the Purchaser in the future. Paragraph 61 of the Proposed Sale Order specifically protects the governmental unit's police or regulatory powers with respect to the Purchaser:

> Nothing in this Order or the Asset Purchase Agreement
>
> (i) releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability of an entity to a governmental unit (as defined in section 101(27) of the Bankruptcy Code (a "**Governmental Unit**")) under any police or regulatory statutes or regulations that such entity would be subject to as the owner or operator of the Purchased Assets after the Closing; _provided, however_, for the avoidance of doubt, nothing herein shall subject the Buyer to any liability to a Governmental Unit for penalties for days of violation prior to the Closing, response costs incurred by a Governmental Unit prior to the Closing, or other matters not related to conditions existing on or after the Closing that require remediation or compliance under applicable non-bankruptcy law by the owner or operator of the applicable Purchased Assets regardless of who is responsible for the condition or when it arose. Nothing in this paragraph should be construed to create for any Governmental Unit any substantive right that does not already exist under law;
>
> (ii) authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law; or
>
> (iii) divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

31. However, it seems that the United States wants the ability to pursue claims against the Purchaser related to the Endurance Trucks manufactured by the Debtors, notwithstanding that the Purchaser is not purchasing these vehicles or purchasing an operating business. The United States cites to several cases analyzing issues under labor law to argue that the sale order cannot extinguish successor liability. However, these cases focus on labor law (an issue that is not relevant to this sale) and are therefore, inapposite. Moreover, they do not stand for the fact that a bankruptcy sale order cannot extinguish prepetition liabilities; rather they focus on the post-transaction conduct of the buyer. In *In re CCX, Inc.* No. 22-01563 (GBW) (D. Delaware Sept. 18, 2023), the court held that the sale order <u>did</u> extinguish pre-sale liabilities, including the liabilities related to the existing collective bargaining agreement, but that the buyer's <u>post-petition</u> conduct subjected it to compliance with labor law requirements, which are unique and far broader with respect to successor liability. *Id.* at 2-5; 20. *See also Overstreet v. Apex Linen Holdings, LLC* 618 F. Supp. 3d 1014, 1027 (D. Nev. 2022) ("Successorship in the 'labor law context is much broader than the strict corporate-law sense of successorship.' Thus, a bankruptcy court's order 'might discharge duties that arose before the bankruptcy petition, but a successor's post-sale conduct can create a new duty to bargain' under labor law.") (internal citations omitted). To the extent that the Purchaser engages in business or other activities following the sale that give rise to recall or other government rights or concerns against the Purchaser, there is nothing in the Proposed Sale Order that would extinguish the Purchaser's obligations with respect thereto.

32. Second, as the United States is aware, the Debtors are not assigning or transferring any contract with the federal government to the Purchaser. As such, the assumption and assignment of the Assumed Contracts to the Purchaser would have no impact on DOT or

NHTSA. Third, the Proposed Sale Order limits its effects on governmental units "[t]o the extent provided by section 525 of the Bankruptcy Code," and does not exceed the scope of section 525. And lastly, the limited mutual releases by the Debtors and the Purchaser with respect to the Transaction, as reflected in the Proposed Sale Order, and the Debtors' requested waiver of Bankruptcy Rules 6004(h) and 6006(d) do not prejudice NHTSA or the United States. But, any further delays of the closing of the Sale, would be to the detriment of the Debtors, their estates and creditors in these Chapter 11 Cases and cause the Debtors to incur more costs (*e.g.*, holdover rent), which could be material. Moreover, the Asset Purchase Agreement contains an outside closing date of October 31, 2023.

33. The Debtors submit that the NHTSA Objection should be overruled for the reasons set forth above alone. It should also be overruled because the Proposed Sale Order submitted to the Court for entry (as well as the version previously filed with the Court) already includes the NHTSA Language that the NHTSA Objection indicates would resolve the objection, but with clarifying language intended to not create any negative inferences against any party and preserve the rights of all parties. A comparison between the language included in the Proposed Sale Order against the NHTSA Language is as follows:

~~Notwithstanding~~54. To the extent applicable, notwithstanding any provision in the Sale Motion, the Asset Purchase Agreement, this Order, and any implementing sale documents (collectively, "Sale Documents"), nothing shall: (1) authorize the assumption, sale, assignment or other transfer to the ~~Purchaser~~Buyer of any federal (i) grants, (ii) grant funds, (iii) contracts, (iv) property, including but not limited to, intellectual property and patents, (v) leases, (vi) agreements, (vii) certifications, (viii) applications or other interests of the federal government (collectively, "Federal Interests") without compliance by the Debtors and the ~~Purchaser~~Buyer with all terms of the Federal Interests and with all applicable non-bankruptcy law; (2) be interpreted to set cure amounts or to require the government to novate, approve or otherwise consent to the assumption, sale, assignment or other transfer of any Federal Interests; (3) waive, alter or otherwise limit the United States' property rights, including but not limited to, inventory, inventions, records, patents, intellectual property, licenses, and data; (4) affect the setoff or recoupment rights or defenses of a governmental unit (as defined in 11 U.S.C. § 101(27)); (5) authorize the assumption, transfer, sale or assignment of any assets subject to the jurisdiction of federal non-bankruptcy recall laws without the assumption by the ~~Purchaser~~Buyer of all recall obligations required, but not yet performed by the Debtors at the time of such assumption, transfer, sale or assignment, including recall obligations that arise after the assumption, transfer, sale or assignment of such assets; (6) authorize the assumption, transfer, sale or assignment of any governmental unit's (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements, obligations and approvals under non-bankruptcy laws; (7) release, nullify, preclude or enjoin the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the manufacturer, owner or operator of property; (8) confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); (9) divest any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order; or (9) expand the scope of 11 U.S.C.§ 525. For the avoidance of doubt and without limiting the foregoing, notwithstanding any provision in the Sale Documents, nothing shall impair, affect, alter or modify any statutes (including, but not limited to, Title 49 of the United States Code), regulations, rules, guidelines, standards, policies and procedures of the Department of Transportation, including but not limited to, the National Highway Traffic Safety Administration; provided, however, that nothing contained herein shall be an admission or acknowledgment that any of the foregoing reservations of rights or remedies are applicable to the Sale Transaction or the Purchased Assets.

34.     As indicated above, the only apparent material differences between the language of the Proposed Sale Order and the NHTSA Language is that the Proposed Sale Order includes (a) language clarifying that the NHTSA Language applies "[t]o the extent applicable" and (b) language stating that nothing is an admission or acknowledgment that any of the reservations or remedies are applicable to the Sale Transaction or the Purchased Action. This language–which is critical to the Purchaser's agreement to include the NHTSA Language–is intended to clarify that the Purchaser is reserving all rights with respect to the matters set forth therein and avoids any potential negative inference that each of the matters listed in the NHTSA Objection is applicable to the Sale Transaction or the Purchased Assets. Such a reservation of rights is

18

reasonable (particularly in light of the fact that most of the language is not implicated by the proposed transaction), and the NHTSA Objection should be overruled.

35.    The Debtors believe the parties will be able to reach mutually agreeable language prior to the hearing on the Motion.  If the parties are unable to reach a resolution, the Debtors will seek the Court's adjudication at the hearing on the Motion.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Sale Order, in the form attached hereto as **Exhibit B**, granting the relief requested in the Motion, and granting such other and further relief as the Court deems just and proper.

Dated: October 16, 2023

Respectfully submitted,

/s/ *Morgan L. Patterson*

**WOMBLE BOND DICKINSON (US) LLP**

Donald J. Detweiler (Bar No. 3087)
Morgan L. Patterson (Bar No. 5388)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile:  (302) 252-4330
don.detweiler@wbd-us.com
morgan.patterson@wbd-us.com

*Proposed Counsel to the Debtors and Debtors-in-Possession*

**WHITE & CASE LLP**

Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
Fan B. He (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
tlauria@whitecase.com
mbrown@whitecase.com
fhe@whitecase.com

David M. Turetsky (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
david.turetsky@whitecase.com

Jason N. Zakia (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
jzakia@whitecase.com

Roberto Kampfner (admitted *pro hac vice*)
Doah Kim (admitted *pro hac vice*)
RJ Szuba (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700
rkampfner@whitecase.com
doah.kim@whitecase.com
rj.szuba@whitecase.com

*Co-Counsel to Debtors and Debtors-in-Possession*