## Exhibit D

**Foxconn Complaint**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Lordstown Motors Corp., *et al.*,[1] | Case No. 23-10831 |
| Debtors. | (Joint Administration Requested) |
| Lordstown Motors Corp. and Lordstown EV Corporation, | Adv. Pro. No. 23-_____(___) |
| Plaintiffs, | |
| -against- | |
| Hon Hai Precision Industry Co., Ltd (a/k/a Hon Hai Technology Group), Foxconn EV Technology, Inc., Foxconn Ventures Pte. Ltd., Foxconn (Far East) Limited, and Foxconn EV System LLC | |
| Defendants. | |

## ADVERSARY COMPLAINT

Lordstown Motors Corp. ("**Lordstown**" or "**Company**") and Lordstown EV Corporation (collectively, "**Plaintiffs**"), as debtors and debtors in possession and the plaintiffs in the above-captioned adversary proceeding, allege for their Adversary Complaint, upon knowledge of their own acts and upon information and belief as to other matters, as follows:

---

[1] The debtors and the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corp. (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101) (collectively, the "**Debtors**"). The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

**NATURE OF THE ACTION**

1.      This case arises from, and is based on, the fraudulent conduct of one of the world's largest multinational manufacturing companies, which, over time, had the intended effect of destroying the business of an American start-up.  Promising a grandiose collaboration as the premise for stripping away Plaintiffs' unique and most valuable asset, Defendant Hon Hai Precision Industry Co., Ltd. ("**Foxconn**") then embarked on a course of conduct, which is littered with a series of broken promises and repeated refusals to take any action in furtherance of the initially proffered venture, that bears all the hallmarks of bad faith, fraud and misrepresentation. This course of conduct is nothing new for Foxconn and its affiliates—their modus operandi in the United States is to overpromise and under or never deliver.

2.      Plaintiffs, debtors in possession in the above captioned case, are in the business of developing, engineering, launching, and selling all-electric vehicles to commercial fleet customers.  Lordstown was formed in 2018 to develop an all-electric full-size pickup truck, the Endurance, for the North American market, the first of its kind.  The Debtors had advanced technology and an innovative product design that they believed would revolutionize the commercial pickup truck market for the modern EV age.  In 2019, the Debtors purchased from General Motors a 6.2 million square foot production facility in Lordstown, Ohio, which is one of the largest automotive assembly plants in North America.  Upon doing so, the Debtors' prospects were so exciting and attractive that it was able to become a publicly-traded company with an equity market capitalization of over $5.3 billion.

3.      But like all start-ups, the Debtors faced daunting challenges and would need help making their vision a reality.  That is why, beginning in 2021, the Debtors forged what they thought would be a mutually beneficial partnership with Foxconn, a global manufacturing

behemoth with over $215 billion in annual revenue.  It brought deep resources and massive economies of scale, as well as ambitions to grow into the electric vehicle sector, to the partnership. The deal was to combine Foxconn's resources and efficiencies with the Debtors' innovation, technology, manufacturing plant and people to jointly develop the next generation of electric vehicles.  Based on Foxconn's repeated assurances, the Debtors materially and permanently changed their entire business model to support deep integration with Foxconn and its self-described "EV Ecosystem."

4.       But it turns out that Foxconn was not the partner that it promised to be. Instead, it used various assurances of support for the Endurance pick-up truck and future joint product development to secure ownership of the Debtors' unique and most valuable asset, its manufacturing plant, and to transfer highly talented and experienced manufacturing and operational employees to the Foxconn team.  But once it secured ownership of the plant and obtained a workforce to go with it, Foxconn refused to honor its obligations.  Over a period of over 18 months, Foxconn continuously misled the Debtors about its own ability or willingness to support the Endurance and collaborate and support future product development, while at the same time causing the Debtors to devote substantial resources to the same cause.

5.       In the most recent transaction with the Debtors, Foxconn caused its affiliate, Defendant Foxconn Ventures Pte. Ltd. ("**FVP**"), to promise to invest approximately $170 million of additional equity capital in the business, and to work closely with the Debtors on a new vehicle development platform.  It did neither.  In fact, within one week after the investment agreement's execution, Foxconn directed the Debtors to abruptly drop the vehicle program then under development with SoftBank, a multibillion-dollar technology investor and a substantial shareholder in FVP, and move to a completely different program.  Then, for almost six months

3

Foxconn failed to engage on the new vehicle platform and programs, after initially requesting that this be the focus instead of the SoftBank program.  Then, after the six-month period, Foxconn caused FVP to refuse to fund its remaining equity investments.  Instead, Foxconn caused FVP to wrongfully purport to terminate the investment agreement, which it subsequently admitted it had no right to do.

6.      From the very beginning, Foxconn continually moved the goal posts on development of the Debtors' next generation products, constantly shifting the nature of the product, failing to meet funding commitments, and absolutely refusing to engage with the Debtors on any of the various initiatives that Foxconn directed the Debtors to pursue and purported to support.

7.      Foxconn consistently failed to honor its agreements and caused its affiliates and instrumentalities to do the same.  After getting the valuable assets it desired upfront, it then sabotaged the Debtors' business, starving it of cash and causing it to fail.  Instead of building a thriving business for the benefit of all Lordstown's stakeholders, Foxconn maliciously and in bad faith destroyed that business, costing Lordstown's creditors and shareholders billions.

8.      While the damage Foxconn wrought cannot be undone, it can be made to pay for its wrongdoing.  This lawsuit will ensure that it does.

## JURISDICTION AND VENUE

9.      This adversary proceeding arises in and relates to the Debtors' cases pending before this Court under chapter 11 of the Bankruptcy Code.

10.      The Court has jurisdiction to consider this adversary proceeding under 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States*

4

*District Court for the District of Delaware*, dated February 29, 2012.  This Court has subject matter jurisdiction over the claims against Defendant under 28 U.S.C. §§ 157 and 1334.

11.    This is a core proceeding under 28 U.S.C. § 157(b), and pursuant to Bankruptcy Rule 7008, Lordstown consents to the entry of a final order by the Court in connection with this adversary proceeding to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

12.    Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

13.    Lordstown is a Delaware corporation.  The Company develops, engineers and sells all-electric vehicles primarily to commercial fleet customers.

14.    Lordstown EV Corporation is a Delaware corporation and an affiliate of Lordstown.

15.    Defendant Foxconn is a global manufacturing company based in Taiwan.

16.    Defendant Foxconn EV Technology, Inc. ("**Foxconn EV Technology**") is an Ohio corporation and an affiliate of Foxconn.

17.    Defendant FVP is a private company limited by shares established under the laws of Singapore and an affiliate of Foxconn.  SoftBank Group Corp. owns a significant minority ownership position in FVP.

18.    Defendant Foxconn (Far East) Limited is a Cayman Islands exempted company.

5

19.     Defendant Foxconn EV Systems LLC (together with Foxconn, Foxconn EV Technology, FVP and Foxconn (Far East) Limited, the "**Defendants**") is an Ohio limited liability company.

## FACTUAL BACKGROUND

### The Company

20.     The Company was founded for the purpose of developing, engineering, manufacturing and selling electric vehicles primarily to commercial fleet customers.   The Company's initial vehicle, the Endurance, is a unique full-size, all-electric pickup truck.   The Company initially planned that the Endurance would launch for sale in 2021.

21.     As is typical for most start-up businesses, the Company experienced some initial challenges that delayed its initial product launch.   That is when the Company began to look for a strategic partner.   This partner would help the Company address its funding needs but, just as importantly, it could help the Company improve the cost structure of the Endurance and develop a scalable vehicle development platform for the next generation of electric vehicles produced by the Company.

### The Company Begins a Partnership with Foxconn

22.     After exploring a number of potentially attractive options, in September 2021, the Company decided to forge a partnership with Foxconn.   While this ultimately turned out to be a mistake based on Foxconn's subsequent conduct, there were many good reasons for the Company to pursue this path at the time.   Foxconn is the world's largest electronics manufacturer.   In 2022 Foxconn achieved total revenues of $215.84 billion.   Foxconn describes itself as the leading technological solution provider, and states that it continuously leverages its expertise in software and hardware to integrate its unique manufacturing systems with emerging technologies.

Foxconn had also declared its intention to significantly expand its capabilities in new technologies, including the development of electric vehicles, which it said was key to driving its long-term growth strategy.  To that end, Foxconn established the Mobility-in Harmony ("**MIH**") Consortium, designed to bring together the talent and resources of hundreds of automotive companies to accelerate EV innovation and vehicle development through open collaboration.  Foxconn described electric vehicles as "one of the Company's main growth drivers in the future" and publicly disclosed aggressive targets to gain 5% of overall EV market share by 2025 and produce 500,000 to 750,000 EVs per year.  Foxconn represented that its scale and expertise were to be of great benefit to the Company.  By pairing the Company's innovation, technology, manufacturing plant and outstanding people with Foxconn's deep resources, manufacturing expertise and supply chain capabilities, the Company would thrive.

23.    On September 30, 2021, the Company and an affiliate of Foxconn entered into an Agreement in Principle (the "**AIP**," attached as **Exhibit A**) to form a deep partnership and work jointly on electric vehicle programs.  The AIP contemplated that Foxconn and the Company would (a) enter into an asset purchase agreement to buy the Company's manufacturing plant in Lordstown, Ohio (the "**Plant APA**," attached as **Exhibit B**), (b) enter into a manufacturing supply agreement (the "**Contract Manufacturing Agreement**" or "**CMA**," attached as **Exhibit C**), and (c) jointly collaborate on the development of future vehicle programs.  The AIP was crucial to the Company's go-forward plan, as selling the Plant would bring in necessary capital while lowering go-forward operational costs.  The Company was also in need of a strategic partner to assist in bringing new vehicles to market, and Foxconn, one of the world's leading manufacturers, was eager to fill this role.  The Company also relied on the AIP and the new business model that it would enable to recruit new talent that believed in Foxconn's vision for the EV industry.

7

24.     Foxconn touted the benefits of this deal to the Company and to the public. On September 30, 2021, Foxconn Chairman Young Liu said he had "high expectations through this partnership that we will be able to successfully integrate our resources with Lordstown Motors. In addition to achieving the goal of moving ahead our timeline to establish electric vehicle production capacity in North America, it also reflects Foxconn's flexibility in providing design and production services for different EV customers." Chairman Liu added that "[t]his mutually beneficial relationship is an important milestone for Foxconn's EV business and our transformation strategy. I believe that the innovative design of the Endurance pickup truck, with its unique hub motors, delivers an advantageous user experience and has manufacturing efficiencies. It will undoubtedly thrive under our partnership and business model." Foxconn later expressed hope that it could create "a trillion-dollar business opportunity for electric vehicles."

25.     On the day the parties' agreement was announced, Lordstown's stock jumped significantly. But skeptics of the deal expressed concern that Foxconn was getting the manufacturing plant too cheap—one noted analyst stated that "[t]he agreed plant value is roughly one-fifth the value we had assumed in our prior price target"—and suggested that Foxconn would not actually follow through on its product development and other commitments. Unfortunately, the deal's skeptics turned out to be right.

26.     In October 2021, Foxconn made its first investment in the Company, purchasing through an affiliate 7.2 million shares of the Company's Class A common stock ("**Common Stock**") for approximately $50 million.

27.     In early November 2021, representatives of the Company met with senior Foxconn executives to discuss Lordstown's proposed product portfolio leveraging. Foxconn's MIH platform, including a C/D-segment van, a C-segment pickup truck, and a C-segment chassis

8

cab.  The Foxconn team, including Chairman Liu, expressed support for the proposal.  Had Foxconn continued with that support and backed it with any meaningful funding, these products could have been completed and launched by late 2024.  This timing was critical for partnering with potential fleet customers who were in discussions with the Company.

28.    On November 10, 2021, Lordstown EV Corporation and two affiliates of Foxconn, Foxconn EV Technology and Foxconn (Far East) Limited, executed the Plant APA. Under the Plant APA, the Company's massive and valuable manufacturing plant would be sold to Foxconn EV Technology, subject to several conditions, for a fraction of its replacement cost.  In addition, hundreds of highly talented and experienced manufacturing and operational employees at the plant would become employees of Foxconn EV System LLC.

29.    It is important to note that this sale was not a stand-alone transaction.  The Company would never have entered into the Plant APA if not for Foxconn's promises that this was simply an initial step in the process of repositioning the Company's business around the Foxconn partnership.  Consistent with this approach, the Plant APA provided that the parties would use commercially reasonable efforts to, among other things, enter into the CMA (by April 30, 2022) and a joint product development arrangement through a joint venture (the "**JV**"). Specifically, the Plant APA contains the following covenant in Section 4.1(k):

> Prior to the Closing, Purchaser [Foxconn EV Technology] and Seller [Debtor] shall use their commercially reasonable efforts to enter into a joint venture agreement (the "Joint Venture Agreement") pursuant to which: (A) Seller and Purchaser shall allocate engineering resources to jointly design, engineer, develop, validate, industrialize, and launch vehicle programs ("CV Programs") for the commercial vehicle market in North America and internationally using Purchaser's MIH open platform; (B) Seller shall have the right to commercialize CV Programs in North America, subject to satisfying reasonable volume requirements and other customary conditions as well as the payment of reasonable and mutually agreed-upon licensing fees to Purchaser; (C) Purchaser shall have the right to manufacture any CV Vehicles manufactured in North America at the Facility, subject to negotiation and execution of a competitive contract manufacturing agreement; (D) Purchaser shall have the right to commercialize CV Programs outside North America,

subject to satisfying reasonable volume requirements and other customary conditions as well as the payment of reasonable and mutually-agreed upon licensing fees to Seller. In connection with or prior to the execution of the Joint Venture Agreement, Seller or one or more of its Affiliates shall join the MIH Consortium and the Open EV Alliance as a vehicle engineering and development partner OEM. The Joint Venture Agreement shall also provide for the sharing of intellectual property rights commensurate with the parties' respective contributions.

30.     The JV was essential to provide the Company with the strategic partner and the scalable business model it had bargained for.  The Company would never have sold its most valuable asset for a fraction of its replacement cost without the CMA and without assurances from Defendants that they would support the Endurance, enter into the JV Agreement (defined below) and follow through on their commitments to joint vehicle development leveraging the Foxconn EV Ecosystem.  The Company expected to negotiate the exact terms of the CMA and JV Agreement in the interim period between execution and the closing of the Plant APA, which was expected to take several months.  In addition, the Plant APA contemplated that the parties would hold weekly meetings to discuss and review expansion plans and use commercially reasonable efforts to enter into support and license agreements during the interim period.

31.     After entering into the Plant APA, the Company recruited additional experienced automotive professionals.  A key selling point was the opportunity to develop future vehicles and components, including proprietary software, in collaboration with Foxconn and the Foxconn EV Ecosystem.  At all times since the signing of the Plant APA, the Company has devoted enormous resources towards making Foxconn's EV ambitions a reality.

**Defendants Avoid Fulfilling their Commitments to the Company**

32.     Unfortunately, Defendants never had any intent of living up to their commitments.  In the months following entry into the Plant APA, Foxconn dragged its feet in working to develop the parties' agreed upon joint development platform.  Although the Company

quickly circulated term sheets outlining a more detailed plan for the partnership, Defendants were extremely slow to engage, notwithstanding their obligations under the Plant APA.  Indeed, in April 2022, five months after the Plant APA was signed, Foxconn senior executives, including Chairman Liu, stated that Foxconn would not even discuss the JV before closing the Plant APA.

33.     On May 11, 2022, Foxconn, eager to secure ownership of the Plant, finally relented and agreed to enter into the JV (the "**JV Agreement**," attached as **Exhibit D**).  On the same day, the parties closed the Plant APA and executed the CMA.  Under the Plant APA, Foxconn EV Technology purchased the Plant, excluding the Company's hub motor assembly line, battery module and packing line assets, certain intellectual property rights and other excluded assets, for $230 million plus certain reimbursements.  Under the CMA, the Company outsourced all the manufacturing of the Endurance to an affiliate of Foxconn, Foxconn EV System LLC, which would manufacture the Endurance at the Plant for a fee per vehicle.  In addition, the Foxconn EV System LLC committed to use commercially reasonable efforts: (a) to improve commercial terms of procurement with the Company's suppliers and take advantage of sourcing synergy opportunities, including with a list of identified suppliers, by providing critical strategic support leveraging Foxconn's size and expertise to achieve better pricing and payment terms with suppliers of the Endurance; (b) to transition procurement of components to Foxconn as expeditiously as possible and in any event no later than October 15, 2022; and (c) during the transition period to (i) support the Company's purchasing efforts in relation to components so as to minimize disruptions and inefficiencies, (ii) assist the Company in managing and communicating with suppliers and (iii) assist the Company in improving the commercial terms of procurement with suppliers.  Foxconn EV System LLC also agreed to work with the Company in good faith to reduce the production cost of the Endurance, which may have included Foxconn directly participating in Company's value

11

analysis and value engineering and sourcing activities.  But Foxconn had no intent of doing anything to achieve these initiatives; they were just promises designed to string the Company along so that Foxconn could starve it out of existence.

34.    The JV was owned 55% by Foxconn EV Technology and 45% by the Company.  The Company would also provide virtually all the personnel necessary to operate the JV and the Company's Chief Executive Officer was named the chief executive of the JV as well. Given that the JV was largely dependent upon the Company's personnel, it was necessary to put in place a Management Services Agreement between the JV and the Company.  Foxconn acknowledged that a Management Services Agreement was needed but did not respond to an initial draft of the agreement for over a month, while the Company was incurring substantial costs.  Once it engaged, it used the opportunity to impose a new spending authority structure that would require a Foxconn representative to approve every dollar spent by the JV.  This veto right directly conflicted with the JV Agreement, which provided that the parties would agree upon an annual budget and Foxconn's approval would be required only if an expenditure exceeded 5% of the budgeted amount.  Ultimately, Foxconn never agreed to a Management Services Agreement, nor a JV budget, and, as further explained below, the JV was ultimately dissolved after five months when Foxconn requested that the JV Agreement be terminated and replaced with a completely different transaction structure and vehicle program.

35.    The JV Agreement contemplated that the JV's first vehicle program would be based on certain vehicle designs that a Foxconn affiliate in Taiwan, called Foxtron, had already largely developed.  These vehicles were known as the Model C, a mid-size crossover, and the Model E, a large sedan. Foxconn committed that it would provide full access to data and information regarding the Model C and Model E vehicle designs necessary for the JV management

12

team to determine what modifications would be required for the North American market. The JV would then take the Model C, engineer the necessary modifications and develop a production plan for the Plant. Based on Foxconn's representations on the maturity of the Model C, the Company was optimistic that it could tailor the vehicle and move it into production quickly with a significant cost advantage. Moreover, the modified Model C could serve as a base platform for other derivative vehicle programs, which would provide additional benefits in terms of speed and cost. The Company began to market the Model C design to potential customers and publicly supported Foxconn's efforts to promote its EV ambitions, including participation in Foxconn and MIH promotional events in Taiwan and across the United States. But Foxconn was slow to respond, or failed to respond at all, to the Model C commitments it made in the JV Agreement.

36.    Despite its delays with the Company, Foxconn was quick to move forward with its other plans for the Plant in Lordstown. The day after closing the Plant APA, Foxconn announced that it would be manufacturing the PEAR EV with automaker Fisker Inc. at the Plant. Over the coming months, Foxconn announced plans to manufacture INDIEV's electric vehicle (the INDI One) and Monarch's all-electric MK-V tractor at the Plant. The Debtors supported Foxconn's commercial efforts with other vehicle makers and had meetings with both Fisker and INDIEV regarding potential product development collaboration opportunities. For example, at Foxconn's request, the Company spent four weeks meeting with and developing a proposal for Fisker. Fisker ultimately communicated that it did not have the funds to proceed with the requested vehicle program.

37.    At the same time, Foxconn stymied the Company's attempts to move forward with the partnership to develop future Lordstown vehicles under the JV Agreement. Among other things, Foxconn: (a) failed to grant the Company access to the Model C and Model

13

E vehicle designs that it committed to provide; (b) stalled the Company's attempts to agree on a budget and timeline for the project as contemplated by the JV Agreement; (c) failed to meaningfully engage with the Company during weekly board meetings on the development of a business plan; (d) no-showed meetings and failed to provide approvals on even the most basic items; and (e) otherwise failed to fulfill other agreed upon commitments.  Foxconn also caused Foxconn EV System LLC to fail to honor several material commitments under the CMA, including its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good faith to reduce the production cost of the Endurance.  Moreover, Foxconn caused Foxconn EV Technology to delay the appointment of the JV's chief financial officer and to fail to make minimum monthly payments to the JV, each as required by the JV Agreement.  Foxconn even refused to provide information about the JV's bank accounts.

38.    Notwithstanding Defendants' lack of engagement, the JV, utilizing Company personnel, began predevelopment work on the Model C design modifications and outreach to potential fleet customers, several of whom were very interested.  To advance these efforts, the Company repeatedly requested from Defendants required engineering drawings and data relating to the Model C and Model E vehicle designs that were a fundamental basis for the JV.  More than two months after the JV Agreement was entered into, no engineering drawings or vehicle design data had been shared.  In a meeting during that time period, Chairman Liu stated that if Company personnel would just come to Taiwan, he would ensure that all necessary information would be shared.  On that basis, the CEO of the Company traveled to Taiwan, during the COVID lock-down, and spent nearly two weeks attempting to meet with Foxtron and Foxconn to discuss and obtain the requested materials.  Defendants ultimately stated that they could not

14

provide access to the requested data to the Company or establish a licensing deal, notwithstanding their representations in the JV Agreement.  Adding insult to injury, the CEO of Foxtron declined to meet with the Company's representatives.  Chairman Liu implausibly stated, without explanation, that he could not force Foxtron to share the required information, notwithstanding the fact that that Foxconn, through its affiliate, had committed to provide that information to the JV by a date certain and Chairman Liu is also the Chairman of Foxtron.

39.    Defendants' actions deprived the Company of the enormous cost savings and time advantages of working with an existing vehicle design.  Instead, the Company was forced to return to the internal platform that it had discussed with Foxconn in November 2021, nine months earlier.  Meanwhile, the Company subsequently learned that Foxtron, majority owned by Foxconn, intended to sell its own vehicles, including the Model C, directly into the United States in direct competition with the Company, despite Defendants' commitment in the JV Agreement to utilize the JV as their primary North American vehicle development partner.

40.    By entering into the JV Agreement, Foxconn EV Technology agreed to make, or to advance on the Company's behalf, capital contributions to the JV of up to $100 million.  A large portion of the capital contributions would not be required until the parties agreed upon a budget, which they were required to use their commercially reasonable efforts to do.  On July 11, 2022, the Company provided a draft budget for the JV to Foxconn EV Technology.  Despite Foxconn EV Technology's agreement to use commercially reasonable efforts to agree upon a budget, for over two months, Defendants refused to even engage with the Company over the proposed budget, let alone approve it.  On September 28, 2022, the Company re-sent the budget to Foxconn, and on September 30, 2022, Foxconn indicated that it disagreed with the budget structure, without providing any further comments or guidance, other than to assert that Foxconn's

internal spending controls should apply to the JV and that Chairman Liu should have veto rights over any expenditure that exceeded $150,000.

41.     On October 14, 2022, the Company sent a letter to Foxconn noting Defendants' various breaches of the JV Agreement and the CMA.  Among other things, the Company noted that Foxconn did not provide data and information for the Model C and Model E designs as required by the JV Agreement.  As a result, the Company had to defer promising discussions with one of the largest fleet managers in North America, which subsequently made large electric vehicle purchases from other manufacturers.

42.     In short, Defendants stonewalled the Company's efforts regarding the JV at each and every turn.  Defendants' actions were driven by Foxconn, which was determined to maliciously and in bad faith destroy Plaintiffs' business in an effort to strip Plaintiffs' assets and poach its talent at little cost.  On many occasions, the Company was told that all material decisions, and even many minor ones, required the approval of Foxconn.  Upon information and belief, the decision to enter into this effort to destroy the Company, and to breach the JV Agreement to help achieve that, was made by Young Liu, CEO and Chairman of Foxconn.

**The Parties Alter the Structure of Their Partnership and FVP Commits to Purchase $70 Million of the Company's Common Stock and up to $100 Million in Preferred Stock**

43.     Soon after receiving the Company's letter setting forth Foxconn's breaches of the JV Agreement, Foxconn scheduled a meeting with the Company to discuss a direct investment by a different Foxconn entity, FVP.  Foxconn was interested in the new entity increasing its share ownership in the Company, potentially even taking the Company private. Importantly, the new entity was 55% owned by Foxconn and 45% owned by SoftBank, a large multi-national technology investor.  SoftBank's Chairman was interested in developing proprietary electric vehicle programs in North America and the Company was told by Foxconn

16

that it should re-focus resources to these new programs. Several meetings were held between the Company and representatives of Foxconn and SoftBank, including SoftBank's Chairman, to discuss the new programs.

44.     Since Foxconn had failed to live up to its commitments in the JV Agreement, the Company agreed, on November 7, 2022, to pivot away from the JV Agreement and instead Lordstown and FVP entered into a direct investment agreement (the "**Investment Agreement**", attached as **Exhibit E**). Under the Investment Agreement, FVP agreed to make additional equity investments in the Company through the purchase of $70 million of Common Stock and up to $100 million in Series A convertible preferred stock ("**Preferred Stock**"), subject to certain conditions. The net proceeds of the Common Stock sale could be used by the Company for general corporate purposes, while the net proceeds from the sale of the Preferred Stock were to be used specifically for the new SoftBank vehicles or any substitute programs (the "**New Vehicle Programs**").

45.     Section 2.01 of the Investment Agreement contemplated: (a) an initial closing (the "**Initial Closing**"), shortly after execution, at which FVP would purchase $22.7 million in Common Stock and $30 million in Preferred Stock; (b) a subsequent closing (the "**Subsequent Common Closing**") at which FVP would purchase $47.3 million in Common Stock, subject to regulatory approval; and (c) additional closings in connection with which FVP would purchase up to $70 million in additional shares of Preferred Stock purchases (the "**Subsequent Preferred Closings**"), subject to an agreement on the funding milestones and budget for the New Vehicle Programs and satisfaction of those milestones. The Initial Closing occurred on November 22, 2022, and the Company immediately began pre-development work on the New Vehicle Programs.

17

46.     The Investment Agreement imposes obligations on FVP to facilitate the fulfillment of conditions precedent to the Subsequent Common Closing and the Subsequent Preferred Closing.  Section 5.02 requires FVP to "use reasonable best efforts to work cooperatively together to, as promptly as reasonably practicable, complete governmental processes . . . in connection with the Subsequent Common Purchase."  Section 5.02(b) further provides the parties will "use their respective reasonable best efforts to, as promptly as practicable, obtain CFIUS Clearance and to prevent impediments to the consummation of the Transactions."  Section 5.20 of the Investment Agreement includes a covenant that FVP will use commercially reasonable good faith efforts to agree upon the Preferred Funding Milestones and the EV Program Budget (each as defined in the Investment Agreement) no later than May 7, 2023.

**Foxconn Tries to Avoid Fulfilling FVP's Promise to Purchase the Company's Common Stock and Preferred Stock**

47.     When Foxconn convinced the Company to terminate the JV Agreement and pivot to the Investment Agreement, Foxconn directed that the new vehicle program would focus on the vehicle platform backed by Softbank.  But within days of entering into the Investment Agreement, Foxconn indicated that SoftBank's commitment was no longer clear, SoftBank's Chairman was sometimes erratic and that the Company should not rely on the SoftBank program.  Instead, Foxconn directed the Company to resume work on the previous internal program that was similar to what was first discussed in November 2021.  The parties then entered into an amendment to the Investment Agreement, effective November 15, 2022 (attached as **Exhibit F**), allowing the Company to use the net proceeds from the purchases of Preferred Stock for the substitute program, which Foxconn claimed to fully support.  The amendment identified the substitute program and broad categories of expenses for which the Company could use the proceeds.

18

48.     While the Company's engineering team pivoted to the substitute program, FVP was dragging its feet on a required regulatory filing with the Committee on Foreign Investment in the United States ("**CFIUS**").  Under Section 5.02(b) of the Investment Agreement, the parties were required to make the filing as promptly as reasonably practicable and in any event within 20 business days from the execution of the Investment Agreement, or December 7, 2022. Section 5.02(b) further provides the parties will "use their respective reasonable best efforts to, as promptly as practicable, obtain CFIUS Clearance and to prevent impediments to the consummation of the Transactions."

49.     In the course of preparing the filing, in early December, Foxconn executives in Taiwan apparently became aware for the first time of the Investment Agreement amendment and demanded that the Company agree to its immediate rescission, with retroactive effect.  On December 14 – when the CFIUS filing was already late – FVP's Chief Product Officer advised the Company that Foxconn's Chief Financial Officer in Taiwan "insists to have [the rescission document] signed before filing CFIUS this week."  Similarly, Foxconn's outside legal counsel indicated that they would be prepared to file the CFIUS application but only after the rescission agreement was executed.

50.     Even though FVP had no contractual basis to withhold its cooperation, the Company, with a tremendous need for the financing FVP promised and the looming holiday season, agreed to execute the rescission and enter into a new, more restrictive amendment document (the "**Rescission and First Amendment**," attached as **<u>Exhibit G</u>**) that also identified the substitute program, which Foxconn continued to claim to fully support.   The CFIUS application was filed on the evening of December 23 – two weeks after the absolute deadline and after the start of the holiday shutdown.  FVP's breach of the CFIUS covenant not only demonstrates extreme

19

bad faith but it ultimately held up CFIUS Clearance and therefore the date of the Subsequent Common Closing, likely by several weeks at least, at a time when the Company was in need of critical funding.

51.     Between December 2022 and March 2023, the Company completed the first phase of the new vehicle development work.  This work including market analyses to determine the target segments and attributes needed to be successful in the U.S. commercial fleet marketplace, vehicle architecture engineering to create a platform that could yield multiple vehicle model types, studies to determine which components (e.g., batteries, electronics and motors) could be supplied by the Foxconn EV Ecosystem, initial design alternatives, and cost targets needed to ensure program profitability.

52.     The Company also held regular meetings with potential customers, including a major vehicle fleet owner in the United States, to discuss predevelopment collaboration and potentially large purchase orders. On January 24, 2023, the Company sent Foxconn its proposed program budget, development milestones and deliverables.  On January 25, the Company held a meeting with Chairman Liu to discuss the budget, program direction, opportunities for collaboration with the Foxconn EV Ecosystem, the status of the Endurance, and Foxconn's expectations for future reviews.  In this meeting, Chairman Liu stressed four topics that he wanted to see covered in the milestone reviews – total addressable market (TAM), compound annual growth rate (CAGR) of the segment, unique selling proposition (USP) and key attributes of the product that would allow the Company to secure a path to profitability.

53.     The Company confirmed that these topics would be part of the Company's early phase product development work and that Foxconn would see these topics covered in regular program milestone scorecards and reviews.  The Company subsequently provided Foxconn,

20

including Chairman Liu, with regular updates about its work, scorecards on the completion status of each deliverable, and topics where assistance was needed from Foxconn.

54.    On March 22, 2023, the Company delivered the first set of program deliverables contemplated by the Investment Agreement.  Once those deliverables were approved by FVP, FVP was required to pursue and to fund the Second Tranche Preferred Purchase (as defined in the Investment Agreement).

55.    But Defendants continued their longstanding pattern of delay.  A meeting to discuss the deliverables scheduled for March 23rd was cancelled by Foxconn and never re-scheduled.  To date, the Company still has not received any substantive response from Foxconn on its proposals for budgeting and milestones.

56.    On April 24, 2023, in no small part as a result of the Company's continued efforts, FVP received CFIUS approval to complete the Subsequent Common Closing.  Under the Investment Agreement, the Subsequent Common Closing—and FVP's purchase of $47.3 million shares of Common Stock—was slated to occur no later than 10 business days from receipt of the CFIUS approval, *i.e.*, on May 8, 2023. As stated earlier, if FVP had not improperly delayed the CFIUS filing, approval would have been received much earlier.

57.    Meanwhile, the only other relevant conditions to the Subsequent Preferred Closings were agreement on the Preferred Funding Milestones and the EV Program Budget, and satisfaction of the Preferred Funding Milestones.  But Defendant has refused to use commercially reasonable efforts to reach agreement on the Preferred Funding Milestones and the EV Project Budget; indeed, it has refused to engage at all.

58.    FVP now asserts that its obligation to develop the Preferred Funding Milestones and the EV Program Budget were contingent on the execution of engineering and

21

program agreements with SoftBank – agreements that, within days after signing the Investment Agreement, Defendants instructed the Company should be abandoned in favor of a pivot to the substitute program, which substitute program is identified in both the first amendment to the Investment Agreement that was rescinded and in the Recission and First Amendment.

59.     Thus, while the Company worked in good faith to accommodate Foxconn's ever shifting views with respect to which programs should be developed, Foxconn ensured that FVP never met its contractual obligations and sabotaged the Company's product development efforts.   Foxconn caused its affiliate to breach its contractual obligations in furtherance of a plan to maliciously and in bad faith destroy Plaintiffs' business and to strip Plaintiffs' assets and poach their talent.  Upon information and belief, the decision to breach the Investment Agreement was made by Young Liu, CEO and Chairman of Foxconn.

**The Improper Attempt to Terminate the Investment Agreement**

60.     On March 7, 2023, with increasing uncertainty regarding the strength of the Company's partnership with Foxconn, the Common Stock dropped below the $1.00 per share threshold set forth in Nasdaq Listing Rule 5450(a)(1).   On April 19, 2023, the Listing Qualifications Department of Nasdaq, where the Common Stock is listed, issued a notice ("**Nasdaq Notice**", attached as **Exhibit H**) to the Company.  The Nasdaq Notice notified the Company that it had a 180-day period to return the stock price to above $1.00 per share. The Company, having anticipated that its stock price could drop below the $1.00 level, had already included a proposal for a reverse stock split in the agenda for its annual meeting to be held on May 22, 2023.

61.     Seizing on the Nasdaq Notice, by letter dated April 21, 2023, just 17 days before the anticipated Subsequent Common Closing, Defendant sent a notice of default (the

"**Notice of Default**", attached as **Exhibit I**) under the Investment Agreement.  The Notice of Default provided that Defendant would terminate the Investment Agreement effective May 21, 2023, one day prior to the Company's shareholders' meeting and the approval of the reverse stock split, in the event the Company failed to cure such default.

62.    On April 25, 2023, the Company responded to the Notice of Default.  The Company (i) disputed that the Nasdaq Notice constituted a breach under the Investment Agreement, (ii) noted that the Investment Agreement, by its terms, does not permit Defendant to terminate it following the Initial Closing (which occurred on November 22, 2022), and (iii) in any event, Defendant cannot exercise termination rights because FVP breached the Investment Agreement by failing to use necessary efforts to agree upon the budget and milestones to facilitate the Subsequent Preferred Funding.  The Company's response noted that if the termination notice was not immediately retracted, the Company would be forced to publicly disclose the purported termination which would result in material harm and damage.

63.    Foxconn did not respond to the Company's letter.  As a result, the Company was forced to file a Current Report on Form 8-K with the Securities and Exchange Commission on May 1, 2023, announcing FVP's purported termination.  While the Company made clear that it did not agree the termination was proper, the disclosure nevertheless caused the Company's stock price to plummet and caused unfavorable media coverage.  The announcement also materially and negatively impacted the Company's customer, employee, supplier and other business relationships. Within hours of the filing, several customers, including one of the largest fleet managers in North America, cancelled or deferred discussions regarding the purchase of Lordstown vehicles.  Since then, the impact of the Foxconn dispute on the Company has been severe.

64.     On May 2, 2023, after forcing the Company to publicly disclose FVP's purported termination, causing a significant drop in the Company's stock price and uncertainty about its future, Foxconn acknowledged both in correspondence to the Company and publicly that it agreed that it had no legal right to terminate the Investment Agreement after the Initial Closing. Foxconn nonetheless asserted in correspondence with the Company that the Nasdaq Notice constituted a breach of a representation that is a condition to the Subsequent Common Closing and, therefore, Foxconn was not obligated to consummate the Subsequent Common Closing until such breach was cured.

65.     On May 3, 2023, Lordstown sent Foxconn a letter recognizing the retraction of its purported termination of the Investment Agreement.  But the Company disputed Foxconn's assertion that the Nasdaq Notice constituted a failure of a condition of the Subsequent Common Closing.

66.     Section 3.13 sets forth a representation and warranty that:

The Common Stock is registered pursuant to Section 12(b) of the Exchange Act and listed on the Nasdaq, and the Company has taken no action designed to, or which to the Knowledge of the Company is reasonably likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act or delisting the Common Stock from the Nasdaq, nor has the Company received any written notification that the SEC or the Nasdaq is contemplating terminating such registration or listing.

67.     Defendant has not identified any action of the Company "designed to, or which to the Knowledge of the Company is reasonably likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act or delisting the Common Stock from the Nasdaq."  Nor has "the Company received any written notification that the SEC or the Nasdaq is contemplating terminating such registration or listing."

24

68. Rather, under Nasdaq Marketplace Rule 5810(c)(3)(A), the Company was given 180 calendar days, or until October 16, 2023, to return the stock price above the $1.00 per share minimum. Only if the Company failed to return the stock price above $1.00 per share by the end of that period would it be at risk of a potential termination of its listing.

69. Thus, as explained in its May 3 letter, Lordstown's representations in section 3.13 were true when made, were true on the date of the letter and would be true on the Subsequent Common Closing Date. The Company reiterated that the Company would be ready, willing and able to close the transaction on the Subsequent Common Closing Date, May 8, 2023. But FVP refused to close on the Subsequent Common Closing Date, further harming the Company and ultimately requiring it to seek chapter 11 relief.

70. FVP's further asserted in SEC filings that the Nasdaq Notice constituted a "breach" of the Investment Agreement. Even if FVP's position were correct, and the closing condition were not satisfied, the Nasdaq Notice would not have constituted a breach of the Investment Agreement. On May 3, Defendant demanded a correction to FVP's false public disclosure. FVP has failed to do so.

71. Moreover, FVP's refusal to file the CFIUS application until the Company rescinded an amendment to the Investment Agreement that the parties had executed (despite the Investment Agreement's covenants to the contrary) is the only reason that the Nasdaq Notice was received before the Subsequent Common Closing Date, as the application would have been approved weeks earlier absent FVP's breach. In other words, absent FVP's breach of its contractual obligations regarding CFIUS Clearance, the entire Nasdaq Notice issue would have been moot.

72.    On May 23, 2023, the Company executed a reverse stock split to improve the marketability and liquidity of the Common Stock.  As of June 7, 2023, the Common Stock price had remained above $1.00 per share for 10 consecutive trading days following the reverse stock split.  As a result, even under FVP's flawed interpretation of the agreement, all conditions to closing would have been satisfied and FVP's pretext for not closing was gone.

73.    Knowing that its most recent excuse for failing to meet its contractual obligation was about to disappear, on June 5, FVP asserted for the first time in a letter (attached as **Exhibit J**) that because of the company's 1:15 reverse stock split, it was now entitled to purchase not the 10% of the Common Stock of the Company that had been agreed, but 62.7% for the same $47.3 million price.

74.    FVP's assertion ignores several provisions of the Investment Agreement, which makes clear that following the Subsequent Common Closing, FVP and its affiliates would not own more than 19.99% of the capital stock of the Company that is entitled to vote generally in any election of directors of the board of directors of the Company and at no point would it own anywhere near 65.9%, which is the percentage of the voting interest that FVP would hold on an as-converted basis when combining the stock that FVP asserts it has the right to purchase in the Subsequent Common Closing with its existing holdings of the Company's capital stock and warrants.  In fact, FVP had agreed that, until at least December 31, 2024, it and its affiliates would not acquire, offer or seek to acquire or make a proposal to acquire (a) more than 19.99% of the capital stock of the Company that is entitled to vote generally in any election of directors of the board of directors of the Company prior to a vote of the Company's stockholders allowing FVP to acquire more than 19.99% of such capital stock and (b) more than 24% of the capital stock of the Company that is entitled to vote generally in any election of directors of the board of directors of

26

the Company even after the Subsequent Common Closing and a vote of the Company's stockholders approving an acquisition by FVP of more than 19.99% of such capital stock, if such vote were obtained.

75.     FVP's newest position also contradicts the terms of its own certifications to CFIUS, where it represented to the United States government that the transactions contemplated by the Investment Agreement, together with FVP's existing holdings of the Company's capital stock and warrants on an as-converted basis, could not result in FVP owning anywhere near a 65.9% voting interest in the Company.  FVP's position would mean that the Company could have effectuated a 30:1 stock dividend (which is has the right to do under the Investment Agreement) and FVP would have been required to pay $47.3 million for a mere fraction of the capital stock of the Company, which is an absurd interpretation of the Investment Agreement.

76.     It is unclear whether this newly concocted position was just one more effort to sabotage the deal or to capture a windfall by stealing control of the Company for what it was supposed to pay for 10% of the stock.  But either way, FVP's position was in clear violation of the Investment Agreement.  The Company demanded that FVP withdraw its absurd argument and close the transaction on the agreed terms.  FVP refused.

77.     Meanwhile, even if FVP's earlier reliance on the Nasdaq Notice were valid—and it was not—Nasdaq sent a notice (attached as **Exhibit K**) closing the matter on June 7, 2023.  Under Section 2.03(a) of the Investment Agreement, the Subsequent Common Closing shall occur on the tenth business day after all of the conditions to the closing have been satisfied.  Thus, even if the Nasdaq Notice had been an impediment to closing, the Subsequent Common Closing should have occurred on June 26, 2023, but FVP refused—and continues to refuse—to close.

27

78.    FVP's actions, driven by Foxconn, have had a devastating effect on the Company's business.  Upon information and belief, the decision to breach the Investment Agreement was made by Young Liu, CEO and Chairman of Foxconn as part of Foxconn's scheme to starve the Company and destroy its business.  Rather than embracing Lordstown as its partner in "a trillion-dollar business opportunity for electric vehicles," Foxconn has maliciously and in bad faith sabotaged the ability of Lordstown to execute its business plan for scalable electric vehicle production in North America.  The Company has recently laid off a substantial number of its employees, and its ability to continue its operations is now in question.  Meanwhile, Foxconn is hiring Lordstown employees and continues to refuse to provide financing and cooperation that is essential for Lordstown to sustain its ongoing operations. Foxconn thus far has succeeded in executing its plan to force the Company to shut down so that it can take over the Company's remaining assets and talent, while evading liability for its repeated breaches.

**The Debtors' Bankruptcy Proceeding**

79.    On June 27, 2023 (the "Petition Date"), faced with the reality that there were no circumstances under which Foxconn would meet its contractual obligation to close, the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the **"Chapter 11 Cases"**).  The Debtors have filed a separate procedural motion requesting that the Chapter 11 Cases be jointly administered.  The Debtors continue to operate their businesses and manage their properties pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

<u>**COUNT ONE**</u>

**(Common Law Fraud – Against Foxconn)**

80.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

28

81.     Foxconn has induced Plaintiffs to enter into a series of agreements, including the AIP, the Plant APA, the CMA, the JV Agreement, and the Investment Agreement, based on the false representation that it sought a partnership with Plaintiffs to jointly develop the next generation of electric vehicles.

82.     Foxconn knew that it never intended to have a partnership and its statements regarding its interest in a partnership with Plaintiffs were false.  Rather than seeking to develop a partnership with Plaintiffs, Foxconn intended to deprive the Company of necessary capital and sabotage its business in an effort to strip Plaintiffs' assets and poach its talent at little cost.

83.     Foxconn made its statements regarding its interest in a partnership with Plaintiffs with the intent to induce Plaintiffs to sell their unique and most valuable asset, their manufacturing plant, to transfer highly talented and experienced manufacturing and operational employees to the Foxconn team, and to refrain from pursuing opportunities with other strategic partners.  These agreements were the instruments by which Foxconn perpetrated its broader scheme to loot Plaintiffs of their most valuable assets.

84.     Plaintiffs, seeking a strategic partner to address their funding needs and to help develop a scalable vehicle development platform for the next generation of electric vehicles, justifiably relied on the statements of Foxconn, one of the world's largest multinational manufacturing companies.

85.     As a direct and proximate cause of Foxconn's fraudulent conduct, the Company sold its most valuable asset and refrained from pursuing opportunities with other strategic partners.  Deprived of necessary funding and cooperation to develop a scalable vehicle development platform, Plaintiffs' ability to continue operations is in jeopardy, and they have suffered, and will continue to suffer, billions of dollars in damages.

## COUNT TWO

**(Breach of Contract - Section 2.01(b) of the Investment Agreement -
Against FVP)**

86.     Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

87.     The Investment Agreement is a valid agreement governed by Delaware law. It was properly formed and entered into by the Company and FVP.

88.     The Company has fully performed its obligations under the Investment Agreement.

89.     Section 2.01(b) of the Investment Agreement requires that at the Subsequent Common Closing, FVP purchase approximately 10% of the Company's Common Stock for $47.3 million.  In memorializing the parties' agreement, the provision specifies the number of shares that represented this percentage as of the time the Investor Agreement was signed.

90.     On May 23, 2023, the Company executed a 1:15 reverse stock split to improve the marketability and liquidity of its Common Stock.  Reverse stock splits are permissible under the Investment Agreement, and the parties understood that such a split would not change the business terms of the agreement and that FVP would still purchase approximately 10% of the Company's Common Stock at the Subsequent Common Closing.

91.     But for FVP's failure to consummate the Subsequent Common closing as required, the Subsequent Common Closing would have occurred before the reverse stock split occurred.

92.     All of the conditions precedent to the Subsequent Common Closing have occurred.

30

93.     FVP has breached section 2.01(b) the Investment Agreement by refusing to purchase the Common Stock.  FVP initially claimed that it had no obligation to close due to the Nasdaq Notice, and now claims that it is entitled to purchase a majority interest in the Company due to the reserve stock split.

94.     As a direct and proximate cause of FVP's breaches of its contractual obligations, the Company's ability to continue operations is in jeopardy, and it has suffered, and will continue to suffer, billions of dollars in damages.

95.     FVP is liable to the Company for its breaches of its contractual obligations.

### COUNT THREE

**(Breach of Contract - Section 5.20 of the Investment Agreement -
Against FVP)**

96.     Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

97.     Section 5.20 of the Investment Agreement provides that both the Company and FVP will "use commercially reasonable good faith efforts to agree upon the Preferred Funding Milestones and the EV Program Budget no later than the 6-month anniversary of the date of this Agreement."

98.     The Company has sent proposals to FVP regarding the Preferred Funding Milestones and the EV Program Budget, but FVP has neither agreed to nor commented upon the proposals.

99.     FVP has breached section 5.20 of the Investment Agreement by failing to use commercially reasonable good faith efforts to agree upon the Preferred Funding Milestones and the EV Program Budget no later than the 6-month anniversary of the date of this Agreement.

31

100.     Section 6.05 sets forth two conditions precedent to the Second Preferred Closing and the Third Preferred Closing: (i) the Company and the Investor shall have agreed to the EV Program Budget and the Preferred Funding Milestones; and (ii) the Preferred Funding Milestone for such Closing shall have been satisfied.

101.     FVP's failure to comply with its obligations under section 5.20 of the Investment Agreement has the effect of avoiding Defendant's obligation to purchase $70 million of preferred shares from the Company.

102.     As a direct and proximate cause of FVP's breaches of its contractual obligations, the Company's ability to continue operations is in jeopardy, and it suffered, and will continue to suffer, billions of dollars in damages.

103.     Defendant is liable to Lordstown for its breaches of its contractual obligations.

## COUNT FOUR

### (Breach of Contract – Improper Attempt to Terminate the Investment Agreement - Against FVP)

104.     Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

105.     FVP has breached the Investment Agreement by purporting to terminate the Agreement in contravention of the express provisions of section 7.01.

106.     Section 7.01 provides that the "Agreement may be terminated and the Transactions abandoned at any time prior to the Initial Closing."

107.     The Initial Closing occurred on November 22, 2022.

108.     No provision in the Investment Agreement allows FVP to terminate following the Initial Closing.

32

109.    On April 21, 2023, FVP sent the Notice of Default, citing the Nasdaq Notice.  The Notice of Default provided that FVP would terminate the Investment Agreement effective May 21, 2023 in the event the Company failed to cure such default.

110.    On April 25, 2023, the Company sent a letter noting that FVP had no contractual basis to terminate and requested a retraction of the termination notice.

111.    FVP did not retract the termination notice, thus forcing the Company to announce the purported termination in its SEC filings.

112.    The announcement also materially and negatively impacted the Company's customer, employee, supplier and other business relationships.

113.    Shortly after the filing, FVP admitted that it had no right to terminate the Investment Agreement.

114.    As a direct and proximate cause of FVP's breaches of its contractual obligations, the Company's ability to continue operations is in jeopardy, and it suffered, and will continue to suffer, billions of dollars in damages.

115.    Defendant is liable to Lordstown for its breaches of the Investment Agreement.

## COUNT FIVE

### (Breach of Contract – Section 5.02(b) of the Investment Agreement - Against FVP)

116.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

117.    FVP has breached the Investment Agreement by failing to comply with its obligations under section 5.02 of the Investment Agreement.

33

118.    Section 5.02(b) of the Investment Agreement requires the Company and FVP to "as promptly as reasonably practicable, and in any event within twenty (20) Business Days from date of this Agreement, submit a draft joint voluntary notice . . . to CFIUS."  Section 5.02(b) further provides the parties will "use their respective reasonable best efforts to, as promptly as practicable, obtain CFIUS Clearance and to prevent impediments to the consummation of the Transactions."

119.    In December, FVP sought a rescission of an amendment to the Investment Agreement and held up the necessary CFIUS filing until the Company finally agreed.  On December 14 – when the application was already late – FVP indicated to the Company that it would not go forward with the CFIUS filing unless and until the Company agreed to rescind the prior amendment.

120.    Even though FVP had no contractual basis to withhold its cooperation, the Company executed the rescission document, and that CFIUS application was filed on December 23 –  two weeks beyond the absolute deadline, and in the middle of the holiday season.

121.    As a result of FVP's breach, CFIUS did not approve the application until April 25, 2023—four days after the issuance of the Nasdaq Notice that FVP now unjustifiably cites as its basis for not fulfilling its commitment to purchase an additional $47.3 million in Common Stock.

122.    As a direct and proximate cause of FVP's breaches of its contractual obligations, the Company's ability to continue operations is in jeopardy, and it suffered, and will continue to suffer, billions of dollars in damages.

123.    FVP is liable to Lordstown for its breaches of the Investment Agreement.

34

## COUNT SIX

### (Breach of Contract – Limited Liability Company Agreement of MIH EV Design LLC - Against Foxconn EV Technology, Inc.)

124.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

125.    The JV Agreement is a valid agreement governed by Delaware law.  It was properly formed and entered into by Lordstown EV Corporation and Foxconn EV Technology.

126.    Lordstown EV Corporation fully performed its obligations under the JV Agreement.

127.    The JV Agreement imposed a number of obligations on Foxconn EV Technology including (i) using its commercially reasonable efforts to prepare and agree to a Fiscal Year 2022 budget to design and develop its first electric commercial vehicle (section 2.8(a)), (ii) granting the JV perpetual, irrevocable, non-exclusive, worldwide, license to certain intellectual property of Foxconn EV Technology and its affiliates (section 2.10(a)), (iii) causing access to be granted to the joint venture of all information and data necessary for the JV to commence pre-development activities (section 2.10(a)), and (iv) agreeing not to engage in a competing business opportunity unless presented to the JV's board (section 11.2).

128.    Foxconn EV Technology repeatedly breached its obligations under the JV Agreement.  Foxconn EV Technology stymied the Company's efforts to move forward with the development of electric vehicles by refusing to engage on proposed budgets and timelines for EV projects.  Despite repeated assurances, Foxconn EV Technology refused to provide intellectual property rights and access to data and information to allow the project to move forward.  Defendants further announced a plan to sell vehicles directly into North America and promoted

their own vehicles, notwithstanding Foxconn EV Technology's commitment to utilize the JV as its primary North American development partner.

129.    As a direct and proximate cause of Foxconn EV Technology's breaches of its contractual obligations, Lordstown EV Corporation incurred substantial costs and suffered from lost business opportunities as its vehicle development program was stalled. Lordstown EV Corporation suffered, and will continue to suffer, billions of dollars in damages.

130.    Foxconn EV Technology is liable to Lordstown EV Corporation for its breaches of the Investment Agreement.

## <u>COUNT SEVEN</u>

### (Breach of Contract – Asset Purchase Agreement -
### Against Foxconn EV Technology, Inc. and Foxconn (Far East) Limited)

131.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

132.    The Plant APA is a valid agreement governed by Delaware law.  It was properly formed and entered into by Lordstown EV Corporation and Foxconn EV Technology, Inc. and Foxconn (Far East) Limited.

133.    Lordstown EV Corporation fully performed its obligations under the Plant APA.

134.    Section 4.1(k) of the Plant APA imposed obligations on Foxconn EV Technology to use its commercially reasonable efforts to enter into a joint venture agreement under which the parties would, among other things, allocate engineering resources to jointly design, engineer, develop, validate, industrialize, and launch vehicle programs for the commercial vehicle market in North America and internationally using Foxconn's MIH open platform.

36

135.    Foxconn EV Technology repeatedly breached its obligations under the Plant APA to use its commercially reasonable efforts to enter into a joint venture agreement. Foxconn EV Technology dragged its feet in working to develop the parties' agreed upon joint development platform.  Although the Company quickly circulated term sheets outlining a more detailed plan for the partnership, Foxconn EV Technology was extremely slow to engage, notwithstanding its obligations under the Plant APA.  Indeed, in April 2022, five months after the Plant APA was signed, Foxconn senior executives, including Chairman Liu, stated that Foxconn would not even discuss the JV before closing the Plant APA.

136.    As a direct and proximate cause of Foxconn EV Technology's breaches of its contractual obligations, Lordstown EV Corporation incurred substantial costs and suffered from lost business opportunities as its vehicle development program was stalled. Lordstown EV Corporation suffered, and will continue to suffer, billions of dollars in damages.

137.    Foxconn EV Technology is liable to Lordstown EV Corporation for its breaches of the Plant APA.

138.    Section 10.18(a) of the Plant APA provides that Foxconn (Far East) Limited "hereby unconditionally and irrevocably guarantees to Seller the due and punctual payment, performance and observance by Purchaser (and any permitted assignees thereof) of any and all of Purchaser's (or such permitted assignee's) obligations pursuant to this Agreement."

139.    Foxconn (Far East) Limited is jointly and severally liable for Foxconn EV Technology's breaches of the Plant APA.

## COUNT EIGHT

**(Common Law Fraud -
Against Foxconn (Far East) Limited)**

140.     Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

141.     Foxconn (Far East) Limited induced Lordstown EV Corporation to enter into the Plant APA based on the false representation that Foxconn sought a partnership with Plaintiffs to jointly develop the next generation of electric vehicles.

142.     Foxconn (Far East) Limited knew that Foxconn never intended to have a partnership and its statements regarding its interest in a partnership with Plaintiffs were false. Rather than seeking to develop a partnership with Plaintiffs, Foxconn intended to deprive the Company of necessary capital and sabotage its business in an effort to strip Plaintiffs' assets and poach its talent at little cost.

143.     Foxconn (Far East) Limited made its statements regarding Foxconn's interest in a partnership with Plaintiffs with the intent to induce Plaintiffs to enter into the Plant APA and deprive Plaintiffs of their most valuable asset.  The Plant APA was an instrument by which Foxconn and Foxconn (Far East) Limited perpetrated a broader scheme to loot Plaintiffs of their most valuable assets.

144.     Plaintiffs, seeking a strategic partner to address their funding needs and to help develop a scalable vehicle development platform for the next generation of electric vehicles, justifiably relied on the statements of Foxconn (Far East) Limited, an affiliate of one of the world's largest multinational manufacturing companies.

145.     As a direct and proximate cause of Foxconn's fraudulent conduct, the Company sold its most valuable asset and refrained from pursuing opportunities with other

38

strategic partners.  Deprived of necessary funding and cooperation to develop a scalable vehicle development platform, Plaintiffs' ability to continue operations is in jeopardy, and they have suffered, and will continue to suffer, billions of dollars in damages.

## COUNT NINE

**(Breach of Contract – Contract Manufacturing Agreement -
Against Foxconn EV System LLC)**

146.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

147.    The CMA is a valid agreement governed by Ohio law.  It was properly formed and entered into by Lordstown EV Corporation and Foxconn EV System LLC.

148.    Lordstown EV Corporation fully performed its obligations under the CMA.

149.    Section 2 of the CMA imposed obligations on Foxconn EV System LLC to use commercially reasonable efforts: (a) to improve commercial terms of procurement with the Company's suppliers and take advantage of sourcing synergy opportunities, including with a list of identified suppliers, by providing critical strategic support leveraging Foxconn's size and expertise to achieve better pricing and payment terms with suppliers of the Endurance; (b) to transition procurement of components to Foxconn as expeditiously as possible and in any event no later than October 15, 2022; and (c) during the transition period to (i) support the Company's purchasing efforts in relation to components so as to minimize disruptions and inefficiencies, (ii) assist the Company in managing and communicating with suppliers and (iii) assist the Company in improving the commercial terms of procurement with suppliers.  Foxconn EV System LLC also agreed to work with the Company in good faith to reduce the production cost of the Endurance, which may have included Foxconn directly participating in Company's value analysis and value engineering and sourcing activities.

39

150.    Foxconn EV System LLC failed to honor several material commitments under the CMA, including its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good faith to reduce the production cost of the Endurance.

151.    As a direct and proximate cause of Foxconn EV System LLC's breaches of its contractual obligations, Lordstown EV Corporation incurred substantial costs and suffered from lost business opportunities as its vehicle development program was stalled. Lordstown EV Corporation suffered, and will continue to suffer, billions of dollars in damages.

152.    Foxconn EV System LLC is liable to Lordstown EV Corporation for its breaches of the CMA.

## COUNT TEN

### (Tortious Interference with Contract -
### Against Foxconn)

153.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

154.    Foxconn has knowledge of the JV Agreement, the Investment Agreement, the Plant APA, and the CMA.

155.    Upon information and belief, Foxconn's actions were a significant factor in causing its affiliates, FVP, Foxconn EV Technology, Foxconn (Far East) Limited, and Foxconn EV System LLC, to breach their respective obligations under the JV Agreement, the Investment Agreement, the Plant APA, and the CMA.

40

156.    Foxconn's decision to cause its affiliates to breach their contractual obligation is without justification.  Foxconn has embarked on a plan to maliciously and in bad faith destroy Plaintiffs' business in an effort to strip Plaintiffs' assets and poach its talent at little cost.

157.    As a direct and proximate cause of Foxconn's tortious conduct, the Plaintiffs' ability to continue operations is in jeopardy, and they have suffered, and will continue to suffer, billions of dollars in damages.

158.    Foxconn is liable to Plaintiffs for its tortious conduct.

## COUNT ELEVEN

### (Equitable Subordination -
### Against All Defendants)

159.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

160.    As detailed above, the Defendants have engaged and continue to engage in grossly inequitable conduct, and have effectively destroyed the Debtors' business, by, among other things, refusing to honor the contractual promises that they made in order to secure the Lordstown plant, failing to invest approximately $170 million of additional equity capital in Lordstown's business, and refusing to work with the Debtors to develop the next generation of electric trucks.

161.    The actions of Defendants complained of herein constitute inequitable misconduct that harmed the Debtors, their estates, and the Debtors' other creditors, and has conferred an unfair advantage on Defendants.

162.    Equitable subordination of any claim that has been or will be filed by the Defendants and any equity interests in the Debtors held by Defendants is not inconsistent with the provisions of the Bankruptcy Code.

163.    As a result of Defendants' inequitable conduct, any and all proofs of claims

filed by the Defendants and any equity interests in the Debtors held by Defendants should be equitably subordinated pursuant to 11 U.S.C. § 510(c).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment for Plaintiffs and against Defendants as follows:

a. Finding that Foxconn has committed common law fraud by knowingly making false representations to Plaintiffs with the intent to induce them to enter into a series of agreements that Foxconn did not intend to observe, as part a broader scheme to loot Plaintiffs of their most valuable assets;

b. Finding that FVP has breached the Investment Agreement by failing to purchase 10% of the Company's Common Stock for an aggregate purchase price of $47,265,597 (prior to the subsequent reverse stock split);

c. Finding that FVP breached the Investment Agreement by failing to use commercially reasonable good faith efforts to agree upon the Preferred Funding Milestones and the EV Program Budget no later than the 6-month anniversary of the date of the Investment Agreement;

d. Finding that FVP has breached the Investment Agreement by purporting to terminate the Investment Agreement in contravention of the express provisions of section 7.01;

e. Finding that FVP has breached the Investment Agreement by failing to use its reasonable best efforts to, as promptly as practicable, obtain CFIUS Clearance, in contravention of the express provisions of section 5.02;

f. Finding that Foxconn EV Technology has breached the JV Agreement by refusing to engage on proposed budgets and timelines for EV projects, failing to provide intellectual property rights and access to data and information to allow the EV projects to move forward, and planning to sell its own vehicles directly into North America;

g. Finding that Foxconn EV Technology has breached the Plant APA by refusing to use commercially reasonable efforts to enter into a joint venture agreement;

h. Finding that Foxconn (Far East) Limited is liable for Foxconn EV Technology's breaches of the Plant APA;

i. Finding that Far (Far East) Limited committed common law fraud by knowingly making false representations to Plaintiffs with the intent to induce them to enter

42

into the Plant APA as part a broader scheme to loot Plaintiffs of their most valuable assets;

j.  Finding that Foxconn EV System LLC has breached the CMA by failing to honor its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good faith to reduce the production cost of the Endurance;

k.  Finding that Foxconn has tortiously interfered with Plaintiffs' contractual rights by causing its affiliates to breach their agreements with Plaintiffs maliciously and in bad faith in an attempt to destroy Plaintiffs' business;

l.  Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses incurred as a result of Defendants' breaches, including without limitation those fees, costs, and expenses incurred in connection with this adversary proceeding;

m.  Awarding Plaintiffs damages in an amount to be determined at trial;

n.  Equitably subordinating any claims filed by Defendants and any equity interests in the Debtors held by Defendants pursuant to 11 U.S.C. § 510(c); and

o.  Awarding such other and further relief as may be just and proper.

Dated: June 27, 2023

Respectfully submitted,

/s/     *Cory D. Kandestin*
**RICHARDS, LAYTON & FINGER, P.A.**

Kevin Gross (No. 209)
Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704))
Amanda R. Steele (No. 5530)
Jason M. Madron (No. 4431)
Cory D. Kandestin (No. 5025)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
gross@rlf.com
defranceschi@rlf.com
heath@rlf.com
steele@rlf.com
madron@rlf.com
kandestin@rlf.com

*Proposed Co-Counsel to Debtors and*
*Debtors-in-Possession*

**WHITE & CASE LLP**

Thomas E Lauria (*pro hac vice* application pending)
Matthew C. Brown (*pro hac vice* application pending)
Fan B. He (*pro hac vice* application pending)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
tlauria@whitecase.com
mbrown@whitecase.com
fhe@whitecase.com

David M. Turetsky (*pro hac vice* application pending)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
david.turetsky@whitecase.com

Jason N. Zakia (*pro hac vice* application pending)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
jzakia@whitecase.com

Roberto Kampfner (*pro hac vice* application pending)
Doah Kim (*pro hac vice* application pending)
RJ Szuba (*pro hac vice* application pending)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700
rkampfner@whitecase.com
doah.kim@whitecase.com
rj.szuba@whitecase.com

*Proposed Co-Counsel to Debtors and*
*Debtors-in-Possession*