### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Lordstown Motors Corp., *et al.*,[1] | Case No. 23-10831 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: December 11, 2023 at 2:00 p.m. (ET)**<br>**Objection Deadline: Nov. 27, 2023 at 4:00 p.m. (ET)** |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO SETTLE CLAIMS UNDER CERTAIN EMPLOYMENT AGREEMENTS AND (II) GRANTING RELATED RELIEF

The debtors and debtors in possession in the above-captioned chapter 11 cases hereby file this motion (the "**Motion**") pursuant to sections 105(a), 363, and 502 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**") for entry of an order, substantially in the form attached as **Exhibit A** (the "**Proposed Order**") (i) authorizing and approving the Debtors' settlement of certain employee claims under employment agreements (the "**Employment Agreements**," each an "**Employment Agreement**") in accordance with the term sheet (the "**Settlement Term Sheet**") attached hereto as **Exhibit B**, and (ii) granting related relief. In support of this Motion, the Debtors state as follows:

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corp. (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101). The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

## Preliminary Statement[2]

1.      The Debtors commenced these cases in order to maximize value for the benefit of all stakeholders.  In order to complete this objective, the Debtors engaged in a sale process that resulted in the sale of certain of their assets, resolved a major litigation with Karma, and filed a complaint against Foxconn, all in a short period of time.  In addition, the Debtors have proposed a plan agreed to by both official committees, obtained approval of the related disclosure statement, and begun the process of soliciting acceptances on the plan.  A confirmation hearing with respect to the Debtors' plan is set for December 19, 2023.  The plan is expected to pay general unsecured creditors in full and leave existing equity in place.  The Debtors could not have made this progress or be in a position to achieve these goals without the dedicated work of their management team, which has remained largely intact throughout these cases and whose employment with the Debtors is likely to terminate upon (or shortly before) the completion of these cases.

2.      But the work is not done.  These cases are at a critical juncture.  The Debtors are seeking to both confirm and consummate their proposed plan by year end, but there is no assurance that this will occur.  Regardless, the Debtors believe that it is critical that members of their management team remain in place, as needed, through plan effectiveness to assure a smooth exit from bankruptcy.  The Debtors have fewer than twenty employees that remain, with additional employees anticipated to leave the Debtors' employ by December 1, 2023.  As a result, there will be a significant further burden on the core management team to do the work that must be done to complete these cases, including significant claims reconciliation efforts,

---

[2]     Capitalized terms not otherwise defined in this preliminary statement shall have the meanings ascribed to them in Motion.  Capitalized terms not otherwise defined in the Motion shall have the meanings ascribed to them in the Plan (defined below).

addressing potential government claims, complying with SEC reporting and other regulatory requirements, and addressing issues relating to plan confirmation, among other matters.  It is also important for the management team to provide support to the post-effective date Debtors and the Claims Ombudsman after the Debtors' plan has become effective.  Indeed, the post-effective date Debtors will continue to have public company reporting obligations (including the filing of a Form 10-K), are expected to pursue certain "Retained Causes of Action," including against Foxconn and their insurers (among others), for the benefit all parties in interest, and the Claims Ombudsman will be tasked with reconciling the vast majority of claims and paying general unsecured creditors.  Support from the Debtors' management team will be critical to those efforts.

3.      Unlike in many chapter 11 cases in which Debtors implement a key employee incentive program providing for administrative entitlements to program participants, the Debtors have not done so, and are not seeking to do so, here.  Instead, each member of the Debtors' management team that is the subject of this Motion has worked solely under the terms of, and in reliance upon, their respective Employment Agreement with the Debtors.  Those terms provide for the payment of severance in the event that such member terminates his or her employment for "Good Reason."[3]  The Debtors do not concede that "Good Reason" currently exists or that the Essential Employees have satisfied the contractual prerequisites for exercising termination for "Good Reason."  Nevertheless, the Debtors believe that it is in the interest of all stakeholders to avoid any disputes about this issue; incentivize the members of the core management team (who are effectively working themselves out of their jobs) to do the hard work that will be necessary to confirm and consummate the proposed plan and successfully resolve these cases; obtain a

---

[3]     The Employment Agreements also provide for the payment of the same severance in the event that the Debtors' terminate the employee's employment without "Cause."

commitment from the core management team to provide support and cooperation to the post-effective date Debtors and the Claims Ombudsman; and avoid  any disputes that may exist regarding the amounts payable under the applicable Employment Agreements.  Doing so will maximize the chances of a smooth exit from bankruptcy, provide the post-effective Debtors and the Claims Ombudsman with the support they will need post-effectiveness, to the benefit of all stakeholders, and eliminate the possibility of litigation regarding the amount of severance to be paid under the applicable Employment Agreements.[4]

4.    In order to resolve potential disputes with the Debtors' management team and incentivize their continued contributions to confirming, consummating, and supporting the implementation of a plan, the Debtors propose to offer a settlement of prepetition Employment Agreement claims to the members of the management team. That settlement has been approved by the Compensation Committee of the Debtors' Board of Directors.  Moreover, the Official Committee of Equity Security Holders (the "**EC**") was an active participant in the negotiations of, and supports, the settlement and the Official Committee of Unsecured Creditors (the "**UCC**") has indicated that it does not oppose the settlement.  Pursuant to the settlement, each employee agreeing to its terms will receive an allowed general unsecured claim on account of the Debtors' obligations under his or her Employment Agreement upon the effective date of a chapter 11 plan. For four of the six management team members, the Debtors believe that the proposed allowed claims are clearly below the section 502(b)(7) cap.  For the remaining two, whether the proposed allowed claims are below the section 502(b)(7) cap would likely be subject to litigation absent the proposed settlement, but in each case remains within the range of potential litigation

---

[4]    Such litigation could include, without limitation, the amounts of such employees' contractual entitlements in light of the terms of their Employment Agreements and the cap on claims for damages arising from the termination of employment contracts under section 502(b)(7) of the Bankruptcy Code.

outcomes. Furthermore, with respect to three of the management team members, the allowed claims would be less than their contractual severance entitlements as computed by the Debtors (and none would be above the contractual entitlement). In exchange for agreement on the allowed claim amounts, each of the applicable executives will agree to the terms set forth as set forth in more detail in the Settlement Term Sheet attached as **Exhibit B**, which include remaining in the Debtors' employ through the effective date of the plan (unless terminated earlier by the Debtors) and providing consulting services after the plan has been confirmed. The settlement preserves the Debtors' management through the effectiveness of the plan and provides the required support to execute the plan after effectiveness. The Debtors and the EC believe that the settlement is fair and equitable and should be approved.

### Relief Requested

5.      By this Motion, pursuant to sections 105(a), 363, and 502  of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors seek entry of an order (a) authorizing the Debtors to settle certain claims arising under the Employment Agreements of six members of the senior management team of the Debtors pursuant to the terms set forth below, and (b) granting related relief. At least four of the six members of the management team subject to this Motion would be considered "insiders" under section 101(31) of the Bankruptcy Code.

### Jurisdiction, Venue, and Authority

6.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.

7.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  In addition, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

8.      Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

### A.    General Background

9.      On June 27, 2023 (the "**Petition Date**"), each Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").  The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On July 11, 2023, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed the UCC for these Chapter 11 Cases.  On September 7, 2023, the U.S. Trustee appointed the EC (the EC, collectively with the UCC, the "**Committees**") for these Chapter 11 Cases.  No trustee or examiner has been appointed in these Chapter 11 Cases.

10.      Additional factual background regarding the Debtors, including their business operations and the events leading to the filing of these Chapter 11 Cases, is set forth in the

*Declaration of Adam Kroll in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "**First Day Declaration**"), which is fully incorporated here by reference.

**B.    Chapter 11 Cases**

11.    The Debtors' objective in filing these Chapter 11 Cases has been to maximize value for the benefit of all stakeholders.  To that end, the Debtors have centralized the resolution of claims before this Court, established a general and a government bar date, resolved Karma's claims against the Debtors, and brought suit against Foxconn.

12.    The Debtors also sought to sell some, all, or substantially all of the Debtors' assets.  To that end, the Debtors obtained the Court's approval of the bidding procedures [Docket No. 237] (the "**Bidding Procedures Order**") and conducted a robust marketing process to sell the Debtors' assets in accordance with the Bidding Procedures Order.  After months of marketing and negotiating with potential bidders, the Debtors were able to reach an agreement with a bidder to sell certain of their assets.  On September 29, 2023, the Debtors filed a *Notice of (I) Selection of Successful Bidder, (II) Cancellation of Auction, and (III) Sale Hearing* [Docket No. 488], disclosing the selection of LAS Capital, LLC (together with, its assignee, LandX Motors Inc., the "**Purchaser**") as the Successful Bidder, subject to Court approval.  Pursuant to the asset purchase agreement dated September 28, 2023 (the "**Asset Purchase Agreement**"), by and between the Debtors and the Purchaser, the Purchaser would acquire specified assets of the Debtors related to the design, production and sale of electric light duty vehicles focused on the commercial fleet market.

13.    On October 18, 2023, the Court held a hearing on the proposed sale to the Purchaser.  Following the hearing, the Court entered an order approving such sale (the "**Sale**

Order"). [Docket No. 586]. The sale to the Purchaser pursuant to the Sale Order and the Asset Purchase Agreement closed on October 27, 2023.

14. On September 1, 2023, the Debtors filed a *Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors* (as amended and modified, the "**Plan**") [Docket No. 360] and *Disclosure Statement Pursuant to 11 U.S.C. § 1125 with Respect to Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors* (as amended and modified, the "**Disclosure Statement**") [Docket No. 361], both of which were subsequently amended and modified [Docket Nos. 605, 606, 624, 625, 635, 637]. After substantial negotiations with the UCC and the EC, the Debtors filed a *First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors* on October 24, 2023. [Docket No. 605]. After further negotiations with certain creditors, the Debtors filed a *Modified First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors* on November 1, 2023. [Docket No. 657].

15. On November 1, 2023, the Court entered its *Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief.* [Docket No. 651].

16. The Plan is being solicited and confirmation hearing has been set for December 19, 2023.

### C.      Exiting Bankruptcy

17.      The Debtors are focused on exiting bankruptcy as quickly as possible.  In order to accomplish that goal, the Debtors believe that it is important to resolve any Employment Agreement disputes that may exist, incentivize their core management team to continue to do the necessary work to administer and/or support the Debtors' and the post-effective date Debtors' affairs (including their SEC filing and other regulatory requirements) and achieve confirmation and consummation of the Plan.  The Debtors have identified six members of the Debtors' senior management team ("**Essential Employees**") whose ongoing employment will be essential to complete this case.  A list of the Essential Employees, including their job titles and a description of their Employment Agreements, is set forth in **Exhibit C**, attached hereto and the terms of the proposed Settlement with respect to each such Essential Employee are set forth on **Exhibit B** hereto.[5]

18.      The Essential Employees possess extensive institutional knowledge of the Debtors' historical operations, which is vital to the Debtors' ability to confirm and effectuate the Plan.  Indeed, without these Essential Employees, it will be far more difficult, time consuming and expensive for the Debtors to meet their bankruptcy reporting requirements, complete the claims reconciliation process, satisfy applicable SEC and other regulatory requirements, file tax returns, and prosecute their Retained Causes of Action.  The Debtors and their professionals currently rely on these Essential Employees to review and analyze proofs of claims, manage litigation settlement negotiations, reconcile pre-payments and other set-offs with vendors, prepare monthly operating reports, prepare SEC and other regulatory filings, prosecute the plan

---

[5]      In addition to the proposed Essential Employees set forth on **Exhibit B** and **Exhibit C**, the Debtors may add up to two additional employees who are parties to employment agreements with the Debtors to the proposed settlement as may be agreed by the Debtors, the EC, and the UCC.  To the extent that such employees are added, the Debtors will supplement and file with the Court a revised **Exhibit B** and **Exhibit C** to include such employees as Essential Employees and reflect the terms of their participation in the settlement.

process, sell additional assets (where appropriate), and otherwise manage the Debtors. The Debtors believe that if any of the Essential Employees were to leave the Debtors before Plan effectiveness, the Debtors could face significant additional challenges in exiting chapter 11. Further, the post-effective date Debtors and the claims ombudsman to be appointed in connection with the proposed Plan (the "**Claims Ombudsman**") will need the Essential Employees' institutional knowledge and support after emerging from bankruptcy to, among other things, efficiently reconcile claims, satisfy SEC and other regulatory requirements, and prosecute the Retained Causes of Action.

### D.    Settlement of Claims Relating to the Employment Agreements

19.    At least four of the Essential Employees are insiders of the Debtors. The Essential Employees are also members of the Debtors' core senior management team and each has an Employment Agreement with the Debtors. Under the Employment Agreements, the Essential Employees may resign for "Good Reason." In such event or in the event that they are terminated without "Cause," the Essential Employees would be entitled to, among other things, separation pay consisting of a percentage of base salary (six to eight months), a *pro rata* bonus based on the month in which employment is terminated, a payment in lieu of health insurance benefits, and accelerated vesting of equity awards granted to such Essential Employees.[6] An Essential Employee may have "Good Reason" to terminate his or her Employment Agreement if, among other things, the Debtors breach the Employment Agreement or if the Essential Employee suffers a material reduction in position, status, duties or responsibilities. Given the circumstances of these Chapter 11 Cases, there is a significant likelihood that these Essential

---

[6]    The Essential Employees have all timely filed proofs of claim against the Debtors to assert, among other things, their claims for obligations arising under the Employment Agreements, including severance, benefits, bonuses, and acceleration of all stock grants not otherwise vested under the Employment Agreements.

Employees will be terminated once the cases are completed (if not sooner) and that such employees may, in fact, assert that they already have "Good Reason" to terminate their own employment.[7]   The Debtors do not concede that "Good Reason" exists and would prefer that the Essential Employees remain rather than risk testing whether the Essential Employees have "Good Reason" to separate from the Debtors and still collect significant severance payments.

20.     Additionally, the amount of severance payments to which such Essential Employees would be entitled is also subject to dispute in light of the terms of the Employment Agreements and limitations on claims for damages arising from the termination of employment contracts set forth in section 502(b)(7) of the Bankruptcy Code.   That provision would limit such allowed claims to (a) one year of compensation provided by the contract, without acceleration, following the petition date plus (b) any unpaid compensation due under the contract, without acceleration, on the petition date.   *See* 11 U.S.C. § 502(b)(7).   Although not conceding the merits of an employee's position, in the event of a contested claim process, the Debtors expect that the Essential Employees would argue that the capped amounts permitted by section 502(b)(7) are in excess of their claimed severance amounts.

21.     In order to prevent the Essential Employees from exercising a purported Good Reason termination (to which the Debtors reserve all rights), incentivize the Essential Employees to do the necessary work to successfully complete these chapter 11 cases, secure post-effective date cooperation and support, and avoid any dispute regarding the allowed amounts of the Essential Employees' claims under the Employment Agreements, the Debtors have proposed a

---

[7]    The Debtors reserve all rights and defenses to oppose any argument that there is "Good Reason" but note that the Essential Employees might allege that they have not received all of their employment entitlements (including equity award vesting and indemnification rights) or that their responsibilities have substantially changed given the filing of the Chapter 11 Cases, significant reduction in personnel, or the sale of certain of the Debtors' assets.

settlement (the "**Settlement**") whose terms are set forth in the Settlement Term Sheet attached as

**Exhibit B** to this Motion.  Among other things, the Settlement provides for the following:

- Each Essential Employee participating in the Settlement shall continue to work through the Effective Date on a full-time basis, unless terminated by the Debtors, subject to such participating employee's compliance in all material respects with the general terms of the Settlement Term Sheet and execution (and, if applicable, non-revocation) of the release of the Debtors consistent with the Settlement Term Sheet at termination of employment.

- Each Essential Employee participating in the Settlement shall receive, on the Effective Date, an agreed allowed general unsecured claim (the "**Employee Claim**") in the amounts and on the terms set forth in the Settlement Term Sheet.

- Distribution with respect to each Employee Claim would be made as follows: distribution on account of two-thirds of each Employee Claim shall be made within thirty (30) days of the plan effective date (provided that the Debtors file a Form 10-Q for the third quarter of 2023) and the remainder shall be made within 120 days of the plan effective date; in each case, *provided that*, participating employees shall not be entitled to a greater percentage recovery than other allowed General Unsecured Claims and provided further that participating employees shall be entitled to any subsequent "holdback" distributions made by the post-effective date Debtors or Claims Ombudsman.

- All payments are to be made without setoff or counterclaim.  Without limiting the foregoing, allowed Employee Claims shall not include: (a) rights/claims of Essential Employees for indemnification or reimbursement, and all such claims would be reserved,  (b) rights of Essential Employees to restricted stock units ("RSUs"), which shall receive the treatment of common stock interests as set forth in the plan, provided that the participating employees agree that the Debtors are not required to withhold or sell shares issued upon vesting of unvested RSU's to satisfy state or federal or local income taxes, or (c) rights/claims of Essential Employees with respect to D&O insurance, which rights/claims shall be reserved.

- In the event that the post-effective date Debtors default on their payment obligations, the Essential Employees' cost of collecting the Employee Claim shall be borne by the post-effective date Debtors; *provided that*, for the avoidance of any doubt, it shall not be a default for the post-effective date Debtors to pay participating employees the same percentage recovery as other allowed General Unsecured Claims under the plan.  In the event of a breach by an Essential Employee of his or her obligations under this Settlement, the Bankruptcy Court shall have jurisdiction to fashion an equitable remedy, which may include, without limitation, disgorgement of any payments made under the Settlement.

- Each Essential Employee participating in the Settlement would agree to consult with the post-effective date Debtors as set forth in the Settlement Term Sheet attached as **Exhibit B**.  All consulting requirements would terminate six months after the Effective Date and, except as set forth on **Exhibit B** with respect to certain post-effective date services by certain Essential Employees, the Essential Employees would not receive any additional consideration for post-effective date consulting.  Post-Effective Date services will be provided on an independent contractor basis, and not be entitled to receive any benefits.  Each Essential Employee participating in the Settlement and the post-effective date Debtors shall work in good faith to address and abide by any restrictions on consulting services necessary to such Essential Employee's post-effective date employment.

- All confidentiality provisions set forth in the applicable Employment Agreements of Essential Employees participating in the Settlement would remain in place notwithstanding rejection.

- All Essential Employees participating in the Settlement would execute a "standard" release of claims at termination, which would include (without limitation) any additional severance, but would reserve all rights and claims in respect of indemnification, reimbursement, RSUs, D&O insurance, and under the Settlement.

- The obligation to execute any securities filings would be subject to the post-effective date Debtors having satisfactory directors and officers insurance.

- Essential Employees participating in the employment agreement claim settlement shall execute an agreement (in form and substance reasonably acceptable to the EC) acknowledging the terms of the Settlement and such other terms as may be reasonably acceptable to the Debtors.

- The Settlement is subject to approval by the Bankruptcy Court.  For the avoidance of any doubt, in the event that the Settlement is not approved by the Bankruptcy Court or the Debtors' chapter 11 cases are converted to cases under chapter 7 of the Bankruptcy Code, the Settlement shall be null, void, and without effect, and all rights of the Debtors, their estates (and any successor thereto, including a Chapter 7 Trustee), and the Essential Employees shall be fully reserved.

In addition, as part of the Essential Employees ultimate termination from the Debtors, the Employment Agreements will be rejected pursuant to section 365 of the Bankruptcy Code in connection with the Debtors' proposed Plan (or sooner if ordered by the Bankruptcy Court).  The allowed Employee Claims would resolve any rejection damage claims (other than indemnification, reimbursement, RSUs, and D&O insurance) related to such rejection.

**Basis for Relief**

**A.     The Proposed Settlement Is Fair and Equitable and Should Be Approved**

22.     Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, a court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).   Compromises are favored in bankruptcy because they minimize the costs of litigation and further the parties' interests in expediting administration of a bankruptcy estate. *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 393 (3d Cir. 1996); 10 Collier on Bankruptcy, ¶ 9019.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed., 2013).   In deciding whether to approve a compromise under Bankruptcy Rule 9019, a court must determine if the settlement is "fair, reasonable, and in the interest of the estate."   *In re TSIC, Inc.*, 393 B.R. 71, 78 (Bankr. D. Del. 2008); *In re Key3Media Grop., Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005) (citing *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).   This test is known as the "best interests" test.

23.     Under the "best interests" test, a debtor must show that a compromise or settlement is "fair and equitable" to the estate.   *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Nutraquest, Inc.*, 434 F.3d 639, 645 (3d Cir. 2006) (discussing application of the fair and equitable standard); *Martin*, 91 F.3d at 393 (same); *In re Marvel Entm't Grop., Inc.*, 222 B.R. 243 (D. Del. 1998) (proposed settlement held to be fair and equitable and in the best interests of the estate).

24.     Here, at least four of the Essential Employees are insiders.   Typically, this would require closer scrutiny.   *Schubert v. Lucent Techs. Inc.* (*In re Winstar Commc'ns, Inc.*), 554 F.3d 382, 412 (3d Cir. 2009) ("A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts." (*quoting Fabricators Inc. v. Tech. Fabricators, Inc.* (*In re Fabricators, Inc.*), 926 F.2d 1458, 1465 (5th Cir. 1991)); *see also In re Drexel Burnham*

*Lambert Grp, Inc.,* 134 B.R. 493 (Bankr. S.D.N.Y. 1991) (agreements negotiated with insiders are subject to closer scrutiny).  In this case, however, closer scrutiny is not necessary or required, because the Settlement was approved by the Compensation Committee of the Debtors' Board of Directors, the members of which are independent and not participants in the Settlement.  *See In re Soup Kitchen International Inc.*, 506 B.R. 29, 45 (Bankr. E.D.N.Y. 2014).  In addition, the EC, an independent estate fiduciary, also supports the settlement.  *Id.*

25.    Courts consider the following four factors when evaluating a proposed settlement: (1) the probability of success in litigation concerning the subject matter of the settlement; (2) the projected difficulty in collecting after obtaining a judgment in such litigation; (3) the complexity of the issues involved, and the expense, inconvenience, and delay that would therefore attend such litigation; and (4) the paramount interest of holders of claims against and interests in the debtor, to which proper deference should be afforded.  *Martin*, 91 F.3d at 393 (following *TMT* and clarifying four-factor test); *see also Nutraquest*, 434 F.3d at 644-45; *In re RNI Wind Down Corp.*, 348 B.R. 286, 297-99 (Bankr. D. Del. 2006) (applying *Martin* factors and approving settlement); *In re Kaiser Aluminum Corp.*, 339 B.R. 91, 96-97 (D. Del. 2006) (same).

26.    In applying the *Martin* four-factor test, the appropriateness of a proposed compromise and settlement does not depend on a determination that the settlement reached is the best that could possibly be obtained, but rather, whether the settlement "fall[s] below the lowest point in the range of reasonableness."  *In re Pa. Truck Lines, Inc.*, 150 B.R. 595, 598 (E.D. Pa. 1992), *aff'd*, 8 F.3d 812 (3d Cir. 1993).  The Debtors submit that the Settlement is reasonable and should be approved.  Indeed, the compromises embodied in the Settlement are fair and equitable, fall squarely within the range of reasonableness, and satisfy each of the applicable *Martin* factors.

27.    The *Martin* factors favor the approval of the Settlement.   If the Essential Employees sought to terminate their employment for "Good Reason," the Debtors would retain all defenses to such arguments but, as a practical matter, would lose the expertise that the Essential Employees possess and would face significant challenges in taking the Plan effective. In addition, the post-effective date Debtors and the Claims Ombudsman would face significant additional challenges, including substantial additional cost in complying with continuing SEC and other regulatory requirements, in reconciling claims and prosecuting the Retained Causes of Action.   Thus, even if the Debtors prevailed in arguing that that none of the Essential Employees has "Good Reason" to terminate their employees, they would nevertheless risk significant loss. The Settlement avoids this outcome.

28.    Further, if the Essential Employees successfully established termination for "Good Reason," or if they were terminated without "Cause" before the conclusion of these cases, the Debtors would potentially owe significant severance obligations to the Essential Employees over and above the settled amounts.  The settlement resolves disputes over the calculation of the claim amount, timing of payment, and secures ongoing cooperation of the Essential Employees. The Employment Agreements call for a severance payment equal to a portion of the employee's annual base salary, a prorated target bonus and an additional payment in lieu of health insurance. It is uncertain whether the contractual severance payments exceed the cap set forth in section 502(b)(7) of the Bankruptcy Code for at least certain of the Essential Employees.  Accordingly, without a settlement, the Debtors and the Essential Employees would likely have to engage in costly litigation to determine the proper amount of the Essential Employees' allowed claims. That is not in the best interests of the Debtors, and the Settlement avoids this result.  Importantly, under the Settlement, certain of the Essential Employees have agreed to accept general unsecured

claims in discounted severance amounts.  Moreover, the Debtors believe that the agreed four of

the six settlement amounts are below the 502(b)(7) cap as computed by the Debtors and that the

remaining two are reasonably within the range of litigation possibilities if the matter were to be

litigated.  In addition, it is a condition of the Settlement that the Essential Employees agree to

continue to work through the Effective Date and to provide significant support post-

effectiveness, as needed.  Finally, the Debtors note that the Essential Employees are merely

receiving a general unsecured claim, which will be paid pro rata with other unsecured claims.

For the foregoing reasons, the Settlement falls within the range of reasonableness and should be

approved.

**B.      Section 503(c) of the Bankruptcy Code is Not Applicable**

29.      The Debtors have not sought to implement—and do not here seek to implement—

a key employee incentive, retention, or similar program that would implicate section 503(c) of

the Bankruptcy Code.  Even though at least certain of the Essential Employees are "insiders"

under section 101(31) of the Bankruptcy Code, the Settlement does not implicate section 503(c)

of the Bankruptcy Code.  Most importantly, the Settlement does nothing more than resolve the

Essential Employees' general unsecured claims under their Employment Agreements, which

would be paid pursuant to the terms of a confirmed plan.  No administrative expense claims are

being awarded and no payments are to be made prior to the effectiveness of the Plan.  Thus,

section 503(c) of the Bankruptcy Code is not applicable.  *In re Dana Corp.*, 358 B.R. 567, 578

(Bankr. S.D.N.Y. 2006) ("[T]he language of section 503(c) is clear and unambiguous that *only*

*administrative claims* are subject to section 503(c) restrictions"); *In re Journal Register Co.*, 407

B.R. 520, 535 n.8 (Bankr. S.D.N.Y. 2009) ("Like the rest of § 503, subsection 503(c) applies

only when the proposed bonuses are to be paid as administrative expenses of a bankruptcy

estate"); *In re Airway Indus., Inc.*, 354 B.R. 82, 87 (Bankr. W.D. Pa. 2006) ("Section 503(c) covers three categories of administrative expense: (1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business . . .  (2) a severance payment to an insider of the debtor . . . (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.").  Importantly, pursuant to the Settlement, the Essential Employees would not be "jumping the line."  Instead, they would be receiving allowance of unsecured claims on account of contractually mandated severance, which would be paid after the effective date of the proposed Plan—claims that the Essential Employees would be entitled to pursue regardless of the Settlement.  Section 503(c) does not apply.

### No Prior Request

30.     No prior request for the relief sought in this Motion has been made to this or any other Court in connection with these Chapter 11 Cases.

### Notice

31.     Notice of this Motion will be provided to the following parties: (a) the U.S. Trustee; (b) counsel to Foxconn; (c) counsel to the UCC; (d) counsel to the EC; (e) the Securities and Exchange Commission; (f) the Internal Revenue Service; (g) the United States Attorney's Office for the District of Delaware; (h) the state attorneys general for states in which the Debtors conduct business; (i) any parties that have asserted liens against the Debtors' assets; (j) each of the Essential Employees; and (k) all parties entitled to notice pursuant to Local Bankruptcy Rule

2002-1(b).  Based on the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is required.

### Conclusion

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order, substantially in the form attached hereto, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated: November 13, 2023

Respectfully submitted,

/s/ *Morgan L. Patterson*

**WOMBLE BOND DICKINSON (US) LLP**

Donald J. Detweiler (Bar No. 3087)
Morgan L. Patterson (Bar No. 5388)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile:  (302) 252-4330
don.detweiler@wbd-us.com
morgan.patterson@wbd-us.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**WHITE & CASE LLP**

Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
Fan B. He (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
tlauria@whitecase.com
mbrown@whitecase.com
fhe@whitecase.com

David M. Turetsky (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
david.turetsky@whitecase.com

Jason N. Zakia (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
jzakia@whitecase.com

Roberto Kampfner (admitted *pro hac vice*)
Doah Kim (admitted *pro hac vice*)
RJ Szuba (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700
rkampfner@whitecase.com
doah.kim@whitecase.com
rj.szuba@whitecase.com

*Counsel to Debtors and Debtors-in-Possession*