## Exhibit A

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**ADMINISTRATIVE PROCEEDING**
**File No.**

|  |  |  |
|---|---|---|
| | : | |
| **In the Matter of** | : | |
| | : | |
| **LORDSTOWN MOTORS CORP.,** | : | **OFFER OF SETTLEMENT** |
| | : | **OF LORDSTOWN MOTORS CORP.** |
| **Respondent.** | : | |
| | : | |
| | : | |

**I.**

Lordstown Motors Corp. ("Lordstown" or "Respondent"), pursuant to Rule 240(a) of the Rules of Practice of the Securities and Exchange Commission ("Commission") [17 C.F.R. § 201.240(a)], submits this Offer of Settlement ("Offer") in anticipation of cease-and-desist proceedings to be instituted against it by the Commission, pursuant to Section 8A of The Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act").

**II.**

This Offer is submitted solely for the purpose of settling these proceedings, with the express understanding that it will not be used in any way in these or any other proceedings, unless the Offer is accepted by the Commission (provided, however, that Respondent may file or otherwise make use of this Offer in connection with its pending chapter 11 proceedings in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), styled *In re: Lordstown Motors Corp., et al.*, Case No. 23-10831 (jointly administered)). If the Offer is not accepted by the Commission, the Offer is withdrawn without prejudice to Respondent and shall not become a part of the record in these or any other proceedings, except that rejection of the Offer does not affect the continued validity of the waivers pursuant to Rule 240(c)(5) of the Commission's Rules of Practice [17 C.F.R. § 201.240(c)(5)] with respect to any discussions concerning the rejection of the Offer.  This Offer is subject to Bankruptcy Court approval.

**III.**

On the basis of the foregoing, the Respondent hereby:

A.      Admits the jurisdiction of the Commission over it and over the matters set forth in the Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order");

B.      Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission or in which the Commission is a party, prior to a hearing pursuant to the Commission's Rules of Practice [17 C.F.R. § 201.100 et seq.], and without admitting or denying the findings contained in the Order, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, consents to the entry of an Order by the Commission containing the following findings[1] set forth below:

## Summary

These proceedings arise from misrepresentations by Lordstown and its former Chairman and CEO, Steve Burns, about the company's plans to develop the first full-size electric pickup truck called the Endurance during and after the process of taking the company public. Lordstown, founded by Burns in 2019, became publicly traded in October 2020 through a merger with a special purpose acquisition company ("SPAC") called DiamondPeak Holdings Corporation ("DiamondPeak"). During and after the merger, which raised approximately $675 million from investors, Lordstown and Burns made materially false and misleading statements about Lordstown's business in SEC filings and other public statements. These statements told investors that Lordstown would be first-to-market with a viable electric pickup truck targeted for the commercial fleet market, and Lordstown already had an established base of customer demand evidenced by tens of thousands of "pre-orders" from commercial fleet customers. Knowing that this first-mover advantage would be critical to the company's success, Lordstown and Burns misrepresented the true nature of the pre-orders for the truck, whether Lordstown had access to the key parts it needed to make the truck, and when the company would be able to deliver the truck to customers.

Lordstown also filed financial statements audited by a purportedly independent accounting firm when that firm was not in fact independent under the relevant audit standards. As a private company, in early 2020, Lordstown engaged Clark Schaefer Hackett & Co., ("CSH") to audit its 2019 financial statements under Generally Accepted Auditing Standards ("GAAS"), and to provide non-audit services by assisting management in preparing the financial statements and performing bookkeeping services. Later in the year, CSH audited the same 2019 financials under Public Company Accounting Oversight Board ("PCAOB") standards. CSH violated SEC rules and independence standards by auditing the financial statements while providing prohibited bookkeeping services to Lordstown during the same audit and professional engagement period.

In connection with the above material misstatements and omissions, and failure to file financial statements audited by an independent auditor, Lordstown violated Sections 17(a)(2) and

---

[1]      The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

17(a)(3) of the Securities Act, Sections 13(a) and 14(a) of the Exchange Act and Rules 12b-20, 13a-11, and 14a-3 thereunder.

## A.    RESPONDENT

**Lordstown Motors Corp**., is incorporated in Delaware with its principal place of business in Lordstown, Ohio. Lordstown was an original equipment manufacturer of electric light duty vehicles focused on the commercial fleet market. On June 27, 2023, Lordstown filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code. Lordstown's Class A common stock traded on the Nasdaq Global Stock Market under the symbol "RIDE" from October 26, 2020 until July 7, 2023, when it began trading on the over-the-counter market under the symbol "RIDEQ." Lordstown's common stock was registered with the Commission under Section 12(b) until October 25, 2023 when the registration reverted to Section 12(g) of the Exchange Act pursuant to a Form 25 filed by Nasdaq Global Select Market on July 27, 2023. At all relevant times, Lordstown was required to file periodic reports with the Commission pursuant to Section 13(a) of the Exchange Act.

## B.    RELEVANT INDIVIDUAL AND ENTITY

**Stephen "Steve" Scott Burns,** 64, resident of Maineville, Ohio, in April 2019 founded Lordstown as a private company, and a director and its CEO.  After Lordstown merged with DiamondPeak in October 2020, Burns became Lordstown's Chairman and CEO until he resigned from both positions on June 14, 2021.

**Clark Schaefer Hackett & Co**. ("CSH"), an Ohio corporation headquartered in Cincinnati, Ohio, is an accounting and advisory firm that provided accounting and audit services to Lordstown. CSH is registered with the PCAOB.

## C.    FACTS

1.      Burns founded then-private Lordstown in April 2019 for the purpose of developing and manufacturing light duty electric trucks targeted for sale to fleet customers. Since its inception, Lordstown had been developing its flagship vehicle, the Endurance, an electric full-size pickup truck, for the commercial fleet market. To manufacture the Endurance, in November 2019 Lordstown acquired from General Motors Company ("GM") an assembly and manufacturing plant in Lordstown, Ohio.

2.      On August 3, 2020, DiamondPeak, a publicly traded SPAC, and Lordstown announced that they had entered into a proposed business combination transaction via a merger agreement. From August to October 2020, DiamondPeak filed proxy soliciting materials relating to the merger, which was approved by DiamondPeak's shareholders on October 22, 2020. DiamondPeak and Lordstown's merger transaction closed on October 23, 2020, and Lordstown emerged as the publicly traded successor to DiamondPeak. In connection with the merger, Lordstown received approximately $675 million in proceeds from DiamondPeak's cash held in trust and from a private investment in public equity ("PIPE") offering to accredited investors. Also in connection with the merger, Lordstown assumed publicly traded and private warrants

previously issued by DiamondPeak in its initial public offering in March 2019, and additional private warrants issued for the merger.

3.      On November 12, 2020, Lordstown filed a registration statement and prospectus on Form S-1 to register its common stock, its publicly traded and private warrants, and for resale the shares issued in the PIPE offering. The Form S-1 was declared effective on December 4, 2020. On December 14, 2020, Lordstown issued a redemption notice for the public warrants, and on January 27, 2021 Lordstown redeemed all of the public warrants and received approximately $107 million from investors who exercised the warrants. On December 28, 2020, Lordstown filed a registration statement and prospectus on Form S-8 to register certain of its common stock and stock options issued or to be issued to certain of its directors, officers, and employees under incentive compensation plans.

4.      Lordstown and Burns told investors that Lordstown's purpose was to develop and manufacture the Endurance, the first electric full-size pickup truck designed for the commercial fleet market, which Lordstown defined in SEC filings as "commercial and governmental organizations with three or more vehicles." For this purpose, Lordstown touted in investor presentation materials at the time of the merger announcement that it was uniquely positioned to obtain a "first mover" advantage by becoming the first to produce and deliver the Endurance to commercial fleet markets. Lordstown claimed, among other things, it had secured 27,000 "pre-orders" for the Endurance from fleet customers representing $1.4 billion in potential revenue. Lordstown also highlighted that its relationship with GM, including Lordstown's acquisition of its near-production-ready plant from GM, and Lordstown's agreements with GM that provided Lordstown access to certain GM parts to develop the Endurance, would enable Lordstown to develop the Endurance with only a modest incremental investment compared to other companies. Lordstown claimed to investors that these and other factors positioned Lordstown to deliver an electric pickup truck in the second half of 2021, sooner than anyone else, and estimated it would sell and deliver 2,200 Endurance trucks in 2021, 31,600 trucks in 2022, and 65,000 trucks in 2023, generating $5.3 billion in cumulative revenue.

5.      From August 2020 to February 2021, however, Lordstown and Burns made numerous materially false or misleading statements about Lordstown's business, including its "pre- orders," access to critical parts from GM, and the delivery timeline for the Endurance. These misrepresentations concealed the truth about the demand for the Endurance, and about Lordstown's ability to be the first company to manufacture and deliver an electric full-size pickup truck to the commercial fleet market.

**<u>Misrepresentations About Pre-Orders for the Endurance</u>**

6.      From August 3, 2020 to February 6, 2021, in SEC filings and other public statements, Lordstown and Burns made materially false or misleading statements about Lordstown's pre-orders for the Endurance.

<u>Background of Lordstown's Pre-Orders</u>

7.      To estimate the demand for the Endurance, Lordstown's sales team contacted potential customers beginning in early 2020, and requested them to sign a form of a non-binding

letter of intent and reservation agreement ("LOI") specifying the quantity of Endurance trucks the customer wished to reserve. The LOI by its terms was a one-page, form agreement prepared by Lordstown, and did not require payment of any kind by the customer, and the customer was under no obligation to purchase the Endurance.

8.      In SEC filings and other public statements, Lordstown described these LOIs as "pre-orders" from or primarily from fleet operators, and generally that the pre-orders were not binding and did not require any deposit. Lordstown further qualified that there could be no assurance that Lordstown will successfully convert the pre-orders into binding orders or sales. During the relevant period, Lordstown and Burns used the terms LOIs, reservations, pre-orders, and "pre- sales" interchangeably as having the same meaning.

9.      Pre-orders were an important metric for Lordstown because, as a startup company developing a new product, Lordstown had no orders or sales to report to investors. Because Lordstown's business purpose was to develop and manufacture the Endurance for the commercial fleet market, pre-orders were also important for potential fleet customers, who Lordstown believed may be more comfortable buying a truck from a new manufacturer that their peers are also buying. Lordstown believed that increasing numbers of pre-orders from fleets would create further demand for the Endurance. After the merger with DiamondPeak, Burns directed Lordstown's sales team to obtain additional pre-orders from customers to increase the total amount because pre-orders were "[r]eally important to the investment community and to our prospect[ive] fleet customers."

10.      Lordstown did not have any policies or procedures to evaluate pre-order counterparties. Lordstown's sales team, comprised mostly of individuals with no sales experience in the automotive industry, were not given any instructions or guidance to determine whether a customer was a commercial fleet customer. In addition, Lordstown did not have any policies or procedures around recording, tracking, or maintaining pre-order data.

11.      After Lordstown announced in August 2020 that it had secured 27,000 pre-orders for the Endurance from fleet customers, Lordstown continued to solicit potential fleet customers to increase the number of pre-orders to highlight to potential investors and customers. Throughout the fall of 2020, Lordstown and Burns made numerous public statements touting increasing numbers of pre-orders from fleet customers. On January 11, 2021, Lordstown issued a press release stating it had received 100,000 pre-orders from commercial fleets, which Burns described as "unprecedented in automotive history."

12.      On March 12, 2021, however, Hindenburg Research ("Hindenburg"), which had taken a short position in Lordstown's stock, published a report that alleged, among other things, that Lordstown's 100,000 pre-orders were largely fictitious and nonbinding, and from customers that generally did not even have fleets of vehicles. Shortly after Hindenburg published its report, Lordstown's Board of Directors formed a Special Committee to investigate Hindenburg's allegations.

13.      On June 14, 2021, the Special Committee issued a public statement addressing Hindenburg's allegations, and stated that certain statements by Lordstown concerning pre-orders were "in certain respects, inaccurate." The Special Committee determined that, while Lordstown

had stated on several occasions that its pre-orders were from, or "primarily" from commercial fleets, in fact many pre-orders were obtained from (i) fleet management companies or other end users that indicated interest in purchasing Endurance trucks, similar to commercial fleets, and (ii) so-called "influencers" or other potential strategic partners that committed to attempt to secure pre- orders from other entities, but did not intend to purchase Endurance trucks directly. The Special Committee also stated that one entity that provided a large number of pre-orders did not appear to have the resources to complete large purchases of trucks. It also found that other entities provided commitments that appeared too vague or infirm to have been appropriately included in the total number of pre-orders disclosed by Lordstown.

<u>Lordstown's Pre-Orders Were Not All From or Primarily From Fleet Customers</u>

14.    On September 21, 2020, DiamondPeak filed a preliminary proxy statement to solicit votes for its merger with Lordstown. In the proxy statement Lordstown stated it had "received pre-orders primarily from fleet operators to purchase over 38,000 Endurance vehicles." In fact, according to the Special Committee's analysis, pre-orders from intermediaries or influencers, and not fleets, comprised over 40% of the 38,000 amount. That amount included pre- orders for 14,000 trucks from one customer representing around $735 million in potential revenue. This customer had no apparent resources to buy such large quantities of the Endurance, and Burns had questioned the customer's financial strength. The 38,000 amount also included another customer who had submitted a pre-order for 1,000 trucks in a non-standard LOI stating that it wished to broker the trucks, and did not intend to buy the Endurance for its own use. The 38,000 amount further included 1,500 pre-orders from a coalition of nonprofit organizations that encouraged or facilitated the use of clean energy, but did not intend to or have any ability to buy the Endurance.

15.    On October 26, 2020, the first day of trading for Lordstown's common stock, Burns stated in an interview by The Detroit News that Lordstown had "pre-sold 40,000 of [the Endurance] to fleet customers already." On November 12, 2020, Lordstown filed a Form S-1 stating it currently had "pre-orders primarily from fleet operators to purchase over 44,000 vehicles[.]" According to the Special Committee's analysis, 48% of the 40,000 amount was from intermediaries or influencers.

16.    On November 16, 2020, Lordstown issued a press release stating it had "received approximately 50,000 non-binding production reservations from commercial fleets…." On the same date, Burns stated in a capital markets-oriented forum that Lordstown had "50,000 pre-sales already, all from fleets." On November 17, 2020, Burns stated in an interview by CNBC that Lordstown had received "50,000 preorders," sold to "fleets," and described the pre-orders as "very serious orders." Lordstown's Form S-1/A filed on December 1, 2020 stated it had "received pre- orders primarily from fleet operators to purchase approximately 50,000 Endurance vehicles." According to the Special Committee's analysis, however, 50% of the 50,000 amount was from intermediaries or influencers.  On December 2, 2020, Burns stated in an investor conference, "[w]e have 50,000 pre-orders already, well in advance of what we thought we would have[,] … almost $3 billion in pre-orders already."

17.    On December 21, 2020, Lordstown posted on social media and filed a Form 8-K stating it had received "80,000 non-binding reservations for the Endurance to date." Although

the statements did not specify whether the pre-orders were from or primarily from fleets, they implied that the pre-orders were from or primarily from fleets, consistent with prior statements. The 80,000 amount also included a pre-order for 5,000 trucks (representing $263 million in potential revenue) by a customer who later canceled the pre-order due to a misunderstanding, but Lordstown's sales team continued to count it towards the total amount. According to the Special Committee's analysis, 67% of the 80,000 amount at this time was from intermediaries or influencers.

18.    On January 11, 2021, Lordstown issued a press release stating that Lordstown "has received more than 100,000 non-binding production reservations from commercial fleets…." The press release quoted Burns as saying, "[r]eceiving 100,000 pre-orders from commercial fleets for a truck like the Endurance is unprecedented in automotive history…." According to the Special Committee's analysis, however, by that time 71% of the 100,000 amount was from intermediaries or influencers. The 100,000 amount also included a verbal indication of interest from a customer who would agree to an "influencer" memorandum of understanding, which was not executed at the time. This memorandum of understanding was not a pre-order agreement or an LOI to buy Lordstown's Endurance, but rather an understanding "to assist Lordstown in generating leads to support the sale of up to 15,000 Endurance trucks by December 31, 2023." This customer expressly informed Lordstown that it did not have a fleet and did not intend to buy any trucks. In interviews with a research analyst and on media outlets in January and February 2021, Burns nevertheless stated that the 100,000 pre- orders were submitted by "fleets," and described the pre-orders as "sticky."

19.    Lordstown and Burns' statements about the increasing numbers of pre-orders from 27,000 to 100,000 were false or misleading. First, the pre-orders were not all from or primarily from fleet customers, a market Lordstown had described in SEC filings as "commercial or governmental organizations with three or more trucks." As the Special Committee found, 40% to 71% of the pre-orders during this period were from intermediaries or influencers who indicated they would encourage, facilitate, or influence the purchase of the Endurance and did not intend to buy it for their own use. Second, Burns' statements that the pre-orders were "very serious orders" or "very sticky" were misleading because the pre-orders were non-binding and customers were not obligated to purchase any trucks. Third, the pre-orders included large quantities from customers who had no apparent ability to buy such quantities of the truck. As a result, Lordstown and Burns, who knew or should have known that certain pre-orders were not from or primarily from fleets, misrepresented the true nature of the demand for the Endurance, which was substantially less than what they had described to investors.

## Misrepresentations About Access to GM Parts

20.    From August 2020 to January 2021, Lordstown and Burns made false and misleading statements about Lordstown's access to certain critical parts from GM to develop the Endurance.

21.    In DiamondPeak's proxy statements for the merger filed beginning in August 2020, Lordstown claimed it had entered into an agreement with GM in April 2020 purportedly providing Lordstown with "access to certain non-customer-facing GM parts, including airbags, steering columns, and steering wheels," that will offer significant benefits to Lordstown's supply

chain. Partly because of this access to GM parts, Lordstown claimed it expected "to substantially complete sourcing [parts] for the Endurance by the end of 2020." In the proxy statements Lordstown also estimated approximately $120 million of capital expenditures for retooling its plant and other investments to complete the Endurance and its supply chain.

22.     Under the agreement with GM, Lordstown's management expected to get access to over 200 GM parts, including approximately 100 critical non-customer-facing parts necessary to develop the Endurance, beyond the three parts mentioned in the SEC filings. These parts were necessary for building the Endurance prototypes and testing them for compliance with federal motor vehicle safety standards ("FMVSS") established by the National Highway Transportation Safety Administration before any Endurance could be sold and delivered to customers.

23.     But soon after the announcement of the merger in August 2020, Lordstown's management realized they did not have access to the vast majority of the critical non-customer-facing GM parts. These parts could not be purchased directly from GM because GM did not make them; the parts were made by GM's suppliers under GM's authorization, which was a complex, time-consuming process with no certainty as to whether GM would ultimately authorize Lordstown to use the parts. For each part requested by Lordstown, Lordstown had to obtain authorization from GM to determine whether the part could be used by Lordstown. If GM authorized Lordstown's use of the part, GM had to authorize the part's supplier to conduct a feasibility analysis to determine whether the supplier could produce the quantities of the part requested by Lordstown. If so, then Lordstown and the supplier had to develop a product agreement for the part for GM's approval. After that, the supplier could then produce the part, which could take months to do.

24.     By October 2020, Lordstown still had no access to the vast majority of the requested GM parts. A Lordstown officer alerted Burns, "so far we have GM Tooling authorization letters for just 4 of ~90 parts completed…. The Endurance program timing is now in jeopardy for the key parts that need [GM] approval." Also in October, another Lordstown officer complained to a GM officer, "we represented to the market that [Lordstown] and GM had a parts deal…. We are not getting the necessary support from [GM] …. This delay is going to have a serious impact if it is not addressed immediately."

25.     By the end of December 2020, Lordstown's lack of access to the GM parts remained unchanged, and Lordstown's plan to produce and deliver the Endurance by the second half of 2021 was in serious jeopardy. Lordstown had no visibility into if or when it might obtain access to the GM parts needed to produce and certify the Endurance with FMVSS before selling and delivering it to customers. In fact, GM informed Lordstown and Burns in December 2020 that Lordstown's requests for GM parts would constrain GM's own supply chain, and advised Lordstown to find a backup solution for the vast majority of the requested parts in case GM ultimately rejected Lordstown's request.

26.     Nevertheless, Lordstown continued to state falsely in SEC filings in fourth-quarter 2020 that Lordstown had access to the GM parts. Lordstown's Forms S-1 and S-1/A filed in November and December 2020 and signed by Burns stated, like the August 2020 DiamondPeak proxy statement, that Lordstown had access to the GM parts, and management

expected to substantially complete sourcing parts for the Endurance in the second half of 2020, when in fact Lordstown did not have such access, and was nowhere close to sourcing the parts.

27.     Further, in the November 17, 2020 CNBC interview, Burns misleadingly stated GM "has opened up their parts bin" to Lordstown, implying that Lordstown was free to buy or take whatever parts it wanted from GM. On December 2, 2020, in an investor conference Burns again claimed GM "opened up its parts bin to us. The parts bin is very very valuable to us…." And on January 11, 2021, in an interview by a research analyst, Burns stated GM "opened up their parts bin, right? So we're using GM parts in here and some critical parts, mostly around the safety stuff, so we can get through the crash testing."

28.     These statements by Lordstown and Burns were false and misleading because Lordstown did not have access to the GM parts as stated in SEC filings, and GM had not "opened up its parts bin" in any sense. In fact, GM specifically informed Lordstown that its requests for GM parts would constrain GM's own supply chain, and that Lordstown should find backup plans for the vast majority of its requested parts. As a result, Lordstown had to source from other suppliers the necessary parts it could not access from GM, thereby increasing Lordstown's capital expenditure by at least an additional $150 million, on top of the $120 million estimate at the time of the merger announcement in August 2020.

**Misrepresentations About the Delivery Timeline for the Endurance**

29.     In October and November 2020, Lordstown and Burns made materially false and misleading statements about Lordstown's ability to deliver the Endurance to the commercial fleet market.

30.     To obtain the "first mover" advantage by bringing an electric full-size pickup truck to the market before anyone else, at the time of the merger announcement in August 2020 Lordstown and Burns stated Lordstown planned to deliver the Endurance by the second half of 2021. At that time, Lordstown's production and engineering teams had, with Burns' approval, internally targeted the production of the Endurance in September or October of 2021. Production referred to the process of starting to build a vehicle that can be sold and delivered to a customer after it is certified to comply with regulatory requirements, including FMVSS. Because Lordstown's production and engineering teams expected the testing required to certify the Endurance with FMVSS to take at least several months to complete after production had started, it was not possible for Lordstown to sell or deliver to a customer an Endurance at the same time Lordstown started production without certifying that the vehicle complied with FMVSS.

31.     But shortly after the August 2020 merger announcement, Lordstown was already experiencing delays with its suppliers, including its lack of access to GM's parts described above, that jeopardized the production and delivery timelines for the Endurance. By October 2020, Lordstown's supply chain and other issues had delayed the production timeline for the Endurance to November 2021 at the earliest, and its delivery schedule to months later, likely into 2022. Lordstown's production and engineering teams, who regularly updated Burns on the production and delivery timelines, informed Burns of these delays, and he was "in line" with them.

32.     Despite these worsening delays to the Endurance's production and delivery timelines, Lordstown and Burns made false and misleading public statements that Lordstown would deliver (not just start production for) the Endurance to customers by September 2021.

33.     On October 26, 2020, just after Lordstown's merger with DiamondPeak had closed, and on the first day of trading for Lordstown's common stock, Burns stated to The Detroit News, "[n]ext September [2021] deliveries start. We've pre-sold 40,000 of them to fleet customers already, … but September it starts."

34.     On October 27, 2020, in an interview with Fox Business, in response to a question of when someone can actually buy an Endurance, Burns stated, "[y]ou can buy one now but you can take delivery in September [2021]."

35.     On November 16, 2020, just before a series of public media appearances by Burns and before Lordstown was scheduled to issue its first SEC filing as a public company, Burns directed Lordstown to issue a press release claiming, "Lordstown Motors has received approximately 50,000 non-binding production reservations [for the Endurance] from commercial fleets …. [D]eliveries … are expected to begin in September 2021, with full production ramping up throughout 2022." Burns knew that Lordstown could not deliver the Endurance in September 2021, even if production could start in September 2021. He nevertheless directed the press release to state "September 2021" for the expected delivery date because he "did not want [Lordstown's] internal [production and engineering] team to think they have extra time."

36.     These statements were materially false and misleading at the time they were made because Lordstown could not, and had no plans to, sell and deliver the Endurance to a customer by September 2021 without certifying that the Endurance complied with regulatory requirements.

### Failure to File Financial Statements Audited by Independent Public Accountant

37.     In January 2020, Lordstown, then a private company, engaged CSH to audit Lordstown's 2019 financial statements under GAAS applicable to private companies, and to provide financial statement preparation services. Lordstown's then-CFO also asked CSH to calculate Lordstown's stock compensation expense and prepare notes to the financial statements.

38.     At the conclusion of the audit, in May 2020, CSH issued an audit report containing an opinion under GAAS for Lordstown's 2019 financial statements.

39.     In July 2020, in anticipation of Lordstown's merger transaction with DiamondPeak, CSH and Lordstown entered into a new engagement letter to audit Lordstown's 2019 financial statements under PCAOB standards applicable to audits of public companies. During the course of that audit, Lordstown identified and corrected errors in the financial statements, including a $271,103 understatement of stock compensation expense that was previously both prepared and audited by CSH during its previous GAAS audit.

40.     On August 24, 2020, CSH issued an audit report under PCAOB standards containing an opinion on Lordstown's revised 2019 financial statements. DiamondPeak's August 24, 2020 proxy statement, filed with the Commission, included this audit opinion.

41.     From 2020 through 2023, CSH's August 24, 2020 audit opinion on Lordstown's 2019 financial statements was filed in Lordstown's registration statements, and periodic filings incorporated by reference therein, filed with the Commission.

42.     The facts and circumstances in which an auditor will—and will not—be deemed independent are set forth in Rule 2-01 of Regulation S-X. Rule 2-01(c) provides a non-exclusive list of specific relationships that render an accountant not independent. Rule 2-01(c)(4) states that an auditor will not be considered independent if it provides certain bookkeeping services for its audit client or if it prepares financial statements "that are filed with the Commission or that form the basis of financial statements filed with the Commission." Further, PCAOB Rule 3520, Auditor Independence, requires that an auditor be independent of its client throughout the audit and professional engagement period, and an auditor to comply with independence criteria established by the rules and regulations of the Commission. When CSH performed the audit of Legacy Lordstown's 2019 financial statements under PCAOB standards, CSH audited its own work and consequently lacked independence. CSH's audit report contained an unqualified opinion in which it represented that it had conducted an audit in accordance with PCAOB standards.  By violating PCAOB independence standards, that representation was inaccurate.

### Subsequent Developments

43.     During the relevant period, Lordstown offered and sold securities, including the offer and sale of common stock, the issuance of warrants to purchase common stock, the offer of shares to employees in employee benefit plans, and the award of stock and stock options to employees as incentive compensation. Lordstown received money and property from the offer and sale of securities throughout the relevant period.

44.     Following the company's response to the Hindenburg report, Burns resigned as Lordstown's Chairman and CEO. The company failed to develop and sell a material number of the Endurance, and in June 2023, the company, and certain affiliates, each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, Case No. 23-10831 (MFW) (Bankr. D. Del.) (jointly administered) (the "Delaware Bankruptcy").

45.     Lordstown and DiamondPeak, as well as Burns and other defendants, were subsequently named as defendants in a series of private class action and stockholder derivative lawsuits, alleging similar misconduct to the findings described above. At the time of its bankruptcy filing, Lordstown, Burns and other individuals were defendants in a consolidated securities fraud class action that was pending in the U.S. District Court for the Northern District of Ohio, captioned *In re Lordstown Motors Corp. Sec. Litig.* No. 4:21-cv-616-DAR (N.D. Ohio) (the "Ohio Securities Class Action"). In addition, a separate consolidated stockholder class action was filed prior to the bankruptcy in the Delaware Court of Chancery against DiamondPeak Sponsor LLC (an entity that was involved in the merger with Lordstown) and certain individuals, in a case captioned *In re Lordstown Motors Corp. Stockholders Litig.*, C.A. No. 2021-1066-LWW (Del. Ch.) ("Delaware Shareholder Class Action"). Derivative lawsuits were also filed in federal courts in Ohio and Delaware, and in the Delaware Court of Chancery.

**Violations**

46.　　As a result of the conduct described above, Lordstown violated Section 17(a)(2) of the Securities Act which proscribes, in the offer or sale of a security, obtaining "money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." In addition, Lordstown also violated Section 17(a)(3) of the Securities Act which proscribes, in the offer or sale of a security, engaging "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." A violation of these provisions does not require scienter and may rest on a finding of negligence. *See Aaron v. SEC*, 446 U.S. 680, 685 & 701-02 (1980).

47.　　As a result of the conduct described above, Lordstown violated Section 13(a) of the Exchange Act and Rule 13a-1 thereunder which require issuers with securities registered under Section 12 of the Exchange Act to file annual reports with the Commission. Annual Reports on Form 10-K must include financial statements meeting the requirements of Regulation S-X. The General Instructions as to Financial Statements in Regulation S-X state that financial statements shall be audited, unless otherwise indicated.  The obligation to file such reports embodies the requirement that they be true and complete. *See, e.g.*, *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1165 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 913 (1979).

48.　　As a result of the conduct described above, Lordstown violated Section 13(a) of the Exchange Act, which requires issuers to file such periodic and other reports as the Commission may prescribe and in conformity with such rules as the Commission may promulgate. Exchange Act Rule 13a-11 requires issuers with securities registered under Section 12 of the Exchange Act to file current reports. The obligation to file such reports embodies the requirement that they be true and correct. *See, e.g.*, *Savoy Indus.*, 587 F.2d at 1165. In addition to the information expressly required to be included in such reports, Rule 12b-20 of the Exchange Act requires issuers to add such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading. A violation of these reporting provisions does not require scienter. *See SEC v. Wills*, 472 F. Supp. 1250, 1268 (D.D.C. 1978).

49.　　As a result of the conduct described above, Lordstown violated Section 14(a) of the Exchange Act and Rules 14a-3 and 14a-9 thereunder, which set forth the information to be provided by issuers of securities registered pursuant to Section 12 of the Exchange Act in proxy solicitations, and make it unlawful for any person to solicit any proxy in respect of any security by means of a proxy statement or other communication containing a materially false or misleading statement, respectively. Item 13 of Exchange Act Rule 14a-101 requires that financial statements meeting the requirements of Regulation S-X be furnished with Schedule 14.  Proxy material disclosure is required to be accurate and complete. *Lichtenberg v. Besicorp*, 43 F. Supp. 2d 376, 393 (S.D.N.Y. 1999).

**Disgorgement**

50.　　The disgorgement ordered in Section IV.B. below is consistent with equitable principles and does not exceed Lordstown's net profits from its violations.

## Lordstown's Remedial Efforts and Cooperation

51.     In determining to accept the Offer, the Commission considered remedial acts undertaken by Respondent and cooperation afforded the Commission staff.

## Undertakings

52.     Lordstown (including its post-bankruptcy successor or representative, officers, directors, and employees, and third-party consultants within Lordstown's control) shall continue to cooperate fully with the Commission with respect to this action and to any related judicial proceeding, administrative proceeding, or investigation commenced by the Commission or to which the Commission is a party, subject to compliance with applicable law. Lordstown agrees that such cooperation shall include, but is not limited to:

a.     Production of Information: at the Commission's request, upon reasonable notice, and without subpoena, Lordstown shall truthfully and completely disclose all information in its possession reasonably requested by the Commission staff in connection with this action or any related investigation, litigation, or other proceeding commenced by the Commission or to which the Commission is a party.

b.     Production of Documents: at the Commission's request, upon reasonable notice, and without subpoena, Lordstown shall provide any document, record or other tangible evidence in its possession reasonably requested by the Commission staff in connection with this action or any related investigation, litigation, or other proceeding commenced by the Commission or to which the Commission is a party. Further, Lordstown shall produce to the Commission any documents produced to any party in the litigation identified above in paragraph 45.

c.     Production of Cooperative Personnel: at the Commission's request, upon reasonable notice, and without subpoena, Lordstown shall secure the attendance and truthful statements, deposition, or testimony of any Lordstown officer, director, or employee or third-party consultant within Lordstown's control, excluding any person who is a party to any related litigated judicial or administrative proceeding, at any meeting, interview, testimony, deposition, trial, or other legal proceeding commenced by the Commission or to which the Commission is a party. At the Commission's request, Lordstown shall also use its best efforts to secure the attendance and truthful statements, deposition, or testimony of any former Lordstown officer, director, or employee, excluding any person who is a party to any related litigated judicial or administrative proceeding, at any meeting, interview, testimony, deposition, trial, or other legal proceeding commenced by the Commission or to which the Commission is a party.

The foregoing obligations are subject to Lordstown's reservation of rights: (i) to claim that documents or information requested is subject to attorney-client privilege, or attorney work-product protection; and (ii) to seek entry of a confidentiality order as to: sensitive business documents or information; sensitive personnel documents or information; or confidential information pertaining to parties other than Lordstown; and

      d.    <u>Service and Personal Jurisdiction Consents</u>: Lordstown further agrees that, with respect to this action and any related judicial proceeding, administrative proceeding, or investigation commenced by the Commission or to which the Commission is a party, it will: (i) accept service by email, mail, or facsimile transmission of notices, requests, or subpoenas issued by the Commission for documents or testimony at depositions, hearings, or trials, or in connection with any related investigation by the Commission staff ("Commission Service"); (ii) appoint Lordstown's counsel as agent to receive Commission Service; (iii) with respect to Commission Service, waive the territorial limits upon service contained in Rule 45 for the Federal Rules of Civil Procedure and any applicable local rules, provided that the party requesting the testimony reimburses Lordstown's travel, lodging, and subsistence expenses at the then-prevailing U.S. Government per diem rates; and (iv) consent to personal jurisdiction over Lordstown in any United States District Court for purposes of enforcing any Commission Service.

      In determining whether to accept the Offer, the Commission has considered these undertakings.

## IV.

      On the basis of the foregoing, Respondent hereby consents to the entry of an Order by the Commission that:

      A.    Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Lordstown cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act, and Sections 13(a) and 14(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 14a-3, and 14a-9 thereunder.

      B.    Lordstown shall be liable to pay disgorgement in the amount of $25.5 million, which amount shall be deemed fully satisfied upon the occurrence of both of the following: (i) entry in the Delaware Bankruptcy of an order confirming the company's Joint Chapter 11 Plan, which provides for Lordstown to fund no less than $3.0 million, and up to $10.0 million, to resolve claims asserted or that could have been asserted by the class in the Ohio Securities Class Action, and such Plan having gone effective, and (ii) execution of a binding term sheet providing for the payment of no less than $15.5 million to resolve claims asserted or that could have been asserted by the class in the Delaware Shareholder Class Action. The Commission agrees that upon satisfaction of this disgorgement requirement, the Commission will promptly (and, in any event, no later than within 3 business days following satisfaction of such requirement), file a notice in the Delaware Bankruptcy withdrawing any proofs of claim filed in the Delaware Bankruptcy.

## V.

      By submitting this Offer, Respondent hereby waives, subject to the acceptance of the offer, the rights specified in Rule 240(c)(4) [17 C.F.R. §201.240(c)(4)] of the Commission's Rules of Practice. Specifically, Respondent waives:

      (1) All hearings pursuant to the statutory provisions under which the proceeding is to be or has been instituted;

(2)  The filing of proposed findings of fact and conclusions of law;

(3)  Proceedings before, and an initial decision by, a hearing officer;

(4)  All post-hearing procedures; and

(5)  Judicial Review by any court.

In addition, by submitting this offer, Respondent waives the rights specified in Rule 240(c)(5) [17 C.F.R. § 201.240(c)(5)] of the Commission's Rules of Practice. Specifically, Respondent waives:

(1)  Any and all provisions of the Commission's Rules of Practice or other requirements of law that may be construed to prevent or disqualify any member of the Commission's staff from participating in the preparation of, or advising the Commission as to, any order, opinion, finding of fact, or conclusion of law that may be entered pursuant to this Offer; and

(2)  Any right to claim bias or prejudgment by the Commission based on the consideration of or discussions concerning settlement of all or any part of this proceeding.

Respondent also hereby waives service of the Order.

## VI.

Respondent understands and agrees to comply with the terms of 17 C.F.R § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings," and "a refusal to admit the allegations is equivalent to a denial, unless the defendant or respondent states that he neither admits nor denies the allegations." As part of Respondent's agreement to comply with the terms of Section 202.5(e), Respondent: (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any finding in the Order or creating the impression that the Order is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Respondent does not admit the findings of the Order, or that the Offer contains no admission of the findings, without also stating that the Respondent does not deny the findings; and (iii) upon the filing of this Offer of Settlement, Respondent hereby withdraws any papers previously filed in this proceeding to the extent that they deny, directly or indirectly, any finding in the Order. If Respondent breaches this agreement, the Division of Enforcement may petition the Commission to vacate the Order and restore this proceeding to its active docket. Nothing in this provision affects Respondent's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

**VII.**

Consistent with the provisions of 17 C.F.R. § 202.5(f), Respondent waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein.

**VIII.**

Respondent hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Respondent to defend against this action. For these purposes, Respondent agrees that Respondent is not the prevailing party in this action since the parties have reached a good faith settlement.

**IX.**

Respondent states that it has read and understands the foregoing Offer, that this Offer is made voluntarily, and that no promises, offers, threats, or inducements of any kind or nature whatsoever have been made by the Commission or any member, officer, employee, agent, or representative of the Commission in consideration of this Offer or otherwise to induce it to submit to this Offer.

_____ Day of _____

Lordstown Motors Corp.
Name: _____
Title: _____

**STATE OF**                                   **}**

                                               **}    SS:**

**COUNTY OF**                                  **}**

    The foregoing instrument was acknowledged before me this __ day of _____, by
_____, who ( ) is personally known to me or ( ) who has produced a _____
driver's license as identification and who did take an oath.

_____
Notary Public State of
Commission Number **:**
Commission Expiration           **:**

## LORDSTOWN MOTORS CORP.
## CERTIFICATE OF CORPORATE RESOLUTION

I, _____, do hereby certify that I am the duly elected, qualified and acting _____ of Lordstown Motors Corp. ("Lordstown"), a Delaware corporation, and that the following is a complete and accurate copy of a resolution adopted by the Board of Directors of Lordstown at a meeting held on _____ at which a quorum was present and resolved as follows:

**RESOLVED:** That _____, an Officer of this Corporation, be and hereby is authorized to act on behalf of the Corporation, and in his sole discretion, subject to approval of the Bankruptcy Court, to negotiate, approve, and make the offer of settlement of Lordstown, attached hereto, to the United States Securities and Exchange Commission ("Commission") in connection with the investigation conducted by the Commission; in this connection, the aforementioned Officer be and hereby is authorized to undertake such actions as he may deem necessary and advisable, including the execution of such documentation as may be required by the Commission, in order to carry out the foregoing.

I further certify that the aforesaid resolution has not been amended or revoked in any respect and remains in full force and effect.

IN WITNESS WHEREOF, I have executed this Certificate as a sealed instrument this ___ day of _____.

<div style="margin-left:40%">

Lordstown Motors Corp.
By: _____
Name: _____
Title: _____

</div>

Notary

30ᵗʰ Day of January 2024

_____

Lordstown Motors Corp.
Name: Adam Kroll
Title: Secretary, Chief Financial Officer and
      Executive Vice President


**STATE OF** Illinois    }

                    }    **SS:**

**COUNTY OF** COOK    }


    The foregoing instrument was acknowledged before me this 30ᵗʰ day of January 2024, by Jessica Muniz, who ( ) is personally known to me or ( ) who has produced a Illinois driver's license as identification and who did take an oath.


_____

Notary Public
State of Illinois
Commission Number    :
Commission Expiration    :

```
JESSICA L MUNIZ
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 13, 2026
```

## LORDSTOWN MOTORS CORP.
## CERTIFICATE OF CORPORATE RESOLUTION

I, Adam Kroll, do hereby certify that I am the duly elected, qualified and acting Secretary, Chief Financial Officer and Executive Vice President of Lordstown Motors Corp. ("Lordstown"), a Delaware corporation, and that the following is a complete and accurate copy of a resolution unanimously adopted by written consent of the Board of Directors dated January 26, 2024:

> **RESOLVED:** That each of Daniel Ninivaggi and Adam Kroll, an Officer of this Corporation, be and hereby is authorized to act on behalf of the Corporation, and in his sole discretion, subject to approval of the United States Bankruptcy Court for the District of Delaware, to negotiate, approve, and make the offer of settlement of Lordstown, attached hereto, to the United States Securities and Exchange Commission ("Commission") in connection with the investigation conducted by the Commission; in this connection, the aforementioned Officer be and hereby is authorized to undertake such actions as he may deem necessary and advisable, including the execution of such documentation as may be required by the Commission, in order to carry out the foregoing.

I further certify that the aforesaid resolution has not been amended or revoked in any respect and remains in full force and effect.

IN WITNESS WHEREOF, I have executed this Certificate as a sealed instrument this 30th day of January.

By: _____

Lordstown Motors Corp.
Name: Adam Kroll
Title: Secretary, Chief Financial Officer and
Executive Vice President

**STATE OF**   Illinois   }

}   **SS:**

**COUNTY OF**   Cook   }

The foregoing instrument was acknowledged before me this 30th day of January 2024 , by Jessica Muniz , who ( ) is personally known to me or ( ) who has produced a Illinois driver's license as identification and who did take an oath.

Notary Public
State of Illinois
Commission Number        :
Commission Expiration    :

> JESSICA L MUNIZ
> Official Seal
> Notary Public - State of Illinois
> My Commission Expires Sep 13, 2026

4855-5514-0256.2                    1