## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Lordstown Motors Corp., *et al.*,[1] | Case No. 23-10831 (MFW) |
| | (Jointly Administered) |
| Debtors. | **Re: Docket Nos. 657, 766, 793, 878, 941, 1014, 1016, 1017 & 1018** |
| | **Hearing Date: March 5, 2024 at 3:00 p.m. E.T.** |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THIRD MODIFIED FIRST AMENDED JOINT CHAPTER 11 PLAN OF LORDSTOWN MOTORS CORP. AND ITS AFFILIATED DEBTORS

Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
Fan B. He (admitted *pro hac vice*)
**WHITE & CASE LLP**
200 S. Biscayne Blvd
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email:   tlauria@whitecase.com
         mbrown@whitecase.com
         fhe@whitecase.com

David M. Turetsky (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email:   david.turetsky@whitecase.com

Jason N. Zakia (admitted *pro hac vice*)
**WHITE & CASE LLP**
111 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 881-5400
Email:   jzakia@whitecase.com

Roberto Kampfner (admitted *pro hac vice*)
Doah Kim (admitted *pro hac vice*)
RJ Szuba (admitted *pro hac vice*)
**WHITE & CASE LLP**
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700
Email:   rkampfner@whitecase.com
         doah.kim@whitecase.com
         rj.szuba@whitecase.com

Donald J. Detweiler (Bar No. 3087)
Morgan L. Patterson (Bar No. 5388)
**WOMBLE BOND DICKSON (US) LLP**
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
Email:   don.detweiler@wbd-us.com
         morgan.patterson@wbd-us.com

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corp. (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101). The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................12

BACKGROUND .....................................................................................................18
    A.    General Case Background .........................................................................18
    B.    The Development of the Debtors' Plan ....................................................19
    C.    The Sale Process.......................................................................................22
    D.    The Solicitation Process ...........................................................................24
    E.    Plan Supplement Documents.....................................................................24
    F.    The Voting Results ...................................................................................25

IMMATERIAL AND NON-ADVERSE MODIFICATIONS TO THE PLAN .............................26

THE OBJECTIONS TO CONFIRMATION ...................................................................32

BASIS FOR RELIEF ..............................................................................................33
    A.    The Plan Satisfies the Requirements for Confirmation Under Section 1129
        of the Bankruptcy Code...........................................................................33
    1.    Section 1129(a)(1):  The Plan Complies with Applicable Provisions of the
        Bankruptcy Code.....................................................................................33
        (a) The Plan Complies with Section 1122 of the Bankruptcy Code.............34
        (b) The Plan Complies with All Requirements of Section 1123(a) of the
            Bankruptcy Code...............................................................................35
            (1)    Section 1123(a)(1):  Designation of Classes of Claims and
                Interests.....................................................................................35
            (2)    Section 1123(a)(2):  Classes That Are Not Impaired by the Plan36
            (3)    Section 1123(a)(3):  Treatment of Classes That Are Impaired by
                the Plan .....................................................................................36
            (4)    Section 1123(a)(4):  Equal Treatment Within Each Class...........36
            (5)    Section 1123(a)(5):  Adequate Means for Implementation .........37
            (6)    Section 1123(a)(6): Post-Effective Date Debtors Securities .......38
            (7)    Section 1123(a)(7):  Provisions Regarding Directors and Officers
                 .................................................................................................38
        (c) Section 1123(b): The Plan Incorporates Certain Discretionary Provisions
            .........................................................................................................38
            (1)    Section 1123(b)(1): Impairment of Claims and Interests ...........39
            (2)    Section 1123(b)(2): Assumption or Rejection of Executory
                Contracts and Unexpired Leases ...............................................39
            (3)    Section 1123(b)(3): Settlement of Claims or Interests by the
                Debtors.....................................................................................40
            (4)    Section 1123(b)(3): Retention of Claims or Interests by the
                Debtors.....................................................................................44

(5) Section 1123(b)(6): Provisions Not Inconsistent with the Bankruptcy Code .......................................................................45

2. Section 1129(a)(2): The Debtors Have Complied with Applicable Provisions of the Bankruptcy Code ...................................................................54

3. Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law ...................................................................55

4. Section 1129(a)(4): The Payment for Certain Services or for Certain Costs and Expenses Is Subject to Court Approval .......................................57

5. Section 1129(a)(5): Information Regarding Directors and Officers of the Debtors Under the Plan Has Been Disclosed .....................................58

6. Section 1129(a)(6) of the Bankruptcy Code Is Not Applicable .........................59

7. Section 1129(a)(7): The Plan Is in the Best Interests of Creditors and Equity Interest Holders .......................................................................59

8. Section 1129(a)(8): While one Class has Not Voted to Accept the Plan, the Plan Satisfies the Bankruptcy Code's Cramdown Requirements .............................61

9. Section 1129(a)(9): The Plan Provides for Payment in Full of Allowed Administrative and Priority Claims ...................................................61

10. Section 1129(a)(10): The Plan Has Been Accepted by at Least One Impaired Class of Claims, If Any ...................................................................62

11. Section 1129(a)(11): The Plan Is Feasible .........................................62

12. Section 1129(a)(12): The Plan Provides for Full Payment of Statutory Fees ....65

13. Sections 1129(a)(13) through 1129(a)(16) Do Not Apply .................................65

14. Section 1129(b): The Plan Satisfies the Cramdown Requirements ...................66

(a) The Plan Does Not Discriminate Unfairly ...............................................66

(b) The Plan Is Fair and Equitable ...............................................70

15. Section 1129(c): The Plan Is the Only Plan .......................................71

16. Section 1129(d): Principal Purpose of the Plan .................................71

17. Section 1129(e) Is Inapplicable.........................................................72

B. The Objections Should Be Overruled.........................................................72

1. The UST Objection Should be Overruled ...............................................72

2. The Singh Objection Should be Overruled .......................................79

WAIVER OF STAY ...................................................................81

CONCLUSION...................................................................82

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Ascalon Enters. v. Revstone Indus.* (*In re Revstone Indus.*), 2016 U.S. Dist.
LEXIS 43044 (D. Del. Mar. 30, 2016) *aff'd In re Revstone Indus. LLC*, 690 F.
App'x 88 (3d Cir. 2017).................................................................................................77

*Bank of Am. Nat'l Tr. & Savs. Ass'n v. 203 N. Lasalle St. P'ship.*, 526 U.S...........................59, 69

*Clarkson v. Cooke Sales & Serv. Co.* (*In re Clarkson*), 767 F.2d 417 (8th Cir.
1985) ................................................................................................................................62

*CoreStates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R. 33 (E.D. Pa. 1996)......................62

*Gillman v. Cont'l Airlines* (*In re Cont'l Airlines*), 203 F.3d 203 (3d Cir. 2000)....................45, 49

*Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd. II* (*In re Briscoe
Enters., Ltd. II*), 994 F.2d 1160 (5th Cir. 1993)...........................................................33, 62, 63

*In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd
on other grounds, Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St.
P'ship.*, 526 U.S. 434 (1999) .........................................................................................66

*In re Abeinsa Holding, Inc.*, 562 B.R. 265 (Bankr. D. Del. 2016) ................................................49

*In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415 (Bankr. S.D.N.Y. 2003)................................63

*In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007), *aff'd*, 544
F.3d 420 (2d Cir. 2008)...................................................................................................40

*In re Am. Apparel, Inc.,* No. 15-12055 (BLS), 2016 Bankr. LEXIS 3331 (Bankr.
D. Del. Jan. 27, 2016) .....................................................................................................53

*In re Am. Solar King Corp.*, 90 B.R. 808 (Bankr. W.D. Tex. 1988) .............................................57

*In re Ambanc La Mesa L.P.*, 115 F.3d 650 (9th Cir. 1997) ...........................................................66

*In re Armstrong World Indus., Inc.*, 348 B.R. 111 (D. Del. 2006) .........................................33, 66

*In re Armstrong World Indus., Inc.*, 348 B.R. 136 (Bankr. D. Del. 2006) .............................34, 62

*In re Aztec Co.*, 107 B.R. 585 (Bankr. M.D. Tenn. 1989) .............................................................66

*In re Buttonwood Partners, Ltd.*, 111 B.R. 57 (Bankr. S.D.N.Y. 1990).......................................67

*In re Capmark Fin. Grp. Inc.*, 438 B.R. 471 (Bankr. D. Del. 2010) .......................................40, 41

iv

*In re Century Glove, Inc.*, 1993 U.S. Dist. LEXIS 2286 (D. Del. Feb 10, 1993)..........................27

*In re Charter Commc'ns, Inc.*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009) ....................................41, 57

*In re Chemtura Corp.*, 439 B.R. 561 (Bankr. S.D.N.Y. 2010) ......................................................52

*In re Choisnard*, 98 B.R. 37 (Bankr. N.D. Okla. 1989)................................................................79

*In re City of Detroit*, 524 B.R. 147 (Bankr. E.D. Mich. 2014) ....................................................27

*In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004) ..............................40, 41, 49

*In re Dow Corning Corp.*, 237 B.R. 374 (Bankr. E.D. Mich. 1999) ............................................27

*In re Drexel Burnham Lambert Grp.*, 138 B.R. 723 (Bankr. S.D.N.Y. 1992) .............................64

*In re Drexel Burnham Lambert Grp.*, 960 F.2d 285 (2d Cir. 1992) .............................................53

*In re Drug Fair Grp., Inc.*, No. 09-10897 (BLS), 2010 Bankr. LEXIS 2984
   (Bankr. D. Del. June 7, 2010) ..................................................................................................53

*In re Fama*, 655 B.R. 648 (Bankr. E.D.N.Y. 2023)....................................................................79

*In re Flintkote Co.*, 486 B.R. 99 (Bankr. D. Del. 2012) ..............................................................78

*In re Freymiller Trucking Inc.*, 190 B.R. 913 (Bankr. W.D. Okla. 1996) ...................................66

*In re G-1 Holdings, Inc.*, 420 B.R. 216 (Bankr. D.N.J. 2009), Bankruptcy ................................28

*In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001)..................................70

*In re Glob. Indus. Techs., Inc.*, No. 02-21626-JKF, 2013 WL 587366 (Bankr.
   W.D. Pa. Feb. 13, 2013).........................................................................................................41

*In re Global Water Technologies*, 311 B.R. 896 (Bankr. D. Colo. 2004) ...................................78

*In re Grausz*, 63 Fed. Appx. 647 (4th Cir. 2003).........................................................................76

*In re HRI Holding Corp.*, No. 19-12415 (MFW) (Bankr. D. Del. Nov. 5, 2020)
   [Docket No. 816] .....................................................................................................................53

*In re Idearc Inc.*, 423 B.R. 138 (Bankr. N.D. Tex. 2009), *subsequently aff'd sub
   nom. In re Idearc, Inc.*, 662 F.3d 315 (5th Cir. 2011) ............................................................70

*In re Indianapolis Downs, LLC,* 486 B.R. 286 (Bankr. D. Del 2013) ..........................................49

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986) ..............................................67

*In re The Leslie Fay Cos.*, 207 B.R. 764 (Bankr. S.D.N.Y. 1997) ...........................................62, 64

*In re Machne Menachem, Inc.*, 371 B.R. 63 (Bankr. M.D. Pa. 2006) ...........................................64

*In re Marvel Ent. Grp.*, 222 B.R. 243 (D. Del. 1998)......................................................40

*In re Masonite Corp.*, No. 09-10844 (PJW), 2009 Bankr. LEXIS 4698 (Bankr. D. Del. May 29, 2009) ...........................................................................53

*In re Mayer Pollock Steel Corp.*, 174 B.R. 414 (Bankr. E.D. Pa. 1994) .....................................62

*In re Mount Vernon Plaza Cmty. Urban Redevelopment Corp.*, 79 B.R. 305 (Bankr. S.D. Ohio 1987) ...........................................................................27

*In re NII Holdings*, 288 B.R. 356 (Bankr. D. Del. 2002) ................................................62

*In re NII Holdings, Inc.*, 536 B.R. 61 (Bankr. S.D.N.Y. 2015) ...........................................42

*In re P.J. Keating Co.*, 168 B.R. 464 (Bankr. D. Mass. 1994) .......................................70

*In re Penn Cent. Transp. Co.*, 596 F.2d 1127 (3d Cir. 1979) .......................................40

*In re PG&E Corporation*, Case No. 19-30088 (Bankr. N.D. Cal. June 20, 2020) [Docket No. 8053] ...........................................................................69

*In re Port Arthur Steam Energy, L.P.*, 629 B.R. 233 (Bankr. S.D. Tex. 2021)...........................79

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000)...........................................52, 55

*In re Rath Packing Co.*, 55 B.R. 528 (Bankr. N.D. Iowa 1985)........................................... passim

*In re Regent Commc'ns, Inc.*, No. 10-10632 (KG), 2010 Bankr. LEXIS 5793 (Bankr. D. Del. Apr. 12, 2010) ...........................................................................53

*In re Resorts Int'l, Inc.*, 145 B.R. 412 (Bankr. D.N.J. 1990)........................................65

*In re River Capital Corp.*, 155 B.R. 382 (Bankr. E.D. Va. 1991) .................................77

*In re Rosewood at Providence, LLC*, 470 B.R. 619 (Bankr. M.D. Ga. 2011) .............................69

*In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999) .................................................55

*In re South Canaan Cellular Investments Inc.*, 427 B.R. 44 (Bankr. E.D. Pa. 2010)...................77

*In re St. Therese Care Ctr., Inc.*, 1991 Bankr. LEXIS 1509 (Bankr. D. Minn. Oct. 23, 1991) ...........................................................................79

*In re Stallion Oilfield Servs.*, No. 09-13562 (BLS), 2010 Bankr. LEXIS 4500 (Bankr. D. Del. Jan. 20, 2010) ...............................................................53

*In re Sun Country Dev., Inc.*, 764 F.2d 406 (5th Cir. 1985) ...........................55

*In re Sweetwater*, 57 B.R. 354 (D. Utah 1985) ...............................................31

*In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790 (5th Cir. 1997) .................62

*In re Texaco, Inc.*, 84 B.R. 893 (Bankr. S.D.N.Y. 1988) .................................62

*In re TK Holdings, Inc.*, No. 17-11375 (BLS), 2018 Bankr. LEXIS 756 (Bankr. D. Del. Feb. 21, 2018) ....................................................................53

*In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141 (Bankr. S.D.N.Y. 1984) .................................54

*In re Trib. Co.*, 972 F.3d 228 (3d Cir. 2020) ..................................................66

*In re U.S. Truck Co.*, 47 B.R. 932 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ............................................................................................62

*In re Washington Mut., Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011)...................42, 49, 50

*In re WorldCom, Inc.*, No. 02-13533, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. Oct. 31, 2003) .......................................................................57, 63

*In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999) ........................45

*Internal Revenue Serv. v. Kaplan* (*In re Kaplan*), 104 F.3d 589 (3d Cir. 1997) ...........................62

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154 (3d Cir. 1993) ...................................................................................35

*KBC Bank, N.V. v. Capitol Lakes, Inc.*, 2016 U.S. Dist. LEXIS 132101 (W.D. Wis. Sep. 27, 2016)..............................................................................31

*Koelbl v. Glessing* (*In re Koelbl*), 751 F.2d 137 (2d Cir. 1984) .....................55

*Myers v. Martin* (*In re Martin*), 91 F.3d 389 (3d Cir. 1996) .........................42

*Olympia & York Fla. Equity Corp. v. Bank of N.Y.* (*In re Holywell Corp.*), 913 F.2d 873 (11th Cir. 1990) ......................................................................35

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968)..............................................................41

*U.S. Bank. Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion)*, 426 B.R. 114 (Bankr. D. Del. 2010) .......................................................................45, 48, 49, 50

*Um v. Spokane Rock I, LLC*, 904 F.3d 815 (9th Cir. 2018)........................................77

*United States v. Energy Res. Co.*, 495 U.S. 545 (1990)............................................62

*United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213 (1996) ............................................................................................................59

*Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639 (3d Cir. 2006).....................42

## FEDERAL STATUTES AND REGULATIONS

11 U.S.C. § 105(a) ............................................................................................28

11 U.S.C. § 507(a)(1).........................................................................................64

11 U.S.C. § 1123(b)(3)(A)........................................................................40, 44, 45

*11 U.S.C. § 1125* .................................................................................19, 20, 54

11 U.S.C. § 1129(b)(1) ...............................................................................65, 66

11 U.S.C. §§ 1129(b)(2)(B)(ii) .............................................................................69

28 U.S.C. § 1930 ..............................................................................................64

United States Code Title 11, 11 U.S.C. §§ 101-1532 ................................................13

Bankruptcy Code ....................................................................................... passim

Bankruptcy Code Chapter 7.......................................................................59, 60, 72

Bankruptcy Code Chapter 11 ......................................................................... passim

Bankruptcy Code § 105 ......................................................................................28

Bankruptcy Code § 365 ......................................................................................39

Bankruptcy Code § 365(a)...................................................................................39

Bankruptcy Code § 507 ......................................................................................64

Bankruptcy Code § 510(b)............................................................................ passim

Bankruptcy Code § 727(a)...................................................................................72

Bankruptcy Code §§ 1107(a) and 1108 ...........................................................................19

Bankruptcy Code § 1114 ...............................................................................................65

Bankruptcy Code § 1114(a) ...........................................................................................65

Bankruptcy Code § 1122 ..........................................................................................34, 35

Bankruptcy Code §§ 1122 and 1123 ............................................................26, 33, 34, 54

Bankruptcy Code § 1122(a) ...........................................................................................34

Bankruptcy Code § 1123(a) ...........................................................................................35

Bankruptcy Code § 1123(a)(1) .......................................................................................35

Bankruptcy Code § 1123(a)(2) ..................................................................................35, 36

Bankruptcy Code § 1123(a)(3) .......................................................................................36

Bankruptcy Code § 1123(a)(4) .......................................................................................36

Bankruptcy Code § 1123(a)(5) ..................................................................................36, 37

Bankruptcy Code § 1123(a)(6) .......................................................................................37

Bankruptcy Code § 1123(a)(7) .......................................................................................38

Bankruptcy Code § 1123(b) ...........................................................................................38

Bankruptcy Code § 1123(b)(1) ..................................................................................38, 39

Bankruptcy Code § 1123(b)(2) .......................................................................................39

Bankruptcy Code § 1123(b)(3) ..................................................................................40, 44

Bankruptcy Code § 1123(b)(3)(B) ..................................................................................44

Bankruptcy Code § 1123(b)(6) .......................................................................................44

Bankruptcy Code §§ 1125 and 1126 ...............................................................................54

Bankruptcy Code §§ 1127 ........................................................................................27, 32

Bankruptcy Code § 1127(a) ......................................................................................26, 27

Bankruptcy Code § 1129 ...........................................................................17, 18, 33, 57

Bankruptcy Code § 1129(a)(1) ..................................................................................33, 54

Bankruptcy Code § 1129(a)(2) ...................................................................................54

Bankruptcy Code § 1129(a)(3) ........................................................................54, 55, 56

Bankruptcy Code § 1129(a)(4) ...................................................................................56

Bankruptcy Code § 1129(a)(5) ..............................................................................57, 58

Bankruptcy Code § 1129(a)(6) ...................................................................................58

Bankruptcy Code § 1129(a)(7) ........................................................................58, 59, 60

Bankruptcy Code § 1129(a)(8) ..............................................................................60, 65

Bankruptcy Code § 1129(a)(9) ...................................................................................61

Bankruptcy Code § 1129(a)(10) .................................................................................61

Bankruptcy Code §§ 1129(a)(10) and 1129(b).............................................................61

Bankruptcy Code § 1129(a)(11) ......................................................................61, 62, 64

Bankruptcy Code § 1129(a)(12) ..............................................................................64, 65

Bankruptcy Code § 1129(a)(13) ...................................................................................65

Bankruptcy Code § 1129(a)(14) ...................................................................................65

Bankruptcy Code § 1129(a)(16) ...................................................................................65

Bankruptcy Code § 1129(b)............................................................................65, 66, 70

Bankruptcy Code §§ 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii)....................................69

Bankruptcy Code § 1129(c)...........................................................................................71

Bankruptcy Code § 1129(d)...........................................................................................71

Bankruptcy Code § 1129(e)...........................................................................................71

Bankruptcy Code § 1141(d)(3) ............................................................................... passim

Bankruptcy Code § 1181(1)(A) ....................................................................................79

Bankruptcy Code § 1182 ...............................................................................................79

Securities Act ...............................................................................................................79

Securities Act of 1933 § 5..............................................................................................71

*Securities Act of 1933 § 8A* .................................................................................................15

*Securities Exchange Act of 1934 § 21 C* ..............................................................................15

## LEGISLATIVE MATERIALS

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977) .......................................34, 54

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978) ...................................................54

## RULES

Bankruptcy Rule 1015(b) ..............................................................................................19

Bankruptcy Rule 3019 ...................................................................................................27

Bankruptcy Rule 3019 ...................................................................................................32

Bankruptcy Rule 3020(e) ..............................................................................................81

Bankruptcy Rule 3020(e) ..............................................................................................81

*Bankruptcy Rule 7023* ..................................................................................................16

Bankruptcy Rule 9019 ...................................................................................................44

Bankruptcy Rule 9019(a) ..............................................................................................40

Fed. R. Bankr. P. 3019 ..................................................................................................27

Fed. R. Bankr. P 3020(e) ..............................................................................................81

Fed. R. Bankr. P. 3020(e) ..............................................................................................81

Rule 3017(d) ..................................................................................................................28

Rule 3019 .......................................................................................................................31

Rule 3020(e) ..................................................................................................................81

Rule 9019 .......................................................................................................................40

The debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") hereby submit this memorandum of law (this "**Memorandum**") in support of confirmation of the *Third Modified First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors* (as amended, modified, or supplemented from time to time, the "**Plan**") [Docket No. 1014], pursuant to sections 1125, 1126, and 1129, respectively, of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**").  In support of confirmation of the Plan and in response to the objections thereto, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1.      The Debtors filed these Chapter 11 Cases to maximize value for their creditors and stakeholders by, among other things, consolidating the resolution of claims in a single forum, selling certain assets in an efficient and value maximizing manner, pursuing their substantial claims against Foxconn, and developing and confirming a chapter 11 plan that would maximize recoveries to Holders of Allowed Claims and Interests.  The Debtors have made substantial progress and accomplished many of these goals since filing the Chapter 11 Cases. The Debtors commenced litigation asserting substantial claims against Foxconn, resolved the litigation brought by Karma, and sold certain of their assets to LandX Motors Corp. (as assignee of LAS Capital, LLC).  Just as importantly, as more fully discussed below, the Debtors have negotiated a consensual resolution of claims brought by the Ohio Securities Litigation Lead Plaintiff and by the SEC, which will result in the SEC withdrawing its $45 million claim against the Debtors (subject to the conditions of the Debtors' settlement with the SEC, including the confirmation and consummation of the Plan).  As a result, the Debtors are on the verge of

---

[2]     Capitalized terms used and not otherwise defined herein have the meaning ascribed to them in the Plan or the Disclosure Statement, as applicable.

confirmation a plan that has the support of all of their principal stakeholders and maximizes value for all parties in interest.

2.      The Plan enables the Debtors to pay all administrative and priority claims in full, and is expected to provide full cash recoveries (plus interest) to Holders of General Unsecured Claims.  The Plan leaves the Debtors' existing common stock in place, unimpairs the Foxconn preferred equity interests, preserves the Debtors' significant litigation and other claims, and seeks to preserve more than $1 billion in combined estimated federal, state, and local net operating losses and other tax attributes.  Among the Retained Causes of Action that are being preserved is the Debtors' substantial litigation against Foxconn, in which the Debtors have alleged substantial damages.  The Plan will also permit the Debtors to engage in post-Effective Date operations for the benefit of their common stock holders, which will include pursuing substantial litigation assets and exploring new business opportunities (as determined by the New Board) to enhance value (including by realizing value from the Debtors' significant tax attributes).

3.      The Plan further reflects consensual resolutions of significant issues that, if left unresolved, could have imperiled not just recoveries to equity holders, but also the Debtors' ability to pay the claims of creditors in full.  Over the past several months, the Debtors have negotiated extensively and in good faith with the Ohio Securities Litigation Lead Plaintiff, Foxconn, the SEC, and each of the Committees to reach a settlement (the "**Ohio Securities Litigation Settlement**") that resolves the claims against the Debtors of the putative class (members of such class, "**Ohio Settlement Class Members**") in the Ohio Securities Litigation and, as discussed below, the SEC.  The settlement provides Ohio Settlement Class Members (which will not include individuals who choose to opt out) with a $10 million allowed class

13

claim, which is satisfied in full by such class members receiving their *pro rata* share of (a) $3 million of cash paid on the Effective Date, and (b) the lesser of (i) 25% of the net proceeds generated by the Debtors' retained causes of action and (ii) $7 million.  Foxconn will provide a backstop of the litigation proceed recoveries allotted to the Ohio Settlement Class Members by contributing 16% of any distributions that would otherwise be made to Foxconn on account of the liquidation preference related to its preferred shares (if any), up to $5 million, in the event that the net litigation proceeds generated by the Debtors are less than $7 million.  Pursuant to the settlement, the Ohio Securities Litigation Lead Plaintiff shall dismiss the Debtors and Ohio Released Directors and Officers from the Ohio Securities Litigation and provide releases to such parties as set forth in the Plan.[3]

4.      Additionally, the Debtors and the SEC have agreed to a settlement that will resolve the SEC's $45 million claim filed against the Debtors (the "**SEC Claim**"), without the payment of any cash consideration to the SEC, subject to satisfaction of the terms of that settlement.  Such terms include, without limitation, the confirmation and the effectiveness of a plan which provides for the Debtors to pay no less than $3 million and up to $10 million for claims in the Ohio Securities Litigation (as the Plan does by incorporating the Ohio Securities Litigation Settlement).  On February 29, 2024, the SEC approved an offer of settlement (the "**Offer**") submitted by the Debtors to resolve the SEC Claim as set forth in that certain *Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21 C of the Securities Exchange Act of 1934, Making Findings, and Imposing a*

---

[3]     Pursuant to the Ohio Securities Litigation Stipulation (defined below), the putative class in the Ohio Securities Litigation has been certified for the sole purpose of administering the Ohio Securities Litigation Settlement, the Ohio Securities Litigation Lead Plaintiff has been appointed as class representative, and Labaton Keller Sucharow LLP has been appointed as class counsel.

*Cease-and-Desist Order* (the "**OIP**").[4]  The SEC has advised the Debtors and filed a notice with

the Court (the "**SEC Notice**") confirming that upon the confirmation and effectiveness of the

Plan, the conditions for the SEC to withdraw the SEC Claim will be satisfied.[5]  As a result, the

Debtors fully expect the SEC to withdraw its claims promptly (and in any event within 3

business days) after the Plan becomes effective.

5.      The Debtors solicited votes to accept or reject the Plan from Holders of Claims

and Interests who are entitled to vote on the Plan in accordance with the Disclosure Statement

Order (defined below).   The Plan is supported by each of the Debtors' major stakeholders,

including the Ohio Securities Litigation Lead Plaintiff, Foxconn, SEC, and the Committees.

Other than Classes 8 (which voted to reject the plan) and 9 (which did not cast any Ballots and

shall be deemed eliminated from the Plan for voting purposes), all other Impaired Classes of

Claims and/or Interests have voted to accept the Plan.  Specifically, Class 3 (General Unsecured

Claims) voted to accept the Plan by 84.09% in number and 92.24% in amount (each excluding

insiders),[6] and Class 7 (Common Stock Interests) voted to accept the Plan by 96.51% in amount.

In addition, pursuant to the Ohio Securities Litigation Stipulation[7] the Ohio Securities Litigation

Lead Plaintiff has been deemed to have voted to accept the Plan, and, accordingly, Class 10 has

---

[4]     The Debtors have filed copies of the Offer and the OIP at Docket No. 1030.  *See Notice of Filing of Offer of Settlement and of Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8a of the Securities Act of 1993 and Section 21c of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-And-Desist Order* [Docket No. 1030].

[5]     *See* Docket No. 1030-1, Art. IV.B.

[6]     Including insiders Class 3 (General Unsecured Claims) voted to accept the Plan by 88.33% in number and 92.24% in amount (the percentage of amount voting to accept the Plan rounds to the same number due to the low dollar amount of insider claims voted on the Plan).

[7]     The "**Ohio Securities Litigation Stipulation**" is the stipulation approved by and attached to that certain *Order Approving Stipulation Between Debtors, Ohio Securities Litigation Lead Plaintiff, Official Committee of Unsecured Creditors, and Official Committee of Equity Security Holders Regarding Ohio Securities Litigation Lead Plaintiff's Motion to Apply Bankruptcy Rule 7023 to Class Claims and Proofs of Claim Numbers 1368, 1379, 1380, 1394, 1426, and 1434* [Docket No. 953].  Pursuant to the Ohio Securities Litigation Stipulation, the Ohio Securities Litigation Claim was Allowed in the amount of $10 million as a Class 10 Claim.

accepted the Plan.  Classes 1, 2, 3, 5, 6, and 7 are Unimpaired and deemed to accept the Plan. These results are a testament to the consensus reflected in the settlement(s) that were reached following significant arms' length, good faith negotiations among the Debtors, Foxconn, the SEC, the Committees, and the Ohio Securities Litigation Lead Plaintiff.

6.     As provided in detail below, in the *Declaration of Andres Estrada Regarding the Solicitation and Tabulation of Votes on the Debtors' Joint Chapter 11 Plan* (the "**Voting Report**") [Docket No. 1018], the *Declaration of Daniel A. Ninivaggi in Support of the Third Modified First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors* filed contemporaneously herewith (the "**Ninivaggi Declaration**"), the *Declaration of Adam Kroll in Support of the Third Modified First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors* filed contemporaneously herewith (the "**Kroll Declaration**"), the *Declaration of Ryan Hamilton in Support of the Third Modified First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors* filed contemporaneously herewith (the "**Hamilton Declaration**"), and the *Declaration of William Gallagher in Support of the Third Modified First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors* filed contemporaneously herewith (the "**Gallagher Declaration**," and, together with the Ninivaggi Declaration, the Kroll Declaration, and the Hamilton Declaration, the "**Confirmation Declarations**"),[8] the Plan satisfies all applicable requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

7.     In light of the overwhelming stakeholder support, it is not surprising that the Debtors received only a small number of Objections to confirmation.  Indeed, the Debtors and their advisors engaged in arm's-length, good faith negotiations with numerous constituencies,

---

[8]    The Debtors may also file additional declarations or offer additional evidence in support of confirmation as the Debtors deem appropriate.

including (i) the official committee of unsecured creditors (the "**UCC**"), (ii) the official committee of equity security holders (the "**EC**"), (iii) the United States Trustee (the "**U.S. Trustee**"), (iv) the National Highway Traffic Safety Administration ("**NHTSA**"), (v) the Environmental and Natural Resources Division of the United States Department of Justice (the "**DOJ**"), (vi) the Securities and Exchange Commission (the "**SEC**"), (vii) Ohio Securities Litigation Lead Plaintiff, (viii) the lead plaintiffs in the Post-Petition Securities Class Action (the "**RIDE Plaintiffs**"), (ix) the plaintiffs in the Delaware Shareholder Class Action (the "**Delaware Plaintiffs**"), (x) certain former directors and officers of the Debtors represented by Young Conaway Stargatt & Taylor, LLP (the "**Former D&Os**"), and (xi) certain former directors of DiamondPeak (the "**DiamondPeak Directors**") to address and attempt to resolve their remaining issues and achieve further consensus with respect to the Plan.

8.      Through diligent efforts, the Debtors consensually resolved informal comments to the Plan from the EC, UCC, NHTSA, DOJ, SEC, Ohio Securities Litigation Lead Plaintiff, RIDE Plaintiffs, Delaware Plaintiffs, Former D&Os, and DiamondPeak Directors through modifications to the Plan or Proposed Confirmation Order (as defined below).  The Debtors received only two formal Objections: (a) the *Objection of Rahul Singh to Debtor's Plan* [Docket No. 793] (the "**Singh Objection**") and (b) the *Objection of the United States Trustee to Confirmation of the Debtors' Plan* [Docket No. 878] (the "**UST Objection**," together with the Singh Objection, the "**Objections**").[9]  As set forth below, the Debtors believe that each of the Objections is without merit and should be overruled.

---

[9]    Shortly prior to filing this Memorandum, Automotive Power Inc. ("**AMP**"), filed *Auto Motive Power, Inc.'s (D/B/A Amp) Limited Objection To Second Modified First Amended Joint Chapter 11 Plan Of Lordstown Motors Corp. And Its Affiliated Debtors* [Docket No. 1033] (the "**AMP Limited Objection**").  The AMP Limited Objection was filed long after the Plan objection deadline and AMP never sought—let alone obtained—an extension of such deadline.  The AMP Limited Objection appears to be made for the purpose of

9.     For the reasons stated herein, in the Confirmation Declarations and the Voting Report, and in light of any other evidentiary support to be offered at the Confirmation Hearing, the Debtors respectfully request that the Court overrule the Objections, find that the Plan satisfies all applicable provisions of section 1129 of the Bankruptcy Code and otherwise complies with all applicable sections of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and non-bankruptcy law, and enter the order, substantially in the form as filed contemporaneously herewith (the "**Proposed Confirmation Order**"), confirming the Plan.

## BACKGROUND

### A.     General Case Background

10.     On June 27, 2023 (the "**Petition Date**"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**" or the "**Court**"). The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On July 11, 2023, the U.S. Trustee appointed the UCC for these Chapter 11 Cases. On September 7, 2023, the U.S. Trustee appointed the EC (the EC, collectively with the UCC, the "**Committees**") for these Chapter 11 Cases. No trustee or examiner has been appointed in these Chapter 11 Cases.

11.     Additional factual background regarding the Debtors, including their business operations and the events leading to the filing of these Chapter 11 Cases, is set forth in the

---

preserving AMP's alleged setoff and recoupment rights following the Effective Date, but does not seek a determination or adjudication as to the merits of any setoff right that it may have and does not otherwise oppose confirmation of the Plan. The Debtors reserve all rights with respect to the AMP Limited Objection and any rights or claims asserted by AMP.

*Declaration of Adam Kroll in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "**First Day Declaration**"), which is fully incorporated here by reference.

**B.     The Development of the Debtors' Plan**

12.     On September 1, 2023, the Debtors filed a *Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors* (as amended and modified, the "**Initial Plan**") [Docket No. 360] and *Disclosure Statement Pursuant to 11 U.S.C. § 1125 with Respect to Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors* (as amended and modified, the "**Initial Disclosure Statement**") [Docket No. 361], both of which were subsequently amended and modified.  *See* Docket Nos. 605, 606, 624, 625, 635, 637.

13.     Subsequently, the Debtors engaged in various rounds of negotiations with different parties in interest.  After substantial negotiations with the Committees and other parties in interest, the Debtors filed a *First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors* on October 24, 2023 [Docket No. 605].  After further negotiations with certain parties in interest, the Debtors filed a *Modified First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors* on November 1, 2023 [Docket No. 657].  Contemporaneously, the Debtors filed the *Disclosure Statement Pursuant to 11 U.S.C. § 1125 With Respect to Modified First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and its Affiliated Debtors* [Docket No. 658] (the "**Disclosure Statement**").

14.     On November 1, 2023, the Court entered its *Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [Docket

No. 651] (the "**Disclosure Statement Order**").   The Disclosure Statement Order fixed December 12, 2023 as the deadline by which all Ballots to accept or reject the Plan and to opt-out of the third-party releases needed to be completed and received by the Solicitation Agent (except as may be extended by the Debtors).

15.    After the entry of the Disclosure Statement Order, the Debtors continued to negotiate with the Committees, Ohio Securities Litigation Lead Plaintiff, SEC, Foxconn, the U.S. Trustee, and others to try to resolve the remaining issues relating to the Plan.   The Confirmation Hearing was continued from December 19, 2023 to January 10, 2024, and then to February 22, 2024, to provide the parties additional time to consensually resolve issues relating to the Plan.

16.    After extensive arms' length negotiations, the Debtors, the Committees, the Ohio Securities Litigation Lead Plaintiff, Foxconn, and the SEC reached the Ohio Securities Litigation Settlement.   Under the terms of the settlement, members of the settlement class in the Ohio Securities Litigation (through Class 10 Treatment of the Ohio Securities Litigation Claim) would receive, in satisfaction of a $10 million class claim, their *pro rata* share of (a) $3 million of cash on the Effective Date, and (b) the lesser of (i) 25% of the net proceeds generated by the Debtors' retained causes of action and (ii) $7 million.   Foxconn would provide a backstop to the Ohio Securities Litigation class of the litigation proceeds recoveries by contributing 16% of any distributions that would otherwise be made to Foxconn on account of the liquidation preference relating to its preferred shares (if any), up to $5 million, in the event that the net litigation proceeds generated by the Debtors are less than $7 million.   Pursuant to the settlement, the Ohio Securities Litigation Lead Plaintiff shall dismiss the Debtors and Ohio Released Directors and Officers from the Ohio Securities Litigation and provide releases to such parties as set forth in

the Plan.  In addition to the resolving the Ohio Securities Litigation Claim, the Ohio Securities Litigation Settlement is a critical component of the Debtors' settlement with the SEC.

17.    On February 29, 2024, the SEC entered the OIP, accepting the Debtors' settlement Offer.  Without any admission by the Debtors, the OIP includes certain findings by the SEC regarding alleged past misconduct by the Debtors and their former Chairman and CEO, Steve Burns, and an order that the Debtors cease and desist from committing or causing any violations or future violations under certain sections of the securities laws.[10]  In addition, the OIP provides that the SEC will promptly (and in any event, within three business days following the Effective Date) withdraw the SEC claim following satisfaction of the following disgorgement conditions: (a) confirmation and the effectiveness of a plan which provides for the Debtors to pay no less than $3 million and up to $10 million for claims in the Ohio Securities Litigation and (b) the execution of a binding term sheet providing for the payment of no less than $15.5 million to resolve claims asserted to or that could have been asserted by the class in the Delaware Shareholder Class Action ((a) and (b) collectively, the "**OIP Conditions**").  The first of these conditions would be satisfied by the confirmation and effectiveness of the Plan.  The SEC has advised the Debtors that the second of these conditions has been satisfied through the execution of a term sheet by parties to the Delaware Shareholder Action.  The Debtors are not parties to the Delaware Shareholder Action or any settlement thereof, nor do they have any payment obligations thereunder.[11].  On March 1, 2024, the SEC filed the SEC Notice confirming that,

---

[10]    Specifically, OIP provides that the Debtors will cease and desist from engaging and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933, Sections 13(a) and 14(a) of the Securities Exchange Act of 1934, and Rules 12b-20, 13a-11, 13a-11, 14a-3 and 14a-9 thereunder.

[11]    Although the Debtors do not have payment obligations with the respect to the Delaware Shareholder Action Settlement, the Debtors anticipate that the individual director defendants who are parties to the settlement will seek indemnification claims from the Debtors with respect to $3.5 million associated with the settlement plus attorney's fees.  The Debtors have not agreed to pay these amounts and all rights are reserved with respect to such amounts.

upon the effectiveness of the Plan, the Debtors would have no further disgorgement obligations under the OIP and that the SEC would promptly withdraw all proofs of claim. Accordingly, the Debtors believe, and the SEC has agreed, that such conditions (which include a resolution of the Ohio Securities Litigation that provides for the Debtors to pay no less than $3 million and up to $10 million on account of claims asserted in the Ohio Securities Litigation) will be met on the Effective Date of the Plan.

18.     On February 28, 2024, the Debtors filed the Plan. The Plan incorporates the terms of the Ohio Securities Litigation Settlement, including comments from the Ohio Securities Litigation Lead Plaintiff, Foxconn, the SEC, the UCC, and the EC with respect to the same, as well as a settlement with the UCC regarding the amount and mechanisms governing the GUC Reserve, along with other negotiated non-material modifications to the Plan. In addition, on February 28, 2024, the Debtors filed their proposed *Order (I) Confirming Third Modified First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors and (II) Granting Related Relief* [Docket No. 1019] (the "**Confirmation Order**"), conforming to the latest Plan and incorporating comments from the various parties. As discussed below, the Debtors also filed the latest Plan Supplement on February 28, 2024.

**C.      The Sale Process**

19.     The Debtors conducted a sale process to sell certain assets during the Chapter 11 Cases. On June 27, 2023, the Debtors filed the *Motion for Entry of an Order (I) (A) Establishing Bidding and Auction Procedures, (B) Scheduling Certain Dates With Respect Thereto, (C) Approving the Form and Manner of Notice Thereof, (D) Approving Contract Assumption and Assignment Procedures, and (E) Granting Other Related Relief; and (II) (A) Authorizing the Debtors to Enter into a Definitive Purchase Agreement and (B) Granting Other Related Relief*

[Docket No. 16], seeking approval of certain bidding procedures to sell certain or substantially all of the Debtors' assets for distribution to creditors and stakeholders, which was approved by the Court by order entered on August 8, 2023 [Docket No. 237] (the "**Bidding Procedures Order**").

20.     Following the entry of the Bidding Procedures Order, the Debtors conducted a robust marketing process to sell the Debtors' assets in accordance with the Bidding Procedures Order.

21.     After months of marketing and negotiating with potential bidders, the Debtors received one qualified bid and were able to reach an agreement with the bidder to sell certain of their assets.  As a result, on September 29, 2023, the Debtors filed a *Notice of (I) Selection of Successful Bidder, (II) Cancellation of Auction, and (III) Sale Hearing* [Docket No. 488], disclosing the selection of LAS Capital, LLC (together with, its assignee, LandX Motors Inc., the "**Purchaser**") as the Successful Bidder, subject to Court approval.[12]  Pursuant to the asset purchase agreement dated September 28, 2023 (the "**Asset Purchase Agreement**"), by and between the Debtors and the Purchaser, the Purchaser would acquire certain assets of the Debtors related to the design, production and sale of electric light duty vehicles focused on the commercial fleet market.

---

[12]     As disclosed to the Court and in the various notices and pleadings filed by the Debtors, (i) Mr. Burns, whom the Debtors understand is the majority equityholder of LAS Capital (the "**Buyer Majority Equityholder**"), was the founder and former Chief Executive Officer and a member of the board of directors of Lordstown Motors Corp. ("**LMC**"), and (ii) Mr. Julio Rodriguez, whom the Debtors understand is one of the indirect managers of LAS Capital (the "**Buyer Manager**"), was the former Chief Financial Officer of LMC. Each of the Buyer Majority Equityholder and Buyer Manager resigned from his respective position, as of June 14, 2021, and, each ceased being employed by and has no management role with LMC since that time. In connection with the Debtors' sale process, LAS Capital, including the Buyer Majority Equityholder and the Buyer Manager, have not had and do not currently have any affiliation with the Debtors, other than as a third-party bidder in the Debtors' Court-approved sale process.

22.     On October 18, 2023, the Court entered an order approving such sale [Docket No. 586] (the "**Sale Order**").   The sale to the Purchaser pursuant to the Sale Order and the Asset Purchase Agreement closed on October 27, 2023.

**D.     The Solicitation Process**

23.     On November 1, 2023, the Debtors filed the solicitation version of the *Modified First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and Its Affiliated Debtors* and the solicitation version of the Disclosure Statement.   The Debtors also caused the Solicitation Agent to serve the Solicitation Packages containing, among other things, the Disclosure Statement describing the Plan, the Confirmation Hearing Notice, and applicable Ballots to all Holders of Claims in Class 3 (General Unsecured Claims) Class 7 (Common Stock Interests), Class 8 (Section 510(b) Claims), and Class 9 (RIDE Section 510(b) Claims).   *See* Docket Nos. 747, 770, 820, and 852.

24.     The Debtors caused the Confirmation Hearing Notice to be published in *The Wall Street Journal* and *Automotive News* on November 7, 2023 and November 13, 2023, respectively.   *See* Docket No. 748.

**E.     Plan Supplement Documents**

25.     On December 1, 2023, the Debtors filed the *Notice of Filing of Plan Supplement for the Modified First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and its Affiliated Debtors* [Docket No. 766] (the "**Initial Plan Supplement**").   On December 1, 2023, the Debtors caused the Initial Plan Supplement to be served upon parties in interest.   *See* Docket No. 825.

26.     On December 5, 2023, the Debtors filed their *Debtors' Omnibus Motion for Entry of an Order (I) Authorizing the Assumption of Certain Executory Contracts, (II) Fixing the Cure*

*Costs in Connection Thereto and (III) Granting Related Relief* [Docket No. 776], which sets forth a list of executory contracts to be assumed in connection with the Plan and the corresponding proposed cure amounts.  The Debtors filed a revised form of proposed assumption order on December 11, 2023.  *See* Docket No. 808.

27.    On February 28, 2024, the Debtors filed their *Notice of Filing of First Supplemental Plan Supplement for the Modified First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. And Its Affiliated Debtors* [Docket No. 1016] ("**First Supplemental Plan Supplement**," and together with the Initial Plan Supplement, the "**Plan Supplement**").

## F.    The Voting Results

28.    Pursuant to the Disclosure Statement Order, the Debtors solicited votes on the Plan from Holders of Claims or Interests in Class 3 (General Unsecured Claims), Class 7 (Common Stock Interests), Class 8 (Section 510(b) Claims), and Class 9 (RIDE Section 510(b) Claims) (collectively, "**Voting Classes**").

29.    Contemporaneously herewith, the Debtors filed the Voting Report, which is summarized below in detail.

| Class | Claims or Interests | Number Accepting (%) | Amount Accepting (%) | Number Rejecting (%) | Amount Rejecting (%) | Voting Result |
|-------|---------------------|----------------------|----------------------|----------------------|----------------------|---------------|
| 3 | General Unsecured Claims (Including Insider Votes) | 88.33 | 92.24 | 7.76 | 11.67 | Accept |
| 3 | General Unsecured Claims (Excluding | 84.09 | 92.24 | 15.91 | 7.76 | Accept |

| Class | Claims or Interests | Number Accepting (%) | Amount Accepting (%) | Number Rejecting (%) | Amount Rejecting (%) | Voting Result |
|-------|---------------------|----------------------|----------------------|----------------------|----------------------|----------------|
|       | Insider Votes)      |                      |                      |                      |                      |                |
| 7     | Common Stock Interests[13] | -             | 96.51                | -                    | 3.49                 | Accept         |
| 8     | Section 510(b) Claims | 50.00              | 50.00                | 50.00                | 50.00                | Reject         |
| 9     | RIDE Section 510(b) Claims | 0.00           | 0.00                 | 0.00                 | 0.00                 | N/A[14]        |
| 10    | Ohio Securities Litigation Claims | 100.00 | 100.00               | 0.00                 | 0.00                 | Accept[15]     |

30.    Holders of Claims and Interests were not entitled to vote if their rights are Unimpaired.  The following Classes of Claims and Interests were Unimpaired and not entitled to vote on the Plan, and the Debtors did not solicit votes from Holders of such Claims and Interests: Class 1 (Other Priority Claims), Class 2 (Secured Claims), Class 4 (Intercompany Claims), Class 5 (Foxconn Preferred Stock Interests), and Class 6 (Intercompany Interests).

**IMMATERIAL AND NON-ADVERSE MODIFICATIONS TO THE PLAN**

31.    Section 1127(a) of the Bankruptcy Code permits a plan proponent to modify a plan "at any time before confirmation, but may not modify such plan so that the plan as modified fails to meet the requirements of sections 1122 and 1123 of this title.  After a plan proponent files a modification of such plan with the court, the plan as modified becomes the plan." 11 U.S.C. § 1127(a).

---

[13]    Pursuant to section 1126(d) of the Bankruptcy Code, acceptance of a class of Interests is measured only by amount, and not number.  Accordingly, above-table does not report the number of Holders of Interests that voted to accept or reject the Plan.

[14]    As set forth in the Voting Report, the Debtors' Solicitation Agent did not receive any ballots cast by Holders of Class 9 Claims.  Accordingly, pursuant to Article III.C of the Plan, Class 9 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan.

[15]    As set forth in the Ohio Securities Litigation Stipulation, the Ohio Securities Litigation Lead Plaintiff is deemed to have voted to accept the Plan.

32.     Additionally, Bankruptcy Rule 3019 provides that when a plan proponent modifies a plan after the plan has been accepted and before its confirmation, the plan shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds, after notice and a hearing, that the modification "does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification."  Fed. R. Bankr. P. 3019; *see In re Century Glove, Inc.*, 1993 U.S. Dist. LEXIS 2286, at *12 (D. Del. Feb 10, 1993) (upholding bankruptcy court's conclusion that section 1127 did not require further disclosure and resolicitation of votes on modification that altered the treatment to only one creditor when "the modification at issue did not materially and adversely impact any creditor that voted for the Plan."); *see also In re City of Detroit*, 524 B.R. 147, 253 (Bankr. E.D. Mich. 2014) (holding debtors were not required to re-solicit votes as modifications "maintained or improved the treatment of claims or otherwise clarified various plan provisions"); *In re Dow Corning Corp.*, 237 B.R. 374, 379 (Bankr. E.D. Mich. 1999) (holding "those who previously accepted a less favorable plan are logically deemed to have accepted the more favorable modified plan," and "claimants in [the applicable voting class] who accepted the original plan are now deemed to have accepted the modified version."); *In re Mount Vernon Plaza Cmty. Urban Redevelopment Corp.*, 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987) (finding "[n]one of the changes negatively affects the repayment of creditors, the length of the Plan, or the protected property interests of parties in interest" and holding that re-solicitation was not required); *See also In re G-1 Holdings, Inc.*, 420 B.R. 216, 256 (Bankr. D.N.J. 2009) (no adverse treatment when objecting creditor is unimpaired and other creditors not adversely affected).[16]

---

[16]   Bankruptcy Rule 3017(d) further specifies the materials to be distributed to holders of eligible claims and

33.     As noted above, the Debtors have been in active discussions with the Committees, Foxconn, the U.S. Trustee, SEC, NHTSA, DOJ, Ohio Securities Litigation Lead Plaintiff, RIDE Plaintiffs, Delaware Plaintiffs, Former D&Os, and DiamondPeak Directors and various stakeholders to address their concerns with the Plan.  Following the launch of the solicitation process, Debtors made certain modifications to the Plan and Proposed Confirmation Order to resolve formal and informal comments to the plan by parties in interests (collectively, the "**Modifications**").[17]

34.     The primary Modification to the Plan was to incorporate the terms of the Ohio Securities Litigation Settlement, which in turn serves as the basis for the Debtors' settlement with the SEC embodied in the OIP which is expected to result in the withdrawal of the $45 million SEC Claim.  The Modifications also incorporate provisions to resolve certain issues with the Committees.  These Modifications do not adversely affect the treatment of any impaired Classes of Claims and Interests.  To the contrary, they materially improve their treatment by, among other things, eliminating the SEC's asserted $45 million claim against the Debtors.

35.     The Modifications did not alter the treatment of Holders of Claims or Interests in Class 1 (Other Priority Claims), Class 2 (Secured Claims), Class 4 (Intercompany Claims), Class 6 (Intercompany Interests), Class 7 (Common Stock Interests), Class 8 (Section 510(b) Claims), or Class 9 (RIDE Section 510(b) Claims).

---

interests upon approval of a disclosure statement.  Such materials generally include the plan or a court-approved summary of the plan, the court approved disclosure statement, notice of the voting deadline, and "any other information as the court may direct." Fed. R. Bankr. P. 3017(d).  Moreover, section 105 of the Bankruptcy Code grants courts broad authority to enter any order or judgment "necessary or appropriate to carry out the provisions of the Bankruptcy Code." 11 U.S.C. § 105(a).

[17]   To the extent there are any further technical modifications that are necessary, the Debtors will file a further modified Plan prior to the Confirmation Hearing.

36.     The Modifications do not adversely alter the treatment of Class 3 (General Unsecured Claims) and, if they have any effect at all, enhance the likely recoveries of Holders of Allowed General Unsecured Claims.   The only Modification with respect to the Class 3 treatment section was a clarification that distributions to Holders of Allowed General Unsecured Claims may come from any cash or proceeds of the Debtors or Post-Effective Date Debtors, even proceeds from assets of the Post-Effective Date Debtors acquired after the Effective Date.   This clarification was made at the request of the UCC and only enhances Class 3 treatment, by ensuring that the Plan does not limit the ability of Holders in Class 3 to receive payment in full, with interest, pursuant to the Plan.

37.     In addition, the Debtors made certain other modifications to the Plan that benefit Holders of Claims in Class 3 by safeguarding and providing for mechanisms to increase (and reduce, as appropriate in connection with progress in the claims resolution process) the initial amount of the reserve (the "**GUC Reserve**") established under the Plan for the payment of Allowed and Disputed General Unsecured Claims, as set forth in Article VII.I.   These Modifications were also made at the request of the UCC, which supports the Plan.

38.     Moreover, the Modifications were made in connection with the negotiation of the initial amount of the GUC Reserve.   As disclosed in the Plan Supplement and the Confirmation Order, the initial GUC Reserve will be $45.0 million, and includes: (a) $23.1 million on account of the face amounts of asserted liquidated general unsecured claims (other than certain indemnification claims and rejection damages claims included in (c)-(e) below) after removing duplicates and proofs of claims filed on account of equity; (b) $3.0 million on account of the Ohio Securities Litigation Settlement Payment; (c) $3.5 million on account of potential indemnification claims related to a settlement of the Delaware Shareholder Class Action to

which the Debtors are not a party; (d) $1.6 million on account of certain liquidated indemnification claims; (e) $6.7 million on account of estimated rejection damages claims, and (f) $7.1 million of additional reserve.[18]  *See* Kroll Decl. ¶ 7.  The initial GUC Reserve may also be increased by up to $5.0 million.  *Id.* at ¶ 8; Plan, Art. V.E.  The GUC Reserve was heavily negotiated with the Committees, and the Debtors believe that it is sufficient to ensure the full payment of all Allowed General Unsecured Claims with interest.  *See* Kroll Decl. ¶¶ 6-8.  However, as noted above, in the event the GUC Reserve proves to be insufficient, Allowed General Unsecured Claims may be paid from any cash or proceeds of the Debtors or Post-Effective Date Debtors.  *Id.* at ¶ 8; Plan, Art. III.B.3.b.

39.    Finally, the modifications to the Plan incorporating the Ohio Securities Litigation Settlement and with respect to the OIP further enhance the recoveries for Allowed General Unsecured Claims.  Most importantly, the $45 million SEC Claim will be withdrawn promptly after the Effective Date of the Plan, ensuring that the pool of General Unsecured Claims will not be diluted by the SEC's $45 million claim, thereby dramatically increasing the likelihood that all General Unsecured Claims will be satisfied in full, with applicable interest, as contemplated under the Plan.[19]

40.    The Modifications also enhance the potential recovery for the Holders of Claims and Interests in Class 7 (Common Stock Interests) and Class 8 (Section 510(b) Claims).  The SEC Claim was asserted as General Unsecured Claim that would have been senior to Common Stock Interests and Section 510(b) Claim, if Allowed as such.  Withdrawal of the SEC Claim

---

[18]    The reserve does not constitute an opinion of or admission with respect to the validity of any potential general unsecured claim.  The Debtors (and the Claims Ombudsman) reserve all of their rights to object to any and all Claims.

[19]    Although the SEC Claim was asserted as a General Unsecured Claim, nothing in this Memorandum is intended to or should be construed as an admission or concession that the SEC Claim would be properly classified as a General Unsecured Claim and the Debtors reserve all rights.

will remove a substantial senior claim from the claims registry. In addition, the Ohio Securities Litigation Stipulation, entered into in connection with the settlement embodied in the Plan, ensures that the claims of the Ohio Securities Litigation Lead Plaintiff, filed in the face amount of not less than $695 million will be reduced to $10 million and satisfied by the treatment for Holders of Class 10 Claims set forth in the Plan. Absent the settlement, which is also critical to the Debtors' settlement with the SEC, Holders of Claims and Interests in Classes 7 and 8 would have been subject to greater uncertainties and potentially reduced recoveries in the event that the Ohio Securities Lead Plaintiffs' substantial claims were litigated and Allowed in a higher amount.

41. Moreover, although these Modification enhance their potential recoveries, Holders of Class 8 Claims (Section 510(b) Claims) voted to reject the Plan, and accordingly, lack standing to challenge the Modifications on the basis of inadequate disclosure. *See KBC Bank, N.V. v. Capitol Lakes, Inc.*, 2016 U.S. Dist. LEXIS 132101, at *25 (W.D. Wis. Sep. 27, 2016) (where a party rejected the debtors' amended plan, it "lack[ed] standing to challenge the [further amended plan] on the basis that it was not disclosed"); *In re Sweetwater*, 57 B.R. 354, 358 (D. Utah 1985) (holding a party that rejected the plan had no standing to appeal the bankruptcy court's ruling that the requirements of Rule 3019 had been satisfied).

42. The treatment of Holders of Class 10 (Ohio Securities Litigation Claims) is also enhanced by the Modifications. The Holders of Ohio Securities Litigation Claims will receive the $3 million settlement payment and up to $7 million in future litigation proceeds, representing a significant improvement over the $1 million allocated for putative settlement class members under the Plan prior to the Modifications. Further, the Ohio Settlement Class Members are given

the opportunity to opt-out of the Ohio Settlement Class and receive the treatment provided to Class 8 (Section 510(b) Claims), which did not change.

43.    In addition, the Modifications may alter the proposed treatment for Holders of Class 5 (Foxconn Preferred Stock Interests) as a result of Foxconn providing the Ohio Securities Litigation Backstop as part of the Ohio Securities Litigation Settlement.  Foxconn has consented to the Ohio Securities Backstop and the altered treatment under the Plan.  But in any event, the Modifications enhance the treatment of any of Foxconn's claims or preferred equity (to the extent that it is determined to have them) by resulting in the withdrawal in the $45 million SEC Claim.  Further, Class 5 (Foxconn Preferred Stock Interests) are unimpaired and deemed to have accepted the Plan.

44.    The Debtors, along with Committees and other major stakeholders, believe the Modifications do not adversely affect the treatment of Claims and Interests and thus comply with sections 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the Modifications, and that such Modifications should be deemed accepted by all holders of Claims and Interests that previously accepted the Plan.

## THE OBJECTIONS TO CONFIRMATION

45.    The Debtors received two formal Objections and numerous informal comments to the Plan and Proposed Confirmation Order.  As of the date of this filing, the Debtors have consensually resolved all informal comments to the Plan and Proposed Confirmation Order, as further summarized herein.  A summary of each formal Objection, and the reasons that it should be overruled, is described in greater detail below.

**BASIS FOR RELIEF**

46.     To obtain confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies the applicable provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.  *See Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd. II* (*In re Briscoe Enters., Ltd. II*), 994 F.2d 1160, 1165 (5th Cir. 1993) (stating that "the combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof under both § 1129(a) and in a cramdown"); s*ee also In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006).

47.     Through filings with the Court, the Confirmation Declarations, the Voting Report, the testimony and other evidence and argument that may be presented at the Confirmation Hearing, and the record in these Chapter 11 Cases, the Debtors will demonstrate, by a preponderance of the evidence, that all applicable subsections of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.

**A.     The Plan Satisfies the Requirements for Confirmation Under Section 1129 of the Bankruptcy Code**

48.     As addressed in detail herein, the Plan satisfies the applicable requirements for confirmation of section 1129 of the Bankruptcy Code.

**1.     Section 1129(a)(1):  The Plan Complies with Applicable Provisions of the Bankruptcy Code**

49.     Section 1129(a)(1) of the Bankruptcy Code provides that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(1).  The legislative history of section 1129(a)(1) explains that this provision incorporates the requirements of sections 1122 and 1123 of the Bankruptcy Code governing classification of

claims and contents of a plan, respectively.  H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977).

50.     As demonstrated below, the Plan fully complies with the requirements of sections 1122 and 1123 and all other applicable provisions of the Bankruptcy Code.

### (a)     The Plan Complies with Section 1122 of the Bankruptcy Code

51.     Section 1122(a) of the Bankruptcy Code provides in relevant part that, "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).

52.     For a classification structure to satisfy section 1122 of the Bankruptcy Code, it is not necessary that all substantially similar claims or interests be designated to the same class, but only that all claims or interests designated to a particular class be substantially similar to each other.  *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (Bankr. D. Del. 2006).

53.     The Plan provides for the separate classification of Claims and Interests based upon differences in the legal nature and/or priority of such Claims and Interests.  The Plan designates the following classes of Claims and Interests:  Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 3 (General Unsecured Claims), Class 4 (Intercompany Claims), Class 5 (Foxconn Preferred Stock Interests), Class 6 (Intercompany Interests), Class 7 (Common Stock), Class 8 (Section 510(b) Claims), Class 9 (RIDE Section 510(b) Claims), and Class 10 (Ohio Securities Litigation Claims).

54.     As reflected in the respective definitions of each Class of Claims and Interests, each of the Claims or Interests in each Class is substantially similar to the other Claims or Interests in such Class.  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims and Interests into the Classes created under the Plan.

Accordingly, the Plan's classification of Claims and Interests, is consistent with the requirements of the Bankruptcy Code and, thus, is appropriate.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993) (explaining that the determination of whether a classification scheme is reasonable "must be informed by the two purposes that classification serves under the Code: voting to determine whether a plan can be confirmed . . . and treatment of claims under the plan") (internal citation omitted); *Olympia & York Fla. Equity Corp. v. Bank of N.Y.* (*In re Holywell Corp.*), 913 F.2d 873, 880 (11th Cir. 1990) (plan proponent allowed considerable discretion to classify claims and interests according to facts and circumstances of case so long as classification scheme does not violate basic priority rights or manipulate voting).

### (b)    The Plan Complies with All Requirements of Section 1123(a) of the Bankruptcy Code

55.    Section 1123(a) of the Bankruptcy Code sets forth seven requirements with which every chapter 11 plan must comply.  *See* 11 U.S.C. § 1123(a).  As demonstrated herein, the Plan fully complies with each such requirement.

### (1)    Section 1123(a)(1):  Designation of Classes of Claims and Interests

56.    Section 1123(a)(1) requires that a plan must designate classes of claims and classes of equity interests subject to section 1122 of the Bankruptcy Code.  As discussed above, the Plan designates seven Classes of Claims and three Classes of Interests in compliance with section 1122.  Accordingly, the Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

> **(2)    Section 1123(a)(2):  Classes That Are Not Impaired by the Plan**

57.    Section 1123(a)(2) requires a plan to specify which classes of claims or interests are unimpaired by the plan.  <u>Article III.B</u> of the Plan specifies that Class 1 (Other Priority Claims), Class 2 (Secured Claims), Class 4 (Intercompany Claims), Class 5 (Foxconn Preferred Stock Interests), and Class 6 (Intercompany Interests) are Unimpaired.

58.    Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

> **(3)    Section 1123(a)(3):  Treatment of Classes That Are Impaired by the Plan**

59.    Section 1123(a)(3) requires a plan to specify how classes of claims or interests that are impaired by the plan will be treated.  <u>Article III</u> of the Plan sets forth the treatment of Impaired Claims in Class 3 (General Unsecured Claims), Class 7 (Common Stock Interests), Class 8 (Section 510(b) Claims), Class 9 (RIDE Section 510(b) Claims) and Class 10 (Ohio Securities Litigation Claims).  *See* Plan, Art. III.B.  Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

> **(4)    Section 1123(a)(4):  Equal Treatment Within Each Class**

60.    Section 1123(a)(4) requires that a plan provide the same treatment for each claim or interest within a particular class unless any claim or interest holder agrees to receive less favorable treatment than other class members.  Pursuant to the Plan, the treatment of each Claim against or Interest in the Debtors, in each respective Class, is the same as the treatment of each other Claim or Interest in such Class.  Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

**(5)    Section    1123(a)(5):    Adequate    Means    for Implementation**

61.    Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means for the plan's implementation."  11 U.S.C. § 1123(a)(5).  Article V of the Plan provides adequate and proper means for the implementation of the Plan, including, without limitation, (i) consolidation of the Chapter 11 Cases for Distribution purposes only; (ii) continued existence as Post-Effective Date Debtors; (iii) appointment of the Claims Ombudsman; (iv) appointment of the New Board; (v) vesting of assets in the Post-Effective Date Debtors; (vi) the preservation of the Common Stock Interests, Foxconn Preferred Stock Interests and any other Interests; (vii) the preservation of certain tax attributes; (viii) the preservation of Causes of Action; (ix) the preservation of the Insurance Policies and vesting with the Post-Effective Date Debtors; (x) the creation of the Litigation Trust to pursue certain causes of action; (xi) the creation of the Ohio Securities Litigation Settlement Fund to implement the Ohio Securities Litigation Settlement; and (xii) approval of the settlements and discharge of Claims and Interests as set forth in the Plan.  In addition, Article VII of the Plan also provides for the establishment of reserves with respect to allowed and disputed claims.

62.    The mechanisms contemplated by the Plan are designed to maximize the value of the Debtors' assets and provide sufficient capital and liquidity for the Post-Effective Date Debtors.  Accordingly, the Plan, together with the documents and agreements contemplated by the Plan and the Plan Supplement, provide the means for implementation of the Plan as required by and in satisfaction of section 1123(a)(5) of the Bankruptcy Code.

**(6)   Section 1123(a)(6):   Post-Effective Date Debtors Securities**

63.   Section 1123(a)(6) requires that a plan must provide for the inclusion in the debtor's constitutive documents of a provision prohibiting the issuance of non-voting equity securities.  The Debtors' constitutive documents contain such a provision.  Accordingly, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

**(7)   Section 1123(a)(7):   Provisions Regarding Directors and Officers**

64.   Section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."  11 U.S.C. § 1123(a)(7).  Article V.F of the Plan provides that the directors and officers of the Post-Effective Date Debtors constituting the New Board and management shall be those individuals identified in the Plan Supplement.  It further specifies that the New Board shall, among other things, oversee and direct the administration of the Post-Effective Date Debtors' Estates in accordance with the Plan and the New Organizational Documents.  *See* Plan, Art. V.F.  The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

**(c)   Section 1123(b): The Plan Incorporates Certain Discretionary Provisions**

65.   Section 1123(b) of the Bankruptcy Code sets forth certain discretionary provisions that may be incorporated into a chapter 11 plan.  The contents of the Plan are consistent with these provisions.

###### (1)      Section 1123(b)(1): Impairment of Claims and Interests

66.      Section 1123(b)(1) of the Bankruptcy Code provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests." 11 U.S.C. § 1123(b)(1).   Here, Claims or Interests in Class 1 (Other Priority Claims), Class 2 (Secured Claims), Class 4 (Intercompany Claims), Class 5 (Foxconn Preferred Stock Interests), and Class 6 (Intercompany Interests) are Unimpaired by the Plan.   Claims or Interests in Class 3 (General Unsecured Claims), Class 7 (Common Stock Interests), Class 8 (Section 510(b) Claims), Class 9 (RIDE Section 510(b) Claims) and Class 10 (Ohio Securities Litigation Claims) are Impaired by the Plan.   Accordingly, the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

###### (2)      Section 1123(b)(2): Assumption or Rejection of Executory Contracts and Unexpired Leases

67.      Section 1123(b)(2) of the Bankruptcy Code allows a plan to provide for assumption, assumption and assignment, or rejection of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code.   Article IX.A of the Plan provides that any Executory Contract (including any and all warranties covering any vehicles sold by the Debtors): (i) which has not been assumed with the approval of the Bankruptcy Court on or prior to the Effective Date, (ii) which is not assumed pursuant to another provision of the Plan and/or Confirmation Order, or (iii) as to which no motion to assume is pending as of the Confirmation Date, shall be deemed a rejected Executory Contract by the applicable Debtor effective on the Effective Date or, if applicable, such other date identified in an order entered by the Bankruptcy Court granting a motion to reject such Executory Contract that was pending as of the Confirmation Date.   The Plan also provides that it shall constitute a motion to reject such Executory Contracts and the Debtors shall have no liability thereunder, except that any Claim

arising from the rejection of an Executory Contract shall be treated as a General Unsecured Claim subject to filing of a Proof of Claim pursuant to <u>Article III.B.3</u> of the Plan.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejection is in the best interest of the applicable Debtor, its Estate, and all parties in interest in the Chapter 11 Cases.  These provisions of the Plan are permitted by section 1123(b)(2) of the Bankruptcy Code.

### (3) Section 1123(b)(3): Settlement of Claims or Interests by the Debtors

68.    Section 1123(b)(3) of the Bankruptcy Code provides that a chapter 11 plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A).  As part of the restructuring process, the Court "may approve a compromise or settlement" under Bankruptcy Rule 9019(a), and "[t]he standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019[.]" *In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004).  To be approved, a settlement need only be "fair and equitable."  *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 514 (Bankr. D. Del. 2010) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see also In re Marvel Ent. Grp.*, 222 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'") (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).

69.    The Court need not conduct a "mini-trial" of the facts or the merits of the underlying disputes to be settled to approve a compromise.  *Capmark*, 438 B.R. at 515 ("[T]he Court is not required to conduct a full evidentiary hearing as a prerequisite to approving a compromise."); *In re Penn Cent. Transp. Co.*, 596 F.2d 1127, 1146 (3d Cir. 1979).  Rather, the

Court need only "canvas[s] the issues to determine whether the settlement falls above the lowest point in the range of reasonableness." *Capmark*, 438 B.R. at 515; *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 242 (Bankr. S.D.N.Y. 2007) ("[A] bankruptcy court need not be aware of or decide the particulars of each individual claim resolved by the settlement agreement, or assess the minutia of each and every claim; rather, the court need only canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.") (internal quotation marks omitted), *aff'd*, 544 F.3d 420 (2d Cir. 2008).

70.    Courts in the Third Circuit consider the following factors when evaluating whether the settlement falls above the lowest point in the range of reasonableness: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Capmark*, 438 B.R. at 515 (quoting *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 393 (3d Cir. 1996)).  Courts defer to the debtor's business judgment "so long as there is a legitimate business justification for [its] action." *Coram Healthcare*, 315 B.R. at 330 (citing *Martin*, 91 F.3d at 395); *see also In re Charter Commc'ns, Inc.*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) (explaining that while the "approval of a settlement rests in the Court's sound discretion, the debtor's business judgment should not be ignored"), *appeal dismissed sub nom. R2 Invs. LDC v. Charter Commc'ns, Inc.* (*In re Charter Commc'ns, Inc.*), 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012); *In re Glob. Indus. Techs., Inc.*, No. 02-21626-JKF, 2013 WL 587366, at *11 (Bankr. W.D. Pa. Feb. 13, 2013) ("The Settlements are fair and equitable and a proper exercise of the Debtors' business judgment because they enable the Debtors to consummate the [plan] and to reorganize their business operations, while at

the same time avoiding complex, expensive and protracted litigation with uncertain outcomes that could cripple the Debtors' ability to reorganize.").

71.    In considering whether to approve a settlement, courts should exercise their discretion "in light of the general public policy favoring settlements." *Capmark*, 438 B.R. at 515 (quoting *In re Hibbard  Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (noting that "compromises are a normal part of the process of reorganization") (internal citation omitted); *Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."); *Martin*, 91 F.3d at 393; 10 Collier on Bankruptcy ¶ 9019.01 (16th ed. rev. 2021).  Finally, when evaluating the settlement, courts look to "whether the settlement as a whole is reasonable."  *In re Washington Mut., Inc.*, 442 B.R. 314, 329 (Bankr. D. Del. 2011) ("[E]ach part of the settlement must be evaluated to determine whether the settlement as a whole is reasonable.  This is not to say, however, that this is a mere math exercise comparing the sum of the parts to the whole.  Rather, the Court recognizes that there are benefits to be recognized by a global settlement of all litigation . . . that may recommend a settlement that does not quite equal what would be a reasonable settlement of each part separately."); *see also In re NII Holdings, Inc.*, 536 B.R. 61, 105 (Bankr. S.D.N.Y. 2015) ("[A]s mandated by precedent, the Court will undertake its own analysis of each component of the Settlement . . . and of the Settlement as a whole . . . .").

72.    The Plan incorporates the Ohio Securities Litigation Settlement reached between the Debtors, Ohio Securities Litigation Lead Plaintiff, Foxconn, and the SEC, with the support of each of the Committees, which were also instrumental in every step of the negotiations.  The

Plan also provides for the resolution of the SEC Claim in accordance with the OIP. These compromises are designed to achieve a beneficial and efficient resolution of the Chapter 11 Cases for all parties in interest. The compromises set forth in the Plan are fair, equitable, and fall within the range of reasonableness. Moreover, they are critical to resolving these and other matters addressed in the Plan and to permitting the Debtors to maximize (i) the value of the Debtors' estates and (ii) the recoveries for all Holders of Claims and Interests.

73.     After analyzing the merits of the arguments by the Ohio Securities Litigation Lead Plaintiff and following multiple rounds of negotiation, the Debtors determined that the Ohio Securities Litigation Settlement, including the settlement amounts, was in the best interests of the estates and should be entered into. That business judgment should not be disturbed. The Ohio Securities Litigation Settlement is well within the range of reasonableness and constitutes a fair and equitable settlement of the dispute. The Ohio Securities Litigation Settlement allows the Post-Effective Date Debtors to avoid potentially costly and complicated litigation with respect to the Ohio Securities Litigation. It also is a critical component of resolving the $45 million Claim that the SEC asserted against the Debtors' estates, which would (if Allowed) significantly reduce recoveries to general unsecured creditors and other claims and interests. The Ohio Securities Litigation Settlement is also supported by each of the Committees.

74.     The consensual resolution with the SEC in accordance with the OIP is also well within the range of reasonableness and should be approved. The issues raised by the SEC's $45 million SEC Claim are complex, involving alleged claims under the securities laws. The OIP was the result of extensive arms' length negotiation among the parties, and will result in the withdrawal of the SEC Claim promptly following the Effective Date, with no requirement that

the Debtors pay any money to the SEC.[20]  The Debtors have consulted with the Committees throughout, and each of the Committees supports the Debtors' resolution with the SEC.

75.    In sum, the Ohio Securities Litigation Settlement and the compromise with the SEC under the OIP resolve major potential objections to the Plan and claims against the Debtors which will pave the way for the Debtors to confirm the Plan and emerge from bankruptcy in a fashion that will maximize value to stakeholders.   Accordingly, such the settlements and compromises incorporated into the Plan should be approved pursuant to Bankruptcy Rule 9019 and section 1123(b)(3)(A) of the Bankruptcy Code.

**(4)    Section 1123(b)(3): Retention of Claims or Interests by the Debtors**

76.    Section 1123(b)(3)(B) of the Bankruptcy Code provides that a plan may provide for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose" of any claim or interest.  11 U.S.C. § 1123(b)(3)(B).  In this case, the Plan preserves the Post-Effective Date Debtors' rights to enforce any claims, rights, or causes of action that the Debtors may hold against any person or entity, except those causes of action that are explicitly released under the Plan.  *See* Plan, Arts. V.J, K, L; VIII; Plan Supplement, Ex. C (Schedule of Retained Causes of Action).  These provisions are expressly permitted by section 1123(b)(3) of the Bankruptcy Code and, for the reasons discussed more fully below, appropriate in this case.

---

[20]    While the OIP provides that the Debtors are liable for disgorgement of up to $25.5 million, those obligations are deemed satisfied once the OIP Conditions are satisfied, which they would be upon the effectiveness of the Plan. The OIP further requires that the Debtors cease and desist from engaging and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933, Sections 13(a) and 14(a) of the Securities Exchange Act of 1934, and Rules 12b-20, 13a-11, 13a-11, 14a-3 and 14a-9 thereunder.

**(5)    Section 1123(b)(6): Provisions Not Inconsistent with the Bankruptcy Code**

77.    Section 1123(b)(6) of the Bankruptcy Code provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."   11 U.S.C. § 1123(b)(6).   Here, the Plan includes various provisions necessary or appropriate to effectuate the Plan, none of which is inconsistent with the applicable provisions of the Bankruptcy Code.

**(a)    Releases, Exculpation, and Injunction**

78.    In accordance with section 1123(b)(6) of the Bankruptcy Code, <u>Article VIII</u> of the Plan contains certain release, exculpation, and injunction provisions that are consistent with the applicable provisions of the Bankruptcy Code and conform to the requirements of Third Circuit case law.   The release, exculpation, and injunction provisions are the product of good-faith, arms' length negotiations between the Debtors, the Committees, and other stakeholders.   These provisions enable the Debtors to emerge from chapter 11 with a clean slate and focus on their business operations going forward.   The Debtors believe that this Court should approve these provisions because they are fair and reasonable under the circumstances, supported by consideration, and essential to the reorganization in the Chapter 11 Cases.

79.    ***Releases by the Debtors***.   Section 1123(b)(3)(A) of the Bankruptcy Code states that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."   11 U.S.C. § 1123(b)(3)(A).   The Bankruptcy Code thus clearly contemplates that the Debtors are permitted to settle or release any claim or cause of action that they might otherwise have against a third party.   In this district, courts have found that chapter 11 debtors are generally allowed to release claims pursuant to section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair,

reasonable, and in the best interests of the estate." *U.S. Bank. Nat'l Ass'n v. Wilmington Trust Co.* (*In re Spansion*), 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also Gillman v. Cont'l Airlines* (*In re Cont'l Airlines*), 203 F.3d 203, 214 (3d Cir. 2000) (holding that the hallmarks of permissible releases include fairness and necessity to the reorganization).  In addition, courts in this district have held that a plan may provide for the release by a debtor of non-debtor third parties if appropriate based on the facts and equities of each case.  *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999).

80.    The Plan provides for a release of the Released Parties by the Debtors and Post-Effective Date Debtors, in their respective individual capacities and as debtors-in-possession, as more fully set forth in Article VIII.C of the Plan (the "**Debtor Release**").  Under the Plan, the term "Released Party" is defined in Article I.A as follows:

> "*Released Party*" means each of the following in their capacity as such: (i) the Debtors; (ii) the Post-Effective Date Debtors; (iii) each of the Debtors' Estates; (iv) the UCC, (v) each of the UCC Members, solely in its capacity as a UCC Member; (vi) the EC; (vii) each of the EC Members, solely in its capacity as an EC Member; and (viii) with respect to each of the foregoing Entities in clauses (i) through (vii), their respective current and former officers, directors, employees, attorneys, accountants, investment bankers, consultants and other professionals other than Excluded Parties, each in its capacity as such; *provided that*, notwithstanding anything in the foregoing, any Person or Entity that is an Excluded Party shall not be a Released Party; *provided further that*, notwithstanding anything in the foregoing, any Person or Entity that is entitled to vote on the Plan but does not vote to accept the Plan or otherwise opt in to the releases shall not be a Released Party; provided further that, no defendant in the Ohio Securities Litigation shall be a "Released Party" for purposes of any release provided by any Ohio Settlement Class Members, in their capacities as such, other than the Debtors, the Post-Effective Date Debtors and each of the Ohio Released Directors and Officers.

Plan, Art. I.A.153.

81.    The Debtor Release was the product of arm's length negotiations throughout the course of the plan process, including between the Debtors, the UCC, EC, the U.S. Trustee, and

other stakeholders. Ninivaggi Decl., ¶ 18. The Debtors, in their business judgment, determined that the Debtor Release was necessary to achieve consensus on the Plan and was therefore critical to the Debtors' success in the Chapter 11 Cases. *Id.* Each of the Released Parties has played a role in and contributed to the success of the Debtors' Chapter 11 Cases. *Id.* The Plan represents a global resolution of prepetition claims and, the Debtors believe, will likely result in full payment to all of the Debtors' creditors, while keeping equity interests in place in the Post-Effective Date Debtors. *Id.* Indeed, as evidenced by the Voting Report and noted herein, in the aggregate, the majority of the Debtors' stakeholders support the Plan. Voting Report, Ex. A. Given the Released Parties' contributions to, and the success of, the Debtors' Chapter 11 Cases, the Debtors believe that the Debtor Release is appropriate under the circumstances. Ninivaggi Decl., ¶ 18. Furthermore, the pursuit of claims against certain of the Released Parties (e.g., the Chapter 11 Directors and Officers) could trigger indemnification obligations by the Debtors to such Released Parties. The Debtor Release therefore affords the Post-Effective Date Debtors appropriate protections with respect to potential claims that might otherwise be brought against the Debtors by Released Parties that are owed Indemnification Obligations.

82. Importantly, the Debtors retained Winston & Strawn LLP ("**Winston**") and appointed an independent Derivative Claims Oversight Committee to evaluate potential derivative claims, including against current and former directors and officers, and the inclusion of any person as a released party under the Plan was subject to the recommendations of the Derivative Claims Oversight Committee. *See* Disclosure Statement, Art. III.F; Ninivaggi Decl., ¶ 8. Winston conducted a detailed investigation into potential causes of actions and claims against the current and former directors and officers. Ninivaggi Decl., ¶ 8. It submitted its findings and recommendation to the Derivative Claims Oversight Committee, which findings

and recommendations the Committee adopted.  *Id.*  Thereafter, the full board of LMC adopted the findings and recommendations adopted by the Derivative Claims Oversight Committee.  *Id.* Thus, the Debtors in their reasonable business judgment believe that they have no credible causes of action against the directors and officers receiving releases under the Plan (*i.e.*, the Chapter 11 Directors and Officers).  *Id.*  The Debtors have also shared Winston's conclusions with each of the Committees, and each of the Committees supports the Plan.  *Id.*

83.     In any event, the Debtor Release expressly excludes "Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence."  Plan, Art. VIII.C.  The Debtors do not believe that any material claims or causes of action of the types released under the Plan exist against any of the Released Parties.  Moreover, given that these causes of action belong to the Debtors, it is plainly within the purview of the Debtors to release their own causes of action. Additionally, the Plan, including the Debtor Release, was negotiated by sophisticated entities that were represented by able counsel and advisors.  Moreover, the Debtor Release does not affect creditor recoveries in a case where all creditors will be paid in full.  Accordingly, the Debtor Release is fair, equitable, justified, in the best interests of the Debtors' estates.

84.     The Debtors have reasonably exercised their business judgment to release those causes of action proposed to be released under the Debtor Release.  The Debtor Release is not only fair, equitable, and necessary to the success of the Debtors' Chapter 11 Cases, but it is also appropriate under prevailing Third Circuit case law.  *See, e.g.*, *Spansion*, 426 B.R. at 143.

85.     ***Release by Third Parties***.  In addition to the releases granted by the Debtors in Article VIII.C of the Plan, Article VIII.D of the Plan provides for the consensual release of the Released Parties from any Causes of Action or Claims relating to the Debtors under the Plan (the

"**Third-Party Releases**"), which does not extend to, among other things, Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.  The Third-Party Releases were the product of arm's-length negotiations throughout the course of the plan process, including between the Debtors, the UCC, the EC, the U.S. Trustee, and other stakeholders.   Ninivaggi Decl., ¶ 20.  The Third-Party Releases were consensually given by the Releasing Parties, which include Holders of Claims or Interests that have voted to accept the Plan, and Holders of Claims or Interests that have not voted to accept the Plan but have opted into the Third-Party Releases. The Debtors believe that, without the Third Party Releases, they would not have been able to attain the positive result reached in these Chapter 11 Cases.   Importantly, the Third-Party Releases are consensual and not binding on any party that elected not to grant such release in compliance with the procedures approved by the Court.   Plan, Art. I.A.156 & VII.D; *see* Ninivaggi Decl., ¶ 20.

86.     In the Third Circuit, courts, including this Court, have recognized that consensual releases of third-party claims against non-debtors are permissible.  *See Cont'l Airlines*, 203 F.3d at 214 n.11 ("Several of the Bankruptcy Courts in our Circuit have stated that non-debtor releases are permissible only if consensual.") (citing *In re Zenith Elecs. Corp*., 241 B.R. 92, 111 (Bankr. D. Del. 1999)); *Spansion*, 426 B.R. at 144.  In this regard, a plan may provide for a release of third-party claims against a non-debtor by parties who submitted their ballot in favor of the Plan.  *See In re Abeinsa Holding, Inc*., 562 B.R. 265, 286 (Bankr. D. Del. 2016) (recognizing that courts in the Third Circuit uphold plan provisions that provide each person who votes to accept the plan is deemed to consent to third party releases and approving same); *Washington Mut. Inc.,* 442 B.R. 314, 352 (Bankr. D. Del. 2011) (to be enforceable, "any [third

party] release must be based on consent of the releasing party (by contract or the mechanism *of voting in favor of the plan*)") (internal citation omitted; emphasis added); *In re Indianapolis Downs, LLC,* 486 B.R. 286, 304 (Bankr. D. Del 2013) (same); *Coram Healthcare*, 315 B.R. at 336 (finding that voting in favor of a plan of reorganization that provides for a third-party release indicates consent to the release, even without an explicit election to opt-in to the third-party release).

87.     Pursuant to the Plan, the Third-Party Releases are only provided by those who (i) vote to accept the Plan, or (ii) vote to reject and/or abstain from voting on the Plan and affirmatively choose to opt-in to the Third-Party Releases.  Holders of Claims or Interests entitled to vote on the Plan who abstain from doing so, and have not otherwise opted-in, are not bound by the Third-Party Releases.  This Court has previously held that a release is consensual if it constitutes part of the contractual arrangement set forth in the Plan.  Further, the Court has determined that an "opt-in" procedure for those that vote against or abstain from voting on the plan is also acceptable.  *See Washington Mutual*, 442 B.R. at 355; *Spansion*, 426 B.R. at 144. Accordingly, the Third-Party Releases are fully voluntary and represent contractual agreements by the Releasing Parties.

88.     Importantly, prior to the Disclosure Statement hearing, the U.S. Trustee and various other parties objected to the Third-Party Releases as originally proposed in the Initial Plan on the basis that it attempted to use an "opt-out" method in connection with the Third-Party Releases and were not truly consensual.  In response, the Debtors amended the Plan to require that third parties affirmatively consent to the release either by voting to accept the Plan or otherwise opting-in to the release.  The Court indicated that it would likely treat an opt-in release form as consensual.  *See* Oct. 31, 2023 Hr'g Tr. at 19:15-20:5 (indicating that a vote to accept

the Plan constitutes consent to be bound by all provisions of the Plan, including the Plan releases).

89.     The Debtors therefore solicited votes employing Ballots that provided for an opt-in selection method for the parties to opt into the Third-Party Releases.  As approved by the Court, each of the Ballots to vote to accept or reject the Plan (including those mailed with the Disclosure Statement and the Plan) provided that a vote to approve the Plan would be deemed consent to the Plan's release provisions and contained an opt-in election box, and specifically advised Holders entitled to vote on the Plan in bold, capitalized type that the opt-in election is:

> ONLY APPLICABLE IF YOU VOTE TO REJECT THE PLAN.  IF YOU VOTE TO ACCEPT THE PLAN, YOU WILL ALSO BE CONSENTING TO THE RELEASE BELOW CONTAINED IN ARTICLE VIII.D OF THE PLAN REGARDLESS OF WHETHER YOU CHECK THE ABOVE BOX OR NOT.  IF YOU VOTE TO REJECT THE PLAN, YOU ARE ENTITLED TO OPT IN TO THE RELEASE BELOW CONTAINED IN ARTICLE VIII.D OF THE PLAN BY CHECKING THE BOX IN ITEM 3 OF THIS BALLOT.

*See* Discl. Stmt. Order, Exs. 2-1 at 6; 2-2 at 6; 2-5 at 6; 2-6 at 6; 2-7 at 6.  Further, each Ballot restated the Third-Party Releases set forth in the Plan in their entirety.

90.     All other creditors that were Unimpaired under the Plan, as well as holders of administrative and priority claims, will not be deemed as Releasing Parties in connection with the Third-Party Releases.

91.     In accordance with the Solicitation Procedures approved by the Court in the Disclosure Statement Order, all Holders of Claims and Interests in the Debtors were provided adequate notice of the releases and of the acceptance/opt-in mechanism employed to consent to the releases.  Accordingly, the Third-Party Releases are voluntary, consensual, consistent with case law and the Court's guidance at the Disclosure Statement hearing and should be approved.

92.     *Exculpation*.  Article VIII.E of the Plan provides, among other things, that each

Exculpated Party[21] is exculpated from any Cause of Action for any claim relating to any act or

omission from the Petition Date to the Effective Date relating to the Chapter 11 Cases, the

Debtors, and certain other matters, except for acts or omissions that are judicially determined by

Final Order to have arisen from fraud, gross negligence, or willful misconduct.

93.     The exculpation provisions of the Plan are standard, appropriate, and should be

approved.  The exculpation provisions are "commonplace" and do not affect the liability of third

parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future

litigation by a non-releasing party against an Exculpated Party for acts arising out of the Debtors'

restructuring.  *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an

exculpation provision is "a commonplace provision in Chapter 11 plans, [and] does not affect the

liability of these parties, but rather states the standard of liability under the Code").

94.     The Debtors also believe that the exculpation is necessary to protect parties who

have made substantial contributions to the Debtors' chapter 11 proceeding from collateral attacks

related to their good faith acts or omissions in effecting the Debtors' Plan implementation during

the course of the Chapter 11 Cases.  *See In re Chemtura Corp.*, 439 B.R. 561, 610 (Bankr.

S.D.N.Y. 2010) (recognizing that "exculpation provisions are included so frequently in chapter

11 plans because stakeholders all too often blame others for failures to get the recoveries they

---

[21]    Under the Plan "**Exculpated Parties**" means:

[E]ach of the following in their capacity as such:  (i) the Debtors; (ii) the Chapter 11 Directors and Officers, (iii) agents, members of management and other employees of the Debtors, in each case who are or were acting in such capacity on or after the Petition Date; (iv) the UCC and the UCC Members; (v) the EC and the EC Members; and (vi) all predecessors, successors and assigns, subsidiaries, affiliates, members, partners, officers, directors, agents, attorneys, advisors, accountants, investment bankers, consultants, and other professionals, to the extent such parties are or were acting in such capacity of any of the Persons identified in (i), (ii), (iii) (iv), and (v) above on or after the Petition Date.

Plan, Art. I.A.56.

desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers in the chapter 11 case").  Put simply, the Debtors could not have developed the Plan without the support and contributions of the Exculpated Parties.  Further, the scope of the exculpation is limited in time and subject matter and has no effect on liability resulting from gross negligence, actual fraud, or willful misconduct, as determined by a Final Order.  *See* Plan Art. VIII.E.  Thus, the exculpation provision is consistent with applicable law and should be approved in connection with the Confirmation of the Plan.

95.     ***Injunction***.  Article VIII.F of the Plan provides that Confirmation of the Plan shall have the effect of permanently enjoining all entities from (i) commencing or continuing any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) except to the extent required to render Holders of Class 5 Claims unimpaired, asserting a setoff or right of subrogation of any kind; or (v) commencing or continuing any action or other proceeding, in each case on account of or with respect to any claims or causes of action discharged, released, exculpated, settled, or discharged pursuant to the Plan or the Confirmation Order against any entity released, discharged, or exculpated party under the Plan.

96.     The injunction is necessary to preserve and enforce the discharge and release of the Debtors and other releases and exculpation granted by the Plan, and it is narrowly tailored to achieve that purpose.  The Injunction is, therefore, a justified and appropriate component of the Debtors' Plan implementation.  *See In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 293 (2d Cir. 1992); *see also In re TK Holdings, Inc.*, No. 17-11375 (BLS), 2018 Bankr. LEXIS 756, at *61 (Bankr. D. Del. Feb. 21, 2018) ("The injunctions are necessary to preserve and enforce the releases and are narrowly tailored to achieve that purpose."); *In re Regent Commc'ns, Inc.*, No.

10-10632 (KG), 2010 Bankr. LEXIS 5793, at *18-19 (Bankr. D. Del. Apr. 12, 2010) ("The injunction provisions set forth in <u>Article X.F</u> of the Plan are necessary to preserve and enforce the release, exculpation, non-debtor release and injunction provisions . . . of the Plan and are narrowly tailored to achieve that purpose."); *In re Drug Fair Grp., Inc.*, No. 09-10897 (BLS), 2010 Bankr. LEXIS 2984, at *16 (Bankr. D. Del. June 7, 2010) ("The injunction provision set forth in Section 9.2 of the Plan . . . is necessary to preserve and enforce the Release and the Exculpation, and the Injunction is narrowly tailored to achieve this purpose.").  Courts in this district routinely approve similar injunctions. *See, e.g.*, *In re Am. Apparel, Inc.,* No. 15-12055 (BLS), 2016 Bankr. LEXIS 3331, at *250 (Bankr. D. Del. Jan. 27, 2016); *In re HRI Holding Corp.*, No. 19-12415 (MFW) (Bankr. D. Del. Nov. 5, 2020) [Docket No. 816]; *In re Stallion Oilfield Servs.*, No. 09-13562 (BLS), 2010 Bankr. LEXIS 4500, at *70 (Bankr. D. Del. Jan. 20, 2010); *In re Masonite Corp.*, No. 09-10844 (PJW), 2009 Bankr. LEXIS 4698, at *66 (Bankr. D. Del. May 29, 2009).

97.     Based upon the foregoing, the Plan fully complies with the requirements of sections 1122 and 1123, as well as with all other provisions of the Bankruptcy Code, and thus satisfies the requirement of section 1129(a)(1) of the Bankruptcy Code.

### 2.     Section 1129(a)(2):   The Debtors Have Complied with Applicable Provisions of the Bankruptcy Code

98.     Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent "compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(2). The legislative history of section 1129(a)(2) informs that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code.  *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978) ("Paragraph (2) [of section 1129(a)] requires that the proponent of

the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984). The Debtors have complied with section 1129(a)(2) of the Bankruptcy Code by distributing the Disclosure Statement, and by soliciting acceptances of the Plan through the Solicitation Agent, all in accordance with the procedures approved by this Court pursuant to the Disclosure Statement Order. Docket No. 651 ¶¶ E, G, 8-10. Furthermore, pursuant to the Disclosure Statement Order, this Court approved the content of the Disclosure Statement as containing adequate information in compliance with section 1125 of the Bankruptcy Code. *Id.* ¶ A, 2. Based upon the foregoing, the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

### 3. Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law

99. Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Third Circuit has found that "[f]or purposes of determining good faith under section 1129(a)(3) the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *PWS Holding*, 228 F.3d at 242 (internal quotations, citations, and modifications omitted). Moreover, good faith requires "some relation" between the chapter 11 plan and the "reorganization-related purposes" of chapter 11. *See In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999); s*ee also Koelbl v. Glessing (In re Koelbl*), 751 F.2d 137, 139 (2d Cir. 1984) (interpreting the standard as requiring a showing that "the plan was proposed with honesty and good intentions") (internal citation omitted). Furthermore, "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is

satisfied." *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985) (internal citation omitted). The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan. *Id*.

100.    The Debtors have met their good faith obligation under the Bankruptcy Code. Throughout the Chapter 11 Cases, the Debtors have focused on maximizing value for their various stakeholders. The Plan, the Plan Supplement and all documents necessary to effectuate the Plan were developed after months of analysis and negotiations between the Debtors, the Committees, and other key constituents and were proposed with the legitimate and honest purpose of maximizing the recovery for all stakeholders of the estates. The Plan is the result of a process of vigorous arm's-length negotiations and will maximize the recovery of all stakeholders. Moreover, the Plan provides that the Post-Effective Date Debtors may engage in business operations and provides them with access to working capital to position them for success as they emerge from chapter 11 protection.

101.    The Plan is the product of a negotiation process designed to maximize value for all stakeholders. Ninivaggi Decl. ¶¶ 6-22. It was developed with the input of the Debtors' key constituents, including the Committees, the Ohio Securities Litigation Lead Plaintiff, the SEC, Foxconn and others. *Id*. at ¶¶ 9-16. It is clear that the Plan has been proposed in good faith as interpreted under the Bankruptcy Code. The Plan will achieve a result consistent with the overall objectives and purposes of the Bankruptcy Code.

102.    From the outset of the Chapter 11 Cases, the Debtors have been forthright about the reasons they sought bankruptcy protection: to maximize value by conducting a robust sale process, preserving the Debtors' substantial claims, and centralizing the claims asserted against the Debtors to efficiently resolve those claims and provide meaningful recoveries to all parties in

interest.  *See* First Day Decl. ¶¶ 4, 59; *see also* Ninivaggi Decl. ¶ 6.  The Debtors have made

good on this commitment, proposing a Plan that will maximize the recovery of all of the Holders

of Claims and Interests.

103.    The Plan satisfies section 1129(a)(3) of the Bankruptcy Code.

        **4.**        **Section 1129(a)(4):  The Payment for Certain Services or for Certain Costs and Expenses Is Subject to Court Approval**

104.    Section 1129(a)(4) of the Bankruptcy Code states that "any payment made or to

be made by the proponent, by the debtor, or by a person issuing securities or acquiring property

under the plan, for services or for costs and expenses in or in connection with the case, or in

connection with the plan and incident to the case, has been approved by, or is subject to the

approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).  This section of the Bankruptcy

Code requires that all payments of professional fees made from estate assets be subject to review

and approval of the bankruptcy court as to their reasonableness.  *See In re WorldCom, Inc.*, No.

02-13533, 2003 Bankr. LEXIS 1401, at \*159 (Bankr. S.D.N.Y. Oct. 31, 2003).

105.    Here, all payments made or to be made by the Debtors on account of Professional

Fee Claims are subject to this Court's approval.    Pursuant to Article II.B of the Plan,

Professionals and other Entities asserting Professional Fee Claims must file with the Court an

application for final allowance of such Professional Fee Claims.  Furthermore, all monthly and

interim compensation of Professionals by the Debtors prior to final allowance of such

Professional Fee Claims have been or will be approved by the Court and paid in accordance with

the procedures established by the *Order Establishing Procedures for Interim Compensation and

Reimbursement of Expenses for Chapter 11 Professionals and Committee Members* [Docket No.

181].  Finally, the Debtors have fully disclosed the compensation to be paid to the Claims

Ombudsman.

### 5. Section 1129(a)(5): Information Regarding Directors and Officers of the Debtors Under the Plan Has Been Disclosed

106.    Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor; that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy, and that there be disclosure of the identity and compensation of any insiders to be retained or employed by the reorganized debtor.

107.    The members of the New Board that are known prior to the Confirmation Hearing have been identified in the Plan Supplement.[22] *See* Initial Plan Supp., Ex. B.  The Debtors do not anticipate that any non-officer members of the New Board will be insiders.  If they are, the Debtors will disclose the nature of all compensation to be paid to such individual(s).  In addition, the Debtors have identified the Chief Executive Officer of the Post-Effective Date Debtors in the Plan Supplement and will disclose the identity and affiliations of any other Person proposed to serve as an officer of the Post-Effective Date Debtors, and, to the extent such Person is an insider of the Debtors, will disclose the nature of any compensation for such Person.  Each such director, manager, managing member and/or officer shall serve from and after the Effective Date pursuant to applicable law and the terms of the New Organizational Documents and the other constituent and organizational documents of the applicable Post-Effective Date Debtors.  Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

---

[22]    *See In re Am. Solar King Corp.*, 90 B.R. 808, 815 (Bankr. W.D. Tex. 1988) ("The debtor's inability to specifically identify future board members does not mean that the debtor has fallen short of the requirement imposed in [§ 1129](a)(5)(A)(i), because the debtor *at this point* has no particular individual whom it proposed should serve[.]"); *Charter Commc'ns*, 419 B.R. at 260 n.30 ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at [confirmation] the identities of the *known* directors.") (emphasis in original).

### 6.      Section 1129(a)(6) of the Bankruptcy Code Is Not Applicable

108.    Section 1129(a)(6) of the Bankruptcy Code requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."   11 U.S.C. § 1129(a)(6).   Section 1129(a)(6) is inapplicable because, to the extent any Debtor is subject to the jurisdiction of any governmental regulatory commission with respect to any rates, no rate changes are proposed in the Plan.

### 7.      Section 1129(a)(7):  The Plan Is in the Best Interests of Creditors and Equity Interest Holders

109.    Section 1129(a)(7) of the Bankruptcy Code is often referred to as the "best interests test" or the "liquidation test," and provides, in relevant part:

> With respect to each impaired class of claims or interests –
>
> (A)      each holder of a claim or interest of such class –
>
> (i)      has accepted the plan; or
>
> (ii)      will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . . .

11 U.S.C. § 1129(a)(7).

110.    The best interests test focuses on individual dissenting creditors or interest holders rather than classes of claims or interests.  *See Bank of Am. Nat'l Tr. & Savs. Ass'n v. 203 N. Lasalle St. P'ship.*, 526 U.S. at 441.  Under the best interests test, the court "must find that each [non-accepting] creditor will receive or retain value that is not less than the amount he would receive if the debtor were liquidated [under chapter 7 of the Bankruptcy Code]."  *Id*. at 442; *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 228 (1996).

111.    As section 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting impaired claims or equity interests.  The only parties that could raise such objection are the Impaired Class 3 (General Unsecured Claims), Class 7 (Common Stock Interests), Class 8 (Section 510(b) Claims), Class 9 (RIDE Section 510(b) Claims) and Class 10 (Ohio Securities Litigation Claim).  No such Holder has raised any such objection.

112.    The Debtors completed their Liquidation Analysis attached as Exhibit C to the Disclosure Statement after due diligence and the development of reasonable assumptions about the circumstances that would attend a hypothetical chapter 7 liquidation of the Debtors commenced as of December 31, 2023.  As described more fully in the Liquidation Analysis each Holder of Class 3 (General Unsecured Claims), Class 7 (Common Stock Interests), Class 8 (Section 510(b) Claims), and Class 9 (RIDE Section 510(b) Claims) stand to receive more under the Plan than it would if the Debtors were liquidated.  Kroll Decl. ¶¶ 13-17.

113.    Moreover, since the Liquidation Analysis was prepared, the SEC has filed the $45 million SEC Claim, which if Allowed would substantially further dilute recoveries to creditors and stakeholders.  The Plan will result in the withdrawal of the SEC's claim.  Such resolution is not available in the context of a chapter 7.  This provides significant further value to all creditors and interest holders.  Among other things, the withdrawal of the SEC claim will greatly increase the likelihood of payment in full to creditors and will provide significant value to holders of Common Stock Interests by removing a substantial senior claim from the claims registry.  In addition, the creation of a litigation trust and the preservation of the Debtors' tax attributes create significant value not available to stakeholders in a chapter 7 case.  The Plan satisfies section 1129(a)(7).

8.     **Section 1129(a)(8):  While one Class has Not Voted to Accept the Plan, the Plan Satisfies the Bankruptcy Code's Cramdown Requirements**

114.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.  Of the impaired Classes of Claims or Interests entitled to vote under the Plan, Class 3 (General Unsecured Claims) and Class 7 (Common Stock Interests) voted to accept the Plan, and Class 10 (Ohio Securities Litigation Claims) are deemed to have voted to accept the Plan.  *See* Voting Report, Ex. A; Ohio Securities Litigation Stipulation, ¶ 7.

115.     Class 8 (Section 510(b) Claims) is the only Impaired class under the Plan that did not vote to accept the Plan.[23]   While the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to Class 8 (Section 510(b) Claims), the Plan is confirmable nonetheless because the Plan has been accepted by at least one impaired Class, is fair and equitable, and does not discriminate unfairly, thereby satisfying sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as discussed below.

9.     **Section 1129(a)(9):  The Plan Provides for Payment in Full of Allowed Administrative and Priority Claims**

116.     Unless the holder of a particular claim agrees to a different treatment with respect to such claim, section 1129(a)(9) of the Bankruptcy Code requires a plan to satisfy administrative claims, other priority claims, and priority tax claims in full in cash.  The Plan satisfies these requirements.  *See* Plan, Art. II.A.

---

[23]   Holders of Claims in Class 9 (RIDE Section 510(b) Claims) have been deemed eliminated from the Plan pursuant to <u>Article III.C</u> of the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining acceptances or rejection of the Plan by such Classes pursuant to section 1129(a)(8) of the Bankruptcy Code.

10. **Section 1129(a)(10):  The Plan Has Been Accepted by at Least One Impaired Class of Claims, If Any**

117.    Section 1129(a)(10) of the Bankruptcy Code requires that, if a class of claims is impaired under a plan, at least one impaired class of claims has voted to accept the Plan.  As set forth in the Voting Report, Class 3 (General Unsecured Claims), Class 7 (Common Stock Interests), Class 8 (Section 510(b) Claims), Class 9 (RIDE Section 510(b) Claims), and Class 10 (Ohio Securities Litigation Claim) are entitled to vote on the Plan.  As noted in the Voting Report, all of the Voting Classes except Class 8 (Section 510(b) Claims) voted to accept the Plan.  *See* Voting Report, Ex. A.

11. **Section 1129(a)(11):  The Plan Is Feasible**

118.    Section 1129(a)(11) of the Bankruptcy Code requires that, as a condition to confirmation, the bankruptcy court determine that a plan is feasible.  Specifically, the bankruptcy court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

119.    The statute requires the bankruptcy court to determine whether a plan is workable and has a reasonable likelihood of success.  *See In re Armstrong World Indus., Inc.*, 348 B.R. 136, 167 (Bankr. D. Del. 2006); *In re NII Holdings*, 288 B.R. 356, 364 (Bankr. D. Del. 2002); *In re The Leslie Fay Cos.*, 207 B.R. 764, 788-89 (Bankr. S.D.N.Y. 1997).

120.    To demonstrate that a plan is feasible, it is not necessary for a court to find a guarantee of success.  *See Internal Revenue Serv. v. Kaplan* (*In re Kaplan*), 104 F.3d 589, 597 (3d Cir. 1997); *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *see also In re U.S.*

*Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986). Rather, a debtor must provide only a reasonable assurance of success. *Clarkson v. Cooke Sales & Serv. Co.* (*In re Clarkson*), 767 F.2d 417, 420 (8th Cir. 1985) ("The feasibility test contemplates 'the probability of actual performance of the provisions of the plan. . . . The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.'") (citing *Chase Manhattan Mortg. & Realty Trust v. Bergman* (*In re Bergman*), 585 F.2d 1171, 1179 (2d Cir. 1978)); *In re Texaco, Inc.*, 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) ("All that is required is that there be a reasonable assurance of commercial viability.").

121.    No party has contested the feasibility of the Plan.  While the debtor bears the burden of proving plan feasibility, the applicable standard is by a preponderance of the evidence, which means presenting proof that a given fact is "more likely than not." *See In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997); *Briscoe Enters.*, 994 F.2d at 1164; *CoreStates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R. 33, 45 (E.D. Pa. 1996).  A number of courts have held that this constitutes a "relatively low threshold of proof." *In re Mayer Pollock Steel Corp.*, 174 B.R. 414, 423 (Bankr. E.D. Pa. 1994) (stating that the debtors "have established that they meet the requisite low threshold of support for the plan as a viable undertaking"); *see also Briscoe Enters.*, 944 F.2d at 1166 (upholding the bankruptcy court's ruling that reorganization that had only a "marginal prospect of success" was feasible because only "a reasonable assurance of commercial viability" was required).

122.    Courts have also made clear that "speculative prospects of failure cannot defeat feasibility.  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds." *See WorldCom*, 2003 Bankr. LEXIS 1401, at *170; *see also In re Adelphia Bus.*

*Solutions, Inc.*, 341 B.R. 415, 421 (Bankr. S.D.N.Y. 2003) ("However, just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility.  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds.").

123.     Applying the foregoing standards of feasibility, courts have identified the following nonexclusive factors as probative with respect to the feasibility of a plan:

(a)     the adequacy of the capital structure;

(b)     the earning power of the business;

(c)     economic conditions;

(d)     the ability of management;

(e)     the probability of the continuation of the same management;

(f)     the availability of prospective credit, both capital and trade;

(g)     the adequacy of funds for equipment replacements;

(h)     the provisions for adequate working capital; and

(i)     any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*In re Leslie Fay Cos.*, 207 B.R. at 789; *see also In re Machne Menachem, Inc.*, 371 B.R. 63, 71 (Bankr. M.D. Pa. 2006); *In re Drexel Burnham Lambert Grp.*, 138 B.R. 723, 762-63 (Bankr. S.D.N.Y. 1992) (factors are nonexclusive).

124.     The Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  As set forth in the Kroll Declaration, the Debtors and their advisors have analyzed the ability of the Post-Effective Date Debtors to meet their obligations under the Plan following the Effective Date.   *See* Kroll Decl. ¶¶ 9-12.  The Debtors believe that the Claims Reserve, the Post-Effective Date Debtor Amount, the Post-Effective Date Debtor Cash and other

cash on hand provide adequate liquidity to implement the Plan.  And no party has objected to the feasibility of the Plan.

125.    The Debtors believe that the Plan is feasible and satisfies the requirement of section 1129(a)(11) of the Bankruptcy Code.

### 12.    Section 1129(a)(12):  The Plan Provides for Full Payment of Statutory Fees

126.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under [28 U.S.C. § 1930], as determined by the court at the hearing on confirmation of the plan." 11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [28 U.S.C. § 1930]" are afforded priority as administrative expenses.    11 U.S.C. § 507(a)(1).    In accordance with these provisions, Article XIII.A of the Plan provides that all fees payable pursuant to 28 U.S.C. § 1930 shall be paid when due.  All such fees payable after the Effective Date shall be paid in the ordinary course of business.   Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

### 13.    Sections 1129(a)(13) through 1129(a)(16) Do Not Apply

127.    Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for retiree benefits, as such term is defined in section 1114(a) of the Bankruptcy Code, at levels established pursuant to section 1114 of the Bankruptcy Code.  The Debtors do not have any retirees. Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  The Debtors are not subject to any domestic support obligations, and, as such, this section of the Bankruptcy Code does not apply.  Section 1129(a)(15) applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code).  None of the Debtors is an "individual."  Finally, section 1129(a)(16) of the Bankruptcy Code provides

65

that property transfers by a corporation or trust that is not a moneyed, business or commercial corporation or trust be made in accordance with applicable provisions of non-bankruptcy law; however, as the Debtors are moneyed, business, or commercial corporations, this section is not applicable.

### 14.    Section 1129(b): The Plan Satisfies the Cramdown Requirements

128.    Section 1129(b) of the Bankruptcy Code provides that if all applicable requirements of section 1129(a), other than section 1129(a)(8), are met, a plan may be confirmed so long as the requirements set forth under section 1129(b) of the Bankruptcy Code are met. *See* 11 U.S.C. § 1129(b).    Section 1129(b) of the Bankruptcy Code states that a plan shall be confirmed if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan," notwithstanding that the plan has not been accepted by all impaired classes of interests and equity interests. *See* 11 U.S.C. § 1129(b)(1); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 481 (Bankr. D.N.J. 1990).

129.    The Plan satisfies the requirements under section 1129(b) because the Plan does not discriminate unfairly and is fair and equitable with respect to Class 8 (Section 510(b) Claims) that is Impaired under, and has not accepted, the Plan.    No party has objected to confirmation on the basis that the Plan fails to satisfy this provision of the Bankruptcy Code.

### (a)    The Plan Does Not Discriminate Unfairly

130.    Section 1129(b)(1) of the Bankruptcy Code requires that a dissenting class should receive relative value equal to the value given to other similarly situated classes. *In re Trib. Co.*, 972 F.3d 228, 240 (3d Cir. 2020) ("Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes.");

*see also In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (same).   The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.   *See In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"), *rev'd on other grounds, Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship.*, 526 U.S. 434 (1999).   Rather, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.   *See e.g.*, *In re Freymiller Trucking Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (finding that determination of unfair discrimination requires court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989).   At a minimum, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so.   *See In re Ambanc La Mesa L.P.*, 115 F.3d 650, 654-55 (9th Cir. 1997); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and thus there was no unfair discrimination).   Accordingly, between two classes of claims or two classes of interests, there is no unfair discrimination if (a) the claims or interests in each such class are dissimilar from those in the other class, or (b) taking into account the particular facts and circumstances of the case, there is a reasonable basis for disparate treatment of otherwise similar claims or interests.   *See In re Buttonwood Partners, Ltd.*, 111 B.R. 57 (Bankr. S.D.N.Y. 1990).

131.     Here, Class 8 (Section 510(b) Claims) is the only Class entitled to vote on the Plan that did not vote to accept the Plan.  The Section 510(b) Claims generally arise from alleged damages relating to the purchase or sale of the Debtors' common stock that allegedly incurred during the Ohio Settlement Class Period.  Such claims have the same priority as the Common Stock Interests pursuant to the Bankruptcy Code.  The treatment of 510(b) Claims under the Plan is, therefore, intended to provide fair and substantially equivalent treatment between the Holders of Section 510(b) and the Holders of Common Stock Interests.  Class 8 contains Claims that will be Allowed (if at all) in a specific dollar amount.  Class 7 contains Interests that do not provide for recovery in any set amount and are, instead, measured by numbers of shares.  These two different legal entitlements must be reconciled to provide non-discriminatory treatment in a fashion that fairly allocates value among the two Classes.  In order to accomplish such reconciliation, the treatment of Class 8 establishes a method of "converting" any Allowed Class 8 Claim into shares of Common Stock to facilitate equal distributions.  The Plan does so by providing that Holders of Allowed Claims in Class 8 will receive Common Stock Interests of a value (measured as of the Ohio Settlement Class Period) equal to the Allowed amount of their respective Section 510(b) Claims.  As more fully discussed below, this is to ensure that the Holders of Section 510(b) Claims are allocated value in a fashion that reflects any damages suffered due to actionable misrepresentations but not for declines in the Debtors' share price due to other reasons, such general business conditions (which would overcompensate Section 510(b) Holders).  This is accomplished by taking the Allowed amount of a Holder's Section 510(b) Claim (if any) and dividing such amount by the weighted average share price of the Common Stock Interests during the Ohio Settlement Class Period, adjusted for a reverse stock split that occurred prior to the Petition Date.  *See* Plan, ¶ III.B.8.b.  The Holders of Section 510(b) Claims

will then receive a *pro rata* share of any distributions to Holders of Common Stock Interests, resulting in equal treatment.

132.    The formula set forth in the Plan is fair and reasonable and no party contends otherwise.    Hamilton Decl., ¶ 14.    Importantly, this very approach was used in the PG&E bankruptcy case.    *See In re PG&E Corporation*, Case No. 19-30088 (Bankr. N.D. Cal. June 20, 2020) [Docket No. 8053] (confirming plan that utilized formula to convert allowed 510(b) claims into equity).    Pursuant to the formula, Holders of Allowed Section 510(b) Claim will receive payment of their claims in shares of Common Stock Interests, based on the prices and capitalization that existed at the time that the Section 510(b) Claims arose.    This is proper because the amount of the Section 510(b) Claims derives from damages resulting from purported misrepresentations made during the Ohio Settlement Class Period.    Any such damages would be calculated based on the stock prices and capitalization that existed at such time.    It is, therefore, appropriate for Section 510(b) Claims to be converted to equity based on the prevailing prices during the class period.    To do otherwise could overly compensate Holders of Allowed Section 510(b) Claims, because they would not include damages for losses attributable to general business risk or other, non-compensatory matters which might cause a decline in the stock price. The Bankruptcy Code subordinates the priority of Section 510(b) Claims to the level of common equity to ensure that Holders of Section 510(b) Claim are treated in a manner similar to Holders of the Debtors' Common Stock Interests.    It is plainly consistent with this purpose to award Holders of Section 510(b) Claims with equity interests based on values existing at the time damages were incurred, even if those share subsequently declined in value due to general business conditions.    That is the risk that equity holders take.    The Plan does not discriminate unfairly.

**(b)    The Plan Is Fair and Equitable**

133.    Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if the plan provides that the holder of any claim or interest that is junior to the claims or interests of such class will not receive or retain any property under the plan on account of such junior claim or interest.  *See* 11 U.S.C. §§ 1129(b)(2)(B)(ii); 1129(b)(2)(C)(ii).  This "absolute priority rule" requires that, if the holders of claims or interests in a particular class that votes to reject a plan receive less than full value for their stakes, then no holder of claims or interests in a junior class may receive property under the plan on account of such claims or interests.  *See 203 N. LaSalle*, 526 U.S. at 441-42 (explaining that, under the absolute priority rule, "a plan may be found to be 'fair and equitable' only if the allowed value of the claim [in a dissenting class of impaired unsecured creditors] is to be paid in full . . . or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property'" (citations omitted).  Courts have found that, where the dissenting class is the most junior class under a plan, the absolute priority rule is satisfied.  *See e.g.*, *In re Rosewood at Providence, LLC*, 470 B.R. 619, 632 (Bankr. M.D. Ga. 2011) ("Class 7 claims will receive no distribution and the equity interests will be cancelled; no interests are junior to Class 7.  Thus, no junior interests are retaining property on account of their interest, and the cramdown requirements are satisfied as to Class 7."); *In re Idearc Inc.*, 423 B.R. 138, 171 (Bankr. N.D. Tex. 2009), *subsequently aff'd sub nom. In re Idearc, Inc.*, 662 F.3d 315 (5th Cir. 2011) (finding that cram down was appropriate "[b]ecause Class 7 represents the lowest priority of any interests in the [d]ebtors, there are no holders of any interests that are junior to the interests of [c]lass 7 that are receiving or retaining

anything under the Plan. . . ."); *In re P.J. Keating Co.*, 168 B.R. 464, 468 (Bankr. D. Mass. 1994) (holding that there is no interest junior to class A shares and that the cramdown requirement under section 1129(b)(2)(C)(ii) is satisfied, noting that "[t]here is no interest junior to these [c]lass A shares. Thus, paragraph (ii) is satisfied."). The absolute priority rule also requires that senior classes cannot receive more than a 100 percent recovery for their claims. *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001).

134.    The Plan satisfies the absolute priority rule with respect to the dissenting class (Class 8). Class 8 – Section 510(b) Claims are subject to mandatory subordination under section 510(b) of the Bankruptcy Code to "the same priority as common stock." 11 U.S.C. § 510(b). There are no Holders of Claims and Interests junior to such Holders, and no Holders of Claims or Interests senior to Holders of Claims in Class 8 (Section 510(b) Claims) will receive more than full payment on account of their Claims.

135.    The Plan satisfies the cramdown requirements of section 1129(b) of the Bankruptcy Code.

### 15.    Section 1129(c): The Plan Is the Only Plan

136.    Section 1129(c) of the Bankruptcy Code provides, as applicable, that a bankruptcy court may confirm only one plan. The Plan is the only chapter 11 plan filed by any party in the Chapter 11 Cases and the only one submitted to the Court for confirmation. Section 1129(c) therefore permits confirmation of the Plan.

### 16.    Section 1129(d): Principal Purpose of the Plan

137.    The principal purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933. Moreover, no governmental unit or any other party has

71

requested that the Court decline to confirm the Plan on such grounds. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

### 17.  Section 1129(e) Is Inapplicable

138.    The provisions of section 1129(e) of the Bankruptcy Code apply only to "small business cases" as defined therein. The Chapter 11 Cases are not "small business cases," and accordingly, section 1129(e) of the Bankruptcy Code is inapplicable to the Chapter 11 Cases.

### B.    The Objections Should Be Overruled

139.    The Court should overrule each of the Objections for the reasons stated below.

### 1.    The UST Objection Should be Overruled

140.    The U.S. Trustee objects to the Debtors' being granted discharge under section 1141(d)(3) of the Bankruptcy Code, contending that the Plan is a liquidating plan and that "the Debtors will not engage in business after consummation of the Plan." *See* UST Obj. ¶¶ 11-16. The U.S. Trustee's objection is without merit and should be overruled.

141.    Under section 1141(d)(3) of the Bankruptcy Code, the confirmation of a plan results in a discharge unless an objector can establish that *all* of the following conditions are present: "(A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (C) the debtor would be denied a discharge under section 727(a) of the Bankruptcy Code if the case were a case under chapter 7." 11 U.S.C. § 1141(d)(3). Section 1143(d)(3) is inapplicable and thus the Debtors are entitled to a discharge.

142.    *First*, the Plan does not provide for the liquidation of all or substantially all of the Debtors' assets. Far from providing for a liquidation, the Debtors' assets will vest in the Post-Effective Date Debtors and the Plan preserves "the Debtors' ability to conduct business and enter

into one or more transactions after the Effective Date to maximize value, including transactions that could permit the Post-Effective Date Debtors to make use of substantial tax attributes; *all in a manner that is superior to a liquidation*." Disclosure Statement, Art. I.E (emphasis added); Plan, Art. V.G; s*ee also* Gallagher Decl., ¶ 8.

143.    Under the Plan, Allowed Common Stock Interests will be retained (*see* Plan Art. III.B.7) and the Debtors will emerge from chapter 11 as a public company with substantial assets, including (a) anticipated cash of approximately $78.4 million, of which $7.2 million will be the Post-Effective Date Debtor Amount, and of which it is expected that there will be additional approximately $23.5 million of Post-Effective Date Debtor Cash that may be used to fund the post-Effective Date business (*see* Kroll Decl., ¶¶ 8, 10 & 11), (b) significant Retained Causes of Action, including, but not limited to, (i) Causes of Action against Foxconn asserting claims for substantial damages and (ii) potential litigation against the Debtors' prepetition insurers, who denied coverage under the Debtors' directors and officers policies that have a $50 million ABC tower (*see* Plan, Art. V.G; Plan Supplement, Ex. C (Schedule of Retained Causes of Action); Disclosure Statement, Ex. D (the Debtors' complaint against Foxconn filed in the adversary proceeding captioned *Lordstown Motors Corp. v. Foxconn Ventures Pte. Ltd.*, Adv. Proc. No. 23-50414 (MFW) (Bankr. D. Del.))), and (c) more than $1 billion in combined estimated federal, state, and local net operating losses and other tax attributes (*see* Disclosure Statement, Art. II.C (disclosing the amount of the Debtors' tax attributes).

144.    The Plan does not liquidate the Debtors' assets and does not winddown the Debtors. Gallagher Decl., ¶ 6. This is not a Plan under which the Debtors' assets will simply be converted to cash and used to pay claims. *See id.* at ¶ 8 ("[T]he business of the Post-Effective Date Debtors is not simply to pay cash to creditors and equity holders, but to (i) investigate and

prosecute causes of action and (ii) identify, evaluate, and pursue any commercial transaction(s) that the New Board determines will be accretive to equity holders"). To the contrary, the Plan specifically preserves the Post-Effective Date Debtors' ability to conduct existing or new businesses—including the pursuit of Retained Causes of Action and of transactions to enhance shareholder value and make use of the Debtors' substantial tax attributes—and further provides for the funding of such business from Post-Effective Date Debtor Cash (Plan, Art. I.A.138 & V.C), which includes the proceeds of assets that vest in the Post-Effective Date Debtors (Plan, Art. V.B, V.C & V.E). As noted above, the purpose of such business is to enhance the value available for the Debtors' stakeholders, particularly Holders of Common Stock Interests, beyond what would be available in a liquidation. *Cf.* Disclosure Statement, VII.K (disclosing, as a risk factor, that the Debtors may conduct post-Effective Date operations and that the value of the Interests is therefore uncertain). Accordingly, the Plan does not provide for the liquidation of all or substantially all of the Debtors' assets and the Debtors are entitled to a discharge for this reason alone.

145.    The court's decision in *Rath Packing* is instructive. *In re Rath Packing Co.*, 55 B.R. 528, 537 (Bankr. N.D. Iowa 1985). In *Rath Packing*, the public-company debtor, which had ceased operations and sold its assets, proposed a plan in which the debtor (a) issued new common equity to existing shareholders, creditors, and a third party investor ("**Black Hawk**") and (b) formed a subsidiary to borrow funds from Black Hawk to potentially acquire new business with the objective of generating value for the subsidiary (and ultimately debtor and its common stockholders). *Id.* at 530-35. The court held, over the objection of the IRS, that the debtor was entitled to a discharge, noting that attempts to find new businesses in which to invest could significantly enhance the value of the debtor's common stock and finding that the plan

provided that the Debtors would engage in business following the effective date.  *Id.* at 537-38.

Similarly to *Rath Packing*, the Debtors' Plan provides for the Post-Effective Date Debtors to

engage in business following the Effective Date for the purpose of enhancing value to

stakeholders.  *See* Gallagher Decl., ¶ 8.

146.    This Court's ruling in *Solyndra* is also instructive.  *In re Solyndra, LLC*, Case No.

11-12799 (MFW) (Oct. 22, 2012, Hr'g Tr).[24]   In *Solyndra*, this Court granted the debtor a

discharge over the U.S. Trustee's objection, finding that the debtor's retention and pursuit of

substantial litigation was not a liquidation.  *Id.* at 67:9-17.  The Court further noted that efforts to

preserve tax attributes enhanced the likelihood that the debtor would conduct business following

the effective date, and noted that the substantial support for the plan, which included the

discharge, also weighed in favor of granting the discharge.  *Id.* at 68:5-15.  The same holds true

here: the Post-Effective Date Debtors are authorized to pursue the Retained Causes of Action

(including the substantial claims against Foxconn), the Debtors have more than $1 billion in

combined estimated federal, state, and local tax attributes, and the Plan—which includes a

discharge and enjoys significant creditor and equity holder support—preserves the Post-Effective

Date Debtors' ability to conduct business (including the pursuit of business and transactions to

realize the value of their assets and tax attributes).  *See* Gallagher Decl., ¶¶ 6-10.  Thus, the Court

should approve the discharge of the Debtors as part of the Plan.

147.    ***Second***, the Debtors anticipate and the Plan contemplates that the Post-Effective

Date Debtors will engage in post-Effective Date business.  As set forth in the Gallagher

Declaration, the business of the Post-Effective Date Debtors will be to deploy the assets of the

Post-Effective Date Debtors in order to generate stakeholder value in at least two ways.  First,

---

[24]    Relevant excerpts of the Solyndra hearing transcript, including this court's bench ruling, are attached hereto as
**Exhibit A**.

the Post-Effective Date Debtors will pursue the Retained Causes of Action as determined by the New Board. Gallagher Decl., ¶ 8. Second, the Post-Effective Date Debtors intend to seek new business opportunities to maximize value, which may include identifying potential business acquisition or merger opportunities (including opportunities where the Debtors' tax attributes and/or public filing status may provide significant value). *See id.* at ¶¶ 8-9; *see also* Plan, Art. III.B.7; Plan Art. V.E; Disclosure Statement, Art. I.E. The Debtors' pursuit of these businesses provides an independent reason for approving the discharge here. *See Rath Packing*, 55 B.R. at 537-38 (granting discharge and finding that the debtor would be conducting business where the plan provided that subsidiary could borrow money and seek to acquire businesses); *Solyndra*, Case No. 11-12799 (MFW) (Oct. 22, 2012, Hr'g Tr. 67:9-24) (granting discharge and finding that debtor would be conducting business where debtor would pursue business opportunities and litigation).

148.    The U.S. Trustee argues that because the Debtors' "main activities will be pursuing litigation claims and trying to monetize tax attributes," the Debtors will not be conducting business. UST Obj. ¶ 16. This argument is misplaced. The pursuit of significant litigation or transactions to enhance value (including by realizing the value of tax attributes) are themselves sufficient businesses to warrant a discharge. In *Solyndra*, this Court held that the debtor was entitled to discharge, over the objection of the U.S. Trustee, precisely because it would conduct those very activities. *Solyndra*, Case No. 11-12799 (MFW) (Oct. 22, 2012, Hr'g Tr. 67:9-24) (approving the discharge of a debtor where the plan at issue provided "for the prosecution of [an anti-trust litigation]," which was found not to be a liquidation); *Rath Packing*, 55 B.R. at 537-38 (approving a discharge where the debtor's remaining business was its ownership of a subsidiary which would pursue transactions); *see also See In re Port Arthur*

*Steam Energy, L.P.*, 629 B.R. 233, 236 (Bankr. S.D. Tex. 2021) (concluding that "pursuing litigation against a third party" is a "commercial and business activit[y]").. Moreover, there are numerous companies that have, as their business, the pursuit of litigation (*e.g.*, so-called "patent trolls") or business combinations. *See* Gallagher Decl., at ¶ 8. Moreover, contrary to the U.S. Trustee's contention that the Post-Effective Date Debtors activities will be restricted to these already sufficient business activities, the Plan provides that the Debtors may engage in any business activities as may be determined by the New Board. *See* Plan, Art. V.E.

149.   In addition, contrary to the arguments of the U.S. Trustee, the fact that the Post-Effective Debtors may require some time to ramp-up their business operations does not prevent them from obtaining a discharge. In *Rath Packing*, the court squarely addressed this issue and concluded that the prospect of the debtor, through a subsidiary, potentially raising capital in the future and thereby creating value in the debtor's stock was sufficient for purposes of establishing that the debtor will engage in business after consummation of the plan under section 1141(d)(3) of the Bankruptcy Code. *Id.* at 537-38. Moreover, as this Court noted in *Solyndra*, "[t]he fact that [the debtor's] one current business is being liquidated, . . . does not mean that it does not intend to operate a business in the future, or that it is liquidating all of its businesses." *Solyndra*, Case No. 11-12799 (MFW) (Oct. 22, 2012, Hr'g Tr. 67:18-21).

150.   The cases cited by the U.S. Trustee in support of its position are inapposite. Each decision involved situations in which the debtor was winding down and dissolving its remaining affairs through liquidation plans. *See In re Grausz*, 63 Fed. Appx. 647 (4th Cir. 2003) (holding that a discharge was not warranted where the individual debtor's liquidation plan did not permit the continuation of the debtor's prepetition businesses); *Um v. Spokane Rock I, LLC*, 904 F.3d 815, 819 (9th Cir. 2018) (holding that section 1141(d)(3)(B) is not satisfied by an individual

debtor's mere employment in someone else's business after plan consummation); *In re South Canaan Cellular Investments Inc.*, 427 B.R. 44 (Bankr. E.D. Pa. 2010) (finding that the sale of the debtors' general and limited partnership interests, which were substantially all of their assets, would preclude a discharge).

151.     Here, all assets of the Debtors are vested in the Post-Effective Date Debtors under the Plan, the Plan does not provide for a winddown of the Debtors, the Plan contemplates that the Post-Effective Date Debtors will administer those assets and engage in lawful business activities so as to create value that is superior to a liquidation, and the Post-Effective Date Debtors intend to engage in business to do so.  In particular, the potential value of the substantial tax attributes and other assets available to the Post-Effective Date Debtors provide real incentive to for the Post-Effective Date Debtors to engage in value maximizing business and transactions following the Effective Date.  These circumstances all warrant providing the Debtors with a discharge as contemplated by the Bankruptcy Code.  Indeed, courts have granted discharges even under plans that (unlike the Plan) provide for the liquidation of a debtor's assets where the debtor would—as here—conduct business following the effective date to maximize the value of such assets. *Ascalon Enters. v. Revstone Indus.* (*In re Revstone Indus.*), 2016 U.S. Dist. LEXIS 43044, at *4 (D. Del. Mar. 30, 2016) *aff'd In re Revstone Indus. LLC*, 690 F. App'x 88, 91 (3d Cir. 2017); *Enron Corp.*, 2004 Bankr. LEXIS 2549, at *215-17 (Bankr. S.D.N.Y. July 15, 2004); *In re River Capital Corp.*, 155 B.R. 382, 387 (Bankr. E.D. Va. 1991).

152.     Furthermore, the U.S. Trustee also mistakenly implies that the Debtors are not eligible for a discharge because they have ceased prepetition vehicle business activities.  Section 1141(d) contains no such requirements, referring instead (in alternative sub-sections) to the plan providing for a liquidation of all (or substantially all) assets of the debtor (which the Plan does

not) or the debtor not engaging in business after consummation of the plan (the Post-Effective Date Debtors will be engaged in business as contemplated by the Plan). Indeed, the U.S. Trustee's position here is at odds with both *Rath*, which granted a discharge even after the debtor had ceased its prepetition operations, and *Flintkote*, in which the Court recognized that there is no requirement that a debtor continue the same business as it engaged in prepetition. *Rath Packing*, 55 B.R. at 530; *In re Flintkote Co.*, 486 B.R. 99, 132 (Bankr. D. Del. 2012) ("[T]here is no requirement under § 1141(d) that a debtor continue the same business lines and activities as it engaged in pre-petition."). The U.S. Trustee's references to the "vertical dimension" ordinary course of business test as being relevant for purposes of section 1141 is similarly misplaced. The Post-Effective Debtors are not limited, either by the Bankruptcy Code or the Plan, to conducting business that is consistent with the ordinary course of the Debtors' prepetition business. *See* Plan, Art. V.E. Moreover, section 1141 contains no ordinary course requirement and the case law forecloses such a position. *See In re Solyndra, LLC*, Case No. 11-12799 (MFW) (Oct. 22, 2012, Hr'g Tr. 67:18-21) (holding the Debtor was still entitled to a discharge even though its pre-effective date business was being liquidated); *Rath Packing*, 55 B.R. at 530; *In re Flintkote Co.*, 486 B.R. at 132.

153.     Accordingly, the Debtors are entitled to a discharge and the U.S. Trustee has failed to establish that they are subject to the exception set forth in section 1141(d)(3) of the Bankruptcy Code.

### 2.      The Singh Objection Should be Overruled

154.     The Singh Objection should be overruled because it does not articulate any well-founded objection to the Plan. Mr. Singh is purportedly the Holder of Common Stock Interests and argues that he should be paid the full amount of his purported losses with respect to his

stockholdings. While the Debtors are sympathetic to Mr. Singh and his family's financial loss and plight, the Plan maximizes value and provides for fair and equitable treatment to all Holders of Common Stock Interests in Class 7 (including Mr. Singh) consistent with the Bankruptcy Code. As set forth in Article III.B.7 of the Plan, all members of Class 7 will retain their Common Stock Interests in the Post-Effective Date Debtors. Such treatment complies with the absolute priority rule and provides equal treatment among all shareholders of Debtors. The Bankruptcy Code does not permit any individual shareholders to receive a higher recovery than other similarly situated Holders of Common Stock in the same class simply because they may have suffered a greater loss.

155.    As a Holder of Class 7 Common Stock Interests, Mr. Singh was entitled to vote to reject the Plan and not to opt into the Third-Party Releases contained in Article VIII.D of the Plan or simply abstain from voting, in which case he also would not be bound by such releases. To the extent Mr. Singh voted against the Plan or abstained from voting without opting into the Third-Party Releases, he will retain all potential individual claims and causes of action against, among others, the Debtors' current and the Former Directors and Officers, as well as other third parties.

156.    In addition, Mr. Singh appears to raise objections to the sale to the Purchaser approved by this Court pursuant to the Sale Order. The sale occurred only after a competitive and thorough marketing process and was negotiated at arms' length, as this Court found in the Sale Order, which was entered only after parties in interest (including Mr. Singh) received notice and an opportunity to object. It was found to be a good faith sale and in the best interests of the Debtors and their estates. The time to challenge the sale has passed and such objections cannot be resurrected now, at confirmation.

157.    For the foregoing reasons, Mr. Singh's objection should be overruled.

## WAIVER OF STAY

158.    The Debtor respectfully requests that the Court cause the Confirmation Order to become effective immediately upon its entry notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e), which states that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P 3020(e); *see also* Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend. (stating that a "court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately").

159.    According to the Advisory Committee notes to the 1999 amendments to the Bankruptcy Rules, the purpose of Bankruptcy Rule 3020(e) is to permit a party in interest to request a stay of the confirmation order pending appeal before the plan is implemented and an appeal becomes moot.  Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend.  To the extent a party wishes to seek an appeal, it may seek to stay the effectiveness of the Confirmation Order in connection with the appeal.  Moreover, the Debtors submit that, based on the circumstances of these cases discussed above (including: the global settlement among the key constituencies, including the Ohio Securities Litigation Settlement and the settlement of the SEC Claim, the prior postponements of the confirmation hearing to achieve these settlements, and the cash burn that would be implicated by further extending the timetable of these Chapter 11 Cases), it is reasonable and amply justified for the Debtors and parties in interest to proceed with implementing the Plan, to minimize the significant ongoing chapter 11 administrative costs, and to provide, as promptly as possible, distributions to the Debtors' creditors.  Accordingly, the

Debtor respectfully requests that the Court cause the Confirmation Order to become effective immediately upon its entry.

## **CONCLUSION**

The Debtors submit that the Plan satisfies all applicable requirements of the Bankruptcy Code and request that the Court enter an order confirming the Plan and granting such other and further relief as is just and proper.

Dated: March 1, 2024

Respectfully submitted,

*/s/ Morgan L. Patterson*
**WOMBLE BOND DICKINSON (US) LLP**
Donald J. Detweiler (Bar No. 3087)
Morgan L. Patterson (Bar No. 5388)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
don.detweiler@wbd-us.com
morgan.patterson@wbd-us.com

**WHITE & CASE LLP**

Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
Fan B. He (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
tlauria@whitecase.com
mbrown@whitecase.com
fhe@whitecase.com

David M. Turetsky (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
david.turetsky@whitecase.com

Jason N. Zakia (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
jzakia@whitecase.com

Roberto Kampfner (admitted *pro hac vice*)
Doah Kim (admitted *pro hac vice*)
RJ Szuba (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700
rkampfner@whitecase.com
doah.kim@whitecase.com
rj.szuba@whitecase.com

*Co-Counsel to the Debtors and Debtors in Possession*