## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | Chapter 11 |
| Lordstown Motors Corp., *et al.*,[1] | Case No. 23-10831 (MFW) |
| Debtors. | (Jointly Administered) |
|  | **Re:  D.I. 1014, 1034** |

### DECLARATION OF ADAM KROLL IN SUPPORT OF CONFIRMATION OF THIRD MODIFIED FIRST AMENDED JOINT CHAPTER 11 PLAN OF LORDSTOWN MOTORS CORP. AND ITS AFFILIATED DEBTORS

I, Adam Kroll, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.  I am Executive Vice President and Chief Financial Officer of Lordstown Motors Corp. ("**LMC**," and collectively with its subsidiaries, the "**Debtors**") and have served in this capacity since October 25, 2021.  I make this declaration (the "**Declaration**") in support of the *Third Modified First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and its Debtor Affiliates* [Docket No. 1014] (the "**Plan**").[2]  Except as otherwise noted, I have personal knowledge of the matters set forth herein.  If called upon to testify, I would testify competently to the facts set forth herein.

### I.    Background of Declarant

2.  I have more than 25 years of experience in corporate finance as a strategic advisor,

---

[1]    The Debtors in these chapter 11 cases (these "**Chapter 11 Cases**"), along with the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corp. (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101). The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

lender and principal.  Since 2015, I have been a senior operating executive overseeing or directly involved in finance, treasury, accounting, budgeting, financial planning and analysis, M&A, strategy, investor relations and purchasing with various companies.  Prior to joining LMC, I was the Chief Administrative Officer of Hyzon Motors, a startup original equipment manufacturer of heavy-duty fuel cell electric trucks that executed a de-SPAC transaction in the third quarter of 2021.  Prior to that, I served as the interim CFO of UPG Enterprises, a family office acquisition vehicle in the metal services sector.  Preceding UPG, I held roles of increasing responsibility over five years at PSAV Holdings LLC ("**PSAV**"), a leading global event production company.  In my final two years at PSAV, I served as the Senior Vice President of Finance, overseeing a substantial portion of its finance functions, including financial planning and analysis, treasury, investor relations, financial reporting and procurement.  Prior to PSAV, I had an 18-year career in banking, the last nine years of which were as an investment banker with J.P. Morgan Securities, providing strategic, M&A and capital markets advisory services to primarily mid and large capitalization automotive companies.  I have a bachelor's degree in Business Administration from the University of Wisconsin and a master's degree in Business Administration from the University of Chicago Graduate School of Business.

3.      In my capacity as the Debtors' Chief Financial Officer, I am responsible for the Debtors' accounting, treasury, financial reporting, budgeting and planning, investor relations, corporate development and corporate strategy functions.  I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

## II.    Subject Matter of the Declaration

4.      The testimony set forth in this Declaration includes: (a) the amount (the "**Proposed Claims Reserve Amount**") of the reserve (the "**Claims Reserve**,") for general unsecured creditors

contemplated under Article VII.I of the Plan, (b) the amount of the Post-Effective Date Debtor Amount contemplated pursuant to Article I.A.105 and Article V.E of the Plan, and (c) the Plan's satisfaction of the so-called "best interests" test embodied in section 1129(a)(7) of the Bankruptcy Code.

5.       In forming my views on the matters set forth in this Declaration, I have relied upon or considered, among other things, the following: (a) the Plan and the exhibits thereto, (b) the *Disclosure Statement for the Modified First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and its Debtor Affiliates* [Docket No. 637] (the "**Disclosure Statement**") and the exhibits thereto; (c) the proofs of claim filed in the chapter 11 cases; (d) the debtors books and records; (e) discussions with the professionals at the Debtors' financial advisor retained in these Chapter 11 Cases, Silverman Consulting Inc. ("**Silverman**"), and (f) discussions with advisors to the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**UCC**") and the official committee of equity security holders appointed in the Chapter 11 Cases (the "**EC**").

## III.    Development of The Claims Reserve Amount

6.       As contemplated by the Plan, the Proposed Claims Reserve Amount has been negotiated among the Debtors, the UCC, and the EC.   The Proposed Claims Reserve Amount is $45 million.  In developing the Proposed Claims Reserve Amount, I worked with Silverman to conduct a comprehensive analysis of the General Unsecured Claims filed against the Debtors and reviewed the Debtors books and records with respect to such Claims.  I also considered the views of the UCC and the EC and their respective advisors.  It is my understanding that the UCC and the EC agree with the Proposed Claims Reserve Amount.  I believe that the procedures used to establish the Proposed Claims Reserve Amount were reasonable under the circumstances and consistent with the Plan.  I further believe that the Proposed Claims Reserve Amount of $45 million

satisfies the reserve requirements set forth in Article VII.I of the Plan and will be sufficient to pay the Debtors' estimates of all Allowed General Unsecured Claims in full with interest as set forth in the Plan.

7.      Without limiting the foregoing, the Proposed Claims Reserve Amount includes: (a) $23.1 million on account of the face amounts of asserted liquidated general unsecured claims (other than certain indemnification claims and rejection damages claims included in (c)-(e) below) after removing duplicates and proofs of claims filed on account of equity; (b) $3.0 million on account of the Ohio Securities Litigation Settlement Payment; (c) $3.5 million on account of potential indemnification claims related to the settlement of the Delaware Shareholder Class Action; (d) $1.6 million on account of certain potential liquidated indemnification claims; (e) $6.7 million on account of estimated rejection damages claims, and (f) an additional $7.1 million to cover unliquidated claims (if any).

8.      To the extent that the Proposed Claims Reserve Amount proves insufficient to pay Allowed General Unsecured Claims in full with interest, I believe that additional protections for Holders of General Unsecured Claims have been provided by the Plan's provisions which (a) permit an increase of the Claims Reserve by up to an additional $5 million and (b) provide that deficiencies in payments for Allowed General Unsecured Claims are payable from the assets of the Post-Effective Date Debtors (as set forth in the Plan).  Moreover, the Debtors anticipate that they will emerge from chapter 11 with significant cash, prior to making distributions or reserving for claims, of approximately $78.4 million.

## IV.    Development of The Post-Effective Date Debtor Amount

9.      I also supervised the determination of the Post-Effective Date Debtor Amount. Pursuant to the Plan, the Post-Effective Date Debtor Amount is "an amount of Cash to be agreed

to by and among the Debtors, the EC and the UCC on or before the Confirmation Hearing, which shall be used to fund (a) the fees and expenses of the Post-Effective Date Debtors in performing their duties under the Plan, (b) the Claims Ombudsman Expenses and (c) future operational expenses, as permitted by the Plan." Plan Art. I.A.105.

10.     Throughout the Plan process, I have worked closely with advisors for the EC to determine the proper level for the Post-Effective Date Amount. The Debtors, the EC and the UCC each agree that Post-Effective Date Debtor Amount should be set at $7.2 million. Based on the information provided to me and assumptions I made, in connection with counsel from the Debtors' and the EC's advisors, I believe that such amount will be sufficient to fund the Debtors' contemplated operating activities for the next year.

11.     I further note that, in addition to the Post-Effective Date Debtor Amount, the Post-Effective Date Debtors may make use of Post-Effective Date Cash, as set forth in the Plan. While there can be no assurance, assuming consummation of the Plan by the end of March, the Debtors currently estimate that there will be Post-Effective Date Cash of approximately $23.5 million upon the consummation of the Plan.

12.     Given the foregoing, I believe that the Plan is feasible.

## V.    The Plan Is in the Best Interests of All Creditors and Equity Interest Holders

13.     I understand that in order to satisfy the "best interests" test under section 1129(a)(7) of the Bankruptcy Code, a debtor must demonstrate that each holder of a claim or equity interest in an impaired class has either (a) accepted the proposed plan, or (b) is receiving at least as much value under the proposed plan as they would receive in a hypothetical chapter 7 liquidation. To the best of my knowledge, information, and belief, I believe that the Debtors have satisfied this requirement.

14.     I, in consultation with Silverman, was involved with and oversaw the Debtors' hypothetical, reasonable, and good-faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code (the "**Liquidation Analysis**"), which was attached as **Exhibit C** to the Disclosure Statement.  The Liquidation Analysis was based on a variety of assumptions, which are detailed in the Liquidation Analysis and the notes thereto.  I believe that the Liquidation Analysis and the assumptions and conclusions set forth therein were reasonable under the circumstances and represented the good faith judgment of the Debtors regarding the results of a hypothetical chapter 7 liquidation of the Debtors.

15.     In addition, to the Liquidation Analysis, I understand that the Plan includes, as a condition to confirmation, approval of a settlement with the SEC, which I believe will result in the withdrawal of its $45 million claim against the Debtors upon the Effective Date of the Plan.  I further understand that this settlement would not be available in a chapter 7 liquidation.

16.     I also understand that the Plan enables the Post-Effective Date Debtors to pursue substantial litigation recoveries and to engage in post-Effective Date operations for the benefit of their common stock holders, which will include pursuing substantial litigation assets and exploring new business opportunities (as determined by the New Board) to enhance value (including by realizing value from the Debtors' significant tax attributes), each in a more efficient manner than what could occur in a chapter 7.

17.     Based on the foregoing, I believe that the recoveries under the Plan equal or exceed those under a hypothetical chapter 7 liquidation.  Accordingly, I believe that the Plan satisfies the "best interests" test requirement under section 1129(a)(7) of the Bankruptcy Code.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 1, 2024

                                              */s/ Adam Kroll*
                                              Adam Kroll
                                              Chief Financial Officer
                                              Lordstown Motors Corp.