# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* <br><br> Lordstown Motors Corp., *et al.*,[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 23-10831 (MFW) <br><br> (Jointly Administered) <br><br> **Re:  D.I. 1014, 1034** |

**DECLARATION OF RYAN HAMILTON IN SUPPORT OF CONFIRMATION
OF THIRD MODIFIED FIRST AMENDED JOINT CHAPTER 11 PLAN
OF LORDSTOWN MOTORS CORP. AND ITS AFFILIATED DEBTORS**

I, Ryan Hamilton, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Senior Vice President at Jefferies LLC ("**Jefferies**"), an investment banking and financial advisory firm with principal offices located at 520 Madison Avenue, New York, New York 10022. Jefferies also maintains other locations worldwide.

2. I am duly authorized to make this declaration (the "**Declaration**") on behalf of Jefferies in support of the *Third Modified First Amended Joint Chapter 11 Plan of Lordstown Motors Corp. and its Affiliated Debtor* [D.I. 1014] (the "**Plan**").[2]  I have prepared this Declaration in order to summarize the opinions and conclusions I would offer, if called to testify, in support of the Debtors' request for confirmation of the Plan.

---

[1]  The Debtors in these chapter 11 cases (these "**Chapter 11 Cases**"), along with the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corp. (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101). The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

3. Except as otherwise noted, I have personal knowledge of the matters set forth herein. In forming the views set forth herein, I have relied upon or considered, among other things, the following: (a) my experiences in chapter 11 cases, including both plans of reorganization and liquidations; (b) the Plan and the exhibits thereto; (c) the *Declaration of Adam Kroll in Support of Debtors' Chapter 11 Petitions and First Day Motions* [D.I. 15]; (d) certain of the Debtors' financial statements and reports; (e) discussions with the Debtors' management concerning the Debtors' business and finances; and (f) research conducted by my team members at Jefferies.

4. The only compensation for the services I have rendered to the Debtors in connection with the preparation of this Declaration or any of the analyses relating thereto consists of the Court-authorized fees paid or payable to Jefferies. I have not personally received any compensation directly from the Debtors, nor is the compensation paid or payable to Jefferies in any way contingent on the substance of the opinions that I express or confirmation of the Plan.

**Experience & Qualification**

5. I am a Senior Vice President at Jefferies. Jefferies provides a broad range of corporate advisory services to its clients including, without limitation, services relating to the following: (a) financial advice; (b) mergers, acquisitions, and divestitures; (c) special committee assignments; (d) capital raising; and (e) corporate restructurings. Jefferies and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out of court and in chapter 11 proceedings. Jefferies has advised debtors, creditor and equity constituencies, and purchasers in numerous reorganizations in the United States and worldwide. Since 2007, Jefferies has been involved in over 250 restructurings representing over $550 billion in restructured liabilities.

6. I have advised companies in financial restructurings and distressed mergers and acquisitions, raised capital for troubled companies, and represented debtors and creditor constituencies in bankruptcy proceedings. Before joining Jefferies in 2017, I was a vice president in the restructuring and finance group of Barclays Capital, Inc., which I joined in 2009. I have an MBA from the University of Chicago Booth School of Business, a JD from the University of Chicago Law School, and a BA from Emory University.

### Section 510(b) Claims Treatment

7. I am advised by Debtors' counsel that pursuant to section 510(b) of the Bankruptcy Code, Allowed Section 510(b) Claims (expressed in dollar amounts) have the same priority as Common Stock Interests (expressed in shares) and that one of the purposes of the Plan is to provide treatment that fairly allocates value between the two classes.

8. I was asked to evaluate the volume weighted average share price ("**Volume-Weighted Average Price**") as used in the Plan of a share of Common Stock during the period of August 3, 2020 through July 2, 2021 (the "**Period**"), which corresponds to the Ohio Settlement Class Period during which the purported wrongs giving rise to the alleged Section 510(b) Claims allegedly occurred.

9. I understand that the Volume-Weighted Average Price during the Period as used in the Plan was a product of negotiation between the Debtors and the Official Committee of Equity Security Holders and was determined by the following process. First, for each trading day during the Period, the highest share price, the lowest share price and the closing share price, in each case, of a share of Common Stock were added and that number was divided by three. This produced the "typical" price of a share of Common Stock for the applicable trading day (the "**Typical Price**"). Next, the product of the Typical Price for each trading day during the Period and the

volume of shares of Common Stock traded on that respective day (the "**Daily Trading Value**") was calculated.  Then, the Daily Trading Values for each trading day during the Period were added (the "**Total Trading Value**").  Thereafter, the volume of shares traded for each trading day during the Period were added to determine the aggregate volume of shares of Common Stock traded during the Period (the "**Total Trading Volume**").  As a final step, the Total Trading Value was divided by the Total Trading Volume.  The result of this equation provided the Volume-Weighted Average Price of $252.28 per share during the Period, which is used in the Plan.

10. While the formula described in paragraph 9 is among several methodologies for calculating the Volume-Weighted Average Price of a share of stock during a period, if Jefferies had been asked to determine the Volume-Weighted Average Price during the Period, we would have likely employed an alternative methodology.

11. Jefferies is a global full-service investment banking and capital markets firm. Jefferies has access to numerous widely used third-party market data services including Bloomberg L.P. ("Bloomberg"), S&P Global Market Intelligence ("Capital IQ"), and FactSet Research Systems Inc. ("FactSet"), some of which have their own functions for determining the Volume-Weighted Average Price for a period.  For example, Bloomberg has one such function, and the Volume-Weighted Average Price provided by Bloomberg for the Period is $251.01.

12. If not utilizing one of the above-referenced functions and if asked to independently calculate the Volume-Weighted Average Price, Jefferies would have employed the following approach, which is consistent with other investment banking practices.  First, Jefferies would multiply the closing price of a share of Common Stock for the applicable trading day (the "**Closing Price**") by the Daily Trading Volume to get the daily trading value (the "**Closing Price-Based Daily Trading Value**").  Then we would add the Closing Price-Based Daily Trading Values for

each trading day during the Period to arrive at the total trading value (the "**Closing Price-Based Total Trading Value**"). Then, we would divide the Closing Price-Based Total Trading Value by the Total Trading Volume. The result of this equation would provide a Volume-Weighted Average Price of $251.81 for the Period.

13. Comparing the approach employed in the Plan to determine the Volume-Weighted Average Price during the Period against a) the Bloomberg Volume-Weighted Average Price and b) the approach described in paragraph 12 results in differences of $1.27 and $0.47 or approximately 0.5% and 0.2%, respectively. Had one of these alternatives approaches been used in the Plan, there would not have been a material difference in the treatment of 510(b) Claims.

14. I am advised by Debtors' counsel that the purpose of the formula provided under the Plan in connection with the treatment of Allowed Section 510(b) Claims is to treat those claims in a similar fashion to the Common Stock Interests, thereby allowing the Debtors to provide the Holders of such Claims with shares of Common Stock on account of their Allowed Section 510(b) Claims in a fair and reasonable manner. To address this goal, the amount of an Allowed Section 510(b) Claim is divided by the product of (a) the Volume-Weighted Average Price and (b) 15 (the "**Reverse Stock Split Adjustment Factor**"). The Reverse Stock Split Adjustment Factor is included to adjust for a reverse stock split of Common Stock that occurred after the Period but before the Petition Date. By this formula, the Debtors are seeking to satisfy each Allowed Section 510(b) Claim by exchanging each such Allowed Section 510(b) Claim for shares of Common Stock based on the Volume-Weighted Average Price during the Period when the purported wrongs giving rise to the asserted Section 510(b) Claims occurred. This is intended to fairly compensate Holders of any Allowed Section 510(b) Claims for any harm suffered as a result of alleged wrongful conduct, while also protecting current Holders of Common Stock Interests from

overcompensating Holders of Allowed Section 510(b) Claims as a result of the decline of the Debtors' market capitalization based on general business risks. I understand the treatment of Allowed Section 510(b) claims under the Plan was based on the treatment of 510(b) claims in the PG&E bankruptcy case. The Debtors' use of the Volume-Weighted Average Price for the class period is a reasonable method of allocating value to Allowed Section 510(b) Claims under the Plan.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 1, 2024

                                                                                               */s/ Ryan Hamilton*
                                                                                               Ryan Hamilton
                                                                                               Senior Vice President
                                                                                               Jefferies LLC